**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MYLAN LABORATORIES INC., et al.,    )
    )
           Plaintiffs,    )
    )
    and    )
    )
MUTUAL PHARMACEUTICAL CO.,    )
    )
          Intervenor-Plaintiff,    )
    )
    v.    )  Civil Action No. 07-579 (RMU)
    )
MICHAEL O. LEAVITT, et al.,    )  Judge Ricardo M. Urbina
    )
          Defendants,    )
    )
    and    )
    )
TEVA PHARMACEUTICALS USA, INC.,    )
    )
          Intervenor-Defendant,    )
    )
    and    )
    )
APOTEX INC.,    )
    )
          Intervenor-Defendant.    )
_____)

**APOTEX INC.'S EMERGENCY MOTION TO REQUIRE
PLAINTIFFS MYLAN LABORATORIES INC., ET AL., TO POST BOND**

**INTRODUCTION**

Intervenor-defendant Apotex Inc. ("Apotex") hereby moves, pursuant to Fed.R.Civ.P. 65(c),

for an order requiring plaintiffs Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc.

(collectively "Mylan") to post a bond in the amount of at least $78 million dollars to cover any costs

and damages that may be incurred by Apotex if Apotex is harmed by the injunction issued by this

Court on March 26, 2007, or any similar injunction that may be issued by this Court in the future, if such temporary or preliminary injunction is found to have been improvidently granted.

In its March 26 order, this Court enjoined the Food and Drug Administration ("FDA") from granting final approval of any abbreviated new drug applications ("ANDAs") in this matter until April 13, 2007. The FDA's final approval of Apotex's ANDA is imminent, and would issue but for the Court's injunction against the FDA. Because this Court's injunction against the FDA also effectively enjoins Apotex from selling its generic version of the popular Norvasc® drug while Mylan enjoys undeserved exclusivity in the market for this drug, Apotex will suffer tens of millions of dollars in losses as a result of this Court's injunction. However, Mylan did not give notice of its motion for an injunction to Apotex as required by Rule 65, and did not provide any bond or security in connection with this injunction. Fed.R.Civ.P. 65(c) states that "no preliminary injunction shall be issued without notice to the adverse party," and no restraining order or preliminary injunction shall issue "except upon the giving of security by the applicant . . .." Requiring Mylan to post a bond in the amount Apotex seeks herein will protect Apotex from the losses it will suffer if it is found that the injunction was wrongfully issued.

Counsel for Apotex has conferred with counsel for the parties to this action concerning this motion. Counsel for federal defendants (Drake Cutini) indicated that they take no position on Apotex's motion. Counsel for intervenor Teva Pharmaceuticals USA, Inc. ("Teva") (Michael Shumsky) indicated that they do not oppose Apotex's motion. Counsel for plaintiff Mylan (David Harth) and counsel for intervenor Mutual Pharmaceutical Co. ("Mutual") (John Ongman) indicated that they oppose this motion.

A proposed order pursuant to Local Rule 7(c) is submitted herewith.

## **FACTS**

Over the past five years, several pharmaceutical companies filed ANDAs under the provisions of the Hatch-Waxman Act (21 U.S.C. § 355(j)), in order to gain FDA approval to sell generic versions of the hypertension drug amlodipine besylate. This hugely successful drug is sold by Pfizer under the brand name Norvasc®, and was protected by a patent owned by Pfizer—Patent No. 4,879,303 ("the '303 Patent"). The companies who have filed ANDAs include (among others) plaintiff Mylan and intervenors Apotex, Teva, and Mutual. (*See* Docket Nos. 1, 8, 15, 19.)

As a result of these ANDAs, Pfizer brought patent infringement suits against Mylan and Apotex (among others), as contemplated by 21 U.S.C. § 355(j)(5)(B)(iii). Pfizer prevailed in the district court in its case against Apotex on January 29, 2006, and in its case against Mylan on February 27, 2007 (*see Pfizer Inc. v. Apotex Inc.*, No. 03 C 5289 (N.D. Ill.) and *Pfizer Inc. v. Mylan Laboratories, Inc.*, No. 02 CV 1628 (W.D. Pa.)). Apotex appealed the district court's ruling, and on March 22, 2007, the Federal Circuit Court of Appeals entered a judgment finding Pfizer's '303 patent invalid. *Pfizer Inc. v. Apotex, Inc.*, No. 06-1261, 2006 U.S.App. LEXIS 6623 (Fed. Cir. March 22, 2007). Two days later, on March 25, 2007, Pfizer's '303 patent expired.

