IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MYLAN LABORATORIES INC., AND MYLAN
PHARMACEUTICALS INC.,

    *Plaintiffs*,

and

MUTUAL PHARMACEUTICAL CO.,

    *Intervenor-Plaintiff*

v.

MICHAEL O. LEAVITT, et al.

    *Defendants*,

and

TEVA PHARMACEUTICALS USA, INC.,

    *Intervenor-Defendant*

and

APOTEX INC.,

    *Intervenor-Defendant*

Civil Action No. 07-579 (RMU)

Judge Ricardo M. Urbina

**APOTEX'S AMENDED EMERGENCY MOTION TO SET BOND**

**<u>INTRODUCTION</u>**

    Intervenor-Defendant Apotex Inc. ("Apotex") hereby moves, pursuant to Fed.R.Civ.P. 65(c), for an order requiring Plaintiffs Mylan Laboratories Inc., and Mylan Pharmaceuticals Inc. (collectively "Mylan") to post a bond in the amount of at least $78 million dollars to cover any costs and damages that may be incurred by intervenor-defendant Apotex if it is later found to have been wrongfully enjoined or restrained, in connection with the Preliminary Injunction

issued by this Court on March 26, 2007, or any similar injunction that may be issued by this Court in the future.

In its March 26th order, this Court enjoined the FDA from granting any ANDAs in this matter until April 13, 2007. The FDA's final approval of Apotex's ANDA is imminent, and would issue but for the Court's injunction against the FDA. Because this Court's injunction against the FDA also enjoins Apotex from selling the generic version of the popular Norvasc® drug while Mylan enjoys undeserved exclusivity in the market for this drug, Apotex will suffer tens of millions of dollars in losses as a result of this Court's injunction. However, Mylan did not give notice of its motion for an injunction to Apotex as required by Rule 65, and did not provide any bond or security in connection with this injunction. Fed.R.Civ.P. 65(c) states that "no preliminary injunction shall be issued without notice to the adverse party," and no restraining order or preliminary injunction shall issue "except upon the giving of security by the applicant . . .." Requiring Mylan to post a bond in the amount Apotex seeks herein will protect Apotex from the losses it will suffer if it is found to have been wrongfully restrained.

On or about April 12 ,2003, counsel for Apotex conferred with counsel for the parties to this action concerning Apotex's initial Motion to Set Bond. Counsel for federal defendants (Drake Cutini) indicated that they take no position. Counsel for intervenor Teva Pharmaceuticals USA, Inc. (Michael Shumsky) indicated that they have no objection to Apotex's motion. Counsel for plaintiff Mylan (David Harth) and counsel for intervenor Mutual Pharmaceutical Co. (John Ongman) indicated that they object to this motion.

A proposed order pursuant to Local Rule 7(c) was submitted with Apotex's original motion.

**FACTS**

Over the past five years, several pharmaceutical companies filed Abbreviated New Drug Applications ("ANDAs") under the provisions of the Hatch-Waxman Act (21 U.S.C. § 355), in order to gain FDA approval to sell generic versions of the hypertension drug amlodipine besylate. This hugely successful drug is sold by Pfizer under the brand name Norvasc®, and was protected by a patent owned by Pfizer—Patent No. 4,879,303 ("the '303 patent"). The companies who have filed ANDAs include (among others) plaintiff Mylan and intervenors Apotex, Teva Pharmaceuticals and Mutual (*See* Docket Nos. 1, 8, 15, 19.)

As a result of these ANDAs, Pfizer brought patent infringement suits against Mylan and Apotex (among others), as contemplated by 21 U.S.C. § 355(j)(5)(B)(iii). Pfizer prevailed in the district court in its case against Apotex on January 29, 2006, and in its case against Mylan on February 27, 2007 [*see Pfizer Inc. v. Apotex Inc.,* No. 03 C 5289(N.D. Ill.) and *(Pfizer Inc. v. Mylan Laboratories, Inc.*, No. 02 CV 1628 (W.D. Pa.)]. Apotex appealed the district court's ruling, and on March 22, 2007, the Federal Circuit Court of Appeals entered a judgment finding Pfizer's '303 patent invalid. *Pfizer Inc. v. Apotex, Inc.*, No. 06-1261, 2006 U.S.App. LEXIS 6623 (Fed. Cir. March 22, 2007). Two days later, on March 25, 2007, Pfizer's '303 patent expired.

