IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MYLAN LABORATORIES INC., AND MYLAN PHARMACEUTICALS INC., | |
| *Plaintiffs*, | |
| and | |
| MUTUAL PHARMACEUTICAL CO., | |
| *Intervenor-Plaintiff,* | |
| v. | Civil Action No. 07-579 (RMU) |
| MICHAEL O. LEAVITT, et al. | Judge Ricardo M. Urbina |
| *Defendants*, | |
| and | |
| TEVA PHARMACEUTICALS USA, INC., | |
| *Intervenor-Defendant,* | |
| and | |
| APOTEX INC., | |
| *Intervenor-Defendant.* | |

**APOTEX'S REPLY IN SUPPORT OF ITS AMENDED EMERGENCY
MOTION TO SET BOND**

**INTRODUCTION**

The Court should grant Apotex Inc.'s ("Apotex") amended motion for an injunction bond

in the amount of at least $78 million dollars pursuant to Fed.R.Civ.P. 65(c), because Apotex has

shown its entitlement, and Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc. (collectively

"Mylan") have failed to rebut Apotex's position.  Although Mylan has requested that FDA be

enjoined, its real target for this injunction is generic competitors such as Apotex, whose products

Mylan seeks to keep off the market through an injunction against FDA. To preclude Apotex from seeking a bond under such circumstances elevates form over substance and fails to take into account the realities of the situation here, which is that Mylan is enjoying a substantial, undeserved windfall through its legal maneuvering with FDA.

## **ARGUMENT**

### I.    **The Record Is Complete Enough To Grant Apotex's Bond Request.**

The record before this Court supports an injunction bond in the amount requested.

1. Mylan does not deny that Norvasc® was a "Top 10" drug last year with about $5 *billion* in sales. *Apotex's Amended Emergency Motion to Set Bond*, at 9.

2. Mylan does not deny that if Apotex is permitted to enter the market, Apotex could expect up to a 30% market share. *McIntire Decl.*, ¶14 at 4.

3. Mylan does not deny that if Apotex were held off the market for 6 months, that Apotex might only have annual revenues of $5,244,000 for its generic amlodipine product.

4. Mylan provides no estimate of its own for what these numbers *should* be.

5. Mylan's own witness *in this very proceeding* supports Apotex's case that *hundreds of millions* of dollars are at stake at a rate of *millions* of dollars a day. As the Vice-President and General Counsel of Mylan swore:

> Mylan would lose a portion of the amlodipine market and associated sales that are forecasted to reach the hundreds of millions of dollars, harms for which there is no legal redress. Mylan has forecasted that its revenues would reach several million dollars per day.

*Roman Decl.*, ¶ 6 at 3 (submitted with Mylan's April 13, 2007 bond motion; attached hereto for the Court's convenience as Exhibit A).

Pursuant to Federal Rule of Civil Procedure 43(e) ("When a motion is based on facts not appearing in the record the court may hear the matter on affidavits.…"), the Court can determine the bond amount based on this affidavit evidence, contrary to Mylan's suggestion that a hearing is necessary.

Although Mylan now argues that this Court is powerless to issue a bond to protect intervenor-defendant Apotex in this action, other courts have ordered that just such a bond be posted in nearly identical circumstances to the present circumstances.  For example, in *Glaxo Group Ltd. v. Leavitt*, No. AMD 06-469 (D. Md. Feb. 23, 2006), Judge Bennett issued a TRO (attached as Exhibit C) against FDA stopping approvals for the sales of generic Flonase®.  The amount of the injunction bond was $3 million for a mere 10 days, $300,000 a day. *Id.*  The bond was eventually paid out to compensate Roxane Laboratories, an intervening generic competitor, for an improvidently granted injunction. *See Roxane Laboratories Press Release, attached as Exhibit D.*  Flonase had 2005 sales of about £ 506 million. *See Glaxo-Smith-Kline Annual Report Excerpt,* at fifth line, attached as Exhibit E.  The ratio of dollars to pounds in 2005 was about 1.90:1.    http://www.signetgroupplc.com/pages/436/Financial+market+risks.stm.    Therefore, Flonase sales were about $961 million a year, about one-fifth of that of Norvasc®. Five times the Flonase bond rate would be $1.5 million a day, or about $270 million dollars of bond for 180 days – much higher than what Apotex is asking.

## II.    The Potential Windfall To Mylan For An Improvidently Granted Injunction Should Be Offset By A Bond.

Mylan tells this Court that Apotex's bond request should be denied so that no matter what happens, *even if Mylan is wrong*, Mylan will get millions of dollars a day with no risk. Mylan's

proffered reasons do not support this outcome. This Court of equity, on the record before it, should grant Apotex's motion.

