# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| MYLAN LABORATORIES, INC., *et al.*, | ) | |
| Plaintiffs/Cross-Defendants, | ) | |
| and | ) | |
| MUTUAL PHARMACEUTICAL CO., INC., | ) | Case No. 07-579 (RMU) |
| Intervenor-Plaintiff/Cross-Defendant, | ) | |
| v. | ) | |
| MICHAEL LEAVITT, *et al.*, | ) | |
| Defendants/Cross-Defendants, | ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| Intervenor-Defendant/Cross-Claimant, | ) | |
| and | ) | |
| APOTEX INC., | ) | |
| Intervenor-Defendant/Cross-Defendant. | ) | |

---

## TEVA PHARMACEUTICAL USA, INC.'S CROSS-CLAIM
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Pursuant to Fed. R. Civ. P. 13(g) and this Court's scheduling order of April 19, 2007,

Defendant-Intervenor/Cross-Claimant Teva Pharmaceuticals USA, Inc. ("Teva") hereby asserts

this cross-claim for declaratory and injunctive relief against Defendants Michael O. Leavitt, in

his official capacity as Secretary of Health and Human Services, Andrew C. von Eschenbach, in

his official capacity as Commissioner of Food and Drugs, and the United States Food and Drug

Administration (collectively "FDA"). In support thereof, Teva states the following:

## NATURE OF THE ACTION

1.      Teva brings this suit based on a final ruling issued by FDA in the form of a letter from Gary Buehler, Director of the Office of Generic Drugs, dated April 18, 2007 ("FDA Decision"). The FDA Decision provided that Teva is not entitled to final approval on its abbreviated new drug application ("ANDA") to market a generic version of amlodipine besylate ("amlodipine"), a high-blood pressure medication marketed by Pfizer Inc. in 2.5-mg, 5-mg, and 10-mg dosages under the trade name Norvasc®.

2.      Pfizer asserts two patents as claiming Norvasc®, U.S. Patent No. 4,572,909 ("the '909 patent") and U.S. Patent No. 4,879,303 ("the '303 patent"). The '909 patent expired on July 31, 2006, and the '303 patent expired on March 25, 2007.

3.      Teva submitted an ANDA, No. 76-846, seeking final approval to market generic amlodipine drug products on September 9, 2003. As originally submitted, Teva's ANDA contained a certification pursuant to 21 U.S.C. § 355(j)(2)(a)(vii)(III) ("Paragraph III certification") that it would not market its generic amlodipine product until both the '909 and '303 patents expired. Prior to the expiration of the '303 patent, Teva amended its ANDA to assert that the '303 patent was invalid or would not be infringed by Teva's generic amlodipine product, pursuant to 21 U.S.C. § 355(j)(2)(a)(vii)(IV) ("Paragraph IV certification").

4.      On March 22, 2007, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") determined that Pfizer's asserted claims on the '303 patent are invalid for obviousness. *Apotex, Inc. v. Pfizer Inc.*, No. 2006-1261, 2007 WL 851203 (Fed Cir. Mar. 22, 2007) ("*Apotex*").

5.      Despite this court determination that the '303 patent is invalid, FDA ruled that Teva's ANDA could not be approved pending expiration of a six-month period of exclusivity

enjoyed by Pfizer on the '303 patent based on its testing of Norvasc® in at least one clinical study in pediatric age groups (known as "pediatric exclusivity").

6.    FDA further ruled that no pending ANDAs, including the one filed by Teva, could be approved until the Federal Circuit issued its mandate in *Apotex*.

7.    The FDA decision contravenes both the Hatch-Waxman Act and the Administrative Procedure Act and fails to embody principles of reasoned agency decision-making.  It conflicts with the plain language of both 21 U.S.C. § 355 and 21 U.S.C. § 355a, is contrary to settled agency practice, and is arbitrary, capricious, or otherwise contrary to law.

8.    As a result, Teva seeks immediate declaratory and injunctive relief from this Court to set aside FDA's decision as contrary to law, an abuse of discretion, and arbitrary and capricious, and order FDA to grant immediate final approval to Teva's ANDA No. 76-846.

**PARTIES**

9.    Defendant-Intervenor/Cross-Claimant Teva is incorporated under Delaware law with its principal place of business in North Wales, Pennsylvania.  Teva is the wholly-owned, indirect subsidiary of Teva Pharmaceutical Industries Ltd. ("Teva Ltd."), a global pharmaceutical company organized under the laws of Israel with its principal place of business in Israel.  Teva distributes the finished pharmaceutical products of Teva Ltd. in the United States and is an industry leader in the development, manufacture, and marketing of generic pharmaceutical in the United States.

10.    Defendant Michael O. Leavitt is the Secretary of Health and Human Services and is the official charged by law with administering the FDCA.  Secretary Leavitt is sued in his official capacity.  Secretary Leavitt maintains offices at 200 Independence Avenue, S.W., Washington, DC, 20204.

11.     Defendant Andrew C. von Eschenbach, the Commissioner of the FDA, has the delegated authority to administer the drug approval provisions of the FDCA.  Commissioner von Eschenbach is sued in his official capacity.  He maintains offices at 200 C Street, S.W., Washington, DC, 20204, and 5600 Fishers Lane, Rockville MD, 20857.

12.     Defendant United States Food and Drug Administration is the agency within the United States Department of Health and Human Services charged with overseeing, *inter alia,* the human drug approval process, including pursuant to the FDCA.

## JURISDICTION AND VENUE

13.     Jurisdiction and venue are proper as asserted in Mylan's First Amended Complaint in this action.

## FACTUAL ALLEGATIONS

### The Relevant Statutory Framework

14.     The approval of generic drugs is governed by the Food, Drug and Cosmetic Act ("FDCA"), as amended by the Hatch-Waxman Act and the Medicare Modernization Act of 2003.  *See* 21 U.S.C. §§ 301 *et seq*.; Pub. L. No. 108-173 § 1101(c)(1).

15.     Generic drugs contain the same active ingredients, and provide the same therapeutic value, as branded drugs.  They are, however, generally sold at a lower price to consumers, private insurers, and public insurers.  Congress enacted the Hatch-Waxman Act to increase the availability of generic drugs by expediting the process of bringing them to market there, and thereby significantly reduce the cost that the public pays for pharmaceuticals.  *See* 21 U.S.C. § 355.

16.     Congress has also enacted provisions intended to encourage drug manufacturers to conduct studies of the effectiveness of their drugs on pediatric age groups.  As a result, in

certain circumstances the manufacturer of a drug that has conducted such studies may be eligible for an additional six months of exclusivity on that drug following expiration of the relevant patent(s) claiming the drug. *See* 21 U.S.C. § 355a.

**Amlodipine Proceedings**

17.    Pfizer holds the approved NDA for amlodipine, No. 19-787, which it commercially markets under the brand name Norvasc®.  Amlodipine is a calcium-channel blocker that is used to treat high blood pressure and chest pain.

18.    Pfizer submitted two patents to the FDA as claiming Norvasc®, U.S. Patent No. 4,572,909 ("the '909 patent") and No. 4,879,303 ("the '303 patent").  Both patents were listed in FDA's official register of pharmaceutical-claiming patents (the "Orange Book").  Both patents have expired—the '909 patent expired on July 31, 2006, and the '303 patent expired on March 25, 2007.

19.    On May 22, 2002, Mylan filed the first ANDA seeking approval for generic amlodipine.  Mylan's ANDA contained Paragraph IV certifications asserting that the '909 and '303 patents were invalid or would not be infringed by its generic amlodipine product.  Mylan notified Pfizer of its Paragraph IV certifications on July 23, 2002.  On September 20, 2002, Pfizer sued Mylan for infringement of both patents in the United States District Court for the Western District of Pennsylvania ("Pennsylvania action").  Because the lawsuit was filed more than 45 days after Pfizer received Mylan's Paragraph IV certification notice, it did not trigger the thirty-month stay, and FDA granted Mylan final approval on October 3, 2005.

20.    Apotex Inc. ("Apotex") filed a separate ANDA seeking approval to commercially market a generic amlodipine product in or about June 2003.  Like Mylan's ANDA, Apotex's ANDA contained Paragraph IV certifications for both the '303 and the '909 patents.  Apotex

notified Pfizer of its Paragraph IV certifications on June 23, 2003, and Pfizer filed a patent infringement action against Apotex on July 30, 2003 in the United States District Court for the Northern District of Illinois ("Illinois action").  As this lawsuit was filed within the forty-five-day statutory period, the statutory 30-month stay applied to Apotex.  To date, FDA has not granted final approval of Apotex's ANDA.

21.    On September 9, 2003, Teva filed an ANDA for generic amlodipine, No. 76-846. Originally, Teva's ANDA contained Paragraph III certifications as to both the '303 and '909 patents.  On March 23, 2007, Teva amended its ANDA, submitting a Pargraph II certification with respect to the '909 patent, which expired in July 2006, and submitting a Paragraph IV certification with respect to the '303 patent.  Teva provided notice of its Paragraph IV certification to Pfizer on the same day.  On March 28, 2007, based on FDA's longstanding rule compelling ANDA applicants to convert extant Paragraph IV certifications to Paragaph II certifications following patent expiration, Teva converted its certification on the '303 patent to a Paragraph II certification.  It then moved for immediate final approval of its ANDA.

22.    On January 18, 2006, the district court in the Illinois action issued an oral decision holding that Apotex had infringed the '303 patent and rejecting the claims that the '303 patent was invalid or otherwise unenforceable.  The district court entered an order enjoining FDA from approving Apotex's ANDA until expiration of the '303 patent and completion of any period of pediatric exclusivity to which Pfizer may be entitled.  Apotex appealed this decision to the Federal Circuit.

23.    On February 23, 2007, the district court in the Pennsylvania action held that Mylan's amlodipine product literally infringed Pfizer's '303 patent and rejected Mylan's claims that the '303 patent was invalid for obviousness or otherwise unenforceable.  The district court

issued an order that the effective date of Mylan's ANDA be no earlier than March 25, 2007, and enjoined Mylan from commercially marketing its product until the '303 patent expired on that date. Mylan has appealed this decision to the Federal Circuit, and it remains pending.

24.     On March 22, 2007, the Federal Circuit reversed the district court's ruling in the Illinois action and held that the asserted claims on the '303 patent were "invalid for obviousness." *Apotex*, 2007 WL 851203, at *20.

25.     On March 23, 2007, the Federal Circuit (in an order by Judge Proust) temporarily lifted the stay in the Pennsylvania action. Mylan began to commercially market its generic amlodipine product on that same day.

26.     On March 25, 2007, the '303 patent expired.

27.     On March 26, 2007, Mylan filed this action, seeking to enjoin FDA from granting final approval to any subsequent ANDA applicant for amlodipine, based on Mylan's belief that it is entitled to a 180-day period of exclusivity because it was the first manufacturer to file a Paragraph IV ANDA for amlodipine ("180-day first-filer exclusivity").

28.     Also on March 26, this Court entered an Order requiring FDA to determine by April 11, 2007, whether subsequent ANDA applicants for amlodipine are entitled to final approval. This Order was subsequently amended by an Order dated April 10, 2007, which extended the time allowed for FDA's decision to April 18, 2007. Pursuant to this Order, FDA solicited comments in a letter dated March 29, 2007. FDA received comments from approximately thirteen companies between April 4 and April 6.

29.     Both Mylan and Pfizer submitted comments to FDA during this process, and both sought a ruling that FDA would not grant final approval to any pending amlodipine ANDAs. Mylan based its request on its alleged entitlement to 180-day first-filer exclusivity. Pfizer based

its argument on its putative claim to a six-month period of exclusivity based on its testing of Norvasc® in at least one clinical study in pediatric age groups ("pediatric exclusivity").

30.     On March 29, 2007, Teva moved to intervene in this action to protect its interests. This Court granted the motion.

31.     On April 11, 2007, Mylan successfully amended its complaint in this action, asserting a second claim that FDA may not approve subsequent generic applicants pending the termination of Pfizer's asserted six-month pediatric exclusivity.  Mylan further claimed that because it already had obtained final approval, its amlodipine product should be allowed to remain on the market during Pfizer's period of exclusivity.

32.     On April 18, 2007, FDA issued its decision in this matter ("FDA Letter Decision").

33.     Applying well-settled case law, FDA ruled Mylan was not entitled to 180-day exclusivity following the expiration of the '303 patent.

34.     Despite this ruling, however, the FDA Letter Decision also stated that FDA could not grant final approval to the other pending ANDAs for amlodipine due to Pfizer's pediatric exclusivity.  Specifically, FDA ruled that it would not grant final approval to additional amlodipine ANDAs until (a) in the case of Apotex, but no other generic applicant, the Federal Circuit issues its mandate in the *Apotex* case; or (b) in the case of any other applicant, including Teva, Pfizer's voluntary delisting of the '303 patent from the Orange Book or the termination of a six-month period of pediatric exclusivity asserted by Pfizer.

## FIRST CAUSE OF ACTION
### (Violation of the FDCA and the APA)

35.     FDA's refusal to grant final approval to Teva's amlodipine ANDA violates the FDCA, and is in excess of statutory authority, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law and is therefore in violation of 5 U.S.C. § 706.

36.     The FDA Letter Decision of April 18, 2007 was not based on reasoned agency decision-making.  There is no basis in the FDCA for requiring each ANDA applicant to prevail in patent litigation in order to defeat a brand manufacturer's pediatric exclusivity.  Nor is there any support in the statute, applicable rules, or case law for the FDA's ruling that a court determination is effective, not when an appeals court actually decides a case, but only upon issuance of the mandate.  The FDA Letter Decision is thus in excess the agency's statutory authority, arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

37.     The FDA Letter Decision denying final approval on Teva's ANDA constitutes final agency action that is subject to judicial review.  Teva has exhausted every available administrative avenue and has no adequate remedy at law.

38.     Neither defendants nor any other entity will suffer cognizable harm if the relief requested herein is granted, and the public interest will be served by such relief.

39.     Teva will suffer substantial and irreparable harm absent the granting of the requested relief, in the form of lost sales and decreased market share that can never be recovered.

40.     The FDA's unlawful conduct has caused, is causing, and will continue to cause substantial harm to Teva unless and until the FDA's actions are declared unlawful pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the FDCA, and this Court issues a ruling that Teva is entitled to immediate final approval of its amlodipine ANDA.

**PRAYER FOR RELIEF**

WHEREFORE, Teva prays that this Court:

A.      Vacate the FDA Letter Decision of April 18, 2007 as contrary to law, an abuse of discretion, and arbitrary and capricious;

B.      Declare that Teva is entitled to immediate final approval of its amlodipine ANDA No. 76-846;

C.      Enter an injunction compelling FDA to grant immediate final approval of Teva's amlodipine ANDA No. 76-846;

D.      Provide such further relief as the Court may deem just and proper.

Dated: April 23, 2007                    Respectfully submitted,

                                         By:   /s Michael D. Shumsky
                                         Jay P. Lefkowitz, P.C. (D.C. Bar No. 449280)
                                         Michael D. Shumsky (D.C. Bar No. 495078)
                                         KIRKLAND & ELLIS LLP
                                         655 15th Street N.W., Suite 1200
                                         Washington, D.C.  20005
                                         (202) 879-5000 (phone)
                                         (202) 879-5200 (facsimile)

                                         *Counsel for Teva Pharmaceuticals USA, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| MYLAN LABORATORIES, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs/Cross-Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MUTUAL PHARMACEUTICAL CO., INC., | ) | Case No. 07-579 (RMU) |
| | ) | |
| Intervenor-Plaintiff/Cross-Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL LEAVITT, *et al.*, | ) | |
| | ) | |
| Defendants/Cross-Defendants, | ) | |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| | ) | |
| Intervenor-Defendant/Cross-Claimant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| APOTEX INC., | ) | |
| | ) | |
| Intervenor-Defendant/Cross-Defendant. | ) | |

_____)

## BRIEF OF TEVA PHARMACEUTICALS USA, INC. IN SUPPORT OF ITS CROSS-CLAIM AND APPLICATION FOR DECLARATORY AND INJUNCTIVE RELIEF

Jay P. Lefkowitz, P.C. (D.C. Bar No. 449280)
Michael D. Shumsky (D.C. Bar No. 495078)
KIRKLAND & ELLIS LLP
655 15th Street N.W., Suite 1200
Washington, D.C. 20005
(202) 879-5000 (phone)
(202) 879-5200 (facsimile)

*Counsel for Teva Pharmaceuticals USA, Inc.*

April 23, 2007

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ 1

TABLE OF AUTHORITIES ............................................................................................... 2

INTRODUCTION ............................................................................................................... 5

BACKGROUND .................................................................................................................. 7

      A.      The Statutory Framework ................................................................................. 7

      B.      Factual Background ......................................................................................... 10

                  1.      Pfizer's Amlodipine Besylate Products ................................................. 10
                  2.      Mylan's ANDA .................................................................................... 11
                  3.      Apotex's ANDA ................................................................................... 11
                  4.      Teva's ANDA ...................................................................................... 12
                  5.      Post-*Apotex* Proceedings ..................................................................... 12
                  6.      FDA's Letter Decision .......................................................................... 14

LEGAL STANDARD FOR INJUNCTIVE RELIEF .................................................... 14

ARGUMENT ..................................................................................................................... 15

I.      TEVA IS LIKELY TO PREVAIL ON THE MERITS. .................................................. 15

      A.      FDA's Decision That Generic Applicants Must Prevail In Their Own Litigation
               With The Brand Manufacturer Conflicts With The Plain Text Of The Statute,
               Settled Case Law, And The Policies Underlying The FDCA. ............................. 15

      B.      FDA Erred By Construing The Statute To Require An Appellate Mandate. ....... 22

                  1.      The Plain Text Of The Statute Forecloses FDA's Interpretation. ............ 22
                  2.      Even If The Statute Were Genuinely Ambiguous, FDA's Interpretation Of
                        The Statute Is Unreasonable. ................................................................. 25

II.      THE EQUITIES STRONGLY FAVOR THE ENTRY OF INJUNCTIVE RELIEF. ....... 30

      A.      Teva Will Be Irreparably Harmed In The Absence Of Injunctive Relief. ............ 30

      B.      The Balance of Hardships Favors Teva. ........................................................... 32

      C.      The Public Interest Favors Teva. ..................................................................... 33

CONCLUSION ................................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Young*,
  920 F.2d 984 (D.C. Cir. 1990) .......................................................................... 26

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001) ..................................................................... 7, 28

*Barnhart v. Sigmon Coal Co., Inc.*,
  534 U.S. 438 (2002) .......................................................................................... 25

*Biovail Corp. v. FDA*,
  No. 06-1487, 2007 WL 891365 (D.D.C. Mar. 22, 2007) ................................... 32

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*,
  402 U.S. 313 (1971) .................................................................................... 5, 19

*Brendsel v. Office of Fed. Hous. Enter. Oversight*,
  339 F. Supp. 2d 52 (D.D.C. 2004) .................................................................... 31

*Calderon v. Coleman*,
  525 U.S. 141 (1998) .......................................................................................... 23

*Chapman v. United States*,
  500 U.S. 453 (1991) .......................................................................................... 23

*Chevron U.S.A., Inc. v. National Resources Defense Council*,
  467 U.S. 837 (1984) .................................................................................... 22, 27

*CityFed Fin. Corp. v. OTS*,
  58 F.3d 738 (D.C. Cir. 1995) ............................................................................ 15

*CSX Transp. v. Williams*,
  406 F.3d 667 (D.C. Cir. 2005) .......................................................................... 31

*Davenport v. Int'l Bd. of Teamsters, AFL-CIO*,
  166 F.3d 356 (D.C. Cir. 1999) .......................................................................... 14

*Dr. Reddy's Labs., Inc. v. Thompson*,
  302 F. Supp. 2d 340 (D.N.J. 2003) ..................................................................... 8

*Eli Lilly & Co. v. Medtronic, Inc.*,
  496 U.S. 661 (1990) ............................................................................................ 9

*Entergy Ark., Inc. v. Nebraska*,
  210 F.3d 887  (8th Cir. 2000) ........................................................................... 31

*FDIC v. Meyer*,
  510 U.S. 471 (1994) .......................................................................................... 23

*Fisher v. National Insts. of Health*,
  934 F. Supp. 464 (D.D.C. 1996) ....................................................................... 23

*Garcetti v. Ceballos,*
  126 S.Ct. 1951 (2006) ........................................................................................................ 23

*In re Barr Labs., Inc.,*
  930 F.2d 72 (D.C. Cir. 1991) ..................................................................................... 7, 28, 33

*In re England,*
  375 F.3d 1169 (D.C. Cir. 2004) ......................................................................................... 23

*Inwood Labs., Inc. v. Young,*
  723 F. Supp. 1523 (D.D.C. 1989) ...................................................................................... 21

*Kennecott Utah Copper Corp. v. U.S. Dept. of Int.,*
  88 F.3d 1191 (D.C. Cir. 1996) ........................................................................................... 27

*King Broad. Co. v. FCC,*
  860 F.2d 465 (D.C. Cir. 1988) ........................................................................................... 21

*Mead Johnson & Co. v. Bowen,*
  838 F.2d 1332 (D.C. Cir. 1988) ......................................................................................... 29

*Mendenhall v. Barber-Greene Co.,*
  26 F.3d 1573 (Fed. Cir. 1994) ............................................................................................ 19

*Mova Pharm. Corp. v. Shalala,*
  140 F.3d 1060 (D.C. Cir. 1998) .............................................................................. 5, 9, 14, 17

*Mova Pharm. Corp. v. Shalala,*
  955 F. Supp. 128 (D.D.C. 1997) ........................................................................................ 21

*Mylan Labs., Inc. v. Thompson,*
  332 F. Supp. 2d 106 (D.D.C. 2004), *aff'd* 389 F.3d 1272 (D.C. Cir. 2004) ..................... 17, 18

*New York v. EPA,*
  413 F.3d 3 (D.C. Cir. 2005) ............................................................................................... 26

*Perrin v. United States,*
  444 U.S. 37 (1979) ............................................................................................................. 23

*Pfizer Inc. v. Apotex, Inc.,*
  No. 06-1261, __ F.3d __, 2007 WL 851203 (Fed. Cir. Mar. 22, 2007) ......................... 10, 12

*Pfizer Inc. v. Mylan Labs., Inc.,*
  No. 02-cv-1628, 2007 WL 654274 (W.D. Pa. Feb. 22, 2007) ............................................ 11

*Purepac Pharm. Co. v. Thompson,*
  354 F.3d 877 (D.C. Cir. 2004) ............................................................................................. 9

*Ranbaxy Labs. Ltd. v. FDA,*
  307 F. Supp. 2d 15 (D.D.C. 2004), *aff'd* 2004 WL 886333 (D.C. Cir. Apr. 26, 2004) .... 17, 18

*Ranbaxy Labs. Ltd. v. Leavitt,*
  469 F.3d 120 (D.C. Cir. 2006) ....................................................................................... 5, 17

*Russello v. United States,*
  464 U.S. 16 (1983) ............................................................................................................. 25

*Serono Labs., Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) ......................................................................... 28, 33

*United States v. Natfalin*,
    441 U.S. 768 (1979) .............................................................................................. 25

## Statutes

15 U.S.C. § 21(g) ..................................................................................................... 24

15 U.S.C. § 45 .......................................................................................................... 24

21 U.S.C. § (j)(5)(B)(iii) ........................................................................................... 9

21 U.S.C. § 355(j) ..................................................................................................... 8

21 U.S.C. § 355(j)(2)(A) ........................................................................................... 8

21 U.S.C. § 355(j)(2)(A)(vii) .................................................................................... 8

21 U.S.C. § 355(j)(2)(B) ........................................................................................... 9

21 U.S.C. § 355(j)(5)(B) ........................................................................................... 9

21 U.S.C. § 355(j)(5)(B)(iv)(I) (2002) ..................................................................... 10

21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA) .................................................................... 24

21 U.S.C. § 355a ...................................................................................................... 10

21 U.S.C. § 355a(c)(2)(A) ........................................................................................ 17

21 U.S.C. § 355a(c)(2)(B) ......................................................................... 5, 6, 16, 18, 19, 20

21 U.S.C. §§ 355(j)(5)(B)(iv) (2002) ....................................................................... 11

26 U.S.C. § 7481(a) .................................................................................................. 24

35 U.S.C. § 271(e) .................................................................................................... 9

35 U.S.C. § 271(e)(2)(A) .......................................................................................... 11

## Other Authorities

21 C.F.R. § 314.107(c) .............................................................................................. 8

H.R. Rep. No. 98-857, *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647 .......................... 29

## Rules

Fed. R. App. P. 40(a) ................................................................................................ 29

Fed. R. App. P. 41(d) ................................................................................................ 29

Fed. R. Civ. P. 65 ..................................................................................................... 15

## INTRODUCTION

For the third time in ten years, FDA's Letter Decision in this matter attempts to revive its discredited "successful defense requirement," which in this incarnation would require patent-challenging generic drug applicants to prevail in their own litigation against a brand manufacturer in order to evade a brand manufacturer's pediatric exclusivity. That interpretation has no basis in the text, structure, or policies of the statutory scheme governing generic drug approvals, and similar approaches have been rejected by every court that has ever considered one. *See Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120 (D.C. Cir. 2006); *Mova Pharm. Corp. v. Shalala*,140 F.3d 1060 (D.C. Cir. 1998).

To begin with, FDA's Letter Decision inverts the plain text of the relevant statutory provisions. Though Congress unambiguously required ***the brand manufacturer*** to secure a "court determin[ation] that the patent is ***valid and would be infringed***" in order to ***earn*** pediatric exclusivity, 21 U.S.C. § 355a(c)(2)(B) (emphasis added), FDA has now rewritten the statute to require ***each generic applicant*** to secure a "court determination that the patent is ***in***valid or would ***not*** be infringed" in order to ***defeat*** the brand manufacturer's pediatric exclusivity, FDA Letter Decision at 6 (emphasis in original)—even where the brand manufacturer does not initiate litigation against a patent-challenging generic applicant at all. Whatever deference FDA might otherwise enjoy, no amount of deference can justify FDA's inversion of the plain statutory text—or its arbitrary refusal to treat all patent-challenging ANDA applicants equally despite recognizing that patentees are estopped from asserting invalidated patent claims against any other alleged infringer. *Id*. at 9 (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971)).

Were that not enough, FDA's Letter Decision then elevates form over substance—not only requiring a generic "applicant to prevail in ***its*** patent challenge," *id*. (emphasis added), but

then to await issuance of the Federal Circuit's mandate before entering the market. *Id.* at 6-7. Once again, that approach has no basis in the text or structure of the statute—which (on FDA's inverted view) requires only that the court "***determine***[] that the patent is invalid or not infringed," and not (in contrast to many other federal statutes) that it issue a "***mandate***" or even render a "***final decision***" to that effect. 21 U.S.C. § 355a(c)(2)(B) (emphasis added). FDA's only response is that "Congress could have been more precise and [done what] it has done in other statutes." FDA Letter Decision at 6. But that is precisely the point: Congress did ***not*** do what it has done in other statutes, and FDA erred by refusing to recognize the significance of that deliberate legislative choice.

FDA's Letter Decision is particularly troubling because it subjects consumers to the whims of a brand manufacturer seeking to preserve its monopoly. On one hand, FDA's successful defense requirement allows the brand manufacturer to exclude most generic challengers from the market by selectively asserting its patent claims in piecemeal litigation. That is so because on FDA's view, any generic applicant that fails to secure its own final decision of patent invalidity—including an applicant that was never even sued by the brand manufacturer in the first place—can be approved until the end of the pediatric exclusivity period so long as a single ***unasserted*** claim remains on the books. FDA Letter Decision at 10.

On the other hand, FDA's requirement that generic challengers await the Federal Circuit's mandate effectively swallows its (inverted) rule that a prevailing patent challenger might not be barred by pediatric exclusivity. That is so because a brand manufacturer easily can delay the mandate for the entire six-month pediatric exclusivity period by filing a petition for rehearing *en banc* and then seeking to stay the mandate pending the Supreme Court's disposition of a petition for writ of *certiorari*—even though the brand manufacturer has no realistic chance

of securing further review of an adverse Federal Circuit decision (and even less chance of securing its reversal). Whatever interest there might be in "err[ing] on the side of greater finality," FDA Letter Decision at 7, that interest is not meaningfully furthered by FDA's formalistic approach—and is dwarfed by the core purpose of the statutory scheme, which is to "'get generic drugs into the hands of patients at reasonable prices—fast.'" *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 809 (D.C. Cir. 2001) (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991)).

This Court thus should set aside FDA's April 18 Letter Decision and enter an injunction requiring FDA to grant Teva immediate final approval for its ANDA No. 76-846.

## BACKGROUND

### A.    The Statutory Framework

The Food, Drug, and Cosmetic Act ("FDCA"), as modified by the Hatch-Waxman Act ("Hatch-Waxman") and Medicare Modernization Act ("MMA"), establishes an expedited approval process for generic drugs and encourages manufacturers to develop such drugs.[1] To that end, it authorizes FDA to approve a proposed generic drug if the proposed drug is shown to be chemically and therapeutically equivalent to a previously approved drug product.

---

[1]    Though FDA's Letter Decision pays little attention to the point, different aspects of this case are governed by different versions of the statutory scheme. Mylan's claims regarding 180-day "first-filer exclusivity" are governed by Hatch-Waxman because the first patent-challenging application was filed prior to the MMA. *See* FDA Letter Decision at 1 & n.1; *see also* MMA, Pub. L. No. 108-173, 117 Stat. 2006, § 1102(b)(1) (Dec. 8, 2003). By contrast, Pfizer's eligibility for "pediatric exclusivity" against other generic manufacturers is governed by the MMA's application approval provisions. *See* MMA § 1101(c)(1).

Because this brief focuses on Teva's right to marketing approval and not Mylan's claims about first-filer exclusivity—FDA's Letter Decision cogently explains why such exclusivity does not survive patent expiration—all statutory citations refer to the post-2003 version of the FDCA, as amended by the MMA, unless otherwise noted.

In order to do so, a generic manufacturer must submit an abbreviated new drug application ("ANDA") to FDA for each proposed generic drug product. *See* 21 U.S.C. § 355(j). If an ANDA adequately demonstrates that the proposed generic drug product would be chemically and therapeutically equivalent to the previously approved drug, its manufacturer need not repeat the studies that accompanied the brand manufacturer's new drug application ("NDA"). Instead, FDA can approve the generic drug product for commercial marketing without requiring new safety and efficacy studies. 21 U.S.C. § 355(j)(2)(A); *see also Dr. Reddy's Labs., Inc. v. Thompson*, 302 F. Supp. 2d 340, 343 (D.N.J. 2003).

Beyond requiring an applicant to demonstrate that its proposed generic drug product is chemically and therapeutically equivalent to the previously approved drug, the statute requires the applicant to make a "certification" regarding any patent that the brand manufacturer listed with FDA as claiming the previously approved drug. The statute lists four such certifications:

- A "paragraph I" certification indicates that the brand manufacturer has not filed any patent information with respect to the previously approved drug, and thus that no patent issues bar the immediate commercial marketing of a proposed generic drug product. 21 U.S.C. § 355(j)(2)(A)(vii)(I).

- A "paragraph II" certification indicates that the brand manufacturer has listed a particular patent as claiming the previously approved drug, but that the patent has expired and thus likewise does not bar immediate commercial marketing of the proposed generic drug product. *Id.* § 355(j)(2)(A)(vii)(II).

- A "paragraph III" certification lists the date of an unexpired patent that the brand manufacturer has listed as claiming the previously approved drug product, *id.* § 355(j)(2)(A)(vii)(III), and thereby indicates that the generic applicant will not be able market its drug product until the patent expires.

- Finally, a "paragraph IV" certification asserts that an unexpired patent that the brand manufacturer has listed as claiming the previously approved drug is invalid, unenforceable, or will not be infringed by the proposed generic drug product, *see id.* § 355(j)(2)(A)(vii)(IV); *see also* 21 C.F.R. § 314.107(c), and thus indicates that the applicant either has developed a viable legal challenge to the patent or has engineered a non-infringing pathway around such a patent.

8

Where FDA determines the other requirements for approval are met, it must approve ANDAs containing only paragraph I and/or II certifications "effective immediately," 21 U.S.C. § 355(j)(5)(B)(i), and ANDAs containing a paragraph III certification on the date the blocking patent expires.  *Id*. § 355(j)(5)(B)(ii).  FDA's ability to approve paragraph IV ANDAs, however, depends on subsequent events.

In order to help resolve patent disputes and provide patent certainty before generics enter the market, Congress has deemed the act of submitting a paragraph IV certification to be a "technical" form of patent infringement that supports federal jurisdiction over pre-market patent litigation.  *See* 35 U.S.C. § 271(e); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990).  To make that mechanism work, ANDA applicants must notify the patentee and brand manufacturer whenever they file a paragraph IV certification.  *See* 21 U.S.C. § 355(j)(2)(B).  If an applicant is sued within 45 days of its paragraph IV notice, the statute generally precludes the FDA from approving its ANDA for 30 months (the "30-month stay"), *Id*. § 355(j)(5)(B)(iii), and the specific date on which FDA may do so depends on the litigation outcome.  *See* 21 U.S.C. § 355(j)(5)(B)(iii)(I)-(IV).  Where the applicant is not sued within 45 days, however, FDA can approve its ANDA at any time—even if the applicant subsequently is sued (or seeks a declaratory judgment of invalidity or non-infringement) and such litigation is ongoing at the time the applicant requests final approval.  *Id*. at § 355(j)(5)(B)(iii).

In order to help clear the "patent thicket" and speed the onset of market competition, the statute encourages applicants to file paragraph IV certifications by rewarding the first applicant that does so with eligibility for a 180-day period of marketing exclusivity ("first-filer exclusivity").  *See, e.g.*, *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 879 (D.C. Cir. 2004); *Mova*, 140 F.3d at 1064.  In pre-MMA cases, that period runs from the earlier of the date the first

filer first commercially markets its generic drug product (the "commercial marketing trigger"), 21 U.S.C. § 355(j)(5)(B)(iv)(I) (2002), or the date of a court decision holding that the challenged patent is invalid or not infringed (the "court decision trigger").  *Id*. § 355(j)(5)(B)(iv)(II) (2002).

Because most drug products are intended for adults, the FDCA also encourages brand manufacturers to conduct pediatric safety studies by rewarding them with a six-month exclusivity period that bars generic competition even after the expiration of a patent claiming the branded drug ("pediatric exclusivity").  *See generally* 21 U.S.C. § 355a.  Here, too, eligibility for such exclusivity is tied to the ANDA patent certification process.

- If a patent claiming the reference listed drug is subject only to paragraph II or paragraph III certifications, the brand manufacturer is entitled to six months of pediatric exclusivity beginning on the date the patent expires. *See* 21 U.S.C. § 355a(c)(2)(A)(i)-(ii).

- If, by contrast, a patent claiming the reference listed drug has been the subject of one or more paragraph IV certifications, the pioneer is eligible for pediatric exclusivity with respect to that patent **only** if "the court determines that the patent is valid and would be infringed" in the ensuing post-paragraph IV litigation.  *Id*. § 355a(c)(2)(B).

As a result, where an applicant submits a paragraph IV certification, the brand manufacturer must win its infringement case in order to become eligible for pediatric exclusivity.

## B.    Factual Background

### 1.    Pfizer's Amlodipine Besylate Products

Pfizer Inc. ("Pfizer") manufactures amlodipine besylate ("amlodipine"), a high-blood pressure medication that it markets in 2.5, 5, and 10-mg dosage tablets under the trade-name Norvasc®.  *Pfizer Inc. v. Apotex, Inc.* [*Apotex*], No. 06-1261, __ F.3d __, 2007 WL 851203, *1 (Fed. Cir. Mar. 22, 2007).  Pfizer has listed two patents as claiming amlodipine in FDA's official register of pharmaceutical-claiming patents (the "Orange Book"): US Patent Nos. 4,572,909 ("the '909 patent") and 4,879,303 ("the '303 patent").  *See* Orange Book at 887-88, *available at*

http://www.fda.gov/cder/orange/obannual.pdf (27th ed. 2007) (last visited April 21, 2007).  Both

patents have expired: the former on July 31, 2006, and the latter on March 25, 2007.  *See id*.

### 2.    Mylan's ANDA

On May 22, 2002, Mylan filed the first ANDA for generic amlodipine tablets.  *See Pfizer*

*Inc. v. Mylan Labs., Inc.* [*Mylan*], No. 02-cv-1628, 2007 WL 654274, *2-*3 (W.D. Pa. Feb. 22,

2007).  That ANDA contained paragraph IV certifications asserting that both the '909 and '303

patents were invalid or would not be infringed by its proposed amlodipine drug products.  *Id*.  As

a result, Mylan became eligible for first-filer exclusivity.  21 U.S.C. §§ 355(j)(5)(B)(iv) (2002).

Mylan notified Pfizer of its paragraph IV certifications on July 23, 2002, and on

September 20, 2002, Pfizer sued Mylan for infringement of both patents pursuant to 35 U.S.C.

§ 271(e)(2)(A).  *Mylan*, 2007 WL 654274, *3.  Because that lawsuit was not filed within 45

days, it did not trigger a 30-month stay.  On October 3, 2005, FDA granted Mylan final approval

to begin marketing its generic amlodipine drug products.  *Id*.  Nonetheless, Mylan chose not to

market its amlodipine drug products at that time.

On October 18, 2006, the district court held that Pfizer's infringement claims under the

'909 patent were moot because the patent had expired.  *Id*.  On February 27, 2007, however, the

court held that Mylan's amlodipine drug products infringed the '303 patent and that that patent

was valid and enforceable.  *Id*. at *26-31, *31-35.  It therefore enjoined FDA from approving

Mylan's ANDA until "a date which is not earlier than the date of expiration of the '303 patent

(March 25, 2007)."  *See Mylan*, Amended Judgment at 2 (Mar. 16, 2007) (Attachment 1).  Mylan

appealed to the Federal Circuit, which has not yet issued a decision.

### 3.    Apotex's ANDA

After Mylan submitted its ANDA, Apotex, Inc. ("Apotex," then known as Torpharm,

Inc.) filed its own ANDA for amlodipine.  Like Mylan's ANDA, Apotex's ANDA contained a

paragraph IV certification to the '303 patent. *See* Complaint, *Pfizer Inc. v. Torpharm, Inc.*, No. 03-5289 (N.D. Ill., filed Aug. 1, 2003), at 3 (Attachment 2). On June 23, 2003, Apotex provided a paragraph IV notice to Pfizer, and on July 30, 2003, Pfizer triggered a 30-month stay by suing Apotex for infringement. *Id.* Apotex then counterclaimed for a declaratory judgment of patent invalidity, but on January 18, 2006, the district court held that Apotex infringed Pfizer's '303 patent and that that patent was valid and enforceable. *Apotex*, 2007 WL 851203, *5-*7. It then enjoined FDA from approving Apotex's ANDA until patent expiration and any period of pediatric exclusivity to which Pfizer might be entitled. *Id.* Apotex appealed, and on March 22, 2007, the Federal Circuit reversed—squarely holding in a published decision that the asserted claims of the '303 patent were "invalid for obviousness." *See id.*

### 4.    Teva's ANDA

On September 9, 2003, Teva filed its own ANDA for amlodipine. As filed, that ANDA contained paragraph III certifications to the '909 and '303 patents. Teva eventually amended its ANDA. First, to reflect that the '909 patent expired in July 2006, Teva submitted a paragraph II certification. Second, to reflect its belief that '303 patent was invalid, Teva submitted a paragraph IV certification. Teva simultaneously notified Pfizer of its paragraph IV certification, but Pfizer did not sue Teva before the '303 patent expired. On March 28, 2007, based on FDA's longstanding rule compelling ANDA applicants to convert extant paragraph IV certifications to paragraph II certifications following patent expiration, Teva converted its paragraph IV certification to a paragraph II certification. It then moved for immediate final approval of its ANDA. *See generally* Letter from D. Jaskot to G. Buehler, April 4, 2007 (Attachment 3).