Apotex, not Mylan, is the only litigant sued by Pfizer to successfully show the '303 patent to be invalid. Nevertheless, Mylan is the only company currently selling generic amlodipine besylate because the other generic manufacturers are still awaiting final approval from the FDA for their ANDAs. Apotex understands that final approval for its ANDA is imminent. (Declaration of Bernice Tao ¶ 5, Ex. A attached.) However, in order to maintain its position of exclusivity in the generic market for amlodipine besylate, Mylan brought this action against the FDA, claiming its first-to-file status entitled it to a 180-day period of exclusivity in selling the generic version of Norvasc®. (Complaint, Doc. No. 1.) Mylan then moved for preliminary injunctive relief, and on March 26, 2007, this Court entered an order granting Mylan's motion, and stating that "the FDA is enjoined

3

from taking final agency action (*i.e.,* granting any ANDAs at issue in this matter) from April 11, 2007 until April 13, 2007 at 5:00 p.m. to enable the court to rule formally on the plaintiffs' application for a TRO." (Doc. No. 6.) Subsequently, this Court, pursuant to a motion by the FDA, altered those dates so that the FDA has until April 18 to take action on the pending applications and the injunction is in effect from April 18 until April 20, 2007. (Doc. 29.)

Contrary to Mylan's representations, it is likely that this Court will find that Mylan's claimed 180-day exclusivity period does not survive the expiration date of the listed patent. *See* 64 Fed. Reg. 42,873 (Aug. 6, 1999); *Ranbaxy Laboratories Ltd. v. Leavitt*, 469 F.3d 120, 126 n.* (D.C. Cir. 2006) ("the text and structure of the statute suggest a distinction … such that the first generic applicant may no longer retain exclusivity when the patent has expired"), *citing* 21 U.S.C. § 355(j)(5)(B)(i); *Dr. Reddy's Labs., Inc. v. Thompson*, 302 F.Supp. 2d 340, 354-55 (D.N.J. 2003). In obtaining its injunction, Mylan did not inform this Court of prior guidance by the FDA and the D.C. Circuit suggesting that the 180-day exclusivity Mylan might otherwise have been entitled to did not survive the expiration of the patent.

Mylan also obtained this preliminary injunction without notifying Apotex or the other ANDA filers who would be affected by the preliminary injunction, and without posting a bond. Indeed, counsel for Mylan was well aware of the other ANDA filers, and told this Court in a declaration that he was "aware that FDA is considering issuing final approval to other ANDAs for amlodipine besylate as early as Monday, March 26, 2007." (Declaration of Brian Roman ("Roman Dec.") ¶ 5, Ex. B attached.) By bringing its motion without notice to the adverse parties, Mylan has precluded Apotex and the other ANDA filers from obtaining final ANDA approval and competing with Mylan in the lucrative market for generic Norvasc®.

Based on its experience in the industry, Apotex calculates that if it receives final FDA approval for its ANDA in April 2007, a best case scenario would give Apotex a 30% market share of

the generic sales, which would result in Apotex sales of $83,718,851 for the first 12 months post-launch.  (Declaration of Tammy McIntire ("McIntire Dec.") ¶14, Ex. C attached.)