Apotex, not Mylan, is the only litigant sued by Pfizer to successfully show the '303 patent to be invalid. Nevertheless, Mylan is the only company currently selling generic amlodipine besylate because the other generic manufacturers are still awaiting final approval from the FDA for their ANDAs. Apotex understands that final approval for its ANDA is imminent. (Declaration of Bernice Tao ("Tao Dec.") ¶ 5, Ex. A to Apotex's April 13, 2007 motion.) However, in order to maintain its position of exclusivity in the generic market for

amlodipine besylate, Mylan brought this action against the FDA, claiming its first-to-file status entitled it to a six-month period of exclusivity in selling the generic version of Norvasc®. (Complaint, Doc. No. 1.)  Mylan then moved for preliminary injunctive relief, and on March 26, 2007, this Court entered an Order granting Mylan's motion, and stating that "the FDA is enjoined from taking final agency action (i.e., granting any ANDAs at issue in this matter) from April 11, 2007 until April 13, 2007 at 5:00 pm to enable the court to rule formally on the plaintiff's application for a TRO."  (Doc. No. 6.)  Subsequently, the Court pursuant to a motion by the FDA, altered its dates so that the FDA has until April 18 to take action on the pending applications and the injunction is in effect from April 18 until April 20, 2007. (Doc. No. 29.)

Contrary to Mylan's representations, it is likely that this Court will find that Mylan's claimed 180-day exclusivity period does not survive the expiration date of the listed patent. *See* 64 Fed. Reg. 42,873 (Aug. 6, 1999); *Ranbaxy Laboratories Ltd. v. Leavitt*, 469 F.3d 120, 126 (D.C. Cir. 2006) ("the text and structure of the statute suggest a distinction … such that the first generic applicant may no longer retain exclusivity when the patent has expired").  In obtaining its injunction, Mylan did not inform this Court of prior guidance by the FDA and the D.C. Circuit suggesting that the 180-day exclusivity Mylan might otherwise have been entitled to did not survive the expiration of the patent.

Mylan also obtained this preliminary injunction without notifying Apotex or the other ANDA filers who would be affected by the preliminary injunction, and without posting a bond. Indeed, counsel for Mylan was well aware of the other ANDA filers, and told this Court in a declaration that he was "aware that FDA is considering issuing final approval to other ANDAs for amlodipine besylate as early as Monday, March 26, 2007."  (Roman Dec. ¶ 5, Ex. B to Apotex's April 13, 2007 motion)  By bringing its motion without notice to the adverse parties,

Mylan has precluded Apotex and the other ANDA filers from obtaining final ANDA approval and competing with Mylan in the lucrative market for generic Norvasc®.

Based on its experience in the industry, Apotex calculates that if it receives final FDA approval for its ANDA in April 2007, a best case scenario would give Apotex a 30% market share of the generic sales, which would result in Apotex sales of $83,718,851 for the first 12 months post-launch. (Declaration of Tammy McIntire ("McIntire Dec.") ¶14, Ex. C to Apotex's April 13, 2007 motion.)

Even in a worst case scenario, for an April launch, Apotex would have 20% of the market at approximately $55,673,036 in sales for the first 12 months post-launch. (*Id*.)  However, if Apotex is prohibited from launching until September 2007, it would be lucky to obtain a 10% market share with yearly revenues of approximately $5,244,000. (*Id*.)

Mylan itself recognizes the value of the market for generic Norvasc® tablets.  Mylan's Vice President and General Counsel, Brian S. Roman, filed a declaration to support Mylan's emergency application for a temporary restraining order, stating that Mylan "has forecasted that its revenues would reach several million dollars per day," (Ex. B ¶ 6), and he further stated that by being the first to launch into the generic marketplace, Mylan will be able to gain favorable positioning in customer supply programs and access to additional customers, thereby obtaining and retaining a greater market share in the long term. (*Id*.)  Mr. Roman also claimed that FDA approval of other ANDA's would mean that "Mylan would lose a portion of the amlodipine market and associated sales that are forecasted to reach the hundreds of millions of dollars. . . ." (*Id*.)

# **ARGUMENT**

Rule 65(c) of the Federal Rules of Civil Procedure states,

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

An injunction has issued in this case, yet Mylan was not required to post a security for the damage that Apotex and others will surely suffer if it is later determined that the injunction was wrongfully issued. Rule 65 clearly dictates that a bond is required under the circumstances here presented. In fact, where an injunction raises a risk of monetary harm to the defendant, "a district court commits reversible error when it fails to require the posting of a security bond by the successful applicant for a preliminary injunction." *System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131, 1145-46 (3d Cir. 1977). *See also Flowserve Corp. v. Burns Int'l Services Corp.*, 2006 U.S. Dist. LEXIS 79757 *5 (D. Del. October 26, 2006) ("In commercial cases . . . the failure to post a bond can be reversible error, unless there is no risk of monetary harm to the party bound by the injunction.")