A.     **Mylan Does Not Undermine Apotex's Cases That Show It Has Standing To Demand A Bond.**

Apotex's principal cases on the issue of standing have not been undermined by Mylan's arguments. Nothing in the text of Rule 65(c) prohibits a court in its discretion from ordering a bond to protect the interests of affected parties, even if those parties have not been expressly enjoined. Courts have in fact ordered that such bonds be posted to protect the interests of parties not expressly enjoined. *Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212, 217 (8th Cir. 1970); *Glaxo Group Ltd. v. Leavitt*, No. AMD 06-469 (D. Md. Feb. 23, 2006). Mylan's reliance on *Federal Prescription Serv. v. American Pharmaceutical Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980), for the proposition that where there can be no harm, there need be no bond, is inconsistent with the record. Apotex has proven that it will lose money and will be harmed by an injunction in Mylan's favor. Mylan has not offered contrary proof that Apotex will not lose money. Therefore, Mylan's authority is inapposite.

B.     **Mylan's Authorities Do Not Outweigh Apotex's.**

1.     **Mylan Provides No On-Point Authorities.**

Mylan has not provided appellate authority to support its position that Rule 65(c) precludes issuance of a bond in favor of an intervening party. One of Mylan's authorities, *McGregor Printing Corp. v. Kemp*, No. 91-3255, 1992 U.S. Dist. LEXIS 6717, at *21-22 (D.D.C. May 14, 1992), is inapposite because the parties were not enjoined or restrained directly or indirectly. *Id*. at *22. In *McGregor Printing Corp.*, McGregor Printing Corporation sued the Committee for Purchase from the Blind and Other Severely Handicapped ("the Committee") to prevent the Committee from listing certain goods on a procurement list that could be dedicated

for manufacture by the blind. *Id*. at *1. Nothing kept the blind workshops from selling their goods to anyone except the Government under the preferred treatment under the regulation. Here, Apotex would be enjoined at least indirectly.  It is *not* free to sell its generic replacement for Norvasc® without FDA approval. 21 U.S.C. § 355(a) (requiring the approval Apotex seeks under 21 U.S.C. § 355(j)).  If FDA is enjoined from granting that approval, Apotex too is effectively enjoined from getting its generic amlodipine product to market.

Mylan also cites *CollaGenex Pharms., Inc. v. Thompson*, No. 03-1405, 2003 U.S. Dist. LEXIS 25228, *2 (D.D.C. Aug. 26, 2003), for the proposition that when an injunction of agency action is sought, parties that are restrained by the agency's inability to act do not have standing under Rule 65. However, in *CollaGenex* the party moving for security also gave the Court affirmative evidence that it would not be harmed by a lack of bond – **regardless of the outcome of the preliminary injunction** at issue. *See id*. at n.1. Therefore, because there are alternate grounds, the authority that Mylan invokes is too weak to even be considered under the law of collateral estoppel. The D.C. Circuit denies preclusive effect to alternative findings. *AT&T v. FCC*, 602 F.2d 401, 411 n.1 (D.C. Cir. 1979).

### 2.    Mylan's Argument That Apotex Lacks Standing Under Rule 65(c) To Seek A Bond Is Not Borne Out By The Closest D.C. Circuit Opinion.

In a case not cited by Mylan, *DSE, Inc. v. United States*, 169 F.3d 21, 24, 33-34 (D.C. Cir. 1999), the Court of Appeals for the D.C. Circuit had the opportunity to address the issue of an intervenor bond request.  Although the bond requested by the intervenor was ultimately denied, neither the district court nor the court of appeals indicated that a lack of standing under Rule 65(c) was the problem.  Rather, the bond was denied only because the intervenor was "at fault" for "inadequate disclosures" that caused delay, not because of lack of standing.  *Id*. at 24.

### 3. Mylan's Reliance On Criticized Authorities Outside Of The D.C. Circuit Should Not Be Given Weight.

Mylan's arguments based on the law of other jurisdictions also are weak. First, Mylan relies on *Puerto Rico v. Price Com.*, 342 F. Supp. 1311, 1312-1313 (D.P.R. 1972), and *Powelton Civic Home Owners Ass'n* v. *HUD*, 284 F. Supp. 809 (E.D. Pa. 1968). Those cases were disposed of by the analysis in *Timken Co. v. United States*, 569 F. Supp. 65, 72 (Ct. Int'l Trade 1983) (italics in original, bolding added):

> Timken's two case authorities for its position that only the enjoined party may demand security are **wholly unpersuasive**. In *Puerto Rico* v. *Price Comm'n*, 342 F. Supp. 1308 (D.P.R. 1972), a codefendant's request for an increase in the amount of security bond was denied simply on the ground that "[the] amount of security bond required . . . is a matter that falls within the ample range of discretion" of the court. *Id*. at 1309-10. Similarly unavailing is *Powelton Civic Home Owners Ass'n* v. *HUD*, 284 F. Supp. 809 (E.D. Pa. 1968). The pivotal language of that opinion explains why security was not required:
>
>> We have been concerned only with the legality under federal law of the disbursement of federal funds by federal officers. As the plaintiffs explained in their brief and at oral argument, the Philadelphia Redevelopment Authority was named as a party defendant merely as a courtesy and in order to allow the Court to hear the local agency's point of view. They were not indispensable defendants; *nor have they been legally affected by our decision in this case*.