### 5.    Post-*Apotex* Proceedings

Following the *Apotex* decision, a motions panel of the Federal Circuit "temporarily stayed" the district court's injunction preventing Mylan from marketing its amlodipine products.

*See Pfizer Inc. v. Mylan, Inc.*, No. 2007-1194 (Fed. Cir. Mar. 23, 2007) (Attachment 4). Mylan immediately entered the market. Mylan Press Release, Mar. 23, 2007 (Attachment 5).

At the same time, Mylan commenced this case and sought a TRO that would preclude FDA from approving any other amlodipine ANDA pending a determination of whether Mylan was entitled to continued first-filer exclusivity even after the '303 patent expired. On March 26, this Court partially granted Mylan's TRO application. Based on FDA's representation that it would solicit comments and issue a decision on April 11, the Court declined to enjoin FDA from approving subsequent ANDAs before April 11. It did, however, enter a temporary injunction barring the agency from making those approvals effective between April 11 and April 13.

With those proceedings underway, Mylan and Pfizer petitioned FDA to prevent further amlodipine ANDA approvals—the former alleging it was entitled to continued first-filer exclusivity, and the latter that it was entitled to pediatric exclusivity. *See* Pfizer Citizen Petitions Nos. 2007P-0110 (Attachment 6) and 2007P-0111 (Attachment 7); Mylan Citizen Petition No. 2007P-0116 (Attachment 8). On March 29, FDA solicited comments from the affected parties. *See* Letter from G. Buehler to Teva, Mar. 29, 2007 (Attachment 9).

That day, Teva intervened in this case, and Apotex and Mutual soon followed. FDA eventually moved to extend the deadline for its decision until April 18 and to reset the dates of the Court's temporary injunction for April 18 to April 20. This Court granted FDA's motion. Mylan then filed an Amended Complaint. Beyond renewing its request that the Court enjoin FDA from approving additional amlodipine ANDAs during its putative first-filer exclusivity period, Mylan for the first time asserted that FDA should not be permitted to approve any additional ANDAs pending the expiration of Pfizer's pediatric exclusivity period. *See* Amended Complaint at ¶¶ 25-27.

### 6.     FDA's Letter Decision

On April 18, FDA released its Letter Decision in this matter.  Applying well-settled case law, FDA held that the '303 patent's expiration divested Mylan of any remaining first-filer exclusivity.  FDA Letter Decision at 10-13.  At the same, FDA refused to approve any other amlodipine ANDAs on the ground that they are "blocked by Pfizer's pediatric exclusivity."  *Id*. at 13.  That was so, according to FDA, because a brand manufacturer's pediatric exclusivity bars each generic applicant unless a "court determines that the patent is *in*valid or would *not* be infringed," *id*. at 6 (emphasis in original), in each applicant's own patent litigation with the brand manufacturer.  *Id*. at 10.  Moreover, according to FDA, even where the Federal Circuit enters a judgment invalidating every patent claim asserted by the brand manufacturer, generic applicants may not enter the market until the appellate court's mandate issues, on the ground that the appellate court has not "determine[d]" anything until "the date the mandate issues."  *Id*. at 7.

### LEGAL STANDARD FOR INJUNCTIVE RELIEF

A plaintiff may demonstrate its entitlement to preliminary injunctive relief by showing that (1) it has a substantial likelihood of success on the merits, (2) it would suffer irreparable injury if injunctive relief is denied; (3) injunctive relief would not substantially injure the opposing party or other third parties; and (4) injunctive relief would further the public interest. *Mova*, 140 F.3d at 1066.  "These factors interrelate on a sliding scale and must be balanced against each other." *Davenport v. AFL-CIO*, 166 F.3d 356, 360-61 (D.C. Cir. 1999).  Thus, "[a]n injunction may be justified … where there is a particularly strong likelihood of success on the

merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995). Teva satisfies all four prongs of this standard.[2]

## ARGUMENT

## I.    TEVA IS LIKELY TO PREVAIL ON THE MERITS.

FDA's Letter Decision is inconsistent with the statute's text, settled judicial precedent, and the policies underlying the statutory regime. The statutory text unambiguously requires the brand manufacturer to prevail in its post-paragraph IV patent litigation in order to qualify for pediatric exclusivity. FDA's Letter Decision, however, awards Pfizer pediatric exclusivity despite the Federal Circuit's unanimous decision rejection of every patent claim that Pfizer has ever asserted against any paragraph IV challenger. At the same time, FDA ignores the preclusive effect of patent invalidation, invites anticompetitive gamesmanship by brand manufacturers, and elevates form over substance in a manner that permits brand manufacturers to enjoy pediatric exclusivity in cases where there is no reasonable basis for thinking that the brand manufacturer is entitled to such exclusivity. Teva thus is likely to succeed in demonstrating that FDA's Letter Decision was arbitrary, capricious, and contrary to law, and this Court should order FDA to grant immediate final approval to Teva's ANDA No. 76-846.

### A.    FDA's Decision That Generic Applicants Must Prevail In Their Own Litigation With The Brand Manufacturer Conflicts With The Plain Text Of The Statute, Settled Case Law, And The Policies Underlying The FDCA.

As noted above, a brand manufacturer's eligibility for pediatric exclusivity depends on the kind of certification that a generic applicant submits with respect to the brand manufacturer's

---

[2]    Given the significant, irreparable, and mounting harms that FDA's Letter Decision is imposing on both Teva and Apotex, and in order to facilitate prompt appellate review of this matter—if necessary—Teva believes it would be appropriate to consolidate its motion with a trial on the merits. *See* Fed. R. Civ. P. 65(a)(2).

listed patents.  In cases where an application has submitted a paragraph IV certification to the

'303 patent prior to its expiration, the key provision in this statute is subclause (c)(2)(B), which

awards a brand manufacturer pediatric exclusivity only if "in the patent infringement litigation

resulting from the certification the court *determines that the patent is valid and would be*

*infringed*."  21 U.S.C. § 355a(c)(2)(B).

FDA's Letter Decision does not follow this plain statutory language.  Rather than

requiring *the brand manufacturer* to prevail in its litigation against a generic applicant in order

to *earn* pediatric exclusivity, FDA's Letter Decision reads the statute to provide that *each*

*generic applicant* must secure its own "court determination that the patent is *in*valid or would

*not* be infringed" in order to *defeat* the brand manufacturer's pediatric exclusivity—even where

the brand manufacturer does not initiate litigation against a patent-challenging generic applicant

at all.  FDA Letter Decision at 6 (emphasis in original); *see also id*. at 8 ("[I]f in paragraph IV

litigation a court determines that the patent is *invalid* or *not infringed*, pediatric exclusivity will

not bar approval of that applicant's ANDA.") (emphasis in original); *id*. ([W]here an applicant

has challenged a patent and has received a decision of invalidity or non-infringement, that

applicant will not be subject to the [brand manufacturer's] pediatric exclusivity.").

That interpretation of the statute does not withstand scrutiny.  The statute's plain text puts

the onus on the brand manufacturer to win its lawsuit in order to *earn* pediatric exclusivity, by

requiring a "court determin[ation] that the patent is *valid and would be infringed*."  21 U.S.C.

§ 355a(c)(2)(B).  Indeed, as FDA's own emphasized additions to the statutory language

demonstrate, the statute itself simply does not require each and every generic applicant to secure

its own court determination that "the patent is *in*valid or would *not* be infringed" in order to

*defeat* the brand manufacturer's pediatric exclusivity.  FDA Letter Decision at 6 (emphasis in

original); *cf. also id*. at 8 ("[I]f in paragraph IV litigation a court determines that the patent is **invalid** or **not infringed**, pediatric exclusivity will not bar approval of that applicant's ANDA.") (emphasis in original). In short, those are FDA's words—not Congress's.

In that respect, FDA's construction of the statute is eerily reminiscent of its discredited "successful defense requirements," which required generic applicants to prevail in patent litigation in order to become eligible for first-filer exclusivity, or which otherwise conditioned a first filer's eligibility for exclusivity on the maintenance of patent infringement litigation. *See, e.g.*, *Mova*, 140 F.3d 1060 (invalidating FDA's requirement that the first filer must successfully defend itself against a patent infringement suit in order to qualify for exclusivity); *see also Ranbaxy*, 469 F.3d 120 (invalidating FDA's decision that a brand manufacturer is free to delist a challenged patent and deprive the first filer of its exclusivity—unless litigation resulted from the first-filer's paragraph IV certification, in which case the first filer would remain eligible for exclusivity). In short, every time FDA has interpreted the FDCA to put the burden on generic applicants to prevail in patent litigation, the courts have rejected FDA's approach—and there is no basis for departing from that principle here.

FDA's initial response is that in prior cases, the agency has required applicants to convert from paragraph IV to paragraph II certifications on patent expiration, thereby entitling the brand manufacturer to pediatric exclusivity under the statutory provision regarding pediatric exclusivity for paragraph II filers—21 U.S.C. § 355a(c)(2)(A). *See* FDA Letter Decision at 8 (citing *Mylan Labs., Inc. v. Thompson* [*Fentanyl Patch*], 332 F. Supp. 2d 106 (D.D.C. 2004), *aff'd* 389 F.3d 1272 (D.C. Cir. 2004); *Ranbaxy Labs. Ltd. v. FDA* [*Fluconazole*], 307 F. Supp. 2d 15 (D.D.C. 2004), *aff'd* 2004 WL 886333 (D.C. Cir. Apr. 26, 2004) (unpublished disposition).

But that response is inadequate here. Unlike the two cases FDA cites—one in which the brand manufacturer won its post-paragraph IV litigation in the district court and the Federal Circuit had not yet reviewed the case at the time FDA gauged the brand manufacturer's entitlement to pediatric exclusivity, *Fentanyl Patch*, 389 F.3d at 1277; 332 F. Supp. 2d at 114, and the other in which the generic applicant stipulated to a dismissal, *Fluconazole*, 307 F. Supp. 2d at 17—the brand manufacturer in this case outright lost its patent case in a unanimous Federal Circuit decision that was entered before the '303 patent expired. As FDA forthrightly acknowledges, things are very different where, as here, an "ANDA applicant has received a favorable court decision." FDA Letter Decision at 8.

In this situation, it simply makes no sense to penalize paragraph IV applicants simply because the patent has expired—a point FDA's Letter Decision comes tantalizingly close to recognizing when it carves out an "exception" to its past cases based on the view "that the language of the statute manifests a clear Congressional intent that pediatric exclusivity not block the approval of an ANDA where the ANDA applicant has prevailed in the paragraph IV litigation." *Id.* at 9. The problem with that analysis, of course, is that it once again inverts the actual congressional intent manifested in the plain text of the statute. Congress did not clearly manifest its intent "not to block the approval of an ANDA ***where the ANDA applicant has prevailed in the paragraph IV litigation***," but rather manifested its intent that pediatric exclusivity not block the approval of an ANDA unless ***the brand manufacturer*** secures a "court determin[ation] that the patent is valid and would be infringed." 21 U.S.C. § 355a(c)(2)(B).

If FDA is going to carve out an "exception" to the usual rule—and it has to, or else § 355a(c)(2)(B) would never apply because pediatric exclusivity commences on patent expiration and every applicant's ANDA would be controlled by § 355a(c)(2)(A)—its approach

18

must faithfully reflect the statutory text by requiring the brand manufacturer to secure a determination of patent validity.

That principle is controlling here.  As Pfizer itself has conceded, the Federal Circuit's *Apotex* decision did ***not*** determine that the '303 patent was "valid and would be infringed."  21 U.S.C. § 355a(c)(2)(B).  Instead (to quote Pfizer), the Federal Circuit "issued [a] Decision, holding that … the only claims Pfizer asserted in its Hatch-Waxman patent infringement action … are invalid as obvious."  *See* Resp. of Plaintiff-Appellee Pfizer Inc. Pursuant To The Court's March 23, 2007 Order [the "Pfizer Admission"], *Pfizer Inc. v. Mylan Labs., Inc.*, No 2007-1194 (Fed. Cir., filed Mar. 26, 2007), at 3 (capitalization in original) (Attachment 10). FDA's refusal to award Teva final approval after the Federal Circuit's invalidation of every asserted '303 patent claim thus conflicts with the statute's plain text.

Indeed, FDA's action is particularly arbitrary because it overlooks the significance of the fact that a decision of patent invalidity or unenforceability estops the brand manufacturer from asserting infringement claims based on that patent against any other defendant.  *See, e.g.*, *Blonder-Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 350 (1971).  Indeed, it is well-settled that "once the claims of a patent are held invalid in a suit involving one alleged infringer, an unrelated party who is sued for infringement of those claims may reap the benefit of the invalidity decision under the principles of collateral estoppel."  *Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1577 (Fed. Cir. 1994).  As a result, the Federal Circuit's decision invalidating every patent claim Pfizer has ever asserted against any paragraph IV applicant precludes Pfizer from prevailing in other paragraph IV patent litigation, and entitles all other paragraph IV applicants to "reap the benefit … under the principles of collateral estoppel."  *Id.*

In a case where the Federal Circuit's invalidation of the patent ensures that the brand manufacturer will be unable to prevail in any future post-Paragraph IV litigation, it makes no sense to have a rule requiring the generic applicant to await the onset of that litigation. Pfizer in order to defeat Pfizer's pediatric exclusivity simply makes no sense. After all, as a result of the Federal Circuit's decision in the *Apotex* case, Pfizer can no longer reasonably hope to fulfill the essential precondition to pediatric exclusivity; it cannot secure a "court determin[ation] that the patent is valid and would be infringed," 21 U.S.C. § 355a(c)(2)(B), in any case involving any applicant that had submitted a paragraph IV certification at the time the '303 patent expired.

FDA's only response is that the Federal Circuit did not invalidate every claim of the '303 patent. Instead, FDA observes, the Federal Circuit invalidated only three of the patent's eleven claims, so that the '303 patent must remain listed in the Orange Book (unless and until Pfizer voluntarily withdraws it). FDA Letter Decision at 9-10. But that is a red herring. As set forth above, the statute does not put the burden on *the generic applicant* to knock out every asserted claim of a listed patent in order to *defeat* the brand manufacturer's pediatric exclusivity. It puts the burden on *the brand manufacturer* to have its patent upheld "in the patent infringement litigation resulting from the [paragraph IV] certification" in order to *earn* pediatric exclusivity. If the brand manufacturer chooses only to assert three of eleven possible patent claims, the fact that it might have received a favorable determination on the other eight claims does nothing to change the invalidation of the three it chose to assert into a validation of the eight it did not.

FDA's approach thus subjects the entire process to manipulation by the brand manufacturer. If FDA's Letter Decision stands, all a brand manufacturer will have to do to exclude patent-challenging generic applicants from the market is selectively assert patent claims in paragraph IV litigation. After all, on FDA's view, every other paragraph IV applicant

(including those that were never even sued in the first place) will be blocked by the brand manufacturer's pediatric exclusivity so long as a single patent claim remains unadjudicated at the time the patent expires.[3]  Congress surely did not countenance such an approach to pediatric exclusivity; time and again, the courts have warned against interpreting the statute in ways that would give brand manufacturers such unfettered control over generic market entry, *Inwood Labs., Inc. v. Young*, 723 F. Supp. 1523, 1527 (D.D.C. 1989); *Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997), and this case is no exception.

Finally, FDA's ruling in this case is inconsistent with longstanding agency practice. Because the plain text of the statute explicitly requires the brand manufacturer to prevail in post-paragraph IV litigation in order to obtain eligibility for pediatric exclusivity, FDA routinely grants applicants final approval where the brand manufacturer does not initiate suit at all.  To provide just a few examples, FDA approved Teva's ANDAs for ciprofloxacin hydrochloride (Cipro®), *see* Orange Book 116; fosinopril sodium and hydrochlorothiazide (Monopril-HCT®), *see id*. 204; glyburide and metformin hydrochloride (Glucovance®), *see id*. 213; and pravastatin sodium (Pravachol®), *see id*. 331, despite the absence of any patent litigation by the respective brand manufacturers of those drugs against Teva, and despite the brand manufacturers' respective submissions of pediatric safety studies regarding those drugs.  *See id*. at 908 (Cipro®), 943 (Monopril-HCT®), 948 (Glucovance®), 996 (Pravachol®).  While agencies are not always bound by their prior determinations, they cannot depart from them without providing a reasoned explanation for its reversal.  *King Broad. Co. v. FCC*, 860 F.2d 465, 470 (D.C. Cir. 1988).

---

[3]   As if to anticipate FDA's Letter Decision in this matter, Pfizer initially asserted claims 4 and 5 of the '303 patent in its lawsuit against Mylan, and then unceremoniously dropped them via a footnote in its pre-trial brief.  *See* Stipulation of Uncontested Facts, *Pfizer Inc. v. Mylan Labs. Inc.*, No. 02-cv-1628 (W.D. Pa. filed Dec. 1, 2006) (Attachment 11).

Having previously required the brand manufacturer to prevail in post-paragraph IV litigation in order to obtain pediatric exclusivity, FDA's unacknowledged departure from that practice in this case cannot withstand review.

Because FDA's interpretation of the statute thus conflicts with the plain text and policies underlying the statute, prior case law, and settled agency practice, its Letter Decision should be set aside and this Court should require the agency to immediately approve Teva's ANDA for generic amlodipine drug products.

### B. FDA Erred By Construing The Statute To Require An Appellate Mandate.

Above and beyond the foregoing, FDA erred by holding that the entry of a Federal Circuit judgment invalidating every asserted claim of a pharmaceutical patent is not sufficient to entitle a paragraph IV applicant to immediate final approval of its ANDA. According to FDA, that is so because a brand manufacturer has not actually lost its case—or, given FDA's inverted reading of the plain statutory text, a generic applicant has not actually won its case—until the Federal Circuit issues its mandate. FDA Letter Decision at 6-7. That interpretation has no sound basis in the text, structure, or history of the statute—which (again on FDA's inverted view) denies a brand manufacturer pediatric exclusivity if the court merely "***determines*** that the patent is ***in***valid or would ***not*** be infringed," FDA Letter Decision at 6 (first emphasis added), but nowhere requires the court to issue a "mandate" or even render a "final decision" to that effect. For the reason, FDA's Letter Decision cannot withstand scrutiny under either prong of *Chevron* and should be vacated. *See Chevron U.S.A., Inc. v. National Resources Defense Council*, 467 U.S. 837, 842-43 (1984).

### 1. The Plain Text Of The Statute Forecloses FDA's Interpretation.

In this case, the plain meaning of the statute is unambiguous. It is well-settled that in interpreting a statute, its words should be given their ordinary meaning. *See, e.g., Chapman v.*

*United States*, 500 U.S. 453, 462 (1991); *Perrin v. United States*, 444 U.S. 37, 42 (1979). Laymen, lawyers, and judges alike routinely describe judicial opinions (including appellate court opinions) as "determining" the merits of a case, and there are literally hundreds of examples of that ordinary usage in Westlaw. *See, e.g.*, *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1956 (2006) ("The Court of Appeals determined that Ceballos' memo … was inherently a matter of public concern.") (quotation omitted); *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) ("[T]he Court of Appeals determined that the giving of the Briggs instruction was constitutional error."); *FDIC v. Meyer*, 510 U.S. 471, 474 (1994) ("[T]he Court of Appeals determined that the Federal Tort Claims Act … did not provide Meyer's exclusive remedy."); *In re England*, 375 F.3d 1169, 1176 (D.C. Cir. 2004) (Roberts, J.) ("In *Philip Morris*, this court determined that a party's claim of attorney-client privilege would be effectively unreviewable because disclosure of privileged material would make the issue of privilege effectively moot on appeal") (quotations omitted); *Fisher v. National Insts. of Health*, 934 F. Supp. 464, 472 (D.D.C. 1996) (Urbina, J.) ("The court determined that since the letter clearly identifies plaintiff by name and address, it unmistakably constitutes a record for Privacy Act purposes.") (alteration and quotation omitted).

As a result, it simply strains credulity to think that the Federal Circuit's *Apotex* decision did anything other than "determine" that the patent claims Pfizer asserted are invalid for obviousness. Indeed, Pfizer itself—the very party whose pediatric exclusivity is on the line, and which thus has the most to gain from disputing that characterization—essentially has described the Federal Circuit's opinion as having done just that. *See* Pfizer Admission at 3 ("On March 22, 2007, [the Federal Circuit] issued the *Apotex* Decision, holding that … the only claims Pfizer asserted in its Hatch-Waxman patent infringement action against Apotex, are invalid as obvious ….").

FDA's Letter Decision in this case does not remotely contest that the ordinary usage of the term "determines" encompasses the issuance of an appellate court's opinion.  To the contrary, the Letter Decision expressly concedes that "the word 'determines' could suggest that the issuance of the opinion itself is sufficient," notes that "one dictionary definition of 'determine' is 'to come to a decision as the result of investigation or reasoning,'" and even observes that an appellate court's "judgment" is linked to the court's opinion and is "entered when it is noted on the docket."  FDA Letter at 6 (alterations and citations omitted).

Despite all of this, FDA seeks to justify its assertion that the term "determines" is genuinely ambiguous and may be interpreted to require an appellate mandate based on the fact that a few hand-picked dictionary definitions of the term "determine" evoke the concept of finality, *id*. at 6, and because the 1998 advisory committee notes to Rule 41 of the Federal Rules of Appellate Procedure indicate that a "court of appeals judgment or order is not final until issuance of the mandate."  *Id*. at 7.

The problem with that analysis, of course, is that Congress knows how expressly to require finality—including the issuance of an appellate mandate—when it wants to, and it simply did not do so here.  *See, e.g.*, 26 U.S.C. § 7481(a) (finality is determined "upon mandate" issued by Court of Appeals or Supreme Court); 15 U.S.C. § 21(g) (finality determined *inter alia* "upon the expiration of thirty days from the date of issuance of the mandate of the Supreme Court"); 15 U.S.C. § 45 (same).  Most telling, perhaps, Congress has gone out of its way to expressly provide in other parts of ***this very statutory regime*** that key events are triggered as of the date "a court enters a ***final decision*** from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed."  21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA) (emphasis added); *see also* MMA § 1102(b) (retroactively defining

"the term 'decision of a court' as used in [21 U.S.C. §] 505(j)(5)(B) [(2002) to] mean[] a ***final***

***decision*** of a court from which no appeal (other than a petition to the Supreme Court for a writ of

certiorari) has been or can be taken") (emphasis added).

Of course, it is axiomatic that "where Congress includes particular language in one

section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v.*

*United States*, 464 U.S. 16, 23 (1983) (internal quotation and alteration omitted). But apart from

its makeweight suggestion that "Congress could have been more precise in indicating the action

by the court to which it was referring, as it has done in other statutes," FDA Letter Decision at 6,

FDA offers no basis for casting doubt on the applicability of that canon of construction here. *See*

*also Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452-54 (2002). At bottom, then, the many

statutory provisions in which Congress has expressly required finality—including other

provisions of this very statutory regime—refute FDA's attempt to read the concept of finality

into the straightforward term "determines." Congress knows how to require finality when it

wants to, and as the Supreme Court put the point in *United States v. Naftalin*, "[t]he short answer

is that Congress did not write [§ 355a(c)(2)(B)] that way." 441 U.S. 768, 773 (1979). For these

reasons, FDA's interpretation of the statute contradicts the plain meaning of the statute and fails

the first step of the *Chevron* analysis.

> **2.     Even If The Statute Were Genuinely Ambiguous, FDA's**
> **Interpretation Of The Statute Is Unreasonable.**

Even if the term "determines" were genuinely ambiguous—which it is not—none of

FDA's rationales for opting to require an appellate mandate withstands scrutiny. FDA offers

three putative justifications for its decision. First, it observes that where the district court

upholds a patent in post-paragraph IV litigation, that "decision continues to control the rights of

the parties until the appellate court mandate issues." FDA Letter Decision at 7. Second, it reiterates that a few dictionary definitions of the term "determine" suggest finality, *id*. at 6, and that the Rule 41 advisory notes state that a judgment is not final until the mandate issues. *Id*. Finally, it argues that "as a matter of policy … parties to paragraph IV litigation are best served by a rule that … errs on the side of greater finality." *Id*.

None of these rationales withstands scrutiny. Whatever their merit, the first two simply beg the question. After all, it only matters that the district court decision "controls" the rights of the parties until an appellate mandate finalizes the parties' rights, or that certain hand-picked dictionary definitions use terms like "fixing" and "settling," if the term statutory term "determines" necessarily incorporates the notion of finality. But having expressly taken the position that the term "determines" does ***not*** necessarily encompass that concept—that is, "that the operative phrase … is ambiguous as to the action it describes," *id*. at 6—the fact that (at least on FDA's view) the term "determines" ***could*** be read to require finality provides no basis at all for FDA's determination that it "***should*** be read" to do so. *Id*. at 7 (emphasis added).[4]

The key point here, then, is that when an agency interprets an ambiguous term, it cannot simply throw darts at the dictionary and pick whichever meaning it wants. Instead, "[t]he 'reasonableness' of an agency's construction depends on the construction's 'fit' with the statutory language ***as well as its conformity to statutory purposes***." *Abbott Labs. v. Young*, 920 F.2d 984, 988 (D.C. Cir. 1990) (emphasis added); *see also New York v. EPA*, 413 F.3d 3, 23 (D.C. Cir. 2005) ("Under *Chevron* Step 2, a court must defer to the agency's interpretation of the

---

[4] In any event, it is worth noting that FDA's concern about the district court decision continuing to control the parties rights carries no weight here—where no district court has ever held that Teva infringed Pfizer's '303 patent and enjoined Teva from entering the market for amlodipine drug products.

ambiguous statutory term *if* it 'represents a **reasonable accommodation of conflicting policies** that were committed to the agency's care by the statute.'") (emphasis added) (quoting *Chevron*, 467 U.S. at 845); *Kennecott Utah Copper Corp. v. U.S. Dept. of Int.*, 88 F.3d 1191, 1213 (D.C. Cir. 1996) (even where "the text of the statute is not so clear as to preclude [the agency's] interpretation under *Chevron* step one," its interpretation still must be "**reasonable [when] viewed with an eye to [the statute's] structure and purposes**") (emphasis added).

In this case, FDA has not even attempted to reconcile its interpretation of the statute with the various policies underlying the statute. The only actual basis FDA offers for requiring a mandate is that everyone is better off "err[ing] on the side of greater finality," lest "an appellate court opinion … be relied upon and then overturned (through an adverse opinion after rehearing or rehearing en banc) in very short order." FDA Letter Decision at 7. But that is far too thin a reed on which to support FDA's interpretation of the term "determines." As Teva informed the Agency—though you would not know it from reading the Letter Decision—just one out of every 500 appellate decisions, **or two-tenths of one percent**, is reviewed by an *en banc* court. *See* Administrative Office of the U.S. Courts, *Judicial Business of the United States Courts: 2006* at 50 Table S.1 (Attachment 12) (showing that of 34,580 dispositions in the various courts of appeals, just 65 were issued by *en banc* courts). Of course, even fewer of those decision are actually overturned by the *en banc* court. And the possibility that a brand manufacturer can secure Supreme Court review of an adverse Federal Circuit decision is equally slim: the Supreme Court grants only one in 110 petitions for writ of *certiorari*—**or nine-tenths of one percent**. *See id*. at 101 Table A-1 (Attachment 13) (showing that of approximately 9600 petitions for *certiorari*, fewer than 90 were granted by the Supreme Court). As a result, there is virtually no reasonable probability that a three-judge panel decision will be reviewed by an *en banc* court or

the Supreme Court—much less that it will be reversed "in short order."  FDA Letter Decision at 7.[5]

If the statutory scheme manifested no other structural or policy considerations, the improbable likelihood that a Federal Circuit panel decision could be reversed on rehearing or at the Supreme Court might be sufficient to justify FDA's decision to "err on the side of finality" by requiring the issuance of an appellate court's mandate.  *Id.*  But there **are** other obvious policy considerations at play in the statutory scheme.  Indeed, the whole point of Hatch-Waxman's expedited mechanism for approving generic drugs is to "'get generic drugs into the hands of patients at reasonable prices—fast.'"  *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 809 (D.C. Cir. 2001) (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991)); *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("The purpose of the Hatch-Waxman Amendments was, after all, 'to increase competition in the drug industry by facilitating the approval of generic copies of drugs.'  Congress expected that competition 'to make available

---

[5]  While the Administrative Office of the U.S. Courts does not track Federal Circuit proceedings in as much detail as the other federal courts of appeal, the chance of en banc review in that court are likely to be especially low.  In contrast to virtually every other appellate court, the Federal Circuit requires three-judge panels to pre-circulate their opinions to the full court before releasing them, and has established a formal mechanism for the court's judges to request revisions to those opinions—and even *sua sponte en banc* review of a case—before the panel opinion issues.  *See generally* Fed. Cir. Internal Operating P. 14.  As a result, *en banc* review is especially rare in the Federal Circuit because the full court has an opportunity to review, comment on, and secure changes to panel opinions before those dispositions are finalized and released—significantly minimizing the possibility that a three-judge panel will issue a decision with which a court majority disagrees.

As to the Supreme Court, it hears virtually no cases from the Federal Circuit at all.  In the ten Terms between 1994 and 2003, just 26 of the 823 cases in which the Supreme Court granted *certiorari* originated in the Federal Circuit—the second lowest total of any federal court of appeals in the country.  *See Nine Justices, Ten Years: A Statistical Retrospective*, 118 HARV. L. REV. 510, 522 (2004).  To put that in perspective, the Supreme Court actually granted more cases during that period on direct review from a district court than it did on petitions for writ of *certiorari* to the Federal Circuit.  *Id.*

more low cost generic drugs.'") (quoting *Mead Johnson & Co. v. Bowen*, 838 F.2d 1332, 1333 (D.C. Cir. 1988);  H.R. Rep. No. 98-857, *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647).

The problem here, of course, is that FDA's preference for appellate finality is completely at odds with that paramount congressional objective.   The slim prospect that a brand manufacturer might secure further review of an adverse Federal Circuit decision—and the even slimmer likelihood that such review will result in the reversal of such a decision—is dwarfed by strong likelihood that a losing brand manufacturer can run out the clock on its pediatric exclusivity before the mandate issues, thereby delaying the onset of full generic market competition and providing brand manufacturers with an undeserved windfall.  As Pfizer was quick to note before the Agency, losing litigants have 14 days to file a petition for rehearing *en banc*, Fed. R. App. P. 40(a), and the filing of such a petition indefinitely stays the mandate pending the court's disposition of such a motion.  Fed. R. App. P. 41(d)(1).

Even after a petition is denied, the mandate is generally delayed another 7 days—and during that period, the losing litigant can move to stay issuance of the mandate pending the Supreme Court's disposition of a petition for writ of *certiorari*.   Fed. R. App. P. 41(d)(2). Suffice it to say, that process can take months, because litigants have 90 days to file a petition for writ of *certiorari* (and can seek an extension of up to 60 days), and respondents have 30 days to respond to such a petition.  *See* Sup. Ct. RR. 13.1, 13.5, 15.3, 30.4.  It thus should come as no surprise that Pfizer filed a petition for rehearing *en banc* at the Federal Circuit on April 5, 2007, and is likely to seek a stay of the mandate in the event that petition is denied.

Ultimately, then, FDA's decision to forestall the onset of full generic market competition until an appellate mandate issues will all but guarantee that brand manufacturers can block full generic market competition for the duration of a pediatric exclusivity period—even though there

is no reasonable likelihood of subsequent appellate proceedings that would culminate in a final judgment entitling the brand manufacturer to its (since-expired) pediatric exclusivity period.

FDA's failure even to address these serious concerns is alone sufficient to require the reversal of its decision, and given the slim likelihood that the agency could demonstrate that its own preference for finality outweighs Congress's well-recognized preference for speeding the approval of generic drugs, this Court should grant Teva immediate injunctive relief and require the agency to approve its ANDA for generic amlodipine drug products.

## II.  THE EQUITIES STRONGLY FAVOR THE ENTRY OF INJUNCTIVE RELIEF.

### A.  Teva Will Be Irreparably Harmed In The Absence Of Injunctive Relief.

FDA's refusal to approve Teva's ANDA for generic amlodipine has already injured Teva irreparably.  As the foregoing analysis makes clear, Teva's ANDA was eligible for final approval on March 25, 2007, when the '303 patent expired.  As a result of FDA's delay and this Court's prior injunction, Teva already has lost a month of potential product sales while its competitors lock up long-term market share.

The ongoing consequences of FDA's actions are severe: If Teva is precluded from entering the market until the conclusion of Pfizer's six-month exclusivity period, it stands to lose tens of millions of dollars that it reasonably could have expected to make from selling generic amlodipine drug products during that period.  *See* Declaration of David Marshall ("Marshall Decl.") ¶ 12 (Attachment 14).  Even a brief delay in Teva's entry into the market could result in the loss of significant sales opportunities.  *Id.*  And by permitting Teva's competitors to establish

long-term market position ahead of Teva, FDA's ruling may cost Teva millions of dollars in additional lost sales in the year following its eventual entry into the market. *Id*. ¶ 13.[6]

These hardships are genuinely irreparable. On one hand, it is not possible to make up for lost sales opportunities with future sales: Teva cannot turn back the clock when it enters the market in September 2007 and sell patients the heart medication they needed in April 2007. And on the other, FDA's immunity bars Teva from recovering its damages from the agency (as does this Court's determination that the intervening defendants cannot recover damages from Mylan, *see* 4/18/07 Order). Courts have long recognized that such harms are sufficiently irreparable to justify injunctive relief under these circumstances. *See, e.g.*, *Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004) ("While it is well established that the possibility that adequate compensatory or other corrective relief will be available at a later date weighs heavily against a claim of irreparable harm, it is of no avail in this case where the plaintiff will be unable to sue to recover any monetary damages against [federal agencies].") (internal quotation, citation, and alteration omitted); *see also Entergy Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000) ("The importance of preliminary injunctive relief is heightened in this case by the likely unavailability of money damages should the [plaintiff] prevail on the merits of its claims. Relief in the form of money damages could well be barred by [defendant's] sovereign immunity."); *cf. CSX Transp. v. Williams*, 406 F.3d 667, 674 n.7 (D.C. Cir. 2005) (accepting that a $2-3 million loss would be sufficiently irreparable to ground injunctive relief

---

[6]    If the Court requires additional information, Teva is willing to submit detailed projections in a sealed declaration.

had recovery of that sum been barred by sovereign immunity, but declining to award relief because the District of Columbia is not immune from damage suits).[7]

**B.      The Balance of Hardships Favors Teva.**

The balance of hardships also favors Teva.  On one side of the ledger, FDA's action is currently harming not only Teva, but Apotex—which, by virtue of the arguments set forth above, also has been improperly prevented from entering the market for generic amlodipine drug products.  *See* Apotex Inc.'s Emergency Motion To Require Plaintiffs Mylan Laboratories et al. To Post Bond at 4-5 (filed 4/13/07) (asserting that Apotex stands to lose $50-78 million as a result of FDA's unlawful refusal to approve its ANDA).

On the other, FDA will suffer no tangible damage by granting final approval to Teva's ANDA: It is simply a government agency with no particular stake in this dispute.  Mylan has no legal right that will be infringed by entry of an injunction requiring FDA to approve Teva's ANDA; as FDA explained, Mylan is not entitled to first-filer exclusivity under the Act, FDA Decision at 10-13, and remains on the market only as an unintended consequence of FDA's decision that Pfizer "earned" pediatric exclusivity by losing its lawsuit against Apotex and then tactically delaying the Federal Circuit's mandate.  The requested injunction will not require Mylan to take its generic amlodipine product off the market, and in any event, Mylan's revenue losses would be offset by its competitors' gains.

---

[7]    This Court's recent decision in *Biovail Corp. v. FDA*, No. 06-1487, 2007 WL 891365 (D.D.C. Mar. 22, 2007), does not require a different result.  In that case, Biovail not only "cite[d] no on-point case law to support [the] proposition" that its losses were sufficiently "irreparable … because the FDA is immune from suit for damages," *id*. at *8, but Biovail could have recovered damages in its pending patent litigation had it prevailed on the merits.

C.     **The Public Interest Favors Teva.**

Make no mistake: However the entry of injunctive relief would affect the parties to this litigation, the parties who most stand to benefit are the millions of Americans who depend on amlodipine drug products to lower blood pressure and relieve chest pain.  FDA's Letter Decision has prolonged the absence of full generic competition in the market for this ***$2.7 billion*** drug, Marshall Decl. ¶ 3, diminishing consumer choice and maintaining an elevated pricing structure. The amlodipine market should have opened to full generic competition on March 25, when the '303 patent expired.  As it now stands, the public has been deprived of full access to safe and affordable generic amlodipine drug products for nearly one month.  This Court should not further prevent patients from obtaining access to these drug products; to do so would violate the fundamental goals of the statutory scheme—to "increase competition in the drug industry," *Serono Labs.*, 158 F.3d at 1326, and "get generic drugs into the hands of patients at reasonable prices—fast." *Barr Labs.*, 930 F.2d at 76.

## CONCLUSION

For the foregoing reasons, this Court should vacate FDA's April 18, 2007 Letter Decision and compel FDA to grant immediate final approval to Teva's ANDA No. 76-846.