Even in a worst case scenario, for an April launch, Apotex would have 20% of the market, at approximately $55,673,036 in sales for the first 12 months post-launch.  (*Id.*)  However, if Apotex is prohibited from launching until September 2007, it would be lucky to obtain a 10% market share, with yearly revenues of only approximately $5,244,000.  (*Id.*)

Mylan itself recognizes the value of the market for generic Norvasc® tablets.  Mylan's Vice President and General Counsel, Brian S. Roman, filed a declaration to support Mylan's emergency application for a temporary restraining order, stating that Mylan "has forecasted that its revenues would reach several million dollars per day," (Ex. B ¶ 6), and he further stated that by being the first to launch into the generic marketplace, Mylan will be able to gain favorable positioning in customer supply programs and access to additional customers, thereby obtaining and retaining a greater market share in the long term.  (*Id.*)  Mr. Roman also claimed that FDA approval of other ANDAs would mean that "Mylan would lose a portion of the amlodipine market and associated sales that are forecasted to reach the hundreds of millions of dollars . . . ."  (*Id.*)

## ARGUMENT

Rule 65(c) of the Federal Rules of Civil Procedure states:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

An injunction has issued in this case, yet Mylan was not required to post any security for the damage that Apotex and others will surely suffer if it is later determined that the injunction was wrongfully issued.  Rule 65 clearly dictates that a bond is required under the circumstances here presented.  In fact, where an injunction raises a risk of monetary harm to the defendant, "a district court commits

reversible error when it fails to require the posting of a security bond by the successful applicant for a preliminary injunction." *System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131, 1145-46 (3d Cir. 1977). *See also Flowserve Corp. v. Burns Int'l Services Corp.*, 2006 U.S. Dist. LEXIS 79757 *5 (D. Del. October 26, 2006) ("In commercial cases . . . the failure to post a bond can be reversible error, unless there is no risk of monetary harm to the party bound by the injunction.")

The fact that the injunction is entered against the FDA rather than Apotex does not preclude Apotex's ability to seek a bond, because Apotex is the party that will experience direct financial harm as a result of an injunction against the FDA. In *Timkin Co. v.U.S.*, 569 F.Supp. 65 (Ct. Int'l Trade 1983), the court enjoined the International Trade Administration ("ITA") from liquidating entries of roller bearings manufactured by the intervenor ("NBCA"). As a result of the injunction, the intervenor was denied its legal right to a refund of the duties deposited with the Customs Service. When the intervenor moved for a security bond, the plaintiff ("Timkin") objected on the basis that it was the ITA, and not the intervenor, who was actually enjoined by the order. The court rejected this argument, calling it a "rather narrow" and "skewed" construction" of Rule 65(c). 569 F.Supp. at 71-72. The court continued:

> Rule 65(c), properly read, merely provides that as a condition precedent to the issuance of a restraining order or preliminary injunction security shall first be given to protect the enjoined party. *That rule does not state that security may not be required to protect other party-litigants who may be harmed by the operation of an injunction which is subsequently found to have been wrongfully issued.* In the somewhat unique circumstances arising under United States trade law, the court is presented with a situation where NBCA, as intervenor, will be the only party harmed if it should develop that the injunction was improvidently issued; and yet the government, as stakeholder and liquidator, is the only party who can be enjoined. The result argued for by Timken would be highly inequitable and cannot be countenanced by a court sitting in equity. In short, *NBCA, as a party in interest, is entitled to security where, as here, it is plainly evident that it will have suffered a compensable loss – the use*

> *of monies held by the government as duties – in the event the*
> *government is found to have been wrongfully enjoined.*

*Id.* (footnote omitted; emphasis added). Likewise, the case at bar presents a situation where Apotex and the other ANDA applicants stand to lose millions of dollars as a result of an injunction against the FDA. Therefore, Apotex is entitled to seek a security bond in the amount which it will lose if it turns out that the injunction was improvidently granted.

Apotex has determined that it will lose at least $78 million as a result of the injunction against the FDA. If Apotex is permitted to sell the generic version of Norvasc® right away, Apotex stands to generate sales in the amount of $83,718,851 in a best case scenario. (McIntire Dec. ¶ 14, Ex. C.) If, however, Apotex is unable to launch its product until September of 2007 because the FDA has been enjoined from granting Apotex final ANDA approval until then as Mylan requests, Apotex would be lucky to obtain revenues in the amount of $5,244,000. (*Id.*) The difference in Apotex's revenues without injunctive relief being granted and its revenues if the requested injunction were allowed is $78,474,851. This is the amount, at the very least, that Apotex stands to lose if it turns out that the injunction was wrongfully granted, and this should be the amount of the bond as it relates to Apotex. *See Timken,* 569 F.Supp. at 72 (plaintiff was required to post a bond in the amount of $100,000, which reflected the amount of duty refunds due to the Intervenor, multiplied by annual interest and the estimated duration of the proceedings).