The fact that the injunction is entered against the FDA rather than Apotex does not preclude Apotex's ability to seek a bond, because Apotex is the party that will experience direct financial harm as a result of an injunction against the FDA. In *Timkin Co. v. U.S.*, 569 F.Supp. 65 (Ct. Int'l Trade 1983), the court enjoined the International Trade Administration ("ITA") from liquidating entries of roller bearings manufactured by the intervenor ("NBCA"). As a result of the injunction, the intervenor was denied its legal right to a refund of the duties deposited with the Customs Service. When the intervenor moved for a security bond, the plaintiff ("Timkin") objected on the basis that it was the ITA, and not the intervenor, who was actually enjoined by

the order.  The court rejected this argument, calling it a "rather narrow" and "skewed" construction" of Rule 65(c).  569 F.Supp. at 71-72.  The court continued:

> Rule 65(c), properly read, merely provides that as a condition precedent to the issuance of a restraining order or preliminary injunction security shall first be given to protect the enjoined party. *That rule does not state that security may not be required to protect other party-litigants who may be harmed by the operation of an injunction which is subsequently found to have been wrongfully issued.* In the somewhat unique circumstances arising under United States trade law, the court is presented with a situation where NBCA, as intervenor, will be the only party harmed if it should develop that the injunction was improvidently issued; and yet the government, as stakeholder and liquidator, is the only party who can be enjoined.  The result argued for by Timken would be highly inequitable and cannot be countenanced by a court sitting in equity.  In short, *NBCA, as a party in interest, is entitled to security where, as here, it is plainly evident that it will have suffered a compensable loss – the use of monies held by the government as duties – in the event the government is found to have been wrongfully enjoined.*

*Id*. (footnote omitted; emphasis added).  Likewise, the case at bar presents a situation where Apotex and the other ANDA applicants stand to lose millions of dollars as a result of an injunction against the FDA.  As a result, Apotex is entitled to seek a security bond in the amount which it will lose if it turns out that the injunction was improvidently granted.

Similarly, when a party seeks to restrain administrative agency action to the detriment of third parties, injunction bonds are appropriate. *See Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212 (8th Cir. 1970) ("*Middlewest Motor Freight*"). In *Middlewest Motor Freight*, carriers of freight had filed for a rate increase in freight tariffs to the Interstate Commerce Commission ("ICC"). *Id* at *216*.  The ICC then ordered cancellation of the rate increase. *Id* at *217*.  In allowing a preliminary injunction against the commission, the district court required a bond of $200,000 that was later increased to $300,000 for the payment of damages to shippers using the freight carriers' services at the higher rate if the order stopping the rate increase had been wrongfully restrained. *Id*.

Apotex has determined that it will lose at least $78 million as a result of the injunction against the FDA. If Apotex is permitted to sell its generic version of Norvasc® right away, Apotex stands to generate sales in the amount of $83,718,851 in a best case scenario. (McIntire Dec. ¶ 14, Ex. C.) If, however, Apotex is unable to launch its product until September of 2007 because the FDA has been enjoined from granting Apotex final ANDA approval for 180 days as Mylan requests, Apotex would be lucky to obtain revenues in the amount of $5,244,000. (*Id*.) The difference in Apotex's revenues without injunctive relief being granted and its revenues if the requested injunction were allowed is $78,474,851. This is the amount, at the very least, that Apotex stands to lose if it turns out that it was wrongfully enjoined, and this should be the amount of the bond as it relates to Apotex. *See Timken,* 569 F.Supp. at 72 (plaintiff was required to post a bond in the amount of $100,000, which reflected the amount of duty refunds due to the intervenor, multiplied by annual interest and the estimated duration of the proceedings.)[1]

Indeed, the amount of the bond sought is conservative, because it does not include lost interest on the lost revenues, and is far below the estimated value of the potential revenues that Mylan claims could be generated by a generic Norvasc® product. In the declaration submitted by Mylan's own counsel in support of its motion for preliminary injunction, Mr. Roman indicated that the value of the market for generic Norvasc® is "several million dollars per day." (Roman Dec. ¶ 6, Ex. B.) This being the case, Apotex's request for a $78 million bond to cover Apotex's losses for a period of up to six months is more than reasonable.

---

[1]In the event intervenor-defendant Teva moves for a bond, the bond amount will have to be even higher to account for the losses Teva may sustain if it turns out that the injunction was improvidently granted.

In view of the balance of the hardships of a too-high bond versus a too-low bond, a high bond is advisable.

> When setting the amount of security, district courts should err on the high side. If the district judge had set the bond at $ 50 million, as [the enjoined party] requested, this would not have entitled [the enjoined party] to that sum; [the enjoined party] still would have had to prove its loss, converting the "soft" numbers to hard ones. An error in setting the bond too high thus is not serious. (The fee for a solvent firm … to post a bond, a standby letter of credit, or equivalent security is a very small fraction of the sum involved.) Unfortunately, an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond.