In other words, the *Timken* court's reading of Mylan's cases was not that they precluded the grant of a bond on behalf of any party that was not directly enjoined, but rather, that the third parties seeking a bond in those cases were not sufficiently affected by the injunction to entitle them to a bond. The present case is different. Apotex is a generic competitor that would be directly affected by the injunction that Mylan seeks against FDA and would itself be effectively enjoined should Mylan be granted its requested relief here.

Mylan's last case, *PPG Industries, Inc. v. United States*, 11 C.I.T. 5 (Ct. Int'l Trade 1987), denied a bond requested by intervenors because, in part, the damages *were speculative*. *Id*. at 9-10 ("Since the injunctive order in this case runs to the defendant United States, and not the defendant-intervenors, *and since the damages asserted by the defendant-intervenors appear speculative, the Court will not require the posting of security*") (emphasis supplied). These remaining words of the sentence that Mylan omits and replaces with ellipsis in its brief (emphasized in italics in quotation above) are alternative grounds, again making the holding too weak to even be collateral estoppel. *AT&T v. FCC*, 602 F.2d 401, 411 n.1 (D.C. Cir. 1979). Also, while Mylan invokes 11A Wright & Miller, Federal Prac. & Proc., § 2954 n.41 (attached as Exhibit B) as an authority, the authors lend none of their reputation to the proposition, only indicating that there is authority for the proposition, not whether it is right or wrong.

**C.    The Irreparable Harm To Apotex By Virtue Of An Improvidently Granted Injunction Should Be Considered By This Court In Requiring Mylan To Post A Bond.**

Mylan has taken the position that if a party could have had a bond, and does not get a bond, then it cannot recover damages. *Opposition To Apotex's Amended Emergency Motion To Set Bond*, at 5-7.  By Mylan's logic, if Apotex is denied a bond it can never recover damages for Mylan's actions to block the FDA from granting final marketing approval for Apotex's generic amlodipine product.   This is a tacit admission that if Apotex is denied a bond it will be irreparably harmed with no possibility of recovery or recourse for the damages imposed by Mylan's actions.   Mylan's admission of the nature of the harm should be considered by this Court sitting in equity when it decides the present motion.  *See Mead Johnson & Company, v. Abbott Laboratories*, 201 F.3d 883 (7th Cir. 2000).

## **CONCLUSION**

For the reasons stated herein, Apotex respectfully requests that this Court enter an order requiring Mylan to post a security bond in the amount of at least $78 million, to cover the losses that Apotex will incur if it later is found to have been wrongfully enjoined.


April 18, 2007                                        Respectfully submitted,

                                                     /s/Arthur Y. Tsien
                                                     Arthur Y. Tsien, Bar No. 411579
                                                     OLSSON, FRANK AND WEEDA, P.C.
                                                     1400 16th Street, N.W., Suite 400
                                                     Washington, DC 20036-2220
                                                     (202) 789-1212
                                                     (202) 234-3550 (fax)
                                                     Counsel for Apotex Inc.

Of Counsel:
Robert B. Breisblatt
Steven E. Feldman
A. Sidney Katz
WELSH & KATZ, LTD.
120 South Riverside Plaza
22nd Floor
Chicago, Illinois 60661
Telephone: (312) 655-1500
Fax: (312) 655-1501

Attorneys for Apotex, Inc.

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MYLAN LABORATORIES INC.<br><br>and<br><br>MYLAN PHARMACUETICALS INC.<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL O. LEAVITT,<br>in his official capacity as<br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>and<br><br>ANDREW C. VON ESCHENBACH, M.D.,<br>in his official capacity as<br>COMMISSIONER OF FOOD AND DRUGS,<br><br>and<br><br>UNITED STATES FOOD AND DRUG<br>ADMINISTRATION,<br><br>Defendants. | Civil Action No. |

## DECLARATION OF BRIAN S. ROMAN IN SUPPORT OF MYLAN'S
## EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER

I, Brian S. Roman, declare as follows:

1.     I currently am the Vice President and General Counsel of Mylan Pharmaceuticals

Inc. ("Mylan Pharmaceuticals"), a Plaintiff in this action.  Prior to being appointed to this

position, from April 2003, I was responsible for overseeing and directing all litigation involving

Mylan Pharmaceuticals' parent corporation, Mylan Laboratories Inc. ("Mylan Laboratories").

The latter included all litigation including, but not limited to, Mylan Pharmaceuticals.

2.      I submit this declaration in support of the Emergency Application for a Temporary Restraining Order filed in this Court by Mylan Pharmaceuticals and Mylan Laboratories (collectively "Mylan"). All statements contained herein as to Mylan are based upon my personal knowledge, including those relating to the organization and operation of both Mylan Pharmaceuticals and Mylan Laboratories. All statements contained herein as to persons other than Mylan, and matters unrelated to Mylan, such as the sales and marketing activities of both brand and generic pharmaceuticals, are based upon my knowledge, information and belief.

3.      Mylan Pharmaceuticals is a wholly owned subsidiary of Mylan Laboratories, which is a publicly traded company. Mylan Pharmaceuticals develops, manufactures and sells generic pharmaceuticals in the United States. This case involves Mylan Pharmaceuticals' Abbreviated New Drug Application ("ANDA") No. 76-418, for amlodipine besylate tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base) ("Mylan's ANDA"). Mylan Pharmaceuticals has expended tremendous resources toward the development and approval of its amlodipine products, including millions of dollars on materials, studies, overhead and litigation. .