Dated: April 23, 2007                    Respectfully submitted,

                                         By: /s Michael D. Shumsky
                                         Jay P. Lefkowitz, P.C. (D.C. Bar No. 449280)
                                         Michael D. Shumsky (D.C. Bar No. 495078)
                                         KIRKLAND & ELLIS LLP
                                         655 15th Street N.W., Suite 1200
                                         Washington, D.C.  20005
                                         (202) 879-5000 (phone)
                                         (202) 879-5200 (facsimile)

                                         *Counsel for Teva Pharmaceuticals USA, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PFIZER, INC.,** ) | |
| ) | |
| **Plaintiff and** ) | |
| **Counterclaim Defendant,** ) | |
| ) | |
| **v.** ) | **02: 02cv1628** |
| **MYLAN LABORATORIES, INC. and** ) | |
| **MYLAN PHARMACEUTICALS, INC.,** ) | |
| ) | |
| ) | |
| **Defendants and** ) | |
| **Counterclaim Plaintiffs.** ) | |

## AMENDED JUDGMENT

AND NOW, this 16th day of March, 2007, it is **ORDERED, ADJUDGED AND**

**DECREED** that, for the reasons set forth in the Court's findings of fact and conclusions of law,

Judgment shall be entered in favor of Plaintiff Pfizer Inc. and against Defendants Mylan

Laboratories, Inc. and Mylan Pharmaceuticals, Inc. (herein collectively "Mylan") on Pfizer's

claims that Mylan has infringed claims 1-3 of United States Patent No. 4,879,303 (the "303

patent"); and it is further,

**ORDERED, ADJUDGED AND DECREED** that Judgment shall be entered in favor of

Pfizer and against Mylan dismissing Mylan's counterclaims which alleged and sought

declarations of noninfringement, invalidity, or unenforceability of the '303 patent; and it is

further,

**ORDERED, ADJUDGED AND DECREED** that, pursuant to the provisions of 35

U.S.C. §271(e)(4)(A), the effective date of any approval of Mylan's Abbreviated New Drug

Application No. 76-418, seeking FDA approval of amlodipine besylate tablets, 2.5, 5 and 10 mg

dosage strengths, shall be a date which is not earlier than the date of expiration of the '303 patent

(March 25, 2007); and it is further,


**ORDERED, ADJUDGED AND DECREED** that, pursuant to the provisions of 35

U.S.C. §271(e)(4)(B), Mylan, its officers, agents, servants, employees and attorneys, and those

persons in active concert or participation with Mylan are enjoined until the date of expiration of

the '303 patent (March 25, 2007), from engaging in the commercial manufacture, use, offer to

sell, or sale within the United States, or importation into the United States, of any product

comprising the chemical compound amlodipine besylate covered by, or the sale or use of which

is covered by claims 1-3 of the '303 patent.


BY THE COURT:


s/ Terrence F. McVerry
United States District Court Judge

cc:     All Counsel of Record

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

PFIZER INC, )
)
          Plaintiff, )
)
    v. )
)
TORPHARM, INC., )
)
          Defendant. )
)

Civil Action **03C 52**

**DOCKETED**
AUG 0 1 2003

JUDGE JOAN H. LEFKOW

MAGISTRATE JUDGE MASON

## COMPLAINT

Pfizer Inc ("Pfizer"), by its attorneys, for its complaint against TorPharm,

Inc. ("TorPharm") alleges as follows:

    1.    This is an action by Pfizer against TorPharm for infringement of

United States Patent No. 4,879,303 (the "'303 patent").

### PARTIES, JURISDICTION AND VENUE

    2.    Pfizer is a corporation organized and existing under the laws of the

State of Delaware and having a principal place of business at 235 East 42nd Street, New

York, New York. Pfizer invests extensively in designing, developing, and testing and

evaluating new and innovative pharmaceutical products and it sells pharmaceutical

products to the public throughout the United States.

    3.    Upon information and belief, TorPharm is a corporation organized

and existing under the laws of Canada and has its principal place of business at 50

Steinway Blvd., Etobicoke, Ontario.

4.    TorPharm has designated A. Sidney Katz, Esq. of Welsh & Katz, Ltd. at 120 South Riverside Plaza, Suite 2200, Chicago, Illinios as its agent authorized to accept service of process in the United States.

5.    Upon information and belief, TorPharm is in the business of making and selling generic and branded pharmaceutical products.

6.    This action arises under the patent laws of the United States, Title 35, United States Code. This Court has subject matter jurisdiction over this action pursuant to the provisions of 28 U.S.C. §§ 1331, 1338, 2201 and 2202.

7.    Defendant is subject to personal jurisdiction in this judicial district.

8.    Venue is proper in this judicial district pursuant to the provisions of 28 U.S.C. §§ 1391 and 1400(b).

## CLAIM FOR RELIEF: INFRINGEMENT OF THE '303 PATENT

9.    Pfizer realleges paragraphs 1 through 8 above as if fully set forth herein.

10.    On November 7, 1989, the PTO issued to Pfizer the '303 patent, entitled "Pharmaceutically Acceptable Salts," based on the application filed by Edward Davis and James I. Wells, which had been assigned to Pfizer. Pfizer currently holds, and it continuously has held title to the '303 patent since it was issued. A copy of the '303 patent is attached hereto as Exhibit A.

11.    Pursuant to 21 U.S.C. § 355(b)(1) and the regulations the FDA promulgated pursuant thereto, the '303 patent is listed in the Orange Book with respect to the Norvasc® drug product.

12. Norvasc® is entitled to six months of "pediatric exclusivity" pursuant to the provisions of 21 U.S.C. § 355a. Consequently, the Orange Book lists the '303 patent's expiration date as September 25, 2007.

13. By letter dated June 23, 2003 ("Notice Letter"), TorPharm gave notice to Pfizer that it had filed with the United States Food and Drug Administration (the "FDA"), pursuant to 21 U.S.C. § 355(j)(2), Abbreviated New Drug Application No. 76-719 ("ANDA No. 76-719"), addressed to a proposed drug product identified as amlodipine besylate tablets (2.5 mg, 5 mg and 10 mg strengths) ("TorPharm Amlodipine Tablets").

14. The June 23, 2003 Notice Letter states that TorPharm's ANDA No. 76-719, filed with the FDA, seeks approval to market and sell its TorPharm Amlodipine Tablets before the '303 patent's expiration date of September 25, 2007, as listed in the Orange Book, pursuant to 21 C.F.R. § 314.94(a)(12)(i)(A)(4) ("paragraph IV certification").

15. TorPharm has infringed the '303 patent under 35 U.S.C. § 271(e)(2)(A) by submitting to the FDA ANDA No. 76-719, which includes the paragraph IV certification as to the '303 patent and which seeks approval from the FDA to engage in the commercial manufacture, use, or sale of its TorPharm Amlodipine Tablets prior to the expiration of the '303 patent.

16. Upon information and belief, TorPharm is committed to selling and intends to market its TorPharm Amlodipine Tablets promptly following FDA approval of ANDA No. 76-719.

17.    Upon information and belief, TorPharm has knowingly and willfully infringed the '303 patent.

18.    Pfizer will be irreparably harmed if TorPharm is not enjoined from infringing the '303 patent.

**WHEREFORE**, Pfizer requests the following relief:

1.    A judgment providing that the effective date of any FDA approval for TorPharm to make, use, sell, offer for sale, or import the TorPharm Amlodipine Tablets described in ANDA No. 76-719 be no earlier than the date on which the '303 patent term, as extended by the pediatric exclusivity period, expires;

2.    An order preliminarily enjoining and a judgment permanently enjoining TorPharm from making, using, selling, offering to sell, or importing into the United States the TorPharm Amlodipine Tablets described in ANDA No. 76-719 until after expiration of the '303 patent term, as extended by the pediatric exclusivity period, and a judgment declaring that TorPharm's making, using, selling, offering to sell, or importing into the United States the TorPharm Amlodipine Tablets described in ANDA No. 76-719 will infringe the '303 patent;

3.    Attorneys' fees, costs and expenses incurred in pursuing this action as enhanced pursuant to 35 U.S.C. § 285.

4.     Such further and other relief as this Court may determine to be just

and proper.

Dated:  July 30, 2003                                Respectfully submitted,

_____
Michael B. Solow
**KAYE SCHOLER LLC**
3 First National Plaza, Suite 4100
70 West Madison Street
Chicago, Illinois  60602-4231
(312) 583-2300

   -and-

Richard G. Greco
**KAYE SCHOLER LLP**
425 Park Avenue
New York, New York  10022
(212) 836-8000

*Attorneys for plaintiff*

30689936                                    5

# United States Patent [19]

## Davison et al.

[11] Patent Number: 4,879,303

[45] Date of Patent: Nov. 7, 1989

[54] PHARMACEUTICALLY ACCEPTABLE SALTS

[75] Inventors: Edward Davison, Margate; James I. Wells, Canterbury, both of England

[73] Assignee: Pfizer Inc., New York, N.Y.

[21] Appl. No.: 256,938

[22] Filed: Oct. 13, 1988

### Related U.S. Application Data

[63] Continuation of Ser. No. 30,658, Mar. 25, 1987, abandoned.

[30] Foreign Application Priority Data

Apr. 4, 1986 [GB] United Kingdom ................ 8608335

[51] Int. Cl.$^4$ ................ C07D 211/86; A61K 31/455
[52] U.S. Cl. ................................ 514/356; 546/321
[58] Field of Search ..................... 514/356; 546/321

[56] References Cited

#### U.S. PATENT DOCUMENTS

3,816,612 6/1974 Schmidt et al. .................... 425/45
4,032,637 6/1977 Spiegel et al. ..................... 514/224

#### OTHER PUBLICATIONS

Berge et al., Jour. of Pharmaceutical Science, Jan. 1977, vol. 66, No. 1.

Primary Examiner—Jane T. Fan
Attorney, Agent, or Firm—Peter C. Richardson; J. Trevor Lumb; James M. McManus

[57] ABSTRACT

Improved pharmaceutical salts of amlodipine, particularly the besylate salt, and pharmaceutical compositions thereof. These salts find utility as anti-ischaemic and anti-hypertensive agents.

**11 Claims, No Drawings**

4,879,303

**1**

# PHARMACEUTICALLY ACCEPTABLE SALTS

This application is a continuation application of co-pending application Ser. No. 07/030,658, filed Mar. 25, 1987, now abandoned.

## BACKGROUND OF THE INVENTION

The present invention relates to improved pharmaceutical salts of amlodipine and pharmaceutical compositions thereof.

The compound amlodipine (3-ethyl 5-methyl 2-(2-aminoethoxymethyl)-4-(2-chlorophenyl)-1,4-dihydro-6-methylpyridine-3,5-dicarboxylate) is a potent and long acting calcium channel blocker having utility as an anti-ischaemic and anti-hypertensive agent.

European Patent Application Publication No. 89167 and U.S. Pat. No. 4,572,909 disclose several different pharmaceutically acceptable salt forms of amlodipine. In particular, the pharmaceutically acceptable acid addition salts are said to be those formed from acids which form non-toxic acid anions such as the hydrochloride, hydrobromide, sulphate, phosphate or acid phosphate, acetate, maleate, fumarate, lactate, tartrate, citrate and gluconate salts. Of these salts the maleate is disclosed as being particularly preferred.

## SUMMARY OF THE INVENTION

It has now unexpectedly been found that the benzene sulphonate salt (hereinafter referred to as the besylate salt) has a number of advantages over the known salts of amlodipine and, additionally, has unexpectedly been found to have a unique combination of good formulation properties which make it particularly suitable for the preparation of pharmaceutical formulations of amlodipine.

Thus according to the present invention there is provided the besylate salt of amlodipine.

In a further aspect the invention provides a pharmaceutical composition of the besylate salt of amlodipine together with a pharmaceutically acceptable diluent or carrier.

The invention further provides a tablet formulation comprising the besylate salt of amlodipine in admixture with excipients. A preferred formulation includes the besylate salt, a compression aid such as microcrystalline cellulose, an additive to provide sheen to the table such as anhydrous dibasic calcium phosphate, a disintegrant such as sodium starch glycollate and a lubricant such as magnesium stearate.

In addition the invention provides a capsule formulation comprising the besylate salt of amlodipine in admixture with excipients. A preferred formulation includes the besylate salt, an inert diluent, a dried disintegrant and a lubricant as described above.

The invention further provides the besylate salt of amlodipine in sterile aqueous solution for parenteral administration. Preferably such solution contains from 10 to 40% by volume of propylene glycol and preferably also sufficient sodium chloride to avoid haemolysis, e.g. about 1% w/v.

The invention also provides the besylate salt of amlodipine for use in treating ischaemic heart disease, especially angina, or hypertension, in a human being.

The invention also provides a process for preparing the besylate salt of amlodipine by reacting amlodipine base with a solution of benzenesulphonic acid in an inert solvent and recovering the besylate salt of amlodipine.

**2**

The preferred inert solvent is industrial methylated spirit.

## DETAILED DESCRIPTION OF THE INVENTION

Although amlodipine is effective as the free base, in practice it is best administered in the form of a salt of a pharmaceutically acceptable acid. In order to be suitable for this purpose the pharmaceutically acceptable salt must satisfy the following four physiochemical criteria: (1) good solubility; (2) good stability; (3) non-hydroscopicity; (4) processability for tablet formulation, etc.

It has been found that whilst many of the salts outlined above satisfy some of these criteria, none satisfy them all and even the preferred maleate, whilst exhibiting excellent solubility tends to break-down in solution after a few weeks. Consequently a range of pharmaceutically acceptable salts of amlodipine has been made and evaluated using these criteria:

1. Generally, it is known in the art that a good aqueous solubility is necessary for good bioavailability. Usually a solubility of greater than 1 mg ml$^{-1}$ at pH 1-7.5 is sought although higher solubilities are required to formulate injections. In addition, salts which provide solutions having a pH close to that of blood (7.4) are preferred because they are readily biocompatible and can easily be buffered to the required pH range without altering their solubility.

As can be seen from the following comparative data the besylate salt of amlodipine exhibits good solubility characteristics, compared with other salts.

TABLE 1

| Salt | solubility mg ml$^{-1}$ | pH at saturation |
|---|---|---|
| Benzene sulphonate (besylate) | 4.6 | 6.6 |
| Toluene sulphonate (tosylate) | 0.9 | 5.9 |
| Methane sulphonate (mesylate) | 25 | 3.1 |
| Succinate | 4.4 | 4.9 |
| Salicylate | 1.0 | 7.0 |
| Maleate | 4.5 | 4.8 |
| Acetate | 50 | 6.6 |
| Hydrochloride | 50 | 3.5 |

2. Good stability in the solid state is very important for tablets and capsules, whilst good stability in solution is required for an aqueous injection.

In order to screen for chemical stability, each of the salts was blended in a powder vehicle and formed into tablets or capsules. In the case of tablets the vehicle comprised microcrystalline cellulose in 50:50 combination with anhydrous dibasic calcium phosphate. In the case of capsules the vehicles comprised mannitol in 4:1 combination with dried maize starch. These were then stored in sealed vials at 50° and 75° C. for up to three weeks. The drug and any breakdown products were extracted with methanol:chloroform (50:50) and separated on silica tlc plates using a variety of solvent systems.

The results were compared and the salts ranked according to the number and amount of breakdown product produced.

By comparing the results the following rank order emerges with besylate being the most stable salt and hydrochloride the least stable.

4,879,303

| Salt | Stability |
|------|-----------|
| Besylate | most stable |
| Mesylate | ↓ |
| Tosylate | ↓ |
| Succinate | ↓ |
| Salicylate | ↓ |
| Maleate | ↓ |
| Acetate | ↓ |
| Hydrochloride | unstable |

3. In order to provide stable formulations it is desirable to have a non-hygroscopic salt. In the solid state where drug content is high, absorbed films of moisture can act as a vector for hydrolysis and chemical breakdown. It is the hygroscopic nature of a drug or its salt which contributes to the free moisture which is normally responsible for instability.

Only the maleate, tosylate and besylate salts do not pick up any moisture when exposed to 75% relative humidity at 37° C. for 24 hours. Even when exposed to 95% relative humidity at 30° C. for 3 days both the besylate and maleate remain anhydrous whilst the tosylate formed the dihydrate salt. Therefore the besylate salt can be considered to be non-hygroscopic and thus provides stable formulations while minimising the risk of intrinsic chemical breakdown.

4. The final characteristic of an acceptable salt to be considered is the processability, i.e. the compression properties and also the ability not to stick or adhere to the tablet making machinery.

For high dose formulations, good compressibility is very important to make elegant tablets. With lower dose tablets the need for good compressibility can be eliminated to a certain extent by the use of suitable diluting excipients called compression aids. Microcrystalline cellulose is a commonly used compression aid. However whatever the dose the adhesion of the drug to the punches of the tablet machine must be avoided. When drug accumulates on the punch surfaces this causes the tablet surface to become pitted and therefore unacceptable. Also sticking of the drug in this way results in high ejection forces when removing the tablet from the machine. In practice it is possible to reduce sticking by wet-massing, careful selection of excipients and the use of high levels of anti-adherents, e.g. magnesium stearate. However selection of a salt with good anti-adhesion properties minimises these problems.

In order to compare the stickiness of the various salts of amlodipine the following procedure was carried out using conventional tablet making machinery: fifty tablets containing calcium sulphate dihydrate, microcrystalline cellulose and amlodipine besylate were made (47.5:47.5:5), the material sticking to the tablet punch was then extracted using methanol and the amount measured spectrometrically. This procedure was then repeated for runs of 100, 150, 200, 250 and 300 tables. After each run the amount of material sticking to the tablet punch was measured after extraction with methanol. The values are plotted and an average value calculated from the slope of the line produced.

This same procedure was then repeated for each of the salts of amlodipine. The amount of amlodipine measured as sticking to the tablet punch is shown in Table 2 for each salt and relative to the maleate salt.

## TABLE 2

| Salt | Stickiness | |
|------|-----------|--|
| | g Amlodipine $cm^{-2}$ tablet$^{-1}$ | Relative to maleate |
| Mesylate | 1.16 | 58% |
| Besylate | 1.17 | 59 |
| Tosylate | 1.95 | 98 |
| Maleate | 1.98 | 100 |
| Free base | 2.02 | 102 |
| Succinate | 2.39 | 121 |
| Hydrochloride | 2.51 | 127 |
| Salicylate | 2.85 | 144 |

Clearly the besylate has superior anti-adhesion properties to the maleate. Whilst the mesylate also shows good processability it tends to be isolated as the anhydride but this equilibrates to the monohydrate leading to variable composition after manufacture which makes it unacceptable for use in tablets.

Thus the besylate salt of amlodipine shows a unique combination of good solubility, good stability, non-hygroscopicity and good processability which makes it outstandingly suitable for the preparation of pharmaceutical formulations of amlodipine.

In order that the present invention be more readily understood, reference is now made to the following Examples.

### EXAMPLE 1

#### Preparation of Besylate Salt of Amlodipine

Amlodipine base (65.6 g, 0.161 mols) was slurried in industrial methylated spirit (326.4 ml) and cooled to 5° C. Benzenesulphonic acid (26.2 g, 0.168 mols) was dissolved in industrial methylated spirit (65.6 ml) at 5° C. and added to the slurry of the base. The resulting slurry was then granulated, filtered and washed with 2 volumes of industrial methylated spirit (65.6 ml). The damp solid was slurried at 5° C. for 1 hr in industrial methylated spirit (327.6 ml), filtered, washed with 2 volumes of industrial methylated spirit (65.6 ml) and dried under vacuum at 55° C. for 24 hours. A yield of 6.5 g (83.8%) was obtained with the following analysis.

| Analysis % | Melting Point 201.0° C. | | |
|------------|---|---|---|
| | C | H | N |
| Calc. | 55.07 | 5.51 | 4.94 |
| Found | 54.91 | 5.46 | 4.93 |

### EXAMPLE 2

#### Formulation of Tablets Containing Besylate Salt of Amlodipine

Amlodipine besylate was blended with sodium starch glycollate and anhydrous dibasic calcium phosphate for 5 minutes. This mixture was then sieved, reblended and sieved again followed by blending with microcrystalline cellulose. The resultant mixture was then sieved again and blended for a further 10 minutes. Finally magnesium stearate was added and the whole mixture blended for 5 minutes. The blend was then pressed into tablets using conventional tablet making machinery.

4,879,303

5

### TABLE 3

| | | TABLET COMPOSITIONS | | |
|---|---|---|---|---|
| Besylate salt (mg) | Microcrys- talline cellulose (mg) | Anhydrous dibasic calcium phosphate (mg) | Sodium starch glycollate (mg) | Magnesium stearate (mg) |
| 1.736 | 63.514 | 31.750 | 2.00 | 1.00 |
| 3.472 | 62.028 | 31.500 | 2.00 | 1.00 |
| 6.944 | 124.056 | 63.000 | 4.00 | 2.00 |
| 13.889 | 248.111 | 126.000 | 8.00 | 4.00 |

This method was used to make tablets containing different concentrations of the amlodipine besylate salt as shown in table 3.

### EXAMPLE 3

Formulation of Capsules Containing Besylate Salt of Amlodipine

Microcrystalline cellulose and dried maize starch were preblended. The besylate salt of amlodipine was then mixed with some of this preblend and then sieved. The remainder of the preblend was then added and mixed for 10 minutes. This was then sieved again and mixed for a further 5 minutes.

This method was used to make mixtures containing different concentrations of the amlodipine besylate salt as shown in Table 4 and the mixtures were then filled into capsules of appropriate size.

### TABLE 4

| | | CAPSULE COMPOSITIONS | | |
|---|---|---|---|---|
| Besylate salt (mg) | Microcrys- talline cellulose (mg) | Dried Maize starch (mg) | Magnesium stearate (mg) | Total Capsule weight (mg) |
| 1.736 | 38.014 | 10.00 | 0.250 | 50 |
| 3.472 | 76.028 | 20.00 | 0.500 | 100 |
| 6.944 | 72.556 | 20.00 | 0.500 | 100 |
| 13.889 | 145.111 | 40.00 | 1.00 | 200 |

### EXAMPLE 4

Formulation of Sterile Aqueous Solution of Besylate Salt of Amlodipine

Sodium chloride was dissolved in water for injection and propylene glycol was mixed with this solution. The besylate salt of amlodipine was added and, when it has dissolved, further water for injection was added to adjust the volume to give the desired concentration of amlodipine (1 mg/ml). The solution was then filtered through a sterilising filter and filled into suitable sterile containers, e.g. ampoules, for use in parenteral, e.g. intravenous, administration.

This methods was used to prepare the formulations shown in Table 5.

### TABLE 5

| | STERILE AQUEOUS SOLUTIONS | |
|---|---|---|
| | (1) | (2) |
| Besylate salt of amlodipine | 1.389 g | 1.389 g |
| Sodium chloride | 9.000 g | 9.000 g |

6

### TABLE 5-continued

| | STERILE AQUEOUS SOLUTIONS | |
|---|---|---|
| | (1) | (2) |
| Propylene glycol | 200.000 g | 400.000 g |
| Water for injection | to 1 liter | to 1 liter |

### EXAMPLE 5

Alternative preparation of Besylate salt of Amlodipine

Ammonium benzenesulphonate (0.943 g) was added to a slurry of amlodipine base (2 g) in industrial methylated spirit (10ml) and the resulting solution was heated at reflux for 10 minutes. The reaction mixture was cooled and granulated at 5° C. for 1 hour. The amlodipine benzenesulphonate was filtered, washed with industrial methylated spirit (2×2 ml) and dried in vacuum.

Yield 1.9 g (70% of theory).

Mpt.: 201.0° C.

| | Mpt.: 201.0° C. | |
|---|---|---|
| | Analysis % | |
| Found | C, 54.98; H, 5.46; N, 4.90; | |
| Calculated for | C, 55.07; H, 5.51; N, 4.95. | |

We claim:

1. The besylate salt of amlodipine.

2. A pharmaceutical composition comprising an antihypertensive, antiischaemic or angina - alleviating effective amount of the besylate salt of amlodipine as claimed in claim 1 together with a pharmaceutically acceptable diluent or carrier.

3. A tablet formulation comprising an anti-hypertensive, antiischaemic or angina - alleviating effective amount of the besylate salt of amlodipine as claimed in claim 1 in admixture with excipients.

4. A tablet formulation as claimed in claim 3 wherein the excipients comprise a compression and, an additive to provide sheen to the tablet, a disintegrant and a lubricant.

5. A tablet formulation as claimed in claim 4 wherein the excipients comprise microcrystalline cellulose, anhydrous dibasic calcium phosphate, sodium starch glycollate and magnesium stearate.

6. A capsule formulation comprising an antihypertensive, antiischaemic or angina - alleviating effective amount of the besylate salt of amlodipine as claimed in claim 1 in admixture with excipients.

7. A capsule formulation as claimed in claim 6 wherein the excipients comprise an inert diluent, a dried disintegrant and a lubricant.

8. A capsule formulation as claimed in claim 7 wherein the excipients comprise microcrystalline cellulose, dried maize starch and magnesium stearate.

9. A sterile aqueous solution comprising an antihypertensive, antiischaemic or angina - alleviating effective amount of the besylate salt of amlodipine for parenteral administration.

10. A sterile aqueous solution as claimed in claim 9 comprising from 10 to 40% w/v of propylene glycol.

11. A sterile aqueous solution as claimed in claim 9 or claim 10 comprising about 1% w/v sodium chloride.

* * * * *

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use **only** in the Northern District of Illinois.

---

**Plaintiff(s): PFIZER INC**

County of Residence:

Plaintiff's Atty:    Michael B. Solow
                     Kaye Scholer LLC
                     70 West Madison, Suite 4100,
                     Chicago, IL 60602
                     312-583-2300

**Defendant(s):TORPHARM, INC.**

County of Residence:

Defendant's Atty:    A. Sidney Katz
                     Welsh & Katz
                     120 South Riverside Plaza, Suite
                     2200, Chicago, IL 60606
                     312-655-1500

**DOCKETED**

AUG 0 1 2003

---

II. Basis of Jurisdiction:

III. Citizenship of Principal Parties
**(Diversity Cases Only)**

          Plaintiff:- **N/A**
          Defendant:- **N/A**

# 3 FEDERAL QUESTION 03C 5289

JUDGE JOAN H. LEFKOW

IV. Origin :                **1. Original Proceeding**          MAGISTRATE JUDGE MASON

V. Nature of Suit:          **830 Patent**

VI.Cause of Action:          **This action arises under the patent laws of the United States, Title 35, United States Code**

VII. Requested in Complaint
                Class Action:
                Dollar Demand:
                Jury Demand: **No**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

---

Signature:

Date:    7/30/03

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

Pfizer Inc

v.

Torpharm, Inc.

Case Number **03C 5289**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

PFIZER INC

JUDGE JOAN H. LEFKOW

MAGISTRATE JUDGE MASON

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE **DOCKETED** |
| NAME Michael B. Solow | NAME AUG 0 1 2003 |
| FIRM Kaye Scholer LLC | FIRM |
| STREET ADDRESS 70 West Madison, Suite 4100 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL 60602 | CITY/STATE/ZIP |
| TELEPHONE NUMBER 312-583-2300 FAX NUMBER | TELEPHONE NUMBER FAX NUMBER |
| E-MAIL ADDRESS msolow@kayescholer.com | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6188259 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES X NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES X NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES X NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |
| (C) | (D) |
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER FAX NUMBER | TELEPHONE NUMBER FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

Gary J. Buehler
Director, Office of Generic Drugs
Food and Drug Administration
Document Control Room, Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855

**RE:** **OGD NO. 2007N-0123: AMLODIPINE ABBREVIATED NEW DRUG APPLICATION APPROVALS**

**ANDA NO. 76-846: AMLODIPINE BESYLATE TABLETS (EQUIVALENT TO 2.5 MG, 5 MG, AND 10 MG AMLODIPINE)**

**CP NO. 2007P-0116: STAY ANY ADDITIONAL ABBREVIATED NEW DRUG APPLICATIONS FOR GENERIC AMLODIPINE PRODUCTS UNTIL AFTER THE MYLAN PHARMACEUTICALS INC. 180-DAY EXCLUSIVITY EXPIRES ON SEPTEMBER 23, 2007**

**CP NO. 2007P-0110: TO ENFORCE PEDIATRIC EXCLUSIVITY RIGHTS FOR AMLODIPINE**

**CP NO. 2007P-0111: STAY APPROVAL OF ANY AND ALL SUPPLEMENTS TO LOTREL CONCERNING AMLODIPINE AND PEDIATRIC EXCLUSIVITY**

Dear Mr. Buehler:

This letter is in reference to your March 29, 2007 facsimile, in which you solicited our response to several questions regarding FDA's approval of abbreviated new drug applications ("ANDAs") for generic amlodipine besylate drug products ("amlodipine"). We understand that the Agency has established a unified docket for the amlodipine matters, No. 2007N-0123, and reference is therefore made to that docket. Reference is also made to Teva's ANDA No. 76-846, for which Teva requested final approval by letter dated March 29, 2007, and to the above-referenced Citizen Petitions, in which Mylan Pharmaceuticals, Inc. ("Mylan") has requested that FDA stay the approval of any other generic amlodipine ANDA pending the expiration of a 180-day first-filer exclusivity period, and Pfizer Inc. has requested that FDA stay its approval of any amlodipine products—including Novartis' Lotrel®—pending the expiration of a 180-day pediatric exclusivity period for its Norvasc®-branded drug products.

The questions raised in your facsimile and implicated by the above-referenced Citizen Petitions fall into two general categories. One set of questions essentially seeks to determine whether Mylan is entitled to a 180-day period of exclusivity for its generic amlodipine products, despite the fact that the patent upon which Mylan purports to base such exclusivity—Pfizer's U.S. Patent No. 4,879,303 ("the '303 patent")—expired on March 25, 2007. The other set of questions seeks to determine whether Pfizer is entitled to a six-month period of pediatric exclusivity for its Norvasc®-branded drug products

despite the fact that a three-judge panel of the U.S. Court of Appeals for the Federal Circuit now has determined that every asserted claim of the '303 patent is invalid.

The answer to both inquiries is "No." With respect to the former, FDA has long held that the expiration of a patent subject to a first-filer's paragraph IV certification divests the first-filer of any entitlement to 180-day exclusivity. *See, e.g.*, *Abbreviated New Drug Applications: Patent And Exclusivity Provisions*, 59 Fed. Reg. 50338, 50348 (Oct. 3, 1994) ("[A] patent is deemed relevant until the end of the term of the patent of the patent or applicable 180-day period, ***whichever occurs first***.") (emphasis added). That interpretation is consistent with the plain language and policies of the statutory scheme, and every court that has addressed this issue has deemed FDA's interpretation a reasonable one. *See, e.g.*, *Dr. Reddy's Labs. v. Thompson*, 302 F. Supp. 2d 340 (D.N.J. 2003); *see also Ranbaxy Labs. Ltd. v. Leavitt [Simvastatin]*, 469 F.3d 120, 126 n.* (D.C. Cir. 2006) ("[T]he first generic applicant may no longer retain exclusivity when the patent has expired."). There is no basis for departing from that settled interpretation here, and the Agency should rule that Mylan is not entitled to continued marketing exclusivity following the March 25, 2007 expiration of the '303 patent.

With respect to the latter inquiry, the plain language of the statute requires the brand manufacturer to ***prevail*** in post-paragraph IV litigation in order to remain eligible for pediatric exclusivity. *See* 21 U.S.C. § 355a(c)(2)(B) (requiring "the court [to] determine[] that the patent is valid and would be infringed" in post-paragraph IV litigation in order for the brand manufacturer to maintain eligibility for pediatric exclusivity). FDA therefore has interpreted the statute to divest the brand manufacturer of any entitlement to pediatric exclusivity "'where an ANDA applicant submits a paragraph IV certification, and prevails in the patent litigation.'" *Mylan Laboratories, Inc. v. Thompson [Fentanyl Patch]*, 332 F. Supp. 2d 106, 124 (D.D.C. 2004) (quoting FDA).

Crucially, that interpretation applies to any paragraph IV applicant—not just the applicant that first obtained a court determination of invalidity. That is so because long-settled principles of patent law hold that a determination of invalidity estops the brand manufacturer from pursuing infringement claims against any other defendant. *See Blonder-Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 350 (1971). As a result, a brand manufacturer that loses its post-paragraph IV litigation against one applicant cannot possibly prevail in post-paragraph IV litigation against any other defendant—and therefore cannot satisfy the key requirement for obtaining pediatric exclusivity: that it prevail in post-paragraph IV patent litigation.

Those principles control the outcome in this case. Pfizer sued Apotex for infringement, and on March 22, 2007, the Federal Circuit issued its determination that Pfizer's patent claims were "invalid for obviousness." *Pfizer Inc. v. Apotex, Inc.*, No. 2006-1261, 2007 WL 851203, at *20 (Fed. Cir. Mar. 22, 2007). That decision prevents Pfizer from asserting pediatric exclusivity as to *any* ANDA filer that maintained a paragraph IV certification at the time of expiration, because Pfizer could not realistically hope to prevail in such litigation. It is of no moment that the Federal Circuit has not yet issued its mandate; nothing in the text of the pediatric exclusivity statute remotely

requires the issuance of a mandate, and the policies underlying the Hatch-Waxman Act weigh heavily against adopting any such interpretation of the statute. Indeed, such an interpretation of the statute would permit brand manufacturers to indefinitely delay generic market entry despite the fact that there is no realistic chance of further appellate review. As a result, the Agency should rule that Pfizer is not entitled to pediatric exclusivity for sales of its Norvasc®-branded amlodipine drug products.

For these reasons, and as set forth in greater detail below, final approval of Teva's ANDA is neither barred by Mylan's 180-day exclusivity nor blocked by Pfizer's pediatric exclusivity. The Agency should therefore grant Teva's ANDA No. 76-846 immediate final approval.

## FACTUAL BACKGROUND

### A.     Pfizer's Amlodipine Besylate Products

Pfizer Inc. ("Pfizer") manufactures amlodipine besylate ("amlodipine"), a high-blood pressure medication that it markets in 2.5, 5, and 10mg dosage tablets under the trade name Norvasc®. *Apotex*, 2007 WL 851203, *1. Pfizer has listed two patents as claiming amlodipine in FDA's official register of patents claiming approved pharmaceutical products (the "Orange Book"): US Patent Nos. 4,572,909 ("the '909 patent") and 4,879,303 ("the '303 patent"). *See* Orange Book at 887-88, *available at* http://www.fda.gov/cder/orange/obannual.pdf (27th ed. 2007) (last visited April 1, 2007). Each of those patents has expired: the former on July 31, 2006, and the latter on March 25, 2007. *See id*.

### B.     Mylan's ANDA

On May 22, 2002, Mylan filed the first ANDA seeking approval to sell generic amlodipine in 2.5, 5, and 10-mg dosage tablets. *See Pfizer Inc. v. Mylan Labs., Inc.*, No. 02-cv-1628, 2007 WL 654274, *2-*3 (W.D. Pa. Feb. 22, 2007). Mylan's ANDA contained paragraph IV certifications asserting that the '909 and '303 patents were invalid or would not be infringed by its proposed generic amlodipine drug products. *Id*. As a result, Mylan became eligible for a period of 180-day exclusivity for sales of its generic amlodipine products. 21 U.S.C. §§ 355(j)(5)(B)(iv).

Mylan notified Pfizer of its paragraph IV certifications on July 23, 2002, and on September 20, 2002, Pfizer sued Mylan for infringement of both patents pursuant to 35 U.S.C. § 271(e)(2)(A). *Pfizer Inc. v. Mylan Labs., Inc.*, 2007 WL 654274, *3. That lawsuit did not trigger a 30-month stay of FDA's authority to grant Mylan final marketing approval because it was filed more than 45 days after Pfizer received Mylan's paragraph IV notice. On October 3, 2005, the Agency therefore granted Mylan final approval to begin marketing its generic amlodipine drug products. *Id*. Nonetheless, Mylan chose not to immediately launch its generic amlodipine products into the market.

On October 18, 2006, the *Mylan* district court dismissed Pfizer's infringement claims arising from the '909 patent as moot, noting that the '909 patent had expired on July 31, 2006 and thus could not ground a continuing case or controversy between the

parties. *Id.* On February 27, 2007, however, the court held that Mylan's amlodipine drug products infringed Pfizer's '303 patent and that the '303 patent was valid and enforceable. *Id.* at *26-31, *31-35. The district court therefore enjoined FDA from approving Mylan's ANDA until "a date which is not earlier than the date of expiration of the '303 patent (March 25, 2007)." *See Pfizer Inc. v. Mylan Labs., Inc.*, No. 02-cv-1628, Amended Judgment at 2 (Mar. 16, 2007) (Attachment 1). Mylan has since appealed the district court's decision to the U.S. Court of Appeals for the Federal Circuit, which temporarily stayed the district court's injunction on March 23, 2007 but has not yet issued a decision in Mylan's case. *See Pfizer Inc. v. Mylan Labs, Inc.*, No. 2007-1194, Order at 2 (Mar. 23, 2007) (Attachment 2).

### C.    Apotex's ANDA

After Mylan had submitted its ANDA for generic amlodipine drug products, Apotex, Inc. ("Apotex," which then was known as Torpharm, Inc.) filed its own ANDA for generic amlodipine drug products. Like Mylan's ANDA, Apotex's ANDA contained a paragraph IV certification to the '303 patent. *See* Complaint, *Pfizer Inc. v. Torpharm, Inc.*, No. 03-5289 (N.D. Ill., filed Aug. 1, 2003), at 3 (Attachment 3). On June 23, 2003, Apotex notified Pfizer of its paragraph IV certification, and on July 30, 2003, Pfizer filed a patent infringement action against Apotex. *Id.* In contrast to the *Mylan* case, that lawsuit did trigger a 30-month stay of approval for Apotex's products because it was filed within 45 days of Pfizer's receipt of Apotex's paragraph IV notice.

Apotex eventually counterclaimed for a declaratory judgment of patent invalidity or unenforceability, but on January 18, 2006, the district court issued an oral decision holding that Apotex infringed Pfizer's '303 patent and that the '303 patent was valid and enforceable. *See Apotex*, 2007 WL 851203, *5-*7. The district court then entered an order enjoining the Agency from approving Apotex's ANDA until patent expiration and any period of pediatric exclusivity to which Pfizer might be entitled. *Id.* Apotex appealed the district court's decision to the Federal Circuit, and on March 22, 2007, the Federal Circuit reversed the district court's decision, holding in a published decision that the asserted claims of the '303 patent were "invalid for obviousness." *See id.*

### D.    Teva's ANDA

On September 9, 2003, Teva filed its own ANDA for sales of generic amlodipine products. As filed, that ANDA contained paragraph III certifications to the '909 and '303 patents. On March 23, 2007, Teva amended its ANDA. First, to reflect the fact that the '909 patent expired in July 2006, Teva revised its paragraph III certification with respect to that patent to a paragraph II certification. Second, in order to reflect its belief that '303 was invalid or otherwise unenforceable, Teva revised its paragraph III certification with respect to that patent to a paragraph IV certification. Teva simultaneously notified Pfizer of its paragraph IV certification, but Pfizer did not file an infringement action against Teva prior to the expiration of the '303 patent. On March 28, 2007, based on FDA's longstanding rule compelling ANDA applicants to convert extant paragraph IV certifications to paragraph II certifications following patent expiration, Teva converted its

paragraph IV certification on the '303 patent to a paragraph II certification. It then moved for immediate final approval of its ANDA.

### E.     Post *Pfizer v. Apotex* Proceedings

On March 22, 2007, Pfizer filed a Citizen Petition seeking to enforce pediatric exclusivity rights against Novartis's Lotrel®, a combination product containing amlodipine. *See* CP No. 07-p-0110.

On March 23, 2007, following the Federal Circuit's decision in *Pfizer v. Apotex*, Mylan simultaneously moved the district court in its litigation and the Federal Circuit to vacate the district court's prior injunction precluding Mylan from marketing its generic amlodipine drug products until the expiration of the '303 patent. The district court refused to do so, *see Pfizer Inc. v. Mylan, Inc.*, No. 02-CV-1628, Order at 1 (Mar. 23, 2007) (Attachment 4), but Judge Prost, presiding over a motions panel of the Federal Circuit, entered an order "temporarily stay[ing]" the district court's order pending further briefing by the parties. *See Pfizer Inc. v. Mylan, Inc.*, No. 2007-1194 (Fed. Cir. Mar. 23, 2007) (single-judge order) (Attachment 5). With the injunction lifted, Mylan launched its generic amlodipine drug products into the market on the afternoon of March 23, 2007. *See* Mylan Press Release, Mar. 23, 2007 (Attachment 6).