Indeed, the amount of the bond sought is conservative, because it does not include lost interest on the lost revenues, and is far below the estimated value of the potential revenues that Mylan claims could be generated by a generic Norvasc® product. In the declaration submitted by Mylan's own General Counsel in support of its motion for preliminary injunction, Mr. Roman indicated that the value of the market for generic Norvasc® is "several million dollars per day."

(Roman Dec. ¶ 6, Ex. B.)  This being the case, Apotex's request for a $78 million bond to cover Apotex's losses for a period of up to 180 days is more than reasonable. [1]

Finally, this Court should not countenance Mylan's attempt to obtain injunctive relief without notifying the other ANDA parties, three of whom have since been granted leave to intervene in this action.  Rule 65(a)(1) requires that "[n]o preliminary injunction shall be issued without notice to the adverse party."  Moreover, a temporary restraining order may be granted without notice to the adverse party only where, among other things, "the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required." Fed.R.Civ.P. 65(b).  Mylan, however, made no attempt to notify Apotex or the other ANDA applicants of the present proceedings, even though Mylan was well aware of their identities.  The fact that other ANDA applicants were not parties to the action does not excuse Mylan from its duty to notify them.  As stated by the Fifth Circuit, Rule 65(a)(1) requires notice to the "adverse party," and "[w]hen dealing with a preliminary injunction, the 'adverse party' means the party adversely affected by the injunction, not the opponent in the underlying action." *Parker v. Ryan*, 960 F.2d 543, 545 (5th Cir. 1992). Clearly, Apotex and the other ANDA filers have been "adversely affected" by the injunction entered in this case.

## <u>CONCLUSION</u>

For the reasons stated herein, Apotex respectfully requests that this Court enter an order requiring Mylan to post a security bond in the amount of at least $78 million, to cover the losses that Apotex will incur if it later found that this Court's injunction was improvidently granted.

---

[1]    In the event intervenor-defendant Teva moves for a bond, the bond amount will have to be even higher to account for the losses Teva may sustain if it turns out that the injunction was improvidently granted.

April 13, 2007

Respectfully submitted,

/s/  Arthur Y. Tsien

Arthur Y. Tsien, Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W.
Suite 400
Washington, DC 20036-2220
(202) 789-1212
(202) 234-3550 (fax)
Counsel for Apotex Inc.

Of Counsel:
Robert B. Breisblatt
Steven E. Feldman
A. Sidney Katz
WELSH & KATZ, LTD.
120 South Riverside Plaza
22nd Floor
Chicago, Illinois 60661
Telephone: (312) 655-1500
Fax: (312) 655-1501

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MYLAN LABORATORIES, INC., et al.,<br><br>            Plaintiffs,<br><br>   vs.<br><br>MICHAEL LEAVITT, et al.,<br><br>       Defendants. | Civil Action No.:     07-579 (RMU) |

## DECLARATION OF BERNICE TAO

**BERNICE TAO**, of full age, hereby declares as follows:

1.     I am presently the Director, Regulatory Affairs U. S. for Apotex Inc.  In that role, I am familiar with the various pending ANDA's that Apotex Inc. has pending in the United States.

2.     Prior to becoming the Director, I was the Associate Director, RA Solid Dose US. Prior to that, I was Manager, RA US.

3.     In both my present position and my previous position, I have had direct contact with the FDA for over three years.

4.     I am familiar with Apotex's ANDA No. 76-719 which is presently waiting final approval by the FDA.  Apotex's ANDA No. 76-719 is for the generic equivalent of Pfizer's brand name drug Norvasc® also known as amlodipine besylate tablets.