*Mead Johnson & Company, v. Abbott Laboratories*, 201 F.3d 883 (7th Cir. 2000) (citations omitted) (injunction relating to sales of infant formula *Similac*).

Recently in *Sanofi-Synthelabo, v. Apotex, Inc.*, 2006 U.S. Dist. LEXIS 65127 (Aug. 31, 2006 S.D.N.Y.), *aff'd*, 470 F.3d 1368 (Fed. Cir. 2006), a bond of $400 million dollars was ordered for the drug Plavix®. The drug in this case, Norvasc®, has sales almost as large as those of Plavix® -- both are "Top 10" drugs, with Plavix having $6.4 billion in sales in the year ending June 2006, and Norvasc "only" $5.0 billion in sales for the same year.

**TOP 10 PRODUCTS** Lipitor was the top-selling drug in the 12 months ending June 2006

| BRAND NAME | COMPOUND | MARKETER | INDICATION | SALES TO JUNE 2006 ($ BILLIONS) | 12-MONTH CHANGE IN SALES |
|---|---|---|---|---|---|
| Lipitor | Atorvastatin | Pfizer | Hypercholesterolemia | $13.3 | 4.7% |
| Plavix | Clopidogrel | Bristol-Myers Squibb | Atherosclerotic events | 6.4 | 14.3 |
| Nexium | Esomeprazole | AstraZeneca | Gastroesophageal reflux disease (GERD), gastric ulcers | 6.2 | 17.1 |
| Seretide | Fluticasone and salmeterol | GlaxoSmithKline | Asthma | 5.9 | 13.4 |
| Zocor | Simvastatin | Merck | Hypercholesterolemia | 5.5 | -3.9 |
| Norvasc | Amlodipine | Pfizer | Hypertension | 5.0 | 1.3 |
| Zyprexa | Olanzapine | Lilly | Schizophrenia | 4.7 | -3.8 |
| Risperdal | Risperidone | Johnson & Johnson | Schizophrenia | 4.3 | 12.0 |
| Aranesp | Darbepoetin alfa | Amgen | Anemia | 4.3 | 34.7 |
| Enbrel | Etanercept | Amgen | Rheumatoid arthritis | 4.1 | 25.7 |
| Top 10 products | | | | $59.7 | 9.3% |

NOTE: Sales are in U.S. dollars for the 12 months ending June 2006. SOURCE: IMS MIDAS Quantum

Joanne Grimley, *Market shifts and generic competition create dynamic environment for drug developers*, Chemical & Engineering News, Vol. 84, No. 49 (December 4, 2006) (available online at: http://pubs.acs.org/cen/coverstory/84/8449cover.html).

Drug cases are not the only ones with large bonds. Other cases require tends of millions of dollars in bonds in support of preliminary injunctions in non-drug cases. E.g. *Blue Cross & Blue Shield Mutual Of Ohio v. Blue Cross and Blue Shield Association*, 110 F.3d 318 (6th Cir. 1997) (non-consummation of a transaction).

Finally, this Court should not countenance Mylan's attempt to obtain injunctive relief without notifying the other ANDA applicants, three of whom have since been granted leave to intervene in this action. Rule 65(a)(1) requires that "[n]o preliminary injunction shall be issued without notice to the adverse party." Moreover, a temporary restraining order may be granted without notice to the adverse party only where, among other things, "the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required." Fed.R.Civ.P. 65(b). Mylan, however, made no attempt to notify Apotex or the other ANDA applicants of the present proceedings, even though Mylan was well aware of their identities. The fact that other ANDA applicants were not parties to the action does not excuse Mylan from its duty to notify them. As stated by the Fifth Circuit, Rule 65(a)(1) requires notice to the "adverse party," and "when dealing with a preliminary injunction, the 'adverse party' means the party adversely affected by the injunction, not the opponent in the underlying action.'" *Parker v. Ryan*, 960 F.2d 543, 545 (5th Cir. 1992). Clearly Apotex and the other ANDA filers have been "adversely affected" by the injunction entered in this case.

## **CONCLUSION**

For the reasons stated herein, Apotex respectfully requests that this Court enter an order requiring Mylan to post a security bond in the amount of at least $78 million, to cover the losses that Apotex will incur if it later is found to have been wrongfully enjoined.

April 17, 2007

Respectfully submitted,

/s/Arthur Y. Tsien
Arthur Y. Tsien, Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, DC 20036-2220
(202) 789-1212
(202) 234-3550 (fax)
Counsel for Apotex Inc.

Of Counsel:
Robert B. Breisblatt
Steven E. Feldman
A. Sidney Katz
WELSH & KATZ, LTD.
120 South Riverside Plaza
22nd Floor
Chicago, Illinois 60661
Telephone: (312) 655-1500
Fax: (312) 655-1501

Attorneys for Apotex, Inc.