4.      The Food and Drug Administration ("FDA") issued Final Approval for Mylan's ANDA on October 3, 2005. The 180-day exclusivity period granted to Mylan currently prevents the FDA from issuing Final Approval to any generic companies other than Mylan Pharmaceuticals, which means that Mylan Pharmaceuticals enjoys a six-month head start over its generic competitors.

5.    I am aware that FDA is considering issuing final approval to other ANDAs for amlodipine besylate as early as Monday, March 26, 2007. At least one other ANDA filer has publicly announced its view that no company has exclusivity and that it expects to launch the product in the very near future. <u>See</u> Apotex 3/21/07 Press Release attached hereto.

6.    Any approval of additional amlodipine besylate ANDAs prior to expiration of Mylan's exclusivity would not only destroy the 180-day exclusivity rights that FDA already granted to Mylan, but it would also fundamentally undermine the value of Mylan's enormous investments aimed at capitalizing on its 180-day exclusivity. Any FDA approval of other ANDAs would deprive Mylan of its first entrant, leadership position in the market for generic amlodipine besylate. Mylan would lose a portion of the amlodipine market and associated sales that are forecasted to reach the hundreds of millions of dollars, harms for which there is no legal redress. Mylan has forecasted that its revenues would reach several million dollars per day. Being the first to launch into the generic marketplace also permits Mylan to secure distribution channels, favorable positioning in customer supply programs and access to additional customers, thereby obtaining and retaining a greater market share in the long term.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 23, 2007.

Brian S. Roman



**NEWS**

Contact: Steve Giuli
Director, Government Relations &
Industry Affairs
800-706-5575 EXT 3984
sgiuli@apotex.com

**FOR IMMEDIATE RELEASE**

# Apotex Invalidates Norvasc® Patent

## *Company to Launch In Near Future*

**Weston, Fl (March 21, 2007)** – Apotex Corp. announced today the Federal Circuit Court of Appeals in the case of Pfizer, Inc. v. Apotex, Inc. reversed a trial court's ruling and found that Pfizer's U.S. Patent 4,879,303 (the '303 patent) covering the Pfizer product Norvasc® was invalid. The '303 patent covers amlodipine besylate the active ingredient in Norvasc® as well as tablets made from amlodipine besylate. Because the limiting patent expires in two days, no company will have exclusivity over the product. Apotex expects to launch the product in the very near future.

The Federal Circuit found that Apotex had proven that the '303 patent was invalid because it was obvious. In other words, the patent should never had been issued because someone skilled in the art would have known to make amlodipine besylate from materials, called prior art, that were publicly available. The Federal Circuit cited as some of the prior art an earlier Pfizer patent that taught amlodipine maleate as well as amlodipine with other pharmaceutically acceptable salts. The earlier Pfizer patent did not specifically mention besylate but the Court found that it was sufficient that besylate salt was discussed in other pieces of prior art.

By finding the Pfizer '303 patent invalid and not infringed by Apotex's ANDA, the Court is allowing Apotex to obtain final approval for its generic amlodipine besylate product. By finding Pfizer'303 patent invalid the Court also causes Pfizer to loose the additional six months of pediatric exclusivity that they had obtained.

"Our pursuit of this case after losing at the District Court level was rooted in Apotex's belief that the right thing to do for consumers and customers is to never, ever stop fighting to bring generics to market at the earliest possible time," said Apotex CEO Barry Sherman. "There was no guarantee when we appealed the case that we would be able to enter the market if we won. The odds, in fact, were against us achieving that outcome. But we believed we have an obligation to consumers to keep fighting, and are extremely pleased that our victory in the courts will bring significant savings in short order to the US health care system."

"It goes without saying that we will continue to press on all fronts for changes in the US legislative and regulatory framework that will better serve consumers . The commitment to the consumer that guided our actions in this case will continue to guide our efforts in Washington, DC, for instance, to work with policymakers to put an end to anti-competitive patents settlements that delay consumer access to affordable, quality generic medicines," Sherman added.

"Today's decision also has implications for the outcome of the clopidogrel case as some of the same legal principles are at stake in that trial. As today's ruling underscores, consumers can be sure we will do everything in our power to prevail in that case as well," Sherman added.

The Apotex Group manufactures more than 200 different high-quality generic pharmaceuticals, used by millions of patients worldwide. Its product line includes oral solids, liquids, injectables, nasal sprays, opthalmics, and inhalation solutions.

# EXHIBIT B

Ch. 9    REQUIREMENT OF RESTRAINING ORDER    **§ 2954**
Rule 65

The last sentence of the first paragraph of Rule 65(c) declares that "no such security shall be required of the United States or of an officer or agency thereof." [37]   The sovereign's immunity from security is not affected by the 1966 amendment of Section 2412 of Title 28, which makes the United States liable for the costs listed in Section 1920 of the same title.[38]   Although the government later may be liable for the costs listed in that section, security is unnecessary because there is no substantial risk that the United States will be financially unable to indemnify the enjoined party for any of the costs it is legally obligated to pay.