At almost the same time, Mylan filed an emergency application to the United States District Court for the District of Columbia for a Temporary Restraining Order ("TRO") that would preclude FDA from approving any other generic ANDAs for amlodipine. *See Mylan Pharmaceuticals, Inc. v. Thompson*, No. 07-579 (D.D.C. filed Mar. 26, 2007). On March 26, 2007, the district court (Urbina, J.) partially granted Mylan's TRO application. *See id.*, Order at 1-2 (filed Mar. 26, 2007) (Attachment 7). In particular, based on FDA's representation to the Court that it would solicit comments from all affected parties and issue a decision with respect to Mylan's exclusivity on April 11, 2007, the Court declined to enjoin FDA from approving subsequent ANDAs prior to April 11, but entered a temporary injunction that would preclude the Agency from making those approvals effective between April 11 and April 13, so that TRO proceedings could unfold. *See id*.

On March 26, 2007, Mylan filed a Citizen Petition seeking to preclude FDA from approving any other generic amlodipine products pending the expiration of a 180-day first-filer exclusivity period.

On March 29, 2007, Teva intervened to protect its interests in the *Mylan v. Thompson* TRO action. *See id*., Order Granting Teva's Motion to Intervene (filed Mar. 29, 2007) (Attachment 8). Later that afternoon, Teva received FDA's request to respond to the questions addressed in this letter.

## ARGUMENT

## I.    MYLAN IS NOT ENTITLED TO 180-DAY EXCLUSIVITY.

For more than a decade, FDA has squarely held that the expiration of a patent subject to a first filer's paragraph IV certification divests the first filer of any entitlement to 180-day exclusivity.  That interpretation is consistent with the plain language of the statute; longstanding FDA regulations on 180-day exclusivity; the existing case law on 180-day exclusivity; and the policies underlying the statute.  Mylan has not identified any basis for departing from FDA's settled practice, and there is none.  As a result, Mylan is not entitled to continued marketing exclusivity for generic amlodipine drug products, and the Agency may not lawfully rely upon Mylan's first-filer status to withhold the approval of any pending ANDA that otherwise is eligible for final approval.

### A.    The Plain Language Of The Statute And Longstanding FDA Regulations Compel The Conclusion That Patent Expiration Divests The First Filer Of Any Remaining 180-Day Exclusivity.

On its face, the plain language of the Hatch-Waxman Act distinguishes between cases where a patent has expired and cases where the patent has not.  In the former circumstance, the statute permits the Agency to grant an applicant final approval "effective immediately."   21 U.S.C. § 355(j)(5)(B)(i).  In the latter circumstance, by contrast, the statute precludes the Agency from granting final approval for "one hundred and eighty days after" either (1) the first paragraph IV applicant commercially markets its product or (2) the date of a court decision holding the patent invalid or not infringed.  *Id.* § 355(j)(5)(B)(iv).

The statute implements this sharp dichotomy between expired and unexpired patents by tying the effective date of an applicant's final approval to the type of patent certification contained in the applicant's ANDA.  To that end, the statute provides that the approval of an ANDA "shall be made effective" on the latest of four possible dates, and each of those dates depends on the applicant's patent certification at the time it seeks final approval from the Agency.  21 U.S.C. § 355(j)(5)(B).

- First, where an applicant has submitted a paragraph I or paragraph II certification, the statute provides that "the approval [of the applicant's ANDA] may be made effective immediately."  21 U.S.C. § 355(j)(5)(B)(i).

- Second, where an applicant has submitted a paragraph III certification, "the approval [of the applicant's ANDA] may be made effective on the [certified] date [of patent expiration]."  *Id.* § 355(j)(5)(B)(ii).

- Third, where an applicant has submitted a paragraph IV certification and was sued by the brand manufacturer within 45 days, "the approval [of the applicant's ANDA] shall be made effective upon the expiration of the thirty-month [stay]" or, depending on the outcome of such litigation, upon the date of a court decision holding the patent invalid or not infringed, or the date a

patent injunction is lifted following a court decision that the patent is valid and would be infringed.  *Id*. § 355(j)(5)(B)(iii).

- Finally, where an applicant has submitted a paragraph IV certification and filed its ANDA subsequent to another manufacturer's ANDA containing a paragraph IV certification, "the application shall be made effective not earlier than one hundred and eighty days after" either the prior applicant's first commercial marketing or a court decision holding the patent invalid, not infringed, or otherwise unenforceable.  *Id*. § 355(j)(5)(B)(iv).

Thus, where a blocking patent expires and the applicant submits a paragraph II certification, the first-filer's exclusivity no longer bars final approval of the applicant's ANDA.  Instead, under the plain terms of the statute, "the approval may be made effective immediately."  *Id*. § 355(j)(5)(B)(i).

To effectuate that aspect of the statutory scheme, FDA regulations have long required applicants to amend their earlier patent certifications upon patent expiration (or otherwise permit the Agency to deem all extant certifications to be paragraph II certifications).  *See, e.g.*, 21 C.F.R. § 314.94(a)(12)(viii)(C)(1) (2002) ("[A]n applicant shall amend a submitted certification if, at any time before the effective date of the approval of the application, the applicant learns that the submitted certification is no longer accurate."); *id*. § 314.94(a)(12)(viii) (2002) (addressing certification amendments for cases where "the patent expires before [a post-paragraph IV] lawsuit is resolved or expires after the suit is resolved but before the end of the 180-day exclusivity period."); *see also Abbreviated New Drug Applications: Patent And Exclusivity Provisions*, 59 Fed. Reg. 50,338, 50,348 (Oct. 3, 1994) ("[A] patent is deemed to be relevant … until the end of the term of the patent or applicable 180-day exclusivity period, ***whichever occurs first***.  Thus, where there is a patent that has been challenged by a paragraph IV applicant, a subsequent applicant will not be able to file a certification that there is no relevant patent or seek an immediately effective approval ***until either the patent or the 180-day exclusivity period expires***.") (emphasis added).

That is precisely what happened in this case.  Prior to the '303 patent's expiration, Teva filed a paragraph IV certification to that patent.  Following the patent's expiration, and pursuant to the mandate of § 314.94(a)(12)(viii)(C)(1), Teva amended its ANDA to include a paragraph II certification to the '303 patent.  As a result, Teva's ANDA no longer contains a paragraph IV certification, and the plain language of the statute divests Mylan of any exclusivity it previously held against Teva, by requiring the Agency to grant Teva's otherwise eligible ANDA final approval "effective immediately."  21 U.S.C. § 355(j)(5)(B)(i).

Mylan's Citizen Petition neither addresses 21 U.S.C. § 355(j)(5)(B)(i) nor challenges FDA's longstanding regulations with respect to amended patent certifications.  Indeed, the petition specifically represents that "Mylan does not request that the FDA reverse any position that is has publicly announced with respect to the effect of the 180-day exclusivity after patent expiration."  *See* Mylan Petition at 3.  That should be the beginning and end of this matter.  FDA's longstanding regulations compel the conversion

of paragraph IV certifications to paragraph II certifications upon patent expiration, and FDA has "publicly announced" on multiple occasions that the expiration of a patent divests the first-filer of its exclusivity—even after the first-filer's 180-day period has commenced.

Nonetheless, Mylan insists that it remains entitled to exclusivity under 21 U.S.C. 355(j)(5)(B)(iv), because "Mylan's Paragraph IV certification did <u>not change</u> when the patent expired [and] fully complies with the language of § 355(j)(5)(B)(iv), as it 'is for a drug for which a previous application has been submitted under this subsection [containing] a [subclause IV] certification." *Id.* (underscore and alterations in original). But that argument is not only wrong on the facts—it completely misses the point of the statute.

It is wrong on the facts, because Mylan's application is ***not*** an application "'for a drug ***for which a previous application has been submitted*** … containing a subclause IV certification.'" *Id.* (alterations omitted; emphasis added). Instead, Mylan's application—which contained the first paragraph IV certification filed by any generic applicant—***is*** the "previous application containing a paragraph IV certification" to which the statute refers. And Mylan's argument misses the point of the statute, because 21 U.S.C. § 355(j)(5)(B)(iv) does not hinge only on the previous applicant's paragraph IV certification, but on the subsequent applicant's certification. By its plain terms, 21 U.S.C. § 355(j)(5)(B)(iv) applies ***only*** where the subsequent applicant—here, Teva (and not Mylan)—has a paragraph IV certification at the time it moves for final approval. *See* 21 U.S.C. § 355(j)(5)(B)(iv) ("If the application contains a [paragraph IV] certification … and is for a drug for which a previous application has been submitted under this subsection [containing] such a certification…"). It therefore is irrelevant that "Mylan's Paragraph IV certification did <u>not change</u> when the patent expired." Mylan Petition at 3. Teva's certification <u>did</u> change at that time, and by its plain terms, 21 U.S.C. § 355(j)(5)(B)(iv) no longer bars the Agency from granting immediate final approval to Teva's ANDA. Instead, now that Teva has a paragraph II certification on file, 21 U.S.C. § 355(j)(5)(B)(i) is the appropriate provision to apply, and that provision mandates that the Agency approve Teva's ANDA "effective immediately." 21 U.S.C. § 355(j)(5)(B)(i).

## B.    Existing Case Law Supports Holding That Patent Expiration Divests A First-Filer Of 180-Day Exclusivity.

Every court that has addressed the impact of patent expiration on a first-filer's 180-day exclusivity supports the view that patent expiration divests the first filer of its exclusivity period, even after that period has commenced. *See, e.g.*, *Ranbaxy Labs. Ltd. v. Leavitt* [*Simvastatin*], 469 F.3d 120, 126 n.* (D.C. Cir. 2006); *Dr. Reddy's Labs., Inc. v. Thompson*, 302 F. Supp. 2d 340, 354-55 (D.N.J. 2003). For instance, in *Dr. Reddy's*, the court specifically upheld FDA's determination that the expiration of a patent divests the first-filer of its eligibility for exclusivity as a reasonable interpretation of the statute. 302 F. Supp. 2d at 354-55.

To be sure, *Dr. Reddy's* involved a case where the underlying patent expired before the Agency granted final approval to the first filer, rather than after it did so. But

the court's rationale applies equally on the facts of this case. As *Dr. Reddy's* explains, a rule maintaining exclusivity after patent expiration would lead to perverse results, because it would allow an applicant to file the first paragraph IV certification immediately prior to patent expiration and then delay the onset of full market competition even after the only patent barrier to full generic competition has fallen. *Dr. Reddy's*, 302 F. Supp. 2d at 354. As the court noted, that would be inconsistent with the purpose of the statutory scheme, which is intended to encourage patent challenges in order to remove "listed patents that prevent final ANDA approval," *id.*, and thereby facilitate early generic market entry. Once there are no remaining listed patents that prevent final ANDA approval, however, there is no reason to erect another barrier to full generic market entry; all subsequent applicants should be permitted to enter the market without regard to their status as subsequent filers. *Id.* ("Once a listed patent expires, there is no longer a need to provide an incentive to challenge it in court. Consistent with this statutory purpose, the FDA construes the statute to award 180-day exclusivity based only upon paragraph IV certifications to unexpired patents.") (citing 59 Fed. Reg. 50338, 50348)). Moreover, *Dr. Reddy's* squarely upheld FDA's determination that all applicants (and not just first filers) must convert to paragraph II certifications following patent expiration. *Id.* at 354-55; *see also id.* at 355-56 (upholding FDA's interpretation of 21 C.F.R. § 314.94(a)(12)(viii)). That, of course, is precisely what Teva did, and Mylan neither challenges Teva's conversion to a paragraph II certification nor addresses its consequences.

More recently, the D.C. Circuit built on *Dr. Reddy's* holding by explaining that "the text and structure of the statute suggest … that the first generic applicant may no longer ***retain*** exclusivity when the patent has expired." *Ranbaxy*, 469 F.3d at 126 n.* (emphasis added). That is so, the court suggested, because of 21 U.S.C. § 355(j)(5)(B)(i), which provides that an application containing a paragraph II certification may be approved "effective immediately." *Id.* As the D.C. Circuit thus has recognized, the statute plainly suggests that there is no basis for continuing first-filer exclusivity after patent expiration, because the statute unambiguously permits subsequent ANDAs to be approved as soon as they contain post-expiration paragraph II certifications. *See supra* at 6-7.

### C.  Divesting The First Filer Of Exclusivity Upon Patent Expiration Is Consistent With FDA's Interpretation Of The Court-Decision Trigger.

Finally, interpreting the statute to divest a first filer of its remaining 180-day exclusivity is consistent with FDA's longstanding interpretation of the pre-MMA court-decision trigger. By now, it is well-settled that the first filer effectively may be deprived of its exclusivity where a subsequent applicant prevails in its own paragraph IV litigation, and thereby triggers the first-filer's 180-day exclusivity period, before the first filer can market its product. *See, e.g.*, *Minnesota Mining & Mfg. Co. v. Barr Labs.*, 289 F.3d 775, 780 (Fed. Cir. 2002) ("The District of Columbia Circuit has explicitly held that § 355(j)(5)(B)(iv)(II) [can be] triggered by the termination of an action commenced by the second ANDA filer, and we agree.") (citing *Teva Pharms. USA, Inc. v. FDA*, 182 F.3d 1003, 1010 (D.C. Cir. 1999)). Thus, if a subsequent applicant obtains a court

decision of invalidity, non-infringement, or unenforceability through its own post-paragraph IV litigation with the patentee, the first filer's exclusivity will begin to run—whether or not the first filer is eligible to market its product at that time.

As a result, the first filer's 180-day exclusivity period may run out entirely before the first filer can market its product for a single day. *See, e.g.*, *SmithKline Beecham Corp. v. Geneva Pharms., Inc.*, 210 F.R.D. 547, 553 (E.D. Pa. 2002). In such cases, all applicants—regardless of their patent certification—are entitled to market their drug products on the 181st day after the triggering court decision, and that is so whether or not the first applicant has enjoyed a moment of its exclusivity period. It goes without saying that if the first filer's exclusivity period can ***begin and end*** before the first filer can ever use it, that period cannot be extended past the 180th day simply because the manufacturer began its commercial marketing at some point ***during*** the period. In other words, it is well-settled that the mere triggering of a 180-day exclusivity period does not necessarily entitle the first filer to its full 180 days of exclusive marketing.

The same is true of patent expiration: the mere fact that Mylan finally triggered its 180-day exclusivity period two days before patent expiration does not entitle Mylan to the full measure of its exclusivity now that the final patent obstacle has expired. Instead, permitting Mylan to do so would be flatly inconsistent with the fundamental goal of the statutory scheme, which aims to "'get generic drugs into the hands of patients at reasonable prices—fast.'" *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 809 (D.C. Cir. 2001) (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991)). That policy assumes a paramount importance once the expiration of a listed patent opens the pathway to full generic market entry, and there is no basis for depriving consumers of broader competition and increased price relief now that the '303 patent has expired.

## II.    PFIZER IS NOT ENTITLED TO PEDIATRIC EXCLUSIVITY.

Likewise, the plain language of the statute, longstanding Agency regulations, existing judicial precedent, and the policies underlying Hatch-Waxman divest Pfizer of any pediatric exclusivity associated with its Norvasc®-branded amlodipine products. That is so because the Agency consistently has held that the NDA holder must prevail in its post-paragraph IV patent litigation in order to qualify for pediatric exclusivity against generic applicants holding paragraph IV certifications at the time of patent expiration—and Pfizer has now lost its post-paragraph IV patent litigation. Pfizer identifies no compelling basis for departing from that interpretation of the pediatric exclusivity statute, and there is none. As a result, Pfizer is not entitled to pediatric exclusivity for its Norvasc®-branded drug products against generic applicants that held paragraph IV certifications at the time of patent expiration.

A.    **The Plain Language Of The Statute And Existing Judicial Precedent Compel The Conclusion That Pfizer's Patent Loss Divests Pfizer Of Its Entitlement To Pediatric Exclusivity Against Applicants That Held Paragraph IV Certifications At The Time Of Patent Expiration.**

As with 180-day first filer exclusivity, a brand manufacturer's eligibility for pediatric exclusivity depends in part on the kind of certification that a generic applicant submits with respect to the brand manufacturer's listed patents.  Specifically, the statute provides that where a brand manufacturer submits studies demonstrating the effectiveness of its drug product in the pediatric population, it may be entitled to a six-month period of post-expiration marketing exclusivity in three certification-related circumstances:

- First, where the branded manufacturer's drug product claims "a listed patent for which a [paragraph II] certification has been submitted … the period during which an application may not be approved under [21 U.S.C. §] 355(j)(5)(B) … shall be extended by a period of six months after the date the patent expires."  21 U.S.C. § 355a(c)(2)(A)(i).

- Second, where the branded manufacturer's drug product claims "a listed patent for which a [paragraph III] certification has been submitted … the period during which an application may not be approved under [21 U.S.C. §] 355(j)(5)(B) … shall be extended by a period of six months after the date the patent expires."  21 U.S.C. § 355a(c)(2)(A)(ii).

- Finally, where the branded manufacturer's drug product claims "a listed patent for which a [paragraph IV] certification has been submitted…, and in the patent infringement litigation resulting from the certification the court determines that the patent is valid and would be infringed, the period during which an application may not be approved under [21 U.S.C. §] 355(j)(5)(B) … shall be extended by a period of six months after the date the patent expires."  21 U.S.C. § 355a(c)(2)(B).

Read in isolation, each of these provisions seems to be clear.  On one hand, if a generic applicant has submitted a paragraph II or paragraph III certification, the brand manufacturer appears to be entitled to a six-month period of pediatric exclusivity.  On the other, if a generic applicant has submitted a paragraph IV certification, the brand manufacturer is not entitled for pediatric exclusivity against that applicant unless "litigation result[s] from the certification" and "the court determines that the patent is valid and would be infringed" by the applicant.

Nonetheless, significant problems can arise at the intersection of these statutory provisions.  In particular, both FDA and the courts have struggled to determine which provision to apply where an applicant submitted a paragraph IV certification prior to patent expiration. In a series of decisions, the Agency has attempted to solve this dilemma by holding that extant paragraph IV certifications are converted to paragraph II certifications at the time of patent expiration, and that the brand manufacturer is therefore entitled to pediatric exclusivity against those applicants under the statutory provision

regarding pediatric exclusivity for paragraph II filers—21 U.S.C. § 355a(c)(2)(A).  *See Mylan Labs., Inc. v. Thompson* [*Fentanyl Patch*], 332 F. Supp. 2d 106 (D.D.C. 2004), *aff'd* 389 F.3d 1272 (D. Cir. 2004); *Ranbaxy Labs. Ltd. v. FDA* [*Fluconazole*], 307 F. Supp. 2d 15 (D.D.C. 2004), *aff'd* 2004 WL 886333 (D.C. Cir. Apr. 26, 2004) (unpublished disposition); *Barr Labs., Inc. v. Thompson* [*Tamoxifen*], 238 F. Supp. 2d 236 (D.D.C. 2002)).[1]

At the same time, however, the Agency has always made clear that there is an exception to that rule in cases where "'an ANDA applicant submits a paragraph IV certification, and prevails in the patent litigation.'"  *Mylan Labs., Inc. v. Thompson* [*Fentanyl Patch*], 332 F. Supp. 2d 106, 124 (D.D.C. 2004) (quoting Federal Defendants' Memorandum In Opposition To Plaintiffs' Motions For Preliminary Injunction And Summary Judgment And In Support Of Cross-Motion For Summary Judgment at 38 (July 8, 2004).[2]  In that circumstance, FDA has determined that it is appropriate to apply the statutory provision regarding pediatric exclusivity for paragraph IV filers.  *See id.* (citing 21 U.S.C. § 355a(c)(2)(B)).  That is so because in such cases, the court has **not** determined "that the patent is valid and would be infringed," 21 U.S.C. § 355a(c)(2)(B), but rather that the blocking patent is invalid, not infringed, or otherwise unenforceable.  As FDA thus recognizes, it makes no sense in those circumstances to block paragraph IV applicants behind the brand manufacturer's pediatric exclusivity simply because the challenged patent has expired: there is no basis for rewarding a brand manufacturer with an extended monopoly simply because it successfully ran out the clock on a patent it never should have obtained (or which otherwise is unenforceable against generic applicants).  To prevent that perverse result, the plain language of 21 U.S.C. § 355a(c)(2)(B) must apply where the blocking patent has been held invalid or unenforceable, regardless of the post-expiration conversion (whether *de facto* or *de jure*) of an applicant's paragraph IV certification to a paragraph II certification.

Indeed, § 355a(c)(2)(B) must apply not only to the ANDA filer that was successful in obtaining a judgment of invalidity, but also to all other applicants holding a paragraph IV certification at the time of patent expiration.  That is so because a decision of patent invalidity or unenforceability collaterally estops a patentee or brand manufacturer from asserting infringement claims based on that patent against additional defendants.  *See, e.g.*, *Blonder-Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 350 (1971); *see also Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1577 (Fed. Cir. 1994) ("[O]nce the claims of a patent are held invalid in a suit involving one alleged

---

[1]    Notably, no such problem arises where the manufacturer has a paragraph III certification on file at the time of patent expiration, because the pediatric exclusivity statute subjects both paragraph II and paragraph III filers to pediatric exclusivity.  In other words, whether the applicant's paragraph III certification is converted *de facto* or *de jure* to a paragraph II certification, the applicant's final approval is subject to the brand manufacturer's pediatric exclusivity.

[2]    Pfizer itself has conceded the legitimacy of that approach.  In post-*Apotex* briefing, Pfizer specifically conceded that if "the Federal Circuit reverse[s] and find[s] that [the] patent was invalid or unenforceable, the [pediatric] exclusivity period would end immediately."  *See* Pfizer Inc.'s Opposition To Mylan's Motion For A Stay Of The Court's Amended Judgment, *Pfizer Inc. v. Mylan Labs., Inc.*, No 02-CV-1628 (E.D. Pa., filed Mar. 19, 2007), at 5 (Attachment 9).

infringer, an unrelated party who is sued for infringement of those claims may reap the benefit of the invalidity decision under the principles of collateral estoppel."); *General Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1413 (Fed. Cir. 1994) ("The principle of *Blonder-Tongue* ... respecting collateral estoppel also applies to unenforceability.").

As a result, once the Federal Circuit invalidates an asserted patent or declares the patent unenforceable in one paragraph IV applicant's litigation, that judgment precludes the patentee or brand manufacturer from prevailing in patent litigation filed against any other paragraph IV applicant. It therefore must be absurd to interpret the statute to require each generic applicant that submitted a paragraph IV certification prior to patent expiration to await both the onset of patent litigation and its inevitable victory over the brand manufacturer in order to defeat pediatric exclusivity. In other words, while pediatric exclusivity is generally determined on an applicant-by-applicant basis, there is no ground for adopting that approach in cases where there has been a judicial determination that the patent is invalid or unenforceable, because that determination precludes the brand manufacturer from fulfilling the essential precondition to pediatric exclusivity—that it obtain a "court determin[ation] that the patent is valid and infringed," 21 U.S.C. § 355a(c)(2)(B)—in any case involving any applicant that had a paragraph IV certification on file at the time of patent expiration.

That is precisely the case here. As Pfizer itself has recognized, the Federal Circuit did *not* determine that the '303 patent was "valid and infringed," 21 U.S.C. § 355a(2)(B), but rather (to quote Pfizer) "issued [a] Decision, holding that … the only claims Pfizer asserted in its Hatch-Waxman patent infringement action … are invalid as obvious." *See* Response of Plaintiff-Appellee Pfizer Inc. Pursuant To The Court's March 23, 2007 Order, *Pfizer Inc. v. Mylan Labs., Inc.*, No 2007-1194 (Fed. Cir., filed Mar. 26, 2007), at 3 (capitalization in original) (Attachment 10). Under these circumstances, the appropriate provision of the statute to apply is 21 U.S.C. 355a(c)(2)(B), which by its plain terms and pursuant to longstanding patent law principles precludes Pfizer from triggering its pediatric exclusivity against any applicant that had submitted a paragraph IV certification at the time of patent expiration—including Teva.

Despite all of this, Pfizer argues that the *Fentanyl Patch*, *Fluconazole*, and *Tamoxifen* decisions control this case, because they demonstrate that "[t]he agency has .. repeatedly rejected attempts by generic applicants to manipulate the statutory regime in such a way as to deprive innovators who have invested the extensive time and resources required for pediatric studies of their exclusivity." *See, e.g.*, Pfizer Petition For Stay Of Action, No. 07P-0111, at 3; Pfizer Citizen Petition, No. 07P-0110, at 6 (same). But that simply is not so. While each of those decisions did hold that the expiration of a patent and corresponding conversion of an extant paragraph IV certification to a paragraph II certification entitles the brand manufacturer to a six-month period of pediatric exclusivity, none arose after the brand manufacturer lost its litigation.

Thus, in the *Fentanyl Patch* litigation, the brand manufacturer won its post-paragraph IV litigation in the district court, and the Federal Circuit had not issued any decision on the merits of the ensuing appeal at the time the Agency assessed the brand

manufacturer's entitlement to pediatric exclusivity. *See* 389 F.3d at 1277; 332 F. Supp. 2d at 114. In the *Fluconazole* litigation, the parties stipulated to the dismissal of their case prior to trial in the district court. 307 F. Supp. 2d at 17. And in the *Tamoxifen* case, the generic applicant settled its patent litigation with the brand manufacturer, entered the market as an authorized generic, and withdrew its paragraph IV certification before the court issued any decision on the patent merits. 238 F. Supp. 2d at 242. As a result, each of these cases is perfectly consistent with FDA's longstanding position—which specifically has been relied upon by the courts, *see Fentanyl Patch*, 332 F. Supp. 2d at 124—that a brand manufacturer is not entitled to pediatric exclusivity against any applicant holding a paragraph IV application at the time of patent expiration where the brand manufacturer has lost a patent infringement case. Put simply, none of those cases involved a patent loss by the brand manufacturer—much less one based on patent invalidity.

**B.    There Is No Basis For Delaying Generic Entry Until The Federal Circuit's Mandate Issues.**

As if to concede that its patent loss at the Federal Circuit prevents the assertion of pediatric exclusivity against any generic manufacturer that submitted a paragraph IV certification prior to the expiration of the '303 patent, Pfizer ultimately resorts to arguing that the Federal Circuit's decision is ineffective until the Federal Circuit issues its mandate to the district court. *See* Letter from Peter Safir to Sheldon Bradshaw ("Safir Letter"), Mar. 25, 2007, at 2-3 (Attachment 11). But that argument has no basis in the text of the pediatric exclusivity statute—which speaks only to the "court['s] determin[ation] that the patent is valid and infringed"—and it reflects a fundamental misunderstanding of appellate procedure.

That is so because an appellate court "determines" the merits of a case in its opinions and orders, and those opinions and orders constitute the court's "judgment" under Rule 36 of the Federal Rules of Appellate Procedure. That rule directs the clerk of the court to "prepare, sign, and enter the judgment … after receiving the court's *opinion*," and requires the clerk "[o]n the date when judgment is entered [to] serve on all parties a copy of *the opinion* … and a notice of the date when the judgment was entered." Fed. R. App. P. 36 (emphasis added). Here, the clerk entered the court's judgment in this case—"Disposition: Reversed"—on March 22, 2007, and the opinion on which that judgment was based reflected the court's square "determin[ation]" that Pfizer's patent was invalid as obvious. *See* Docket, *Pfizer Inc. v. Apotex, Inc.*, No. 2006-1261 (Attachment 12); *see also* Fed. R. App. P. 36 ("A judgment is entered when it is noted on the docket."). That, after all, is why Pfizer itself has referred to the Federal Circuit's opinion and judgment in the *Apotex* case as a "*Decision*" with a "*holding* that … the only claims Pfizer asserted in its Hatch-Waxman patent infringement action … are invalid as obvious." *See* Response of Plaintiff-Appellee Pfizer Inc. Pursuant To The Court's March 23, 2007 Order, *Pfizer Inc. v. Mylan Labs., Inc.*, No 2007-1194 (Fed. Cir., filed Mar. 26, 2007), at 3 (capitalization in original; emphasis added). It simply defies credulity to think that the Federal Circuit's opinion and judgment were anything other than a "determin[ation]" of patent invalidity.

In sharp contrast to the court's opinion and judgment, the appellate court's mandate merely "consists of a certified *copy* of the judgment, a *copy* of the court's opinion, if any, and any direction about costs." Fed. R. App. P. 41(a). By definition, however, those "*cop[ies]*" do not represent any independent legal "determination" of the patent merits. To the contrary, it is well understood that the scope of a mandate is circumscribed by the content of the court's judgment, as reflected in its opinion on the merits. *See, e.g.*, *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1483-84 (Fed. Cir. 1998).

That, presumably, is why the pediatric exclusivity statute focuses on the merits of the court's "determin[ation]," as opposed to the court's eventual issuance of a mandate. In that respect, the pediatric exclusivity statute stands in marked contrast to the many federal statutes which do focus on the court's issuance of a mandate (as opposed to the judgment embodied in its opinion and order). *See, e.g.*, 26 U.S.C. § 7481(a) (finality is determined "upon mandate" issued by Court of Appeals or Supreme Court); 15 U.S.C. § 21(g) (finality determined *inter alia* "upon the expiration of thirty days from the date of issuance of the mandate of the Supreme Court"); 15 U.S.C. § 45 (same). These statutes thus demonstrate that Congress knows how to time events from the issuance of an appellate "mandate" when it wants to—and it did not do so here.

Moreover, delaying generic market entry until the issuance of the mandate would be flatly inconsistent with the structure and purposes of the Hatch-Waxman Act. The whole point of the statutory scheme is to "'get generic drugs into the hands of patients at reasonable prices—fast.'" *Andrx Pharms.*, 256 F.3d at 809 (quoting *Barr Labs.*, 930 F.2d at 76). Once it is reasonably clear that a patent is invalid or otherwise unenforceable, as it is when the Federal Circuit issues a published opinion invalidating the asserted claims of a patent, there is simply no sound basis for delaying the onset of market competition— not least of all because the prospect of further appellate proceedings resulting in a reversal of the court's opinion and judgment is virtually nonexistent. *See* Judicial Business of the United States Courts: 2006 at 50 Table S.1 (Attachment 13) (showing that of 34,580 dispositions in the various courts of appeals, just 65—less than 1 in 500— were issued by *en banc* courts); *id.* at 101 Table A-1 (Attachment 14) (showing that of approximately 9600 petitions for *certiorari*, fewer than 90—less than 1 in 100—were granted by the Supreme Court).[3]

Those slim prospects for further appellate review thus stand in marked contrast to the high likelihood that a losing brand manufacturer can run out the clock on its pediatric

---

[3]    Though the judicial conference does not track *en banc* review by the Federal Circuit, there is good reason to believe that the prospects of such review in that court are far lower than the national average. In contrast to virtually every other appellate court in the country, the Federal Circuit pre-circulates its opinions to every active member of the court prior to issuing them, and in connection with that process has established a formal mechanism for the court's judges to request revisions and even formal *en banc* review of an opinion prior to its issuance. *See, e.g.*, Federal Circuit Internal Operating Procedure 14. As a result, *en banc* review is especially rare in that court because all active judges of the court have an opportunity to review, comment on, and effectuate changes to opinions before they are finalized— significantly minimizing the possibility that a three-judge panel will issue a decision with which a court majority disagrees.

exclusivity before the mandate issues. As Pfizer is quick to note, losing litigants have 14 days to file a petition for rehearing *en banc*, and the filing of such a petition indefinitely stays the mandate pending the court's disposition of such a motion. Even after a petition is denied, the mandate is generally delayed another 7 days—and during that period the losing litigant can move to stay issuance of the mandate pending further review by the Supreme Court. *See* Safir Letter at 2. Suffice it to say, that process can take months, because litigants have 90 days to file a petition for *certiorari* (and can seek an extension of up to 60 days), and respondents have 30 days to respond to such a petition. *See* Sup. Ct. RR. 13.1, 13.5, 15.3, 30.4. As a result, it should come as no surprise that Pfizer has informed the Agency that it intends to file a petition for rehearing *en banc* at the Federal Circuit (and has foreshadowed subsequent efforts to delay the mandate even longer by seeking a stay pending Supreme Court review). *See* Safir Letter at 2-3 & n.1. At bottom, then, forestalling market competition until the mandate issues will all but guarantee that manufacturers can block market competition for the duration of a pediatric exclusivity period, despite the fact that there is no reasonable possibility that the Federal Circuit's decision of patent invalidity will be reviewed—much less reversed.

Pfizer's only response to these arguments is that the Agency has issued a preliminary, procedural Guidance that in certain cases allegedly precludes the agency from "approving the pending ANDA until 'the date the district court issues a judgment that the patent is invalid, unenforceable, or not infringed pursuant to a mandate issued by a court of appeals." FDA Guidance, *Court Decisions, ANDA Approvals, and 180-Day Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act*, ¶ IV.A (Mar. 2000). But contrary to Pfizer's representations, that Guidance has nothing to do with the pediatric exclusivity provisions at issue in this case. Instead, it addresses how to determine the date of a triggering court decision for purposes of establishing when the first generic applicant's 180-day exclusivity begins to run, and by its own terms, is expressly restricted to a narrow set of circumstances not remotely present here. *See id.* at 4 (stating that the Guidance is intended to interpret the first-filer exclusivity provisions of the Act, and will apply only "for approval and exclusivity determinations for ANDAs containing a paragraph IV certification where the ANDA cites a reference listed drug **for which no other ANDA containing a paragraph IV certification has been submitted**.") (emphasis added).[4]

---

[4]    Even if that Guidance were relevant, however, it provides no support for Pfizer's position in this case. The court-decision provisions of 21 U.S.C. § 355(j)(5)(B) are *timing* provisions, and the Agency has interpreted the statute to delay the court-decision trigger pending issuance of the mandate where a district court decision of patent validity is reversed on appeal. That interpretation has the salutary effect of helping prevent subsequent applicants from prematurely triggering a first filer's exclusivity— and that is especially important where the first applicant's approval is subject either to a 30-month stay or to a patent injunction based on a determination of patent validity in the first-filer's litigation. In that respect, the Agency's interpretation of the court-decision trigger benefits generic applicants by maintaining the core incentive structure of the Hatch-Waxman Act.

By contrast, the "court determin[ation]" requirement of 21 U.S.C. § 355a(c)(2)(B) is an *eligibility* provision, and thus focuses on the substance of the court's determination—not its timing. After all, the commencement of pediatric exclusivity is already fixed as the date of patent expiration, and the issuance of a mandate thus has no impact on the timing of pediatric exclusivity or the core incentive

## CONCLUSION

Consistent with the analysis set forth above, Teva therefore responds to the questions presented in your March 29, 2007 facsimile as follows:

(1)    The Federal Circuit's *Apotex* decision should be given effect as of the date of the court's judgment, and FDA need not await the issuance of the Federal Circuit's mandate.  Entry of the Federal Circuit's judgment divested Pfizer of its eligibility for pediatric exclusivity against any manufacturer that had submitted a paragraph IV certification prior to the expiration of the '303 patent, and the subsequent expiration of that patent both divested Mylan of its 180-day exclusivity and entitled all applicants holding paragraph IV certifications at the time of patent expiration to immediate final approval.

(2)    If FDA must await the issuance of the mandate, all unapproved ANDAs are subject to Pfizer's pediatric exclusivity pending issuance of that mandate.

(3)    Now that the '303 patent has expired, longstanding FDA regulations either require all unapproved ANDA applicants to convert to paragraph II certifications or permit the Agency to deem all extant certifications to be paragraph II certifications.

(4)    As a result of the *Apotex* decision and following the expiration of the '303 patent, pediatric exclusivity attaches only to those applicants that held paragraph III certifications at the time of patent expiration.  Applicants that held paragraph IV certifications at that time are eligible for immediate final approval, whether or not the Agency subsequently deemed the applicant's certification to be a paragraph II certification or the applicant subsequently filed a paragraph II certification.

(5)    180-day exclusivity triggered before patent expiration no longer bars the approval of otherwise eligible ANDAs following patent expiration.

For the foregoing reasons, final approval of Teva's ANDA is neither barred by Mylan's 180-day exclusivity nor blocked by Pfizer's pediatric exclusivity.  The Agency should therefore grant Teva's ANDA No. 76-846 immediate final approval.

Sincerely,
Teva Pharmaceuticals USA, Inc.

---

structure of the Hatch-Waxman Act.  Indeed, requiring generic applicants to await the issuance of the mandate would undermine the statute's incentive structure by minimizing the incentive to challenge pharmaceutical patents.

OGD NO. 2007N-0123
Amlodipine Abbreviated New Drug Application Approvals
Page 18

Deborah A. Jaskot
Vice-President, Regulatory Affairs

NOTE:  This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-1194

PFIZER INC.,

Plaintiff-Appellee,

v.

MYLAN LABORATORIES, INC. and MYLAN PHARMACEUTICALS, INC.,

Defendants-Appellants.

ON MOTION

Before PROST, <u>Circuit Judge</u>.

<u>O R D E R</u>

Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc. (Mylan) move for a stay, pending appeal, of the amended judgment of the United States District Court for the Western District of Pennsylvania that ordered that the effective date of any approval of Mylan's abbreviated new drug application "shall be a date which is not earlier than the date of expiration of the '303 patent" and that prohibited Mylan from making, using or selling the concerned drug.  Pfizer Inc. opposes.  Mylan replies.  Mylan also moves for leave to "append" to its motion certain news articles that are not part of the district court record.  Mylan submits a supplement to its motion to make arguments concerning this court's recent decision in <u>Pfizer Inc. v. Apotex, Inc.</u>, --- F.3d ---, no. 2006-1261 (Fed. Cir. March 22, 2007), invalidating the asserted claims of the patent in this case.  Pfizer responds.

Upon consideration thereof,

IT IS ORDERED THAT:

(1)    Pfizer and Mylan are each are directed to respond, no later than 10 a.m. on Monday, March 26, 2007, concerning how the invalidity determination affects the pediatric exclusivity period and the ANDA approval.    Inter alia, the parties should address when and how the FDA will likely respond to the court's decision in no. 2006-1261. Each response should not exceed 15 pages.

(2)    Mylan's motion for a stay, pending appeal, is held in abeyance pending receipt of the parties' responses to this order and the court's consideration of the papers submitted.

(3)    The district court's order is temporarily stayed, pending this court's further consideration of the papers submitted.

MAR 2 3 2007
_____
Date

_Sharon Prost_
Sharon Prost
Circuit Judge

cc:    Richard G. Greco, Esq.
       David J. Harth, Esq.

s8

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

MAR 2 3 2007

JAN HORBALY
CLERK



Home > Media Room > News Releases

Welcome

Company Overview

**News Releases**

<< [Back to News Releases]

### Mylan Laboratories Launches Amlodipine Besylate Tablets and Has Triggered Its 180 Days of Exclusivity

PITTSBURGH, March 23 /PRNewswire-FirstCall/ -- Mylan Laboratories Inc. (NYSE: MYL) today launched Amlodipine Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base). Amlodipine Besylate Tablets are the generic version of Pfizer's Norvasc® Tablets, which had U.S. sales of approximately $2.7 billion for the 12-month period ended December 31, 2006, according to IMS Health. Mylan was the first generic company to file on all strengths of amlodipine and therefore has triggered its 180 days of exclusivity. The U.S. Court of Appeals for the Federal Circuit in Washington ruled yesterday that the last remaining patent in place for amlodipine besylate is invalid.