5.     It is my understanding that the FDA's issuance of final approval for Apotex's ANDA 76-719 for amlodipine besylate is imminent and, but for the court order enjoining the FDA from granting any ANDAs relating to amlodipine besylate, Apotex would receive final ANDA approval for amlodipine besylate.

I declare under the laws of the United States of America that the foregoing is true and correct.

_____
BERNICE TAO

Executed on:_____, 2007

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MYLAN LABORATORIES INC.<br><br>and<br><br>MYLAN PHARMACUETICALS INC.<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL O. LEAVITT,<br>in his official capacity as<br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>and<br><br>ANDREW C. VON ESCHENBACH, M.D.,<br>in his official capacity as<br>COMMISSIONER OF FOOD AND DRUGS,<br><br>and<br><br>UNITED STATES FOOD AND DRUG<br>ADMINISTRATION,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. |

## DECLARATION OF BRIAN S. ROMAN IN SUPPORT OF MYLAN'S
## EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER

I, Brian S. Roman, declare as follows:

     1.     I currently am the Vice President and General Counsel of Mylan Pharmaceuticals

Inc. ("Mylan Pharmaceuticals"), a Plaintiff in this action.  Prior to being appointed to this

position, from April 2003, I was responsible for overseeing and directing all litigation involving

Mylan Pharmaceuticals' parent corporation, Mylan Laboratories Inc. ("Mylan Laboratories").

The latter included all litigation including, but not limited to, Mylan Pharmaceuticals.

2.      I submit this declaration in support of the Emergency Application for a Temporary

Restraining Order filed in this Court by Mylan Pharmaceuticals and Mylan Laboratories

(collectively "Mylan").  All statements contained herein as to Mylan are based upon my personal

knowledge, including those relating to the organization and operation of both Mylan

Pharmaceuticals and Mylan Laboratories.  All statements contained herein as to persons other

than Mylan, and matters unrelated to Mylan, such as the sales and marketing activities of both

brand and generic pharmaceuticals, are based upon my knowledge, information and belief.

3.      Mylan Pharmaceuticals is a wholly owned subsidiary of Mylan Laboratories,

which is a publicly traded company.  Mylan Pharmaceuticals develops, manufactures and sells

generic pharmaceuticals in the United States.  This case involves Mylan Pharmaceuticals'

Abbreviated New Drug Application ("ANDA") No. 76-418, for amlodipine besylate tablets, 2.5

mg (base), 5 mg (base) and 10 mg (base) ("Mylan's ANDA").  Mylan Pharmaceuticals has

expended tremendous resources toward the development and approval of its amlodipine

products, including millions of dollars on materials, studies, overhead and litigation.  .

4.      The Food and Drug Administration ("FDA") issued Final Approval for Mylan's

ANDA on October 3, 2005.  The 180-day exclusivity period granted to Mylan currently prevents

the FDA from issuing Final Approval to any generic companies other than Mylan

Pharmaceuticals, which means that Mylan Pharmaceuticals enjoys a six-month head start over its

generic competitors.

5.    I am aware that FDA is considering issuing final approval to other ANDAs for amlodipine besylate as early as Monday, March 26, 2007. At least one other ANDA filer has publicly announced its view that no company has exclusivity and that it expects to launch the product in the very near future. See Apotex 3/21/07 Press Release attached hereto.

6.    Any approval of additional amlodipine besylate ANDAs prior to expiration of Mylan's exclusivity would not only destroy the 180-day exclusivity rights that FDA already granted to Mylan, but it would also fundamentally undermine the value of Mylan's enormous investments aimed at capitalizing on its 180-day exclusivity. Any FDA approval of other ANDAs would deprive Mylan of its first entrant, leadership position in the market for generic amlodipine besylate. Mylan would lose a portion of the amlodipine market and associated sales that are forecasted to reach the hundreds of millions of dollars, harms for which there is no legal redress. Mylan has forecasted that its revenues would reach several million dollars per day. Being the first to launch into the generic marketplace also permits Mylan to secure distribution channels, favorable positioning in customer supply programs and access to additional customers, thereby obtaining and retaining a greater market share in the long term.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 23, 2007.