In 1966 Rule 65(c) was amended by the deletion of a second paragraph that had been added to the rule by the amendment that became effective in 1948.  This was replaced by a cross-reference to Rule 65.1, which was promulgated at the same time.[39]  That rule deals with the procedure for recovering against a surety on a security bond or undertaking.  Accordingly, questions concerning what costs and damages are collectable under an injunction bond when a plaintiff becomes liable for a wrongfully issued injunction, and how a defendant proceeds to secure costs and damages are discussed under Rule 65.1.[40]

Courts at various times have been called upon to decide a number of other issues under Rule 65(c).  For example, there is authority for the proposition that "someone not a party to the case or restrained or enjoined by order of the Court is without standing to demand security for possible damages incurred as a result of

When an earlier court order had directed school authorities to take affirmative action to disestablish segregated schools and to locate any new school with the objective of eradicating the vestiges of the dual system, the court would issue a preliminary injunction against construction of a proposed school that was to be built in a predominantly Negro area and on an inadequate site and would not require a bond since "no bond is required here where the preliminary injunction is issued by the court 'to protect and enforce its lawful orders.'"  Bivins v. Board of Public Educ. & Orphanage

for Bibb County, D.C.Ga.1967, 284 F.Supp. 888, 899.

**37.  Government need not post**

U.S. v. O'Brien, D.C.Ohio 1993, 836 F.Supp. 438.

**38.  Liability for costs**

See vol. 10, § 2672.

**39.  1966 Revision**

The 1966 Advisory Committee Note to Rule 65 is reprinted in the Appendix to vol. 12.

**40.  Rule 65.1**

Rule 65.1 is discussed in §§ 2971–2974.

305

§ **2954**
Rule 65
SECURITY
Ch. 9

such restrainment or enjoinment." [41]   And, it has been decided that
the burden of proof on an application to increase the amount of the
security is on the enjoined party.[42]   As is made clear by Rule
65(e),[43] Rule 65(c) does not apply to cases before three-judge courts
pursuant to § 2284(b)(3) of the Judicial Code,[44] although a three-
judge court has discretion to require the posting of security.[45]

At one time, injunctions issued in bankruptcy proceedings were
a source of confusion because some courts imposed the mandatory

**41.  Decisional law**

Commonwealth of Puerto Rico v. Price
Comm'n, D.C.Puerto Rico 1972, 342
F.Supp. 1308, 1311.

**See also**

Powelton Civic Home Owners Ass'n v.
Department of HUD, D.C.Pa.1968,
284 F.Supp. 809.

**42.  Burden**

"In requesting an increase in the
amount of security required for the
issuance of a Temporary Restraining
Order, the burden is upon the movant
to place the Court in a position to
make a determination whether such
increase is justified."  Commonwealth
of Puerto Rico v. Price Comm'n,
D.C.Puerto Rico 1972, 342 F.Supp.
1308, 1310–1311.

When defendants did not raise the ques-
tion of a security bond at the hearing
on defendants' motion to dismiss but
raised the issue for the first time one
week after the preliminary injunction
was issued, the court found there was
no showing on injury and denied de-
fendants' request for $20,000,000 se-
curity.  Powelton Civic Home Owners
Ass'n v. Department of HUD, D.C.Pa.
1968, 284 F.Supp. 809, 839.

Since the district judge was satisfied
that the voluminous evidence offered
at the hearing for a preliminary in-
junction was sufficient to justify the
issuance of an order he saw no reason
to increase the required security from
its original $7,500 to $25,000 simply

because the order will be in effect at
least another three months while de-
fendant prosecutes his appeal.  Lacey
v.  O'Rourke,  D.C.N.Y.1956,  147
F.Supp. 922.

**43.  Rule 65(e)**

This rule is discussed in § 2959.

**44.  Does not apply**

G.B.C., Inc. v. U.S., D.C.Tenn.1969, 302
F.Supp. 1283.

Denny v. Health & Social Serv. Bd. of
Wisconsin Dep't of Health & Social
Servs., D.C.Wis.1968, 285 F.Supp. 526.

Tennessee Public Serv. Comm'n v. U.S.,
D.C.Tenn.1967, 275 F.Supp. 87.

City of Williamsport v. U.S., D.C.Pa.
1967, 273 F.Supp. 899, affirmed per
curiam 1968, 88 S.Ct. 2286, 392 U.S.
642, 20 L.Ed.2d 1348.

Campbell Sixty-Six Express, Inc. v. U.S.,
D.C.Mo.1966, 253 F.Supp. 613.

Florida East Coast Ry. Co. v. U.S.,
D.C.Fla.1964, 228 F.Supp. 340.