Mylan Laboratories Inc. is a leading pharmaceutical company with three principal subsidiaries, Mylan Pharmaceuticals Inc., Mylan Technologies Inc. and UDL Laboratories Inc., and a controlling interest in Matrix Laboratories Limited, India. Mylan develops, licenses, manufactures, markets and distributes an extensive line of generic and proprietary products.

For more information about Mylan, visit http://www.mylan.com/.

This press release includes statements that constitute "forward-looking statements," including with regard to the launch of Amlodipine Besylate Tablets and the duration of market exclusivity. These statements are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Because such statements inherently involve risks and uncertainties, actual future results may differ materially from those expressed or implied by such forward- looking statements. Factors that could cause or contribute to such differences include, but are not limited to: the use of legal, regulatory and legislative strategies by competitors or other third parties to delay or prevent product introductions; risks inherent in legal proceedings; and the other risks detailed in the Company's periodic filings with the Securities and Exchange Commission. The Company undertakes no obligation to update these statements for revisions or changes after the date of this release.

SOURCE: Mylan Laboratories Inc.

CONTACT: Media, Patrick Fitzgerald, +1-724-514-1800, or Investors, Kris King, +1-724-514-1800, both of Mylan Laboratories Inc.

Web site: http://www.mylan.com/

Legal & Copyright Disclaimer.

© Copyright 2005 Mylan Laboratories Inc. All rights reserved.

Pfizer Inc
235 East 42nd Street     235/24/10A
New York, NY 10017-5755
Tel 212 733 5225  Fax 646 383 9498
Email Jeffrey.b.chasnow@pfizer.com



**Jeffrey B. Chasnow**
Assistant General Counsel
Legal Division

March 21, 2007

Division of Dockets Management
Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane, Room 1061
Rockville, M 20857

## CITIZEN PETITION

Pfizer Inc ("Pfizer") submits this petition under sections 505, 505A, and 506A of the Federal Food, Drug, and Cosmetic Act ("FDCA") to request that FDA apply Pfizer's pediatric exclusivity rights for amlodipine to NDA 20-364, the Novartis Pharmaceuticals Corporation ("Novartis") new drug application ("NDA") for Lotrel® (amlodipine besylate; benazepril hydrochloride). As set forth in this petition, Pfizer believes that FDA is required, as a matter of law, to rescind approval of Novartis's Lotrel® NDA, and withhold approval of any supplements to the Lotrel® NDA, in order to effectuate the pediatric exclusivity that FDA granted to Pfizer for amlodipine under section 505A of the FDCA.

### A. **Actions Requested**

Pfizer requests that FDA take the following actions to enforce its pediatric exclusivity for amlodipine:

1. Deem the Lotrel® NDA a section 505(b)(2) application subject to Pfizer's pediatric exclusivity for amlodipine;

2. Rescind final approval of the Lotrel® NDA and reclassify approval as tentative; and

2007P.0110                                                                                            CP1

3. Withhold final approval of any supplemental NDA ("sNDA") submitted by
   Novartis to its Lotrel® NDA because any such sNDA is a section 505(b)(2) NDA
   subject to Pfizer's pediatric exclusivity for amlodipine.[1]

## B. **Statement of Grounds**

### I.    **Background**

#### 1.    **Pfizer's Pediatric Exclusivity for Amlodipine**

Pfizer holds NDA 19-787, the reference listed drug for amlodipine besylate,
which Pfizer markets under the trade name Norvasc®. Pfizer owns, and submitted for
listing in FDA's "Orange Book," two patents claiming amlodipine: United States Patent
4,572,909 ("'909 patent") and United State Patent 4,879,303 ("'303 patent").

In November 2001, FDA granted Pfizer pediatric exclusivity for amlodipine
pursuant to section 505A of the FDCA. As reflected in the Orange Book, the pediatric
exclusivity associated with the '909 patent expired on January 31, 2007, and the pediatric
exclusivity for the '303 patent expires on September 25, 2007. Pfizer has successfully
enforced the pediatric exclusivity associated with the '303 patent by prevailing in patent
litigation against every ANDA applicant that has challenged the patent. Thus, no generic
amlodipine besylate product will be marketed prior to expiration of the pediatric
exclusivity for amlodipine (i.e., prior to September 25, 2007).

#### 2.    **Pfizer's License Agreement With Novartis Regarding Lotrel®**

In 1989, Pfizer executed a License Agreement with Ciba-Geigy Corp., a
predecessor to Novartis, authorizing Ciba-Geigy to seek approval of, and market, a
combination product containing amlodipine and benazepril. The License Agreement
granted Ciba-Geigy a license under Pfizer's '909 and '303 patents, and also a right of
reference to Pfizer's IND and NDA for amlodipine. Pursuant to the License Agreement,
in June 1993 Pfizer filed with FDA a right of reference to Pfizer's approved NDA 19-
787.[2] This right of reference enabled Novartis to submit a section 505(b)(1) application
for Lotrel®. *See* 21 C.F.R. §314.50(g); *see also* FDA, *Applications Covered by Section
505(b)(2) (Draft Guidance)*, at 3 (1999) ("*505(b)(2) Draft Guidance*") ("If the applicant
had a right of reference to all of the information necessary for approval, even if the
applicant had not conducted the studies, the application would be considered a 505(b)(1)

---

[1]    Concomitantly with this petition, Pfizer is submitting a Petition for Stay of Action requesting that
FDA withhold approval of any supplements to the Lotrel® NDA until the expiration of the amlodipine
pediatric exclusivity period.

[2]    At Novartis's request, and under the terms of the License Agreement, Pfizer submitted a revised
right of reference in July 2006. The purpose of the July 2006 submission was to clarify that Novartis was
authorized to "refer to Pfizer's Investigational New Drug Application IND #'s 40,703 and 48,971 for
amlodipine and to refer to Pfizer's NDA No. 19-787 for all matters that relate to the manufacture, use, and
sale of amlodipine in support of NDA 20-364."

application."). In reliance on this right of reference, FDA approved Novartis's Lotrel® NDA in March 1995.

### 3.    Termination of Novartis's Right of Reference

Under the License Agreement, Novartis's right of reference to Pfizer's amlodipine IND and NDA "shall expire automatically upon the termination or expiration of this Agreement." Although Pfizer believes that the Agreement remains in effect through September 25, 2007 (when the pediatric exclusivity for amlodipine expires), Novartis recently informed Pfizer that it is repudiating the agreement and will not pay royalties under the agreement after March 25, 2007. Novartis insists, however, that it can continue to sell Lotrel® during the amlodipine pediatric exclusivity period.

On March 21, 2007, in response to Novartis's repudiation of the License Agreement, Pfizer notified FDA that Pfizer is revoking Novartis's right of reference to Pfizer's amlodipine IND and NDA, effective midnight, March 25, 2007. (Attachment A). As explained in the notice of revocation, Pfizer believes that:

> As the result of this revocation, as of midnight March 25, 2007, Novartis's approved NDA No. 20-364 will no longer have a valid right of reference to Pfizer's NDA No. 19-787. Thus, it is Pfizer's view that as of that date and time, Novartis cannot continue to market Lotrel® under NDA No. 20-364 unless Novartis first obtains a valid right of reference to data supporting NDA No. 20-364, or another legal basis (if available) for approval of its Lotrel® product.

The legal reasons supporting this position are set forth below. Pfizer believes that FDA, as a matter of law, is required to rescind approval of Novartis's Lotrel® NDA, and withhold approval of any supplements to the Lotrel® NDA, in order to effectuate Pfizer's pediatric exclusivity for amlodipine.

### II.    Argument

#### 1.    Without a "Right of Reference," the Lotrel® NDA is a 505(b)(2) Application

As of midnight March 25, 2007, Novartis's Lotrel® NDA no longer has a right of reference to Pfizer's Norvasc® NDA. (Attachment A). In the absence of a right of reference, Novartis's application is necessarily a 505(b)(2) application.

> A 505(b)(2) application is one for which one or more of the investigations relied upon by the applicant for approval "were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted."

*505(b)(2) Draft Guidance* at 2 (quoting 21 USC §355(b)(2)).

This is confirmed by FDA's treatment of Novartis's NDA 21-990 for Exforge® (amlodipine and valsartan). The NDA for Exforge® relies on Norvasc® as the reference listed drug, but with no authorized right of reference. FDA explicitly is treating the Exforge® NDA as an application under section 505(b)(2). As set forth in a tentative approval letter FDA issued for Exforge® in December 2006, FDA regards the Exforge® NDA as an application "submitted pursuant to section 505(b)(2) . . .". (Attachment B.)

There is no basis to differentiate between the Lotrel® and Exforge® NDAs. Neither has a right of reference or use to the Norvasc® NDA. Both are thus section 505(b)(2) applications.

Novartis has argued to Pfizer that revocation of the right of reference does not change the regulatory status of the Lotrel® NDA, and thus that Novartis can continue to sell Lotrel® without a right of reference to the Norvasc® NDA. Both the FDCA and FDA's regulations make clear, however, that a 505(b)(1) application must contain either "full reports of investigations" supporting approval or a right of reference to such data. 21 USC § 355(b)(1). Because, as of March 25, 2007, the Lotrel® NDA has neither, its approval can no longer be considered valid under the terms of section 505(b)(1). *See A.L. Labs., Inc. v. Philips Roxane, Inc.,* 803 F.2d 383 (8th Cir. 1986) ("FDA had agreed that if the right of reference were invalidated it would void any drug approvals . . . obtained through use of the . . . data."). Novartis is clearly incorrect, therefore, that its original 505(b)(1) NDA remains valid notwithstanding withdrawal of the right of reference to the data supporting the NDA's approval.

## 2. Because the Lotrel® NDA Is A 505(b)(2) Application, It Is Subject to Pfizer's Pediatric Exclusivity for Amlodipine

All 505(b)(2) applications are subject to patent and exclusivity rights applicable to the listed drug, including pediatric exclusivity. *505(b)(2) Draft Guidance* at 7 (citing 21 CFR § 314.50(i), 314.107, 314.108 and 21 USC § 355a). Here, Pfizer's pediatric exclusivity precludes final approval of any section 505(b)(2) application referencing Norvasc® until after the expiration of the pediatric exclusivity period for amlodipine — until after September 25, 2007. This is equally true whether the section 505(b)(2) application relies on published literature, Pfizer's Norvasc® data, or FDA's "findings" of safety and effectiveness for Norvasc®.[3]

FDA's treatment of Exforge® confirms that the Lotrel® NDA is subject to Pfizer's pediatric exclusivity for amlodipine. FDA explicitly held that Exforge® cannot be approved until the end of the amlodipine pediatric exclusivity period:

> The listed reference drug product (Norvasc®), upon which you base your application, is subject to a period of patent protection and exclusivity

---

[3]    Pfizer has filed previous petitions challenging FDA's interpretation and application of section 505(b)(2). Nothing in this petition should be construed as modifying Pfizer's position on section 505(b)(2).

protection, and therefore, final approval of your application under section 505(c)(3) of the Act (21 USC 355(c)(3)) may not be made effective until this period has expired, i.e., September 25, 2007.

(Attachment B). Because the Lotrel® NDA, like the Exforge® NDA, is a 505(b)(2) application, the Lotrel® NDA is similarly subject to the amlodipine pediatric exclusivity.

### 3. FDA Must Convert Final Approval of the Lotrel® NDA to Tentative Approval In Order to Effectuate Pfizer's Pediatric Exclusivity

Because the Lotrel® NDA is an application under section 505(b)(2) subject to pediatric exclusivity, FDA must rescind final, effective approval of the NDA and convert the NDA's approval status to "tentative approval." This occurs by operation of law, consistent with how FDA has effectuated pediatric exclusivity against ANDA applications holding final approval.

Exactly like an ANDA, a 505(b)(2) application must contain a patent certification. 21 USC §355(b)(2)(A). FDA has clearly held that, at the time a patent expires, an ANDA or 505(b)(2) application should be deemed to contain a paragraph II certification—and thus be subject to pediatric exclusivity—as a matter of law. *See Mylan Labs. v. Thompson,* 389 F.3d 1272, 1282-83 (DC Cir. 2004) (upholding FDA's conclusion that upon patent expiry, patent certification changes to a paragraph II certification and pediatric exclusivity attaches). In those circumstances, it is necessary and appropriate for FDA to rescind approval of the application in order to give effect to pediatric exclusivity. Thus, because the Lotrel® NDA contains a paragraph II certification and is subject to pediatric exclusivity, FDA should rescind its final approval and maintain its approval as "tentative" until after September 25, 2007. 21 USC § 355a(c)(2)(A)(i).

FDA need not invoke the procedures of section 505(e) in order to effectuate this change in status from final approval to approval with a delayed effective date. As FDA itself has explained, that provision merely sets forth the specific circumstances under which FDA must withdraw approval after notice and hearing, not the exclusive circumstances in which FDA may do so. *Mylan Labs.,* 389 F.3d at 1281. The provision "does not prohibit the FDA from withdrawing approval under other circumstances – or more precisely does not prohibit the FDA from changing a final into a tentative approval under circumstances different from those named in section 355(e)." *Id.*

### 4. FDA Must Defer the Effective Date of Any sNDA for Lotrel® until Pfizer's Pediatric Exclusivity Has Expired

Until now, Pfizer has been supplying amlodipine to Novartis for use in manufacturing Lotrel®. As a consequence of Novartis's repudiation of the License Agreement, however, Pfizer is no longer supplying amlodipine to Novartis. Thus, Pfizer

expects that Novartis may seek FDA approval for a manufacturing supplement in order to substitute an alternative amlodipine source.[4]

Pfizer submits that FDA is prohibited by the pediatric exclusivity provisions of the FDCA from approving any sNDA for Lotrel® until after the pediatric exclusivity for amlodipine has expired.  "[A] supplement to an application is a new drug application." *505(b)(2) Draft Guidance* at 1.  Thus, any manufacturing supplement to the Lotrel® NDA must be considered as an NDA.  Moreover, any such NDA must be treated as an NDA under section 505(b)(2), because the Lotrel® NDA no longer contains a right of reference to the data supporting its approval.  For the reasons explained above, such a 505(b)(2) NDA cannot be approved until after the expiration of the pediatric exclusivity period for amlodipine.

### III.    Conclusion

FDA has acknowledged that "[t]he pediatric exclusivity provision has done more to generate clinical studies and useful prescribing information for the pediatric population than any other regulatory or legislative process to date. S. Rep. 107-79 at 5 (2001) (citing FDA's January 2001 Status Report to Congress). FDA has thus been careful to preserve the incentive and to ensure that grants of pediatric exclusivity are certain.  The agency has repeatedly rejected attempts by generic applicants to manipulate the system so as to deprive pioneers who have invested the extensive time and resources required for pediatric studies of their exclusivity.[5]

Similarly, FDA should not in this case permit Novartis to circumvent Pfizer's pediatric exclusivity.  As set forth above, FDA should rescind approval of Novartis's Lotrel® NDA, and withhold approval of any supplements to the Lotrel® NDA, in order to effectuate the pediatric exclusivity that FDA granted to Pfizer for amlodipine under section 505A of the FDCA.

### C.    Environmental Impact

The petition is subject to a categorical exclusion from the requirement of an environmental impact assessment. *See* 21 C.F.R. §25.31(a).

---

[4]    Because Novartis would be seeking approval of a new manufacturing process as well as a new manufacturing site, a prior approval supplement is necessary. 21 CFR 314.70(b); FDA, *Changes to an Approved NDA or ANDA* 3, 9-14 (2004).  If Novartis submits a "Changes Being Effected" supplement, FDA should notify Novartis that a prior approval supplement is required.

[5]    *See e.g., Mylan Labs. v. Thompson,* 389 F.3d 1272 (DC Cir. 2004) (upholding FDA's rejection of Mylan's claim that it was not subject to pediatric exclusivity for fentanyl); *Ranbaxy Labs. Ltd. V. FDA,* Civ. No. 04-5079, 2004 U.S. App. LEXIS 8311 (DC Cir. 2004) (upholding FDA's rejection of Ranbaxy's claim that it was not subject to pediatric exclusivity for fluconazole); *Barr Labs., Inc. v. Thompson,* 238 F. Supp. 2d 236 (DDC 2002) (upholding FDA's rejection of Barr's claim that it was not subject to pediatric exclusivity for tamoxifen).

## D.  Economic Impact

Information on the economic impact of this petition will be submitted if requested by the Commissioner.

## E.  Certification

Pfizer certifies that to the best knowledge and belief of Pfizer, this petition include all information and views on which the petition relies and that it includes representative data and information known to Pfizer which are unfavorable to the petition.

Respectfully submitted,

Jeffrey B. Chasnow
Kelly A. Falconer
Pfizer Inc
235 E. 42nd Street
New York, NY 10017

# TAB   A

Worldwide Regulatory Affairs & Quality Assurance
Pfizer Inc
235 East 42nd Street
New York, NY 10017-5755
Tel 212 573-2913 Fax 212 672-7807
Email andrea.m.garrity@pfizer.com



## Pfizer Global Pharmaceuticals

March 21, 2007

Andrea M. Garrity
Director/Team Leader
US Regulatory Affairs

Norman Stockbridge, M.D.
Director
Division of Cardiovascular and Renal Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
White Oak CDER Office Building 22, Room 4168
10903 New Hampshire Avenue
Silver Spring, Maryland 20993

**RE: NDA # 19-787 - Norvasc® (amlodipine besylate) Tablets
General Correspondence: Right of Cross-Reference**

Dear Dr. Stockbridge:

Reference is made to the new drug application ("NDA") No. 19-787 for Norvasc® (amlodipine besylate) Tablets held by Pfizer Inc. ("PFIZER") and to Pfizer's amlodipine NDA cross-reference authorization letter submitted to the Reviewing Division on June 22, 1993, granting the Agency the right to refer to certain specified portions of Pfizer's NDA No. 19-787 in support of NDA No. 20-364 filed by Ciba Geigy Corporation, a predecessor to Novartis Pharmaceuticals Corporation ("Novartis"), for Lotrel® (benazepril HCl/amlodipine besylate) Capsules (NDA 20-364). Reference is also made to Pfizer's amlodipine NDA cross-reference authorization letter submitted to the Reviewing Division on July 25, 2006, which clarified that the right of reference referred to Pfizer's INDs 40, 703 and 48,971 as well as to NDA 19-787.

Pfizer granted Novartis this right of reference pursuant to a Patent License Agreement ("Agreement") dated July 18, 1989 between Pfizer and Novartis's predecessor company, Ciba-Geigy Corporation. Under the Agreement, "such right of reference shall expire automatically upon the termination or expiration of this Agreement." Although Pfizer believes that the Agreement remains in effect through September 25, 2007 (the period of pediatric exclusivity), Novartis has unexpectedly repudiated the Agreement and refused to pay royalties after March 25, 2007, even while insisting that it will continue to market

CONFIDENTIAL /TRADE SECRET INFORMATION SUBJECT TO 18 USC § 1905 AND TO WHICH ALL CLAIMS OF PRIVILEGE AND CONFIDENTIALITY ARE ASSERTED IN BOTH STATUTORY AND COMMON LAW. FURTHER DISSEMINATION MAY ONLY BE MADE WITH THE EXPRESS WRITTEN PERMISSION OF PFIZER INC.

Norman Stockbridge, M.D.
March 21, 2007
Page 2 of 2

based on the right of reference. In light Novartis's repudiation of the Agreement, Pfizer hereby revokes the right of reference previously granted, effective March 25, 2007.

Please make note of this change in Novartis's NDA for Lotrel®, NDA No. 20-364. As the result of this revocation, as of midnight March 25, 2007, Novartis's approved NDA No. 20-364 will no longer have a valid right of reference to Pfizer's NDA No. 19-787. Thus, it is Pfizer's view that as of that date and time, Novartis cannot continue to market Lotrel under NDA No. 20-364 unless Novartis first obtains a valid right of reference to data supporting NDA No. 20-364, or another legal basis (if available) for approval of its Lotrel® product.

Please be advised that material and data in the Norvasc® NDA are trade secret and confidential commercial information of Pfizer. The legal protection of all such confidential materials is hereby claimed under applicable provisions of 18 U.S.C. § 1905 and 21 U.S.C. § 331(j).

Sincerely,

Andrea M. Garrity

| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>FOOD AND DRUG ADMINISTRATION<br><br>**APPLICATION TO MARKET A NEW DRUG, BIOLOGIC,<br>OR AN ANTIBIOTIC DRUG FOR HUMAN USE**<br>*(Title 21, Code of Federal Regulations, Parts 314 & 601)* | Form Approved: OMB No. 0910-0430<br>Expiration Date: April 30, 2009<br>See OMB Statement on page 2. |
|---|---|
| | **FOR FDA USE ONLY** |
| | APPLICATION NUMBER |

### APPLICANT INFORMATION

| NAME OF APPLICANT<br>**Pfizer Inc** | DATE OF SUBMISSION<br>03/21/07 |
|---|---|
| TELEPHONE NO. *(Include Area Code)*<br>212 733-3412 | FACSIMILE *(FAX)* Number *(Include Area Code)*<br>212 672-7807 |
| APPLICANT ADDRESS *(Number, Street, City, State, Country, ZIP Code or Mail Code, and U.S. License number if previously issued)*<br>235 East 42nd Street<br>New York, NY 10017 | AUTHORIZED U.S. AGENT NAME & ADDRESS *(Number, Street, City, State, ZIP Code, telephone & FAX number)* IF APPLICABLE |

### PRODUCT DESCRIPTION

NEW DRUG OR ANTIBIOTIC APPLICATION NUMBER, OR BIOLOGICS LICENSE APPLICATION NUMBER *(If previously issued)*  NDA 19-787

| ESTABLISHED NAME *(e.g., Proper name, USP/USAN name)*<br>Amlodipine Besylate | PROPRIETARY NAME *(trade name)* IF ANY<br>Norvasc® |
|---|---|

| CHEMICAL/BIOCHEMICAL/BLOOD PRODUCT NAME *(If any)*<br>NORVASC is chemically described as (R.S.) 3-ethyl-5-methyl-2-(2-aminoethoxymethyl)-4-(2-chlorophenyl)-1,4-dihydro-6-methyl-3,5-pyridinedicarboxylate benzenesulphonate. | CODE NAME *(If any)* |
|---|---|

| DOSAGE FORM:<br>Tablet | STRENGTHS:<br>2.5, 5.0, 10.0 mg | ROUTE OF ADMINISTRATION:<br>Oral |
|---|---|---|

(PROPOSED) INDICATION(S) FOR USE:

### APPLICATION DESCRIPTION

APPLICATION TYPE *(check one)*  ☒ NEW DRUG APPLICATION (CDA, 21 CFR 314.50)  ☐ ABBREVIATED NEW DRUG APPLICATION (ANDA, 21 CFR 314.94)
☐ BIOLOGICS LICENSE APPLICATION (BLA, 21 CFR Part 601)

| IF AN NDA, IDENTIFY THE APPROPRIATE TYPE | ☒ 505 (b)(1) | ☐ 505 (b)(2) |
|---|---|---|

IF AN ANDA, OR 505(b)(2), IDENTIFY THE REFERENCE LISTED DRUG PRODUCT THAT IS THE BASIS FOR THE SUBMISSION

Name of Drug _____    Holder of Approved Application _____

TYPE OF SUBMISSION *(check one)*  ☐ ORIGINAL APPLICATION    ☐ AMENDMENT TO A PENDING APPLICATION    ☐ RESUBMISSION
☐ PRESUBMISSION    ☐ ANNUAL REPORT    ☐ ESTABLISHMENT DESCRIPTION SUPPLEMENT    ☐ EFFICACY SUPPLEMENT
☐ LABELING SUPPLEMENT    ☐ CHEMISTRY MANUFACTURING AND CONTROLS SUPPLEMENT    ☒ OTHER

IF A SUBMISSION OF PARTIAL APPLICATION, PROVIDE LETTER DATE OF AGREEMENT TO PARTIAL SUBMISSION: _____

| IF A SUPPLEMENT, IDENTIFY THE APPROPRIATE CATEGORY | ☐ CBE | ☐ CBE-30 | ☐ Prior Approval (PA) |
|---|---|---|---|

REASON FOR SUBMISSION
General Correspondence: Right of Cross-Reference

PROPOSED MARKETING STATUS *(check one)*    ☐ PRESCRIPTION PRODUCT (Rx)    ☐ OVER THE COUNTER PRODUCT (OTC)

NUMBER OF VOLUMES SUBMITTED _____    THIS APPLICATION IS  ☒ PAPER  ☐ PAPER AND ELECTRONIC  ☐ ELECTRONIC

ESTABLISHMENT INFORMATION (Full establishment information should be provided in the body of the Application.)
Provide locations of all manufacturing, packaging and control sites for drug substance and drug product (continuation sheets may be used if necessary). Include name, address, contact, telephone number, registration number (CFN), DMF number, and manufacturing steps and/or type of testing (e.g. Final dosage form, Stability testing) conducted at the site. Please indicate whether the site is ready for inspection or, if not, when it will be ready.

Cross References (list related License Applications, INDs, NDAs, PMAs, 510(k)s, IDEs, BMFs, and DMFs referenced in the current application)

IND# 40,703
IND# 48,971

FORM FDA 356h (4/06)                                                                 PAGE 1 OF 5

This application contains the following items: *(Check all that apply)*

| | | |
|---|---|---|
| ☒ | 1. | Index |
| ☐ | 2. | Labeling *(check one)*   ☐ Draft Labeling    ☐ Final Printed Labeling |
| ☐ | 3. | Summary (21 CFR 314.50 (c)) |
| ☐ | 4. | Chemistry section |
| ☐ | | A.  Chemistry, manufacturing, and controls information (e.g., 21 CFR 314.50(d)(1); 21 CFR 601.2) |
| ☐ | | B.  Samples (21 CFR 314.50 (e)(1); 21 CFR 601.2 (a)) (Submit only upon FDA's request) |
| ☐ | | C.  Methods validation package (e.g., 21 CFR 314.50(e)(2)(i); 21 CFR 601.2) |
| ☐ | 5. | Nonclinical pharmacology and toxicology section (e.g., 21 CFR 314.50(d)(2); 21 CFR 601.2) |
| ☐ | 6. | Human pharmacokinetics and bioavailability section (e.g., 21 CFR 314.50(d)(3); 21 CFR 601.2) |
| ☐ | 7. | Clinical Microbiology (e.g., 21 CFR 314.50(d)(4)) |
| ☐ | 8. | Clinical data section (e.g., 21 CFR 314.50(d)(5); 21 CFR 601.2) |
| ☐ | 9. | Safety update report (e.g., 21 CFR 314.50(d)(5)(vi)(b); 21 CFR 601.2) |
| ☐ | 10. | Statistical section (e.g., 21 CFR 314.50(d)(6); 21 CFR 601.2) |
| ☐ | 11. | Case report tabulations (e.g., 21 CFR 314.50(f)(1); 21 CFR 601.2) |
| ☐ | 12. | Case report forms (e.g., 21 CFR 314.50 (f)(2); 21 CFR 601.2) |
| ☐ | 13. | Patent information on any patent which claims the drug (21 U.S.C. 355(b) or (c)) |
| ☐ | 14. | A patent certification with respect to any patent which claims the drug (21 U.S.C. 355 (b)(2) or (j)(2)(A)) |
| ☐ | 15. | Establishment description (21 CFR Part 600, if applicable) |
| ☐ | 16. | Debarment certification (FD&C Act 306 (k)(1)) |
| ☐ | 17. | Field copy certification (21 CFR 314.50 (l)(3)) |
| ☐ | 18. | User Fee Cover Sheet (Form FDA 3397) |
| ☐ | 19. | Financial Information (21 CFR Part 54) |
| ☒ | 20. | OTHER *(Specify)* General Correspondence: Right of Cross-Reference |

**CERTIFICATION**

I agree to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling. I agree to submit safety update reports as provided for by regulation or as requested by FDA. If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to the following:
1. Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, Parts 606, and/or 820.
2. Biological establishment standards in 21 CFR Part 600.
3. Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809.
4. In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202.
5. Regulations on making changes in application in FD&C Act section 506A, 21 CFR 314.71, 314.72, 314.97, 314.99, and 601.12.
6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.80, and 600.81.
7. Local, state and Federal environmental impact laws.

If this application applies to a drug product that FDA has proposed for scheduling under the Controlled Substances Act, I agree not to market the product until the Drug Enforcement Administration makes a final scheduling decision.
The data and information in this submission have been reviewed and, to the best of my knowledge are certified to be true and accurate.
**Warning:** A willfully false statement is a criminal offense, U.S. Code, title 18, section 1001.

| SIGNATURE OF RESPONSIBLE OFFICIAL OR AGENT | TYPED NAME AND TITLE | DATE: |
|---|---|---|
| *Andrea H. Garrity for RBC* | Robert B. Clark, Vice President US Regulatory Affairs | 03/21/07 |

| ADDRESS *(Street, City, State, and ZIP Code)* | Telephone Number |
|---|---|
| 235 East 42nd Street, New York, NY  10017 | ( 212 ) 733-3412 |

**Public reporting burden for this collection of information** is estimated to average 24 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

| | | |
|---|---|---|
| Department of Health and Human Services<br>Food and Drug Administration<br>Center for Drug Evaluation and Research<br>Central Document Room<br>5901-B Ammendale Road<br>Beltsville, MD 20705-1266 | Department of Health and Human Services<br>Food and Drug Administration<br>Center for Biologics Evaluation and Research (HFM-99)<br>1401 Rockville Pike<br>Rockville, MD 20852-1448 | An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. |

TAB   B



DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
Rockville, MD 20857

NDA 21-990

Novartis Pharmaceuticals Corporation
Attention: Ms. Donna Vivelo
One Health Plaza
East Hanover, New Jersey 07936-1080

Dear Ms. Vivelo:

Please refer to your new drug application (NDA) dated February 22, 2006, submitted pursuant to
section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act for Exforge (amlodipine and valsartan)
5/160, 10/160, 5/320, and 10/320 mg Tablets.

We acknowledge receipt of your submissions dated March 31, April 11 and 25, June 22, July 20,
August 1, 4, 15, and 22, September 22, November 3 and 15, December 5, 7, 15, and 18, 2006.

This NDA provides for the use of Exforge (amlodipine and valsartan) Tablets for the treatment of
hypertension.

We have completed our review of this application, as amended, and it is tentatively approved under
21 CFR 314.105 for use as recommended in the agreed upon labeling submitted December 18, 2006
(text for the package insert and patient package insert, and immediate container and carton labels). This
determination is contingent upon information available to the Agency at this time (i.e., information in
your application and the status of current good manufacturing practices of the facilities used in
manufacturing and testing of the drug product) and is, therefore, subject to change on the basis of any
new information that may come to our attention.

The listed reference drug product (Norvasc®), upon which you base your application, is subject to a
period of patent protection and exclusivity protection, and, therefore, final approval of your application
under section 505(c)(3) of the Act (21 U.S.C. 355(c)(3)) may not be made effective until this period
has expired, i.e., September 25, 2007.

No earlier than 60 days prior to September 25, 2007, submit an amendment to this application
identifying changes, if any, in the conditions under which your product was tentatively approved. This
information should include updated labeling, updated primary stability data as agreed upon during the
November 13, 2006 teleconference, and a safety update.

Failure to submit this amendment will prompt a review of the application that may result in rescission
of the tentative approval letter.

In addition, submit three copies of the introductory promotional materials that you propose to use for
this product. Submit all proposed materials in draft or mock-up form, not final print. Send one copy to

NDA 21-990
Page 2

the Division of Cardiovascular and Renal Drugs and two copies of both the promotional materials and the package insert directly to:

> Food and Drug Administration
> Center for Drug Evaluation and Research
> Division of Drug Marketing, Advertising, and Communications
> 5901-B Ammendale Road
> Beltsville, MD 20705-1266

Any significant change in the conditions outlined in this NDA requires our review before final approval may be granted.

Before we issue a final approval letter, this NDA is not deemed approved. If you believe that there are grounds for issuing the final approval letters before September 25, 2007, you should amend your application accordingly.

This product may be considered misbranded under the Federal Food, Drug, and Cosmetic Act if it is marketed before final approval.

All applications for new active ingredients, new dosage forms, new indications, new routes of administration, and new dosing regimens are required to contain an assessment of the safety and effectiveness of the product in pediatric patients unless this requirement is waived or deferred. We are waiving the pediatric study requirement for this application.

If you have any questions, please contact:

> Quynh Nguyen, Pharm.D.
> Regulatory Health Project Manager
> (301) 796-0510

> Sincerely,
>
> *See appended electronic signature page*
>
> Norman Stockbridge, M.D., Ph.D.
> Director
> Division of Cardiovascular and Renal Products
> Office of Drug Evaluation 1
> Center for Drug Evaluation and Research

Enclosure: PI and PPI

---

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---

/s/
- - - - - - - - - - - - - - - - - - - -
Norman Stockbridge
12/21/2006 03:42:32 PM



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville MD 20857

*FILE COPY*

March 22, 2007

Jeffrey B. Chasnow
Pfizer Inc.
235 East 42nd Street
New York, NY 10017-5755

Dear Mr. Chasnow:

Your petition requesting the Food and Drug Administration to take actions to enforce pediatric exclusivity rights for amlodipine, was received by this office on 03/22/2007. It was assigned docket number 2007P-0110/CP1 and it was filed on 03/22/2007. Please refer to this docket number in future correspondence on this subject with the Agency.

Please note that the acceptance of the petition for filing is a procedural matter in that it in no way reflects an agency decision on the substantive merits of the petition.

Sincerely,

Jennie Butler, Director
Division of Dockets Management
Office of Management Programs
Office of Management

*2007P-0110*                                                                 *ACK 1*



Pfizer Inc
235 East 42nd Street        235/24/10A
New York, NY 10017-5755
Tel 212 733 5225  Fax 646 383 9498
Email Jeffrey.b.chasnow@pfizer.com

**Jeffrey B. Chasnow**
Assistant General Counsel
Legal Division

March 21, 2007

Division of Dockets Management
Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane, Room 1061
Rockville, M 20857

## PETITION FOR STAY OF ACTION

On behalf of Pfizer Inc ("Pfizer"), the undersigned submit this petition requesting that the Food and Drug Administration ("FDA") stay approval of any and all supplements to NDA 20-362, the Novartis Pharmaceuticals Corporation ("Novartis") new drug application ("NDA") for Lotrel® (amlodipine besylate; benazepril hydrochloride), until after Pfizer's pediatric exclusivity for amlodipine has expired on September 25, 2007. Simultaneously with this Petition for Stay of Action, Pfizer is filing a Citizen Petition requesting that FDA: (1) deem the Lotrel® NDA a section 505(b)(2) application subject to the amlodipine pediatric exclusivity; (2) rescind final approval of the Lotrel® NDA; and (3) withhold final approval of any supplemental NDA ("sNDA") submitted by Novartis to its Lotrel® NDA because any such sNDA is a section 505(b)(2) NDA subject to the amlodipine pediatric exclusivity. The basis for this Petition for Stay of Action is set forth below, and in Pfizer's accompanying Citizen Petition, incorporated herein by reference.

### A. Decision Involved

This Petition for Stay of Action pertains to any and all sNDAs, including any and all "Changes Being Effected" ("CBE") supplements, filed to NDA 20-362 concerning the amlodipine ingredient in Lotrel®.

### B. Action Requested

Pfizer requests that FDA stay approval or the effective date of approval of any and all supplements to the Lotrel® NDA concerning the amlodipine ingredient in Lotrel® until after Pfizer's pediatric exclusivity for amlodipine has expired on September 25, 2007.

2007P.0111                                                      PSA-1

## C. *Statement of Grounds*

The effective date of approval of any sNDAs for Lotrel® concerning the amlodipine ingredient in Lotrel® should be deferred until after September 25, 2007, because Novartis's Lotrel® NDA is subject to Pfizer's pediatric exclusivity. As set forth in the accompanying Citizen Petition, Lotrel® was approved under section 505(b)(1) of the FDCA based on a right of reference to Pfizer's amlodipine IND and NDA. Pfizer granted the right of reference under terms of a License Agreement that Pfizer and Ciba-Geigy Corp., a predecessor to Novartis, executed in 1989.

On March 21, 2007, in response to Novartis's repudiation of the License Agreement, Pfizer notified FDA that Pfizer is revoking Novartis's right of reference to Pfizer's amlodipine IND and NDA, effective midnight, March 25, 2007. (Citizen Petition, Tab 1, Attachment A). As explained in Pfizer's Citizen Petition, as a result of this revocation Novartis's Lotrel® NDA became an application under section 505(b)(2), subject to Pfizer's pediatric exclusivity for amlodipine. Moreover, any supplement to the Lotrel® NDA must also be considered as an NDA under section 505(b)(2) subject to pediatric exclusivity.

Thus, as explained more fully in the Citizen Petition, FDA should defer the effective date of approval of any sNDA for Lotrel® concerning the amlodipine ingredient in Lotrel® until after the expiration of the pediatric exclusivity period for amlodipine. Until now, Pfizer has been supplying amlodipine to Novartis for use in manufacturing Lotrel®. As a consequence of Novartis's repudiation of the License Agreement, however, Pfizer is no longer supplying amlodipine to Novartis. Thus, Pfizer expects that Novartis may seek FDA approval for a manufacturing supplement in order to substitute an alternative amlodipine source.[1] FDA should defer the effective date of any such supplement until after September 25, 2007.

As set forth below, this Petition for Stay of Action satisfies the requirements for a mandatory grant of a stay under agency regulations. 21 CFR § 10.35(e).

**The petitioner will otherwise suffer irreparable injury.** Pfizer faces imminent, substantial and irreparable injury in the absence of a stay. Pfizer holds the NDA for Norvasc® (amlodipine beyslate), the reference listed drug for amlodipine. In response to a written request from FDA, Pfizer conducted pediatric studies of amlodipine and earned an additional six months of exclusivity as a result. Unless the stay is granted, Novartis will be able to continue selling Lotrel® during the period of pediatric exclusivity. Thus, Pfizer will lose its pediatric exclusivity rights as against Novartis, and, with those rights, the monetary reward to which Pfizer is statutorily entitled after expending substantial efforts on studies of the safety and efficacy of its product in children.

**The petitioner's case is not frivolous and is being pursued in good faith.** The accompanying Citizen Petition demonstrates that Pfizer's case is not frivolous. Rather, it is strong and compelling, and is being pursued in good faith. Pfizer has raised

---

[1]    Because Novartis would be seeking approval of a new manufacturing process as well as a new manufacturing site, a prior approval supplement is necessary. 21 CFR 314.70(b); FDA, *Changes to an Approved NDA or ANDA* 3, 9-14 (2004). If Novartis submits a "Changes Being Effected" supplement, FDA should notify Novartis that a prior approval supplement is required.

persuasive legal and policy reasons for enforcing its pediatric exclusivity for amlodipine as against the Lotrel® NDA and for withholding approval of any supplements to that NDA.