Brian S. Roman



**Contact: Steve Giuli
Director, Government Relations &
Industry Affairs
800-706-5575 EXT 3984
sgiuli@apotex.com**

**FOR IMMEDIATE RELEASE**

# Apotex Invalidates Norvasc® Patent

## *Company to Launch In Near Future*

**Weston, Fl (March 21, 2007)** – Apotex Corp. announced today the Federal Circuit Court of Appeals in the case of Pfizer, Inc. v. Apotex, Inc. reversed a trial court's ruling and found that Pfizer's U.S. Patent 4,879,303 (the '303 patent) covering the Pfizer product Norvasc® was invalid. The '303 patent covers amlodipine besylate the active ingredient in Norvasc® as well as tablets made from amlodipine besylate. Because the limiting patent expires in two days, no company will have exclusivity over the product. Apotex expects to launch the product in the very near future.

The Federal Circuit found that Apotex had proven that the '303 patent was invalid because it was obvious. In other words, the patent should never had been issued because someone skilled in the art would have known to make amlodipine besylate from materials, called prior art, that were publicly available. The Federal Circuit cited as some of the prior art an earlier Pfizer patent that taught amlodipine maleate as well as amlodipine with other pharmaceutically acceptable salts. The earlier Pfizer patent did not specifically mention besylate but the Court found that it was sufficient that besylate salt was discussed in other pieces of prior art.

By finding the Pfizer '303 patent invalid and not infringed by Apotex's ANDA, the Court is allowing Apotex to obtain final approval for its generic amlodipine besylate product. By finding Pfizer'303 patent invalid the Court also causes Pfizer to loose the additional six months of pediatric exclusivity that they had obtained.

"Our pursuit of this case after losing at the District Court level was rooted in Apotex's belief that the right thing to do for consumers and customers is to never, ever stop fighting to bring generics to market at the earliest possible time," said Apotex CEO Barry Sherman. "There was no guarantee when we appealed the case that we would be able to enter the market if we won. The odds, in fact, were against us achieving that outcome. But we believed we have an obligation to consumers to keep fighting, and are extremely pleased that our victory in the courts will bring significant savings in short order to the US health care system."

"It goes without saying that we will continue to press on all fronts for changes in the US legislative and regulatory framework that will better serve consumers . The commitment to the consumer that guided our actions in this case will continue to guide our efforts in Washington, DC, for instance, to work with policymakers to put an end to anti-competitive patents settlements that delay consumer access to affordable, quality generic medicines," Sherman added.

"Today's decision also has implications for the outcome of the clopidogrel case as some of the same legal principles are at stake in that trial. As today's ruling underscores, consumers can be sure we will do everything in our power to prevail in that case as well," Sherman added.

The Apotex Group manufactures more than 200 different high-quality generic pharmaceuticals, used by millions of patients worldwide.  Its product line includes oral solids, liquids, injectables, nasal sprays, opthalmics, and inhalation solutions.

# Exhibit C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MYLAN LABORATORIES, INC., et al., <br><br> Plaintiffs, <br><br> vs. <br><br> MICHAEL LEAVITT, et al., <br><br> Defendants. | Civil Action No.:    07-579 (RMU) |

## DECLARATION OF TAMMY L. MCINTIRE

**TAMMY L. MCINTIRE**, of full age, hereby declares as follows:

1. I am President of Apotex Corp., which has an office in Weston, Florida. Apotex Corp. is a Delaware Corporation that acts as the United States marketing and sales agent for Apotex, Inc., a Canadian-based pharmaceutical company that develops and manufactures generic drugs for sale in the United States and throughout the world.

2. I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have received in the course of my duties, and am competent to testify to the same.

3. I hold a Bachelor of Science degree in Pharmacy from Ohio Northern University and a Masters of Pharmaceutical Administration from the Ohio State University. I have been employed continuously by Apotex Corp. since December of 1998.

4. Prior to my employment with Apotex Corp., I was Vice-President of Product Management for Cardinal Distributors, Inc., a leading wholesaler of generic drugs. In that position, I was responsible for annual purchases of more than one billion dollars of generic drug products.