**45.  Bond required**

In  an  action  under  28  U.S.C.A.
§ 2284(3), a temporary restraining or-
der was issued enjoining the Inter-
state Commerce Commission from en-
forcing an order cancelling tariff in-
creases, the court ordered the private
shippers to post a bond in the amount
of $200,000 (later increased to $300,-
000).  Middlewest Motor Freight Bu-
reau v. U.S., C.A.8th, 1970, 433 F.2d

306

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND



GLAXO GROUP LTD.
d/b/a/ GLAXOSMITHKLINE

     Plaintiff,

     v.

MICHAEL O. LEAVITT.,
in his official capacity as
SECRETARY, DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

and

ANDREW C. VON ESCHENBACH, M.D.
in his official capacity as
ACTING COMMISSIONER,
FOOD AND DRUG ADMINISTRATION,

     Defendants,

and

ROXANE LABORATORIES,

     Defendant-Intervenor.

CIVIL NO. AMD 06-469

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## TEMPORARY RESTRAINING ORDER

Upon consideration of the Complaint filed by the Plaintiff Glaxo Group Ltd. d/b/a/

GlaxoSmithKline ("GSK"), its Motion for a Temporary Restraining Order, the Memorandum in

Support thereof, and having conducted a hearing on this date, and having heard opposition thereto from

the Defendants and the Defendant Intervenor the Court finds that GSK has demonstrated some

liklihood of success on the merits, that the balance of harms and the public interest clearly weigh in

GSK's favor, and that GSK will suffer immediate and irreparable injury unless the Defendants and the

Defendant Intervenor are temporarily restrained as set forth in this Order.

Accordingly, IT IS HEREBY ORDERED pursuant to Rule 65(b) of the Federal Rules of Civil Procedure that:

(i)    Plaintiff's Motion for a Temporary Restraining Order is GRANTED;

(ii)   During the pendency of this Order, the approval and any future approval by the Food and Drug Administration of an abbreviated new drug application allowing the marketing and sale of a generic version of GSK's Flonase® Nasal Spray SHALL BE AND IS SUSPENDED; and

(iii)  The Plaintiff and PAR Pharmaceuticals shall cease the distribution of such generic product and the Plaintiff will not contract with any other company to distribute such generic product during the pendency of this Order.


IT IS FURTHER HEREBY ORDERED, pursuant to Rule 65(c) that the Plaintiff shall post a surety bond with the Clerk of the Court in the amount of $3,000,000 by 5:00 pm February 24, 2006.

The Clerk of the Court shall provide a copy of this Order to counsel for each party on this date.

This Temporary Restraining Order shall expire at 2:00 pm on March 6, 2006.

The foregoing is Ordered this 23rd day of February 2006 at 6:47 pm.

/s/    Richard D. Bennett
       Richard D. Bennett
       United States District Judge

2

# EXHIBIT D

  
print    e-mail    link

   
RSS    del.icio.us    digg it    Technorati

**District Court Calls for GlaxoSmithKline to Release Bond Amount of $3 Million to Roxane Laboratories Relating to the Launch of Generic Fluticasone Propionate**



**Roxane Laboratories, Inc. Logo. (PRNewsFoto/Roxane Laboratories, Inc.)**

COLUMBUS, OH UNITED STATES 04/10/2007

COLUMBUS, Ohio, April 10 /PRNewswire/ -- Roxane Laboratories, Inc. today announced that on April 6, 2007 the district court of Maryland ordered that the $3 million dollar bond posted by GlaxoSmithKline be released to Roxane. GSK was ordered to post the bond over a year ago when it filed a lawsuit against the FDA following the FDA's approval of Roxane's fluticasone propionate its generic equivalent to FLONASE(R)(1). Following a hearing on the merits of the lawsuit in March 2006, the district court found that the FDA's approval process was well within the law, and that patients are entitled to the cost benefits of Roxane Laboratories' safe and therapeutically equivalent generic fluticasone propionate nasal spray. The payment of the $3 million is the last step in this process and supports Roxane's goal of offering this low-cost alternative to its customers.

(Logo: http://www.newscom.com/cgi-bin/prnh/20070410/CLTU122LOGO )

Roxane Laboratories worked in cooperation with the FDA to satisfy all guidelines to obtain approval for fluticasone propionate nasal spray. The patent for FLONASE(R) (fluticasone propionate) Nasal Spray expired May 14, 2004. Following a three year review period, the FDA approved Roxane's ANDA application after determining Roxane's generic fluticasone propionate is therapeutically equivalent to the branded drug. Roxane Laboratories satisfied all scientific and regulatory requirements and obtained approval from the FDA for a bioequivalent generic version of FLONASE(R) on February 22, 2006.

Roxane Laboratories' fluticasone propionate nasal spray is AB rated to FLONASE(R) (fluticasone propionate) Nasal Spray and is available through all major wholesalers in the United States.

Roxane Laboratories

Roxane Laboratories, Inc. (Columbus, Ohio), is a subsidiary of Boehringer Ingelheim Corporation, based in Ridgefield, CT and a member of the Boehringer Ingelheim group of companies.

The Boehringer Ingelheim group is one of the world's 20 leading pharmaceutical companies. Headquartered in Ingelheim, Germany, it operates globally with 137 affiliates in 47 countries and approximately 38,400 employees. Since it was founded in 1885, the family-owned company has been committed to researching, developing, manufacturing and marketing novel products of high therapeutic value for human and veterinary medicine.