**The petitioner has demonstrated sound public policy grounds supporting the stay.** Pfizer had established sound public policy grounds supporting the stay. As FDA has stated, "[t]he pediatric exclusivity provision has done more to generate clinical studies and useful prescribing information for the pediatric population than any other regulatory or legislative process to date." S. Rep. 107-79 at 5 (2001) (citing FDA's January 2001 Status Report to Congress). The agency has thus repeatedly rejected attempts by generic applicants to manipulate the statutory regime in such a way as to deprive innovators who have invested the extensive time and resources required for pediatric studies of their exclusivity.[2]  FDA has been careful to preserve the incentive and to ensure that grants of pediatric exclusivity are certain.

Here, Pfizer responded to the incentive and conducted studies of amlodipine that produced valuable information concerning effects of the drug on children. FDA should not permit Novartis to circumvent Pfizer's pediatric exclusivity and undermine the incentive to conduct pediatric research.

**The delay resulting from the stay is not outweighed by public health or other public interests.** "The public's interest in 'the faithful application of the laws' outweigh[s] its interest in immediate access to [a competing] product." *Mova Pharma. Corp. v. Shalala,* 140 F.3d 1060, 1066 (DC Cir. 1998). This is particularly true where, as here, the statutory regime provides for a delay in the approval of competing products as an incentive to perform much needed pediatric research and as a reward for those who, like Pfizer, invest in such research. Indeed, as demonstrated above, the public interest is best served by effectuating Pfizer's pediatric exclusivity. Moreover, temporary unavailability of Lotrel® will cause no harm to either the public health or interests. Both amlodipine besylate and benazepril hydrochloride are available as monotherapies. At worst then, the stay could result in a temporary inconvenience.

Even if FDA determines that a mandatory stay is not warranted, a stay should be granted under the agency's discretionary authority. FDA regulations authorize a discretionary stay "in the public interest and in the interest of justice." 21 CFR § 10.35(e). The interests of the public and of justice counsel that Pfizer's pediatric exclusivity should be preserved.

### D. Conclusion

For the reasons set forth above and in the attached Citizen Petition, the undersigned request that the Commissioner stay approval of any and all supplements to

---

[2]      *See e.g., Mylan Labs. v. Thompson,* 389 F.3d 1272 (DC Cir. 2004) (upholding FDA's rejection of Mylan's claim that it was not subject to pediatric exclusivity for fentanyl); *Ranbaxy Labs. Ltd. V. FDA,* Civ. No. 04-5079, 2004 U.S. App. LEXIS 8311 (DC Cir. 2004) (upholding FDA's rejection of Ranbaxy's claim that it was not subject to pediatric exclusivity for fluconazole); *Barr Labs., Inc. v. Thompson,* 238 F. Supp. 2d 236 (DDC 2002) (upholding FDA's rejection of Barr's claim that it was not subject to pediatric exclusivity for tamoxifen).

Novartis's Lotrel® NDA until Pfizer's pediatric exclusivity rights for amlodipine have expired on September 25, 2007.

Respectfully submitted,

Jeffrey B. Chasnow
Kelly A. Falconer
Pfizer Inc
235 E. 42nd Street
New York, NY 10017

# HellerEhrman LLP

March 26, 2007

Division of Dockets Management
Food and Drug Administration
5630 Fishers Lane
Room 1061 (HFA-305)
Rockville, MD  20852

**Re:** **Citizen Petition: Refrain From Granting Final Approval to Further ANDAs
for Amlodipine Besylate Tablets, 2.5 mg, 5 mg or 10 mg**

### PETITION FOR STAY OF ACTION

Mylan Pharmaceuticals Inc. ("Mylan") submits this petition pursuant to 21 C.F.R. § 10.35.

### Decision Involved

This Petition for Stay of Administrative Action is being submitted to request that the Food and Drug Administration ("FDA") refrain from taking any action to issue final approval to any Abbreviated New Drug Application ("ANDA") submitted for amlodipine besylate tablets in contravention of the FDA's award of final approval to ANDA 76-418, and 180-day exclusivity pursuant to 21 U.S.C. § 355(j)(5)(B)(iv) (2002).

### Action Requested

Because Mylan Pharmaceuticals Inc. ("Mylan") is entitled to 180 days of generic marketing exclusivity for amlodipine besylate tablets, 2.5 mg, 5 mg and 10 mg ("Amlodipine"), which commenced on March 23, 2007, the FDA must not approve any additional Abbreviated New Drug Applications ("ANDAs") for generic Amlodipine products until after Mylan's 180-day exclusivity expires on September 23, 2007.  21 U.S.C. § 355(j)(5)(B) (2002).

Because other applicants may be improperly requesting final approval for their generic Amlodipine ANDAs, it is critical that the FDA immediately confirm that it will not approve any such ANDAs until Mylan's 180-day exclusivity expires.  As the FDA and the courts have recognized, the 180-day exclusivity right is extremely valuable and is an integral component of the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 501 *et seq.* ("FDCA").  *See, e.g., Mylan Pharms. v. Shalala*, 81 F. Supp. 2d 30, 33 (D.D.C. 2000) (explaining that Congress created the 180-day exclusivity provision to "encourage generic drug makers to incur the potentially substantial litigation costs associated with challenging pioneer

drug makers' patents."). Any unwarranted deprivation or shortening of the 180-day exclusivity period will cause Mylan immediate and irreparable harm. Therefore, Mylan reserves the right, and intends, to take immediate legal action to enjoin any further approvals that the FDA might grant before Mylan's 180-day exclusivity expires.

## Statement of Grounds

On May 22, 2002, Mylan was the first ANDA applicant to submit a substantially complete application containing a Paragraph IV certification to the patents listed in the Orange Book for the reference listed drug, Norvasc® (amlodipine besylate tablets). The NDA holder and patentee, Pfizer, did not sue Mylan within 45 days of receipt of Mylan's notice of Paragraph IV certification and, therefore, Mylan's ANDA was eligible for immediate final approval. The FDA granted final approval to Mylan's Amlodipine ANDA on October 3, 2005.

The FDA confirmed in its October 3, 2005 final approval letter that because Mylan was the first applicant to file an ANDA with a Paragraph IV certification, "Mylan is eligible for 180 days of market exclusivity." October 3, 2005 letter from Gary J. Buehler to Mylan at 2 (copy attached hereto as Exhibit 1). The FDA's approval letter further states, consistent with the plain language of the FDCA and the FDA's own regulations, that Mylan's 180-day generic marketing exclusivity "will begin to run from the earlier of commercial marketing or court decision dates identified in [21 U.S.C.] section 355(j)(5)(B)(iv)." Mylan commenced commercial marketing of its generic Amlodipine product on March 23, 2007, and notified FDA of this fact. *See* March 23, 2007 General Correspondence from Mylan to Gary J. Buehler and associated Form FDA 356h (copy attached as Exhibit 2).

Because Mylan filed its Amlodipine ANDA prior to the date of enactment of the *Medicare Prescription Drug, Improvement and Modernization Act* ("MMA") on December 8, 2003, the award of 180-day exclusivity to Mylan is governed by the version of the FDCA as in effect prior to December 8, 2003. *See* Exhibit 1 at p.2, n.2 (*citing* MMA § 1102(b)(1)). Accordingly, the statutory language of 21 U.S.C. § 355(j)(5)(B)(iv) as in effect in 2002, governs the application of 180-day generic market exclusivity to Mylan. This statutory language is plain and unambiguous and specifically provides that, once exclusivity has been granted and triggered, that exclusivity lasts for 180 days.[1] Nothing in the statute as it existed prior to December 8,

---

[1] At a minimum, as long as the '303 patent remains listed in the Orange Book, Mylan's 180-day exclusivity applies. It is the FDA's policy that "the Agency may approve the ANDA on the date the district court issues a judgment that the patent is invalid, unenforceable, or not infringed pursuant to a mandate issued by a court of appeals." *Guidance for Industry: Court Decisions, ANDA Approvals, and 180-Day Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* (March 2000) at 4. Therefore, at a minimum, Mylan is entitled to be the exclusive marketer until the mandate is issued to the District Court.

2003[2], FDA's regulations, or case law interpreting the FDCA says otherwise or supports a contrary interpretation.

Although the FDA has expressed the view that eligibility for 180-day exclusivity cannot extend beyond the expiration date of the patent from which that exclusivity derives, that policy does not and cannot apply in situations where the 180-day exclusivity has already been awarded and triggered. Mylan does not request that the FDA reverse any position that it has publicly announced with respect to the effect of the 180-day exclusivity after patent expiration. Instead, the situation presented in this Citizen Petition is one that, to Mylan's knowledge, has never been addressed by the Agency. Specifically, what is the impact, if any, of patent expiration on the 180-day exclusivity afforded to a first-filed ANDA that is finally approved at the time the patent expires.

In *Dr. Reddy's Laboratories, Inc. v. Thompson*, 302 F. Supp. 2d 340 (D.N.J. 2003), the District Court approved the FDA's interpretation of §355(j)(5)(B)(iv) insofar as it relates to *tentatively* approved ANDAs. That rationale is that, upon patent expiration, a Paragraph IV certification in a tentatively approved ANDA is no longer accurate and it converts *de facto* or *de jure* to a Paragraph III certification at the moment the patent expires. *Id.* at 351. However, the FDA has made clear that a holder of a fully *approved* ANDA, like Mylan's, is under no obligation to amend a patent certification upon patent expiration. *See* Letter from Gary Buehler dated June 22, 2004 (attached as Exhibit 3) at 3 ("An application with full effective approval has no continuing obligation to update its patent certifications. *See* 21 C.F.R. 314.94(a)(12)(viii)(C) (obligation to amend certification applies before effective date of approval.)". The FDA's prior administrative rulings in situations like cisplatin (August 6, 1999) or omeprazole (November 16, 2001), involved ANDAs that were *tentatively-approved* when a patent expired, and the FDA was deciding whether a first-filer retained *eligibility* for 180-day exclusivity.

Unlike the situations that the FDA has addressed previously, Mylan's ANDA was fully approved and the 180-day exclusivity period had been triggered before patent expiration. As the Agency has previously concluded, Mylan's Paragraph IV certification did <u>not change</u> when the patent expired. Therefore, Mylan's ANDA fully complies with the language of §355(j)(5)(B)(iv), as it "is for a drug for which a previous application has been submitted under this subsection [containing] such [subclause IV] certification." This makes a significant difference, because § 505(j)(5)(B)(iv) makes it clear that once exclusivity has been triggered, the FDA may not approve additional ANDAs for 180 days. The FDA's previously announced positions do not and should not preclude Mylan's 180-day exclusivity extending beyond the expiration of Pfizer's patent.

---

[2] The MMA included, for the first time, language to the effect that generic marketing exclusivity ends when the patent to which the Paragraph IV certification was made, and from which the exclusivity derives, expires. No such language appears in the pre-MMA version of the statute that applies to Mylan's Amlodipine ANDA.

Therefore, Mylan respectfully requests that the Agency honor the full 180-day generic marketing exclusivity to which Mylan is entitled by law, and that the FDA not approve other ANDAs for Amlodipine tablets until at least 180 days after Mylan's exclusivity was triggered, September 23, 2007.

### Environmental Impact

As provided in 21 C.F.R. § 15.30 neither an environmental assessment nor an environmental impact statement is required.

### Economic Impact

As provided in 21 C.F.R. § 10.30(b) economic impact information is to be submitted only when requested by the Commissioner following review of the petition.

### Certification

The undersigned certifies that to the best of his knowledge and belief, this petition relies on and includes representative data and information known to the petitioner that is unfavorable to the petition.

Sincerely,

David J. Harth
Heller Ehrman LLP
One East Main St.
Suite 201
Madison, WI 53703
(608) 663-7460

Shannon M. Bloodworth
Joseph P. Whitlock
Heller Ehrman LLP
1717 Rhode Island Ave., N.W.
Washington, D.C. 20036
(202) 912-2000

*Counsel for Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc.*

4

cc:    Sheldon Bradshaw, FDA
        Elizabeth Dickinson, FDA
        Gary J. Buehler, FDA

# EXHIBIT 1

OCT-03-2005  11:34        FDA CDER OGD CHEMI

DEPARTMENT OF HEALTH & HUMAN SERVICES



ANDA 76-418

Food and Drug Administration
Rockville MD 20857

OCT  3 2005

Mylan Pharmaceuticals Inc.
Attention:  S. Wayne Talton
            Vice President, Regulatory Affairs
781 Chestnut Ridge Road
P.O. Box 4310
Morgantown, WV  26504-4310


Dear Sir:

This is in reference to your abbreviated new drug application
(ANDA) dated May 22, 2002, submitted pursuant to section 505(j)
of the Federal Food, Drug and Cosmetic Act (Act), for Amlodipine
Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base).

Reference is also made to your amendments dated October 2, 2002;
and January 6, April 1, August 1, and August 4, 2005.

We have completed the review of this ANDA and have concluded
that the drug is safe and effective for use as recommended in
the submitted labeling.  Accordingly, the ANDA is approved.  The
Division of Bioequivalence has determined your Amlodipine
Besylate Tablets 2.5 mg (base), 5 mg (base), and 10 mg (base),
to be bioequivalent and therefore, therapeutically equivalent to
the listed drug, Norvasc Tablets 2.5 mg (base), 5 mg (base), and
10 mg (base), respectively, of Pfizer, Inc. (Pfizer).  Your
dissolution testing should be incorporated into the stability
and quality control program using the same method proposed in
your application.

The listed drug product (RLD) referenced in your ANDA, Pfizer's
Norvasc® Tablets, is subject to periods of patent protection.
As noted in the agency's publication entitled <u>Approved Drug
Products with Therapeutic Equivalence Evaluations</u> (the "Orange
Book"), U.S. Patent Nos. 4,572,909 (the '909 patent) and
4,879,303 (the '303 patent) are scheduled to expire (with
pediatric exclusivity added) on January 31, 2007, and
September 25, 2007, respectively.

Your ANDA contains patent certifications under section 505(j)(2)(A)(vii)(IV) of the Act stating that both these patents are invalid, unenforceable, or will not be infringed by your manufacture, use, or sale of Amlodipine Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base), under this ANDA. Section 505(j)(5)(B)(iii) of the Act provides that approval of an ANDA shall be made effective immediately, unless an action is brought against Mylan Pharmaceuticals Inc. (Mylan) for infringement of either of the patents that were the subject of the paragraph IV certifications.  This action must have been brought against Mylan prior to the expiration of 45 days from the date the notice you provided under paragraph (2)(B)(i) was received by the NDA/patent holder(s).  You have notified the agency that Mylan complied with the requirements of section 505(j)(2)(B) of the Act, and that no action for infringement of the '909 patent or the '303 patent was brought against Mylan within the statutory 45-day period, which action would have resulted in a 30-month stay under section 505(j)(5)(B)(iii).[1]

With respect to 180-day generic drug exclusivity, we note that Mylan was the first ANDA applicant to submit a substantially complete ANDA with a paragraph IV certification for Amlodipine Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base). Therefore, with this approval, Mylan is eligible for 180-days of market exclusivity.  This exclusivity, which is provided for under section 505(j)(5)(8)(iv) of the Act,[2] will begin to run from the earlier of the commercial marketing or court decision dates identified in section 505(j)(5)(B)(iv).  Please submit correspondence to the ANDA informing the agency of the date the exclusivity begins to run.

Under section 506A of the Act, certain changes in the conditions described in this ANDA require an approved supplemental application before the change may be made.

---

[1] Because information on the '909 and '303 patents was submitted before August 18, 2003, this reference to section 505(j)(5)(B)(iii) of the Act is to that section of the Act as in effect prior to December 8, 2003, when the Medicare Prescription Drug, Improvement and Modernization Act (MMA) (Public Law 108-173) was enacted.  See MMA § 1101(c)(3).  The Agency is aware that Pfizer initiated patent litigation against Mylan shortly after expiration of the statutory 45-day period.

[2] Because your ANDA was filed before the date of enactment of the Medicare Prescription Drug, Improvement and Modernization Act (MMA) (Public Law 108-173) on December 8, 2003, this reference to the 180-day exclusivity provision is to the section of the Act as in effect prior to December 8, 2003.  See MMA § 1102(b)(1).

Post-marketing reporting requirements for this ANDA are set
forth in 21 CFR 314.80-81 and 314.98.  The Office of Generic
Drugs should be advised of any change in the marketing status of
this drug.

Promotional materials may be submitted to FDA for comment prior
to publication or dissemination.  Please note that these
submissions are voluntary.  If you desire comments on proposed
launch promotional materials with respect to compliance with
applicable regulatory requirements, we recommend you submit, in
draft or mock-up form, two copies of both the promotional
materials and package insert(s) directly to:

>       Food and Drug Administration
>       Center for Drug Evaluation and Research
>       Division of Drug Marketing, Advertising, and Communications
>       5901-B Ammendale Road
>       Beltsville, MD 20705

We call your attention to 21 CFR 314.81(b)(3) which requires
that materials for any subsequent advertising or promotional
campaign be submitted to our Division of Drug Marketing,
Advertising, and Communications (HFD-40) with a completed Form
FDA 2253 at the time of their initial use.

>               Sincerely yours,

>               Gary Buehler
>               Director
>               Office of Generic Drugs
>               Center for Drug Evaluation and Research

# EXHIBIT 2



# MYLAN PHARMACEUTICALS INC

781 Chestnut Ridge Road • P.O. Box 4310 • Morgantown, West Virginia 26504-4310 U.S.A. • (304) 599-2595

March 23, 2007

**GENERAL CORRESPONDENCE**

Office of Generic Drugs, CDER, FDA
Gary J. Buehler, Director
Document Control Room
Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773

RE:    AMLODIPINE BESYLATE TABLETS, 2.5MG, 5MG AND 10MG
ANDA 76-418
Notification of Commencement of Commercial Marketing

Dear Mr. Buehler:

Reference is made to the Abbreviated New Drug Application (ANDA) identified above and to the Agency's letter dated October 3, 2005 notifying us that our application was approved. The October 3rd approval letter requested that Mylan submit correspondence stating the date our 180 days of market exclusivity begins to run since Mylan was the first ANDA applicant to submit a substantially complete ANDA containing a paragraph IV certification. A copy of the October 3, 2005 approval letter is provided in Attachment A for your reference.

The purpose of this correspondence is to provide FDA with notification that Mylan commenced commercial marketing of Amlodipine Beyslate Tablets, 2.5mg, 5mg and 10mg on March 23, 2007. We are also requesting that FDA's 'Orange Book' be updated accordingly.

This amendment is submitted in duplicate. Should you require additional information or have any questions regarding this amendment, please contact the undersigned at (304) 599-2595, ext. 6551 or via facsimile at (304) 285-6407.

Sincerely,

*S. Wayne Talton*

S. Wayne Talton
Vice President
Regulatory Affairs

SWT/dn

Enclosures

Desk Copy:    Mr. Martin Shimer, Branch Chief
Regulatory Support

| Department—Fax Numbers | | Information Systems | (304) 285-6404 | Purchasing | (304) 598-5401 |
|---|---|---|---|---|---|
| Accounting | \\Project\ANDA\AMLODIPINE-2BESYLATE\General Correspondence_032307.doc | (800) 848-0463 | Quality Assurance | (304) 598-5407 |
| Administration | (304) 599-7284 | Legal Services | (304) 598-5408 | Quality Control | (304) 598-5409 |
| Business Development | (304) 598-5419 | Maintenance & Engineering | (304) 598-5411 | Regulatory Affairs | (304) 285-6407 |
| Corporate Services | (304) 285-6482 | Medical Unit | (304) 598-5445 | Research & Development | (304) 285-6419 |
| Human Resources | (304) 598-5406 | Product Development | (304) 285-6411 | Sales & Marketing | (304) 598-3232 |

MYLAN PHARMACEUTICALS INC.

**SIGNED FORM FDA 356h**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

## APPLICATION TO MARKET A NEW DRUG, BIOLOGIC, OR AN ANTIBIOTIC DRUG FOR HUMAN USE
(Title 21, Code of Federal Regulations, Parts 314 & 601)

Form Approved: OMB No. 0910-0430
Expiration Date: April 30, 2009
See OMB Statement on page 2.

**FOR FDA USE ONLY**

APPLICATION NUMBER

| APPLICANT INFORMATION | |
|---|---|
| NAME OF APPLICANT | DATE OF SUBMISSION |
| **MYLAN PHARMACEUTICALS INC.** | **March 23, 2007** |
| TELEPHONE NO. (Include Area Code) | FACSIMILE (FAX) Number (Include Area Code) |
| **(304) 599-2595** | **(304) 285-6407** |
| APPLICANT ADDRESS (Number, Street, City, State, Country, ZIP Code or Mail Code, and U.S. License number if previously issued): | AUTHORIZED U.S. AGENT NAME & ADDRESS (Number, Street, City, State, ZIP Code, telephone & FAX number) IF APPLICABLE |
| **781 Chestnut Ridge Road**<br>**P.O. Box 4310**<br>**Morgantown, WV 26504-4310** | **N/A** |

**PRODUCT DESCRIPTION**

NEW DRUG OR ANTIBIOTIC APPLICATION NUMBER, OR BIOLOGICS LICENSE APPLICATION NUMBER (If previously issued)    **76-418**

| ESTABLISHED NAME (e.g., Proper name, USP/USAN name) | PROPRIETARY NAME (trade name) IF ANY |
|---|---|
| **Amlodipine Besylate Tablets** | **N/A** |

| CHEMICAL/BIOCHEMICAL/BLOOD PRODUCT NAME (If any) | CODE NAME (If any) |
|---|---|
| **(R.S.) 3-ethyl 5-methyl-2-(2-aminoethoxymethyl)-4-(2-chlorophenyl)-1,4-dihydro -**<br>**6-methyl-3,5-pyridinedicarboxylate benzenesulphonate** | **N/A** |

| DOSAGE FORM: | STRENGTHS: | ROUTE OF ADMINISTRATION: |
|---|---|---|
| **Tablets** | **2.5mg, 5mg and 10mg** | **Oral** |

(PROPOSED) INDICATION(S) FOR USE:

**Indicated for the treatment of hypertension, chronic stable angina and the treatment of confirmed or suspected vasospastic angina.**

**APPLICATION DESCRIPTION**

APPLICATION TYPE

(check one)    ☐ NEW DRUG APPLICATION (CDA, 21 CFR 314.50)    ☒ ABBREVIATED NEW DRUG APPLICATION (ANDA, 21 CFR 314.94)

☐ BIOLOGICS LICENSE APPLICATION (BLA, 21 CFR Part 601)

IF AN NDA, IDENTIFY THE APPROPRIATE TYPE    ☐ 505 (b)(1)    ☐ 505(b)(2)

IF AN ANDA, OR 505(b)(2), IDENTIFY THE REFERENCE LISTED DRUG PRODUCT THAT IS THE BASIS FOR THE SUBMISSION

Name of Drug    **Norvasc®**    Holder of Approved Application    **Pfizer**

TYPE OF SUBMISSION (check one)    ☐ ORIGINAL APPLICATION    ☐ AMENDMENT TO A PENDING APPLICATION    ☐ RESUBMISSION

☐ PRESUBMISSION    ☐ ANNUAL REPORT    ☐ ESTABLISHMENT DESCRIPTION SUPPLEMENT    ☐ EFFICACY SUPPLEMENT

☐ LABELING SUPPLEMENT    ☐ CHEMISTRY MANUFACTURING AND CONTROLS SUPPLEMENT    ☒ OTHER

IF A SUBMISSION OF PARTIAL APPLICATION, PROVIDE LETTER DATE OF AGREEMENT TO PARTIAL SUBMISSION:

IF A SUPPLEMENT, IDENTIFY THE APPROPRIATE CATEGORY    ☐ CBE    ☐ CBE-30    ☐ Prior Approval (PA)

REASON FOR SUBMISSION

**Notification of Commencement of Commercial Marketing**

PROPOSED MARKETING STATUS (check one)    ☒ PRESCRIPTION PRODUCT (Rx)    ☐ OVER THE COUNTER PRODUCT (OTC)

NUMBER OF VOLUMES SUBMITTED    **1**    THIS APPLICATION IS    ☐ PAPER    ☐ PAPER AND ELECTRONIC    ☐ ELECTRONIC

ESTABLISHMENT INFORMATION (Full establishment information should be provided in the body of the Application.)
Provide locations of all manufacturing, packaging and control sites for drug substance and drug product (continuation sheets may be used if necessary). Include name, address, contact, telephone number, registration number (CFN), DMF number, and manufacturing steps and/or type of testing (e.g. Final dosage form, Stability testing) conducted at the site. Please indicate whether the site is ready for inspection or, if not, when it will be ready.

**N/A**

Cross References (list related License Applications, INDs, NDAs, PMAs, 510(k)s, IDEs, BMFs, and DMFs referenced in the current application)

**N/A**

FORM FDA 356h (4/06)    PAGE 1 OF 2

| | This application contains the following items: *(Check all that apply)* |
|---|---|
| ☐ | 1. Index |
| ☐ | 2. Labeling *(check one)*   ☐ Draft Labeling   ☐ Final Printed Labeling |
| ☐ | 3. Summary (21 CFR 314.50 (c)) |
| ☐ | 4. Chemistry section |
| ☐ |    A.  Chemistry, manufacturing, and controls information (e.g., 21 CFR 314.50(d)(1); 21 CFR 601.2) |
| ☐ |    B.  Samples (21 CFR 314.50 (e)(1); 21 CFR 601.2 (a)) (Submit only upon FDA's request) |
| ☐ |    C.  Methods validation package (e.g., 21 CFR 314.50(e)(2)(i); 21 CFR 601.2) |
| ☐ | 5. Nonclinical pharmacology and toxicology section (e.g., 21 CFR 314.50(d)(2); 21 CFR 601.2) |
| ☐ | 6. Human pharmacokinetics and bioavailability section (e.g., 21 CFR 314.50(d)(3); 21 CFR 601.2) |
| ☐ | 7. Clinical Microbiology (e.g., 21 CFR 314.50(d)(4)) |
| ☐ | 8. Clinical data section (e.g., 21 CFR 314.50(d)(5); 21 CFR 601.2) |
| ☐ | 9. Safety update report (e.g., 21 CFR 314.50(d)(5)(vi)(b); 21 CFR 601.2) |
| ☐ | 10. Statistical section (e.g., 21 CFR 314.50(d)(6); 21 CFR 601.2) |
| ☐ | 11. Case report tabulations (e.g., 21 CFR 314.50(f)(1); 21 CFR 601.2) |
| ☐ | 12. Case report forms (e.g., 21 CFR 314.50 (f)(2); 21 CFR 601.2) |
| ☐ | 13. Patent information on any patent which claims the drug (21 U.S.C. 355(b) or (c)) |
| ☐ | 14. A patent certification with respect to any patent which claims the drug (21 U.S.C. 355 (b)(2) or (j)(2)(A)) |
| ☐ | 15. Establishment description (21 CFR Part 600, if applicable) |
| ☐ | 16. Debarment certification (FD&C Act 306 (k)(1)) |
| ☐ | 17. Field copy certification (21 CFR 314.50 (l)(3)) |
| ☐ | 18. User Fee Cover Sheet (Form FDA 3397) |
| ☐ | 19. Financial Information (21 CFR Part 54) |
| ☒ | 20. OTHER *(Specify)*   **Notification of Commencement of Commercial Marketing** |

**CERTIFICATION**

I agree to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling. I agree to submit safety update reports as provided for by regulation or as requested by FDA. If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to the following:
1. Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, Parts 606, and/or 820.
2. Biological establishment standards in 21 CFR Part 600.
3. Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809.
4. In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202.
5. Regulations on making changes in application in FD&C Act section 506A, 21 CFR 314.71, 314.72, 314.97, 314.99, and 601.12.
6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.80, and 600.81.
7. Local, state and Federal environmental impact laws.
If this application applies to a drug product that FDA has proposed for scheduling under the Controlled Substances Act, I agree not to market the product until the Drug Enforcement Administration makes a final scheduling decision.
The data and information in this submission have been reviewed and, to the best of my knowledge are certified to be true and accurate.
**Warning:** A willfully false statement is a criminal offense, U.S. Code, title 18, section 1001.

| SIGNATURE OF RESPONSIBLE OFFICIAL OR AGENT | TYPED NAME AND TITLE | DATE: |
|---|---|---|
| *S. Wayne Talton* | **S. Wayne Talton**<br>**Vice President**<br>**Regulatory Affairs** | **March 23, 2007** |

| ADDRESS *(Street, City, State, and ZIP Code)* | Telephone Number |
|---|---|
| **781 Chestnut Ridge Road, P.O. Box 4310, Morgantown, WV  26504-4310** | **(304) 599-2595** |

**Public reporting burden for this collection of information** is estimated to average 24 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing this collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

| Department of Health and Human Services<br>Food and Drug Administration<br>Center for Drug Evaluation and Research<br>Central Document Room<br>5901-B Ammendale Road<br>Beltsville, MD 20705-1266 | Department of Health and Human Services<br>Food and Drug Administration<br>Center for Biologics Evaluation and Research (HFM-99)<br>1401 Rockville Pike<br>Rockville, MD 20852-1448 | An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. |

MYLAN PHARMACEUTICALS INC.

**AMLODIPINE BESYLATE TABLETS, 2.5MG, 5MG AND 10MG**

**ATTACHMENT A**

**APPROVAL LETTER DATED OCTOBER 3, 2005**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**



ANDA 76-418

Food and Drug Administration
Rockville MD 20857

OCT  3 2005

Mylan Pharmaceuticals Inc.
Attention:  S. Wayne Talton
            Vice President, Regulatory Affairs
781 Chestnut Ridge Road
P.O. Box 4310
Morgantown, WV  26504-4310


Dear Sir:

This is in reference to your abbreviated new drug application
(ANDA) dated May 22, 2002, submitted pursuant to section 505(j)
of the Federal Food, Drug and Cosmetic Act (Act), for Amlodipine
Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base).

Reference is also made to your amendments dated October 2, 2002;
and January 6, April 1, August 1, and August 4, 2005.

We have completed the review of this ANDA and have concluded
that the drug is safe and effective for use as recommended in
the submitted labeling.  Accordingly, the ANDA is approved.  The
Division of Bioequivalence has determined your Amlodipine
Besylate Tablets 2.5 mg (base), 5 mg (base), and 10 mg (base),
to be bioequivalent and therefore, therapeutically equivalent to
the listed drug, Norvasc Tablets 2.5 mg (base), 5 mg (base), and
10 mg (base), respectively, of Pfizer, Inc. (Pfizer).  Your
dissolution testing should be incorporated into the stability
and quality control program using the same method proposed in
your application.

The listed drug product (RLD) referenced in your ANDA, Pfizer's
Norvasc® Tablets, is subject to periods of patent protection.
As noted in the agency's publication entitled Approved Drug
Products with Therapeutic Equivalence Evaluations (the "Orange
Book"), U.S. Patent Nos. 4,572,909 (the '909 patent) and
4,879,303 (the '303 patent) are scheduled to expire (with
pediatric exclusivity added) on January 31, 2007, and
September 25, 2007, respectively.

Your ANDA contains patent certifications under section
505(j)(2)(A)(vii)(IV) of the Act stating that both these patents
are invalid, unenforceable, or will not be infringed by your
manufacture, use, or sale of Amlodipine Besylate Tablets,
2.5 mg (base), 5 mg (base) and 10 mg (base), under this ANDA.
Section 505(j)(5)(B)(iii) of the Act provides that approval of
an ANDA shall be made effective immediately, unless an action is
brought against Mylan Pharmaceuticals Inc. (Mylan) for
infringement of either of the patents that were the subject of
the paragraph IV certifications.  This action must have been
brought against Mylan prior to the expiration of 45 days from
the date the notice you provided under paragraph (2)(B)(i) was
received by the NDA/patent holder(s).  You have notified the
agency that Mylan complied with the requirements of section
505(j)(2)(B) of the Act, and that no action for infringement of
the '909 patent or the '303 patent was brought against Mylan
within the statutory 45-day period, which action would have
resulted in a 30-month stay under section 505(j)(5)(B)(iii).[1]

With respect to 180-day generic drug exclusivity, we note that
Mylan was the first ANDA applicant to submit a substantially
complete ANDA with a paragraph IV certification for Amlodipine
Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base).
Therefore, with this approval, Mylan is eligible for 180-days of
market exclusivity.  This exclusivity, which is provided for
under section 505(j)(5)(8)(iv) of the Act,[2] will begin to run
from the earlier of the commercial marketing or court decision
dates identified in section 505(j)(5)(B)(iv).  Please submit
correspondence to the ANDA informing the agency of the date the
exclusivity begins to run.

Under section 506A of the Act, certain changes in the conditions
described in this ANDA require an approved supplemental
application before the change may be made.

---

[1] Because information on the '909 and '303 patents was submitted before August
18, 2003, this reference to section 505(j)(5)(B)(iii) of the Act is to that
section of the Act as in effect prior to December 8, 2003, when the Medicare
Prescription Drug, Improvement and Modernization Act (MMA)(Public Law 108-
173) was enacted.  See MMA § 1101(c)(3).  The Agency is aware that Pfizer
initiated patent litigation against Mylan shortly after expiration of the
statutory 45-day period.

[2] Because your ANDA was filed before the date of enactment of the Medicare
Prescription Drug, Improvement and Modernization Act (MMA)(Public Law 108-
173) on December 8, 2003, this reference to the 180-day exclusivity provision
is to the section of the Act as in effect prior to December 8, 2003.  See MMA
§ 1102(b)(1).

Post-marketing reporting requirements for this ANDA are set forth in 21 CFR 314.80-81 and 314.98. The Office of Generic Drugs should be advised of any change in the marketing status of this drug.

Promotional materials may be submitted to FDA for comment prior to publication or dissemination. Please note that these submissions are voluntary. If you desire comments on proposed launch promotional materials with respect to compliance with applicable regulatory requirements, we recommend you submit, in draft or mock-up form, two copies of both the promotional materials and package insert(s) directly to:

> Food and Drug Administration
> Center for Drug Evaluation and Research
> Division of Drug Marketing, Advertising, and Communications
> 5901-B Ammendale Road
> Beltsville, MD 20705

We call your attention to 21 CFR 314.81(b)(3) which requires that materials for any subsequent advertising or promotional campaign be submitted to our Division of Drug Marketing, Advertising, and Communications (HFD-40) with a completed Form FDA 2253 at the time of their initial use.

> Sincerely yours,
>
> Gary Buehler
> Director
> Office of Generic Drugs
> Center for Drug Evaluation and Research

# EXHIBIT 3

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

Food and Drug Administration
Rockville MD 20857

**JUN 2 2 2004**

NDA 19-813
ANDA 76-258

E. Anthony Figg
Rothwell, Figg, Ernst and Manbeck
1425 K Street, N.W. - Suite 800
Washington, D.C. 20005

Peter O. Safir
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401

Dear Messrs. Figg and Safir:

This letter responds to letters sent to the Food and Drug Administration (FDA) on behalf of
Mylan Technologies, Inc. (Mylan) dated March 26, 2004, April 2, 2004, and April 12, 2004, as
well as those sent on behalf of ALZA Corporation (ALZA) dated March 31, 2004 and April 8,
2004. In those letters, Mylan asks FDA to confirm that Mylan is not subject to ALZA's pediatric
exclusivity for fentanyl. ALZA, on the other hand, asks FDA to confirm that pediatric
exclusivity applies as to Mylan's generic fentanyl transdermal system. For the reasons described
below, we find that effective approval of Mylan's ANDA will be subject to ALZA's pediatric
exclusivity.

### Background

ALZA obtained approval for its fentanyl transdermal system (trade name: Duragesic) on August
7, 1990. As required by section 505(b)(1) of the Federal Food, Drug, and Cosmetic Act (the
Act), ALZA submitted with its new drug application (NDA) a list of any patents that claimed its
drug and/or its approved uses. The last of these to expire was U.S. Patent Number 4,588,580
(the '580 patent), which is due to expire July 23, 2004. FDA listed these patents in *Approved
Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book).[1]

On July 15, 1999, FDA issued a letter requesting pediatric studies (written request) to ALZA
under section 505A of the Act, 21 U.S.C. 355a(c).[2] Specifically, the written request asked
ALZA to evaluate the use of its fentanyl transdermal system in opioid-tolerant pediatric patients
with chronic pain. ALZA submitted the requested studies on November 26, 2002. On January

---

[1] Two other patents listed for Duragesic have already expired - U.S. Patent No. 4,144,317 expired September 9,
1992 and U.S. Patent No. 4,060,084 expired June 29, 1994.

[2] The written request was subsequently amended on November 30, 1999 and on February 22, 2001.

29, 2003, FDA determined that ALZA's pediatric studies were timely submitted, fairly responded to the written request, were conducted in accordance with good scientific principles, and were reported in accordance with FDA's requirement for filing. Accordingly, FDA granted pediatric exclusivity to ALZA for fentanyl at that time. On May 20, 2003, FDA approved the labeling supplement that ALZA had submitted in response to the written request. Duragesic's labeling was amended to include important information about pediatric use.

Mylan submitted its abbreviated new drug application (ANDA) for fentanyl transdermal system on October 15, 2001. Mylan's ANDA contained a paragraph IV certification to the '580 patent. Mylan sent the required notice of this certification to ALZA. ALZA received that notice on December 10, 2001. ALZA filed suit for patent infringement against Mylan in the United States District Court for the District of Vermont (Vermont District Court) on January 25, 2002, one day after the end of the statutory 45-day period for suit.[3] Because suit was filed outside of the 45-day period prescribed in section 505(j)(5)(B)(iii), there was no 30-month stay of approval on Mylan's ANDA for fentanyl transdermal system. Thus, the pending patent litigation did not present a barrier to ANDA approval. FDA approved Mylan's ANDA on November 21, 2003.

Approximately four months after FDA approved Mylan's ANDA, on March 25, 2004, the Vermont District Court found the '580 patent to be valid and infringed by Mylan's generic fentanyl transdermal system. The court enjoined Mylan from "making, using, offering to sell, selling within the United States or importing into the United States" the fentanyl transdermal system described in its ANDA and ordered that, although Mylan had previously received a final, effective approval from FDA, "the effective date of any approval of Mylan's ANDA product shall be no earlier than the date of expiration" of the '580 patent. Thus, the question arises whether Mylan's previously approved but infringing product is subject to ALZA's pediatric exclusivity.

### Statutory and Regulatory Framework

Under the Act, a pharmaceutical company seeking to market a "pioneer" or innovator drug must first obtain FDA approval of an NDA by filing "full reports" that demonstrate the safety and effectiveness of the proposed drug product under the conditions of use described in the label. 21 U.S.C. § 355(a), (b). An NDA applicant must also submit information on any patent that claims the drug or a method of using the drug, and for which a claim of patent infringement could reasonably be asserted against an unauthorized party. 21 U.S.C. 355(b)(1), (c)(2). FDA publishes the patent information it receives in the Orange Book. *Id.; see also* 21 C.F.R. § 314.53(e).

The Drug Price Competition and Patent Term Restoration Act of 1984 (the Hatch-Waxman Amendments), codified at 21 U.S.C. 355, 360cc, and 35 U.S.C. §§ 156, 271, 282, permits the submission of ANDAs for approval of generic versions of approved drug products. 21 U.S.C. § 355(j). The ANDA process shortens the time and reduces the quantity of information required for approval. If an ANDA applicant establishes that its proposed drug product has the same active ingredient, strength, dosage form, route of administration, labeling, and conditions of use

---

[3] The 45-day period begins on the day after notice is received. 21 U.S.C. 505(j)(5)(B)(iii).