5.  I am familiar with all aspects of marketing generic drugs, including setting the appropriate price point, ways to maximize the market share for the generic, and ensuring that the generic product reaches the pharmacies where it is needed.

6.  I am familiar with the process of acquiring FDA approval of a generic drug product and the considerable benefits and advantages of the 180-day exclusivity period ("first to market advantage") granted to the first generic drug to receive FDA approval, which generally allows one generic company to market and sell its product without other generic competition for 180 days (i.e. six months).

7.  I am also familiar with the benefit that FDA approved generic products give to the end consumer user.  Generic products help to lower the cost of medications for the ultimate consumer while ensuring that they are getting approved products.  Generally speaking, generic drugs lead to a 25% to 75% savings for the ultimate consumer and third-party providers.  In many cases, affordable generic products are the only available way for people who cannot afford brand name drugs to receive the medication they need.

8.  I am now aware that when Apotex filed its ANDA and paragraph IV certification it was the second generic to file.  The first was Mylan which had filed its paragraph IV certification against two Pfizer patents, the '909 and the '303.  I was aware that Apotex had chosen to certify only against the '303.

9.  Even though Apotex was not the first to file, it litigated the '303 patent understanding that, under certain circumstances if it were successful, Apotex could go to market at the same time as the first to file.  For example, if the Mylan litigation ended in a finding that the '303 patent was valid and infringed by Mylan, so that Mylan's status was reduced from a final approval to a

tentative approval. In that circumstance, if either the patent expired or Apotex was able to prove the patent invalid, Apotex would receive approval at the same time as Mylan.

10. Apotex's expectations were met. Apotex went to trial first on the '303 patent before Mylan. Apotex lost and was enjoined by the District Court. Apotex filed a timely Notice of Appeal. Mylan was aware of the Apotex situation. On November 6, 2006, attorneys for Apotex argued its appeal in the Federal Circuit Court of Appeals. Later in November 2006, the Pfizer v. Mylan trial began. On February 27, 2007, Judge Terrence F. Mc Verry entered judgment in favor of Pfizer holding the '303 patent valid and infringed. At this time, Apotex believed Mylan's paragraph IV certification would no longer be valid and its final approval withdrawn. In other words, Mylan should have lost its preference as the first to file.

11. On March 22, 2006 the Federal Circuit reversed the trial court's decision in Pfizer v. Apotex and found that claims 1-3 of the '303 patent were invalid because they were obvious. On March 26, 2007, the '303 patent expired.

12. It is my understanding that Mylan sued the FDA on March 23, 2007 seeking injunctive relief against the FDA in order to prevent the FDA from giving final approval to Apotex's ANDA for amlodipine besylate. Though Mylan knew that Apotex had an interest in the action and though Mylan's counsel knew who Apotex's counsel was, Mylan did not give notice of the lawsuit to Apotex. Then, on March 26, 2007, it is my understanding that Mylan sought a temporary restraining order to prevent the FDA from approving Apotex's ANDA. Again Apotex was not given notice of the action though its interests were directly affected and Mylan knew Apotex's counsel. On March 26, 2007, this Court entered an injunction that effectively will prevent Apotex from getting to market with its amlodipine besylate product until no earlier than April 13, 2007 at 5:00 p.m.

13. Mylan, through its request for the injunction, is irreparably harming both Apotex and the general public.

14. Based on my experience, I have determined that if Apotex receives final approval in April 2007 a best case scenario would give Apotex a 30% market share of the generic sales resulting in Apotex sales of $83,718,851 for the first 12 months post-launch. Apotex's worst case scenario for an April launch would give it only 20% of the market and approximately $55,673,036 in sales for the first 12 months post-launch. If, however, Apotex is prohibited from launching until September 2007, it will be lucky to obtain a 10% market share with yearly revenues of approximately $5,244,000.