In 2006, Boehringer Ingelheim posted net sales of US $13.3 billion (10.6 billion euro) while spending approximately one-fifth of net sales in its largest business segment, Prescription Medicines, on research and development.

For more information, please visit http://us.boehringer-ingelheim.com.

(1) FLONASE(R) is a registered trademark of GlaxoSmithKline Pharmaceuticals.

SOURCE Roxane Laboratories, Inc.

**Related links:**
● http://us.boehringer-ingelheim.com/
**Photo Notes:**http://www.newscom.com/cgi-bin/prnh/20070410/CLTU122LOGO
AP Archive: http://photoarchive.ap.org
PRN Photo Desk, photodesk@prnewswire.com



Issuers of news releases and not PR Newswire are solely responsible for the accuracy of the content.
Terms and conditions, including restrictions on redistribution, apply.
Copyright © 1996- 2007 PR Newswire Association LLC. All Rights Reserved.
A United Business Media company.

# EXHIBIT E

# 2005 Year
continued

## Pharmaceutical turnover by therapeutic area 2005

| Therapeutic area/ major products | % of total | Total 2005 £m | Total 2004 £m | Total Growth CER% | Total Growth £% | USA 2005 £m | USA Growth CER% | USA Growth £% | Europe 2005 £m | Europe Growth CER% | Europe Growth £% | International 2005 £m | International Growth CER% | International Growth £% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Respiratory** | 27 | **5,054** | 4,394 | **14** | **15** | **2,580** | **17** | **18** | **1,660** | **8** | **9** | **814** | **13** | **17** |
| Seretide/Advair | | 3,003 | 2,441 | 22 | 23 | 1,687 | 26 | 27 | 1,033 | 16 | 17 | 283 | 16 | 24 |
| Flixotide/Flovent | | 638 | 618 | 2 | 3 | 262 | 4 | 4 | 188 | (3) | (1) | 188 | 3 | 6 |
| Serevent | | 330 | 349 | (7) | (5) | 104 | (20) | (19) | 160 | (3) | (1) | 66 | 12 | 14 |
| Flixonase/Flonase | | 656 | 578 | 13 | 13 | 506 | 12 | 12 | 60 | (1) | 2 | 90 | 27 | 30 |
| **Central Nervous System** | 17 | **3,219** | 3,462 | **(8)** | **(7)** | **2,051** | **(10)** | **(10)** | **704** | **(7)** | **(6)** | **464** | **2** | **5** |
| Seroxat/Paxil | | 615 | 1,063 | (42) | (42) | 133 | (75) | (74) | 187 | (26) | (25) | 295 | – | 1 |
| Paxil IR | | 488 | 667 | (27) | (27) | 18 | (87) | (87) | 187 | (26) | (25) | 283 | (1) | (1) |
| Paxil CR | | 127 | 396 | (68) | (68) | 115 | (70) | (70) | – | – | – | 12 | 40 | 50 |
| Wellbutrin | | 739 | 751 | (2) | (2) | 723 | (2) | (2) | 2 | 42 | 100 | 14 | (14) | (7) |
| Wellbutrin IR, SR | | 92 | 284 | (68) | (68) | 80 | (70) | (70) | 2 | 42 | 100 | 10 | (35) | (23) |
| Wellbutrin XL | | 647 | 467 | 38 | 39 | 643 | 37 | 38 | – | – | – | 4 | >100 | 100 |
| Imigran/Imitrex | | 697 | 682 | 1 | 2 | 504 | 2 | 2 | 144 | 1 | 1 | 49 | (2) | 3 |
| Lamictal | | 849 | 677 | 24 | 25 | 568 | 36 | 37 | 226 | 3 | 4 | 55 | 15 | 22 |
| Requip | | 156 | 116 | 34 | 34 | 80 | 50 | 51 | 68 | 21 | 21 | 8 | 22 | 14 |
| **Anti-virals** | 14 | **2,598** | 2,359 | **9** | **10** | **1,285** | **10** | **10** | **773** | **6** | **7** | **540** | **12** | **15** |
| HIV | | **1,554** | 1,462 | **5** | **6** | **766** | **2** | **3** | **607** | **8** | **9** | **181** | **12** | **15** |
| Combivir | | 583 | 570 | 1 | 2 | 283 | 1 | 1 | 227 | – | 1 | 73 | 8 | 12 |
| Trizivir | | 303 | 322 | (6) | (6) | 166 | (7) | (6) | 123 | (5) | (5) | 14 | (8) | (7) |
| Epivir | | 261 | 294 | (12) | (11) | 93 | (33) | (33) | 122 | 4 | 6 | 46 | 12 | 15 |
| Ziagen | | 136 | 155 | (14) | (12) | 55 | (26) | (25) | 54 | (8) | (10) | 27 | 11 | 23 |