2

as a drug described in an NDA (the listed drug), and that it is bioequivalent[4] to that drug, the applicant can rely on FDA's previous finding that the listed drug is safe and effective to obtain approval. 21 U.S.C. 355(j).

## Tentative and Final ANDA Approval

Once FDA concludes that an ANDA has met the technical requirements for approval, FDA has two options: it can issue a full effective approval or it can issue a tentative approval. The rights and obligations that stem from each of these options differ. If FDA reviews an ANDA and concludes that the drug described in the ANDA is safe and effective under the conditions of use described in the labeling, and that there are no patent or exclusivity barriers to approval, the ANDA will get a full, effective approval. An applicant who gets a full effective approval will receive an approval letter that permits marketing. 21 C.F.R. 314.105(a). The approval of the application becomes effective on the date the approval letter is issued. *Id.* An application with full effective approval has no continuing obligation to update its patent certifications. See 21 C.F.R. 314.94(a)(12)(viii)(C) (obligation to amend certification applies before effective date of approval).

However, if FDA reviews an ANDA and concludes that the drug described in the ANDA is safe and effective for the conditions of use described in the labeling but patent protection or other marketing exclusivities prevent the approval from becoming effective immediately, FDA will issue a tentative approval. A tentative approval indicates that the technical requirements for approval have been met as of a particular date but that approval cannot be made effective (and marketing is not permitted) until after some future event (such as expiration of a 30-month stay, a patent, or a period of marketing exclusivity). *See* 21 C.F.R. 314.105(d). Under FDA's regulations and longstanding practice, an approval with a delayed effective date is a tentative approval and does not become final before the effective date. A new drug that has received an approval with a delayed effective date or tentative approval "may not be introduced or delivered for introduction into interstate commerce until approval of the [ANDA] is effective." 21 C.F.R. 314.105(a), (d). Moreover, a tentative approval cannot become effective without a final approval letter from the agency resulting in a final effective approval. 21 C.F.R. 314.107(b)(3)(v); *see also,* 59 Fed. Reg. 50338, 50352 (October 3, 1994) (a tentative approval becomes "final and, therefore, effective only when the agency sends an approval letter to the applicant"); *Barr Labs., Inc. v. Thompson,* 238 F. Supp. 2d 236, 245-50 (D.D.C. 2002) (affirming FDA's decision that an approval with a delayed effective date is tentative and does not give applicants the right to enter the market on a date certain without further action from FDA).

In contrast to the holder of a fully approved ANDA, the holder of a tentatively approved ANDA must amend its application to reflect any material changes in circumstances, such as expiration of the patent or withdrawal of a patent challenge. See 21 C.F.R. 314.94(a)(12)(viii)(C)(1). That regulation provides that "an applicant shall amend a submitted certification if, at any time before the effective date of the approval of the application, the applicant learns that the submitted certification is no longer accurate." *Id. See also* 21 U.S.C. § 355(j)(4)(K) (barring approval of an application containing an untrue statement of material fact).

---

[4] Two drugs are considered bioequivalent if, in general, the rate and extent of absorption of the proposed drug is not significantly different from the rate and extent of absorption of the listed drug. 21 U.S.C. § 355(j)(8)(B).

3

Once all patent and exclusivity barriers to approval have been removed, a tentatively approved ANDA may be eligible for final approval. Before issuing a final approval letter to a tentatively approved application, FDA "will examine the application to determine whether there have been any changes in the conditions under which the application was tentatively approved." 59 Fed. Reg. 50338 at 50352. Even when an applicant has a tentative approval, final approval is neither inexorable nor automatic; the applicant with the tentative approval enjoys no vested right to market on a particular date. *See Barr Labs., Inc.,* 238 F. Supp. 2d at 245-50 (affirming FDA's decision that tentatively approved ANDAs do not have vested right to immediate approval upon patent expiry); *Ranbaxy Labs. Ltd. v. FDA,* 307 F. Supp. 2d. 15, 19, 21 (D.D.C. 2004) (upholding FDA's position that an applicant with a tentative approval has "no vested right to enter the market until the FDA gives its final formal approval.") *aff'd per curiam,* Civ. Action 04-5079 2004 U.S. App. LEXIS 8311 (D.C. Cir. Apr. 26, 2004). Instead, FDA must have time and the opportunity to reexamine an application to determine that the approval requirements continue to be met. Only after that examination has been completed will FDA issue a final approval letter. *Id.*

### Patent Certifications and Timing of Approval

As noted above, the timing of an ANDA's approval depends in part on patent protections for the listed drug the ANDA references. A pending ANDA must contain one of four specified certifications for each patent that "claims the listed drug" or "a use for such drug for which the applicant is seeking approval." 21 U.S.C. § 355(j)(2)(A)(vii). The certification must state one of the following:

(I) that the required patent information relating to the patent has not been filed;

(II) that such patent has expired;

(III) that such patent will expire on a particular date; or

(IV) that such patent is invalid or will not be infringed by the drug for which approval is sought.

*See id.* If a certification is made under paragraphs I or II (indicating that patent information has not been filed or that the patent has expired), the patent, in itself, will not delay the approval of an ANDA.[5] 21 U.S.C. § 355(j)(5)(B)(i). A certification under paragraph III indicates that the ANDA applicant does not intend to market the drug until after the applicable patent has expired, and FDA will not issue a final effective approval for the ANDA until after patent expiration. 21 U.S.C. § 355(j)(5)(B)(ii).

If an ANDA applicant wishes to challenge the validity of a listed patent, or to claim that the patent will not be infringed by the product proposed in the ANDA, the applicant must submit a paragraph IV certification. The applicant must provide notice of its paragraph IV certification to the NDA holder and the patent owner. The applicant must also describe the factual and legal basis for its opinion that the patent is invalid or is not infringed. 21 U.S.C. 355(j)(2)(B). The filing of a paragraph IV certification "for a drug claimed in a patent or the use of which is

---

[5] Of course approval may still be delayed due to other patents or marketing exclusivity or because the application is otherwise not ready for approval.

4

claimed in a patent" is an act of infringement. 35 U.S.C. 271(e)(2)(A). This provision enables the NDA holder to sue the ANDA applicant before the ANDA has been approved.

If the patent owner or NDA holder does not bring suit within 45 days after it has received notice of the paragraph IV certification, FDA may approve the ANDA despite the unexpired patent. FDA may do so as long as there are no other patent or exclusivity barriers to approval and the other conditions of approval are met. 21 U.S.C. 355(j)(5)(B)(iii); 21 C.F.R. 314.107(f)(2). FDA may also do so even if patent litigation was commenced outside the 45-day period and is ongoing as of the time the requirements for approval have been met.

If the patent owner or NDA holder brings a patent infringement suit against the ANDA applicant *within* 45 days, there will be an automatic stay of FDA approval for 30 months from the date that the patent owner or NDA holder received notice of the paragraph IV certification (30-month stay). (That is, unless a court decision has been reached earlier in the patent case or the patent court otherwise orders a longer or shorter stay period). 21 U.S.C. 355(j)(5)(B)(iii). If at the end of 30 months (or such shorter or longer period that the court orders) the litigation is ongoing, the 30-month stay will be lifted. If the ANDA is otherwise ready for approval, FDA will approve the ANDA in spite of the ongoing litigation and unexpired patent. Similarly, if the ANDA applicant were to win in the district court and the district court decision were appealed, the 30-month stay would be lifted after the district court decision. In these circumstances, if the ANDA is otherwise ready for approval, FDA can approve the ANDA in spite of the pending appeal -- unless the court otherwise imposes a stay of approval while the appeal is pending.

### Delaying the Effective Date under 271(e)(4)

The Hatch-Waxman amendments also amended the patent code to specify the consequences that follow when the NDA holder or patent owner sues the ANDA applicant, and the court hearing the patent infringement litigation finds the patent valid and infringed. In these circumstances, 35 U.S.C. 271(e)(4)(A) provides that "the court shall order the effective date of any approval of the drug . . . involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed." 35 U.S.C. 271(e)(4)(A). As the unqualified plain meaning of the statute reflects, this mandated delay of the effective date of approval takes place regardless of whether the ANDA remains pending or has obtained a final effective approval.[6]

The legislative history explicitly recognized that this requirement would affect previously approved as well as unapproved applications:

> If the infringing party has not begun commercial marketing
> of the drug, injunctive relief may be granted to prevent any

---

[6] As noted above, if an applicant meets the requirements for final approval, final effective approval may be issued while patent litigation is ongoing under 3 different circumstances: (1) the ANDA applicant was sued outside of the 45 days so no 30-month stay of approval was imposed; (2) the applicant was sued within the 45 days but the 30-month stay expired while the litigation was ongoing; or (3) the ANDA applicant was sued within the 45 days, won at the lower court level, and the decision lifted the 30-month stay and permitted approval, but that decision was appealed.

5

> commercial activity with the drug and FDA would be
> mandated to make the effective date not earlier than the
> expiration date of the infringed patent . . . **In the case
> where an ANDA had been approved, the order would
> mandate a change in effective date.**

H.R. Rep. No. 98-857, pt. 1, at 46 (1984) (emphasis added).

The language of the provision regarding a delay in the effective date under 271(e)(4)(A) parallels the language of the provisions regarding 30-month stays, 5-year exclusivity, 3-year exclusivity and 180-day exclusivity that were enacted at the same time as part of the Hatch-Waxman amendments. Section 271(e)(4)(A), like the provisions regarding 30-month stays, 5-year exclusivity, 3-year exclusivity, and 180-day exclusivity, speaks not in terms of delays in FDA approvals but in terms of the dates such approvals can be made effective. See 21 U.S.C. 505(j)(5)(B)(iii) ("approval shall be made effective upon the expiration of the thirty month period"); 21 U.S.C. 505(j)(5)(B)(iv) ("application shall be made effective not earlier than one hundred eighty days after . . ."); 21 U.S.C. 505(j)(5)(D)(ii) ("approval of such an application shall be made effective in accordance with subsection (b)"); 21 U.S.C. 505(j)(5)(D)(iii) ("Secretary may not make the approval of an application submitted under this subsection for the conditions of approval of such drug in the subsection (b) application effective before the expiration of three years . . . .").

If an ANDA has met the technical requirements for approval and a delay in effective dates is required due to a 30-month stay, 5-year exclusivity, 3-year exclusivity or 180-day exclusivity, FDA issues a tentative approval. 21 C.F.R. 314.105, 314.107. ANDA applicants with tentative approvals that are subject to delays due to 30-month stays, 5-year, 3-year or 180-day exclusivity are not entitled to go to market immediately when the barrier to approval expires; after the applicable stay or exclusivity expires, applicants must still wait until FDA issues an approval letter. FDA will not issue a letter to make the approval of the tentatively approved application effective until after FDA has reexamined the application to determine whether the requirements for approval continue to be met.

Similarly, where patent litigation between an ANDA applicant and NDA holder or patent owner results in a court order under 271(e)(4)(A) stating that the effective date of ANDA approval shall be no earlier than the date the patent expires, FDA will not issue a final effective approval until after the date in the order has passed. If, in the interim between the court's order and the date the approval can be made effective, FDA determines that the applicant meets the technical requirements for approval, a tentative approval will be issued. FDA will not issue a letter to make the approval of the tentatively approved application effective until after the period stated in the court order has run and FDA has reexamined the application to determine whether the requirements for approval continue to be met.

The same result obtains where an ANDA has already received a full effective approval and a court finding patent validity and infringement issues an order under 271(e)(4)(A) stating that the approval of the ANDA not be made effective until after the date the patent expires -- that is, the ANDA reverts to tentative approval status. As the legislative history of the Hatch-Waxman

6

amendments confirms, Congress contemplated that, in these circumstances, the approval would no longer remain effective and the date of effective approval should be delayed to a date in the future. See H.R. Rep. No. 98-857, pt. 1, at 46 (1984) ("In the case where an ANDA had been approved, the order would mandate a change in effective date"). Like other applications with approvals with delayed effective dates, such an approval is tentative and does not give the applicant a vested right to go to market on a date certain. Applicants with tentative approvals cannot go to market until they have received an approval letter. As noted above, FDA will not issue an approval letter until after the barrier to approval has expired (i.e., the period stated in the court order has run) and FDA has reexamined the application to determine whether the requirements for approval continue to be met.

## Pediatric Exclusivity

In 1997, as part of the Food and Drug Administration Modernization Act ("FDAMA"), Congress amended the Act to provide an economic incentive for drug manufacturers to invest the resources necessary to conduct and submit studies of the safety and effectiveness of drugs in pediatric populations. Recognizing that pediatric populations are "therapeutic orphans," and that pediatric studies "pose ethical and moral issues," carry the risk of product liability, and are hard to attract patients for and conduct, Congress created the pediatric exclusivity incentive to ensure that more drugs were studied and adequately labeled for the pediatric patients who use them. S. Rep. No. 105-43 at 51 (1997). Under these provisions, codified at 21 U.S.C. 355a[7], FDA can issue a written request to ask a sponsor to conduct and submit studies on the use of a drug in the pediatric population. If FDA issues a written request for pediatric studies, and the company submits pediatric studies that "fairly respond" to the written request in accordance with FDA's requirements for filing, conducts the studies in accordance with good scientific principles and protocols, the company is entitled to six months of additional exclusivity (pediatric exclusivity) that attaches to existing patent and exclusivity protection for the moiety. This exclusivity results in an additional six-month delay of approval for ANDAs that are blocked from approval by existing patent or exclusivity rights. By giving NDA sponsors an additional six-month period without generic competition, Congress elevated the goal of obtaining pediatric labeling information over the goal of approving generic copies of brand name drugs at the earliest possible time.[8]

In fact, even if an ANDA is on the verge of being given an effective approval, the submission of pediatric studies in response to a written request allows FDA to delay the effective date while FDA determines whether the studies qualify for a pediatric exclusivity award. 21 U.S.C. § 355a(e) ("if the approval of an [ANDA] . . . may occur after submission of reports of pediatric studies . . . but before the Secretary has determined whether the requirements of subsection (d)

---

[7] Congress reauthorized and amended the pediatric exclusivity provisions in the Best Pharmaceuticals for Children Act, Pub. L. No. 107-109 (2001) and made additional amendments in the Pediatric Research Equity Act of 2003, Pub. L. No. 108-155 (2003).

[8] See, e.g. S. Rep No. 107-79, at 11 (2001) ("By granting drug manufacturers a 6-month extension of market exclusivity for a drug upon satisfactory completion of requested pediatric studies of the product and delaying the availability of lower cost generics alternatives, the bill will make those prescription drugs . . . more expensive . . . There would also be cost savings . . . by, for example, the reduced need for hospitalization of children and reduced error in medicating children.").

have been satisfied, the Secretary shall delay the . . . approval . . . until the determination under
subsection (d) is made, but any such delay shall not exceed 90 days").

The prospect of an additional six months of delay in ANDA approvals has been a valuable
incentive for NDA holders. Whereas previous attempts to obtain pediatric information from
sponsors had largely failed, the pediatric exclusivity provision has proven highly effective. *See*
The Pediatric Exclusivity Provision, January 2001 Status Report to Congress, at 3-5, 12 ("In
general, the pediatric exclusivity provision has done more to generate clinical studies and useful
prescribing information for the pediatric population than any other regulatory or legislative
process to date")(available at http://www.fda.gov/cder/pediatric/reportcong01.pdf). Since the
pediatric exclusivity provisions took effect in November 1997, FDA has issued 288 requests for
pediatric studies, has made 108 pediatric exclusivity determinations, and has granted pediatric
exclusivity for 98 drugs for indications ranging from hypertension to HIV. *See*
http://www.fda.gov/cder/pediatric/exgrant.htm.

The statute governing which ANDAs are blocked by pediatric exclusivity provides in relevant
part:

> (c) MARKET EXCLUSIVITY FOR ALREADY MARKETED DRUGS. If
> the Secretary determines that information relating to the use of an
> approved drug in the pediatric population may produce health
> benefits in that population and makes a request to the holder of the
> approved [NDA] for pediatric studies (which shall include a
> timeframe for completing such studies), the holder agrees to the
> request, the studies are completed within any such timeframe, and
> the reports are submitted in accordance with subsection (d)(2) of
> this section or accepted in accordance with subsection (d)(3) of this
> section –
>
> > \*   \*   \*
>
> (2)(A) if the drug is the subject of—
>
> > (i) a listed patent for which a [paragraph II]
> > certification has been submitted . . . and
> > for which pediatric studies were
> > submitted prior to the expiration of the
> > patent (including any patent extensions);
> > or
> >
> > (ii) a listed patent for which a [paragraph
> > III] certification has been submitted . . . ,
>
> the period during which an [ANDA] . . . may not be approved . . . shall be
> extended by a period of six months after the date the patent expires
> (including any patent extensions); or

8

> (B) if the drug is the subject of a listed patent for which a
> [paragraph IV] certification has been submitted under subsection . .
> . (j)(2)(A)(vii)(IV) of section 505, and in the patent infringement
> litigation resulting from the certification the court determines that
> the patent is valid and would be infringed, the period during which
> an ANDA may not be approved under . . . section 505(j)(5)(B)
> shall be extended by a period of six months after the date the
> patent expires (including any patent extensions).

21 U.S.C. 355a(c).

Here, there is no dispute that ALZA conducted pediatric studies fairly responding to a written
request issued by FDA. ALZA conducted the studies in accordance with good scientific
principles and protocols, and submitted them in a supplement appropriate for filing. At issue in
this dispute are which statutory provisions govern whether ALZA's pediatric exclusivity delays
the approval of Mylan's ANDA beyond the date the '580 patent expires, as well as how those
provisions apply to the facts presented.

### Mylan's Argument

Mylan contends that it is not subject to ALZA's pediatric exclusivity. Mylan argues that because
its application was submitted with a paragraph IV certification, section 355a(c)(2)(B) (relating to
paragraph IV certifications) determines whether pediatric exclusivity will attach.[9] Under
355a(c)(2)(B), if the NDA holder satisfies the prerequisites for pediatric exclusivity by
completing the requested studies in the requested timeframe, and in the lawsuit resulting from
the paragraph IV certification the patent is found valid and infringed, "the period during which
an ANDA may not be approved under . . . section [505(j)(5)(B)] shall be extended by six
months after the date the patent expires." Mylan notes that the statute's provisions regarding
paragraph IV certifications at 355a(c)(2)(B) provide for an extension of the "period in which an
application may not be approved under 505(j)(5)(B)." Mylan argues that the only period during
which an application may not be approved under 505(j)(5)(B) is the 30-month stay provided for
in that section. Because Mylan was sued outside of the 45-day period, it contends that no 30-
month stay attached, there is no "period" to extend, and the terms of 355a(c)(2)(B) do not require
a delay of Mylan's approval.

Moreover, although the court reset the effective date of Mylan's ANDA under 271(e)(4)(A) to a
date that is not earlier than the date the '580 patent expires, in Mylan's view, the court order did
not create a "period during which [Mylan's ANDA] may not be approved." Mylan maintains that
its application remains approved and such approval can only be withdrawn in accordance with
the withdrawal provisions of section 505(e) of the Act, 21 U.S.C. 355(e), which require, among
other things, notice and opportunity for hearing before withdrawal can occur. Similarly, in
Mylan's view, the court's order does not and cannot convert (or require FDA to convert) its final
approval to a tentative approval.

---

[9] Mylan argues that because it has appealed the district court order of validity and infringement, in the interim, its
paragraph IV certification (indicating it is challenging the validity or infringement of the patent) remains valid.

9

On the contrary, Mylan argues that although a tentatively approved application is subject to further FDA review before an approval letter will issue and the approval becomes effective, Mylan's application has a different status that does not necessitate such review. In Mylan's view, the court's order does not require FDA to act on Mylan's application before Mylan can begin marketing under it. The court order merely creates a new date certain when the approval will be made effective by operation of law (i.e., the date the patent expires). Under this theory, when the patent expires on July 23, 2004, Mylan's ANDA will once again have a final effective approval without any further action by Mylan or FDA.

Under Mylan's theory, even if new patents have been listed, or ALZA supplements its NDA with a material change in formulation or labeling, or Mylan's application otherwise falls out of compliance with applicable statutes and regulations before July 23, 2004, the approval of Mylan's ANDA would nevertheless "become effective" -- and it may begin marketing -- the moment the patent expires. Moreover, because its application will regain a final effective approval at the moment the patent expires, and because applications with final effective approval have no further obligation to update their patent certifications post approval, Mylan argues that it will not be required to amend its application to change to a paragraph II certification when the patent expires. Mylan thus argues that 355a(c)(2)(A)(i) (which prohibits FDA's approval of ANDAs with paragraph II certifications for six months after the patent expires) will never apply to delay approval of Mylan's ANDA.

### ALZA's Argument

ALZA, on the other hand, argues that its pediatric exclusivity delays final effective approval of Mylan's fentanyl transdermal system ANDA until no earlier than 6 months after the date the '580 patent expires. ALZA argues that where an application has been approved and a court subsequently holds the patent valid and infringed, FDA properly responds to a court order delaying the effective date of approval by converting the full approval to a tentative approval. ALZA notes that, under FDA's regulations, where FDA issues an approval with a delayed effective date, that approval is tentative and does not become final until (1) patent and exclusivity barriers to approval expire, (2) FDA determines that the approval requirements continue to be met, and (3) FDA issues an approval letter. ALZA contends that, under *Barr Labs. Inc. v. Thompson,* when FDA issues an approval with a delayed effective date, the ANDA applicant has no vested right to obtain a final effective approval on a particular date. ALZA argues that the same result necessarily applies when the delay in effective date has been ordered by the court under 271(e)(4)(A). Although in this case the patent is due to expire shortly after the court order resetting the ANDA effective date, ALZA notes that, under Mylan's theory, the same result would apply even if the patent were due to expire 10 or more years in the future.

Moreover, ALZA argues that, once Mylan's effective approval has been converted to a tentative approval, the statutory language, regulations, and policy underlying pediatric exclusivity, require that Mylan be subject to ALZA's pediatric exclusivity. ALZA argues that, under FDA's regulations at 21 C.F.R. 314.94(a)(12)(i)(C), Mylan should have converted its certification to a paragraph III certification after it lost its patent suit. However, ALZA notes that, regardless of whether Mylan's ANDA should now contain a paragraph III or a paragraph IV certification, upon patent expiration, Mylan's ANDA must contain a paragraph II certification to be accurate.

10

ALZA notes that, under the rule of *Ranbaxy*, the only relevant certification for determining pediatric exclusivity is the one in place at the time of final approval. *Ranbaxy Labs. Ltd.*, 307 F. Supp. 2d at 19, 21. Accordingly, because Mylan cannot receive final effective approval until after the patent has expired and patent expiration will require Mylan to submit a paragraph II certification, ALZA argues that 355a(c)(2)(A)(i) (relating to paragraph II certifications), not 355(c)(2)(B) (relating to paragraph IV certifications) determines whether pediatric exclusivity will attach. Under 355(a)(c)(2)(A)(i), pediatric studies were submitted before expiration of the patent so the period during which Mylan's ANDA cannot be approved is "extended six months after the date the patent expires."

## FDA's Determination

FDA finds that ALZA's pediatric exclusivity for fentanyl will attach, and thus delay effective approval of Mylan's ANDA. Unless Mylan were to win its patent case on appeal, Mylan's ANDA would be eligible for final effective approval no earlier than six months after the '580 patent expires on July 23, 2004.

The Vermont District Court found that Mylan infringed ALZA's valid patent. As noted above, pursuant to 35 U.S.C. 271(e)(4)(A), the district court hearing the patent infringement case enjoined Mylan from "making, using, offering to sell [and] selling within the United States or importing into the United States" its fentanyl transdermal system and ordered that the effective date of Mylan's ANDA "shall be no earlier than the date of expiration of U.S. Patent No. 4,588,480."

Under the FDA's regulations, as upheld in *Barr Labs. Inc. v. Thompson*, an approval with a delayed effective date is a tentative approval that cannot be made effective until FDA issues a letter granting final effective approval. 21 C.F.R. 314.107(b)(3)(v); see also *Barr Labs*, 238 F.Supp at 245-50. This is the case regardless of whether approval has been blocked by a 30-month stay, 5-year exclusivity, 3-year exclusivity, 180-day exclusivity or, as in this case, because the court has issued an order prohibiting approval from being made effective until after the patent expires. In each of these cases, the Hatch-Waxman amendments bar FDA's issuance of a final effective approval. See 21 U.S.C. 505(j)(5)(B)(iii); 21 U.S.C. 505(j)(5)(B)(iv); 21 U.S.C. 505(j)(5)(D)(ii); 21 U.S.C. 505(j)(5)(D)(iii); 35 U.S.C. 271(e)(4)(A).

Just as applicants barred from final approval due to 5-year or other Hatch-Waxman exclusivity need FDA to act to issue an approval letter before they are permitted to have a final effective approval, so too, does the Vermont District Court's order require FDA to act before Mylan's effective approval can be restored. Under the court's order, approval of Mylan's ANDA cannot be made effective until after the '580 patent has expired. An approval with a delayed effective date (including a previously effective approval that has had its effective date delayed by court

11

order) is tentative.[10]  It does not give Mylan an unqualified right to obtain final effective approval without further action by Mylan or FDA on the date the patent expires.  Although tentatively approved status embodies FDA's determination that the requirements for approval have been met as of a particular date, FDA must review a tentatively approved application to determine whether the standards for approval continue to be met before it will issue a final approval letter.  Among other requirements, Mylan's ANDA, like all applications with tentative approvals, must maintain accurate patent certifications.  21 C.F.R. 314.94(a)(12)(viii)(C)(i).

Once the patent expires, Mylan's paragraph IV certification (indicating that the patent is invalid or not infringed) will no longer remain accurate.  See *Ranbaxy*, 307 F. Supp. 2d at 19, 21. A change in certification (in this case to a paragraph II certification indicating that the patent has expired) is required when an applicant whose application does not have final, effective approval learns that its existing certification is no longer proper.  See 21 C.F.R. 314.94(a)(12)(viii)(C)(i) ("an applicant shall amend a submitted certification if, at any time before the effective date of the approval of the application, the applicant learns that the submitted certification is no longer accurate."); see also 21 U.S.C. 355(j)(4)(K) (an ANDA that contains an untrue statement of material fact cannot be approved).  If Mylan refuses to amend its application to change its certification after the patent expires, FDA can treat that certification as automatically amended to contain a paragraph II certification (because there is no other proper certification upon patent expiry). See *Ranbaxy*, 307 F. Supp. 2d at 19, 21. Alternatively, FDA can refuse to issue a final approval letter on the ground that the application contains an untrue statement of material fact. In either case, Mylan cannot obtain final approval until its application actually contains or is deemed to contain a paragraph II certification.  See *id.*

Once Mylan's certification has changed - *de facto* or *de jure* - to a paragraph II certification, pediatric exclusivity attaches under 355a(c)(2)(A)(i). See *Ranbaxy*, 307 F. Supp. 2d at 20, 21. Under 355a(c)(2)(A)(i), if an application contains a paragraph II certification and the pediatric studies qualifying for exclusivity were submitted before the patent expires, "the period during which an [ANDA] may not be approved . . . shall be extended by a period of six months after the date the patent expires."  This provision gives ALZA pediatric exclusivity as to Mylan and further delays the effective date of Mylan's approval for 6 months after the patent expires.  If, at the end of this additional 6 months, FDA were to determine that Mylan's ANDA continues to meet the approval requirements and there are no remaining patent or exclusivity barrier to approval, FDA will issue a new letter granting Mylan a final effective approval.

---

[10] Although, in essence, the court's order withdraws Mylan's full effective approval, contrary to Mylan's arguments FDA was not required to comply with the withdrawal provisions of 505(e). Under 505(e), FDA can withdraw approval of an approved application after notice and opportunity for hearing under certain narrowly defined circumstances. However, 505(c) does not state the only circumstances in which withdrawal of effective approval is possible. Instead, 35 U.S.C. 271(e)(4)(A) speaks more specifically to the circumstances at issue. This provision mandates a withdrawal of effective approval where, as here, an ANDA applicant has received a final effective approval and subsequently loses its patent lawsuit with a finding that the patent is valid and infringed. Once that effective approval is withdrawn, the status of Mylan's ANDA is the same as that of other ANDAs blocked from final approval by patent or exclusivity rights - tentatively approved.

This approach properly rewards ALZA for conducting and submitting its pediatric studies and preserves the necessary incentive to conduct such studies.[11] It is consistent with *Barr* and *Ranbaxy* as well as with the structure and purpose of 21 U.S.C. 355a. For all of these reasons, FDA concludes that effective approval of Mylan's ANDA for fentanyl transdermal systems will be subject to ALZA's pediatric exclusivity.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---

[11] Although Mylan argues that its approach (which prevents ANDAs from being subject to pediatric exclusivity if they obtain approval and the effective date of approval is reset by a court) properly punishes NDA holders for failing to sue within the statutory 45-day period, the logic of Mylan's argument applies to any application that has a final effective approval that is reset after a finding of validity and infringement; it is not limited to applications that received approval because the NDA holder or patent owner missed the deadline for suit. Specifically, Mylan's argument would also apply where the NDA holder sued the ANDA applicant within the 45-day period and the ANDA was approved after 30 months while the litigation was ongoing. In that case, if the court subsequently found the patent valid and infringed and reset the effective date of approval, under Mylan's theory this approval would become effective on the date of patent expiry regardless of whether the NDA holder had earned pediatric exclusivity because there is no remaining "period" under 505(j)(5)(B) to extend. Similarly, if the ANDA applicant won its patent litigation at the district court level, obtained final, effective approval after that victory, and subsequently lost on appeal with an order resetting the ANDA approval effective date, approval of that application would also become effective on the date of patent expiration, regardless of whether the NDA holder had earned pediatric exclusivity. This outcome makes little sense, and would substantially diminish the incentives for innovator firms to undertake the studies requested by FDA to earn a pediatric exclusivity which was so tenuous and easily evaded.

13

 **DEPARTMENT OF HEALTH & HUMAN SERVICES** MAR 29  P 4 :18

Food and Drug Administration
Rockville, MD 20857

Dear

This letter is in reference to your pending ANDA for amlodipine besylate tablets. As you may be aware, on March 26, 2007, Mylan Laboratories, Inc. filed a complaint against the Food and Drug Administration ("FDA") seeking to enjoin FDA from immediately approving abbreviated new drug applications for amlodipine besylate products. *Mylan Laboratories, Inc. v. Michael Leavitt*, CA No. 07-579 (RMU) (D.D.C.). Because the recent developments in the amlodipine besylate patent litigation (in particular, the Federal Circuit's March 22, 2007 decision in *Pfizer Inc. v Apotex, Inc.*, No. 2006-1261 (Fed. Cir. March 22, 2007)) presented several regulatory issues that need to be resolved before any applications could be approved, FDA informed the court (in CA No. 07-579) that it planned to solicit comments from interested parties before it reached decisions on the matters that Mylan sought to enjoin. The court has memorialized FDA's proposal, and enjoined the agency from implementing its decisions once made, until 5:00 pm on April 13, 2007, to allow the court the opportunity to review the FDA decisions. *Mylan Laboratories*, CA No. 07-579, Order (March 26, 2007).

The FDA is considering the following questions. Should you wish to comment on them, your response will be posted at http://www.fda.gov/cder/ogd/index.htm. Other submissions relevant to these issues will also be posted at this address. Please send your response, if any, by close of business on April 4, 2007 to:

> Food and Drug Administration
> Office of Generic Drugs, HFD-600
> Attention: Gary J. Buehler, Director
> 7519 Standish Place
> Rockville, MD 20855

1.    What date controls FDA's giving effect to the decision in *Pfizer Inc. v Apotex, Inc.*, No. 2006-1261 (Fed. Cir. March 22, 2007) ("*Apotex* decision") holding that Pfizer's patent 4,879,303 ("the '303 patent") is invalid? Can FDA treat the '303 patent as invalid as of March 22, 2007, or must FDA await the issuance of the mandate? Is the answer the same for all purposes, that is, for determining the applicability of pediatric exclusivity, the triggering of 180-day exclusivity, and the eligibility of other ANDA applicants for final approval?

2007N-0123                                                                LET 1

2.    If FDA must await the issuance of the mandate, does pediatric exclusivity bar approval of all unapproved ANDAs in the meantime?

3.    If and when the *Apotex* decision is implemented, what is the effect of the decision that the '303 patent is invalid on the obligation of an ANDA applicant to change its certification? Must Pfizer delist its patent, so that certifications can be withdrawn? Or can FDA treat an invalid patent as delisted as a matter of law, and presume the withdrawal of the certifications? Or must the ANDA applicants file paragraph II certifications stating that the '303 patent has expired?

4.    If and when the *Apotex* decision is implemented and the patent is treated as invalid, does pediatric exclusivity attach to the '303 patent with respect to any unapproved ANDAs? Does it matter whether the ANDA applicant filed a paragraph III or IV certification before patent expiration?

5.    Does 180-day exclusivity triggered before a patent expires continue to bar approvals of other ANDAs after the patent expires, even if other ANDA applicants change their certifications to paragraph II or withdraw their certifications altogether?

We note that several citizen petitions have been submitted that also raise issues relevant to approval of ANDAs for products containing amlodipine. The petition docket numbers are: 2007P-0116, submitted by Mylan Pharmaceuticals, Inc; 2007P-0110 and 2007P-0111 submitted by Pfizer Inc. If you believe your comments are also relevant to consideration of those petitions, you may submit your comments to the petitions dockets as well. In addition, FDA may consider relevant comments received in this context when answering the petitions.

Thank you for your consideration of these questions. If you have any questions regarding this letter, please contact Cecelia Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs, at 240-276-9310.

Sincerely,

Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

----------------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**
----------------------------------------------------------------------------

/s/
- - - - - - - - - - - - - - - - - - - -
Gary Buehler
3/28/2007 10:19:34 AM

# KAYE SCHOLER LLP

David Bickart
202 682-3503
Fax 202 414-0310
dbickart@kayescholer.com

The McPherson Building
901 Fifteenth Street, NW
Suite 1100
Washington, DC 20005
202 682-3500
Fax 202 682-3580
www.kayescholer.com

March 26, 2007

**VIA HAND DELIVERY**

Honorable Sharon Prost
United States Circuit Judge
c/o Jan Horbaly, Clerk
United States Court of Appeals
  for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

Re:   <u>Pfizer Inc. v. Mylan Laboratories, Inc. et al. (2007-1194)</u>

Dear Judge Prost:

      On behalf of Pfizer Inc. we are filing herewith the Response that is requested in paragraph 1 of the Court's Order issued on March 23, 2007. For the reasons stated in the Response, as the result of Mylan's commercial launch of its generic Norvasc® product last Friday, Pfizer has suffered, and will continue to suffer injury that is both extremely severe and irreparable. Pfizer urgently needs relief from the Court. Specifically, it requests that the temporary stay in paragraph 3 of the Court's March 23, 2007 Order be lifted forthwith.

      We very much appreciate the Court's attention to this matter.

Respectfully submitted,

*David Bickart*

David O. Bickart

cc:   David J. Harth, Esq.
       E. Anthony Figg, Esq.

RECEIVED 2007 MAR 26 AM 9:50 US COURT OF APPEALS FEDERAL CIRCUIT

31441820.WPD

NEW YORK   CHICAGO   LOS ANGELES   WASHINGTON, D.C.   WEST PALM BEACH   FRANKFURT   LONDON   SHANGHAI

No. 2007-1194

# United States Court of Appeals

## for the

# Federal Circuit

PFIZER INC.,

*Plaintiff–Appellee,*

v.

MYLAN LABORATORIES, INC.
and MYLAN PHARMACEUTICALS, INC.,

*Defendants–Appellants.*

*Appeal from the United States District Court for the Western District of Pennsylvania in case no. 2:02-CV-1628, Judge Terrence F. McVerry*

## RESPONSE OF PLAINTIFF–APPELLEE PFIZER INC. PURSUANT TO THE COURT'S MARCH 23, 2007 ORDER

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

MAR 2 6 2007

JAN HORBALY
CLERK

Richard G. Greco
Milton Sherman
David O. Bickart
Daniel Boglioli
Kaye Scholer LLP
425 Park Avenue
New York, NY  10022-3598
(212) 836-8000

*Attorneys for Plaintiff-Appellee
Pfizer Inc.*
**MARCH 26, 2007**

## **CERTIFICATE OF INTEREST**

Counsel for the appellee, Pfizer Inc., certifies the following:

1.    The full name of every party or amicus represented by me is:

   Pfizer Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

   Kaye Scholer LLP; Milton Sherman, Richard G. Greco, Betty A. Ryberg, Joseph V. Saphia, Daniel A. Boglioli, Sapna Walter Palla, Regina O. Kent, Donald Cameron, and David Bickart.

   Thorp, Reed & Armstrong, LLP; C. James Zeszutek, and John J. Richardson.

March 26, 2007

David O. Bickart
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598
*Counsel for Plaintiff-Appellee*

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ................................................................. 2

    Events Preceding This Court's March 23, 2007 Order .................................. 2

    This Court's March 23, 2007 Order ................................................. 4

    Events Subsequent To This Court's March 23, 2007 Order ........................... 4

ARGUMENT ................................................................................. 5

I.    How The FDA Applies Pediatric Exclusivity ................................................. 5

II.   The *Apotex* Decision Did Not Immunize Any ANDA From Pediatric
Exclusivity ................................................................................... 7

III.  If This Court's Temporary Stay Is Lifted, The FDA Should
Implement Pfizer's Six-Month Period Of Pediatric Exclusivity As to
Mylan ........................................................................................ 9

IV.  Pfizer Has Compelling Grounds For Rehearing ........................................... 10

V.   To Prevent Further Irreparable Injury To Pfizer, This Court Should
Lift Its Stay Forthwith And Permit Pediatric Exclusivity To Become
Effective .................................................................................... 12

CONCLUSION .............................................................................. 14

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## CASES

*Alza Corp. v. Mylan Labs., Inc.,*
391 F.3d 1365 (Fed. Cir. 2004)................................................................ 9

*In re Ackermann,*
444 F.2d 1172 (C.C.P.A. 1971) .............................................................. 10

*In re Chupp,*
816 F.2d 643 (Fed. Cir. 1987)................................................................. 10

*In Re Neave,*
370 F.2d 961 (C.C.P.A. 1967) ................................................................ 10

*In re Papesch,*
315 F.2d 381 (CCPA 1963) .................................................................... 10

*Mylan Labs., Inc. v. Thompson,*
389 F.3d 1272 (D.C. Cir. 2004) ............................................................. 10

*Optivus Tech., Inc. v. Ion Beam Applications S.A.,*
469 F.3d 978 (Fed. Cir. 2006)................................................................. 12

*Pfizer Inc. v. Apotex, Inc.,*
Docket No. 2006-1261 .............................................................................. 1

## STATUTES

21 C.F.R. § 314.107(b)(3)(ii) .................................................................... 8

21 C.F.R. § 314.107(e) ............................................................................... 8

21 U.S.C. 355(j)(5)...................................................................................... 4

21 U.S.C. § 355a......................................................................................... 5

21 U.S.C. § 355a(c)(1) ............................................................................... 5

21 U.S.C. § 355a(c)(2) ............................................................................. 5, 6

Page(s)

35 U.S.C. § 103 ........................................................................................ 3, 11

35 U.S.C. § 271(e)(2) ................................................................................ 2, 5

35 U.S.C. § 271(e)(4)(A) ........................................................................ *passim*

35 U.S.C. § 271(e)(4)(A) ............................................................................... 2

Fed. R. App. P. 40(a) .................................................................................... 7

Fed. R. App. P. 41(b) .................................................................................... 7

Fed. R. App. P. 41(d)(1) ............................................................................... 7

Fed. R. Civ. Pro. 52 .................................................................................... 11

## **MISCELLANEOUS**

S. Rep. No. 107-79 ...................................................................................... 12

## PRELIMINARY STATEMENT

On March 23, 2007, this Court directed the parties to submit briefs regarding the effect of the Court's ruling in *Pfizer Inc. v. Apotex, Inc.*, Docket No. 2006-1261 (the "*Apotex* Decision") on ANDA approvals and pediatric exclusivity. As explained herein, the Court's Order held Mylan's motion for a stay in abeyance pending the further consideration of these briefs, and also temporarily stayed the district court's order in an attempt to preserve the *status quo* while it considered the parties' submissions.