15. It is my understanding that Mylan's Vice President and General Counsel, Brian S. Roman has filed a declaration in support of Mylan's emergency application for a temporary restraining order where in paragraph 6 he concedes that Mylan "has forecasted that its revenues would reach several million dollars per day." Moreover, he further conceded that by being the first to launch into the generic marketplace Mylan will be able to gain favorable positioning in customer supply programs and access to additional customers, thereby obtaining and retaining a greater market share in the long term." Though he does not state it, Mylan's gains are coming at a cost to Apotex.

16. It is further my understanding that by not naming Apotex in its lawsuit Mylan was able to avoid the requirement that no injunction should be issued without a proper bond. It is my understanding that Mylan was not compelled to post a bond in obtaining this injunction so any damages to Apotex will not be curable by resorting to the bond.

4

17.  Finally the public will be harmed by limiting the number of generic companies in the market place for amlodipine besylate by artificially restricting the number of Generic companies in the market place based on Mylan's claim of exclusivity after the patent has expired.

Pursuant to 28 U.S.C. § 1746(2), I hereby declare under penalty of perjury that the foregoing statements are true and correct.

*Tammy L McIntire*

**TAMMY L. McINTIRE**

Executed on:___April 2_____, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                                                    |   |                              |
|----------------------------------------------------|---|------------------------------|
| MYLAN LABORATORIES INC., et al.,                   | ) |                              |
|                                                    | ) |                              |
| Plaintiffs,                                        | ) |                              |
|                                                    | ) |                              |
| and                                                | ) |                              |
|                                                    | ) |                              |
| MUTUAL PHARMACEUTICAL CO.,                         | ) |                              |
|                                                    | ) |                              |
| Intervenor-Plaintiff,                              | ) |                              |
|                                                    | ) |                              |
| v.                                                 | ) | Civil Action No. 07-579 (RMU) |
|                                                    | ) |                              |
| MICHAEL O. LEAVITT, et al.,                        | ) | Judge Ricardo M. Urbina      |
|                                                    | ) |                              |
| Defendants,                                        | ) |                              |
|                                                    | ) |                              |
| and                                                | ) |                              |
|                                                    | ) |                              |
| TEVA PHARMACEUTICALS USA, INC.,                    | ) |                              |
|                                                    | ) |                              |
| Intervenor-Defendant,                              | ) |                              |
|                                                    | ) |                              |
| and                                                | ) |                              |
|                                                    | ) |                              |
| APOTEX INC.,                                       | ) |                              |
|                                                    | ) |                              |
| Intervenor-Defendant.                              | ) |                              |

**[PROPOSED] ORDER**

The Court having considered the emergency motion of Apotex Inc. (Apotex) to set bond and the positions of the other parties, it is hereby

**ORDERED** that plaintiffs Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc. shall post a bond of $78,000,000.00 by _____ [a.m./p.m.] on April __, 2007, to cover any costs and damages that may be incurred by Apotex if Apotex is harmed by any temporary restraining order or preliminary injunction that was improvidently issued by this Court.

Dated: _____, 2007.

                                                  _____

                                                  Ricardo M. Urbina
                                                  United States District Judge

## <u>SERVICE LIST</u>

Drake S. Cutini
Department of Justice
Office of Consumer Litigation
P.O. Box 386
Washington, DC  20044
(202) 307-0044
*drake.cutini@usdoj.gov*

David James Harth
Heller Ehrman, LLP
1 East Main Street
Suite 201
Madison, WI 53703
(608) 663-7470
*davidharth@hellerehrman.com*

Arthur Y. Tsien
Olsson, Frank and Weeda, P.C.
1400 16th St. NW, Suite 400
Washington, DC 20036
(202) 518-6318
*atsien@ofwlaw.com*

Robert B. Breisblatt
Welsh & Katz, Ltd.
120 South Riverside Plaza
22nd Floor
Chicago, IL 60606
(312) 655-1500
*rbb-docket@WelshKatz.com*

Jay P. Lefkowitz
Kirkland & Ellis LLP
655 15th Street, N.W.
Washington, DC  20005
(202) 879-5040
*jlefkowitz@kirkland.com*

John Will Ongman
Axinn Veltrop & Harkrider LLP
1801 K Street, N.W.
Suite 411
Washington, DC  20006
(202) 912-4700
*jwo@avhlaw.com*