| Retrovir | | 41 | 43 | (6) | (5) | 14 | (17) | (18) | 16 | (6) | – | 11 | 12 | 10 |
| Agenerase, Lexiva | | 112 | 63 | 77 | 78 | 70 | 50 | 52 | 36 | >100 | >100 | 6 | 46 | 20 |
| Epzicom/Kivexa | | 118 | 1 | >100 | >100 | 85 | – | – | 29 | >100 | >100 | 4 | >100 | >100 |
| Herpes | | **826** | 718 | **14** | **15** | **476** | **24** | **25** | **139** | **–** | **1** | **211** | **4** | **6** |
| Valtrex | | 695 | 571 | 21 | 22 | 470 | 26 | 27 | 98 | 9 | 9 | 127 | 12 | 13 |
| Zovirax | | 131 | 147 | (11) | (11) | 6 | (32) | (45) | 41 | (16) | (15) | 84 | (6) | (5) |
| Zeffix | | 145 | 130 | 9 | 12 | 12 | 11 | 9 | 21 | (8) | (5) | 112 | 13 | 15 |
| **Anti-bacterials** | 8 | **1,519** | 1,547 | **(3)** | **(2)** | **261** | **(27)** | **(27)** | **718** | **3** | **4** | **540** | **5** | **7** |
| Augmentin | | 666 | 708 | (7) | (6) | 139 | (38) | (38) | 316 | 5 | 6 | 211 | 11 | 13 |
| Augmentin IR | | 552 | 533 | 2 | 4 | 40 | (34) | (32) | 305 | 3 | 4 | 207 | 11 | 14 |
| Augmentin ES, XR | | 114 | 175 | (35) | (35) | 99 | (40) | (40) | 11 | 97 | 83 | 4 | (19) | (20) |
| Zinnat/Ceftin | | 197 | 205 | (6) | (4) | 10 | 2 | 11 | 112 | (9) | (7) | 75 | (4) | (1) |
| **Metabolic** | 8 | **1,495** | 1,251 | **18** | **20** | **995** | **16** | **17** | **190** | **39** | **43** | **310** | **12** | **17** |
| Avandia | | 1,154 | 892 | 27 | 29 | 864 | 31 | 32 | 112 | 20 | 23 | 178 | 15 | 22 |
| Avandamet | | 175 | 222 | (22) | (21) | 113 | (43) | (43) | 45 | >100 | >100 | 17 | 2 | 13 |
| Bonviva/Boniva | | 18 | – | >100 | >100 | 17 | – | – | 1 | >100 | >100 | – | – | – |
| **Vaccines** | 8 | **1,389** | 1,194 | **15** | **16** | **338** | **26** | **26** | **592** | **12** | **14** | **459** | **10** | **13** |
| Hepatitis | | 444 | 405 | 8 | 10 | 137 | 1 | 2 | 224 | 11 | 12 | 83 | 13 | 17 |
| Infanrix, Pediarix | | 431 | 356 | 19 | 21 | 145 | 13 | 12 | 202 | 24 | 25 | 84 | 20 | 27 |
| **Oncology and emesis** | 5 | **1,016** | 934 | **8** | **9** | **761** | **12** | **12** | **164** | **(4)** | **(4)** | **91** | **1** | **7** |
| Zofran | | 837 | 763 | 9 | 10 | 639 | 12 | 13 | 124 | (5) | (5) | 74 | 3 | 9 |
| Hycamtin | | 99 | 99 | (1) | – | 66 | 2 | 3 | 27 | (6) | (7) | 6 | (6) | – |
| **Cardiovascular and urogenital** | 7 | **1,331** | 932 | **41** | **43** | **766** | **36** | **36** | **415** | **57** | **59** | **150** | **32** | **39** |
| Coreg | | 573 | 432 | 32 | 33 | 568 | 33 | 34 | – | – | – | 5 | (30) | (29) |
| Levitra | | 40 | 49 | (19) | (18) | 35 | 79 | 75 | 4 | (78) | (81) | 1 | (94) | (88) |
| Avodart | | 129 | 64 | 100 | >100 | 65 | 90 | 91 | 55 | >100 | >100 | 9 | >100 | >100 |
| Arixtra | | 24 | 6 | >100 | >100 | 15 | >100 | >100 | 8 | >100 | >100 | 1 | >100 | >100 |
| Fraxiparine | | 211 | 56 | >100 | >100 | – | – | – | 179 | >100 | >100 | 32 | >100 | >100 |
| Vesicare | | 13 | – | – | – | 13 | – | – | – | – | – | – | – | – |
| **Other** | 6 | **1,040** | 1,027 | **–** | **1** | **69** | **(22)** | **(22)** | **321** | **(2)** | **(1)** | **650** | **3** | **6** |
| Zantac | | 244 | 273 | (12) | (11) | 58 | (19) | (17) | 64 | (15) | (11) | 122 | (6) | (7) |
| | 100 | 18,661 | 17,100 | 8 | 9 | 9,106 | 8 | 8 | 5,537 | 8 | 9 | 4,018 | 9 | 12 |

CER% represents growth at constant exchange rates. £% represents growth at actual exchange rates. Turnover by quarter is given in the Financial record on pages 172 to 177.

REPORT OF THE DIRECTORS