However, Mylan took advantage of this Court's order on Friday to irrevocably alter the *status quo*. Approximately one hour after Pfizer received this Court's Order, and while Pfizer was seeking clarification of it, Mylan announced that it had commercially launched its generic Norvasc® tablets. Mylan's launch permanently altered the market place and caused Pfizer to suffer severe and irreparable injury. Pfizer irrevocably will lose at least part of the benefit of the pediatric exclusivity period, which has a limited duration of six months. Moreover, it will lose very substantial sales on its blockbuster drug Norvasc® for which it has no clear and adequate legal remedy. Pfizer estimates the value of its pediatric exclusivity rights to be approximately $1 billion.

Pfizer shortly will file a petition for panel and *en banc* rehearing of this Court's March 22, 2007 decision in *Apotex*. Pfizer respectfully requests that

the Court lift its temporary stay in this matter while it considers Pfizer's petition

for rehearing. Because Pfizer's injury is both severe and irreparable, Pfizer

further requests that the Court lift the temporary stay forthwith. Once the

temporary stay is lifted, the district court's amended judgment will have full force

and effect. Based on the FDA's prior rulings, Pfizer expects that, based on the

§ 271(e)(4)(A) order in the amended judgment, the FDA will implement Pfizer's

pediatric exclusivity pending this Court's resolution of its petition for rehearing.

## STATEMENT OF FACTS

### Events Preceding This Court's March 23, 2007 Order

On March 16, 2007, the U.S. District Court for the Western District

of Pennsylvania entered judgment in Pfizer's favor in its Hatch-Waxman action

against Mylan (the "Amended Judgment"). The action was brought pursuant to

35 U.S.C. § 271(e)(2)(A) and alleged that Mylan, by filing an Abbreviated New

Drug Application ("ANDA") for generic Norvasc® tablets, infringed Pfizer's U.S.

Patent No. 4,879,303 (the "'303 patent). Pursuant to 35 U.S.C. § 271(e)(4)(A),

the Amended Judgment prohibits final approval of Mylan's ANDA until a date

not earlier than the expiration date of the '303 patent. The Amended Judgment,

pursuant to 35 U.S.C. § 271(e)(4)(B), also enjoins Mylan from commercially

marketing its generic Norvasc® tablets until the '303 patent expires at midnight on March 25, 2007.[1]

On March 16, 2007, Mylan moved in the district court to stay the § 271(e)(4)(A) order in the Amended Judgment pending its appeal to this Court. On March 19, 2007 the district court denied Mylan's motion. Thereafter, on March 20, 2007, Mylan moved for a stay of the § 271(e)(4)(A) order in this Court.

On March 22, 2007, this Court issued the *Apotex* Decision, holding that claims 1 through 3 of the '303 patent, the only claims Pfizer asserted in its Hatch-Waxman patent infringement action against Apotex, are invalid as obvious pursuant to 35 U.S.C. § 103. Mylan supplemented its motion for a stay pending appeal based on the *Apotex* Decision on March 22, 2007, and again requested the district court to stay its order. Mylan's request was denied.

---

[1]    The district court's original judgment enjoined marketing through September 25, 2007, when Pfizer's period of pediatric exclusivity expires, but did not contain an order under 35 U.S.C. § 271(e)(4)(A). After FDA informed Pfizer that it would not effectuate pediatric exclusivity by rescinding its approval of Mylan's ANDA in the absence of an order under 35 U.S.C. § 271(e)(4)(A), the district court amended the judgment to include such an order, and revised the marketing injunction so that it ends on March 25, 2007, the date that the '303 patent expired. The district court thus clearly intended pediatric exclusivity to be applied against Mylan's ANDA. The FDA, however, delayed rescinding Mylan's approval because of Mylan's stay motion before this Court.

circumstances will determine how this works, the nine amlodipine besylate ANDAs of which Pfizer is aware can be divided into two groups, as described below. If not for the stay this Court issued on March 23, Pfizer believes that all of these ANDAs would be subject to pediatric exclusivity at this time.

a.    One group of ANDAs includes those that did not challenge the '303 patent. These ANDAs are subject to pediatric exclusivity pursuant to 21 U.S.C. § 355a(c)(2)(A). The FDA cannot approve these ANDAs unless and until their sponsors challenge the '303 patent and obtain court orders holding the '303 patent invalid or not infringed.

b.    The other group of ANDAs consists of those that challenged the '303 patent; were held to infringe the '303 patent and were thus subject to an order under 35 U.S.C. § 271(e)(4)(A) requiring that their approval not be made effective before expiration of the '303 patent. This group included Mylan's ANDA, until this Court issued the temporary stay on March 23, 2007, and also includes the Apotex ANDA. The FDA cannot approve these ANDAs so long as they are subject to orders under 35 U.S.C. § 271(e)(4)(A). As demonstrated below, the *Apotex* Decision that issued last Thursday did not, in and of itself, modify or reverse any orders under 35 U.S.C. § 271(e)(4)(A). Thus, Pfizer's position is that the FDA cannot

approve any of these ANDAs.  The Mylan ANDA holds full FDA

approval, notwithstanding the district court order under 35 U.S.C.

§ 271(e)(4)(A) that required FDA to rescind its approval, only

because of the temporary stay that this Court issued on March 23,

2007.

## II.    The *Apotex* Decision Did Not Immunize Any ANDA From Pediatric Exclusivity

The *Apotex* Decision is not final and has no legal effect unless and

until this Court issues a mandate implementing the decision.  No mandate may

issue until the later of seven days following expiration of the time for filing a

petition for rehearing, or seven days following disposition of such petition.  Fed.

R. App. P. 41(b).[2]

Unless and until a mandate issues, Pfizer's position is that the FDA

should not give effect to the *Apotex* Decision by altering the approval status of

any ANDA, including Apotex's.  The FDA's own regulations and guidances

support Pfizer's position.  FDA guidance on ANDA approvals clearly states that,

when a district court's decision of patent infringement in Paragraph IV ANDA

---

[2]    Pfizer has 14 days following this Court's filing of the decision to file a petition for rehearing.  Fed. R. App. P. 40(a).  Pfizer will file a petition for rehearing within the 14-day period, and it is making every effort to do so as soon as possible.  Issuance of a mandate in the *Apotex* case will be automatically stayed when Pfizer files its petition for rehearing.  Fed. R. App. P. 41(d)(1).

## This Court's March 23, 2007 Order

On March 23, 2007, this Court issued an Order directing the parties to supply additional information relating to Mylan's stay motion: specifically how the *Apotex* Decision affects Pfizer's pediatric exclusivity and the FDA's approval of Mylan's ANDA. The Court clearly intended to preserve the *status quo* pending its decision on the stay. Thus, the Court held in abeyance Mylan's stay motion and it *temporarily* stayed the district court's order pending the Court's consideration of the parties' further submissions.

## Events Subsequent To This Court's March 23, 2007 Order

Pfizer received the Court's March 23, 2007 Order at 12:02 PM. About an hour later, Mylan irrevocably altered the *status quo*. Relying on the temporary stay issued by this Court, Mylan announced that it had launched its generic version of Norvasc®, and thereby triggered its 180-day exclusivity under the Hatch-Waxman statute. 21 U.S.C. 355(j)(5)(B)(iv). Thus, Mylan used the temporary stay provision, which clearly was intended to preserve the *status quo* pending further consideration of these supplemental briefs, to irrevocably alter the *status quo* by launching its product onto the commercial market.

Pfizer has been irreparably injured by Mylan's launch. Regardless of what action this Court, or any other court takes in the future, Pfizer will lose substantial sales of Norvasc® to Mylan's generic product, and Pfizer has no legal

remedy to recover its losses. Additionally, Pfizer will lose at least some of the six-month pediatric exclusivity period. At approximately 5:00 pm on March 23, 2007, Pfizer announced that in response to Mylan's launch, Pfizer had launched its own generic version of Norvasc®. Pfizer was forced to launch by Mylan's premature action in an attempt to mitigate its sales losses as Mylan sought to flood the supply channels.

## ARGUMENT

### I.    How The FDA Applies Pediatric Exclusivity

Pediatric exclusivity operates as an extension of the data, market, and patent exclusivities that apply to innovative products under provisions of the Hatch-Waxman law. *See generally* 21 U.S.C. § 355a(c)(1) & (2); 35 U.S.C. § 271(e)(2)(A). Pediatric exclusivity attaches at the end of a patent term, and adds six months to the statutory restrictions against FDA approval of ANDAs. *See generally* 21 U.S.C. § 355a. Thus, with respect to Pfizer's '303 patent, which expired on March 25, 2007, the term of pediatric exclusivity runs until September 25, 2007.

Because the statutory restrictions of FDA approval for ANDAs operate individually against each ANDA, pediatric exclusivity also operates individually against each ANDA. Thus, the effect of this Court's *Apotex* Decision must be considered individually against each ANDA. Although individual

litigation is reversed on appeal, the agency cannot approve the pending ANDA until "the date the district court issues a judgment that the patent is invalid, unenforceable, or not infringed *pursuant to a mandate issued by a court of appeals.*" *See* FDA Guidance For Industry, Court Decisions, ANDA Approvals, and 180-Day Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act, ¶ IV(A) (Mar. 2000) (emphasis added); available at http://www.fda.gov/cder/guidance/3659fnl.pdf.  FDA regulations regarding ANDA approvals also recognize the importance of avoiding premature agency actions based on judgments that are not final.  The regulations require an ANDA applicant to notify the FDA of a "final judgment" in patent litigation, 21 C.F.R. § 314.107(e), and they establish an ANDA's approval date based on "the date the court enters judgment," 21 C.F.R. § 314.107(b)(3)(ii).

Even assuming *arguendo* that the FDA were inclined to act on the *Apotex* Decision, the decision has no direct effect on Mylan's approval status. Only an order in the *Mylan* action can affect Mylan's approval status.  Indeed, until this Court entered its temporary stay, the FDA had expressed its intention to withdraw its final approval of Mylan's ANDA, even though Mylan had brought the *Apotex* Decision to the FDA's attention.

## III.    If This Court's Temporary Stay Is Lifted, The FDA Should Implement Pfizer's Six-Month Period Of Pediatric Exclusivity As to Mylan

The '303 patent expired at midnight on Sunday, March 25, 2007. Neither that event, nor this Court's issuance of the temporary stay on March 23, 2007 moots this case. Both this Court and the FDA may enter orders that implement Pfizer's pediatric exclusivity. If this Court lifts its temporary stay, the § 271(e)(4)(A) order in the Amended Judgment will have full force and effect, even though the stay will have been lifted after the '303 patent expired.

As we described in Pfizer's Response to Mylan's stay motion (Pfizer Response at p. 12), ALZA's patent in the fentanyl case expired while Mylan's appeal from the patent judgment was pending in this Court. By exercising jurisdiction over the appeal, this Court concluded that the § 271(e)(4)(A) order from which Mylan appealed had potential effect after patent expiration. *Alza Corp. v. Mylan Labs., Inc.*, 391 F.3d 1365, 1368 (Fed. Cir. 2004). Had the Court read the § 271(e)(4)(A) order as having no effect after the patent expired, then it would have been required to dismiss Mylan's appeal as moot.

Here, the § 271(e)(4)(A) order was entered on March 16, 2007, before the '303 patent expired. The temporary stay that this Court entered does not render the § 271(e)(4)(A) order moot, even though the temporary stay was in effect when the '303 patent expired. Once the temporary stay is lifted, the § 271(e)(4)(A) order in this case requires that the FDA set an effective approval

date "not earlier" than the patent expiration.  As explained in *Mylan Labs., Inc. v. Thompson,* 389 F.3d 1272 (D.C. Cir. 2004), the result of such an order is that the ANDA is subject to pediatric exclusivity.

## IV.    Pfizer Has Compelling Grounds For Rehearing

Pfizer's arguments for rehearing and rehearing *en banc* are substantial.  The district court in *Apotex* was the first of three different district courts to hold that the '303 patent was valid and not obvious.  Both other district court judges held that the ANDA filers, including Mylan, had failed to prove prima facie obviousness.

The Panel decision is in conflict with the well-established law holding that an invention is not obvious (even if it were prima facie obvious) if the claimed invention has at least one unexpected property that is superior to the closest prior art.  *In re Papesch,* 315 F.2d 381 (CCPA 1963);  *In re Chupp*, 816 F.2d 643, 646 (Fed. Cir. 1987); *In Re Neave,* 370 F.2d 961 (C.C.P.A. 1967); *In re Ackermann*, 444 F.2d 1172 (C.C.P.A. 1971).

The *Apotex* district court found that the amlodpine besylate salt was not obvious based on substantial evidence that amlodipine besylate's properties are unexpectedly superior to the prior art:  (a) the properties of new salts are entirely unpredictable (the properties of salts of different active compounds using a particular anion teach nothing about the properties of a new salt made with the

same anion and a new active compound); (b) both the stability and processing properties of amlodipine besylate are superior to the prior art and amlodipine besylate has a superior combination of all properties that no other amlodipine salt has; and (c) the advantages of the amlodipine besylate salt compared to the prior art are substantial. The amlodipine besylate tablets unexpectedly allow the use of a preferred and cost effective manufacturing procedure which the prior art salt of amlodipine did not. The stability of amlodipine besylate unexpectedly is greatly improved, reducing degradants that could have threatened approval of the drug and permitting a superior shelf-life of the product. None of these findings is clearly erroneous.

The Panel improperly rejected the district court's findings of fact in violation of Fed. R. Civ. Pro. 52, and contravened well-established precedent by this Circuit by relying heavily on the inventor's own mental processes and his own non-public research to establish obviousness. By rejecting the invention as a product of routine experimentation, the Panel decision conflicts with the express provisions of 35 U.S.C. § 103 and contravenes a long line of prior decisions of this Court that a trial and error method of making an invention does not undermine patentability.

**V.    To Prevent Further Irreparable Injury To Pfizer, This Court Should Lift Its Stay Forthwith And Permit Pediatric Exclusivity To Become Effective**

Pfizer's injury resulting from Mylan's unilateral destruction of the *status quo* is irreparable. Sales of Norvasc® in the United States alone last year were approximately $2.5 billion. Based on prior generic drug maker entries, Pfizer can expect that it will lose more than 98% of its Norvasc® sales during the first full year that Mylan's generic product is on the market. The monetary value of the full pediatric exclusivity period, based on 2006 sales, is approximately $1 billion. The enormous financial losses that Pfizer will suffer are irreparable. They cannot be remedied by monetary relief, because Pfizer has no clear damages remedy. Its pediatric exclusivity is not a property right created by the Patent Act. It is a right created by the Food, Drug and Cosmetic Act, which confers no private right of action -- and certainly provides no avenue for a private party to obtain monetary damages. *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 986 (Fed. Cir. 2006).

Furthermore, the duration of pediatric exclusivity is limited -- six months. Every day during which Pfizer is unable to benefit from that exclusivity is a day that it never can regain.

The public interest militates in favor of implementing and maintaining pediatric exclusivity at least until the validity of the *Apotex* Decision

is assessed by this Court through rehearing.  The FDA has recognized that pediatric exclusivity is an extremely important incentive that greatly benefits the public health.[3]  This Court should not take any action in derogation of pediatric exclusivity unless and until it has determined with finality, after a full and fair rehearing process, that the patent supporting the exclusivity is invalid.

Finally, the balance of equities should be struck in Pfizer's favor.  By launching its generic Norvasc® product based on this Court's temporary stay, entered with the clear intent to preserve the *status quo*, Mylan unilaterally destroyed the *status quo*.  Having done so, Mylan deserves no further protection by this Court's temporary stay.

---

[3]     In 2001, the FDA advised Congress that the "pediatric exclusivity provision has done more to generate clinical studies and useful prescribing information for the pediatric population than any other regulatory or legislative process to date." *See* S. Rep. No. 107-79, Best Pharmaceuticals for Children Act, at 5.

## CONCLUSION

Pfizer's injury resulting from Mylan's launch of its generic Norvasc®
tablets on Friday is both severe and irreparable. Its need for relief from this Court
is urgent. Consequently, Pfizer respectfully requests that this Court lift its
temporary stay forthwith, thereby reinstating the district court's § 271(e)(4)(A)
order. Once the order has been reinstated, based on the FDA's rulings in the
fentanyl cases, the FDA, pursuant to the § 271(e)(4)(A) order, is expected to
implement Pfizer's six-month pediatric exclusivity period. Pfizer promptly will
move for panel rehearing and rehearing *en banc* of the *Apotex* Decision. If
Pfizer's petition is granted and the *Apotex* Decision is reversed, the Court, by
permitting pediatric exclusivity to attach, will have limited the extent of Pfizer's
irreparable injury. If its petition is denied, Mylan promptly can reenter the market
at that time.

Dated: March 26, 2007

Respectfully submitted,

By: _____

Richard G. Greco
Milton Sherman
David O. Bickart
Daniel Boglioli
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022-3598
(212) 836-8000

## CERTIFICATE OF SERVICE

I hereby certify that I caused two copies of **RESPONSE OF PLAINTIFF–APPELLEE PFIZER INC. PURSUANT TO THE COURT'S MARCH 23, 2007 ORDER** to be served by Federal Express on the 26th day of March, 2007 upon the following:

Shannon M. Bloodworth
HELLER EHRMAN LLP
1717 Rhode Island Avenue, N.W.
Washington, D.C. 20026
(202) 912-2165

David J. Harth
HELLER EHRMAN LLP
One East Main Street
Madison, Wisconsin 53703
(608) 663-7460

Steven Lieberman
Minaksi Bhatt
ROTHWELL FIGG ERNST & MANBECK, P.C.
1425 K Street, NW
Suite 800
Washington, DC  20005
(202) 783-6040

David O. Bickart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PFIZER INC.,                                          :

                Plaintiff and            : 02-CV-1628 (TFM)
                Counterclaim-Defendant,

                                    :

                v.                            :

MYLAN LABORATORIES, INC. and
MYLAN PHARMACEUTICALS, INC.,          :

                Defendants and          :
                Counterclaim-Plaintiffs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STIPULATION OF UNCONTESTED FACTS

1.     Plaintiff, Pfizer Inc. ("Pfizer"), is a corporation organized and existing under the laws of the State of Delaware.  Pfizer has a principal place of business at 235 East 42nd Street, New York, New York.

2.     Mylan Laboratories Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal place of business at 1500 Corporate Drive, Canonsburg, Pennsylvania.

3.     Mylan Pharmaceuticals Inc. is a corporation organized and existing under the laws of the State of West Virginia and has its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia.  Mylan Pharmaceuticals is a wholly-owned subsidiary of Mylan Laboratories.[1]

---

[1] The defendants, Mylan Laboratories Inc. **and** Mylan Pharmaceuticals Inc., are referred to jointly as "Mylan" herein.

31373783_V6.DOC

4.    Mylan filed with the United States Food and Drug Administration (the "FDA") its Abbreviated New Drug Application ("ANDA") No. 76-418, seeking approval to commercially sell 2.5 mg, 5 mg, and 10 mg dosage strength amlodipine besylate tablets (the "ANDA products"), before the expiration of the terms of Pfizer's United States Patent No. 4,879,303 (the "'303 patent") and United States Patent No. 4,572,909 (the "'909 patent").

5.    The '303 patent, entitled "Pharmaceutically Acceptable Salts," was issued by the Patent Office on November 7, 1989.

6.    Pursuant to 21 U.S.C. § 355(b)(1) and the regulations the FDA promulgated pursuant thereto, Pfizer listed the '303 patent and the '909 patent in the FDA's "Orange Book" as covering the drug substance, amlodipine besylate, in Norvasc®.

7.    Dr. James I. Wells and Mr. Edward Davison are identified in the '303 patent as the inventors.

8.    Pfizer is the owner of the '303 patent.

9.    Pursuant to the provisions of 21 U.S.C. § 355a, the FDA granted Norvasc® a period of six-months' pediatric exclusivity, which is applicable to the '303 patent.

10.    The expiration date of the '303 patent is March 25, 2007, and the six-month period of "pediatric exclusivity" for the '303 patent, to the extent applicable, expires on September 25, 2007.

11.    The '303 patent issued from United States Patent Application Serial No. 256,938 (the "'938 application"), which was filed in the Patent Office on October 13, 1988.

12.    The '938 application is a continuation of United States Patent Application Serial No. 30,658 (the "'658 application"), which was filed in the Patent Office on March 25, 1987.

13.     The '303 patent claims, and is entitled to priority based on the April 4, 1986 filing date of British Patent Application No. 8,608,335 (the "'303 patent priority application").

14.     Pfizer filed a New Drug Application ("NDA") for Norvasc® (amlodipine besylate) tablets with the FDA on December 23, 1987 and the FDA approved Pfizer's NDA on July 31, 1992.

15.     Norvasc® is approved by the FDA for treating hypertension and chronic stable and vasospastic angina.

16.     Amlodipine, originally known as UK-48,340, is the common name for the chemical compound 2-[(2-aminoethoxy)methyl]-4-(2-chlorophenyl)-3-ethoxycarbonyl-5-methoxycarbonyl-6-methyl-1,4-dihydropyridine, which is a member of the class of compounds referred to as "1,4-dihydropyridines."

17.     The chemical structure of amlodipine is as follows:



18.     Amlodipine besylate is an acid addition salt, formed from the reaction of the chemical base amlodipine and benzene sulphonic acid.

19.     A salt is the product of the reaction of a base and an acid.

20.     A "base" is a compound which can become a positively charged ion. The positively charged base ion is called a "cation." An "acid" is a compound which can become a negatively charged ion. The negatively charged acid ion is called an "anion."

21.     Mylan has received final approval from the FDA of its ANDA No. 76-418, and it plans to commercially sell the ANDA products in the United States, pursuant to 21 U.S.C. § 355(j)(2).

22.     If the Court holds that the '303 patent is valid and enforceable, the ANDA products, if manufactured, used, sold or offered for sale in the United States, or imported for sale into the United States, will literally infringe claims 1, 2 and 3 of the '303 patent. Pfizer is asserting at trial only claims 1, 2, and 3 of the '303 patent and has dropped its infringement allegations as to other claims of the '303 patent.

23.     The maximum amount of a compound that will dissolve at a specific temperature in a fixed amount of water, or water-based solvent, is called the aqueous solubility of the compound at that temperature.

24.     Chemical stability relates to the resistance of a drug substance to chemical breakdown. Chemical stability may be determined for the drug substance alone ("bulk stability") or for the drug substance in combination with biologically inactive compounds known as excipients ("formulation stability").

25.     The breakdown of the drug substance is known as degradation and the products formed from the breakdown of the drug substance are called "degradants."

26.     Amlodipine is a biologically active chemical compound that has anti-hypertensive and anti-ischaemic activity in the body.

27.     Amlodipine maleate is an acid addition salt, formed from the reaction of the chemical base amlodipine and maleic acid.

28.     Mr. Edward Davison and Dr. James I. Wells were both employees in Pharm. R&D during the time that the tests described in the '303 patent were performed.

29. During the 1980's, each new active moiety made at Pfizer's Sandwich research facility was assigned a code beginning with the prefix "UK," for the United Kingdom, followed by a five-digit number.

30. Amlodipine was assigned compound number "UK-48,340."

31. During the 1980's, salts made from a particular acid anion were assigned a code by Pfizer consisting of the code for the active moiety followed by a two-digit or two-letter code used for all salts made from that acid anion.

32. The Pfizer two-digit code for the maleate anion was "11," and amlodipine maleate was assigned code "UK-48,340-11."

33. The Pfizer code for the hydrochloride anion was "01."

34. The Pfizer code for the acetate anion was "14."

35. The Pfizer code for the tosylate anion was "15."

36. The Pfizer code for the succinate anion was "24."

37. The Pfizer code for the besylate anion was "26."

38. The Pfizer code for the mesylate anion was "27."

39. The Pfizer code for lactate anion was "50."

40. The Pfizer code for salicylate anion was "AB."

41. In April 1984, the amlodipine maleate salt, as capsules and intravenous injections, was being tested on humans in clinical trials.

42. Dr. Platt described his formulation chemical stability procedures and results in memoranda that he prepared and sent to Dr. Wells and Mr. Davison.

43. Based on chemical stability data he accumulated, Dr. Platt set out a rank ordering of all the amlodipine salts that he tested in a memorandum that he sent to Dr. Wells on

or about October 9, 1984.

44.     On or about October 11, 1984, Dr. Wells recommended to Dr. J.R. Davidson, the head of Pharm. R&D, that the amlodipine besylate salt should be substituted for amlodipine maleate salt for the commercial amlodipine tablet product.

45.     At the time Dr. Wells made his recommendation to switch salts, Pfizer was conducting Phase II clinical trials of amlodipine maleate (using capsules and intravenous injections).

46.     Pfizer filed an amendment to its IND to switch salts from amlodipine maleate to amlodipine besylate on or about May 5, 1986. Pfizer submitted additional test data to the FDA for the besylate salt with its amendment.

47.     On or about November 25, 1985, Dr. Wells, submitted to Pfizer's patent group at Sandwich the invention disclosure that led to the preparation and filing of the '303 patent and its foreign counterparts.

48.     The '909 patent, a publication by Berge, S.M., et al., (1977) J. Pharm. Sci. 66:1-19 ("Berge"), United States Patent No. 4,432,987 ("Barth"), United States Patent No. 3,816,612 ("Schmidt"), and United States Patent No. 4,032,637 ("Spiegel"); United States Patent No. 4,346,099 (Tanouchi); United States Patent No. 3,982,007 (Laber), as well as other references are prior art to claims 1 through 3 of the '303 patent.

49.     The compound amlodipine is described in the prior art to the '303 patent.

50.     Before the date of invention of the claims of the '303 patent, benzene sulphonic acid had been used to make two salts of FDA-approved drug products, atracurium besylate and mesoridazine besylate.

52.     As of the date of invention of the claims of the '303 patent, a person of

ordinary skill in the art would have understood the '909 patent as teaching that maleate salts of the 1,4-dihydropyridine compounds disclosed and claimed in the '909 patent were preferred.

53. The chemical structures of the maleate and besylate anions are shown below:



Maleate Anion



Besylate Anion

54. Amlodipine besylate tablets, sold under the brand name Norvasc®, were launched as a commercial product by Pfizer in the United States in November 1992.

55. Since 1997, Norvasc® has been the largest selling branded cardiovascular drug product in the world.

56. In 2003, Norvasc® sales in the United States exceeded $2.1 billion.

57. The worldwide sales of Pfizer's amlodipine besylate drug product are approximately $4 billion annually.

58. Pfizer's amlodipine besylate drug product is its second-largest selling product in terms of worldwide annual dollar sales.

November 29, 2006

/s/ John J. Richardson

Richard G. Greco
Milton Sherman
Joseph Saphia
Regina O. Kent
**KAYE SCHOLER LLP**
425 Park Avenue
New York, NY  10022-3598
(212) 836-8000
John J. Richardson, Esq.
C. James Zeszutek, Esq.
THORP, REED & ARMSTRONG, LLP
One Oxford Centre
Pittsburgh, PA 15219-1425
(412) 394-7711

*Attorneys for Plaintiff Pfizer Inc. and Counterclaim-Defendant Pfizer Inc.*

E. Anthony Figg
Steven Lieberman
Minaksi Bhatt
ROTHWELL FIGG ERNST &
    MANBECK, P.C.
1425 K Street, NW
Suite 800
Washington, DC  20005
Tel:  (202) 783-6040
Fax:  (202) 783-6031

*Attorneys for Defendant Mylan Laboratories, Inc.
and Mylan Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically on December 1, 2006. Notice of filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John J. Richardson

**Table S-1.**
**U.S. Courts of Appeals—Appeals Terminated on the Merits After Oral Hearings or Submission on Briefs During the 12-Month Period Ending September 30, 2006**

| Circuit | Total | After Oral Hearing | | | | After Submission on Briefs | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Percent of Total | En Banc | Panel | Total | Percent of Total | En Banc | Panel |
| TOTAL | 34,580 | 8,956 | 25.9 | 52 | 8,904 | 25,624 | 74.1 | 13 | 25,611 |
| DC | 584 | 278 | 47.6 | 2 | 276 | 306 | 52.4 | - | 306 |
| FIRST | 1,133 | 380 | 33.5 | 3 | 377 | 753 | 66.5 | - | 753 |
| SECOND | 3,794 | 1,221 | 32.2 | - | 1,221 | 2,573 | 67.8 | - | 2,573 |
| THIRD | 2,305 | 450 | 19.5 | 1 | 449 | 1,855 | 80.5 | - | 1,855 |
| FOURTH | 3,206 | 380 | 11.9 | 2 | 378 | 2,826 | 88.1 | 6 | 2,820 |
| FIFTH | 4,688 | 833 | 17.8 | 2 | 831 | 3,855 | 82.2 | - | 3,855 |
| SIXTH | 2,886 | 1,002 | 34.7 | 5 | 997 | 1,884 | 65.3 | - | 1,884 |
| SEVENTH | 1,721 | 802 | 46.6 | 1 | 801 | 919 | 53.4 | - | 919 |
| EIGHTH | 2,307 | 752 | 32.6 | 4 | 748 | 1,555 | 67.4 | 2 | 1,553 |
| NINTH | 6,387 | 1,793 | 28.1 | 18 | 1,775 | 4,594 | 71.9 | 4 | 4,590 |
| TENTH | 1,730 | 463 | 26.8 | 6 | 457 | 1,267 | 73.2 | 1 | 1,266 |
| ELEVENTH | 3,839 | 602 | 15.7 | 8 | 594 | 3,237 | 84.3 | - | 3,237 |

NOTE: THIS TABLE DOES NOT INCLUDE DATA FOR THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT.

**Table A-1.**

**Supreme Court of the United States—Cases on Docket, Disposed of, and Remaining on Docket at Conclusion of December Terms, 2001 Through 2005**

| Cases | Total | Original | Paid | In Forma Pauperis |
|---|---|---|---|---|
| **2001** | | | | |
| Cases on docket | 9,176 | 8 | 2,210 | 6,958 |
| Disposed of | 8,072 | 1 | 1,932 | 6,139 |
| Remaining of docket | 1,104 | 7 | 278 | 819 |
| **2002** | | | | |
| Cases on docket | 9,406 | 7 | 2,190 | 7,209 |
| Disposed of | 8,388 | 1 | 1,899 | 6,488 |
| Remaining of docket | 1,018 | 6 | 291 | 721 |
| **2003** | | | | |
| Cases on docket | 8,882 | 6 | 2,058 | 6,818 |
| Disposed of | 7,836 | 2 | 1,798 | 6,036 |
| Remaining of docket | 1,046 | 4 | 260 | 782 |
| **2004** | | | | |
| Cases on docket | 8,588 | 4 | 2,041 | 6,543 |
| Disposed of | 7,542 | 0 | 1,727 | 5,815 |
| Remaining of docket | 1,046 | 4 | 314 | 728 |
| **2005** | | | | |
| Cases on docket | 9,608 | 8 | 2,025 | 7,575 |
| Disposed of | 8,240 | 4 | 1,703 | 6,533 |
| Remaining of docket | 1,368 | 4 | 322 | 1,042 |

| Cases | October Terms | | | | |
| | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| Argued during term | 88 | 84 | 91 | 87 | 90 |
| Disposed of by full opinions | 85 | 79 | 89 | 85 | 82 |
| Disposed of by per curiam opinions | 3 | 5 | 2 | 2 | 5 |
| Set for re-argument | - | - | - | - | 3 |
| Granted review this term | 88 | 91 | 87 | 80 | 78 |
| Reviewed and decided without oral argument | 72 | 66 | 52 * | 826** | 105 |
| Total to be available for argument at outset of following term | 47 | 40 | 47 | 41 | 31 |

* INCLUDES PER CURIAM OPINIONS IN 03-1261, 03-1669, 04-394, AND 04-5323.
** THIS NUMBER INCLUDES THE BIPARTISAN CAMPAIGN REFORM ACT CASES.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MYLAN LABORATORIES, INC., *et al.*, | ) | |
| Plaintiffs/Cross-Defendants, | ) | |
| and | ) | |
| MUTUAL PHARMACEUTICAL CO., INC. | ) | Case No. 07-579 (RMU) |
| Intervenor-Plaintiff/Cross-Defendant, | ) | |
| v. | ) | |
| MICHAEL LEAVITT, *et al.*, | ) | |
| Defendants/Cross-Defendants, | ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| Intervenor-Defendant/Cross-Claimant, | ) | |
| and | ) | |
| APOTEX INC., | ) | |
| Intervenor-Defendant/Cross-Defendant. | ) | |

## DECLARATION OF DAVID MARSHALL

I, David Marshall, hereby declare under penalty of perjury and to the best of my knowledge as follows:

1. I am the Vice President of Commercial Operations for Teva Pharmaceuticals USA, Inc. ("Teva"). Teva is a wholly owned, indirect subsidiary of Teva Pharmaceutical Industries Ltd., a global pharmaceutical company headquartered in Israel. Teva is an industry leader in the development, manufacture, and marketing of generic pharmaceutical products in the United States.

2.      As Vice President of Commercial Operations for Teva, I am involved in the introduction and promotion of new generic drug products for the United States market.

3.      According to IMS, Pfizer Inc.'s ("Pfizer's") current annual sales of amlodipine besylate drug products ("amlodipine"), which it manufactures and markets under the trade-name Norvasc®, exceed $2.7 billion.

4.      According to the Food and Drug Administration's ("FDA's") official register of patents claiming approved pharmaceutical products (the "Orange Book"), Pfizer has listed two patents as claiming its Norvasc®-branded amlodipine drug products: US Patent Nos. 4,572,909 ("the '909 patent") and 4,879,303 ("the '303 patent").

5.      I am aware that on March 22, 2007, a panel of the United States Court of Appeals for the Federal Circuit issued a unanimous decision holding that every asserted claim of the '303 patent is invalid for obviousness in a case styled *Apotex Inc. v. Pfizer Inc.*, No. 2006-1261 ("*Apotex*").

6.      I have also learned that, as of March 25, 2007, all patents asserted by Pfizer as claiming Norvasc®, including the '303 patent, have expired.

7.      In my capacity as Vice President of Commercial Operations, I have become aware that Mylan Laboratories, Inc. ("Mylan") was the first generic manufacturer to file an Abbreviated New Drug Application ("ANDA") with a paragraph IV certification to the '303 patent for generic amlodipine drug products. I have learned that Mylan's ANDA was granted final approval by FDA on October 3, 2005, and that Mylan began marketing its generic amlodipine product on March 23, 2007.

8.      Teva has also filed an Abbreviated New Drug Application ("ANDA") with FDA seeking to market generic amlodipine drug products. Prior to the expiration of the '303 patent,

Teva amended its ANDA by submitting a paragraph IV certification to FDA and sending a notice of that certification to Pfizer. I understand that Pfizer did not sue Teva for patent infringement before the '303 patent expired.

9. I understand that Apotex, Inc. and Synthon Pharmaceuticals, Inc. also filed paragraph IV ANDAs for generic amlodipine.

10. On April 18, 2007, I learned that FDA issued a Letter Decision informing Teva that FDA would not grant final approval to additional amlodipine ANDAs until (a) in the case of Apotex, but no other generic applicant, the Federal Circuit issues its mandate in the *Apotex* case; or (b) in the case of any other applicant, including Teva, Pfizer's voluntary delisting of the '303 patent from the Orange Book or the termination of a six-month period of "pediatric exclusivity" awarded to Pfizer.

11. I have been informed that Pfizer recently filed a petition for a rehearing *en banc* in the *Apotex* case. It is my understanding that, as a result of this development, the Federal Circuit's mandate likely will not issue until at least June 1, 2007. I also understand that if Pfizer obtains a stay of the *Apotex* mandate pending Supreme Court review, issuance of that mandate could be delayed for more than six months.

12. Based on current market conditions, and assuming that Teva is prevented from entering the amlodipine market until the Federal Circuit issues its mandate, or until the expiration of a six-month pediatric exclusivity period running from March 25, 2007 to September 25, 2007, Teva would stand to lose tens of millions of dollars in generic amlodipine sales that it reasonably could have been expected to make during that period. A significant portion of this loss will occur during the first two to three months following introduction of generic amlodipine products to the marketplace.

3

13.     Furthermore, because Teva would enter the market with additional generic manufacturers, it would attain less market share than if it had been on the market from the outset. For the twelve-month period following such market entry, this reduced market share would cause Teva to lose additional millions of dollars in anticipated generic amlodipine sales.

Dated: April 22, 2007

David Marshall

4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
MYLAN LABORATORIES, INC., *et al.*,                )
)
        Plaintiffs/Cross-Defendants,          )
)
    and                                        )
)
MUTUAL PHARMACEUTICAL CO., INC.,           )    Case No. 07-579 (RMU)
)
        Intervenor-Plaintiff/Cross-Defendant,  )
)
    v.                                          )
)
MICHAEL LEAVITT, *et al.*,                     )
)
        Defendants/Cross-Defendants,           )
)
TEVA PHARMACEUTICALS USA, INC.,            )
)
        Intervenor-Defendant/Cross-Claimant,   )
)
    and                                        )
)
APOTEX INC.,                                   )
)
        Intervenor-Defendant/Cross-Defendant.  )
_____)

## ORDER

      This matter is before the Court on the cross-claim of Teva Pharmaceuticals USA, Inc.

("Teva") for a declaratory judgment that the U.S. Food and Drug Administration ("FDA")

unlawfully declined to grant final approval to Teva's ANDA No. 76-846 for generic amlodipine

besylate drug products and  preliminary injunction that would require FDA to grant immediate

final approval to Teva's ANDA No. 76-846.  After considering the papers filed in support and in

opposition to the cross-claim, it is:

**DECLARED** that FDA's decision not to grant Teva immediate final approval for its

ANDA No. 76-846 was arbitrary, capricious, and contrary to law; and it is

**ORDERED** that FDA grant immediate final approval to Teva's ANDA No. 76-846.


Dated: _____                    _____

                                                    United States District Judge