## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MYLAN LABORATORIES, INC., *et al.*,

       Plaintiffs,

and

MUTUAL PHARMACEUTICAL CO., INC.

       Intervenor-Plaintiff,

   v.

MICHAEL O. LEAVITT, Secretary,
Health and Human Services, *et al.*

       Defendants

and

TEVA PHARMACEUTICALS USA, INC.,

       Intervenor-Defendant,

and

APOTEX INC.,

       Intervenor-Defendant.

Civil Action No. 07-0579 (RMU)

## MUTUAL PHARMACEUTICAL CO., INC.'S MEMORANDUM IN OPPOSITION TO APOTEX, INC.'S MOTION FOR PRELIMINARY INJUNCTION AND TEVA PHARMACEUTICAL USA INC.'S MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

I.   APOTEX AND TEVA FAIL TO MEET THE HIGHER BURDEN
     REQUIRED FOR A MANDATORY INJUNCTION ............................................ 2

II.  FDA CORRECTLY DETERMINED THAT PFIZER'S
     PEDIATRIC EXCLUSIVITY BARS FINAL APPROVAL OF
     ANY UNAPPROVED AMLODIPINE ANDAs .................................................. 5

     A.   FDA's Interpretation of the Ambiguous Language Used
          in the Pediatric Exclusivity Statute is Entitled to Great Deference ........ 5

     B.   FDA Correctly Determined that Pfizer's Pediatric Exclusivity
          Bars Final Approval of All Pending, Unapproved ANDAs .................... 9

     C.   Congressional Policy and Intent Supports FDA's Position ................... 12

CONCLUSION ...................................................................................................... 15

i

# TABLE OF AUTHORITIES

## Cases

Apotex, Inc. v. Thompson, 347 F.3d 1335 (Fed. Cir. 2003) ............................................. 7

Bancoult v. McNamara, 227 F. Supp. 2d 144 (D.D.C. 2002) ............................................. 3

Carabillo v. Ullico Inc. Pension Plan & Trust,
    355 F. Supp. 2d 49 (D.D.C. 2004) ............................................. 3

Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,
    467 U.S. 837 (1984) ............................................. 6

City of Moundridge v. Exxon Mobil Corp.,
    29 F. Supp. 2d 117 (D.D.C. 2006) ............................................. 3

Columbia Hosp. for Women Foundation, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.,
    333 U.S. App. D.C. 46, 159 F.3d 636 (D.C. Cir. 1998) ............................................. 3

Columbia Hosp. for Women Foundation, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.,
    5 F. Supp. 2d 1 (D.D.C. 1997) ............................................. 3, 5

Community Care Found. v. Thompson, 318 F.3d 219 (D.C. Cir. 2003) ............................................. 7

Community Nutrition Inst. v. Young, 476 U.S. 974 (1986) ............................................. 7

Dodd v. Fleming, 223 F. Supp. 2d 15 (D.D.C. 2002) ............................................. 3

Dorfmann v. Boozer, 414 F.2d 1168 (D.C. Cir. 1969) ............................................. 5

Hibbs v. Winn, 542 U.S. 88 (2004) ............................................. 8

Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232 (2004) ............................................. 6

Howard v. Evans, 193 F. Supp. 2d 221 (D.D.C. 2002) ............................................. 3

Investment Co. Inst. v. Conover,
    790 F.2d 925 (D.C. Cir. 1986) ............................................. 6

Leboeuf, Lamb, Greene & Macrae, LLP v. Abraham,
    180 F. Supp. 2d 65 (D.D.C. 2001) ............................................. 3

Lincoln Hockey, LLC v. Semin,
    No. 05-2094, 2005 U.S. Dist. LEXIS 34047 (D.D.C. Dec. 5, 2005) ............................................. 3

ii

MCI Telecomms. Corp. v. AT&T Co.,
    512 U.S. 218 (1994) .................................................................. 14

Missouri v. Jenkins, 495 U.S. 33 (1990) ........................................... 8

Motor Vehicle Mfrs. v. State Farm Mut. Ins. Co.,
    463 U.S. 29 (1983) .................................................................. 6

Mylan Labs., Inc. v. Thompson,
    389 F.3d 1272 (D.C. Cir. 2004) ............................................... 10

Nat'l Conf. on Ministry to the Armed Forces v. James,
    278 F. Supp. 2d 37 (D.D.C. 2003) ......................................... 3, 4

Ranbaxy Labs. v. FDA,
    307 F. Supp. 2d 15, (D.D.C. 2004)
    aff'd, 96 Fed. Appx. 1 (D.C. Cir. 2004) ........................... 9, 10, 11

Serono Lab. v. Shalala,
    158 F.3d 1313 (D.C. Cir. 1998) ............................................. 6-7

Veitch v. Danzig, 135 F. Supp. 2d 32 (D.D.C. 2001) ............................ 3

## Statutes and Regulations

21 U.S.C. § 355a ................................................................. passim

Federal Rule of Appellate Procedure 41(d) ................................... 8, 9

## Other Materials

Advisory Committee Notes on 1998 Amendments
to Fed. R. App. P. 41, Subdivision (d) ........................................ 8

Breslow, L., The Best Pharmaceuticals for Children Act of 2002:
The Rise of the Voluntary Incentive Structure and Congressional Refusal
to Require Pediatric Testing, 40 Harv. J. on Legis 133 (2003) ................ 12

Food & Drug Admin., Dept. of Health and Human Svs, The Pediatric Exclusivity
Provision: January 2001 Status Report to Congress at 1 (2001) ........... 12, 13, 14

S. Rep. No. 105-43, at 51 (1997) ............................................. 12

S. Rep. No. 107-09, at 11 (2001) ............................................. 13

iii

Intervenor-Plaintiff Mutual Pharmaceutical Co., Inc. ("Mutual") respectfully submits this Memorandum in Opposition to Apotex, Inc.'s ("Apotex") Motion For Preliminary Injunction ("Apotex Motion")[1] and Teva Pharmaceutical USA Inc.'s ("Teva") Motion for Declaratory and Injunctive Relief ("Teva Motion").[2]

In its April 18, 2007 letter ruling (the "FDA Decision"), the United States Food and Drug Administration ("FDA") determined, among other things, that all unapproved ANDAs for amlodipine besylate tablets are currently blocked from receiving final approval by Pfizer's pediatric exclusivity. If and when a mandate issues effectuating the Federal Circuit's March 22, 2007 decision in Pfizer, Inc. v. Apotex, Inc., No. 2006-1261 (the "Apotex case"), FDA determined that Apotex's amlodipine ANDA will not be blocked by Pfizer's pediatric exclusivity. (FDA Decision at 13, attached as Exhibit A to the Declaration of Chad A. Landmon ("Landmon Declaration"), filed herewith.) FDA further announced that, based on the current record, it could not determine whether other ANDAs would continue to be blocked by Pfizer's pediatric exclusivity if and when the Federal Circuit issues a final mandate in the Apotex case. (Id.)

Apotex asks this Court for a mandatory injunction requiring FDA to immediately grant Apotex final approval for the sale and marketing of its generic amlodipine products and immediately withdraw Mylan's final ANDA approval for its generic amlodipine products. (Apotex Motion at 7.) Teva asks this Court to set aside the FDA Decision and

---

[1] Citations to "Apotex Motion" are to Apotex's Memorandum of Points and Authorities in Support of Its Motion for Preliminary Injunction to Order FDA to Immediately Grant Approval to Apotex's ANDA for Amlodipine and Require FDA to Order Mylan to Stop Marketing Its Generic Amlodipine and for Other Relief.

[2] To avoid burdening the Court and the parties with additional, and possibly duplicative, statements, Mutual incorporates by reference Plaintiff Mylan Laboratories Inc.'s and Mylan Pharmaceutical Inc.'s (collectively "Mylan") Complaint dated March 26, 2007, Mylan's Amended Complaint dated April 11, 2007, Mylan's Application for a Preliminary Injunction and Memorandum of Points and Authorities in support thereof dated April 23, 2007and Mutual's Complaint dated April 23, 2007.

enter an injunction requiring FDA to grant Teva immediate final approval for its amlodipine ANDA. (Teva Motion at 7.)

The FDA Decision follows a well-worn path regarding Pfizer's pediatric exclusivity and correctly determines that all unapproved ANDAs are presently ineligible for final approval.[3] The relevant statutory scheme, the Federal Rules of Appellate Procedure, caselaw and FDA practice and procedure fully support FDA's decision to withhold all final approvals, as well as FDA's conclusion that all unapproved Paragraph III and IV certifications converted to Paragraph II certifications upon patent expiration, thus triggering application of Pfizer's pediatric exclusivity.

Apotex's and Teva's requests, which go far beyond a status-quo preserving preliminary injunction, seek mandatory injunctions that will significantly alter the current status quo. Such a request can only be granted where a higher burden is met, and Teva and Apotex fall far short of meeting that burden here. Given FDA's well-reasoned and balanced determinations, the extreme mandatory injunctions sought by Apotex and Teva are unwarranted and unsupported. The Court should deny both motions.

## I.    APOTEX AND TEVA FAIL TO MEET THE HIGHER BURDEN REQUIRED FOR A MANDATORY INJUNCTION

To be clear, Apotex and Teva do not simply seek preliminary injunctions that will preserve the status quo. Instead, Apotex and Teva seek mandatory injunctions that would significantly alter the status quo. Such requests can only be granted where a higher burden is met, and Apotex and Teva fall far short of meeting that burden.

---

[3] For purposes of this Opposition, Mutual limits its discussions to FDA's decision regarding Pfizer's pediatric exclusivity as it applies to pending ANDAs prior to the issuance of the Federal Circuit's mandate. Mutual reserves its rights to challenge FDA's determination that Apotex's ANDA will be eligible for approval after the Federal Circuit's mandate issues and FDA's determination regarding Mylan's 180-day exclusivity period.

When a party is requesting mandatory injunctive relief, "i.e., an injunction that would alter, rather than preserve, the status quo by commanding some positive act – the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." Nat'l Conf. on Ministry to the Armed Forces v. James, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) (internal quotation marks omitted). Thus, "[a] district court should not issue a mandatory preliminary injunction unless the facts and law clearly favor the moving party." Id. (internal quotation marks omitted). Indeed, "where a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo *pendente lite*, courts should be extremely cautious about issuing a preliminary injunction." Columbia Hosp. for Women Foundation. Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (internal quotation marks omitted).[4]

In its Motion, Apotex characterizes the FDA Decision as "refus[ing]" to grant final approval of its amlodipine ANDA and argues that a "decision not to order the FDA to approve Apotex's ANDA for generic amlodipine would seriously disadvantage Apotex." (Apotex Motion at 10, 12.) Apotex also devotes much attention to its supposed "lost" market share and sales revenue. (Apotex Motion at 12.) Similarly, Teva claims that FDA's "refusal" to grant final approval for its ANDA has resulted in a "lost" month of sales and "the loss of significant sales opportunities." (Teva Motion at 30-31.) Such

---

[4] While the D.C. Circuit Court of Appeals has not yet had occasion to specifically affirm the heightened standard for mandatory injunction, see Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 333 U.S. App. D.C. 46, 159 F.3d 636, at *1 (D.C. Cir. 1998) (unpublished table decision), a substantial number of D.C. district courts have applied the heightened standard. See, e.g., City of Moundridge v. Exxon Mobil Corp., 429 F. Supp. 2d 117, 126-127 (D.D.C. 2006); Lincoln Hockey, LLC v. Semin, No. 05-2094, 2005 U.S. Dist. LEXIS 34047, at*7 (D.D.C. Dec. 5, 2005); Carabillo v. Ullico Inc. Pension Plan & Trust, 355 F. Supp. 2d 49, 53 (D.D.C. 2004); Bancoult v. McNamara, 227 F. Supp. 2d 144, 151 (D.D.C. 2002); Dodd v. Fleming, 223 F. Supp. 2d 15, 20 (D.D.C. 2002); Howard v. Evans, 193 F. Supp. 2d 221, 226 n.3 (D.D.C. 2002); Leboeuf, Lamb, Greene & Macrae, LLP v. Abraham, 180 F. Supp. 2d 65, 71 (D.D.C. 2001); Veitch v. Danzig, 135 F. Supp. 2d 32, 35 (D.D.C. 2001).

3

statements are specious, at best, and reflect only Apotex's and Teva's exaggerated, and misplaced, sense of entitlement to the amlodipine marketplace. Apotex and Teva have both failed to show, much less show clearly, that they are entitled to relief or that they will suffer "extreme or very serious damage" if their request for a mandatory injunction is denied. See, e.g., Nat'l Conf., 278 F. Supp. 2d at 43.

Moreover, contrary to Apotex's and Teva's suggestions, they have never had a reasonable expectation to enter the market for generic amlodipine prior to the expiration of Pfizer's pediatric exclusivity. Neither Apotex nor Teva has received final approval to market their respective generic amlodipine products and neither has entered the commercial market. (FDA Decision at 4.) Pfizer was granted pediatric exclusivity on November 27, 2001, and since that time all amlodipine ANDA applicants have known that Pfizer's pediatric exclusivity could potentially block ANDA approvals until September 25, 2007. (Id.) Under these circumstances, neither Apotex nor Teva could have ever credibly believed that they were entitled to enter the marketplace prior to the running of Pfizer's pediatric exclusivity.

Pending final adjudication of the status of Pfizer's pediatric exclusivity and Mylan's 180-day exclusivity, the FDA Decision maintains the status quo. Mylan, the first applicant to file an ANDA for amlodipine with a Paragraph IV certification, received final FDA approval of its ANDA and entered the market. Apotex and Teva, who have not yet received final approval of their respective ANDAs, are barred from entering the market by Pfizer's pediatric exclusivity. Apotex's claim that it "will lose its opportunity to fight for a leadership position in the marketplace as an early entrant," (Apotex Motion at 10-11), and Teva's complaint that even a brief delay "could result in the loss of

significant sales opportunities," (Teva Motion at 30), are both baseless and fail to meet the heightened required for a mandatory injunction.

Apotex and Teva were <u>never</u> entitled to enter the market prior to the expiration of Pfizer's pediatric exclusivity period. Their claims are nothing short of a demand for something they never had: premature entry into the amlodipine market. The Court has no basis for changing the status quo to meet Apotex's or Teva's unreasonable demands. <u>See Dorfmann v. Boozer</u>, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.") (internal quotation marks omitted). Under these circumstances – and given the correctness of FDA's decision – the Court should not grant either Apotex's or Teva's request for a mandatory injunction. <u>See, e.g.</u>, <u>Columbia Hosp.</u>, 15 F. Supp. 2d at 4.

## II.   FDA CORRECTLY DETERMINED THAT PFIZER'S PEDIATRIC EXCLUSIVITY BARS FINAL APPROVAL OF ANY UNAPPROVED AMLODIPINE ANDAs

FDA's conclusion that Pfizer is entitled to pediatric exclusivity until the Federal Circuit issues a final mandate on the invalidity of the '303 patent was based on a reasonable and permissible construction of 21 U.S.C. § 355a, falls squarely in line with FDA precedent, and should be accorded the highest deference by the Court.

### A.   FDA's Interpretation of the Ambiguous Language Used in the Pediatric Exclusivity Statute is Entitled to Great Deference

The phrase "the court determines," as used in 21 U.S.C. § 355a(c)(2)(B), is ambiguous and imprecise in indicating the action it describes. <u>See</u> 21 U.S.C. § 355a(c)(2)(B) ("if . . . in patent litigation resulting from the certification the court determines that the patent is valid and would be infringed, the period during which an application may not be approved . . . shall be extended by a period of six months after the

5

date the patent expires. . .").  This ambiguity is evidenced by the several interpretations
advanced by the interested parties.  (FDA Decision at 6.)  Because Congress did not
precisely define the term, and FDA is interpreting its own governing statute, FDA's
interpretation of the phrase "the court determines" is entitled to deference and should not
be disturbed.

Under well-established principles of administrative law and the highly deferential
arbitrary and capricious standard of review, FDA's construction of the pediatric
exclusivity regulations must be upheld unless a contrary result is "clearly compelled" by
the statute.  Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232, 240 (2004).  In the
absence of clear legislative intent, a court should defer to an agency's permissible
construction of the statute.  Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467
U.S. 837, 842-43 (1984).  A court "is not to substitute its judgment for that of an agency."
Motor Vehicle Mfrs. v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983).  Where
Congress "delegate[s] interpretive authority implicitly – by failing to legislate in
sufficient detail as to resolve a particular question of interpretation – or explicitly – by
expressly leaving a gap for the agency to fill . . . interpretive authority has been delegated
to the agency, not to the court."  Investment Co. Inst. v. Conover, 790 F.2d 925, 935
(D.C. Cir. 1986).

Deference to FDA is warranted here for two reasons.  First, where, as here, the
agency is interpreting its own governing statute, particular deference is appropriate.
Chevron, 467 U.S. at 844.  Accordingly, courts have often deferred to FDA's reading of
the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq.  See, e.g., Community
Nutrition Inst. v. Young, 476 U.S. 974, 980 (1986); Serono Lab. v. Shalala, 158 F.3d

1313, 1319 (D.C. Cir. 1998).

Second, deference is "even more warranted when [the agency's] interpretation concerns . . . a complex and highly technical regulatory program." Community Care Found. v. Thompson, 318 F.3d 219, 225 (D.C. Cir. 2003) (citation and internal quotation marks omitted). The drive to promote pediatric testing and the pediatric exclusivity scheme embodied in the statute is exactly the kind of complex regulatory regime over which, in the absence of clear statutory language, a federal agency should be given the maximum amount of discretion to interpret and administer. In such circumstances, the courts have often afforded FDA particular deference. See, e.g., Apotex, Inc. v. Thompson, 347 F.3d 1335, 1352 (Fed. Cir. 2003) (noting deference to FDA because of its "specialized expertise" in the context of the regulatory scheme created pursuant to the Hatch-Waxman Act). Application of these bedrock administrative law principles here compels denial of Apotex's and Teva's requests for mandatory injunctions.

FDA has determined that, in the situation where a court of appeals is reversing a district court's judgment, the phrase "the court determines" should be read as the date the mandate issues. (FDA Decision at 7.) For purposes of determining the applicability of pediatric exclusivity for the '303 patent and for determining the eligibility of ANDAs for approval, the '303 patent is valid until the Federal Circuit issues its mandate invalidating it. FDA's determination is neither arbitrary nor capricious, and a contrary result is not clearly compelled by the statute. FDA's interpretation must be upheld.

Apotex devotes a significant portion of its brief attacking the propriety of FDA's decision to respect Pfizer's pediatric exclusivity pending issuance of a final mandate from the Federal Circuit in the Apotex case. (Apotex Motion at 4-10.) For example, Apotex

7

argues that the Supreme Court's decision in Hibbs v. Winn, 542 U.S. 88, 96-97 (2004), contradicts FDA's interpretation because, as Apotex sees it, entry of judgment is "an appellate court's final adjudication." (Apotex Motion at 6.) Although the Hibbs case addresses the timeliness of a petition for a writ of certiorari, which explicitly runs from the date of entry of judgment, it nevertheless supports FDA's interpretation, not contradicts it as Apotex argues. The Supreme Court specifically recognized that "'while a petition for rehearing is pending,' or while the court is considering, on its own initiative, whether rehearing should be ordered, 'there is no judgment to be reviewed.'" Hibbs, 542 U.S. at 98 (citing Missouri v. Jenkins, 495 U.S. 33, 46 (1990)). Because a petition for rehearing leaves open the possibility that a judgment may be modified and thus alter the parties' rights, such a petition suspends the finality of the judgment until it is resolved. Id. FDA's determination that the Federal Circuit mandate must issue before it will give effect to the decision for purposes of determining eligibility for pediatric exclusivity is thus consistent with the Supreme Court's decision in Hibbs.

Apotex also argues that FDA's reliance on the Federal Rules of Appellate Procedure 41(c) and its Committee Notes was not reasonable and not entitled to deference. In support of this attack, Apotex cites to a portion of the Advisory Committee notes to Federal Rule of Appellate Procedure 41(d). However, Apotex neglected to include the next sentence, which states that the filing of a petition for rehearing *en banc* stays the mandate. See Advisory Committee Notes on 1998 Amendments to Fed. R. App. P. 41, Subdivision (d) ("... [t]he filing of a petition for panel rehearing... stays the issuance of the mandate until the court disposes of the petition..."). Moreover, even the comments specifically relied upon by Apotex fail to support the position Apotex

8

advances. (Apotex Motion at 8.) The purpose of the amendments was to clarify that filing a petition for rehearing *en banc* has the same effect as filing a petition for panel rehearing, which is to suspend the finality of the court of appeal's judgment by staying the issuance of the mandate. See Advisory Committee Notes on 1998 Amendments to Fed. R. App. P. 41, Subdivision (d). These statements confirm that a judgment is not final until the mandate issues, and further support FDA's determination that the '303 patent will not be finally adjudged to be invalid until the Federal Circuit mandate issues.

### B. FDA Correctly Determined that Pfizer's Pediatric Exclusivity Bars Final Approval of All Pending, Unapproved ANDAs

According to the plain language of 21 U.S.C. § 355a, when an ANDA contains a Paragraph II or Paragraph III certification to a listed patent, the period during which the submitted ANDA may not be approved is extended "by a period of six months after the date the patent expires (including any patent extensions)." 21 U.S.C. § 355a(c)(2)(A). The "critical event," therefore, for determining the existence of pediatric exclusivity is "the expiration of the patent." See 21 U.S.C. § 355a; Ranbaxy Labs. v. FDA, 307 F. Supp. 2d 15, 19 (D.D.C. 2004), aff'd, 96 Fed. Appx. 1 (D.C. Cir. 2004).

At the moment the '303 patent expired, Paragraph IV certifications in unapproved ANDAs (such as Apotex's and Teva's) were no longer accurate and no longer valid because the patent to which they related expired. ANDA applicants with Paragraph IV certifications were therefore required to amend their applications to include Paragraph II certifications to the now-expired '303 patent. If such an amendment is not made, FDA is entitled to treat those remaining Paragraph IV certifications as Paragraph II certifications upon patent expiration. See Ranbaxy Labs., 307 F. Supp. 2d at 21.

9

FDA consistently requires such conversions, and the practice has been upheld by the courts. For example, when dealing with a similar situation involving the fentanyl transdermal patch, FDA properly required an ANDA applicant to change its Paragraph IV certification to a Paragraph II certification when the patent expired prior to final approval of the ANDA. Mylan Labs., Inc. v. Thompson, 389 F.3d 1272, 1281-82 (D.C. Cir. 2004). The D.C. Circuit Court of Appeals affirmed FDA's decision and concluded that, "[o]nce the certification changed to *paragraph II* – whether *de facto* or *de jure* – pediatric exclusivity attached under 21 U.S.C. § 355a(c)(2)(A)(i)." Id.

Similarly, with respect to fluconazole, FDA properly determined that a Paragraph IV certification was no longer valid upon patent expiration where the generic challenger stipulated to a dismissal of the patent lawsuit upon expiration. In affirming FDA's determination, the district court noted that, at the "magic moment" of midnight on January 29, 2004, when the listed patent expired, the ANDA filer's Paragraph IV certification was no longer accurate and no longer valid because the patent to which it related had expired. Ranbaxy Labs., 307 F. Supp. 2d at 20. At that point, the Paragraph IV certification either became a Paragraph II certification, or FDA was entitled to treat it as a Paragraph II certification. Id.

Thus, at the "magic moment" of midnight on March 25, 2007, all Paragraph IV certifications to the '303 patent contained in unapproved ANDAs were no longer accurate and either automatically became Paragraph II certifications or the ANDA applicants were required to amend their Paragraph IV certifications to Paragraph II certifications. No matter the mechanism, the result is clear – all unapproved ANDAs that contained Paragraph IV certifications to the '303 patent must be treated as though they contain

10

Paragraph II certifications to the expired '303 patent. Under this analysis, FDA's determination that all unapproved ANDAs, including Apotex's and Teva's, are subject to Pfizer's pediatric exclusivity was eminently reasonable and sound. Ranbaxy Labs., 307 F. Supp. 2d at 19.

Teva specifically recognizes that it is "FDA's longstanding rule" to require ANDA applicants to change Paragraph IV certifications to Paragraph II certifications upon patent expiration. (Teva Motion at 12.) Recognizing and endorsing this policy, Teva did, in fact, convert its Paragraph IV certification to a Paragraph II certification following the expiration of the '303 patent. (Id.) Despite the fact that its ANDA now properly contains a Paragraph II certification to the '303 patent, and the plain language of the statute requires that an ANDA containing a Paragraph II certification cannot be approved until pediatric exclusivity expires, Teva spills much ink arguing that it is somehow entitled to immediate approval. No matter how hard it tries, Teva simply cannot twist the words of the statute to give it the result it wants. As of midnight on March 25, 2007, when the '303 patent expired without a Federal Circuit mandate that it was invalid, all extant Paragraph IV certifications to the '303 patent were converted to Paragraph II certifications, and are now blocked from approval by Pfizer's pediatric exclusivity.

Teva further argues that brand manufacturers can manipulate the approval process by selectively choosing to assert some but not all claims of a listed patent against a generic applicant, leaving some unadjudicated claims available for application of pediatric exclusivity when the patent expires. (Teva Motion at 21-22.) In so arguing, Teva overlooks the simple fact that in most cases, the litigation will be resolved or the

ANDA will otherwise be eligible for final approval before the patent expires. Once an ANDA is finally approved, an applicant is no longer required to update its patent certifications, and the scenario Teva envisions will not materialize.

### C. Congressional Policy and Intent Supports FDA's Position

The FDA Decision is also consistent with the Congressional intent behind the pediatric exclusivity provisions. Through the pediatric exclusivity statute, Congress established an incentive structure to encourage drug manufacturers to invest in conducting safety and efficacy studies of drugs in pediatric patients. Breslow, L., The Best Pharmaceuticals for Children Act of 2002: The Rise of the Voluntary Incentive Structure and Congressional Refusal to Require Pediatric Testing, 40 Harv. J. on Legis 133, 154-55 (2003) (attached as Exhibit B to the Landmon Declaration); see also Food & Drug Admin., Dept. of Health and Human Svs, The Pediatric Exclusivity Provision: January 2001 Status Report to Congress at 1 (2001) (the "2001 Report") (attached as Exhibit C to the Landmon Declaration). By providing an economic incentive, Congress recognized that pediatric populations are "therapeutic orphans," and that pediatric studies "pose ethical and moral issues" and are difficult to conduct. S. Rep. No. 105-43, at 51 (1997). Pediatric exclusivity was created to ensure that more drugs were studied and therefore made safely available to pediatric patients who need them. Breslow, 40 Harv. J. on Legis at 154-55.

The six-month exclusivity period was the cornerstone of this incentive structure. Breslow, 40 Harv. J. on Legis at 154-55 (referring to the pediatric exclusivity provision as "one of the most radical additions" to the Better Pharmaceuticals for Children Act). Congress' grant of an additional six months of marketing exclusivity to a drug

manufacturer that performs pediatric studies elevated the goal of obtaining more drugs that are safe for pediatric use over the goal of accelerating the availability of generic competition to those drugs. See S. Rep. No. 107-09, at 11 (2001) ("By granting drug manufacturers a 6-month extension of market exclusivity for a drug upon satisfactory completion of requested pediatric studies of the product and delaying the availability of lower cost generic alternatives, the bill will make those prescription drugs . . . more expensive . . . There would also be cost savings . . . by, for example, the reduced need for hospitalization of children and reduced error in medicating children.").

Of course, an obvious benefit of such testing is the significant advances in pediatric medicine, i.e., reducing certain types of health care expenditures, speedy recovery from childhood illnesses, and a decrease in the need for hospital stays and physician visits. See 2001 Report at 14. Within the first three years of the enactment of the pediatric exclusivity provisions, over 58 pediatric studies were conducted leading to the approval of 25 drugs for the pediatric treatment of, *inter alia*, HIV, diabetes mellitus, epilepsy, hypertension, juvenile rheumatoid arthritis, obsessive compulsive disorder and gastro-esophageal reflux. Id. at ii, Appendix B, Table 4.[5] The mandatory injunction sought by Apotex and Teva is contrary to this Congressionally-established incentive structure and would devalue the incentive for future pediatric studies.

Whether an unapproved ANDA contained a Paragraph II, III, or IV certification as of midnight on March 25, 2007, all unapproved ANDAs are subject to Pfizer's pediatric exclusivity under FDA's rules. This is the system enacted by Congress, which elevated the need for drugs to safely treat children over increased generic competition,

---

[5] By contrast, in the six years between 1991 and 1996, only 11 post-marketing pediatric drug studies were completed. See 2001 Report at 8.

13

and the Court and FDA should give effect to that purpose. See, e.g., 2001 Report at ii ("pediatric exclusivity provision has done more to generate clinical studies and useful prescribing information for the pediatric population than any other regulatory or legislative process to date"); see also MCI Telecomms. Corp. v. AT&T Co., 512 U.S. 218, 231 n. 4 (1994) (stating that agencies "are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes").

14

## CONCLUSION

For the foregoing reasons, Mutual respectfully requests the Court to reject Apotex's and Teva's requests for mandatory injunctions requiring FDA to immediately approve their unapproved amlodipine ANDAs.

Dated:  April 26, 2007                    Respectfully Submitted,


    /s/ John Will Ongman


John Will Ongman (DC Bar No. 378042)
jwo@avhlaw.com
AXINN, VELTROP & HARKRIDER LLP

1801 K Street W, N.W., Suite 411

Washington, DC 20006

(202) 912-4700

(202) 912-4701 (facsimile)


Chad A. Landmon (admitted *pro hac vice*)
cal@avhlaw.com
Jo-Anne M. Kokoski (admitted *pro hac vice*)
jmk@avhlaw.com
AXINN, VELTROP & HARKRIDER LLP
90 State House Square

Hartford, CT 06103

(860) 275-8100

(860) 275-8101 (facsimile)


Attorneys for Intervenor-Plaintiff
 MUTUAL PHARMACEUTICAL CO., INC.

15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MYLAN LABORATORIES, INC., *et al.*,<br><br>        Plaintiffs,<br><br>and<br><br>MUTUAL PHARMACEUTICAL CO., INC.<br><br>        Intervener-Plaintiff,<br><br>        v.<br><br>MICHAEL O. LEAVITT, Secretary,<br>Health and Human Services, *et al.*<br><br>        Defendants<br><br>and<br><br>TEVA PHARMACEUTICALS USA, INC.,<br><br>        Intervener-Defendant,<br><br>and<br><br>APOTEX INC.,<br><br>        Intervener-Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 07-0579 (RMU)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF CHAD A. LANDMON

I, Chad A. Landmon, hereby declare as follows:

1.     I am an attorney with the law firm of Axinn, Veltrop & Harkrider LLP, counsel to Intervenor-Plaintiff Mutual Pharmaceutical Co. Inc. ("Mutual"). I was admitted to practice *pro hac vice* before the United States District Court for the District of Columbia on April 5, 2007. I submit this declaration in support of Mutual's

Memorandum In Opposition To Apotex, Inc.'s Motion For Preliminary Injunction and Teva Pharmaceutical USA Inc.'s Motion For Declaratory And Injunctive Relief.

2.    Attached as Exhibit A is a true and accurate copy of the April 18, 2007 Letter Decision from the United States Food and Drug Administration to ANDA Applicant/Holder for Amlodipine Besylate Tablets ("FDA Decision").

3.    Attached as Exhibit B is a true and accurate copy of Breslow, L., The Best Pharmaceuticals for Children Act of 2002: The Rise of the Voluntary Incentive Structure and Congressional Refusal to Require Pediatric Testing, 40 Harv. J. on Legis 133 (2003) .

4.    Attached as Exhibit C is a true and accurate copy of Food & Drug Admin., Dept. of Health and Human Svs, The Pediatric Exclusivity Provision: January 2001 Status Report to Congress at 1 (2001).

Dated:  April 26, 2007                     Respectfully Submitted,

                                            /s/ Chad A. Landmon
                                           Chad A. Landmon (admitted *pro hac vice*)
                                           cal@avhlaw.com
                                           AXINN, VELTROP & HARKRIDER LLP
                                           90 State House Square
                                           Hartford, CT 06103
                                           (860) 275-8100
                                           (860) 275-8101 (facsimile)

                                           Attorneys for Intervenor-Plaintiff
                                            MUTUAL PHARMACEUTICAL CO., INC.

# EXHIBIT A



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

April 18, 2007

Dear ANDA Applicant/Holder for Amlodipine Besylate Tablets:

This letter addresses issues related to the timing of potential approvals of abbreviated new drug applications (ANDAs) that reference Norvasc tablets. This letter construes the provisions of the Drug Price Competition and Patent Term Restoration Act of 1984 (known as the Hatch-Waxman Amendments or Hatch-Waxman), codified at 21 U.S.C. §§ 355, 360cc, and 35 U.S.C. §§ 156, 271, 282, and does not necessarily apply to changes made in the Medicare Modernization Act (MMA) of 2003.[1]

As you are aware, Pfizer Inc. (Pfizer) manufactures and markets Norvasc, a besylate salt of amlodipine, indicated for the treatment of hypertension and angina. Pfizer had listed two patents with FDA, asserting that they claim Norvasc and would be infringed by the marketing of generic versions of the product. The later of these patents, Patent No. 4,879,303 ('303 patent), expired on March 25, 2007, so that these patents, by themselves, no longer bar the marketing of generic versions of Pfizer's product. Several companies have submitted ANDAs for approval to market generic versions of Norvasc. Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc. (Mylan) filed the first ANDA to market a generic version of Norvasc and had challenged Pfizer's patents by submitting the first "paragraph IV certifications" to those patents with its application. FDA approved Mylan's ANDA in October 2005, and Mylan began marketing its product on March 23, 2007. On or about the same day, Pfizer began marketing a generic version of Norvasc.

Pfizer and Mylan now contend that the approvals of the other ANDAs for amlodipine besylate are blocked by Pfizer's "pediatric exclusivity" until September 25, 2007. Mylan contends, alternatively, that the approvals of its competitors' ANDAs are blocked by Mylan's "180-day marketing exclusivity" until September 19, 2007.[2] Resolution of whether pending ANDAs referencing Norvasc are blocked either by Pfizer's pediatric exclusivity or Mylan's 180-day exclusivity involves a number of legal issues, some of first impression for the agency. Part of the analysis requires FDA to determine the effect of a recent Federal Circuit decision in patent litigation between Pfizer and Apotex Inc. (Apotex), another ANDA applicant for amlodipine besylate who filed a paragraph IV certification after Mylan had submitted its certification. On March 22, 2007, the Federal Circuit ruled that the three claims in the '303 patent that Pfizer asserted that Apotex infringed were invalid as obvious. *Pfizer Inc. v. Apotex, Inc.*, No. 2006-1261, 2007 U.S. App. LEXIS 6623 (March 22, 2007) (the *Apotex* decision).

---

[1]  The 1984 Hatch-Waxman provisions govern most issues related to ANDA approval for amlodipine besylate tablets. Although certain provisions of Hatch-Waxman have been superseded by changes made in the MMA, the 180-day exclusivity provisions of the MMA apply only to applications for which the first ANDA with a paragraph IV certification was filed after December 3, 2003. Mylan's ANDA was filed before December 3, 2003, and hence is governed by the pre-MMA provisions with respect to 180-day exclusivity.

[2]  Mylan has claimed in its submissions to FDA that its 180-day exclusivity commenced on March 23, 2007 and would expire on September 23, 2007. See Petition for Stay of Action, Docket 2006P-0116 (March 26, 2007) (http://www.fda.gov/ohrms/dockets/dockets/07p0116/07p-0116-psa0001-01-vol1.pdf). However, 180 days after March 23 is September 19.

The questions presented by the pending applications and exclusivity claims include: (1) whether the *Apotex* decision is effective upon issuance of the opinion or upon issuance of the mandate, for purposes of determining the application of Pfizer's pediatric exclusivity; (2) upon the *Apotex* decision becoming effective, whether Pfizer's pediatric exclusivity bars approval of the Apotex ANDA; (3) upon the *Apotex* decision becoming effective, whether Pfizer's pediatric exclusivity bars approvals of the remaining ANDAs; and (4) whether Mylan's eligibility for 180-day exclusivity blocks approval of ANDAs after the expiration of Pfizer's patent. These questions are addressed in turn in the Discussion section below.

## Regulatory Background

### A. Patent Listing and Certification

The Hatch-Waxman Amendments permit the submission of ANDAs for approval of generic versions of approved drug products.  21 U.S.C. § 355(j).  Under the procedure established in Hatch-Waxman, NDA sponsors are required to list patents that protect their approved drug substances, drug products, or approved methods of use, 21 U.S.C. § 355(b)(1); FDA publishes those patents in FDA's "Approved Drug Products With Therapeutic Equivalence Evaluations" (the Orange Book); and ANDA applicants are required to certify whether their proposed drug products infringe those listed patents.  21 U.S.C. § 355(j)(2)(A)(vii).  As to each patent listed in the Orange Book for the listed drug referenced, an ANDA applicant can certify that 1) such patent information has not been filed (paragraph I certification); 2) the patent has expired (paragraph II certification); 3) the date the patent will expire (paragraph III certification); or 4) the patent is invalid or not infringed by the drug product proposed in the ANDA (paragraph IV certification). *Id.*

In the case of paragraph I and paragraph II certifications, the patent does not serve as a barrier to ANDA approval.  A paragraph I or paragraph II certification permits immediate effective approval of the ANDA.  21 U.S.C. § 355(j)(5)(B)(i).  If an applicant files a paragraph III certification, approval may be made effective when the patent expires.  21 U.S.C. § 355(j)(5)(B)(ii).

If an applicant seeks to challenge a listed patent and to obtain approval before the patent expires, it must provide a paragraph IV certification certifying that "in the opinion of the applicant and to the best of his knowledge" the patent is "invalid or will not be infringed by the manufacture, use or sale of the [drug described in the ANDA]."  21 U.S.C. §  355(j)(2)(A)(vii)(IV). The applicant with a paragraph IV certification must notify the patent owner and NDA holder of its paragraph IV certification and of the basis of its belief that the patent is invalid or not infringed.  21 U.S.C. § 355(j)(2)(B).  The filing of a paragraph IV certification "for a drug claimed in a patent or the use of which is claimed in a patent" is an act of infringement.  35 U.S.C. § 271(e)(2)(A).  This enables the NDA holder and patent owner to sue the ANDA applicant.  If the patent owner or NDA holder brings a patent infringement suit against the ANDA applicant within 45 days after receiving notice of the paragraph IV certification, the suit triggers an automatic stay of FDA approval for 30 months from the date the patent owner or NDA holder received notice of the certification ("30-month stay").  21 U.S.C. § 355(j)(5)(B)(iii).  If the patent owner or NDA holder does not bring suit within 45 days after it has received notice of the paragraph IV certification, the unexpired patent will not, by itself, bar FDA's approval of the ANDA, even if patent litigation is subsequently commenced outside the 45-day period and is ongoing at the time the requirements for approval are met.  See *id.*

B. 180-Day Exclusivity

To provide an incentive for ANDA applicants to be the first to challenge a listed patent and remove patent barriers to approval, Congress provided that:

> [I]f the [ANDA] contains a [paragraph IV certification] and is for a drug for which a previous application has been submitted under this subsection . . . [containing] such a certification, the application shall be made effective not earlier than one hundred eighty days after
>
> (I)   the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or
> (II)  the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed, whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv)(2002).

Although this statutory provision is commonly characterized as granting "180-day exclusivity" to the first applicant to submit an ANDA containing a paragraph IV certification challenging a patent, the statute does not provide for that result directly. Instead, this end is accomplished by delaying the approval of subsequent ANDAs *containing a paragraph IV certification* until 180 days after the exclusivity period for the first ("previous") applicant has been triggered. If the first applicant's ANDA no longer contains a valid paragraph IV certification when it is ready for approval, the first applicant is not eligible for exclusivity. Similarly, when subsequent applicants' ANDAs do not contain paragraph IV certifications, their approval is not delayed under the plain language of this statutory provision.

C. Pediatric Exclusivity

The pediatric exclusivity statute, enacted as part of the Food and Drug Administration Modernization Act (FDAMA) and renewed in the Best Pharmaceuticals for Children Act (BPCA), provides an incentive for NDA sponsors to conduct pediatric studies that FDA has requested. Although this incentive for doing pediatric studies is commonly referred to as "pediatric exclusivity," a grant of pediatric exclusivity alone does not guarantee that an NDA will be free of generic competition while the exclusivity is in effect. Instead, as FDA has opined and the D.C. Circuit has affirmed, the applicability of pediatric exclusivity to prevent approval of a particular applicant's ANDA depends on the outcome of that applicant's patent challenges, if any.  See *Mylan Labs., Inc.* v. *Thompson,* 332 F. Supp. 2d 106 (D.D.C. 2004), *aff'd,* 389 F.3d 1272 (D.C. Cir. 2004); *Ranbaxy Labs., Ltd.* v. *FDA,* 307 F. Supp. 2d 15 (D.D.C. 2004) *aff'd,* 2004 U.S. App. LEXIS 8311 (D.C. Cir. April 26, 2004). Specifically, the statute states that if the approved product has completed the pediatric exclusivity requirements and is subject to

> (i)    "a listed patent for which a [paragraph II] certification has been submitted . . . the period during which an application may not be approved under [21 U.S.C. § 355(j)(5)(B)] shall be extended by a period of six months after the patent expires;"
> (ii)   "a listed patent for which a [paragraph III] certification has been submitted . . . the period during which an application may not be approved under [21 U.S.C. § 355(j)(5)(B)]  shall be extended by a period of six months after the date the patent expires;"

3

(iii)        "a listed patent for which a [paragraph IV] certification has been submitted . . .
            , and in the patent infringement litigation resulting from the certification the
            court determines that the patent is valid and would be infringed, the period
            during which an application may not be approved under [21 U.S.C.
            § 355(j)(5)(B)] shall be extended by a period of six months after the date the
            patent expires."

21 U.S.C. § 355a(c)(2)(A)-(B).

Factual Background

On July 31, 1992, FDA approved Pfizer's new drug application (NDA) for amlodipine besylate
tablets, which Pfizer began marketing later that year under the brand name Norvasc. Pfizer
listed two patents with respect to Norvasc: Patent 4,572,909 ('909 patent), originally due to
expire on July 31, 2006, and the '303 patent, originally due to expire on March 25, 2007. Pfizer
conducted pediatric studies requested by FDA and, on November 27, 2001, FDA granted Pfizer
pediatric exclusivity for Norvasc pursuant to 21 U.S.C. § 355a. Pediatric exclusivity, by delaying
approval of ANDAs for six months after the expiration date for a patent, had the potential to
block approvals of ANDAs referencing Norvasc until January 31, 2007, with respect to the '909
patent, and until September 25, 2007, with respect to the '303 patent. Because this period with
respect to the '909 patent has expired, that patent is no longer relevant to the issues discussed
in this letter.

In May 2002, Mylan filed an ANDA for amlodipine besylate, and was the first to file a paragraph
IV certification to the '303 patent pursuant to 21 U.S.C. § 355(j)(5)(B)(iv). Pfizer sued Mylan for
patent infringement. *Pfizer Inc. v. Mylan Labs. Inc.*, No. 02-cv-1628 (W.D. Pa.). However,
because Pfizer did not file its lawsuit within 45 days of receiving notice of Mylan's paragraph IV
certification, the filing of the lawsuit did not result in the 30-month stay of approval pursuant to
21 U.S.C. § 355(j)(5)(B)(iii). In October 2005, FDA approved Mylan's ANDA.

In February 2007, the district court in the patent litigation between Mylan and Pfizer entered
judgment for Pfizer that Mylan had infringed the '303 patent. *Pfizer Inc. v. Mylan Labs., Inc.*, No.
02-cv-1628, 2007 U.S. Dist. LEXIS 14417 (W.D. Pa. Feb. 27, 2007). On March 16, 2007, the
district court amended the judgment and enjoined the approval of Mylan's ANDA until the '303
patent expired. *Id.*, 2007 U.S. Dist. LEXIS 18699 (Mar. 16, 2007).[3] Mylan appealed that
judgment and sought a stay of the district court's injunction. The Federal Circuit granted the
stay. *Pfizer Inc. v. Mylan Labs., Inc.*, No. 2007-1194 (Mar. 23, 2007). Mylan began marketing
its product on March 23, 2007.

Apotex, Inc. (formerly Torpharm, Inc.) filed an ANDA for amlodipine besylate, which contained a
paragraph IV certification to the '303 patent. On July 20, 2003, Pfizer sued Apotex for patent
infringement. In January 2006, the district court held the patent was valid and infringed. *Pfizer,
Inc. v. Apotex*, No. 03C 5289, 2006 U.S. Dist. LEXIS 95778 (N.D. Ill. January 29, 2006). The
Federal Circuit reversed in the opinion noted above, finding that Apotex's amlodipine besylate

---

[3] When an NDA holder or patent owner sues the ANDA applicant and wins — that is, the court hearing
the patent infringement litigation finds the patent valid and infringed — the Patent Code provides that "the
court shall order the effective date of any approval of the drug * * * involved in the infringement to be a
date which is not earlier than the date of the expiration of the patent which has been infringed." 35 U.S.C.
§ 271(e)(4)(A).

4

tablets did not infringe claims 1-3 of the '303 patent because those claims were invalid for obviousness. See *Apotex* decision. The Federal Circuit did not address the validity of the remaining claims of the patent, presumably because those were not claims on which Pfizer had sued Apotex. On April 5, 2007, Pfizer filed a motion in the Federal Circuit, seeking a rehearing and/or rehearing en banc of the *Apotex* decision. This motion stayed issuance of the mandate pending its resolution under Rule 41(d)(1) of the Federal Rules of Appellate Procedure (FRAP).

At midnight on March 25, 2007, the '303 patent expired. Pfizer submitted a letter to FDA dated March 25, 2007, contending that approval of Apotex's ANDA was barred by Pfizer's pediatric exclusivity, at least until the Federal Circuit's mandate issues.

On March 26, 2007, Mylan submitted to FDA a Petition for Stay of Action requesting that the FDA refrain from taking any action to approve any ANDA for amlodipine besylate tables until Mylan's 180-day exclusivity expires. According to Mylan, the 180-day exclusivity for amlodipine besylate tablets had been triggered when it commenced marketing on March 23, and is due to expire on September 19, 2007. Also on March 26, Mylan sued FDA in the U.S. District Court for the District of Columbia, alleging that it was entitled to 180-day exclusivity as to the '303 patent and requesting that the court enjoin FDA from approving additional ANDAs for amlodipine until the merits of its claim for 180-day exclusivity could be heard. *Mylan Labs., Inc.* v. *Leavitt*, CA No. 07-579 (RMU)(D.D.C.).

FDA determined that it was unprepared to immediately resolve all of the legal questions raised by the pending applications and exclusivity claims, and would benefit from soliciting the views and legal arguments of the interested parties. FDA informed the court that it proposed to seek comments to be submitted by April 4, 2007, and to issue its determination by April 11, 2007. The court memorialized FDA's proposal, and enjoined FDA from implementing any ANDA approval decisions, once made, until 5:00 PM on April 13, 2007 to allow the court to review FDA's decisions. *Mylan Labs.*, CA No. 07-579 (RMU), Order (March 26, 2007). FDA subsequently moved the court for an extension of time, until April 18, 2007, to issue its determination, which the court granted.

By letter dated March 28, 2007, FDA requested comments on five specific questions from Pfizer and the ANDA applicants for amlodipine besylate tablets. FDA created a docket for collecting the comments and posting them on the internet, and posted its letter requesting comments to give other interested parties an opportunity to comment on the questions FDA raised. (http://www.fda.gov/ohrms/dockets/dockets/07n0123/07n0123.htm) Several parties expressed a range of opinions on the questions FDA posed. See *id*. After receiving and considering submissions from interested parties, FDA reaches the following conclusions.

Discussion

1. For Purposes of Pediatric Exclusivity, the *Apotex* Decision Will Not be Effective until Issuance of the Mandate.

Under the language of the statute, pediatric exclusivity operates by delaying the approval of an ANDA for six months after a patent expires.[4] The operative subsection of the statute varies

---

[4]   In this case, Mylan's ANDA is not blocked by Pfizer's pediatric exclusivity because its ANDA was already approved in October 2005, and therefore, under the literal terms of the statute, the ANDA's approval cannot be delayed. 21 U.S.C. § 355a(c)(2)(A)-(B). One commenter maintained that FDA should have converted the approval status of Mylan's ANDA to tentative approval after Mylan lost its patent litigation in the district court. See Comments of Synthon Pharmaceuticals, Inc. at 4. However,

according to the certification submitted by the ANDA applicant. When the ANDA applicant, such as Apotex, submits a paragraph IV certification, "if . . . in the patent litigation resulting from the certification the court determines that the patent is valid and would be infringed, the period during which an application may not be approved . . . shall be extended by a period of six months after the date the patent expires . . . ." *See* 21 U.S.C. § 355a(c)(2)(B). As discussed in greater detail below, FDA has previously opined, and concludes below, that this provision means that pediatric exclusivity does *not* apply when the ANDA applicant prevails in its patent challenge -- that the court determines that the patent is *invalid* or would *not* be infringed, and that construction has been acknowledged as appropriate by a court. Accordingly, this provision governs the application of pediatric exclusivity, at least with respect to Apotex.

In determining the effect of the *Apotex* decision on Pfizer's pediatric exclusivity claim, the first issue that FDA must resolve is to ascertain the meaning of the phrase "the court determines" for purposes of the statutory provision quoted above. Specifically, FDA must decide whether the Federal Circuit "determined" invalidity when it issued its opinion or will not "determine" validity or infringement until the mandate issues. Because the Court of Appeal's opinion is not effective until the mandate issues, Pfizer argues that the Federal Circuit will not have determined invalidity until that time. Apotex and others have asserted that the March 22, 2007 date of the issuance of the Federal Circuit opinion is the operative date.

FDA finds that the operative phrase -- "the court determines" -- is ambiguous as to the action it describes. Congress could have been more precise in indicating the action by the court to which it was referring, as it has done in other statutes. Compare, e.g., 26 U.S.C. § 7481(a) (finality is determined "upon mandate" issued by Court of Appeals or Supreme Court) with 21 U.S.C. § 355(j)(5)(B)(iii)(I)(aa)-(bb) (approval "shall be made effective on the date on which the court enters judgment reflecting the decision; or the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed."). Instead, it chose a phrase that, as the comments submitted to FDA reflect, is susceptible to more than one interpretation. On the one hand, the use of the present tense in the word "determines" could suggest that the issuance of the opinion itself is sufficient. Indeed, one dictionary definition of "determine" is "to come to a decision . . . as the result of investigation or reasoning." Webster's Third New International Dictionary (2002) at 616 (definition 1.c). Under this view, a court "determines" validity and infringement when it issues an initial ruling to that effect.

On the other hand, the choice of the word "determines" suggests the fixing or settling of rights and obligations. The dictionary definitions of "determine" include: "to fix conclusively or authoritatively," "to settle a question or controversy about," "to settle or decide by choice of alternatives or possibilities." *Id.* (definitions 1.a, 1.b, and 1.d.). See also Webster's II New Riverside University Dictionary (1994) at 369 ("[t]o end or decide by final, esp. judicial action") (definition 1.b). Under this view, where an appellate court is reversing the district court's judgment below, the parties' rights and obligations continue to be governed by the district court determination until the appellate court issues its mandate effectuating its judgment.

The Federal Rules of Appellate Procedure provide some additional guidance regarding which should be the relevant time frame for determining generally when the Federal Circuit's decision is effective. The rules themselves do not conclusively resolve the issue: FRAP 36 states that a judgment is entered when it is noted on the docket, while FRAP 41(c) states that the mandate is

---

before FDA took such action, the Federal Circuit stayed the district court injunction in that litigation. After that stay, FDA had no basis to convert the approval status of Mylan's ANDA from approved to tentatively approved.

effective when issued.  However, the 1998 advisory committee notes to FRAP 41(c) state that
"[a] court of appeals judgment or order is not final until issuance of the mandate; at that time the
parties' obligations become fixed."  These notes have been cited with approval by courts,
*Mercer v. Duke Univ.*, 401 F.3d 199, 212 n.7 (4th Cir. 2005); *Stewart Park & Reserve Coalition
Inc. v. Slater*, 374 F. Supp. 2d 243, 248 n.5 (N.D.N.Y. 2005); *United States v. Swan*, 327 F.
Supp. 2d 1068, 1071-72 (D. Neb. 2004), and no commenters have cited any authority to FDA
that would indicate that the advisory committee notes do not state the current rule regarding
finality of appellate court decisions.[5]  Therefore, under these rules, until the mandate issues, the
parties continued to be bound by the district court judgment.

In FDA's view, the phrase "the court determines" in section 355a(c)(2)(B), in the context of a
federal court of appeals reversing a district court judgment, should be read as the date the
mandate issues for several reasons.  When the district court decides a patent issue, FDA
applies that decision, unless it is stayed, in determining issues related to ANDA approval.  The
district court decision continues to control the rights of the parties  until the appellate court
mandate issues.  Thus, the vital date under this scheme is when the rights of the parties
become fixed by the decision of the court of appeals, that is, the date the mandate issues.  This
understanding of the phrase "the court determines" is further supported by the dictionary
definitions of "determine" that use the terms "fixing" and "settling," and by the practice under the
FRAP, as reflected in the advisory committee notes and as accepted by courts.  Furthermore,
as a matter of policy, FDA believes that the parties to paragraph IV litigation are best served by
a rule that, consistent with the statutory language, errs on the side of greater finality.  Such a
rule reduces the possibility that an appellate court opinion will be relied on and then overturned
(through an adverse opinion after rehearing or rehearing en banc) in very short order.
Accordingly, FDA concludes that, in determining the applicability of pediatric exclusivity, this
language requires FDA to await issuance of the mandate before giving effect to an appellate
court opinion that would overturn a district court's ruling.

In this case, therefore, for purposes of determining the applicability of Pfizer's pediatric
exclusivity, FDA will continue to be governed by the district court decision upholding the validity
of the patent unless or until the mandate is issued, effectuating the appellate court's judgment.[6]
As a result, all of the unapproved ANDAs are currently blocked by Pfizer's pediatric exclusivity.
If the mandate does not issue before September 25, 2007, when the pediatric exclusivity
expires, Pfizer and Mylan will have no additional competition during the interim period and thus
will obtain the full benefit that could be derived under pediatric and 180-day marketing
exclusivity.  In that event, the remaining issues discussed in this letter will be moot.  However,
given the possibility that the mandate making the panel decision effective may issue before
September 25, 2007, FDA will continue with its analysis.

_____

[5] Several commenters have cited an FDA Guidance document issued in March 2000. See, e.g., Mylan
Comments at 2; Pfizer comments at 2.  FDA is not relying on this guidance document, however, because
it relates to a different statutory provision, with different language, context, and purposes.

[6] In this case, the district court found patent validity and infringement and the appellate court opinion
found invalidity.  Under these circumstances, FDA here declines to give effect to the appellate court's
judgment of invalidity until the mandate issues and the patent and pediatric exclusivity attached to the
patent block ANDA approvals in the interim.  We note, however, that the agency's position on this also
suggests that, had the district court found invalidity and the appellate court reached the contrary
conclusion of validity and infringement, the converse would also be true:  in spite of the appellate court
opinion finding validity and infringement, ANDAs could be approved (or could retain their approvals) and
neither the patent itself nor pediatric exclusivity would attach to that patent to block such approvals unless
and until the mandate issued.

## 2. Apotex will Cease to be Subject to Pfizer's Exclusivity if the Mandate Issues before September 25, 2007.

This is the first time that FDA has been called upon to determine whether an ANDA applicant is subject to the innovator's pediatric exclusivity when the ANDA applicant has received a *favorable* court decision in its paragraph IV litigation but has not yet obtained final approval when the patent expires. The pediatric exclusivity provisions address several scenarios in terms of the status of the ANDA applications, but there are several scenarios that they fail to address, including this one.

The statute provides that, where the ANDA applicant submits paragraph IV certification, "if . . . in the patent litigation resulting from the certification the court determines that the patent is valid and would be infringed, the period during which an application may not be approved . . . shall be extended by a period of six months after the date the patent expires . . . ." *See* 21 U.S.C. § 355a(c)(2)(B). Based on this language, FDA determines that the converse must also be true - if in paragraph IV litigation a court determines that a patent is *invalid* or *not infringed*, pediatric exclusivity will not bar approval of that applicant's ANDA. This is the implicit meaning and logical interpretation of subsection 355a(c)(2)(B); otherwise, the qualification in that provision regarding the victory for the patent holder in the patent litigation would make no sense and would be superfluous, at least as to any ANDA that did not receive final approval before the patent expired. In addition, this outcome is consistent with the goals of the 180-day exclusivity statute which encourages patent challenges to remove barriers to approval. As noted, FDA had previously opined that this was the logical interpretation of 355a(c)(2)(B), although FDA was not directly applying that interpretation at that time. *See Mylan Labs., Inc.* v. *Thompson*, 332 F. Supp. 2d at 124 (D.D.C. 2004) ("As the FDA has correctly noted in its papers, § 355a(c)(2)(B) would apply 'where an ANDA applicant submits a paragraph IV certification, and prevails in the patent litigation.'")(dicta, citing Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction and Summary Judgment and In Support of Cross Motion for Summary Judgment at 38 (July 8, 2004)), *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004). FDA therefore concludes that, where an applicant has challenged a patent and has received a decision of invalidity or non-infringement, that applicant will not be subject to the NDA holder's pediatric exclusivity once that decision becomes effective.

FDA has previously been called upon to address other gaps in the pediatric exclusivity provisions. Specifically, the paragraph III and paragraph IV provisions are silent on the applicability of pediatric exclusivity to delay ANDA approvals where an ANDA applicant has a paragraph III or IV certification and has not received final approval at the time the patent expires. In determining the operation of the statute in those circumstances, FDA has relied on the broader certification scheme under Hatch-Waxman.

It has been FDA's longstanding view, that, when a patent expires before pending patent litigation is resolved, ANDA applicants who have not received final effective approval are required under Hatch-Waxman, to change their paragraph III and paragraph IV certifications to paragraph II certifications. Because, upon patent expiry, all ANDA applicants are presumed to have paragraph II certifications, the paragraph II provision of the pediatric exclusivity statute, 21 U.S.C. § 355a(c)(2)(A)(i), would control. The D.C. Circuit has upheld this approach in two recent decisions. *See Mylan Labs., Inc.* v. *Thompson*, 332 F. Supp. 2d 106, 124 (D.D.C. 2004), *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004); *Ranbaxy Labs., Ltd.* v. *FDA*, 307 F. Supp. 2d 15 (D.D.C. 2004) *aff'd*, 2004 U.S. App. LEXIS 8311 (D.C. Cir. April 26, 2004).

In considering these earlier determinations regarding the switch to paragraph II certifications with today's decision regarding the non-applicability of pediatric exclusivity to applicants who prevail in patent litigation, FDA determines as follows. When the '303 patent expired on March 25, 2007, all of the unapproved ANDAs were required to change (or deemed to have changed) to paragraph II certifications and became subject to Pfizer's pediatric exclusivity at that time. That is their status during the period before the mandate issues. However, FDA believes that the language of the statute manifests a clear Congressional intent that pediatric exclusivity not block the approval of an ANDA where the ANDA applicant has prevailed in the paragraph IV patent litigation and therefore creates an exception to the application of the Hatch-Waxman certification provisions. Thus, if and when the mandate finalizing the panel's March 22 decision issues in the *Apotex* case, Apotex's ANDA will not be blocked by Pfizer's pediatric exclusivity.

### 3. If the Mandate Issues Before the Expiration of Pediatric Exclusivity on September 25, 2007, ANDAs Other than Apotex May Not be Eligible for Immediate Approval.

Although Apotex is the only ANDA applicant to have obtained a favorable decision on the merits against Pfizer in the amlodipine besylate patent litigation, several commenters maintain that all or some of the other ANDAs should not be blocked by Pfizer's pediatric exclusivity because of the *Apotex* decision. Some maintain that, once the patent is declared invalid, it should be presumed delisted from the Orange Book. See Medco Comments at 7. That would mean that no ANDA applicants would be required to maintain their certifications to that patent, and pediatric exclusivity, by its literal terms, would not bar any approvals.

Others maintain that, once a patent is found invalid in litigation against one party, the patent owner is collaterally estopped from asserting infringement claims based on that patent against additional defendants. See, e.g. *Blonder-Tongue Labs., Inc.* v. *University of Ill. Found.*, 402 U.S. 313, 350 (1971). They argue that, applying collateral estoppel, all applicants who submitted paragraph IV certifications should be considered victorious in their individual patent litigation against Pfizer. At that point, they continue, the analysis applied to Apotex's ANDA should be applied to them as well so that their ANDAs would not be blocked by pediatric exclusivity. This would mean, according to at least one commenter, that ANDAs containing paragraph IV certifications at the time of patent expiration would be eligible for approval, while those containing paragraph III certifications would be blocked. See Teva Comments at 11-13.

Other commenters noted, however, that the *Apotex* decision addressed only claims 1-3 of an 11 claim patent. These commenters assert that the patent should stay listed in the Orange Book because some of the claims have not been declared invalid. See Mylan Comments at 1-2; Daiichi Sankyo Inc. Comments at 2. Nevertheless, another commenter maintains that there are no viable claims remaining for these products once claims 1-3 are declared invalid. See Caraco Pharmaceutical Labs, Ltd. at 3.

Patents are required to be listed in FDA's Orange Book if they claim the approved drug substance, approved drug product, or an approved method of use. 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.53. If the remaining claims do not provide a basis on which to list the patent (i.e., do not claim the approved drug substance, drug product, or an approved method of use), the patent would no longer be eligible for listing in the Orange Book. In such a case, the patent must be withdrawn by Pfizer and any pediatric exclusivity that attached to the patent will no longer serve as a barrier to ANDA approval. If, on the other hand, one or more of the remaining claims claims the approved drug substance, approved drug product, or approved method of use, the patent can remain properly listed until the expiration of pediatric exclusivity. In such a case, the patent should remain in the Orange Book and the remaining unapproved ANDAs are potentially subject to Pfizer's pediatric exclusivity.

It is not clear to FDA, based on the current record, whether the remaining claims of the '303 patent would provide a valid basis to list the patent if claims 1-3 are invalid. Moreover, FDA has long maintained that it has neither the expertise nor the resources to resolve patent issues and does not make independent determinations of the merits or applicability of patent claims. 59 Fed. Reg. 50338, 50342-43, 50345, 50349, 50352 (1994). FDA's ministerial role in the listing process has been upheld. *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1348-49 (Fed. Cir. 2003); *aaiPharma, Inc. v. Thompson*, 296 F.3d 227, 243 (4th Cir. 2002), *cert. denied*, 538 U.S. 923 (2003); *Alphapharm Pty Ltd. v. Thompson*, 330 F. Supp 2d 1, 7-8 (D.D.C. 2004).

Because FDA lacks both relevant information and expertise to resolve this issue based on the information before it, in the absence of further judicial or other action clarifying the status of the patent, FDA will assume the '303 patent remains validly listed. If one or more of the remaining claims qualified the patent for listing as of the time the patent expired, all of the remaining ANDAs who had paragraph III and paragraph IV certifications at the time of patent expiry are required to maintain their paragraph II certifications. As such, those ANDAs will be blocked by Pfizer's pediatric exclusivity.

### 4. Mylan's Eligibility for 180-day Exclusivity Does Not Extend Beyond the Expiration of the Patent.

Mylan asserts that regardless of the applicability of pediatric exclusivity, all of the remaining ANDAs are subject to Mylan's 180-day exclusivity, which, if viable, would expire on September 19, 2007. Most commenters assert that it is well settled that 180-day exclusivity does not extend beyond the expiration of the patent. See, e.g., Apotex Comments at 8; Teva Comments at 6-7. Although Mylan acknowledges FDA's longstanding position that 180-day exclusivity expires with the patent, Mylan urges FDA to change that position, at least in the circumstances here, where the 180-day exclusivity has been triggered and begun to run before the patent expires.

By the terms of the statute, when a listed patent expires, a paragraph IV certification is no longer accurate. In these circumstances, the statute and FDA's regulations require ANDA applicants to change from a paragraph IV certification stating that the patent "is invalid or will not be infringed" to a paragraph II certification stating "that such patent has expired." 21 U.S.C. § 355(j)(2)(A)(vii)(II),(IV); 21 C.F.R. § 314.94(a)(12)(viii)(C) ("an applicant shall amend a submitted certification if, at any time before the effective date of the approval of the application, the applicant learns that the submitted certification is no longer accurate"). In cases where an applicant neglects to amend its certification to a paragraph II certification after a patent expires, FDA will treat it as having done so. This approach was upheld in *Dr. Reddy's Laboratories, Inc. v. Thompson*, 302 F. Supp. 2d 340 (D.N.J. 2003) and *Ranbaxy Labs., Ltd. v. FDA*, 307 F. Supp. 2d 15 (D.D.C. 2004) *aff'd*, 2004 U.S. App. LEXIS 8311 (D.C. Cir. April 26, 2004).

As noted above, applications with paragraph II certifications are eligible for immediate effective approval; the patent ceases to be a barrier to that approval upon its expiration. 21 U.S.C. § 355(j)(2)(A)(ii); 21 U.S.C. § 355(j)(5)(B)(i)(where an applicant files a paragraph II certification, approval of the applicant's ANDA "may be made effective immediately"); 21 C.F.R. § 314.94(a)(12)(viii). Thus, consistent with the statutory language and purpose of 180-day exclusivity, FDA has consistently construed the statute to award 180-day exclusivity based upon paragraph IV certifications only to unexpired patents. See 59 Fed. Reg. 50338, 50348 (stating "a patent is deemed to be relevant [for exclusivity purposes] until the end of the term of the patent or applicable 180-day period, whichever occurs first"). Because only subsequent applicants with valid paragraph IV certifications are blocked by 180-day exclusivity, and

because paragraph IV certifications cease to be accurate once the patent expires, the patent and 180-day exclusivity based on a paragraph IV certification to that patent cease to prevent approval of subsequent ANDAs once the patent expires.[7] See *Ranbaxy Labs., Ltd.* v. *Leavitt*, 469 F.3d 120, 126 (D.C. Cir. 2006)("[T]he first generic applicant may no longer retain exclusivity when the patent has expired.").

This plain language reading of the statute effectuates the statutory goals. The 180-day exclusivity provisions were drafted to give ANDA applicants an incentive to be first to challenge a listed patent and remove that patent as a barrier to approval. Once a listed patent expires and is no longer a barrier to ANDA approval, there is no longer a need to provide an incentive to challenge it in court. Thus, an expired patent does not serve as the basis for a 180-day exclusivity award and 180-day exclusivity does not extend beyond the life of the patent.

Mylan has argued that 21 U.S.C. § 355a(k) compels the conclusion that 180-day exclusivity extends beyond the date the patent expires. See Mylan comments at 7-8. That section provides that:

> If [180-day exclusivity period] overlaps with a 6-month [pediatric exclusivity] period . . ., so that the applicant for approval of a drug under section 505(j) entitled to the 180-day period under that section loses a portion of the 180-day period to which the applicant is entitled for the drug, the 180-day period shall be extended from
> > (1) the date on which the 180-day period would have expired by the number of days of overlap, if the 180-day period would, but for application of this subsection, expire after the 6-month exclusivity period; or
> > (2) the date on which the 6-month exclusivity period expires, by the number of days of the overlap if the 180-day period would, but for application of this subsection, expire during the six-month exclusivity period.

21 U.S.C. § 355a(k). On its face, this section is inapplicable here because Mylan is approved and is not subject to Pfizer's pediatric exclusivity and, thus, there is no 180-day exclusivity to restore. No commenters appear to contend otherwise.

Instead, Mylan argues that, by providing, in circumstances not applicable here, that 180-day exclusivity will follow pediatric exclusivity, Congress must have been assuming that 180-day exclusivity survives patent expiration. See Mylan comments at 7-8. If Mylan were correct, then section 355a(k) would conflict with FDA's longstanding understanding of the Hatch-Waxman statutory provisions governing 180-day exclusivity, as discussed above, which FDA believes to be compelled by the plain language of the statute. Thus, Mylan is essentially arguing that section 355a(k) repealed part of the Hatch-Waxman 180-day exclusivity provisions.

For one federal statute to repeal another:

---

[7] We note that if Mylan were correct and 180-day exclusivity continued to block approvals of ANDAs with paragraph IV certifications after the patent expired (essentially ignoring the automatic switch of the certifications to paragraph II), 180-day exclusivity would block ANDAs containing paragraph IV certification but not those containing paragraph III certifications under the plain language of 21 U.S.C § 355(j)(5)(B)(iv). This would have the perverse effect of punishing applicants who took the risk of challenging a patent with a paragraph IV certification in order to remove a barrier to approval and to reward those applicants who sat back and waited for the patent to expire. This result is clearly inconsistent with the intent and logic of Hatch-Waxman. Thus, the fact that section 355(j)(5)(B)(iv) by its terms blocks only ANDAs containing paragraph IV certifications -- the only ANDA that can be approved before the expiration of an applicable patent -- indicates that Congress did not intend exclusivity to extend beyond patent expiration.

> [T]he intention of the legislature to repeal must be clear and manifest. . . . In practical terms, this "cardinal rule" means that in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 189 (1978) (citations omitted). The "irreconcilable conflict" required is a conflict

> in the sense that there is a positive repugnancy between [the two statutes] or that they cannot mutually coexist. It is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem.

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (emphasis added). Here, there is no evidence that Congress ever affirmatively indicated that it intended to repeal or change the operation of the 180-day exclusivity provision in enacting section 355a(k).

Nor can Mylan show that the 180-day provisions in Hatch-Waxman and section 355a(k) are irreconcilable because it is possible to construe them in a way that they can mutually coexist. By its terms, section 355a(k) only addresses the curtailment of exclusivity to which the applicant is otherwise "entitled." As explained above, under Hatch-Waxman, the applicant is not entitled to exclusivity after the patent expires. That means, in reconciling the statutes, that the application of section 355a(k) is limited to the situation where there is more than one patent and the two exclusivity periods are each attached to different patents. Thus, one patent may expire, and pediatric exclusivity would start to run, but the ANDA applicant could still be eligible for 180-day exclusivity on a later patent that had not yet expired. If that 180-day exclusivity period were triggered by a court decision on the later patent, it would be running at the same time the ANDA was blocked from approval by the pediatric exclusivity on the earlier patent.

Indeed, the legislative history demonstrates that Congress intended to address this narrow situation by adding 21 U.S.C. § 355a(k) to restore the exclusivity to which the ANDA applicant was entitled but which otherwise would have been lost because the pediatric exclusivity on another patent blocked final effective approval:

> The amendment gives the filer of an [ANDA] who challenges a patent no more and no less time to market his drug exclusively before subsequent [ANDAs] for the drug may be approved then it would have received but for the intervening period of pediatric exclusivity.
> For example, the committee understands that there may be instances in which 2 patents on a drug are challenged in an [ANDA], and that, in subsequent litigation, a court holds the first patent to expire to be valid and infringed, and the second patent to expire to be invalid. If the section [355(b)(1), 21 U.S.C.] drug is granted a period of pediatric exclusivity with respect to the first patent, and if the court decision, which triggers the beginning of ANDA exclusivity, falls 60 days before that period of pediatric exclusivity begins (that is, 60 days before the first patent will expire), the ANDA exclusivity will overlap with the pediatric exclusivity for 120 days. In the absence of the pediatric exclusivity, the holder of the [ANDA] would enjoy at most 120 days to market its drug before a subsequent [ANDA] for the drug could be approved. But for the amendment, because of pediatric exclusivity, the holder of the [ANDA] would enjoy no ANDA exclusivity, because

the first 120 days of the pediatric exclusivity period would run over the last 120
days of its ANDA exclusivity period.

S. Rep. No. 107-79, at 6-7 (2001); see also *id.* at 14 ("[Section 9 of BPCA] specifies that, when
the pediatric exclusivity period for a drug overlaps with a period of ANDA exclusivity for the
drug, the period of ANDA exclusivity is extended by an amount necessary to ensure that the
holder of ANDA exclusivity enjoys the same possibility of exclusive commercial marketing as
that the holder would have enjoyed in the absence of pediatric exclusivity, no more and no
less."). This language confirms both that Congress intended only the limited application of
section 355a(k) and that this section can be construed consistently with the Hatch-Waxman
exclusivity provisions. Thus, "[b]ecause the statutes are not irreconcilable and there is no
convincing evidence that the later act was intended as a substitute, . . . . a repeal by implication
did not occur." *United States v. Williams*, 216 F.3d 1099, 1102 (D.C. Cir. 2000).

Furthermore, the statute also does not distinguish, as Mylan proposes, between situations in
which 180-day exclusivity has been awarded and triggered at the time of patent expiry and
cases in which it has not. See Mylan Comments at 12-14. Although Mylan correctly notes that
the obligation to update a patent certification only applies before the effective date of approval,
*id.* at 14; Mylan's Petition for Stay at 3, and thus approved applications (such as Mylan's) have
no continuing obligation to update their patent certifications, this does not mean that 180-day
exclusivity for an approved application extends beyond the date the patent expires. On the
contrary, if all of the remaining unapproved applications change to a paragraph II certification
when the patent expires, as they are required to do, they will no longer be applications
containing paragraph IV certifications that are blocked by the previous application containing a
paragraph IV certification. This is the case regardless of whether Mylan's application, which has
been approved, is also required to change its certification. As a result, because all unapproved
applications must change to a paragraph II certification when the patent expires, and
applications with paragraph II certifications are not blocked by 180-day exclusivity, for all intents
and purposes, Mylan's 180-day exclusivity will terminate with the expiration of the patent
regardless of the fact that Mylan itself is no longer obligated to change its certification upon
patent expiry.

Conclusion

In sum, FDA has concluded:

- All of the unapproved ANDAs are currently blocked by Pfizer's pediatric exclusivity.
- If and when the mandate effectuating the panel's March 22 decision issues in the
  *Apotex* case, Apotex's ANDA will not be blocked by Pfizer's pediatric exclusivity.
- FDA cannot determine on the current record whether other ANDAs will continue to be
  blocked by pediatric exclusivity at that time.
- Mylan's 180-day marketing exclusivity terminated when the patent expired.

13

If you have any questions regarding this letter please contact Cecelia Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs at 240-276-9319

Sincerely,

Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research
Food and Drug Administration

cc: Pfizer Inc.

14

# EXHIBIT B

LEXSEE 40 HARV J ON LEGIS 133

Copyright (c) 2003 President and Fellows of Harvard College
Harvard Journal on Legislation

Winter, 2003

*40 Harv. J. on Legis. 133*

**LENGTH:** 35720 words

NOTE: The Best Pharmaceuticals for Children Act of 2002: The Rise of the Voluntary Incentive Structure and Congressional Refusal to Require Pediatric Testing

**NAME:** LAUREN HAMMER BRESLOW *

**BIO:**

* Law Clerk to the Honorable Barbara S. Jones, United States District Judge for the Southern District of New York; Harvard College, A.B., 1998; Harvard Law School, J.D., 2002.

**SUMMARY:**

... In January of 2002, Congress passed the Best Pharmaceuticals for Children Act ("BPCA"), which was its second major attempt to increase the number of clinical tests performed on pediatric populations. ... Indeed, before passage of the FDAMA, few drugs were labeled for children, as neither Congress nor the Food and Drug Administration ("FDA") required pediatric testing of drugs, and drug companies rarely labeled drugs for children on their own. ... The FDA promulgated a final rule that provided that if a pharmaceutical company marketed a drug to children, it would need to include pediatric information on its label. ... Concerned about these gaps in the provision's incentive structure and trying to better balance pediatric labeling needs, children's vulnerability as test subjects, and the desirability of quick drug approval, the FDA promulgated the 1998 final rule. ... If, on the other hand, a manufacturer declines to perform a pediatric study or has already completed a study of one age group and has no incentive to complete another study, the BPCA sets up a fallback system for testing on that drug. ...

**HIGHLIGHT:** *On January 4, 2002, President Bush signed into law the Best Pharmaceuticals for Children Act, which is the government's most comprehensive legislation regarding pediatric research to date. The Act offers pharmaceutical companies a six-month exclusivity term in return for their agreement to conduct pediatric tests on drugs. It also provides public funding and organizes private funding to help conduct pediatric research on those drugs that pharmaceutical companies opt not to test in children. This Note reviews the history of pediatric research and traces the development of the Best Pharmaceuticals for Children Act's unique incentive and public funding structure. The Note contends that, while the Act is comprehensive and promotes important pediatric studies, its incentive structure forces consumers and taxpayers to bear the costs of testing pharmaceuticals in children instead of the manufacturers who research, develop, and market those drugs. Congress should consider mandating pediatric studies in any future enactment of the legislation.*

**TEXT:**

[*133] In January of 2002, Congress passed the Best Pharmaceuticals for Children Act ("BPCA"), which was its second major attempt to increase the number of clinical tests performed on pediatric populations. n1 Congress passed the BPCA in response to the modest success of its earlier effort to promote pediatric clinical testing, n2 the pediatric exclusivity provision of the Food and Drug Administration Modernization Act of 1997 ("FDAMA"). n3 With both the 1997 and 2002 efforts, Congress has attempted to address the dearth of information about the safety and effectiveness of

drugs that children commonly use. n4 Indeed, before passage of [*134] the FDAMA, few drugs were labeled for children, as neither Congress nor the Food and Drug Administration ("FDA") required pediatric testing of drugs, and drug companies rarely labeled drugs for children on their own. n5 A 1994 study found that six of the ten drugs most commonly prescribed to children had no pediatric labeling. n6

The 1997 pediatric exclusivity provision did not require manufacturers to conduct pediatric clinical testing, but rather offered incentives to manufacturers in order to encourage such testing on a voluntary basis. n7 If a manufacturer agreed to conduct pediatric tests on a drug, it would receive a six-month extension on a pre-existing patent or exclusivity term. n8 Likewise, the BPCA does not require pediatric testing, but it does go a step further than the 1997 legislation, establishing a two-tiered approach to ensure research of drugs used by pediatric populations. Under this approach, a manufacturer may again opt to test its own drug in pediatric clinical trials and thereby earn the additional six-month term. n9 If a manufacturer does not wish to perform such pediatric studies, the BPCA allots funds to enable the FDA to contract for the testing of those drugs for which it believes pediatric studies would be beneficial. n10

While the BPCA is a strong step forward for children's health, it comes at a significant price. The six-month patent extensions cost consumers hundreds of millions of dollars because of the delay in cheaper, generic drugs reaching the market. n11 In addition to the patent extensions, taxpayers will fund the drug studies that manufacturers refuse to conduct, which average about $ 3.87 million per drug. n12 For fiscal year 2002, Congress appropriated $ 200 million to that end. n13 For all other groups besides children--men, women, minority and ethnic groups--no such incentive structure or public funding is used to ensure adequate testing. n14 Instead, under the Food, Drug and Cosmetic Act pharmaceutical companies must complete safety and effectiveness tests on these groups as a condition of marketing their drugs. n15 This Note reviews the history of pediatric testing [*135] to determine why children have been separated from the mainstream of drug testing and how Congress came to implement a program for pediatric testing.

Part I considers the reasons pharmaceutical companies have avoided pediatric research. It suggests that the pharmaceutical industry avoided pediatric research to dissociate itself from a history of pediatric testing that exploited and abused children. In addition, pharmaceutical companies sought to avoid tort liability that might arise from adverse drug reactions in children, as well as the scientific and ethical challenges specific to pediatric testing.

As Part II recounts, until the 1990s, the government, including Congress and the FDA, allowed pharmaceutical companies to avoid pediatric testing. The FDA's regulations placed only minimal requirements on pharmaceutical companies regarding pediatric testing. The result was that by the late 1990s, few drugs were labeled for children, leading to an unsafe medical environment for children, especially severely ill children taking many drugs. n16

Part III discusses the FDA's efforts in the 1990s to address the lack of pediatric testing and labeling and reviews its attempt to bring pediatric studies into the mainstream of the Food, Drug, and Cosmetic Act. The FDAMA, however, continued to treat children as a special group of clinical subjects, refusing to mandate pediatric testing by the pharmaceutical industry. It also further separated children from adults by awarding pharmaceutical companies a patent or exclusivity extension for their decision to test in children.

Finally, Part IV addresses Congress's most recent enactment of pediatric testing legislation, the Best Pharmaceuticals for Children Act, which attempts to address many of the weaknesses of its 1997 predecessor, the FDAMA. Part IV concludes by arguing that Congress, under the BPCA, has continued to isolate children from mainstream research, and that this separation is costing taxpayers billions of dollars. Because the voluntary, incentive-based pediatric testing provision is unjust and costly, it should be reformed to allow for more stringent, cost-efficient regulation.

I. THE ISOLATION OF PEDIATRIC RESEARCH FROM THE MAINSTREAM OF CLINICAL TESTING

For much of American history, children were the primary subjects of clinical research. n17 Indeed, until the early 1970s, the government made [*136] few efforts to regulate pediatric testing. n18 Physicians often abused their clinical freedom, conducting tests on children that were exploitative and dangerous. n19 As a result of this exploitation, pediatric clinical testing acquired a negative connotation, pushing private pharmaceutical companies away from the field of pediatric research and drugs. n20 Other factors, such as the high legal costs of harming children, also turned companies away from research on pediatric drugs. n21 The result of pharmaceutical companies' avoidance of pediatric medicine was that by the 1990s few marketed drugs had been tested for safety and effectiveness in children.

*A. Pediatric Testing in the Nineteenth and Twentieth Centuries*

One barrier to pediatric testing is the negative connotation associated with it as a result of a history of abuses in the field. Some of the earliest medical testing was performed on orphans and the children of physicians, rendering them the

unprotected "guinea pigs" of a burgeoning field of medicines and vaccines. n22 The legal status of children contributed to their vulnerability to medical exploitation. Before the twentieth century, the law offered little protection to children, classifying them as chattel, property, and extensions of their parents. n23 Thus, childhood was not only dangerous because of rampant disease n24 but also because children had no legal recourse from abuse or abandonment, be it at home or under the care of a physician. n25

In the 1870s, public outrage regarding the treatment of children led to the creation of organizations dedicated to children's rights. n26 At the same time, medicine and medical societies began to recognize the needs of children as distinct. Children's hospitals began to open in major cities, n27 and in 1873, the American Medical Association ("AMA") established [*137] a separate division for women and children. n28 It would be almost fifty more years before the independent American Academy of Pediatrics was founded in 1930 to specifically promote children's welfare. n29

While pediatric drug testing did lead to the eventual advancement of children's health, the means used to achieve that end exploited the vulnerability of children. n30 In fact, the development of vaccines for diseases such as smallpox and measles can be credited to physicians who used their own children and institutionalized children as subjects. n31 Children were inoculated with potential vaccines and then purposefully exposed to virulent strands of disease. n32 In the late 1800s, Alfred F. Hess, drector of the Hebrew Infant Asylum of New York, explained that using institutionalized children as research subjects was a great benefit to science because "the standardized conditions in the asylum approximated those 'conditions which are insisted on in considering the course of experimental infection among laboratory animals, but which can rarely be controlled in a study of infection in man.'" n33

These experiments were often performed without parental consent, and activists began to protest against medical abuse that occurred when poor parents brought their children to public hospitals. n34 Nonetheless, well into the twentieth century, physicians continued to use children when testing drugs to treat diseases such as tuberculosis, scurvy, and rickets. n35 For example, Saul Krugman, a researcher associated with New York University, conducted hepatitis testing in severely mentally retarded children at Willowbrook State School from the 1950s through the 1970s. n36 While Krugman ostensibly obtained parental consent, these consents were later criticized for being coerced and uninformed. n37 Krugman had enticed parents to consent to the tests in exchange for a promise to aid [*138] their children's entrance into a better care facility. n38 Technological advances in medicine did not spare children either. Researchers used X-rays on children to learn more about digestion and metabolism, n39 and physicians experimented on children to determine the effectiveness of surgical procedures such as vivisections. n40

Other vulnerable groups such as African Americans and the elderly also suffered from exploitation. n41 It was the public exposure of this abuse that finally sparked sufficient public outrage to instigate legal change in the regulation of clinical studies. n42 In the *New England Journal of Medicine* in the late 1960s, Henry K. Beecher reported on twenty-two cases of clinical abuse in various age groups. n43 He highlighted two now-infamous studies: the Tuskegee study, in which black men were infected with syphilis over the course of forty years, and a cancer study conducted on elderly patients at the Jewish Chronic Disease Hospital. n44 At the same time, the American public and the international community increasingly accepted a definition of human rights that included control over one's body, which incorporated the right to decide whether to participate in a clinical study. n45

In the 1970s, the Department of Health, Education and Welfare (now the Department of Health and Human Services ("HHS")) finally responded to the call for clinical standards by issuing new rules on the testing of human subjects. n46 Children did not benefit from this surge in public support for protective clinical guidelines, however, since the rules applied primarily to adults. Then in 1974, Congress enacted the National Research Act, n47 which created the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research ("National Commission") to create standards for the testing in children. n48

[*139] It was another four years, however, before the National Commission made recommendations for pediatric clinical standards. n49 HHS reviewed these recommendations and published a notice in 1978 stating that it would start making rules regarding pediatric studies; n50 it did not publish final rules until 1983. n51 The rules, while establishing strict guidelines and protections for child subjects, applied only to children tested in studies funded or supported by HHS. n52 An earlier FDA proposed rule to govern all pediatric testing, public and private, had been withdrawn. n53 Some regulations addressing adult clinical testing, however, gave the FDA some measure of control over private testing in children. For example, the Internal Review Boards ("IRB's"), which are required for all clinical studies to oversee relevant ethical and research activities, n54 were required to remain especially cognizant of vulnerable groups such as pregnant women, children and those mentally incapable of consent. n55

The FDA also worked with The American Academy of Pediatricians ("AAP") to promulgate guidelines for private studies in 1977. n56 It was not until 2000, however, that Congress enacted the Children's Health Act of 2000 that required HHS to create rules specifically for testing children in private as well as public studies. n57 The final rules promulgated pursuant [*140] to the Children's Health Act of 2000, extended the rules governing HHS studies using children to any pediatric studies, public or private, within the jurisdiction of the FDA. n58 Despite these recent improvements in the regulation of pediatric studies, however, such studies have been left with a scarred reputation. It has become difficult to separate the notion of pediatric testing from unethical medicine. Accordingly, it is not surprising that pharmaceutical companies have opted to avoid pediatric testing.

### B. Liability in the Courtroom: The Costs of Harming Children and Fetuses

Risk of tort liability is a second barrier to adequate pediatric pharmaceutical testing. Drug manufacturers often cite the risk of liability as one of the most important reasons that they avoid a certain area of drug manufacturing. n59 In particular, manufacturers have faced great liability due to vaccines and drugs that have adversely affected children, including fetuses. n60 In the case of vaccines, the degree of liability was so extreme that Congress had to intervene to protect vaccine manufacturers in order to ensure a steady and safe vaccine supply. n61

The advent of vaccines and the subsequent national vaccination program has been considered one of the greatest public health programs in American history. n62 State governments, n63 with the strong endorsement of the federal government, mandated childhood immunizations for a variety of diseases before entrance into public school. n64 Indeed, government-mandated vaccines saved millions of children from death, painful disease, and disability. n65 Nonetheless, even when functioning as approved by the FDA, vaccines will predictably injure and kill a certain percentage of children. n66 In the 1950s and 1960s, companies faced product liability litigation as a result of adverse effects of vaccines in children. n67 By the 1970s and early 1980s, the crisis came to a head, as manufacturers claimed that they would not be able to maintain the vaccine industry if the federal government did not protect them from liability. n68 Between [*141] 1980 and 1985, plaintiffs sought $ 3.5 billion against vaccine manufacturers; the number of manufacturers of the diphtheria, tetanus, pertussis ("DPT") vaccine the most risky vaccine, fell from eight to two, and, by 1986, the national vaccine stockpile fell below the Centers for Disease Control's six-month supply recommendation. n69

In 1986, Congress passed the National Childhood Vaccine Injury Act ("NCVIA") in response to the looming crisis in the manufacture and supply of vaccines. n70 The Act established the National Vaccine Injury Compensation Program, n71 which was intended to protect the supply of vaccines, while at the same time ensuring that those who bore the costs of the adverse effects of testing were compensated in a timely and equitable matter. n72 To this end, the program sought to limit manufacturer liability while allowing for legitimate claimants to recover compensation through an administrative hearing. n73 Thus, Congress rescued manufacturers from an otherwise financially devastating flow of liability. Given that drug companies faced this kind of liability from a product that was approved by the FDA and actually credited with saving millions of lives, drug manufacturers greatly feared liability from a clinical test gone wrong. n74 They also avoided marketing drugs for children because of the potential risk. The vaccine lesson taught manufacturers that such an incident would be incredibly costly. n75

Another reason drug companies have avoided testing on children stems from tort liability with respect to women's reproductive systems. Drug manufacturers claim that the legal repercussions of marketing drugs that adversely affect women's reproductive health and their fetuses have served as inhibitors to advancement and improvement of contraceptive drugs and devices. n76 The most commonly cited examples are the cases of Thalidomide, DES, Dalkon Shield, and Bendectin. n77 Indeed, one study found that the primary source of all tort injury recoveries for women came from medical injuries, primarily those from defective reproductive [*142] drugs and devices. n78 Bearing out the claims of the industry, the National Academy of Science conducted a two-year study that concluded that United States pharmaceutical companies had "fled the field" of contraceptive research and development. n79 The study asserted that the exodus was directly related to the enormous tort liability that drug manufacturers faced in the field. n80 It noted that in the 1970s, eight firms were participating in the field of contraceptive drug development, but by the 1980s, the only company still actively participating was Ortho Pharmaceutical Corp. n81 The link between the contraceptive and vaccine cases was all too obvious to the pharmaceutical industry. n82 The industry would be resoundingly punished in the courtroom for injuring women's reproductive capabilities, their fetuses, or their children. Thus, the pharmaceutical industry generally sought to avoid pediatric liability by neither labeling nor marketing drugs for children.

### C. General Difficulties in Testing Children

In addition to the negative connotations of testing on children and the potential exposure to enormous liabilities, pediatric research has structural impediments that make it difficult to undertake. n83 First, the issue of consent is highly

complicated in the case of pediatric subjects. n84 The contemporary standard for voluntary, informed consent provides that [*143] potential adult research subjects must be made aware of the risks and side effects involved as well as alternative treatments available, but the standard leaves much freedom in the hands of researchers to create and subjects to participate in any degree of risk in a given study. n85

The 2001 regulations regarding clinical tests implemented a new set of rules to govern the ethics of testing and procurement of consent from children and their parents. n86 For any study including children, the IRB is charged with the task of ensuring that the child's assent and the parent's permission were informed. n87 This means that the IRB must consider the "ages, maturity, and psychological state of the children involved." n88 The IRB must also consider the degree of risk involved in a study in relation to the degree that study might directly benefit the child subject. n89 As risk increases, the IRB must ensure that the probability of direct benefit to the child subject increases. n90 The IRB may also consider other factors including the overall benefit of the study to the understanding of the given disease. n91

Designing pediatric studies and obtaining the consent of children and their parents is, therefore, a highly complicated process that must account for degrees of risk and individual maturity levels of potential subjects. The terms of a valid consent are not necessarily clear. n92 Moreover, there are many points in design and consent that could lead to malpractice and tort liability for the sponsoring pharmaceutical company. n93 [*144] Not only would this litigation be fact-intensive and costly, it could also generate damaging press coverage for that company.

Many other challenges also make pediatric testing unappealing to researchers. It is difficult to find consenting subjects. The pool of children with a given disease is smaller than the corresponding adult population, and the general unwillingness of parents to subject their children to tests limits children's availability. n94 Also, it is difficult to obtain patient compliance or collect data from young subjects. n95 Young children cannot always communicate their reactions or feelings well, and have limited patience, mood swings, and fatigue that can interfere with testing. n96

Furthermore, pharmacologic and pharmakinetic differences between children and adults necessitate that researchers develop special studies for child subjects. n97 Children's organs and metabolisms change rapidly throughout infancy and childhood, requiring adjustments for the rate of elimination of a drug from a child's system. n98

Thus, working with pediatric patients is both legally and technically more challenging than working with adults. n99 By opting not to perform pediatric studies, the companies could avoid the complex world of pediatric research, liability for drugs marketed for children, and complicated consent and scientific issues that could have led to high costs and legal liability. n100 These factors explain why children were excluded from mainstream pharmaceutical research and illustrate why children needed special regulatory and legislative attention.

### [*145]  *D. Children as Therapeutic Orphans and Pediatrician Outrage*

The fact that drug companies declined to market or label their drugs for the pediatric population did not prevent children from using those drugs on a regular basis. Coined "therapeutic orphans" because of the scarcity of pediatric drugs on the market, children have been forced to look to adult medicines for treatment. n101 In a practice called "off-label" prescribing, n102 pediatricians treat children's illnesses with medicines labeled for adults with the same affliction. n103 Such prescriptions are legal and are a part of mainstream medical practice. n104 Indeed, the AMA estimates that forty to sixty percent of all prescriptions are off-label. n105

Neither the FDCA nor the FDA regulates off-label prescriptions, although the FDA does monitor and may take action where a drug is prescribed on a widespread basis for an off-label indication. n106 The AMA, however, adopted guidelines to which physicians must conform in off-label practice. n107 The AMA uses the same standard that the FDA uses for drug approvals, permitting physicians to prescribe off-label when such a prescription is based on substantial medical evidence. n108 Substantial medical evidence is defined as "two or more adequate and well-controlled studies performed by experts qualified by scientific training and expertise." n109 The obvious problem, however, is that it takes a great deal of time for substantial medical evidence to accrue. For example, it might take years before sufficient dosing information for children becomes available in references such as journal articles and pediatric handbooks. n110

[*146] Unlike other areas of medicine in which some drugs might be prescribed off-label, pediatricians faced situations in which the majority of the drugs that they were prescribing to children were off-label, leaving children at continual risk of experiencing adverse reactions. n111 Some common childhood afflictions were, and still are in many cases, treated with pharmaceuticals without pediatric labeling. n112 These areas included depression, epilepsy, severe pain, gastrointestinal problems, allergies, and high blood pressure. n113 As the FDA explained in a 1992 proposed rule, the lack of labeling resulted in a situation in which pediatricians were forced to estimate proper dosages

arbitrarily based on the child's age, body weight, or body surface area without regard for the interaction of those factors or age-related physiological and biochemical factors. As a result, children may be exposed to an increased risk of adverse reactions, or decreased effectiveness of prescription drugs, or may be denied access to valuable therapeutic agents. n114

Pediatricians were worried they would improperly medicate their patients, n115 concerned about their own medical malpractice liability, n116 and angry that the FDA continued to fail to assist them in treating children. n117 As one physician complained, "We are operating in a vacuum . . . I might be able to treat [children's] cancer more aggressively, but I don't know how to safely do that." n118

[*147] Historical examples buttressed pediatrician claims that poor labeling endangered children. n119 One of the most recent examples occurred in 1999, where seven newborns were forced into surgery after being treated with erythromycin, a commonly prescribed antibiotic, because there was no pediatric label warning against use in newborns. n120 Indeed, infamous adverse reactions go back many years. For example, in the 1960s, the antibiotic chloramphenicol was given to newborns, but their livers were too immature to break it down, leading to "gray syndrome." n121 Twenty-three babies died as a result. n122 Children have also experienced teeth staining, seizures and cardiac arrest, and hazardous interactions between drugs while using drugs not labeled for pediatric use. n123

Using these examples as ammunition along with their own assertions that they felt ill-equipped to medicate childhood diseases, pediatricians pressed their case for better labeling. They argued that children could not be treated as "little adults"; they were different from adults, with their own set of metabolic and chemical designs. n124 Children, they argued, needed to be protected by special regulations that encouraged pediatric testing. n125

Through the early 1990s, however, the federal government was complicit in the pharmaceutical companies' decision to avoid pediatric research. As the following Part discusses, the FDA's early attempts to protect children from unsafe medicines focused on restricting pharmaceutical marketing and labeling and not on the frequency or accuracy of pediatric research. By the 1990s, much to the dismay of the FDA, the result was a dismal record of pediatric testing that endangered children instead of protecting them.

[*148] II. THE FDA'S EVOLVING ROLE AS THE PROTECTOR OF CHILDREN'S MEDICINE AND RESEARCH

The FDA did not initially require testing of new or marketed drugs on children. Through the 1990s, the FDA focused on ensuring that manufacturers did not label drugs for use on children unless they had first conducted pediatric tests to establish the drugs' safety and effectiveness in children. n126 While this policy served to protect children from false claims about drugs, it did little to ensure that there were sufficient numbers of drugs on the market that had been proven effective for children. n127 At the time that the FDA began to address the dearth of medicines tested for and marketed to children, only twenty percent of drugs were labeled for use in children n128 and six out of the ten leading drugs prescribed to children had never been tested in pediatric studies. n129

### A. A Brief History of the FDA and Its Initial Steps To Protect Children from Unsafe and Ineffective Drugs

The FDA's sluggishness in regulating pediatric testing and promoting a strong pediatric agenda is ironic given the considerable role that children played in both the birth and later empowerment of the FDA. n130 The tragic side effects of drugs on children propelled much of the legislation that led to the creation of the FDA in its modern incarnation. The first national statute dedicated to food and drug regulation was enacted after several children were killed from a diphtheria antitoxin that was infected with tetanus. n131 Subsequently, Congress enacted the Pure Food and Drug Act of 1906 ("PFDA"), which was the first legislation to prohibit misbranding and adulteration of drugs. n132 The PFDA created the Bureau of Chemistry to address the growing epidemic of unsanitary food production facilities and ineffective medicinal remedies marketed without regulation. n133 The Bureau was charged with removing ineffective [*149] drugs from the market if it could prove a given drug did not work and that the seller actually knew this to be the case. n134 With no authority to require pre-market testing of drugs, however, the Bureau was left without the power to prevent hazardous drugs from reaching the market. n135

A tragic result of this ill-conceived regulatory structure occurred in the 1937 "Elixir of Sulfanilamide" disaster. n136 In order to make the key element of sulfanilamide soluble, the manufacturer included diethylene glycol in the drug's formula. n137 Diethylene glycol, a solvent commonly used in antifreeze, had never been tested in humans. n138 In 1938, within two months of its being on the market, the formula caused fatal renal failure in over one hundred people, mostly children. n139

This disaster motivated Congress to take further action with respect to the safety of marketed drugs. n140 In 1938, Congress repealed the Pure Food and Drug Act and enacted the Federal Food, Drug, and Cosmetic Act ("FDCA"), which created the FDA. n141 The FDCA gave the FDA authority to monitor and control new drugs. The FDA was authorized to require a manufacturer to demonstrate the safety and effectiveness of its drugs before that manufacturer could market them. n142 Still, the provision was limited to those drugs that were not yet marketed, offering the FDA no power to control already marketed drugs. n143

It took another public health disaster involving children, however, before any significant changes were made to the FDCA. Senator Estes Kefauver (D-Tenn.) held hearings in the late 1950s and early 1960s to spark interest in strengthening the FDA, but his efforts did not receive great attention until the Thalidomide disaster in Europe. n144 In the late 1950s and early 1960s, women in Europe began to use Thalidomide to treat morning sickness. n145 Under the authority granted to the FDA by the FDCA, the examiner reviewing the Thalidomide application, refused to approve it because of the manufacturer's failure to provide certain evidence about the product's safety. n146 European women were not so fortunate, [*150] however, and Thalidomide caused severe deformities in thousands of babies. n147

With the knowledge that the FDA had saved thousands of children and their families from a lifetime of suffering, Senator Kefauver's hearings took on a new life, and, in 1962, resulted in major amendments to the FDCA. n148 The Kefauver-Harris Amendments, as the new legislation came to be known, n149 confirmed the FDA's authority to determine which drugs could be marketed and empowered the FDA to pull unsafe or ineffective drugs from the market. n150 Thus, the effects of drugs on children prompted some of the most important public health movements in congressional history. n151

Despite the fact that children served as the impetus for strengthening the FDA's authority over drugs, they hardly benefited from the new enabling legislation. n152 In fact, many critics later came to blame these regulations for the isolation of children from the mainstream of clinical research. n153 A pharmaceutical company could conduct clinical tests for a drug in adults and market that drug without ever considering that drug's effects on children.

In addition, as discussed in Part I, the FDA's earliest protections of children were regulations regarding the ethics of public clinical studies. n154 These regulations did not extend to private studies, nor did they require testing of drugs that were likely to be used in children. n155 Therefore, a manufacturer could claim a drug worked for children's illnesses despite the lack of a clinical foundation for this assertion.

[*151] In 1979, the FDA made its first effort to limit these claims by pharmaceutical companies. The FDA promulgated a final rule that provided that if a pharmaceutical company marketed a drug to children, it would need to include pediatric information on its label. n156 Such information would necessitate pediatric testing. n157 Any drug that had not been tested for safety and effectiveness in children would need to indicate as much on its label. n158

The FDA thought that this provision would prompt pediatric testing by drug manufacturers. n159 Instead, the opposite result ensued. Manufacturers simply chose to forego pediatric testing and use labels which stated that safety and effectiveness had not been established in children. n160 As admitted in a subsequent FDA proposed rule, the 1979 rule failed to improve pediatric research or health. n161 Despite being an attempt to protect children, the FDA regulation actually combined with historical pressures to reinforce the lack of pediatric testing.

## B. The FDA Takes Steps To Promote Pediatric Labeling

In the 1990s, David Kessler, then FDA Commissioner, began to respond to pediatricians' concerns that children were therapeutic orphans in need of direct assistance from the FDA. n162 In 1992, the FDA proposed a rule that sought to revise and augment its 1979 predecessor concerning pediatric labeling. n163 The FDA was concerned that pharmaceutical companies were choosing labels without pediatric safety and effectiveness levels because they believed that in order to label a drug for children they would have to actually perform clinical testing in children. n164 The proposed rule sought to eliminate this misunderstanding by stating that a manufacturer did not necessarily have to complete pediatric clinical tests to qualify for a pediatric label. n165 In 1994, the final rule ("1994 rule") was [*152] published in the hopes that it would increase pediatric labeling and offer pediatricians "more reliable information." n166

Under the 1994 rule, pharmaceutical companies could use "adequate and well-controlled" adult studies in addition to pharmacokinetic, safety, and pharmacodynamic data to satisfy the pediatric labeling requirements. n167 While the 1994 rule did not make any new testing mandatory, it did require companies to review their existing data to determine if they could lead to pediatric information. n168 The 1994 rule maintained the requirement that any manufacturer who did not submit valid information regarding pediatric safety and effectiveness include a disclaimer on its labels stating that the drug had not been tested for safety and effectiveness in children. n169 The FDA hoped that this easing of pediatric

labeling standards would provide an incentive for pharmaceutical companies to assemble data and avoid the disclaimer label. n170

In addition, in the 1994 rule, the FDA noted that although it was not requiring pediatric testing for new drugs, it could have chosen to do so. n171 Along these lines, the general comments of the 1994 rule explain that the FDA may require new drug application holders to submit studies to determine whether the drug can be safely and effectively used in populations likely to receive it. n172 By explicitly letting manufacturers know that it was not taking advantage of its full authority under this new rule, the FDA went further than ever in stating its authority to require pediatric testing. n173 The FDA anticipated that this assertion of authority would inspire--and perhaps warn--drug sponsors to change their approach to pediatric labeling. n174

To the dismay of the FDA and pediatricians, the 1994 rule did little to encourage pharmaceutical companies to label for pediatric populations. n175 As pharmaceutical companies faced few repercussions for refusing [*153] to submit pediatric data, the FDA's rules again served only to further solidify the industry's ability to use a disclaimer and avoid pediatric research. n176 As a result, neither patent nor generic manufacturers made significant strides toward changing labels to reflect pediatric data.

It was not for the FDA's lack of effort that manufacturers failed to respond to the 1994 rule's call. The FDA's Center for Drug Evaluation and Research ("CDER") identified the ten drugs most commonly prescribed to children and requested that the manufacturers of such drugs adhere to the 1994 rule by reviewing their literature. n177 Few of the manufacturers complied. n178 While the FDA had received seven promises to conduct post-approval testing, by 1996, only one manufacturer had reported any results. n179 The FDA faced similarly poor results with new drugs, despite the fact that the 1994 rule expected the manufacturers of such drugs to consider pediatric labeling. In 1996, only thirty-seven percent of the new molecular entities likely to be used in children had pediatric labels pending approval. n180 The FDA's voluntary rule was considered a failure, and the FDA decided that it would need to take a more radical approach if it was going to improve the state of pediatric medicine. n181 Consequently, in 1997, the FDA proposed a new rule, under which the FDA would require the pediatric testing of new and marketed drugs. n182 There were three main parts to the 1997 proposal, all of which made it, in some form, into the 1998 final rule. First, the rule would apply to both new and marketed drugs, including biological products that were widely used in pediatric patients or indicated or prescribed for very significant or life threatening illnesses. n183 Second, the FDA would be able to require [*154] information for all pediatric sub-populations, from neonates to teenagers, according to the actual use of the drug. n184

Finally, the rule would allow both partial and full waiver of pediatric testing in certain products as well as deferment of such tests if appropriate in light of the need to release the drug to adult populations. n185 A company could receive a full waiver where studies on children were impossible or highly impractical, or where there was evidence that a drug would be ineffective or unsafe for children. n186 The FDA would grant a partial waiver when at least three conditions were satisfied: (1) the drug was not for a serious or life-threatening disease; (2) the drug was not likely to be used by a substantial number of patients in the age group in question; and (3) the applicant was able to demonstrate that reasonable attempts to make a pediatric formulation had failed. n187

This proposed rule was far more aggressive than its passive predecessors in procuring pediatric testing. Rather than forcing the FDA to cajole manufacturers into tests, manufacturers now had to proactively demonstrate why they should not have to conduct pediatric testing. This groundbreaking proposal would elevate children from their status as therapeutic orphans and exploited clinical subjects. The pharmaceutical industry protested the proposed rule, claiming that it was neither legal nor necessary. n188

Before the FDA finalized its rule, however, Congress enacted the FDAMA, bringing about a sweeping reform of the FDCA. n189 This legislation changed the landscape of pediatric testing.

III. THE CREATION OF "PEDIATRIC EXCLUSIVITY" AND ITS IMPACT ON PEDIATRIC TESTING

The FDAMA overhauled the FDCA. n190 One of the most radical additions was Section 111, the Better Pharmaceuticals for Children Act, which was codified as the pediatric exclusivity provision. n191 The pediatric exclusivity provision sought to promote pediatric labeling by offering pharmaceutical companies a six-month extension in their patent or exclusivity period on a particular drug in exchange for conducting a pediatric [*155] study of that drug. n192 The provision was limited in scope as it was voluntary and affected only those companies that had drugs on patent or in an exclusivity term. n193 While most viewed the provision as a success for pediatric health, even the provision's most ardent supporters recognized its limitations and sought reforms. n194 This Part reviews the components of the provi-

sion, how it affected the 1997 proposed rule, and what its supporters and critics believed to be its strengths and weaknesses.

*A. The FDAMA's Pediatric Exclusivity Provision and the FDA's 1998 Final Rule*

*1. The Food and Drug Administration Modernization Act's Pediatric Exclusivity Provision*

The FDAMA's pediatric exclusivity provision is quite limited in length, but had an enormous impact on pediatric health. Although it did not require pediatric testing, an important incentive it did provide was that a manufacturer could extend its patent or exclusivity term for a new or already marketed drug by six months by conducting pediatric tests. n195 While the provision aimed to increase pediatric labeling, it did not require a label change for the six-month extension to commence. n196 The tests only needed to be completed. n197 The six-month extension was a financial boom for manufacturers. For example, pharmaceutical company Schering-Plough, faced with no competition from generic drugs, earned an additional $ 975 million in sales during the six-month patent extension on its drug Claritin. n198

The provision outlined the procedure by which a drug company could procure the extension. n199 The FDA n200 was to issue a written request for a pediatric study to any manufacturer of a new or already marketed drug either on-patent or on its exclusivity term under the Drug Competition [*156] and Patent Term Restoration Act of 1984 ("Wax-man-Hatch Act"). n201 If the manufacturer agreed to the request and completes its pediatric studies for the drug within the requested timeframe, the six-month extension automatically began. n202 If the manufacturer wanted to perform the study but did not like the terms of the written request, it could negotiate with the FDA for different terms and come to a "written agreement." n203 In practice, manufacturers were held to higher standards in completing terms of written agreements as opposed to written requests, and it was actually more difficult for the manufacturer to meet its burden under the written agreement protocols. n204 In addition to making these agreements, the provision instructed the FDA to "develop [a] list of drugs for which additional pediatric information may be beneficial." n205 A drug did not need to be included on the list to be eligible for the exclusivity term subject to pediatric studies. n206

Significantly, Congress included a section in the provision entitled "Relationship to Regulations." n207 In this section, Congress stated that if any rule promulgated by the Secretary of HHS required a manufacturer to complete a pediatric study and the required study met the "completeness, timeliness, and other requirements of this section, such study shall be deemed to satisfy the requirement for market exclusivity." n208 The Senate report explained that even though the Senate chose to make the legislative provision voluntary, it had supported the FDA's policy toward pediatric [*157] testing thus far. n209 The Report remarked that the FDA's regulations "are clearly steps in the right direction, and the committee commends the FDA's initiatives in this area." n210 The language suggested support for further regulation along the lines of the 1997 proposed rule.

Thus, the "Relationship to Regulations" section ensured that the FDA could continue to make regulations that were broader than the congressional provision. n211 The only distinction would be that any manufacturer that satisfied the broader regulation and, thereby, satisfied the requirements of the Act, would benefit from a six-month patent or exclusivity extension, just like a manufacturer that voluntarily complied with the provision. n212 Congress avoided the controversial step of requiring pediatric studies while, at the same time, approving the authority of HHS to create regulations that promoted the policy of pediatric labeling. n213

Despite these steps, Congress remained uncertain about whether a voluntary structure would be successful. The Senate referred to the voluntary provision as "a modest step toward a better resolution of [the] problem" of limited pediatric research and labeling. n214 Thus, Congress created some precautions to ensure that the legislation would be evaluated and reviewed. It instituted a provision requiring the Secretary of HHS to study and report on the "effectiveness of the program," the "adequacy of the incentive," the "economic impact of the program on taxpayers and consumers," and to make "suggestions for modification" by January [*158] 1, 2001. n215 Congress also included a January 1, 2002 sunset clause for the pediatric exclusivity provision. n216

Upon implementation, the FDA broadly interpreted the incentive structure in the provision, maintaining that the six-month extension attached to the active moiety studied, n217 rather than just the drug. n218 Thus, a manufacturer could conduct a pediatric study in a drug with an active moiety and then receive a patent extension for all the drugs that used that active moiety. n219 The FDA believed that this interpretation was in tune with the purpose and language of the statute and was necessary to give effect to the incentive structure of the statute. n220 By applying the six-month extension to all the drugs that used a particular active moiety, the FDA attempted to further induce manufacturers to conduct studies because they would now be able to tap into an adult market in addition to the pediatric market, augmenting sales. n221

Accordingly, by April of 2001, the FDA "issued [a total of] 188 written requests covering 155 drugs already on the market and 33 new drugs not yet approved." n222 These requests reached a broad range of drugs, ranging from those for cardiovascular disease and cancer to dermatological and dental treatments. n223 Despite the number of requests, [*159] however, only twenty-eight drugs were granted exclusivity periods. n224 While most of these twenty-eight did result in a labeling change of some degree, only 37.5% of those pediatric labels resulted in a significant change in safety or dosing. n225 By the reauthorization discussions in 2001, only twenty-five percent of drugs had been studied in children--a five percent increase from the 1994 statistic. n226 Thus, while the pediatric incentive of the FDAMA sparked activity, it did not accomplish a sweeping change in the number of drugs with pediatric labeling. n227

### 2. The 1998 Final Rule

As the FDA and the pharmaceutical industry negotiated the terms of a voluntary testing process, the FDA contemporaneously pursued rules that would make such testing mandatory. In the 1998 final rule, a modestly adapted version of the 1997 proposed rule, the FDA recognized the enactment of the FDAMA's pediatric exclusivity provision as an intervening event, but it did not believe that the provision should alter its present course of regulation. n228 The FDA believed that the FDAMA "specifically recognize[d the] FDA's intention to require pediatric studies by regulation" and extended the six months to any manufacturer who satisfied provisions of the FDAMA in satisfying FDA regulations. n229 Without such regulations, the FDA explained, the FDAMA would not provide a comprehensive policy with respect to pediatric labeling. n230 For example, the FDA noted that the FDAMA's incentives were insufficient to promote studies in smaller markets and in younger pediatric groups that are more [*160] difficult to test. n231 Additionally, the provision provided no incentive for manufacturers to study more than one age group for a given drug because any further studies would not result in a subsequent extension of the manufacturer's patent or exclusivity term. n232 Concerned about these gaps in the provision's incentive structure and trying to better balance pediatric labeling needs, children's vulnerability as test subjects, and the desirability of quick drug approval, the FDA promulgated the 1998 final rule.

The 1998 final rule empowered the FDA to require pediatric testing of already marketed drugs and instituted a presumption favoring pediatric testing and labeling for new drugs. The first part of the 1998 final rule addressed already marketed drugs. Under the rule, the FDA could require testing for products used by a substantial number of pediatric patients n233 or products that provided a meaningful therapeutic benefit n234 over an existing treatment for pediatric patients. n235 A pharmaceutical company could request a full or partial waiver under certain circumstances where the company could show good cause for not performing the tests. n236 A full waiver would be granted where the necessary studies would be "impossible or highly impractical" or where there was "evidence strongly suggesting that the product would be ineffective or unsafe in all pediatric age groups." n237 The manufacturer could seek a partial waiver for a specific sub-population for similar reasons. n238 Unlike the voluntary 1994 final rule and the FDAMA, the 1998 final rule authorized the FDA to punish manufacturers for noncompliance by deeming an existing drug misbranded or a new drug an unlicensed biologic. n239

[*161] The 1998 final rule also established strict protocols for new drug applications with respect to pediatric testing. n240 Under the rule, each application for a new drug n241 needed to contain data that were "adequate to assess the safety and effectiveness of the drug product for the claimed indications in all relevant pediatric sub-populations." n242 The 1998 final rule, therefore, was distinct from both the 1994 proposed rule and the FDAMA pediatric exclusivity provision in that the FDA could require tests before the drug hit the market in *all* age groups, including those extremely young age groups, such as neonates, that manufacturers had particularly avoided. n243 The rule provided a waiver structure similar to that for already marketed drugs, n244 and it also contained a deferral clause, under which manufacturers could seek to defer pediatric studies until after the drug had been approved for adults. n245 The main reason for the deferral provision was that the FDA did not want to prevent adults from accessing beneficial drugs while pharmaceutical companies focused on pediatric studies. n246 The 1998 final rule, therefore, attempted to balance the medical needs of children and adults.

Many considered the 1998 final rule to be a great victory. As the Executive Director of the Pediatric AIDS Foundation, an organization active in the campaign for pediatric clinical testing, explained, "we see the rule as a real victory . . . . For too long, children have been seen as an afterthought, with so many drugs not available to them. A child is not just half an adult to be given half the adult dose." n247 Others maintained, however, that the FDA did not have the authority to require that private companies test their drugs in children, n248 especially when the drugs at issue were not intended for children. n249 This claim rested on the assertion that the FDA could not predict what customary or usual uses of the involved drug would come to pass. n250

To support the historic and legal argument that the FDA could not require testing without congressional authorization, industry advocates pointed to a 1992 statement made by former FDA Commissioner David [*162] Kessler that the FDA did not have the authority to require a manufacturer to complete pediatric tests if the manufacturer did not indicate that the drug would be used by children. n251 They also argued that the FDA was bound by its previous voluntary approach to pediatric testing. Some of these opponents of the rule filed suit against the FDA, claiming that it had overstepped the bounds of the FDAMA. n252

The FDA vigorously defended the 1998 final rule. In the "Legal Authority" section of the rule, the FDA justified its departure from Kessler's statement, arguing in part that "statements made in speeches, even by Commissioners, are informal expressions of opinion and do not constitute a formal agency position . . . [and] are not binding on the agency." n253 The FDA also pointed to its explanations in the 1992 and 1997 proposed rules and the 1994 final rule to demonstrate that the 1998 final rule did not suggest a drastic change in the FDA's interpretation of the FDAMA. n254

Before 2002, it seemed as though the FDA had strong arguments in favor of its position based on the generous language of the FDAMA's Senate Report. n255 The reauthorization of the pediatric exclusivity provision in 2002, however, greatly transformed the law of pediatric clinical research and added another dimension to the litigation regarding the 1998 final rule. n256 The numerous and comprehensive changes to the pediatric exclusivity provision were the result of heated debate among critics and supporters of the provision as to how and whether the provision should be reauthorized.

### B. The Successes of FDAMA's Pediatric Exclusivity Provision

In general, pediatricians, politicians, and children's health advocates have applauded the results of the pediatric exclusivity provision. n257 As Dr. Myron Genel of the American Pediatric Association told the Senate Committee on Health, Education, Labor, and Pensions in 1999, "rarely is [*163] it possible to witness such dramatic advances in such a short time." n258 Dr. Robert Ward, speaking on behalf of the American Academy of Pediatricians, noted that the numbers proved the success of the FDAMA's pediatric exclusivity provision: the FDA granted twenty-eight products exclusivity and eighteen of those contained new dosage, safety, or adverse event-reporting information. n259 In contrast to the seven years before the enactment of the FDAMA in which only eleven studies were completed, n260 these numbers were impressive. Indeed, the FDA itself reported that the "pediatric exclusivity provision has done more to generate clinical studies and useful prescribing information for the pediatric population than any other regulatory or legislative process to date." n261 Even pharmaceutical groups commended the legislation for inspiring them to undertake the complicated task of pediatric clinical research, admitting that prior federal regulations had done little to accomplish this end. n262

Although some critics claimed that the incentive program was too costly, many pediatricians condemned the notion of putting any price tag on children's health. n263 Dr. Ward testified that while pharmaceutical groups may have benefited from the program, "the greatest windfall has been in the area of pediatric research and information now available for pediatricians . . . . Dollars and cents arguments can not adequately provide the evidence of the effectiveness or importance of this program." n264 In fact, some patient advocacy groups felt that the extension was not a sufficient incentive and wanted Congress to allow even longer exclusivity terms in some cases. n265 The importance of the provision is even clearer in light of claims by pharmaceutical groups that, but for the six-month incentive, they might not have conducted the work entailed in assembling a study to meet the guidelines for pediatric labeling. n266

[*164] New pediatric labels were not the only signs of robust pediatric research activities. n267 Since the enactment of the FDAMA, the infrastructure for pediatric testing has grown dramatically. For example, the National Institute for Children's Health and Development ("NICHD"), which often works in conjunction with pharmaceutical companies, enlarged its pediatric testing capacity from seven to thirteen units to meet the demand for more pediatric studies. n268 This increase in the number of studies has resulted in more researchers being prepared to conduct pediatric studies and has generally furthered the science of pediatric research. n269 Moreover, in its report to Congress, the FDA estimated the savings that increased pediatric research would offer. The FDA conducted a study of five serious illnesses in which the hospitalization rates were much higher for children than adults. n270 It attributed a substantial portion of this higher hospitalization rate for children to the lack of informed drug treatment. n271 The FDA concluded that if this disparity could be reduced by just twenty-five percent, the populace would save $ 228 million annually. n272 Thus, the FDA argued that the cost of any effort to conduct pediatric studies must be viewed in light of the health care savings that such studies would produce. n273 An overwhelming consensus emerged among supporters of pediatric testing that Congress should not risk modifying and potentially ruining the exclusivity program. n274

Moreover, many felt the voluntary program was the proper approach to pediatric testing. n275 The incentive gave companies more liberty to choose an approach best suited to them. n276 It also helped the drug industry to overcome the financial barriers in testing drugs that would be marketed to smaller markets. n277 Dr. Stephen Spielberg, Vice-President of the [*165] Jansen Research Foundation and a spokesperson for the Pharmaceutical Research and Manufacturers of America, explained that the incentives created an environment that promoted pediatric studies by the government's showing increased favor for companies that conducted them. n278 He reasoned that even if the biggest money-making drugs, or "blockbuster drugs," are tested before drugs for smaller markets, the overall effect of increased studies would be to create a stronger pediatric research environment. n279

### C. Criticisms of the Pediatric Exclusivity Provision and Suggestions for Reform

The pediatric exclusivity provision had numerous problems that even its most ardent supporters recognized. n280 In the introductory section of the 1998 final rule, the FDA noted, for example, that the provision did not promote study in more than one age group per drug and that it failed to give incentives to manufacturers of drugs that reached small markets or that were already off-patent. n281 As January 1, 2002, the sunset date, approached, criticism of the pediatric exclusivity provision became more intense and better defined. n282

Concerns about the provision fell into four main categories: (1) its failure to address off-patent and off-exclusivity drugs, (2) the pharmaceutical companies' "windfall" from extended patent terms, (3) its failure to ensure testing in smaller markets such as neonates, and (4) its limited capacity to ensure pediatric labeling and dissemination of information. n283

### [*166] 1. The Provision's Failure To Address Off-Patent and Off-Exclusivity Drugs

The lack of incentive for off-patent and off-exclusivity drugs n284 was a major area of concern, since pharmaceutical companies lacked incentives to research these drugs. n285 There was nothing in the provision that independently promoted the research of off-patent drugs. n286 This lack of incentive had huge implications for children's medicine as six of the ten drugs most widely prescribed to children were older antibiotics n287 that would not be included in the incentive structure. n288 Members of Congress began calling for reform, citing these drugs and others such as Ritalin--a drug that had not been tested for children but is commonly prescribed to children with Attention Deficit Disorder--as proof that the pediatric exclusivity provision needed to be reformed. n289

Some members of Congress advocated the codification of the 1998 rule, which would address this problem. A significant reform proposal that received broad, though tentative, support, codification of the 1998 final rule would confirm the FDA's power to require pediatric testing without financial incentives. n290 Many supporters of the rule, however, [*167] feared that the pharmaceutical industry would kill a bill that codified the rule. n291

Some consumer groups, on the other hand, suggested a combined requirement and incentive approach. n292 For example, Public Citizen Congress Watch requested that Congress allow the FDA to require exclusivity for new drugs and already marketed, on-patent drugs without the reward of an extra exclusivity term. n293 For on-patent drugs used for off-label purposes, Public Citizen Congress Watch recommended giving the FDA authority to require pediatric studies in exchange for a patent extension, with a limitation on that extension for blockbuster drugs. n294

A transfer mechanism was another, less radical, alternative offered to reach off-patent and off-exclusivity drugs. n295 A pharmaceutical company could perform a pediatric clinical study on an off-patent drug, thereby earning a six-month credit, which it could attach to one of its on-patent drugs. n296 These options, while not ultimately adopted, demonstrate the creative ways that policymakers attempted to reform the exclusivity provision.

### 2. The Pharmaceutical Companies' "Windfall" from Extended Patent Terms

A second major concern was that the provision was paying drug manufacturers too much to perform studies they should have done in the first place--pharmaceutical companies received a windfall. n297 Estimates as to the cost of conducting a pediatric test vary. The NICHD estimates that safety and effectiveness studies in children can cost from $ 1 million to $ 7 million. n298 Pharmaceutical Research and Manufacturers of America, a pharmaceutical lobbying group, estimates the cost at anywhere from $ 5 to $ 35 million. n299 A Tufts-based group, whose numbers are often cited, places the cost at an average of $ 3.87 million. n300

[*168] The payout for a six-month extension, on the other hand, often far exceeds these numbers. For example, the *Wall Street Journal* calculated the additional revenue for six drugs granted exclusivity, estimating their gains to be as follows: Claritin $ 975 million, Prozac $ 831 million, Glucophage $ 648 million, Pepcid $ 290 million, Vasotec $ 318

million, and Buspar $ 284 million. n301 In the case of Prilosec, its pediatric clinical study cost between $ 2 and $ 4 million, but it earned $ 1.4 billion during its six-month extension. n302 This 36,000% return on an investment in medical research n303 should be contrasted with the entire 2002 budget for the NICHD of $ 1.1 billion. n304 The FDA performed a cost study of the pediatric exclusivity provision and found that the six-month patent and exclusivity extension would cost American consumers $ 13.9 billion over the next twenty years. n305 The present value of that amount using Office of Management and Budget standards is about $ 7.2 billion over the next twenty years. n306 Many children's advocates, politicians, and consumer advocates argued that this was simply too great a windfall for the pharmaceutical industry, already the wealthiest in the nation. n307

Critics further argued that these costs disproportionately burdened the generic industry and its primary consumers, the elderly. n308 The total cost of the program on an annual basis was $ 695 million, which amounted to half a percent of the nation's pharmaceutical bill. n309 The [*169] FDA predicts that the government will pay for twenty-one percent of this extra burden, while the private sector will pay for seventy-nine percent. n310 According to generic drug manufacturers, the increased costs will affect the elderly more than any other group. n311 As Public Citizen Congress Watch points out, to a senior taking three of the most popular drugs, the increase will seem more costly than half a percent of his budget. n312 As for the generic companies, they will lose $ 10.7 billion in new sales over twenty years, and they could potentially lose up to $ 48 million a year in unrealized profits. n313 Furthermore, the biggest critics of the program charged that the provision paid pharmaceutical companies to release pediatric information that they already had or that they should have acquired on their own accord. n314

To address these concerns, legislators and consumer advocates proffered various proposals as alternatives to the six-month incentive structure. One idea that received broad support and endorsements from Senators Ted Kennedy (D-Mass.) and Hillary Rodham Clinton (D-N.Y.) was the "tiered approach." n315 Under this approach, the term of the extension would be limited by how much money the drug grossed. n316 A simpler version of the reduced-incentive approach would target the blockbuster drugs alone, reducing the provision's extension to drugs that would earn over $ 800 million in sales during the extension. n317 Senator Christopher Dodd (D-Conn.) argued, however, that this approach would result in litigation, as manufacturers and the FDA would argue over how much a drug would actually earn in a given time period. n318 Another approach, touted by the generic industry and Donna Shalala, the former Secretary of HHS, was to award a tax-credit to manufacturers who conducted pediatric studies. n319 Some thought that only a government guarantee of a 100% [*170] return on investment would provide enough incentive. n320 This approach, however, was criticized both for providing too little incentive to conduct tests and for being impractical because the money for such reimbursements would have to come out of taxpayer dollars. n321 Finally, some members of the generic drug industry advocated attaching exclusivity only to the drug studied rather than the active moiety studied, but few beyond the generic industry supported this approach. n322

### 3. The Provision's Failure To Ensure Testing in Smaller Markets Such as Neonates

Critics also focused on the lack of attention that the pediatric exclusivity provision gave to smaller market drugs, which tended to include drugs for neonates. n323 Neonates were rarely studied as a result of the provision's limited opportunity for a second exclusivity term. n324 In order to establish a safe study for neonates, information usually must be gathered from older pediatric age groups first. n325 Once a pharmaceutical company performed a study in any pediatric age group and it received its six-month extension, however, it had little incentive to study other age groups since the provision provided no extra incentives. n326

Many critics of the provision also felt that the incentive structure prompted drug companies to study only blockbuster drugs that would garner the greatest profits in six months, as opposed to lesser selling drugs. n327 Proponents disputed this analysis, arguing that only two of the seventeen drugs that were labeled for children under the exclusivity provision had sales of greater than $ 1 billion. n328 Public Citizen Congress [*171] Watch, however, claims that blockbuster drugs comprise an increasing number of pediatric exclusivity extensions, estimating that fifteen of nineteen of the drugs with over $ 1 billion in sales in 2000 were likely to seek and receive extensions. n329

To address this problem, Public Citizen Congress Watch advocated codification of the 1998 final rule, which would allow the FDA to require testing in smaller markets. On the opposite side of the spectrum, some reformers sought to introduce mechanisms to promote testing of drugs in neonates through secondary periods of exclusivity. n330 For example, Senator Kit Bond (R-Mo.) proposed an additional three month period of exclusivity for those drugs that were tested in neonatal populations. n331

### 4. The Provision's Limited Capacity To Ensure Pediatric Labeling and Dissemination of Information

The pediatric exclusivity provision did not require that labels actually be changed. n332 The provision stated that the six-month extension on a drug's patent or exclusivity period begins when the pharmaceutical company satisfies the research requirements of the written request or agreement. n333 The pharmaceutical company did not have to change its labels for the extension to activate. n334 In fact, if the required testing produced no new labeling information, the FDA had the freedom to grant an extension without requiring a change to the pediatric label. n335 The provision left pharmaceutical companies with little incentive to assent to labeling changes in a timely matter. n336 The General Accounting Office ("GAO") found that, on average, it took nine months for the FDA and drug manufacturers to agree on labeling changes. n337 Moreover, the FDA reported great difficulty in convincing drug manufacturers to list "unfavorable pediatric research results" on their drug labels. n338

This situation disturbed many, as it appeared that drug companies were merely taking advantage of a loophole in the legislation to avoid releasing important information about the hazards of their drugs to parents and their physicians. Representative Bart Stupak (D-Mich.), an active [*172] advocate for strengthening the provision, n339 was outraged by what he believed to be the pharmaceutical companies' foot-dragging. n340 Indeed, two of the companies that grossed the most in their six-month patent extensions were Astra Zenaca for Prilosec ($ 1.4 billion) and Eli Lilly for Prozac ($ 900 million). n341 Neither drug changed its labeling as a result of the pediatric studies. n342

Thus, Stupak, along with others in the House and Senate, the AAP, the FDA, and consumer groups, called on Congress to tie labeling changes to the grant of exclusivity. n343 They sought to condition the six-month extension on the manufacturer's compliance with the FDA's labeling recommendations. n344 Still, others feared that such a conditional approach would lead to less research since drug companies that predicted that their clinical tests would result in no labeling changes or detrimental changes would decide not to conduct the research. n345

### 5. Other Concerns

Other critics noted smaller problems with the pediatric exclusivity provision. For example, the FDA and industry members generally regarded the list of additional drugs needing pediatric testing required by the provision as a waste of the FDA's time, since it produced so few studies. n346 Additionally, the FDA protested that it was underfunded and [*173] understaffed. n347 Also, some drug companies were attempting to exploit loopholes in the provision to obtain a three-year exclusivity extension based upon a combination of the pediatric exclusivity provision and the Waxman-Hatch exclusivity provision. n348 Both supporters and opponents of this position wanted this issue clarified in the reauthorized legislation. n349 The pediatric exclusivity provision's strongest advocates and critics sought ways to improve the provision, hoping to strengthen it without harming its political viability. n350

As the January 1, 2002, deadline for reauthorization drew near, the BPCA began to crystallize, responding to many of the aforementioned concerns. Significantly, it addresses most of the major concerns without modifying the six-month incentive structure. As the following Partwill show, Congress adopted other financial and regulatory measures to meet some of the concerns about the FDAMA's exclusivity provision.

## IV. THE REAUTHORIZATION OF THE PEDIATRIC EXCLUSIVITY PROVISION, AN OVERHAUL WITHIN THE INCENTIVE STRUCTURE

The BPCA is a greatly matured successor to the original pediatric exclusivity provision of the FDAMA. n351 The new legislation, which passed resoundingly in both houses of Congress, n352 will undoubtedly transform the field of pediatric studies, as it both addresses the testing of [*174] off-patent drugs and on-patent drugs that pharmaceutical companies decline to test, and it expedites labeling changes. Nonetheless, it still retains many of the policy and ethical tensions of the original legislation. As this Partwill demonstrate, while Congress has sought to protect as many groups of children as possible through the BPCA, its insistence on an incentive-based system and its reluctance to require manufacturers to conduct pediatric studies will continue to cost consumers billions of dollars and enormous amounts of administrative time and energy. While the BPCA is not due to sunset until October 1, 2007, n353 policymakers should begin to think about non-incentive based policies that could be enacted to improve pediatric testing and health.

### A. The Amendments and Reforms To The Pediatric Exclusivity Provision

### 1. Off-Patent Drug Research Funding

Perhaps the most significant reform of the BPCA is the "Program for Pediatric Studies of Drugs Lacking Exclusivity" ("Program for Pediatric Studies"), which establishes a program by which off-patent drugs can be tested. n354 The Program for Pediatric Studies requires the National Institutes of Health ("NIH") and the FDA to develop an annual list of drugs that are off-patent and off-exclusivity terms "for which additional studies are needed to assess the safety and

effectiveness of the drug in pediatric populations." n355 The list may also include certain on-patent drugs, which are not voluntarily studied by pharmaceutical manufacturers or studied through the Foundation for Pediatric Research. n356 The FDA is then to take action to ensure that those drugs are actually studied through the Program for Pediatric Studies. n357 The BPCA met the FDA's requests to eliminate one section that required the FDA to develop a list of drugs that would benefit from pediatric testing. n358 Under the BPCA, when the FDA n359 decides that a drug requires research, it will issue written requests to all the drug's application holders. n360 These sponsors must respond to the FDA's request within thirty days. If they decline to perform the test or do not respond, then the FDA may publish requests for proposals from [*175] third parties to study the drug. n361 The FDA will accept proposals from organizations such as universities, teaching hospitals, laboratories, contract research organizations, and pediatric pharmacology research units. n362

The BPCA also addresses the information dissemination problems of the pediatric exclusivity provision. The BPCA mandates that all reports completed pursuant to the Act are part of the public domain and will be published in the Federal Register. n363 Indeed, any pediatric report conducted pursuant to the Act must be published in the Federal Register within 180 days after its submission to the FDA. n364

Additionally, the Program for Pediatric Studies establishes a structure for the FDA to negotiate labeling changes with drug application holders. n365 The BPCA created a clear timeline for labeling negotiations and affirmed the FDA's authority to compel label changes. n366 The FDA and all application holders have 180 days to negotiate the labeling changes. n367 At the point of agreement or at the end of the 180 days, the FDA will publish the requested labeling change, along with a copy of the clinical report, in the Federal Register. n368 In cases where no agreement is reached, the BPCA requires the FDA Commissioner to refer his recommendation to the newly formed Pediatric Advisory Subcommittee of the Anti-Infective Drugs Advisory Committee. n369 The Subcommittee has ninety days to review the Commissioner's recommendation and return its own recommendation to the Commissioner concerning the appropriate labeling changes. n370 The Commissioner must then consider, but need not accept, the Committee's recommendation. n371 Within thirty days, the FDA Commissioner will forward final requests to the application holder, n372 who will then have thirty days to comply. n373

If the manufacturer still refuses to accept the labeling change, under the BPCA the FDA has the authority to deem the drug misbranded. n374 The BPCA further states that the FDA has full authority to bring an enforcement action against the offending drug manufacturer. n375 The Program for [*176] Pediatric Studies, therefore, is a considerable departure from the FDAMA's approach, which failed to address either off-patent drug testing or the efficiency and effectiveness with which the FDA can negotiate label changes. Still, the cost of this newfound attention does not fall on manufacturers unless they volunteer. Instead, its cost falls on the public, which supports pediatric testing through tax dollars under the Program for Pediatric Studies. n376 To fund the program, the BPCA appropriated $ 200 million for the fiscal year 2002, and as much as deemed necessary for the following five years. n377

### 2. New Requirements for Drug Manufacturers with Patents or Exclusivity Terms

For on-patent drugs, the BPCA modifies *21 U.S.C. § 355a*, entitled Pediatric Studies of Drugs, to address areas of timing and labeling in a manner similar to the Program for Pediatric Studies' treatment of off-patent drugs. n378 The BPCA compels manufacturers to make a decision regarding the FDA's written request within 180 days. n379 Manufacturers who agree to conduct pediatric studies pursuant to a written request then receive the same six-month extension as they would under the original provision. n380 The BPCA, however, eliminates a fee waiver for pediatric supplements that the FDAMA had allowed. n381 Now, as with all other supplemental applications, manufacturers will pay a mandatory user fee; the Congressional Budget Office estimates that the fee will generate $ 6 million in 2002 and $ 33 million over the 2002 to 2006 period. n382 The funds garnered by the user fees are earmarked to help maintain efficient approval of labels. n383 The BPCA also ensures that pediatric supplements [*177] proposing labeling changes will be considered priority supplements n384 under the standards established for all priority drugs. n385

As with off-patent drugs, manufacturers of on-patent and on-exclusivity drugs now face a time limit for the labeling negotiation process. The FDA and the application holder have 180 days to agree on a pediatric label. n386 If no agreement is reached, the Commissioner of the FDA refers his or her labeling request to the Pediatric Advisory Subcommittee of the Anti-Infective Drugs Advisory Committee, which must return a recommendation to the Commissioner within ninety days. n387 The Commissioner then has thirty days to consider the Committee's recommendation and make a labeling request to the drug sponsor. n388 Again, as with off-patent drugs, the drug sponsor has thirty days in which to agree to the labeling request. n389 If the manufacturer continues to decline the labeling request, the FDA may deem the drug misbranded and take action against the manufacturer. n390

If, on the other hand, a manufacturer declines to perform a pediatric study or has already completed a study of one age group and has no incentive to complete another study, the BPCA sets up a fallback system for testing on that drug. n391 Once a study has been declined, the FDA may refer the drug to the Foundation for the National Institutes of Health ("Foundation for Pediatric Research"). n392 The Foundation for Pediatric Research is a private, non-governmental foundation n393 designed to allay concerns that if public funding is not available there would be no independent funding for pediatric studies. n394 This Foundation is commissioned to collect funds (gifts, grants, and donations) and award grants for pharmacologic pediatric research on already-marketed drugs still on patent or exclusivity terms. n395 The Foundation contracts with an outside group under the guidelines described in the program for pediatric studies. n396 The BPCA also directs that the contract and labeling negotiations function like those of the publicly funded studies in the Program for Pediatric [*178] Studies. n397 If the Foundation has insufficient funds to conduct the study, the drug can then be included on the list of drugs for the Program for Pediatric Studies. n398 Hence, although different provisions apply to off-patent and on-patent drugs, the format by which the FDA negotiates with the various manufacturers is consistent throughout the BPCA.

### 3. Structural Administrative Changes

The BPCA increases the capacity of the FDA, enabling it to handle its new role as the initiator and arbitrator of pediatric studies--something that the original bill had failed to do. The BPCA establishes the Office of Pediatric Therapeutics to oversee and coordinate pediatric activities and programs. n399 The Office will include at least one ethics specialist in pediatric clinical research and at least one person with expertise in agency coordination. n400 The BPCA also establishes a Pediatric Pharmacology Advisory Committee to advise the Secretary of HHS on pediatric pharmacology research priorities and ethical issues. n401 This Committee will help connect the BPCA's provisions to the ethical regulations established to ensure that children are not put at undue risk or used exploitatively for the benefit of research. n402 Finally, the BPCA attempts to address the concerns raised by oncologists that research in their field was particularly absent under the pediatric exclusivity provision. n403 The Act creates a Pediatric Subcommittee of the Oncologic Drugs Advisory Committee, which evaluates and prioritizes cancer drugs for children. n404 It also requires the FDA and NIH to complete a report by January 31, 2003 studying whether pediatric patients have received adequate access to new cancer therapies. n405

While the BPCA specifies the structure of these offices and their interactions quite precisely, it takes no steps to address criticisms from the pharmaceutical industry that the FDA exercises its authority capriciously. It establishes no guidelines to protect drug companies from the strict requirements and lengthy delays that the FDA has imposed on pharmaceutical companies over the past several years. n406 The timeline and review guidelines that the BPCA establishes are concerned with labeling negotiations, not negotiations regarding the satisfaction of the written request. [*179] The Act appears to allocate full discretion to the FDA to determine whether it will request comprehensive tests from drug companies or whether it will request tests of specific age groups. n407 Companies will still need to appeal the FDA's decisions in court, as drug manufacturer Merck did in the case of Lovastatin. n408

### 4. Ethics and Equality Issues

The BPCA addresses pediatric ethical issues by directing HHS to contract with the Institute of Medicine to review the guidelines for pediatric research. n409 The BPCA notes that these reviews should look at issues such as consent, expectations of participants, risks, maturity levels in relation to legal status, payments made to children or their parents in return for participation, compliance with regulations, and the role of internal review boards in pediatric studies. n410

The BPCA also addresses the right of minority children to be equally protected by the pediatric exclusivity program. n411 The BPCA requires that written protocols take into account the representation of children of ethnic and racial minorities. n412 It also requires the General Accounting Office to review whether minorities are included in pediatric research and whether adequate studies are performed on drugs used to treat diseases that disproportionately affect minorities. n413 This study must be completed by the Comptroller General of the United States by January 10, 2003. n414

The BPCA also explicitly acknowledges that neonates are considered a pediatric population, n415 making clear that the FDA can request neonatal studies from manufacturers or contract for such studies with outside organizations. n416 Thus, the FDA could request studies in an older age group, to be followed by studies in neonates. n417 This step will help to ensure that neonates receive more equitable attention, but it is unlikely that this acknowledgment will encourage manufacturers to conduct testing on neonates of their own accord because of the risks and costs associated [*180] with testing neonates. Instead, such tests will likely be funded by public contracts. n418

### 5. Generics

Another main problem with the earlier pediatric exclusivity provision was that its language did not clearly comport with the Waxman-Hatch generic exclusivity provisions. n419 First, the BPCA clarifies that any generic manufacturer that successfully challenged an invalid patent under the exclusivity provision will be awarded 180 days of exclusivity. n420 If the manufacturer also conducts a pediatric study of that drug, it will then receive a six-month extension to run after the initial Waxman-Hatch extension. n421 Some had thought that the pediatric exclusivity provision required the terms to run together, but Congress clarified that a generic manufacturer was to benefit from both in turn. n422

The BPCA also addresses the three-year exclusivity extensions offered to pharmaceutical companies that labeled for a new indication. n423 As explained earlier, some pharmaceutical companies argued that a new pediatric label warranted not only a six-month extension but a three-year exclusivity period under the Drug Price Competition and Patent Term Restoration Act ("Hatch-Waxman"). n424 Under the BPCA, a pharmaceutical manufacturer will earn a three-year extension for indication changes that meet the requirements of the Act in addition to the six-month pediatric exclusivity period. n425 During the three-year exclusivity period, however, generic manufacturers can market the drug for those indications or aspects of the labeling that are not protected. n426 They simply cannot indicate that they have been tested for use in children. n427 If the drug is dangerous to children in any way, however, the generic manufacturer would need to label it as such. n428 This system creates a strange incentive structure [*181] for a drug manufacturer. It has more incentive to complete non-pediatric studies to achieve a supplemental exclusivity term where there will be no generic competition whatsoever. If it achieves such a term with a pediatric medicine, generic drugs will be able to compete with the non-exclusivity drug for pediatric uses through off-label practices. Nonetheless, Congress did not want to award on-patent drugs an extra three years of market exclusivity for pediatric tests, thus it chose this interpretation of the two exclusivity terms. n429

### 6. Planning for the Future

Like its predecessor, the BPCA looks toward the future by including a sunset clause of five years, meaning the BPCA will expire on October 1, 2007. n430 Also, the BPCA requires the United States Comptroller General, in consultation with HHS, to complete a comprehensive report on the effectiveness and costs of the program by October 1, 2006. n431 The report must consider several factors, including the effectiveness of the BPCA; the number and importance of the drugs tested as a result of the BPCA; the relationship between the grant of exclusivity and labeling; the cost to taxpayers in the form of higher expenditures by Medicaid and other government programs; the benefits to government, private insurers, and consumers that result from better health care for children; and the costs of privately and publicly funded studies. n432

An additional reporting device was also instituted in order to catch adverse events more quickly: n433 each pediatric label will include a toll-free telephone number. n434 The BPCA requires the FDA to promulgate a rule ensuring that the toll-free number reaches the broadest consumer audience while minimizing the costs of the rule to pharmaceutical companies. n435 For example, it might require that the phone number be written on an auxiliary label on the drug vial itself. n436 Furthermore, for a one-year period after pediatric exclusivity is granted, drug sponsors must report all adverse events to the Office of Pediatric Therapeutics. n437

The BPCA addressed many of the concerns that were raised in the years before the reauthorization of the pediatric exclusivity provision, but it did so within the framework of the incentive structure. Manufacturers may still make their own decisions as to whether or not they want to conduct [*182] a study and receive a six-month extension on their patent or exclusivity term of a drug. The BPCA, however, attempts to control for this voluntariness by instituting the Pediatric Studies Program and the Foundation for Pediatric Research to support research in drugs that the pharmaceutical companies do not investigate on their own. While further improving pediatric testing, the Act puts very little pressure--beyond the pressures of time and necessitated labeling changes--on manufacturers to change the way they approach researching and marketing new drugs. Manufacturers bear few costs beyond the user fees, while the public is now asked to support not only the six-month extensions but also the public funding of some pediatric research.

### B. Reaction To the BPCA

At the end of the day, the incentive structure won out over proposals to codify the 1998 final rule or to condition exclusivity on new labeling. Some supported renewal of the voluntary incentive structure mainly because, to date, it had been the most effective legislation passed to ensure pediatric testing. n438 Pediatricians expressed hesitation at tampering with a legislative product that actually produced results. n439 Indeed, the idea that the cost of the incentive program should close the program down seemed contrary to the spirit of protecting children's health. n440

Other groups, however, were committed to the voluntary structure for philosophical and economic reasons. n441 For example, the American Association of Physicians, the Competitive Enterprise Institute, and Consumer Alert believed that the government should not regulate off-label [*183] prescriptions, as the 1998 final rule would. n442 They worried that this would lead to other areas of government regulation of physician practices. n443 Additionally, these groups maintained that if pharmaceutical companies were forced to conduct studies in children, the result might be a costlier approval process overall. n444 The incentive process allows pharmaceutical manufacturers to more easily consider undertaking the costs of pediatric research. n445 Ultimately, the arguments of those in favor of the incentive structure overcame those in favor of codification of the 1998 final rule.

Others, however, felt that the BPCA insufficiently addressed the problems latent in the incentive scheme. Several members of the House wrote a strong dissent in the House Report. n446 They argued that pediatric testing should have been required in some cases. n447 The BPCA, they maintained, only further confirmed that children were not a part of the general mandate of the FDCA that required drugs to be safe and effective for intended use. n448 They also criticized the incentive structure for imposing unnecessary costs on consumers, "costing consumers and taxpayers billions of dollars while producing only 19 new labels." n449 The dissenters highlighted the cases of Astra Zeneca's Prilosec and Eli Lilly's Prozac, which earned $ 1.4 billion and $ 900 million, respectively, from [*184] pediatric extensions without making label changes. n450 They argued that the House should have considered alternative structures such as the Waxman-Brown substitute, which would have been a more "cost-effective alternative" than the incentive structure. n451 This substitute would have directly reimbursed drug manufacturers for the cost of pediatric studies and guaranteed them 100% profits on the costs of the studies. n452

The House dissenters also took issue with the BPCA's failure to condition the grant of exclusivity on labeling, and they were dissatisfied by the provisions that required publication of labeling requests and test reports in the Federal Register as a temporary measure. n453 Few pediatricians, parents, or children would look there for advice on dosing or treatment, as most rely solely upon labels. n454 In the end, the dissenters believed that the FDAMA's pediatric exclusivity provision compounded the initial mistake of not requiring pediatric testing. The BPCA, in the dissenters' view, n455 was another flawed piece of legislation that isolated children from the full protections of the FDCA. n456 In general, consumer activists n457 were concerned that the BPCA unjustifiably forced consumers, especially the elderly, to pay more for drugs; that it forced the public to subsidize pharmaceutical research; and that drug makers were gaining hundreds of millions of dollars from studies that cost them only a couple of million dollars--an incentive far out of proportion to the costs of the studies. n458

[*185]  *C. The Impact of the BPCA on the 1998 Final Rule*

The BPCA caused further controversy because of its impact on the 1998 final rule. First, in May 2002, the Bush administration decided to suspend the rule in light of the BPCA's comprehensive structure. n459 The FDA maintained that the BPCA sufficiently addressed safety concerns for pediatric pharmaceutical users, likely making the rule unnecessary. n460 The same Democratic leaders who were disappointed with the BPCA expressed immediate outrage at the FDA's decision to forgo the rule. n461 Representatives Waxman, Dingell (D-Mich.), and Brown (D-Ohio) signed a letter dated March 18, 2002 to President Bush that urged him to prevent the FDA from suspending the rule. n462 They argued that it was a necessary component of pediatric clinical testing, asserting that without it pharmaceutical companies would only engage in the most profitable tests and not conduct tests that were the most worthwhile for children's health. n463

In response to this harsh public criticism, HHS quickly reversed its policy, stating that it would enforce the 1998 final rule. n464 HHS announced that the BPCA and the 1998 final rule could coexist, but also asked for public comment on "what additional steps [the FDA could] take to assure adequate study of drugs in children in light of" the BPCA. n465 Accordingly, the FDA issued an Advanced Notice of Proposed Rulemaking in the Federal Register. n466 The notice acknowledged that the BPCA might not adequately ensure that all drugs, especially human biologics and antibiotics, are tested in pediatric populations. n467 It also acknowledged the BPCA's limitations: that public funding was dependent on yearly congressional outlays and that the legislation had a built-in sunset provision. n468 [*186] It then requested comments on how to "integrate the BPCA and the pediatric rule more effectively." n469

While advocates of the 1998 rule were pleased that the FDA reversed its position, the near-suspension of the rule renewed efforts to codify it. Such a codification would remove discretion from the FDA as to whether pediatric testing could be required. n470 Senator Clinton explained her position on the importance of codification of the 1998 rule: "While I am pleased that the FDA has changed its mind about the pediatric rule, the fact that it can change its mind illustrates how important it is to make this rule the law of the land." n471 Significantly, codification would also moot

legal challenges to the legitimacy of the 1998 rule. n472 Accordingly, Senators Dewine and Dodd have proposed a bill to codify the 1998 rule. n473 There is even evidence that pharmaceutical companies would not strongly oppose such a codification as long as the six-month incentives were kept intact. n474

On the heels of the flip-flop in the executive branch, the fragility of the 1998 rule's foundation was again thrown into question, this time by the United States District Court for the District of Columbia. n475 The court ruled that the 1998 rule exceeded the scope of the FDA's authority under both the FDAMA and the BPCA. n476 The court made this decision based on an examination of the principles of administrative law and the legislative history, noting a concern that acceptance of the 1998 rule might mean that all off-label practices could be regulated by the FDA--a situation contrary to established food and drug law practice, which allows the manufacturer, and not the FDA, to determine how to label its drug. n477 In the end, though, it concluded that the BPCA was incompatible with the 1998 final rule, stating that "Congress adopted an incentive scheme while the FDA adopted a command and control approach . . . . The two [*187] schemes differ in almost every possible regard." n478 Thus, for the FDA to enforce the 1998 final rule, Congress would need to codify it.

This result was not inevitable, though. n479 Upon its passage, the impact of the BPCA on the FDA's 1998 final rule was unclear. n480 The 1997 legislative history had endorsed the FDA's approach to the promotion of pediatric labeling, n481 but the BPCA's legislative history did not include a similar statement of approval. The BPCA did not alter the section of the exclusivity provision that endorsed FDA regulations that were broader than the pediatric exclusivity provision. n482 Rather, it allowed this "regulatory clause" to stand with the knowledge that the FDA had been enforcing the 1998 final rule since its enactment. Neither the Senate Report nor the House Report that accompany the BPCA mentions anything about changing or modifying the "regulatory clause" or the 1998 final rule. Further, many pediatric experts who spoke before Congress also continually referred to the successes of the pediatric exclusivity provision in conjunction with the 1998 final rule, n483 so it would be odd to assume that the BPCA displaced the 1998 final rule without specific direction from Congress. n484

Children's health advocates expressed immediate disappointment and called on Congress to remedy the situation. n485 Senator Clinton, for one, quickly condemned the Court's decision, calling it a "major step backwards for children's health," and accusing the court of being "ill-informed about how the legislation was intended to work, and how it did [*188] work." n486 She and others in the Senate, including Senators DeWine and Dodd, continue, as this Article goes to publication, to lobby for codification of the 1998 final rule. n487 The FDA also announced its dissatisfaction with the court's ruling, saying that it was "very disappointed that the court struck down the pediatric rule, which we have vigorously enforced." n488 At the time of this Article's publication, it was reviewing whether to appeal. n489

### D. The Future of the Pediatric Exclusivity Provision and the BPCA

The BPCA's failure to codify the FDA 1998 final rule is a major deficiency in the legislation, which ultimately may have left the rule open to reversal by the court. Codification of the rule would have been a much stronger step toward ensuring that new and already-marked drugs were tested. This kind of power might not appear necessary when there is public funding available for research, but in the event that congressional expenditures are insufficient to properly test drugs for safety and effectiveness in children, the FDA should be allowed to compel manufacturers to complete such studies. Any such codification could be modeled on the 1998 rule as well as the ethical regulations for pediatric research, which establish a set of rules to determine which drugs should be tested for use in children. n490

The ethical regulations work to prevent the kinds of exploitative situations that historically developed in pediatric testing. If a study poses more than a minimal risk to children, it must meet conditions such as the potential for direct benefit to the child or approval from the FDA that it will serve the larger ends of children's health. n491 Furthermore, the 1998 rule contains waiver provisions. No study will need to be conducted in children when a drug is unlikely to be used in children when it is highly impracticable to complete the study in children (e.g., a study of a drug for Alzheimer's disease), or when there is evidence that the drug would be dangerous to children. n492 The rule also allays concerns about additional costs and delays in releasing useful drugs to the public by granting deferments of the pediatric testing requirement to drug companies that [*189] satisfy safety and effectiveness standards for adults. n493 Thus, a drug should not be delayed from reaching the public any longer than it currently is.

Another concern about codification of the rule is that it would impose substantial costs on consumers. Such concerns are unconvincing in light of the large costs of the six-month extension and the costs of public funding for pediatric research. Certainly, the costs of pediatric studies will increase the price of medicine, as the drug companies will pass the cost increases on to their consumers. Both the industry and the public, however, have bypassed these very costs of drug

development for years. n494 Considering the precautions that the 1998 rule and ethical regulations take to avoid unnecessary testing, n495 these costs seem reasonable in the name of better pediatric health.

In addition to its failure to codify the 1998 rule, the BPCA is unnecessarily expensive to consumers. It seems inherently unfair for the public to have to pay twice in this way: either the public pays directly for publicly funded tests or indirectly through the increased exclusivity terms. Indeed, the irony of the BPCA is that on a cost basis, it would be cheaper for consumers if pharmaceutical companies declined to perform any studies as consumers would pay the cost of the study, which on average costs $ 3.87 million, n496 instead of the extraordinary costs of the six-month patent extensions.

Another problem with the BPCA is in its administratively complex and dispersed design. It fails to place responsibility for pediatric testing on any one institution--public or private. Tests may be performed under the auspices of pharmaceutical companies, the Program for Pediatric Studies, or the Foundation for Pediatric Research. A number of offices have been established to oversee these studies and their resulting labeling, ranging from the Office of Pediatric Therapeutics to the Oncologic Drugs Advisory Committee. n497 Administrative time and financing will be wasted in the coordination of oversight and replication of skills and knowledge, as these offices attempt to oversee the various testing options which the BPCA provides. Instead, Congress should place the responsibility of testing children where it lies: with the pharmaceutical companies [*190] that research and market drugs. This requirement would likely save the public through reduced coordination costs, and reduced costs from the delay of requesting studies on a voluntary basis.

The voluntary incentive structure and the complex administrative system that complements it undercut the BPCA's strides toward improving pediatric research. Congress should contemplate other options for ensuring pediatric research besides market incentives. Policymakers should look at the reasons beyond cost that pharmaceutical companies are so reluctant to perform studies. A mere four million dollar study is not the crux of the problem--liability is. Perhaps the new ethics regulations will help to set up guidelines that can serve as defenses in the courtroom. n498 Congress might also consider creating an arm of the FDA that oversees pediatric studies. Such oversight could then serve as a form of an "FDA defense" to a lawsuit. n499 That is, drug companies could have an affirmative defense to a lawsuit for a failed pediatric test or adverse side effect if they followed the FDA's procedures.

Congress could even consider establishing an administrative hearings procedure, much like that of the National Vaccine Program, n500 which compensates children who are victims of vaccines' adverse side-effects. Such a "clinical pediatric compensation program" could be funded by tax dollars as well as separate fees levied upon pharmaceutical companies. This kind of program would not only greatly reduce the risks of litigation to the pharmaceutical companies but would help to assure that children are fairly compensated for participation in pediatric studies on a timely basis. n501 The compensation program could use the administrative apparatus [*191] of the vaccine program since the administrative judges in that program are already adept at hearing medical issues concerning children. While this alternative n502 would actually be more administratively complex than the BPCA's structure, it would, at least, avoid the costs of the exclusivity incentive, and it would also directly address the liability concerns of the pharmaceutical companies.

Children deserve special treatment, such as larger investments in ethics guidelines, careful oversight, and training of specialists in pediatric research. They are a special-needs group that could benefit from targeted legislation. The history of exploitation and adverse reactions to drugs suggests the importance of creating legislation and regulations devoted to children's needs. Children need to be carefully integrated into mainstream clinical testing in a way that does not put other groups at risk. Nonetheless, Congress has muddled this notion of special treatment with the idea that pharmaceutical companies should not be responsible for pediatric testing. Nothing about children necessitates the placement of pediatric testing outside of the responsibility of the pharmaceutical industry.

## CONCLUSION

Before the 1997 FDAMA pediatric exclusivity provision and the 1998 final rule, pharmaceutical manufacturers had almost free rein to market drugs that they knew would be used in children without performing any pediatric tests. By placing a label on their products stating that the drug had not been tested for safety and effectiveness on children, they could avoid venturing into the complicated area of pediatric testing. To the manufacturers' credit, the world of pediatric studies was highly unregulated, ethically complicated, and scientifically challenging. n503 Still, pharmaceutical companies knew that physicians would go off-label to prescribe to their pediatric patients the drugs that were indicated for adult [*192] diseases. n504 It is hard to justify either their decision to avoid testing or the government's decision to ignore this pattern of pediatric research.

With the 1998 final rule, the FDA attempted to include children into general safety and effectiveness standards for drugs. This radical step toward finally integrating pediatric clinical testing into the same regime as that of adults was thrown off course by Congress in 1997 and again in 2002 when Congress offered pharmaceutical companies rewards for such efforts on behalf of children. Thus, Congress set the tone for the pharmaceutical industry and the pediatric health community, suggesting that it was reasonable for pharmaceutical companies to receive inducements to complete basic pediatric tests. This incentive structure framed the entire debate over the BPCA.

The strongest argument in support of this incentive structure is that without it pharmaceutical companies would not be willing to conduct pediatric tests. This argument depends, however, on a voluntary system of pediatric testing. If Congress had codified the FDA's power to require testing in all new and already marketed drugs, the notion of an incentive or reward for testing would appear ludicrous. It is the controlling idea that testing children is a private and sensitive decision for the pharmaceutical company to make, not one to be imposed by the government, that made it possible for the incentive structure to be created and survive.

Congress, the pharmaceutical industry, and children's advocates should dispense with the notion that pediatric testing should be a voluntary decision on the part of a pharmaceutical company. Justifications for a voluntary structure should be met directly by legislation and regulations, and not by an incentive structure. For example, one argument for a voluntary system is that pediatric testing is ethically challenging. n505 Rather than paying companies to undertake "ethical risks," it would be better health policy and more economically efficient to spend time improving ethical guidelines, training pediatric ethicists, and equipping the FDA to actively participate in helping pharmaceutical companies plan studies. Similarly, pharmaceutical companies fear that they will be exposed to litigation both at the testing stage if their tests harm children, and at the marketing stage if their drugs cause adverse affects when used for a labeled indication. Congress could allay industry concerns by creating an arm of the FDA to assist pharmaceutical companies in dealing with the scientific challenges that children pose. It could also create legal protections, such as an FDA defense or an administrative compensation program to minimize the risk of high stakes tort litigation, which is one of the industry's largest concerns.

[*193] The current voluntary incentive system costs the public billions of dollars, is inequitable, and is poor health policy. It fails to address the underlying concerns about pediatric health by requiring that studies be performed ethically and safely and that marketed drugs be safe and effective. Thus, while the BPCA is an important step toward improved pediatric health, it is simply a modern extension of past neglect of pediatric clinical testing. Congress should reconsider its legislative effort to encourage pediatric testing. It should codify the 1998 final rule and finance the FDA to address the pharmaceutical companies' concerns regarding pediatric testing.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
GovernmentsAgriculture & FoodProcessing, Storage & DistributionGovernmentsAgriculture & FoodFederal Food, Drug & Cosmetic ActFamily LawParental Duties & RightsConsentEducation

**FOOTNOTES:**

n1 Best Pharmaceuticals for Children Act of 2002, Pub. L. No. 107-109, 115 Stat. 1408 (codified as amended in scattered sections of 21 U.S.C. and 42 U.S.C).

n2 See H.R. REP. No. 107-277, at 14 (2001) (explaining that while the incentive had been successful, it was not adequate to address the need for studies in certain drugs such as those with no patent protection or those for neonates); S. REP. NO. 107-79, at 2 (2001) (noting the success of the 1997 legislation as well as the need to augment its provisions).

n3 Food and Drug Administration Modernization Act of 1997, Pub. L. No. 105-115, § 111, 111 Stat. 2296, 2305-09 (codified as amended in scattered sections of 21 U.S.C.).

n4 See, e.g., S. REP. NO. 105-43, at 151-53 (1997); S. REP. NO. 107-79, at 1-2 (2002); H.R. REP. NO. 107-277, at 13-14 (2002).

n5 As this Note will discuss, the FDA began to require pediatric testing in new and already marketed drugs in 1998. *See infra* Part II.B.

n6 FOOD & DRUG ADMIN., DEP'T OF HEALTH AND HUM. SERVS., THE PEDIATRIC EXCLUSIV-ITY PROVISION: JANUARY 2001 STATUS REPORT TO CONGRESS iii, 37 tbl. 7 (2001) [hereinafter 2001 STATUS REPORT TO CONGRESS].

n7 *See 21 U.S.C. § 355a* (1997) (amended 2002).

n8 *Id.*

n9 *See* Best Pharmaceuticals for Children Act of 2002, *21 U.S.C. § 355a.*

n10 Best Pharmaceuticals for Children Act of 2002, *42 U.S.C. § 284m.*

n11 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 14-18.

n12 PUBLIC CITIZEN CONGRESS WATCH, PATENTLY OFFENSIVE: CONGRESS SET TO EX-TEND MONOPOLY PATENTS FOR CIPRO AND OTHER DRUGS 2, *available at* http://www.citizen.org/documents/ACF34F.PDF (last visited Sept. 20, 2002).

n13 Best Pharmaceuticals for Children Act of 2002, Pub. L. No. 107-109, § 409i(d)(1)(A), 115 Stat. 1409, 1411.

n14 *See* H.R. REP. NO. 107-277, at 57 (2001).

n15 *See* Federal Food, Drug and Cosmetic Act of 1938, ch. 675, 52 Stat. 1040 (codified as amended at *21 U.S.C. §§ 301*-397).

n16 *See* Tamar Nordenberg, *Pediatric Drug Studies: Protecting Pint-Sized Patients*, FDA CONSUMER MAG., May-June 1999, at 24.

n17 *See generally* Susan E. Lederer & Michael Grodin, *Historical Overview: Pediatric Experimentation, in* CHILDREN AS RESEARCH SUBJECTS: SCIENCE, ETHICS, AND LAW 3, 4-18 (Michael A. Grodin & Leonard H. Glantz eds., 1994).

n18 *See* Kurt R. Karst, *Pediatric Testing of Prescription Drugs: The Food and Drug Administration's Carrot and Stick for the Pharmaceutical Industry, 49 AM. U. L. REV. 739, 747 (2000).*

n19 *See generally* Leonard H. Glantz, *The Law of Human Experimentation with Children, in* CHILDREN AS RESEARCH SUBJECTS: SCIENCE, ETHICS, AND LAW 103, 103 (Michael A. Grodin & Leonard H. Glantz eds., 1994) (providing a historical overview of pediatric testing).

n20 *See infra* Part I.

n21 *See infra* Part I.

n22 *See generally* Glantz, *supra* note 19, at 103 (providing a historical overview of pediatric testing).

n23 *See id.* at 103; Marvin R. Ventrell, *Rights and Duties: An Overview of the Attorney-Child Client Relationship, 26 LOY. U. CHI. L.J. 259, 261 (1995).*

n24 Lederer & Grodin, *supra* note 17, at 4-5.

n25 *See generally* Jill Elaine Hasday, *Parenthood Divided: A Legal History of the Bifurcated Law of Parental Relations, 90 GEO. L.J. 299 (2002).*

n26 *See, e.g.,* Ventrell, *supra* note 23, at 263.

n27 *See* Lederer & Grodin, *supra* note 17, at 6.

n28 Anne M. Dellinger, Book Review, 21 J. HEALTH POL. POL'Y & L. 159, 160-61 (1996) (reviewing SUSAN E. LEDERER, SUBJECTED TO SCIENCE: HUMAN EXPERIMENTATION IN AMERICA BEFORE THE SECOND WORLD WAR (1995) and CHILDREN AS RESEARCH SUBJECTS: SCIENCE, ETHICS, AND LAW (Michael H. Glantz & Leonard Grodin eds., 1994)). Despite its interest in pediatric medicine, the AMA remained one of the strongest opponents of regulated medical research. William Williams Keen, the President of the AMA at the turn of the eighteenth century, adamantly resisted any regulations, arguing that claims of abuse were exaggerated. *Id.* The AMA did not change its position until after World War II. *Id.*

n29 Lederer & Grodin, *supra* note 17, at 6.

n30 Ann E. Ryan, Note, *Protecting the Rights of Pediatric Research Subjects in the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use, 23 FORDHAM INT'L L. J. 848, 852-53 (2001).*

n31 Lederer & Grodin, *supra* note 17, at 5.

n32 *Id.* at 4-9.

n33 *Id.* at 6 (quoting A. F. Hess, *The Use of a Series of Vaccines in the Prophylaxis and Treatment of an Epidemic of Pertussis, 63 JAMA 1007 (1914)).*

n34 *Id.* at 12.

n35 *See id.* at 15.

n36 Ryan, *supra* note 30, at 854.

n37 *Id.* at 854 n.47.

n38 Lederer & Grodin, *supra* note 17, at 17-18.

n39 Ryan, *supra* note 30, at 853.

n40 Lederer & Grodin, *supra* note 17, at 11-12.

n41 *See, e.g., id.* at 16.

n42 *See* Notice of Publication of the Executive Summary of the Report, "Ethical and Policy Issues in Research Involving Research Participants," by the National Bioethics Advisory Commission (NBAC), *66 Fed. Reg. 45,998, 45,998* (Aug. 31, 2001).

n43 Lederer & Grodin, *supra* note 17, at 16.

n44 *See id. See generally* Henry K. Beecher, *Ethics and Clinical Research, 274 NEW ENG. J. MED. 1354 (1966);* HENRY K. BEECHER, RESEARCH AND THE INDIVIDUAL: HUMAN STUDIES (1970).

n45 *See generally* Robert Mittendorff II, *Primum Non Nocere: Implications for the Globalization of Biomedical Research Trials,* FLETCHER F. WORLD AFF., Summer 2001, at 239, 241-42.

n46 *See* Protection of Human Subjects, *30 Fed. Reg. 18,914* (May 30, 1974) (codified at 45 C.F.R. pt. 46).

n47 National Research Act, Pub. L. No. 93-348, 88 Stat. 342 (1974).

n48 *See* Additional Safeguards for Children in Clinical Investigations of FDA-Regulated Products, *66 Fed. Reg. 20,589, 20,590* (Apr. 24, 2001) (to be codified at 21 C.F.R. pts. 50 and 56).

n49 Protection of Human Subjects, Research Involving Children: Report and Recommendations of the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, *43 Fed. Reg. 2084* (Jan. 13, 1978).

n50 Protection of Human Subjects, Proposed Regulations on Research Involving Children, *43 Fed. Reg. 31,786* (July 21, 1978).

n51 Additional Protections for Children Involved as Subjects in Research, *48 Fed. Reg. 9814* (Mar. 8, 1983) (codified at 45 C.F.R. pt. 46).

n52 *Id. See also* Final Regulations Amending Basic HHS Policy for the Protection of Human Research Subjects, *46 Fed. Reg. 8366, 8367-68* (Jan. 26, 1981) (codified at 45 C.F.R. pt. 46).

n53 Protection of Human Subjects; Proposed Establishment of Regulations, *44 Fed. Reg. 24,106* (Apr. 24, 1979); Withdrawal of Certain Pre-1986 Proposed Rules; Final Action, *56 Fed. Reg. 67,440* (Dec. 30, 1991) (codified at 21 C.F.R. ch. 1). *See also* Additional Safeguards for Children in Clinical Investigations of FDA-Regulated Products, *66 Fed. Reg. 20,589, 20,590* (Apr. 24, 2001) (to be codified at 21 C.F.R. pts. 50 and 56) (explaining that only if a study was funded or conducted by HHS would the clinical guidelines apply).

n54 Circumstances in Which IRB Review Is Required, *21 C.F.R. § 56.103 (2002).*

n55 Criteria for IRB Approval of Research, *21 C.F.R. § 56.111 (2002)*; IRB Membership, *21 C.F.R. § 56.107 (2002)*.

n56 Karst, *supra* note 18, at 747.

n57 Children's Health Act of 2000, *42 U.S.C. § 284h.* Congress was prompted to enact this bill in light of the increased enrollment of children in clinical testing that resulted from the pediatric exclusivity provision of the Food and Drug Modernization Act as well as the 1998 final rule. Additional Safeguards for Children in Clinical Investigations of FDA-Regulated Products, *66 Fed. Reg. 20,589* (Apr. 24, 2001) (to be codified at 21 C.F.R. pts. 50 and 56). As will be discussed in Part III, the pediatric exclusivity program and the 1998 final rule encouraged and required, respectively, manufacturers to research new drugs as well as already marketed drugs on children, thereby increasing the number of studies that included pediatric populations. *See 21 U.S.C. § 355a.* *See also* Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *63 Fed. Reg. 66,632* (Dec. 2, 1998) (codified at 21 C.F.R. pts. 201, 312, 314, and 601).

n58 *See 21 C.F.R. §§ 50.51–56*, 56.109, 56.111 (2002).

n59 *See, e.g.,* Shawn Pogatchnik, *Contraceptive Studies at Standstill, Study Finds*, L.A. TIMES, Feb. 15, 1990, at A24.

n60 *See infra* text accompanying notes 61-82.

n61 Daniel A. Cantor, *Striking a Balance Between Product Availability and Product Safety: Lessons from the Vaccine Act*, *44 AM. U. L. REV. 1853, 1858-60 (1995)*.

n62 *See* H.R. REP. No. 99-908, at 4 (1986) ("Vaccination of children against deadly, disabling, but preventable infectious diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken.").

n63 All fifty states and the District of Columbia have such programs. Elizabeth A. Breen, *A One Shot Deal: The National Childhood Vaccine Injury Act*, 311-12 (1999).

n64 Cantor, *supra* note 61, at 1870-71.

n65 Breen, *supra* note 63, at 311-12.

n66 *Id.* at 313-14.

n67 Russel G. Donaldson, Annotation, *Construction and Application of the National Childhood Vaccination Injury Act*, *129 A.L.R. FED 1 (1996)*.

n68 *National Childhood Vaccine Injury Compensation Act of 1985: Hearings on S. 827 Before the Sen. Comm. on Labor and Human Resources*, 99th Cong. 240 (1985) (statement of Robert Johnson, President, Lederle Lab.) (stating that the number of carriers willing to insure Lederle, a vaccine manufacturer, in 1985 dropped from twenty-six to eight).

n69 Cantor, *supra* note 61, at 1858-59.

n70 National Vaccine Injury Compensation Act, *42 U.S.C.A. §§ 300aa-1* to -34 (200).

n71 *Id.* § 300aa-10.

n72 H.R. REP. NO. 99-908, at 12 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6353.

n73 *See id.* at 6348.

n74 *See, e.g., Consumerists Say Approvals No Product Safety Guarantee*, CHEM. MARKETING REP., May 21, 1990, at 9.

n75 *See, e.g., Liability Nightmare*, NAT'L REV., Aug. 23, 1985, at 15.

n76 Cindy Skrzycki & Michael H. Gallagher, *The Risky Business of Birth Control*, U.S. NEWS & WORLD REP., May 26, 1986, at 42.

n77 *See generally* Sylvia A. Law, *Tort Liability and the Availability of Contraceptive Drugs and Devices in the United States, 23 N.Y.U. REV. L. & SOC. CHANGE 339 (1997);* Thomas Koenig & Michael Rustad, *His and Her Tort Reform: Gender Injustice in Disguise, 70 WASH. L. REV. 1, 38-40 (1995).*

n78 *See* Koenig & Rustad, *supra* note 77, at 53 (arguing that the "vast majority of mass torts leading to punitive damages awards affected products used exclusively by women. These products include the Dalkon Shield and Copper-7 IUDs, oral contraceptives causing kidney failure, and silicone-gel breast implants."). *See generally Vaccine Injury Compensation, 1984: Hearings on H.R. 556 Before the Subcomm. on Health and the Env't of the House Comm. on Energy and Commerce*, 98th Cong. 295 (1984) (statement of Dr. D.L. Shaw, Jr., Wyeth Laboratories) (stating that the company had stopped marketing the DTP vaccine "because of extreme liability exposure, cost of litigation and the difficulty of continuing to obtain adequate insurance").

n79 Pogatchnik, *supra* note 59, at 24.

n80 *Id.*

n81 *Id.*

n82 *Product Liability Reform Act: Hearings on S. 1400 Before the Subcomm. on the Consumer of the Sen. Comm. on Commerce, Science, and Transp.*, 101st Cong. 466 (1990) (statement of Richard Kingham, Partner, Covington & Burling) (testifying that "liability concerns in general, and particularly about punitive damages, have caused manufacturers to withdraw beneficial drugs from the market and reduce research and development activities that could yield important new drugs" and that concerns are greatest in litigation prone areas, such as vaccines and contraceptives).

n83 *See, e.g., Evaluating the Effectiveness of the Food and Drug Administration Modernization Act: Hearings Before the Subcomm. on Health of the House Comm. on Energy and Commerce*, 107th Cong. 97 (2001) [hereinafter *Hearings on Evaluating the Effectiveness of the FDA Modernization Act*] (statement of Timothy R. Franson, Vice President, Clinical Research and Regulatory Affairs, Lilly Research Laboratories, Eli Lilly and Company on behalf of the Pharmaceutical Research and Manufacturers of America) (describing the scientific, ethical, technical, and regulatory difficulties of pediatric testing).

n84 *See* Notice of Publication of the Executive Summary of the Report "Ethical and Policy Issues in Research Involving Research Participants," by the National Bioethics Advisory Commission, *66 Fed. Reg. 45,998, 46,000* (Aug. 31, 2001).

n85 General Requirements for Informed Consent, *21 C.F.R. § 50.20 (2002)*; Elements of Informed Consent, *21 C.F.R. § 50.25 (2002)*.

n86 *See generally* Additional Safeguards for Children in Clinical Investigations of FDA-Regulated Products, *66 Fed. Reg. 20,589, 20,590* (Apr. 24, 2001) (to be codified at 21 C.F.R. pts. 50 and 56).

n87 Requirements for Permission by Parents or Guardians and for Assent by Children, *21 C.F.R. § 50.55 (2002)*.

n88 *Id.* § 50.55(a).

n89 Clinical Investigations Not Involving Greater Than Minimal Risk, *21 C.F.R. § 50.51 (2002)*; Clinical Investigations Involving Greater Than Minimal Risk but Presenting the Prospect of Direct Benefit to Individual Subjects, *21 C.F.R. § 50.52 (2002)*.

n90 *21 C.F.R. §§ 50.51-.52*.

n91 Clinical Investigations Involving Greater Than Minimal Risk and No Prospect of Direct Benefit to Individual Subjects, but Likely to Yield Generalizable Knowledge about the Subjects' Disorder or Condition, *21 C.F.R. § 50.53 (2002)*.

n92 *See* Ryan, *supra* note 30, at 854-55. *See, e.g., supra* text accompanying notes 36-38 (explaining the case of Saul Krugman). Krugman was vilified for his testing of mentally disabled children in a state facility, even though he had received consent. *See* Ryan, *supra* note 30 at 854; Robert M. Nelson, *Children as Research Subjects, in* BEYOND CONSENT: SEEKING JUSTICE IN RESEARCH 47, 49-50 (Jeffrey P. Kahn et al. eds., 1998). He had offered the parents of his patients the hope of better care for their children. Ryan, *supra* note 30, at 854-55. Critics of the research characterized this inducement as coercive to parents desperate to help their children receive better care. Others question the legitimacy of even lesser inducements such as gift certificates to Toys 'R Us in exchange for consent. *See, e.g.,* Rachel Zimmerman, *Child Play: Pharmaceutical Firms Win Big on Plan to Test Adult Drugs on Kids,* WALL ST. J., Feb. 5, 2001, at A1.

n93 *See generally* Glantz, *supra* note 22, at 118-30.

n94 *See* S. REP. NO. 105-43, at 51 (1997).

n95 *Id.*

n96 Gerald P. Koocher & Patricia Keith-Spiegel, *Scientific Issues in Psychosocial and Educational Research with Children, in* CHILDREN AS RESEARCH SUBJECTS: SCIENCE, ETHICS, AND LAW 47, 49 (Michael A. Grodin & Leonard H. Glantz eds., 1994).

n97 *See Off-Label Drug Use and FDA Review of Supplemental Drug Applications: Hearings Before the House Comm. on Gov't Reform and Oversight*, 104th Cong. 106-14 (1996) [hereinafter *Hearings on Off-Label Drug Use*] (statement of Ralph Kauffman, M.D., on behalf of the American Academy of Pediatrics).

n98 *See id.*; Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *62 Fed. Reg. 43,899, 43,901* (Aug. 15, 1997) (codified at 21 C.F.R. pts. 201, 312, 314, and 601b).

n99 *See generally* Elizabeth J. Jameson & Elizabeth Wehr, *Drafting National Health Care Reform Legislation to Protect the Health Interests of Children, 5 STAN. L. & POL'Y REV. 152, 152-55 (1993).*

n100 *See Better Pharmaceuticals for Children: Assessment and Opportunities: Hearings Before the Sen. Comm. on Health, Educ., Labor and Pensions*, 107th Cong. 43-44 (2001) [hereinafter *Hearings on Better Pharmaceuticals for Children*] (statement of Janet Heinrich, Director, Health Care-Public Health Issues) ("Several factors appear to have contributed to the lack of pediatric studies. Drug companies indicated that they had little incentive to perform pediatric studies on drugs they intended to market primarily to adults and that these drugs would provide little additional revenue from use in children. Companies also said they were concerned about liability and malpractice issues and the difficulty of attracting enough pediatric patients for studies because of the small number of children with a particular disease.").

n101 *See* S. REP. NO. 105-43, at 51-52 (1997); Ryan, *supra* note 30, at 855-57.

n102 "Off-label" means a prescription for ages or diseases other than those indicated on a drug's label. *See* Nicole Endejann, *Is the FDA's Nose Growing?: The FDA Does Not "Exaggerate Its Overall Place in the Universe" When Regulating Speech Incident to "Off-Label" Prescription Drug Labeling and Advertising, 35 AKRON L. REV. 491, 502-05 (2002);* Steven R. Salbu, *Off-Label Use, Prescription, and Marketing of FDA-Approved Drugs: An Assessment of Legislative and Regulatory Policy, 51 FLA. L. REV. 181, 186-92 (1999).*

n103 *See* Althea Gregory, *Denying Protection to Those Most in Need: The FDA's Unconstitutional Treatment of Children, 8 ALB. L.J. SCI & TECH. 121, 130-31 (1997).*

n104 *See* Veronica Henry, *Off-Label Prescribing: Legal Implications, 20 J. LEGAL MED. 365, 365 (1999).*

n105 *Id.*

n106 *See* Legal Status of Approved Labeling for Prescription Drugs; Prescribing for Uses Unapproved by the Food and Drug Administration: Notice of Proposed Rule Making, *37 Fed. Reg. 16,503* (Aug. 15, 1972); FOOD AND DRUG LAW: CASES AND MATERIALS 619 (PETER Barton Hutt & Richard A. Merrill eds., 2d ed., 1991) [hereinafter FOOD AND DRUG LAW].

n107 Gregory, *supra* note 103, at 128.

n108 *See* Henry, *supra* note 104, at 370.

n109 *Id.*

n110 Nordenberg, *supra* note 16, at 28. *See also Reauthorization of the Prescription Drug User Fee Act and FDA Reform: Hearings Before the Subcomm. on Health and Environment, of the House Comm. on Commerce,*

105th Cong. 118-24 (1997) [hereinafter *Hearings on FDA Reform*] (statement of Sanford N. Cohen, M.D., on behalf of the American Academy of Pediatrics).

n111 *See Hearings on FDA Reform, supra* note 110 (statement of Sanford N. Cohen, M.D., on behalf of the American Academy of Pediatrics); S. REP. NO. 107-79, at 3 (2001) ("Some drugs may have different adverse side effects or toxicities in children than in adults, so estimating dosages for children from dosages found to be safe and effective in adults may not be appropriate. The lack of pediatric studies and labeling information may lead to unintended medical errors and place children at risk of being under-dosed or over-dosed with medication.").

n112 Nordenberg, *supra* note 16, at 24.

n113 *Id.*

n114 Specific Requirements on Content and Format of Labeling, *57 Fed. Reg. 47,423, 47,424* (Oct. 16, 1992) (codified at 201 C.F.R. pt. 201).

n115 *See* Nordenberg, *supra* note 16 at 24 (quoting Rosemary Roberts, M.D., chair of the pediatric subcommittee of the FDA's Center for Drug Evaluation and Research, as stating that "some physicians won't even try a drug in a child if they don't have enough information.").

n116 *See* Henry, *supra* note 104, at 380; James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions, 53 FOOD & DRUG L.J. 71, 80 (1998).*

n117 *See Hearings on Off-Label Drug Use, supra* note 97 (statement of Ralph Kauffman, M.D., on behalf of the American Academy of Pediatrics).

n118 Sheryl Gay Stolberg, *Children Test New Medicines Despite Doubts*, N.Y. TIMES, Feb. 11, 2001 at Sec. 1. p.1.

n119 *See Better Pharmaceuticals for Children: Assessment and Opportunities: Hearings Before the Sen. Comm. on Health, Educ., Labor and Pensions, 107th Cong. 305 (2001) (statement of Senator Barbara Mikulski (D-Md.)).*

n120 *Id. See also* 147 Cong. Rec. E2368 (daily ed. Dec. 20, 2001) (statement of Rep. Sheila Jackson-Lee (D-Tex.)) (noting that the lack of labeling for children was contributing to potentially fatal physician errors in the treatment of children).

n121 MILLER-KEANE MEDICAL DICTIONARY (2000). Gray syndrome, or gray baby syndrome, is a "potentially fatal condition seen in neonates." *Id.* An affected neonate becomes ashen, listless, weak, and prone to hypotension. *Id.*

n122 Nordenburg, *supra* note 16. *See also* Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *62 Fed. Reg. 43,900, 43,901* (Aug 15, 1997) (codified at 21 C.F.R. pts. 201, 312, 314, and 601).

n123 Regulations Requiring Manufacturers to Assess the Safety and Effectiveness, *62 Fed. Reg. at 43,901.*

n124 William Rodriquez et al., *Adverse Drug Events in Children: The U.S. Food and Drug Administration Perspective*, CURRENT THERAPEUTIC RES., Oct. 2001, at 714-15. *See also Hearings on FDA Reform, supra* note 110 (statement of Sanford N. Cohen, M.D., on behalf of the American Academy of Pediatrics).

n125 *See* Rodriquez et al., *supra* note 124, at 714-15; *Hearings on FDA Reform, supra* note 110 (statement of Sanford N. Cohen, M.D., on behalf of the American Academy of Pediatrics).

n126 *See* Specific Requirements on Content and Format of Labeling for Human Prescription Drugs: Revision of the "Pediatric Use" Subsection on Labeling, *59 Fed. Reg. 64,239, 64,240* (Dec. 13, 1994) (codified at 21 C.F.R. pt. 201).

n127 *See generally* Nordenberg, *supra* note 16.

n128 S. REP. NO. 107-79, at 1 (2001).

n129 *62 Fed. Reg. 43,899, 43,900* (Aug. 15, 1997) ("These ten drugs were . . . prescribed over 5 million times in 1 year for pediatric patients in age groups for which the label carried a disclaimer or lacked adequate use information.").

n130 *See Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83 (statement of Richard Gorman, M.D., on behalf of the American Academy of Pediatrics).

n131 *See* FOOD AND DRUG LAW, *supra* note 106, at 8.

n132 Pure Food and Drug Act of 1906, ch. 3915, 34 Stat. 768 (repealed 1938). *See* FOOD AND DRUG LAW, *supra* note 106, at 4.

n133 Pure Food and Drug Act of 1906, ch. 3915, 34 Stat. 768 (repealed 1938). *See* Jeffrey E. Shuren, *The Modern Regulatory Administrative State: A Response to Changing Circumstances, 38 HARV. J. ON LEGIS. 291, 299-300 (2001).*

n134 *See* Shuren, *supra* note 133, at 300; Mary T. Griffen, *AIDS Drugs and the Pharmaceutical Industry: A Need for Reform, 17 AM. J.L. & MED. 363, 375-76 (1991).*

n135 *See* Shuren, *supra* note 133, at 300.

n136 *Id.*

n137 *Id.*

n138 *Id.*

n139 *Id. See also* Rodriquez et al., *supra* note 124, at 712.

n140 Karst, *supra* note 18, at 746 n.33.

n141 Federal Food, Drug, and Cosmetic Act of 1938, ch. 675, 52 Stat. 1040 (codified as amended at *21 U.S.C. §§ 301*-395 (2000)).

n142 *21 U.S.C. §§ 301*-395 (2002). *See also* FOOD AND DRUG LAW, *supra* note 106, at 13.

n143 *See* Shuren, supra note 133, at 301-02.

n144 FOOD AND DRUG LAW, *supra* note 106, at 452.

n145 *See* Gregory, *supra* note 103, at 125 (1997); Shuren, *supra* note 118, at 301.

n146 Shuren, *supra* note 133, at 102.

n147 *See* Gregory, *supra* note 103, at 125.

n148 FOOD AND DRUG LAW, *supra* note 106, at 452.

n149 Drug Amendments of 1962, Pub. L. No. 87-781, 76 Stat. 780 (1962) (codified as amended in scattered sections of 21 U.S.C. (2000)).

n150 *See 21 U.S.C. § 321* (2000).

n151 *See* Shuren, *supra* note 133, at 302.

n152 *See* Henry, supra note 104, at 379 ("Infants and children have been referred to as therapeutic orphans. The irony of this situation is that both the 1938 and 1962 Amendments to the Food, Drug and Cosmetic statutes grew out of therapeutic catastrophes in children.").

n153 *See, e.g., FDA Modernization Act: Implementation of the Law: Hearings Before the Senate Comm. on Health, Educ., Labor and Pensions*, 107th Cong. 54-57 (2001) [hereinafter *Hearings on Implementation of the FDA Modernization Act*] (statement of Myron Genel, M.D., on behalf of the American Academy of Pediatrics) (crediting the amendments as taking away the incentive for pharmaceutical companies to research the safety and effectiveness of their drugs in children); *Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83 (statement of Christopher-Paul Milne, Assistant Director, Tufts Center for the Study of Drug Development).

n154 Additional Protections for Children Involved as Subjects in Research, *48 Fed. Reg. 9814* (Mar. 8, 1983) (codified at 45 C.F.R. pt. 46 subpt. D). *See also* Final Regulations Amending Basic HHS Policy for the Protection of Human Research Subjects, *46 Fed. Reg. 8366, 8367-68* (Jan. 26, 1981) (codified at 45 C.F.R. pt. 46).

n155 *See* Additional Protections for Children Involved as Subjects in Research, *48 Fed. Reg. 9814* (Mar. 8, 1983) (codified at 45 C.F.R. pt. 46 subpt. D); Final Regulations Amending Basic HHS Policy for the Protection of Human Research Subjects, *46 Fed. Reg. 8366, 8367-68* (Jan. 26, 1981) (codified at 45 C.F.R. pt. 46).

n156 Labeling and Prescription Drug Advertising; Content and Format for Labeling for Human Prescription Drugs, *44 Fed. Reg. 37,434* (June 26, 1979) (codified at 21 C.F.R. pts. 201 and 202).

n157 *Id.*

n158 *Id.*

n159 Specific Requirements on Content and Format of Labeling for Human Prescription Drugs; Proposed Revision of "Pediatric Use" Subsection in the Labeling, *57 Fed. Reg. 47,423, 47,423-24* (Oct. 16, 1992) (codified at 21 C.F.R. pt. 201) (stating that "the 1979 regulations were intended to encourage drug labeling that would regularly provide adequate information about use of prescription drugs in children"). *See also* S. REP. NO. 107-79, at 3 (2001).

n160 Rodriquez et al., *supra* note 124, at 713. *See also* Gregory, *supra* note 103, at 129.

n161 Specific Requirements on Content and Format of Labeling, *57 Fed. Reg. at 47,423-24.*

n162 *See Hearings on FDA Reform, supra* note 110 (statement of Sanford N. Cohen, M.D., on behalf of the American Academy of Pediatrics).

n163 Specific Requirements on Content and Format of Labeling, *57 Fed. Reg. at 47,423.*

n164 *Id. at 47,424.*

n165 *Id.*

n166 Specific Requirements on Content and Format of Labeling for Human Prescription Drugs; Revision of "Pediatric Use" Subsection in the Labeling, *59 Fed. Reg. 64,240* (Dec. 13, 1994) (codified at 21 C.F.R. pt. 201).

n167 *Id. at 64,241.*

n168 *See id.*; Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *62 Fed. Reg. 43,901* (Aug. 15, 1997) (codified at 21 C.F.R. pts. 201, 312, 314, and 601).

n169 Specific Requirements on Content and Format of Labeling, *59 Fed. Reg. at 64,241.*

n170 Specific Requirements on Content and Format of Labeling, *57 Fed. Reg. at 47,426.*

n171 Specific Requirements on Content and Format of Labeling, *59 Fed. Reg. at 64,242.*

n172 *Id. at 64,243.*

n173 *Id. at 64,242-43.*

n174 *See id. at 64,242.*

n175 Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *63 Fed. Reg. 66,632, 66,632* (Dec. 2, 1998) (to be codified at 21 C.F.R. pts. 201, 312, 314, and 601).

> Pediatric labeling supplements were submitted for approximately 430 drugs and biologics, a small fraction of the thousands of prescription drug and biological products on the market. Of the supplements submitted, approximately 75 percent did not significantly improve pediatric use information. Over half of the total supplements submitted simply requested the addition of the statement 'Safety and effectiveness in pediatric patients have not been established.' Others requested minor wording changes or submitted unorganized, unanalyzed collections of possibly relevant data. Approximately 15 percent (approximately 65) of the supplements provided adequate pediatric information for all relevant pediatric age groups, and another 8 percent (approximately 35) provided adequate pediatric information for some but not all relevant age groups.

*Id.*

n176 *See* Karst, *supra* note 18, at 748; *Hearings on FDA Reform, supra* note 110 (statement of Sanford N. Cohen, M.D., on behalf of the American Academy of Pediatrics); Gregory, *supra* note 103, at 129.

n177 Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *62 Fed. Reg. 43,902* (Aug. 15, 1997) (codified at 21 C.F.R. pts. 201, 312, 314, and 601).

n178 *Id.*

n179 *Id.*

n180 *Id.*

n181 *Id. See also* Specific Requirements on Content and Format of Labeling for Human Prescription Drugs; Revision of "Pediatric Use" Subsection in the Labeling; Extension of Compliance, *61 Fed. Reg. 68,623, 68,623* (Dec. 30, 1996) (codified at 21 C.F.R. pt. 201).

n182 *See generally* Regulations Requiring Manufacturers to Assess the Safety and Effectiveness, *62 Fed. Reg. at 43,900, 43,902.*

n183 *Id. at 43,913.*

n184 *Id.*

n185 *Id. at 43,903-05.*

n186 *Id.*

n187 *Id. at 43,914.*

n188 *See, e.g., Hearings on Implementation of the FDA Modernization Act, supra* note 153 (statement of Alan F. Holmer, President, Pharmaceutical Research and Manufacturers of America) (urging the FDA to "delay

finalizing the August 11, 1997 proposed regulation until Congress, the pharmaceutical industry, and the agency are able to measure the effectiveness of Section 111.").

n189 *See* Food and Drug Administration Modernization Act of 1997, Pub. L. No. 105-115, 111 Stat. 2309 (codified as amended in scattered sections of 21 U.S.C.).

n190 *Id.*

n191 *21 U.S.C. § 355a.*

n192 *Id.*

n193 *Id.*

n194 *See, e.g., Hearings on Better Pharmaceuticals for Children, supra* note 100 (statement of Janet Heinrich, Director, Health Care-Public Health Issues).

n195 *Id.* These sections outline how the six-month extension attaches to the patent term or the exclusivity terms under *35 U.S.C. § 156* (2000). Section 355a(a) applies to new drugs, and section 355a(c) applies to already marketed drugs.

n196 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 25.

n197 *Id.*

n198 *User Fees, Pediatric Exclusivity Keys in FDAMA Reauthorization*, FOOD & DRUG LETTER, June 22, 2001 [hereinafter *User Fees], available at 2001 WL 8214943.*

n199 *See 21 U.S.C. § 355a.*

n200 The Act does not refer to the FDA, but rather to the Secretary of Health and Human Services ("HHS"). For purposes of describing the Act, the FDA and the Secretary of HHS are used interchangeably because, in practice, the FDA carries out the pediatric exclusivity provision. *See* Delegations from the Secretary of Health and Human Services to the Commissioner of Foods and Drugs, 21 C.F.R. § 5.10 (2002).

n201 *21 U.S.C. §§ 355a*(a), (c); Drug Price Competition and Patent Term Restoration Act of 1984 ("Waxman-Hatch Act"), Pub. L. No. 98-417, 98 Stat. 1585 (codified at *35 U.S.C. § 355*). The Waxman-Hatch Act established periods of exclusivity in addition to the patent term. *Id.* § 335j. It offers two main "exclusivity" terms: (1) up to five years of market exclusivity for a pioneer drug (on-patent drug) when its manufacturer completes research about that drug's usefulness for new indications and (2) 180 days generic exclusivity to the first generic to have its abbreviated new drug application approved by the FDA. *35 U.S.C. § 156.*

n202 *21 U.S.C. § 355a*(a), (c). Under FDA guidelines, a manufacturer can submit a proposal for a request to the FDA. *See Hearings on Better Pharmaceuticals for Children, supra* note 100 (prepared statement of Janet Woodcock, M.D., Director for Center for Drug Evaluation and Research, Food and Drug Administration). The FDA uses this proposal as a basis for its request. *Id.*

n203 *21 U.S.C. § 355a*(d)(1).

n204 *See Hearings on Better Pharmaceuticals for Children, supra* note 100 (prepared statement of Janet Woodcock, M.D., Director for Center for Drug Evaluation and Research, Food and Drug Administration).

n205 *21 U.S.C. § 355a*(b). The FDA created a draft list by the middle of March 1998. *See National Pharmaceutical Alliance v. Henney, 47 F. Supp. 2d 37, 39 (D.D.C. 1999).* The FDA received input for the list from: the American Academy of Pediatrics, Pharmaceutical Research and Manufacturers of America, National Pharmaceutical Alliance, Generic Pharmaceutical Industry Association, National Institutes of Health, Pediatric Pharmacology Research Units Network, National Association of Pharmaceutical Manufacturers, and U.S. Pharmacopoeia. *Id.*

n206 *See Hearings on Better Pharmaceuticals for Children, supra* note 100 (prepared statement of Janet Woodcock, M.D., Director for Center for Drug Evaluation and Research, Food and Drug Administration).

n207 *21 U.S.C. § 355a*(i).

n208 *Id.*

n209 S. REP. NO. 105-43, at 52 (1997).

n210 *Id.*

n211 *21 U.S.C. § 355a*(i).

n212 S. REP. NO. 105-43, at 52.

n213 Pharmaceutical companies have a vested interest in avoiding pediatric studies. As long as off-label pediatric prescriptions are permissible, the manufacturers can avoid liability for an adverse reaction in a child if that drug was not indicated for use in children. *See* Specific Requirements on Content and Format of Labeling, *59 Fed. Reg. 64,242* (codified at 21 C.F.R. pt. 201) (stating that drug manufacturers, for example, were nervous that the 1994 rule would expose them to liability if they were forced to include pediatric labeling even though the data was not, in their view, sufficient); Rachel Zimmerman, *Drug Makers Find a Windfall Testing Adult Drugs on Kids*, WALL ST. J. INTERACTIVE ED., Feb. 5, 2001, at 1, 3 (arguing that publicity could hurt drug sales in all age groups).

Furthermore, pharmaceutical companies would need to overcome numerous financial, ethical, and scientific boundaries in order to conduct successful studies on an ongoing basis. *See supra* Part I. As the Senate report for the FDAMA noted:

there is little incentive for drug sponsors to perform studies for medications which they intend to market primarily for adults and whose use in children is expected to generate little additional revenue. Pediatric studies pose ethical and moral issues relating to using new unapproved drugs in young patients. Second, there are substantial product liability and medical malpractice issues. Third, pediatric patients are more difficult to attract into studies. Fourth, for some drugs, pediatric use represents more difficult issues of drug administration and patient compliance than adult use.

S. REP. NO. 105-43, at 51 (1997).

n214 *See* S. REP. NO. 105-43, at 51 (1997).

n215 *21 U.S.C. § 355a*(k).

n216 *Id.* § 355a(j).

n217 An active moiety is the "molecule or ion . . . responsible for the physiological or pharmacological action of the drug substance." *21 C.F.R. § 314.108 (2002).*

n218 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 7.

n219 *Id.*

n220 *Id.*

n221 Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drug Products and Biological Products in Pediatric Populations, *63 Fed. Reg. 66,632, 66,633* (Dec. 2, 1998) (codified at 21 C.F.R. pts. 201, 312, 314, and 601). Generic drug companies, led by the General Pharmaceutical Industry Association ("GPIA"), were dismayed by this interpretation, which could potentially cost generic manufacturers billions of dollars. *Generic Makers Fight for Level Playing Field*, CHAIN DRUG REV., Aug. 30, 1999, at RX 80. The six-month extension was already a setback for them because they now had to wait an extra six months before their drugs could hit the market. The application of the extension to all drugs containing a given moiety only further cut into the generic manufacturers' share of the pharmaceutical market. *See id.; Debate Over Exclusivity for Pediatric Provision Testing Heats Up; Generic Pharmaceutical Industry Association*, CHAIN DRUG REV., Apr. 26, 1999, at RX 38; 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 17. Generic manufacturers argued that the "moiety interpretation" of the provision "frustrates incentives for pediatric research by conferring lucrative benefits on 'innovator' drug manufacturers that are completely out of proportion to the useful pediatric data generated in return." *National Pharmaceutical Alliance v. Henney, 47 F. Supp. 2d. 37, 39 (D.D.C. 1999)* (internal citation omitted). GPIA sought a preliminary injunction against implementation of the FDA policy in the District Court of the District of Columbia. *Id. at 38.* The District Court denied the preliminary injunction, finding that the FDA was "entitled to the deference normally accorded to regulatory agencies." *Id. at 38-40.*

n222 *Hearings on Better Pharmaceuticals for Children, supra* note 100, at 4 (statement of Janet Heinrich, Director, Health Care-Public Health Issues). By September 30, 2002, the FDA had issued a total of 253 written requests. Pediatric Exclusivity Studies as of September 30, 2002, *available at* http://www.fda.gov/cder/pediatric/wrstats.htm.

n223 *Id.*

n224 *Id.* at 45.

n225 Rodriquez et al., *supra* note 124, at 718. At the time the article was written, twenty-seven drugs had been granted pediatric exclusivity and, in the authors' estimation, only six of those drugs resulted in significant improvement in pediatric labeling. *Id.* The authors found that the following drugs had greatly improved labels: Midozolam, Etodolac, Fluxamine, Gabapentin, Loratadine, and Propofol. *Id.*

n226 S. REP. NO. 107-79, at 1-2 (2001).

n227 The FDA itself may have been at fault for some of the delay. *See* Karst, *supra* note 18, at 767 (noting that some pharmaceutical companies believed the FDA purposefully withheld patent extensions). At least one court found that the FDA was reading its requirements too strictly. *See Merck v. FDA, 148 F. Supp. 2d 27 (D.D.C. 2001).* In *Merck*, the court granted Merck, the pharmaceutical company that sued the FDA, an injunction pending a trial on the merits to determine whether the FDA had fairly interpreted the language of the statute. *Id. at 30.* Subsequently, the FDA conceded that it had used an incorrect legal standard. Merck v. FDA, Civ. Action No. 01-01343(JR). The Merck lawsuit captures the sentiment of many in the industry that the FDA was doing a poor job of implementing the exclusivity program--that it was abusing its authority over drug companies and thwarting the potential incentive.

n228 Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *63 Fed. Reg. 66,632, 66,633* (Dec. 2, 1998) (codified at 21 C.F.R. pts. 201, 312, 314, and 601).

n229 *Id.*

n230 *Id.*

n231 *Id.*

n232 *Id.*

n233 The 1998 final rule defined a substantial number of pediatric patients with the disease or condition for which the drug or biological product is indicated as 50,000. Regulations Requiring Manufacturers to Assess the Safety and Effectiveness, *63 Fed. Reg. at 66,636.*

n234 The 1998 final rule explained that a "meaningful therapeutic benefit" is created if the drug provides a significant improvement over existing adequately labeled remedies or if the drug is indicated for diseases for which there are currently few products labeled for pediatric use and more therapeutic options needed. *Id. at 66,635.*

n235 *21 C.F.R. § 201.23(a)*, (b) (2002).

n236 *Id.* § 201.23(c)(1)-(2).

n237 *Id.* § 201.23(c)(1). If a waiver were granted because of safety or ineffectiveness concerns, the waiver would be conditioned on the manufacturer's labeling the drug to reflect that it was unsafe or ineffective. *Id.* § 201.23(c)(3).

n238 *See id.* § 201.23(c)(2). In addition to the two waiver conditions available for the full waiver, a partial waiver would be granted where the product: "(A) Does not represent a meaningful therapeutic benefit over existing therapies for pediatric patients in that age group, and (B) Is not likely to be used in a substantial number of patients in that age group, and (C) The absence of adequate labeling could not pose significant risks to pediatric patients." *Id.*

n239 *Id.* § 201.23(d). See Misbranded Drugs and Devices, *21 U.S.C. § 352* for the definition of "misbranded drug."

n240 Pediatric Use Information, *21 C.F.R. § 314.55(a) (2002)*.

n241 The rule included in the definition of "new drug": a new active ingredient, new indication, new dosage form, new dosing regimen, or new route of administration. *Id.* § 314.55(a).

n242 *Id.*

n243 Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *63 Fed. Reg. 66,632, 66,633-34* (Dec. 2, 1998) (codified at 21 C.F.R. pts. 201, 312, 314, and 601).

n244 *21 C.F.R. § 314.55(c)*; *21 C.F.R. § 201.23*.

n245 *21 C.F.R. § 314.55(b)*.

n246 *Id.*

n247 Nordenberg, *supra* note 16, at 28.

n248 Regulations Requiring Manufacturers to Assess the Safety and Effectiveness, *63 Fed. Reg. at 66,657*.

n249 *Id.*

n250 *Id.*

n251 Karst, *supra* note 18, at 762.

n252 *See, e.g., Ass'n of Am. Physicians and Surgeons, Inc. v. FDA, No. CV. 00-02898, 2002 WL 31323411,* at *1 (D.D.C. Oct. 17, 2002).

n253 Regulations Requiring Manufacturers to Assess the Safety and Effectiveness, *63 Fed. Reg. at 66,657*.

n254 *Id.*

n255 S. REP. NO. 105-43, at 52 (1997). *See also supra* text accompanying notes 209-210.

n256 *See Ass'n of Am. Physicians, 2002 WL 31323411,* at *4, *12 (noting that the 2002 legislation "reauthorized and expanded" the pediatric testing incentive set forth in the FDAMA and finding that with the legislation, Congress, "demonstrated its intention to occupy the field").

n257 *See* S. REP. NO. 107-79, at 4 (2001) ("The pediatric exclusivity provision has done more to generate clinical studies and useful prescribing information for the pediatric population than any other regulatory or legislative decision to date."). *See generally Hearings on Better Pharmaceuticals for Children, supra* note 100, at 6 (statement of Janet Heinrich, Director, Health Care-Public Health Issues).

n258 *Hearings on Implementation of the FDA Modernization Act, supra* note 153 (statement of Myron Genel, M.D., on behalf of the American Academy of Pediatrics).

n259 *Hearings on Better Pharmaceuticals for Children, supra* note 100, at 55 (statement of Robert Ward, M.D., on behalf of the American Academy of Pediatrics).

n260 *See id.*

n261 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at ii.

n262 *See, e.g., Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83, at 96 (statement of Timothy R. Franson, Vice President, Clinical Research & Regulatory Affairs, Lilly Research Laboratories, Eli Lilly and Company on behalf of the Pharmaceutical Research and Manufacturers of America).

n263 *See id.* at 79 (statement of Richard Gorman, M.D., on behalf of the American Academy of Pediatrics).

n264 *Hearings on Better Pharmaceuticals for Children, supra* note 100, at 58 (statement of Robert Ward, M.D., on behalf of the American Academy of Pediatrics).

n265 *See* 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 24. For example, oncology groups argued that the exclusivity provision had not done enough to promote research in cancer drug therapies. *Id.*

n266 *See* Zimmerman, *supra* note 92, at 4-5. For example, Eli Lilly's spokesperson noted that the incentive was key to its decision to proceed with three pediatric studies for which it had already developed protocols but had not yet initiated. *Id.* at 4.

n267 *See* Stolberg, *supra* note 118, at 1.

n268 *See Hearings on Better Pharmaceuticals for Children, supra* note 100, at 43-45 (statement of Janet Heinrich, Director, Health Care-Public Health Issues).

n269 *See Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83, at 113 (statement of Christopher-Paul Milne, Assistant Director, Tufts Center for the Study of Drug Development) (explaining that the provision sparked an increase in research facilities and researchers).

n270 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 14. *See also* S. REP. NO. 107-79, at 11 (2001).

n271 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 14.

n272 *Id.*

n273 *Id.* (reporting that the Tufts Center for the Study of Drug Development estimates that the pediatric exclusivity provision saves up to $ 7 billion per year "by making treatments more effective for pediatric patients").

n274 *See generally User Fees, supra* note 198.

n275 Marilyn Elias, *Plan to End Pediatric Drug Trials Draws Fire; Lawsuit Says FDA Exceeds Its Powers By Ordering Tests*, USA TODAY, Apr. 3, 2002, at D9 (quoting a member of the Competitive Enterprise Institute as saying that the FDA "has no business telling private companies to add pediatric tests and label claims.").

n276 S. REP. NO. 105-43, at 51 (1997). *See also* Marc Kaufman, *Judge Rejects Drug Testing on Children; Ruling Finds FDA Overstepped Authority in Forcing Pediatric Studies*, WASH. POST, Oct. 19, 2002, at A9.

n277 *See, e.g., Hearings on Better Pharmaceuticals for Children, supra* note 100 (statement of Stephen P. Speilberg, M.D., Ph.D., Vice-President, Pediatric Drug Development, Janssen Research Foundation, on behalf of the Pharmaceutical Research and Manufacturers of America) ("The difficulties of the studies and the small market for these drugs were acting as major impediments for pediatric drug development, and the basis of the legislation was that an incentive to do pediatric studies would overcome those obstacles.").

n278 *Id.*

n279 *Id.* ("Establishing and maintaining excellence in pediatric drug development is crucial to the success of the pediatric research incentive program, and to its goal of early, timely pediatric studies in the life cycle of medicines. This is driven to a great extent by the higher performing drugs within a company's portfolio. It is crucial for future drug development and innovation in pediatrics.").

n280 *See, e.g., Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83 (letter dated June 11, 2001 from Abbey S. Meyers, President, National Organization for Rare Disorders, Inc.) ("The real issue is that some drug companies receiving pediatric exclusivity are reaping rewards far greater than their investment in pediatric clinical trials. The financial rewards can sometimes be so great that they focus their research on only the most lucrative drugs, rather than the drugs children need most. *Nevertheless, my testimony clearly supports reauthorization of the pediatric exclusivity.*") (emphasis added).

n281 Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *63 Fed. Reg. 66,632* (Dec. 2, 1998) (codified at 21 C.F.R. pts. 201, 312, 314, and 601).

n282 *See, e.g., Hearings on Better Pharmaceuticals for Children, supra* note 100, at 55-60 (2001); *Hearings Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83, at 165-66.

n283 *See Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83 (statement of Travis Plunkett, Legislative Director, Consumer Federation of America on behalf of the Patient and Consumer Coalition) (providing an outline of most of the main ideas considered); 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 18.

n284 Hereinafter, the term "off-patent drugs" will include drugs that are no longer on a patent term and those drugs that no longer have an exclusivity period under the Hatch-Waxman Act or the Orphan Drug Act. *See* Regulations Requiring Manufacturers to Assess the Safety and Effectiveness, *63 Fed. Reg. at 66,633.*

n285 *See, e.g., Hearings on Better Pharmaceuticals for Children, supra* note 100, at 15-20 (statement of Sen. Mike DeWine (R-Ohio)); H.R. REP. 107-277, at 14 (2001) (noting that the exclusivity provision was inadequate because drugs without patent protection or exclusivity were not eligible for its incentive).

n286 The pediatric exclusivity provision did not use any language that referred to or encompassed drugs without patent or exclusivity terms. *See* Better Pharmaceuticals for Children Act, Pub. L. No. 107-109, 115 Stat. 1408 (2001) (codified at *21 U.S.C. § 355a); Zimmerman, supra* note 92.

n287 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 13. These ten drugs were prescribed 5 million times in 1994 and included albuterol inhalation solution for nebulization, phenergan, ampicillin injections, auralgan otic solution, lotrisone cream, Prozac, Intal, Zoloft, Ritalin, Alupent. Nordenberg, *supra* note 16.

n288 *See Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83, at 98 (statement of Timothy R. Franson, Vice President, Clinical Research and Regulatory Affairs, Lilly Research Laboratories, Eli Lilly and Company on behalf of the Pharmaceutical Research and Manufacturers of America).

n289 *See, e.g., Hearings on Better Pharmaceuticals for Children, supra* note 100, at 19 (2001) (statement of Sen. DeWine).

n290 *See id.* at 21, 24 (noting that the FDA, pediatrician groups and consumer groups supported the rule's codification); Public Citizen Congress Watch, *Pediatric Exclusivity: Changes Needed to Assure Safety Effectiveness of Medications for Children and More Affordable Drugs for Seniors* [hereinafter *Pediatric Exclusivity], available at* http://www.citizen.org/congress/reform/drug_patents/pediatric/articles.cfm?ID=5001 (last visited Oct. 2, 2002); *Exclusivity Periods: Pediatric Exclusivity Provision Battle Begins; Generic Consumer Groups Question FDAMA*, PHARMACEUTICAL L. & PUB. POL'Y, Aug. 2, 2001 [hereinafter *Exclusivity Periods*].

n291 *See, e.g.*, Press Release, American Academy of Pediatricians, Law Providing Safer Medications for Children Must Continue (May 4, 2001). For example, Dr. Philip Walson, a member of the AAP Committee on Drugs, stated: "We cannot lose sight of the law's goal to improve the safety and effectiveness of medications taken by children. If we tinker too much within the existing law or fail to renew the law altogether, the health of children will be compromised." *Id.*

n292 *Pediatric Exclusivity, supra* note 290.

n293 *Id.*

n294 *Id.*

N295 *See* 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 22.

n296 *See User Fees, supra* note 198.

n297 *See generally* Rachel Smolkin, *Pros, Cons of Pediatric Drug-Testing are Debated as Congress Debates Extending a Law that Promotes Testing Drugs for Use with Children, the Benefits and Drawbacks are Volleyed*, PITTSBURGH POST-GAZETTE, Aug. 5, 2001 at A3.

n298 *Hearings on Better Pharmaceuticals for Children, supra* note 100, at 3-4 (statement of Janet Heinrich, Director, Health Care-Public Health Issues).

n299 *Id.* at 4.

n300 *Id.*

n301 Zimmerman, *supra* note 92, at 2. These numbers represent the additional revenue earned on the extended exclusivity term of six months as compared to the revenue from the same amount of time in competition with generic drugs. *Id.*

n302 PUBLIC CITIZEN CONGRESS WATCH, *supra* note 12, at 4.

n303 *Id.*

n304 *User Fees, supra* note 198.

n305 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 14.

n306 *Id.*

n307 *See Markup of H.R. 2985, H.R. 2887, and H.R. 2983: Hearings Before the House Energy and Commerce Comm.*, 107th Cong. (Oct. 11, 2001) (statement of Rep. John D. Dingell, (D-Mich.)) (stating that "It is now my view that we made a mistake in enacting the pediatric exclusivity law. First, it establishes a voluntary 'incentive' for activity that should instead simply be required. Second, assuming that we choose to provide an incentive, the exclusivity program is more expensive, less equitable, and less efficient than any number of alternatives . . . . The central feature of this bill, exclusivity, is about further increasing the profits of an already bloated industry . . . . What have the parents, patients, and pediatricians received for this government-provided largess? Nothing."); *User Fees, supra* note 198 (arguing that "these windfalls come out of Americans' pockets because of this legislation as surely as they would if we had increased taxes and paid billions for pediatric trials directly . . . each time we extend patents of exclusivity, however laudable the purpose, we spend the public's money"); Zimmerman, *supra* note 92, at 2.

n308 *Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83, at 71-75 (2001) (statement of Carole Ben-Maimon, President and CEO, Proprietary Research and Development, Barr Laboratories) (expressing concern that the program disproportionately burdened the elderly). *See also Pediatric Indication Will Become Subject to User Fees*, WASH. DRUG LETTER, Dec. 24, 2001 [hereinafter *Pediatric Indication], available at* 2001 WL8205608. Representative Waxman argued that the "windfall has contributed to soaring out-of-pocket cost for seniors." *House Panel Clears Pediatric Study Bill*, GENERIC LINE, Oct. 19, 2001, *available at* WL 15571315.

n309 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 16-17.

n310 *Id.* at 17.

n311 *Id.* at 25.

n312 PUBLIC CITIZEN CONGRESS WATCH, *supra* note 12, at 10. *See also Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83, at 165-66 (letter dated June 11, 2001 from Abbey S. Meyers, President, National Organization for Rare Disorders, Inc.) (expressing concern that for the elderly and uninsured, half a percent is a significant amount).

n313 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 17.

n314 *See* Zimmerman, *supra* note 92, at 4-5; *Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83, at 4-5 (statement of Rep. Frank Pallone, (D-N.J.)) (expressing concern for the amount paid to drug companies for putting forth information that they already have and for paying them to do research on children that they should have done anyway).

n315 *See User Fees, supra* note 198; *Pediatric Exclusivity, supra* note 290.

n316 *See User Fees, supra* note 198.

n317 *See* S. REP. NO. 107-79, at 7 (stating that Senator Clinton proposed and then withdrew such an amendment).

n318 *User Fees, supra* note 198.

n319 *See Exclusivity Periods, supra note* 290; *Pharmaceuticals: Pediatric Exclusivity Provision Battle Begins, as Generic Consumer Groups Questions Law,* BNA'S HEALTH CARE DAILY REP., July 27, 2001.

n320 *See* H.R. REP. NO. 107-277, at 56 (2001) (referring to the Waxman-Brown Substitute).

n321 *User Fees, supra* note 198.

n322 Stolberg, *supra* note 118, at 1.

n323 *See Hearings on Better Pharmaceuticals for Children, supra* note 100 (prepared statement of Janet Woodcock, M.D., Director, Center for Drug Evaluation and Research, Food and Drug Administration); *Hearings on Better Pharmaceuticals for Children, supra* note 100, at 55 (statement of Robert Ward, M.D., on behalf of the American Academy of Pediatrics) (noting that the degree of caution necessary to neonatal study should not render such studies outside the scope of the incentives of pediatric exclusivity). *See, e.g.*, Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *63 Fed. Reg. 66,632* (Dec. 2, 1998) (codified at 21 C.F.R. pts. 201, 312, 314, and 601) (noting that the incentives of the FDAMA were insufficient to promote neonatal studies).

n324 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 13, 21. *See also New Incentive Proposed for Studies in Youngest Children,* WASH. DRUG LETTER, Sept. 10, 2001 [hereinafter *New Incentive], available at 2001 WL 8205396.*

n325 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 13. *See also New Incentive.*

n326 *See* 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at iii.

n327 PUBLIC CITIZEN CONGRESS WATCH, *supra* note 12, at 2.

n328 *Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83, at 68-69 (statement of Gregory L. Kearns, M.D., Professor and Chief, Division of Clinical Pharmacology and Medical Toxicology, Children's Mercy Hospital and Clinics).

n329 PUBLIC CITIZEN CONGRESS WATCH, *supra* note 12, at 10.

n330 *See* 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 20; *New Incentive, supra* note 325.

n331 *New Incentive, supra* note 325.

n332 *21 U.S.C. § 355a*(a)-(b) (2000).

n333 *Id.*

n334 *Id.*

n335 *Id.*

n336 *Hearings on Better Pharmaceuticals for Children, supra* note 100, at 7-8 (statement of Janet Heinrich, Director, Health Care-Public Health Issues).

n337 *Id.* at 7. This finding was based on the eighteen drugs granted pediatric exclusivity at the time the GAO conducted its survey. *Id.*

n338 *Id.*

n339 Representative Stupak's son committed suicide while on the prescription drug Accutane. *See* Jennifer Frey, *With Little Warning a Teen's Parents Were Not Aware that Their Son's Acne Medication Could Lead to Thoughts of Suicide, and They Never Suspected He Would Follow Through*, FLA. SUN-SENTINEL, Feb. 4, 2001, at E1. The drug, manufactured by Hoffman la Roche, did not contain a label warning that the drug might produce depression in teens, even though, by the time of Stupak's son's death, there appeared to be a correlation. *Id.* Accutane is prescribed for acne and is known to have a range of side-effects. *See generally* Tara Parker-Pope, *Alternative to Accutane: Parents Search for New, Less-Toxic Acne Treatments*, WALL ST. J., Apr. 30, 2002, at D1.

n340 147 CONG. REC. E23,890-901 (daily ed. Dec. 20, 2001) (statement of Rep. Stupak) ("What I find horrifying [about the pediatric exclusivity provision] is the grant of exclusivity takes place after the drug company does its study but before anyone knows what is included in the results of the study. Nothing is said to the general public--which includes parents and pediatricians--or prescribing physicians about the safety, effectiveness, or dosage requirements.")

n341 H.R. REP. NO. 107-277, at 56 (2001).

n342 *Id.*

n343 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 25.

n344 *See, e.g., Hearings on Better Pharmaceuticals for Children, supra* note 100, at 43-48 (statement of Janet Heinrich, Director, Health Care-Public Health Issues); Letter from Consumers Union Opposing House Pediatric Exclusivity Bill to Unspecified Representatives in Congress (Oct. 21, 2001), *available at* http://www.citizen.org/congress/reform/drug_patents/pediatric/articles.cfm?ID=6242; H.R. REP. NO. 107-277, at 57 (2001).

n345 *See Hearings Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83, at 3-4 (statement of Rep. Charlie Norwood (R-Ga.)) (expressing concern that making extensions conditional on labeling would counteract the incentive because pharmaceutical companies would want to avoid labeling drugs with negative information); *id.* at 8-11 (statement of Rep. Sherrod Brown (D-Ohio)).

n346 The provision required the FDA to develop such a list, *21 U.S.C. § 355a*(b), but a drug did not need to be on the list to be awarded exclusivity, nor did the FDA's selection of a drug for the list mean that the drug's manufacturer was required to complete testing on pediatric populations. 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 19.

n347 2001 STATUS REPORT TO CONGRESS, *supra* note 6, at 22.

n348 *See* Jill Wechsler, *Policy Makers Seek to Limit Payments for Medicines*, PHARMACEUTICAL EXEC., Feb. 1, 2002, *available at 2002 WL 13373489*. These companies argued that a new pediatric label could also qualify as a new indication under the terms of the Waxman-Hatch Act, entitling a company that satisfied the requirements of the provision to the six-month extension as well as to the three-year exclusivity term under the Waxman-Hatch Act. *Id.* Bristol-Myers Squibb even delayed the reauthorization of the legislation with its attempts to convince Congress of this interpretation. *Id.* After losing the general battle to have Congress include such an interpretation in the new legislation, it sought to obtain a special three-year extension for its diabetes drug Glucophage, continuing to bog down the entire bill's passage. *See infra* text accompanying notes 424-429. In the end, the legislation made no special provisions for Bristol-Myers Squibb. *Bush Signs Pediatric Incentive Bill Extending Exclusivity Provision until 2007*, BNA HEALTH CARE DAILY REP., Jan. 9, 2002.

n349 *See* Wechsler, *supra* note 348.

n350 *See, e.g., Hearings on the Effectiveness of the FDA Modernization Act, supra* note 83, at 166 (letter dated June 11, 2001 from Abbey S. Meyers, President, Nat'l Org. for Rare Disorders, Inc.).

n351 Best Pharmaceuticals for Children Act of 2002, Pub. L. No. 107-109, 115 Stat. 1408 (codified in scattered sections of 21 U.S.C. and 42 U.S.C.).

n352 The House passed House Bill 2887, its version of the bill, by a vote of 338 yeas, 86 nays, and 8 not voting. 147 CONG. REC. H8216 (daily ed. Nov. 15, 2001). The Senate passed its version of the bill, Senate Bill 1789, by voice vote on December 12, 2001. 147 CONG. REC. S13,070, 13,071 (daily ed. Dec. 12, 2001). The House approved the Senate's version by voice vote on December 18, 2001. 147 CONG. REC. H10,200, H20,212 (daily ed. Dec. 18, 2001).

n353 *21 U.S.C. § 355a*(n) (2002).

n354 *42 U.S.C. § 284m* (2002). *See generally* S. REP. NO. 107-79, at 7 (2001).

n355 H.R. REP. NO. 107-277, at 34 (2001); *42 U.S.C. § 284m*(a).

n356 *42 U.S.C. § 284m*(a)(1)(A)(iv); H.R. REP. NO. 107-277, at 34 (2001). The Foundation for Pediatric Research, which the BPCA establishes, is discussed below. *See infra* Part IV.A.2.

n357 *42 U.S.C. § 284m*(b)-(c).

n358 S. REP. NO. 107-79, at 6 (2001). The section eliminated was U.S.C. § 355a(b).

n359 The BPCA refers to the "Secretary," but for purposes of this Act, the two are interchangeable and will be used so here. *See* Delegations from the Secretary of Health and Human Services to the Commissioner of Foods and Drugs, 21 C.F.R. § 5.10 (2002).

n360 *42 U.S.C. § 284m*(c).

n361 *Id.* § 284m(c)(2). Once a drug application holder has declined to conduct a test or misses the thirty day deadline, it is not eligible to respond to a written request for a contract from the FDA. *Id.* § 284m(c)(3).

n362 *Id.* § 284m(b).

n363 *Id.* § 284m(c)(6)(B). *See also* S. REP. NO. 107-79, at 3 (2001).

n364 *21 U.S.C. § 355a*(j); *42 U.S.C. § 284m*(c)(7)(C).

n365 *42 U.S.C. § 284m* 4091(c)(7).

n366 S. REP. NO. 107-79, at 3 (2001).

n367 *42 U.S.C. § 284m*(c)(8).

n368 *Id.* § 284m(c)(7)(C).

n369 *Id.* § 284m(c)(8)(A).

n370 *Id.* § 284m(c)(8)(B).

n371 *Id.* § 284m(c)(9).

n372 *Id.*

n373 *Id.* § 284m(c)(10).

n374 *Id.*

n375 *Id.* § 284m(c)(11). The Senate Report explains that the

> government would make its case that a company's drug is misbranded before the court by show-ing that FDA made an initial request for relabeling that the company refuse [sic], that FDA re-ferred the issue of [sic] the Pediatric Advisory Subcommittee, which reviewed the matter and made a recommendation about a labeling change to FDA, that FDA made a second request for a labeling change, which the company refused, and that FDA's second requested labeling change

was appropriate because without the change the drug would lack adequate direction for use in children.

S. REP. NO. 107-79, at 9 (2001).

n376 *42 U.S.C. § 284m*(d).

n377 *Id. See also* S. REP. NO. 107-79, at 12 (2001).

n378 *21 U.S.C. § 355a*(d)(4)(A).

n379 *Id.*

n380 *Id.* § 355a.

n381 *Id.* § 379h(a)(1).

n382 *See Pediatric Indication, supra* note 308.

n383 S. REP. NO. 107-79, at 2 (2001).

n384 *See 21 U.S.C. § 321*(kk) (defining a "priority supplement" as "a drug application referred to in section 101(4)" of the FDAMA); H.R. REP. NO. 107-277, at 36 (2001); S. REP. NO. 107-79, at 12 (2001).

n385 *21 U.S.C. § 355a*(b)(1)(F).

n386 *Id.* § 355a(d)(4)(A).

n387 *Id.* § 355a(d)(3).

n388 *Id.* § 355a(i)(2)(C).

n389 *Id.* § 355a(i)(2)(D).

n390 *Id.*

n391 *42 U.S.C. § 290b.*

n392 *Id.*

n393 The Foundation is designed to serve the National Institutes of Health. *Id.* § 290b(a)-(b). Pediatric studies are one of its charges, but not its only responsibility. *See id.* § 290b(c).

n394 *See id.* § 290b(a)-(b); H.R. REP. NO. 107-277, at 39 (2001).

n395 *42 U.S.C. § 290b*(c)(1).

n396 *See id.*

n397 H.R. REP. NO. 107-277, at 35 (2001).

n398 *42 U.S.C. § 290b.*

n399 *21 U.S.C. § 393a*(a).

n400 *Id.* § 393a(c).

n401 *42 U.S.C. § 284m.*

n402 *See* Additional Safeguards for Children in Clinical Investigations, *21 C.F.R. §§ 50.50-.56* (2002).

n403 *21 U.S.C. § 355.*

n404 *Id.*

n405 *Id.*

n406 *See infra* note 227 and accompanying text.

n407 *See, e.g., 42 U.S.C. § 284m*(c)(11); *21 U.S.C. § 355a*(a).

n408 *Merck v. FDA, 148 F. Supp. 2d 27, 29 (D.D.C. 2001).*

n409 *42 U.S.C. § 289.*

n410 *Id. See also* Internal Review Board Duties, *21 C.F.R. § 50.50 (2002)*; Clinical Investigations Not Involving Greater than Minimal Risk, *21 C.F.R. § 50.51 (2002)*.

n411 *21 U.S.C. § 355a.*

n412 *Id.* § 355a(d)(2).

n413 *Id.* § 355a.

n414 *Id.*

n415 *Id.* § 355a(a). *See also* S. REP. NO. 107-79, at 3 (2001) (stating that neonates are newborns to one month old).

n416 S. REP. NO. 107-79, at 10 (2001).

n417 *Id.*

n418 This conclusion is based on the difficulty the FDA has had thus far in procuring tests on neonates through voluntary incentives. *See* Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *63 Fed. Reg. 66,632, 66,633-34* (Dec. 2, 1998) (codified at 21 C.F.R. pts. 201, 312, 314, and 601).

n419 *21 U.S.C. § 355*(j)(5)(B)(iv); S. REP. NO. 107-79, at 6 (2001) ("When Congress passed the Pediatric Exclusivity Provision in 1997, it had not meant to change the incentives for challenging patents under the Waxman-Hatch Act by reducing periods of [abbreviated new drug application (generic)] exclusivity.").

n420 *21 U.S.C. § 355a*(k).

n421 S. REP. NO. 107-79, at 5 (2001).

n422 H.R. REP. NO. 107-277, at 36-37 (2001).

n423 *21 U.S.C. § 355a*(l).

n424 *Id.* at § 355(c).

n425 *21 U.S.C. § 355a*(l)(1). A drug company may be awarded three years of exclusivity if it discerns new clinical uses for a drug already approved. *21 U.S.C. § 355*(j)(5).

n426 H.R. REP. NO. 107-277, at 37 (2001).

n427 *Id.*

n428 *21 U.S.C. § 355a*(l)(2)(a)-(b). *See also* H.R. REP. NO. 107-277, at 37 (2001).

n429 S. REP. NO. 107-79, at 8 (2001); H.R. REP. NO. 107-277, at 37 (2001).

n430 *21 U.S.C. § 355a*(n).

n431 *Id.* § 355a(m).

n432 *Id.* §§ 355a(m)(1)-(4).

n433 *Id.* § 355b(a).

n434 *Id.*

n435 *Id.* §§ 355b(a)(1)-(2).

n436 H.R. REP. NO. 107-277, at 27 (2001) (recommending that "auxiliary labels" be placed on the bottles or vials themselves).

n437 *21 U.S.C. § 355b*(b)(1).

n438 *See* 147 CONG. REC. H10,200-01 (daily ed. Dec. 18, 2001) (statement of Rep. Michael Bilirakis (R-Fla.)) ("If it's not broken--don't fix it. By all accounts . . . this program is a resounding success. According to the FDA, 'the pediatric exclusivity provision has been highly effective in generating pediatric studies on many drugs and in providing useful new information in product labeling.' The American Academy of Pediatrics states that they 'can not overstate how important this legislation has been in advancing children's therapeutics.'") *Id.* at H10,202. *See also* 147 CONG. REC. E2073 (daily ed. Nov. 14, 2001) (statement of Rep. Albert Wynn (D-Md.)) (expressing his view that Congress included a sunset provision in the original enactment out of concern that the program would not work, but arguing that since it had been successful it should be renewed.).

n439 *See, e.g.*, Jim Geraghty & Megan Scully, *Child Drug Incentives Challenged Watch-dogs Wary of Pharmaceutical Industry "Windfall,"* RECORD (Bergen County, N.J.), (Aug. 8, 2001) (quoting Dr. Steve Berman, then-president of the American Academy of Pediatrics, to say "What this law has given us over the last four years is a windfall of new, quality information about medications children use every day . . . . We can't go back to the days when children's needs are ignored, and that's what could happen if we tinker with this bill at this stage . . . . We should not be willing to sacrifice the tremendous progress we've made."). *Id.*

n440 *Hearings on Better Pharmaceuticals for Children, supra* note 100, at 55 (statement of Robert Ward, M.D., on behalf of the American Academy of Pediatrics).

n441 Robert Pear, *Judge Rules on Pharmaceutical Tests*, N.Y. TIMES, Oct. 19, 2002, at A9.

n442 *See* Kaufman, *supra* note 276, at A9; *Ass'n of Am. Physicians and Surgeons, Inc. v. FDA, No. CV. 00-02898, 2002 WL 31323411,* at *1 (D.D.C. Oct. 17, 2002). The plaintiffs in this case "argued that the FDA has no authority to require manufacturers to (1) conduct studies of drug uses for which they do not intend to seek approval or (2) devise formulations of the drug tailored to those uses." *Id.* at *5.

n443 *See, e.g.*, Kaufman, *supra* note 276, at A9. Competitive Enterprise Institute's general counsel explained: "The FDA essentially claimed it could force new uses, or new patient populations--in this case, children--on a label. While the rule was limited to pediatric uses, it opened the door for testing requirements for other off-label special patient populations and for other off-label uses." *Id.*

n444 Pear, *supra* note 441, at A9. The Competitive Enterprise Institute general counsel also emphasized the economic risks of a mandatory structure, saying that allowing the FDA to require testing "would have made drugs scarcer and more expensive in the long run, by adding to the risk and the expense of drug development." *Id.*

n445 *Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83, at 97 (May 3, 2001) (prepared statement of Timothy Franson, Vice President, Clinical Research and Regulatory Affairs, Lilly Research Laboratories, Eli Lilly and Company on Behalf of the Pharmaceutical Research and Manufacturers of America) ("Thanks to . . . the FDAMA, a company R&D director today can weigh the substantial cost of pediatric drug development against the incentive . . . provided in FDAMA . . . . The incentive has meant that kids are now standing on equal terms with adults in the stiff competition for research dollars at our companies.").

n446 *See* H.R. REP. NO. 107-277, at 56-58 (2001). These members included Representatives John D. Dingell, Sherrod Brown, Henry A. Waxman, Peter Deutsch (D-Fla.), Frank Pallone, Jr., Tom Barrett (D-Wis.), and Bart Stupak. The House members were actually writing about House Bill 2887, their version of the Best Pharmaceuticals for Children Act. The two versions are slightly different, but not for the purposes of the dissenters' arguments, so the BPCA is used for the sake of clarity.

n447 *Id.* at 56.

n448 *Id.*

n449 *Id.*

n450 *Id.*

n451 *Id.*

n452 *Id.*

n453 *Id.* at 57.

n454 *Id.*

n455 For a discussion of the dissent in the Senate, see S. REP. NO. 107-79, at 6 (2001) (noting that some amendments to BPCA were offered and withdrawn).

n456 *Id.*

n457 These consumer advocacy groups included, among others: Alpha 1 Foundation; Alliance for Retired Americans; American Federation of State, County and Municipal Employees; Center on Disability and Health; Center for Medical Consumers; Consumer Federation of America; Consumers Union; Families USA; Gray Panthers; International Union; National Consumer League; National Organization for Rare Disorders; National Women's Health Network; Public Citizen; Scleroderma Foundation; Service Employees International Union; USAction; and USPIRG. Public Citizen Congress, *Watch List of Groups that Also Oppose Dodd-DeWine in Its Current Form but May Not Subscribe to All the Points of Public Citizen's Analysis of the Bill, available at* http://www.citizen.org/congress/reform/drug_patents/pediatric/articles.cfm?ID=5000 (last visited Sept. 20, 2002).

n458 PUBLIC CITIZEN CONGRESS WATCH, *supra* note 12. Indeed, consumer advocates accused pharmaceutical companies of unduly influencing legislators. *Id.* After the reforms it supported were not included in the BPCA, Public Citizen Congress Watch wrote a letter claiming that more comprehensive legislation was impossible because of industry lobbying. *Id.* The organization reported that those members of the Health Subcommittee of the House Energy and Commerce Committee who voted to retain the six-month patent extension had received on average $ 64,691 in campaign contributions from drug companies since 1990, while those who voted for amendments that would have reduced the extension accepted an average of $ 25,493 from drug companies during the same period. *Id.* at ii. Moreover, it found that three of the four sponsors of the BPCA--Senator Christopher Dodd, Senator Mike DeWine, and Representative Anna Eshoo (D-Cal.)--were among the top ten recipients of campaign contributions from the drug industry. *Id.*

n459 *See* Ceci Connolly, *FDA to Suspend a Rule on Child Drug Testing; Agency Says Patent Plan Meets Safety Goal*, WASH. POST, Mar. 19, 2002, at A10.

n460 *See* Associated Press, *FDA Changes Course on Child Tests*, L.A. TIMES, Apr. 20, 2002, at A17; Connolly, *supra* note 459, at A10.

n461 *Democrats Protest FDA Plan to Suspend Pediatric Testing Rule*, WASH. DRUG LETTER, Mar. 25, 2002.

n462 *Id.*

n463 *Id.*

n464 Marc Kaufman & Ceci Connolly, *U.S. Backs Pediatric Tests in Reversal on Drug Safety*, WASH. POST, Apr. 20, 2002, at A3.

n465 Press Release, U.S. Dep't of Health and Human Servs., HHS Launches New Pediatric Drug Safety Initiative (Apr. 19, 2002), *available at* http://www.hhs.gov/news/press/2002pres/20020419b.html.

n466 *Id. See also* Obtaining Timely Pediatric Studies of and Adequate Pediatric Labeling for Human Drugs and Biologics, *67 Fed. Reg. 20,070* (Apr. 24, 2002) (to be codified at 21 C.F.R. pts. 201, 312, 314, and 601).

n467 *Id. at 20,070.*

n468 *Id. at 20,071.*

n469 *Id. at 20,072.*

n470 Kaufman & Connolly, *supra* note 464, at A3.

n471 *Id.*

n472 *See* Jennifer Silverman, *FDA to Retain, Update Pediatric Drug Rule as Part of New HHS Initiative*, FAM. PRAC. NEWS, May 15, 2002, *available at 2002 WL 18106374*. The General Counsel for the Competitive Enterprise Institute, one of the groups suing the FDA along with the Association of American Physicians and Surgeons to prevent enforcement of the 1998 final rule, conceded that if the rule were codified their "claim . . . would be gone." *Id. See also Sanity on Pediatric Drug Safety*, N.Y. TIMES, Apr. 23, 2002 at A28.

n473 S. 2394, 107th Cong. (2002). *See also* Silverman, *supra* note 472.

n474 Kaufman & Connolly, *supra* note 464, at A3 (reporting that a spokesperson for PhRMA stated that the group was willing to accept such a requirement "as long as the incentives were in place.").

n475 *Ass'n of Am. Physicians and Surgeons, Inc. v. FDA, No. CV. 00-02898, 2002 WL 31323411*, at *1 (D.D.C. Oct. 17, 2002).

n476 *Id.*

n477 *Id.* at *11.

n478 *Id.* at *13.

n479 *Id.* at *8 (noting that determining whether the FDA overstepped the bounds of the FDCA's labeling provisions was a close question).

n480 *See id.* at *12-*13.

n481 S. REP. NO. 105-43, at 52 (1997).

n482 *21 U.S.C. § 355a*(h) (2002).

n483 *See, e.g., Hearings on Evaluating the Effectiveness of the FDA Modernization Act, supra* note 83, at 65-109 (statement of Gregory Kearns, M.D.) (claiming that the "FDAMA conjoined with the 1998 Pediatric Final Rule, provides a most effective 'weapon' to bring pediatric therapeutic injustice to an end.").

n484 Generally, when Congress is silent on an issue, an administrative agency, such as the FDA, is presumed to have discretion to interpret the legislation as it sees fit. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)* (establishing a deferential standard for reviewing administrative agency interpretations of statutory language if (1) Congress is silent or ambiguous as to the challenged matter and (2) the interpretation is reasonable); *Whitman v. American Trucking, 531 U.S. 457 (2001)* (reaffirming deferential judicial standard to reasonable agency interpretation of statute). *But see Ass'n of Am. Physicians, 2002 WL 31323411,* at *1 (explaining that congressional inaction on an issue is not a basis for statutory interpretation) (citing *Brown & Williamson Tobacco Corp. v. FDA, 153 F.3d 155, 170 (4th Cir. 1998)).*

n485 Laura Meckler, *U.S. Court Rejects Efforts to Test Drugs On Children: The Decision Means Companies Don't Have to Study Adult Medicines Often Given to Children*, PHIL. INQUIRER, Oct. 20, 2002, at A7. The Director of Public Policy at the Elizabeth Glaser Pediatric AIDS foundation characterized the ruling as "a devastating setback to children's health in this country," promising that "there's going to be a lot of additional enthusiasm and energy behind this [legislation] as a result of the ruling." *Id.*

n486 *Court Tosses Out Rule on Drugs Tests*, CHARLOTTE OBSERVER, Oct. 19, 2002, *available at 2002 WL 101038056.*

n487 *Id.*; Laura Meckler, *Court Tosses Drug Testing Rules for Kids*, MILWAUKEE J. SENTINEL, Oct. 19, 2002, at 2A. Senator DeWine noted that the case for codification was now much stronger, as children will be harmed without the legislation. *Id.*

n488 Chris Adams, *FDA Can't Require Drug Makers to Test on Children*, WALL ST. J., Oct. 21, 2002, at B4.

n489 *Id.*

n490 *See* Additional Safeguards for Children in Clinical Investigations, *21 C.F.R. § 50.50-.56* (2002).

n491 *Id.*

n492 *Id.* § 314.55(c).

n493 *Id.* § 314.55(b).

n494 *See supra* Section I.

n495 *See* Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and
Biological Products in Pediatric Patients, *63 Fed. Reg. 66,632, 66,654-56,* (Dec. 2, 1998) (to be codified at 21
C.F.R. pts. 201, 312, 314, and 601) (noting that because pediatric patients are a vulnerable population, special
protections are needed to shield them from undue risk). *See generally* 21 C.F.R. §§ 46, 50.51-.56, 56.101-.102,
56.109, 56.111) (2002).

n496 *See* PUBLIC CITIZEN CONGRESS WATCH, *supra* note 12.

n497 Best Pharmaceuticals for Children Act of 2002, Pub. L. No. 107-109, §§ 6, 14, 115 Stat. 1414, 1419
(codified at *21 U.S.C. §§ 284m,* 393a). *See also* List of Standing Advisory Committees, *21 C.F.R. § 14.100
(2002).*

n498 21 C.F.R. §§ 50, 56 (2002).

n499 *See generally* Lars Noah, *Rewarding Regulatory Compliance: The Pursuit of Symmetry in Products
Liability, 88 GEO. L.J. 2147 (2000).* The problem with this solution, however, is that product liability actions
are incredibly expensive to mount. Without the incentive of punitive damages, lawyers will be less willing to
take on liability suits on a contingency basis. This explains the importance of a secondary claims system in com-
bination with any form of an FDA defense.

n500 National Childhood Vaccine Injury Act, Pub. L. No. 99-660, § 311, 100 Stat. 3743, 3755-84 (1986)
(codified as amended in scattered sections of 21 U.S.C. and 42 U.S.C. (2000)).

n501 It is worth noting that the vaccine compensation program has become subject to criticism for its failure
to compensate children sufficiently for their injuries. *See, e.g.,* Derry Ridgway, *No-Fault Vaccine Insurance:
Lessons from the National Vaccine Injury Compensation Program,* 24 J. HEALTH POL. POL'Y & L. 59, 82-83
(1999). Any new program modeled on the vaccine program would need to take the alleged failures of the vac-
cine program into account and make adjustments accordingly. The current criticisms of the vaccine program are:
(1) the process to obtain compensation has become too adversarial and fails to adequately protect and fairly
compensate claimants; (2) the industry has lost the incentive to create safer vaccines because it knows that it will
not face punitive damages; (3) the special masters who hear claims are not subject to sufficient review; (4) cur-
rent levels of compensation are insufficient to reflect the costs of caring for an injured child; and (5) costs
awarded for attorney's fees fail to reflect the actual cost of hiring a lawyer skilled in children's medicine, which
has become increasingly necessary as the process has become more adversarial. *See id.*; Leonard D. Pertnoy, *A
Child's View of Recovery Under the National Children's Vaccine Act or "He Who Hesitates is Lost," 59 MONT.
L. REV. 275, 276-77 (1998);* Michael E. Horwin, *Ensuring Safe, Effective Vaccines for Children, 37 CAL. W. L.
REV. 321, 328-29 (2001);* Breen, *supra* note 63, at 321-26.

n502 *See* National Swine Flu Immunization Program of 1976, *42 U.S.C. § 247b*(k)(1)(A) (repealed 1978)
for another example of tort liability protection for manufacturers. In March 1976, there was an outbreak of an in-
fluenza named swine flu. Congress attempted to establish a vaccine program, but the manufacturers refused to

produce the vaccine without insurance against tort claims, and insurance companies refused to stand behind the vaccine. FOOD AND DRUG LAW, *supra* note 106, at 716. Congress solved the problem by creating the National Swine Flu Immunization Program, which directed all liability suits arising from claims of alleged vaccine injury to be brought against the United States government under procedures almost identical to those of the Federal Tort Claims Act. *Id.* at 717.

n503 *See* Children's Health Act of 2000, Pub. L. No. 106-310, 114 Stat. 1101 (codified as amended in scattered sections of *42 U.S.C., 21* U.S.C., *28 U.S.C., 18* U.S.C., and 25 U.S.C.). It was not until this Act that the FDA enacted clear guidelines regarding the ethics of pediatric testing. *See supra* text accompanying note 57.

n504 *See generally* Henry, *supra* note 104, at 379.

n505 *See* Notice of Publication of the Executive Summary of the Report "Ethical and Policy Issues in Research Involving Research Participants," by the National Bioethics Advisory Commission, *66 Fed. Reg. 45,998, 46,000,* (Aug. 31, 2001).

# EXHIBIT C

# The Pediatric Exclusivity Provision

—

# January 2001
# Status Report to Congress

**Department of Health and Human Services**
**U.S. Food and Drug Administration**

**TABLE OF CONTENTS**

EXECUTIVE SUMMARY.................................................................................................................I

BACKGROUND ........................................................................................................................... I
AGENCY RESPONSE TO CONGRESSIONAL REQUEST FOR SPECIFIC INFORMATION............................................ II

I.    INTRODUCTION ...................................................................................................................... 1

II.   THE NEED FOR MORE INFORMATION ABOUT DRUG EFFECTS IN CHILDREN........................ 2

III.  PREVIOUS EFFORTS TO IMPROVE PEDIATRIC LABELING INFORMATION............................ 3

A.    1994 PEDIATRIC LABELING REGULATION.................................................................................. 3
B.    PEDIATRIC PLAN................................................................................................................... 4
C.    PEDIATRIC RULE................................................................................................................... 4
D.    1997 PEDIATRIC EXCLUSIVITY PROVISION ............................................................................... 4

IV.   FDA'S IMPLEMENTATION OF THE PEDIATRIC EXCLUSIVITY PROVISION............................ 5

A.    PUBLICATION OF THE LIST ..................................................................................................... 5
B.    WRITTEN REQUESTS .............................................................................................................. 6
C.    WRITTEN AGREEMENTS........................................................................................................... 7
D.    SCOPE OF PEDIATRIC EXCLUSIVITY .......................................................................................... 7

V.    SPECIFIC ISSUES TO BE ADDRESSED UNDER SECTION 505A(K) ......................................... 8

A.    EFFECTIVENESS OF THE PEDIATRIC EXCLUSIVITY PROVISION ...................................................... 8
      1.    Pharmaceutical Industry's Response................................................................................. 8
      2.    Public Health Benefit...................................................................................................... 9
B.    ADEQUACY OF THE INCENTIVE................................................................................................ 12
      1.    Drugs Lacking Exclusivity or Patent Protection.................................................................. 12
      2.    Drugs with Insufficient Sales........................................................................................... 13
      3.    Drugs for Which Sequential Pediatric Studies are Necessary.............................................. 13
C.    ECONOMIC IMPACT OF THE PEDIATRIC EXCLUSIVITY PROVISION .................................................. 14
      1.    Consumer and Taxpayer Impacts .................................................................................... 15
      2.    Lower Income Patients................................................................................................... 17
      3.    Impacts by Sector......................................................................................................... 17
D.    SUGGESTIONS FOR MODIFICATION........................................................................................... 18
      1.    Recommended Modifications............................................................................................ 18
            a.  The List.............................................................................................................. 18
            b.  Second 6-Month Period of Exclusivity..................................................................... 19
            c.  Written Agreement............................................................................................... 19
      2.    Addressing Gaps in the Statute....................................................................................... 20
            a.  Incentive for Studies in Younger Age Groups .......................................................... 20
            b.  Ensuring that Certain Drugs of Importance are Studied.............................................. 20
E.    OTHER RELEVANT ISSUES...................................................................................................... 22

VI.   CONCLUSION ...................................................................................................................... 23

APPENDICES:

APPENDIX A ............................................................................................................................. 24

APPENDIX B ............................................................................................................................. 27

APPENDIX C ............................................................................................................................. 39

# Executive Summary

In 1997, as part of the Food and Drug Administration Modernization Act (FDAMA) (Pub. L. 105-115), Congress enacted a new law that provides marketing incentives to manufacturers who conduct studies of drugs in children. This law, which provides six months exclusivity in return for conducting pediatric studies, is commonly known as the pediatric exclusivity provision. The pediatric exclusivity provision has a sunset date of January 1, 2002, and includes a requirement that the Secretary report by January 1, 2001, on the experiences under the new law. This report is submitted in accordance with that requirement.

As described in this report, the *pediatric exclusivity provision* has been highly effective in generating pediatric studies on many drugs and in providing useful new information in product labeling. Some categories of drugs and some age groups remain inadequately studied, however, despite the new incentives. The Secretary has provided suggestions for modifications to the pediatric exclusivity provision that may address these gaps.

## Background

Children are subject to many of the same diseases as adults, and by necessity, are often treated with the same drugs. According to the American Academy of Pediatrics only a small fraction of all drugs[1] marketed in the United States has been studied in pediatric patients, and a majority of marketed drugs are not labeled, or are insufficiently labeled, for use in pediatric patients.[2] Safety and effectiveness information for the youngest pediatric age groups is particularly difficult to find in product labeling.

The absence of pediatric testing and labeling poses significant risks for children. Inadequate dosing information exposes pediatric patients to the risk of adverse reactions that could be avoided if such information were provided in product labeling.[3] The absence of pediatric testing and labeling may also expose pediatric patients to ineffective treatment through underdosing, or may deny pediatric patients the ability to benefit from therapeutic advances because physicians choose to prescribe existing, less effective medications in the face of insufficient pediatric information about a new medication. The failure to produce drugs in dosage forms that can be used by young children (e.g., liquids or chewable tablets) can also deny them access to important medications.

---

[1] For the purposes of this report, the terms *drugs, marketed drugs,* and *products* are often used interchangeably.
[2] Committee on Drugs, American Academy of Pediatrics, Guidelines for the Ethical Conduct of Studies to Evaluate Drugs in Pediatric Populations, *Pediatrics*, 95(2);286-294, 1995.
[3] The proposed rule cited reports of injuries and deaths in children resulting from the use of drugs that had not been adequately tested in the pediatric population (62 FR 43900).

The Food and Drug Administration (FDA or Agency) implemented a number of largely voluntary measures in the early 1990s to encourage the submission of pediatric labeling information. However, these failed to produce significant increases in pediatric labeling. In August 1997, FDA proposed a regulation that for the first time would require manufacturers of new and marketed drugs and biological products to conduct pediatric studies in some circumstances.

In November 1997, Congress enacted FDAMA, which contains the provision establishing economic incentives for conducting pediatric studies. The pediatric exclusivity provision provides 6 months of exclusivity to be attached to any existing exclusivity or patent protection on a drug for which FDA has requested pediatric studies and where the manufacturer has conducted such studies in accordance with the requirements of FDAMA.

After the passage of FDAMA, FDA finalized its regulation requiring pediatric studies in some circumstances (Pediatric Rule).[4] Although FDA believed that the incentives provided by the pediatric exclusivity provision would encourage sponsors to conduct pediatric studies for many drugs, the Agency stated that the rule was still necessary to address some of the gaps left by the pediatric exclusivity provision. No studies were required to be submitted under FDA's pediatric rule before December 2, 2000.

### Agency Response to Congressional Request for Specific Information

Section 505A(k) of the Federal Food, Drug, and Cosmetic Act (the Act) states that the Secretary shall conduct a study and report to Congress not later than January 1, 2001, based on the experience under the pediatric exclusivity program. The study and report are to examine all relevant issues, including 4 specific issues:

1.    The effectiveness of the program in improving information about important pediatric uses for approved drugs.

The pediatric exclusivity provision has done more to generate clinical studies and useful prescribing information for the pediatric population than any other regulatory or legislative process to date. As a result of this provision, FDA has issued over 157 Written Requests, asking for 332 studies that would potentially involve well over 20,000 pediatric patients. In less than 3 years, over 58 pediatric studies have already been conducted, study reports submitted, and exclusivity granted to 25 drugs. The ultimate goal of encouraging pediatric studies is to provide needed dosing and safety information to physicians in product labeling. As a result of the pediatric exclusivity provision and FDA's filing requirement that study reports be submitted in a manner which will result in labeling information for children, critical drugs used to treat a variety of conditions (e.g., gastroesophageal reflux disease, diabetes mellitus, pain, asthma, hypertension) have or soon will have pediatric use information in their labeling.

---

[4] Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients; Final Rule (63 FR 66632; Dec 2, 1998).

The pediatric exclusivity provision has left some significant gaps in pediatric labeling information. As described in #2, below, the provision has not resulted in studies on certain important drug categories and age groups.

2.    The adequacy of the incentive provided under this section.

The large number of pediatric studies proposed by the pharmaceutical industry since the provision took effect demonstrates the adequacy of the incentive provided by the pediatric exclusivity provision for many categories of products. FDA has received over 191 proposals from sponsors to conduct pediatric studies.

For some products and for some age groups, however, the incentives provided by the pediatric exclusivity provision have not produced proposals to conduct pediatric studies. The incentive is not adequate for old antibiotics and other drugs lacking market exclusivity or patent protection because these products are not eligible for any exclusivity under the current pediatric exclusivity provision. The incentive is also not adequate to produce pediatric studies in certain drugs with low sales because the value of the exclusivity decreases as sales decrease. Finally, the exclusivity is not adequate to produce pediatric studies in certain younger age groups, especially the neonatal age group for whom an appropriate trial cannot be designed until studies of older pediatric age groups have been submitted and analyzed. Although a second period of exclusivity is available in the Act it is very limited in scope and to date no sponsor has utilized this option.

Thus, while the incentive provided by the pediatric exclusivity provision has clearly been adequate for many products, it has naturally tended to produce pediatric studies on those products where the exclusivity has the greatest value. This has left some drugs of importance to children, but for which the incentive has little or no value, unstudied. For example, 10 drugs were identified in 1994 as the drugs most frequently prescribed for children that lack adequate labeling[5]. Of these, the 6 without remaining exclusivity or patent life have not been studied under the pediatric exclusivity program and remain inadequately labeled (see Appendix B, table 7).

3.    The economic impact of the program on taxpayers and consumers, including the impact of the lack of lower cost generic drugs on patients, including on lower income patients.

The pediatric exclusivity granted under this program should reduce certain types of health care expenditures, but increase others. The incentives provided by the newly authorized pediatric exclusivity should lead to significant advances in pediatric medicine. Superior drug treatment information is expected to permit quicker recoveries

---

[5] IMS HEALTH Inc., *National Disease and Therapeutic Index™* NDTI was used to identify the most commonly used pediatric drugs. Drugs on this list were checked against their approved labeling and from this the pediatric age range that lacked adequate labeling was identified. The top 10 most frequently prescribed drugs used in the pediatric population that lacked adequate labeling were derived from this comparison.

from childhood illnesses, with fewer attendant hospital stays, physician visits and parental work days lost. On the other hand, the pediatric exclusivity will delay the introduction of lower-priced generic drugs, which will temporarily raise the average price of prescription drugs.

The Secretary finds that the impact of the lack of lower cost generic drugs on some patients, especially those without health insurance and the elderly, may be significant. Nevertheless, the Secretary expects pediatric exclusivity costs to add less than one-half of one percent to the nation's pharmaceutical bill.

4.    Any suggestions for modification that the Secretary determines to be appropriate.

a. Recommended Modifications

Based on its experience with the pediatric exclusivity provision since 1997, the Secretary believes that Congress should renew, with modifications, section 505A of the Act. The Secretary recommends the following modifications of the section to improve FDA's ability to grant exclusivity for useful pediatric studies:

- eliminate the requirement for the pediatric list;

- eliminate the second exclusivity period as currently conceived; and

- eliminate the Written Agreement.

b. Addressing Gaps in the Statute

There are still important gaps in the statute. The statute does not provide an incentive to manufacturers to conduct studies in the youngest age groups, e.g., neonates and infants, if those studies must, for scientific or ethical reasons, be delayed until the completion of studies in older age groups. Yet, sometimes the greatest need is for studies in these age groups. The statute also provides no incentive to conduct studies on drugs that no longer have patent protection or exclusivity, or that have small markets. Some drugs of great importance to children's health fall in this category. The Secretary would like Congress to consider various means to address these gaps. Ideas that might be considered in Congress' deliberations might include:

- providing an incentive for studies in younger age groups, especially neonates; and

- permitting FDA and manufacturers to focus pediatric studies on those drugs that provide the greatest health benefit to children, including those that are not eligible for the incentives in the current statute, by allowing FDA to require studies on these drugs in exchange for new incentives.

iv

# The Pediatric Exclusivity Provision

---

## January 2001
## Status Report to Congress

## I.    Introduction

In 1997, Congress passed the Food and Drug Administration Modernization Act, amending the Act.  In addition to amending numerous previously existing sections of the Act, Congress added several new provisions.

New section 505A (21 U.S.C. 355a) provides that six months of pediatric exclusivity can be added to previously earned marketing exclusivity and listed patent protection for certain drugs[6] if the sponsors of those products submit requested information to FDA relating to the use of the products in children.  This section of the Act, known as the pediatric exclusivity provision, was enacted because Congress recognized that information about the effects of drug and biological products in children was lacking.  It was intended to create an incentive for drug manufacturers to conduct pediatric studies.  The information gained from the studies would then be included in product labeling to permit the safe and effective use of the products in children.

Congress set a sunset date for the pediatric exclusivity provision of January 1, 2002.  Congress also required the Secretary to conduct a study and report on FDA's experiences under the new law by January 1, 2001.  This report is intended to satisfy the statutory reporting requirement.

To obtain public input on the pediatric exclusivity program, FDA issued a *Federal Register* Notice on May 5, 2000, requesting comments on the provision.  Twelve written comments were received from brand name drug manufacturers, generic drug manufacturers, trade associations, physician organizations, and organizations devoted to pediatric oncology.  (For a summary of the comments submitted, see Appendix A.)

---

[6]The provision applies to drug and biological products approved under section 505 with patent life remaining on listed patents or for which exclusivity remains under the Drug Price Competition and Patent Term Restoration Act (Pub. L. 98-417) or the Orphan Drug Act (Pub. L. 97-414).  Periods of marketing exclusivity are available to new chemical entities, drugs designated and approved for small populations, and to certain already marketed drugs for which new clinical studies are conducted, under these provisions of the Act.  During the period of new chemical entity and new clinical study exclusivity generic copies of the drug may not be approved or marketed.  Orphan exclusivity protects sponsors from competition by both generic and innovator drugs.  Although biological products submitted under section 505 of the Act may earn pediatric exclusivity, only a handful of biological products are submitted under section 505.

1

This report first discusses briefly the need for more information on the use of drugs in the pediatric population and previous FDA efforts to encourage the development of more information on the effects of these products in children.  The report then examines the specific issues mandated by Congress.

## II.    The Need for More Information about Drug Effects in Children

Children are subject to many of the same diseases as adults, and by necessity, are often treated with the same drugs and biological products.  According to the American Academy of Pediatrics, however, only a small fraction of all approved drugs[7] marketed in the United States have had clinical trials performed in pediatric patients.  A majority of marketed drugs are not labeled for use in pediatric patients, or are labeled for use only in specific pediatric age groups.[8]  From 1973 to the present, evidence from multiple sources has shown that drugs continue to be inadequately labeled for use in pediatric patients.  As shown in figure 1 below, data from 1991 to 1994 indicate that as of those dates 71 percent of the new molecular entities (NME) still were without pediatric drug labeling.[9]

| Figure 1. | A Continuum of Validation |
| --- | --- |
| 1973 PDR: | 78% without sufficient pediatric drug labeling |
| 1984-1989 NMEs: | 80% without pediatric drug labeling |
| 1991 PDR: | 81% without disclaimers or age restrictions |
| 1992 NMEs: | 79% of potential pediatric use unapproved |
| 1991-1994 NMEs: | 71% without pediatric drug labeling |

Safety and effectiveness information for some pediatric age groups is particularly uncommon in product labeling.  For example, for most drug classes, there is almost no information on use in patients under 2 years of age.[10]  And many of the drugs most widely used in pediatric patients carry disclaimers in their labeling stating that safety and effectiveness in pediatric patients have not been established.[11]  The absence of pediatric labeling information poses significant risks for children.  Inadequate dosing information exposes pediatric patients to the risk of adverse reactions, usually age-specific adverse reactions that could be avoided if such information were provided in

---

[7] For the purposes of this report, the terms *drugs, marketed drugs,* and *products* are often used interchangeably.

[8] Committee on Drugs, American Academy of Pediatrics, Guidelines for the Ethical Conduct of Studies to Evaluate Drugs in Pediatric Populations, *Pediatrics*, 95(2); 286-294, 1995.

[9] Wilson, John T., An Update on the Therapeutic Orphan, *Pediatrics*, 104(3); 585-590, 1999.

[10] Pina, L. M., Drugs Widely Used Off Label in Pediatrics, Report of the Pediatric Use Survey Working Group of the Pediatric Subcommittee, in *News Along the Pike*, January 1997.

[11] Cote, C. J., et.al., "Is the therapeutic orphan about to be adopted?" *Pediatrics*, 98(1); 118-123, 1996.

product labeling.[12] The absence of pediatric testing and labeling may also expose pediatric patients to ineffective treatment through underdosing, or may deny pediatric patients therapeutic advances because physicians choose to prescribe existing, less effective medications in the face of insufficient pediatric information about a new medication.

Pediatric patients also lack access to drugs that do not come in dosage forms (formulations) that children are capable of taking, such as liquids and chewable tablets. Many important drugs are not available in pediatric formulations. Failure to develop a pediatric formulation of a drug, may deny younger pediatric patients access to important new therapies, or may require pediatric patients to take a drug in extemporaneous formulations (e.g., sprinkling a crushed tablet on a child's food) that may be poorly or inconsistently bioavailable.[13]

## III.    Previous Efforts to Improve Pediatric Labeling Information

During the last 2 decades the medical community has expressed increased concern that drugs are used widely in children despite the fact that, in most cases, information about the effects of these products in children is absent or insufficient. In response to this concern, the Agency has undertaken a number of initiatives to address the problem of inadequate pediatric testing and inadequate pediatric use information in drug and biological product labeling.

### A.    1994 Pediatric Labeling Regulation

In 1994, FDA issued a regulation requiring drug manufacturers to survey existing data and determine whether those data were sufficient to support additional pediatric use information in the labeling of their drugs.[14] If a manufacturer determined that existing data permitted modification of the label's pediatric use information, the manufacturer was required to file a supplemental new drug application to FDA seeking approval of a labeling change.

The response to the 1994 rule was disappointing and did not substantially increase the pediatric use information for marketed drugs and biological products.

---

[12] The proposed rule on pediatric studies issued by FDA in 1997 ("Proposed Pediatric Rule") cited reports of injuries and deaths in children resulting from the use of drugs that had not been adequately tested in the pediatric population (62 FR 43900).

[13] Bioavailability is a measure of how well a drug reaches the site in the body at which it is intended to act. Poorly or inconsistently bioavailable drugs can be both ineffective and unsafe.

[14] 21 CFR Part 201, Specific Requirements on Content and Format of Labeling for Human Prescription Drugs; Revision of "Pediatric Use" Subsection in the Labeling; Final Rule, December 13, 1994 (FR 59 64240).

### B.    Pediatric Plan

In December 1994, FDA's Center for Drug Evaluation and Research (CDER) and Center for Biologics Evaluation and Research (CBER) implemented a *Pediatric Plan* designed to focus attention on and encourage voluntary development of pediatric data both during the drug development process and after marketing.  These voluntary activities did not substantially increase the number of drugs with adequate pediatric labeling.

### C.    Pediatric Rule

The Pediatric Rule, which was proposed in 1997, finalized in 1998, and became effective on April 1, 1999, requires that manufacturers of certain new and marketed drugs and biological products conduct studies to provide adequate labeling for the use of these products in children.  Under this regulation, FDA can require pediatric studies of a new drug or biological product if the product is likely to be used in a "substantial number of pediatric patients"[15] or would provide a "meaningful therapeutic benefit"[16] to pediatric patients over existing treatments.  FDA can also require pediatric studies of marketed drugs if either of these conditions applies and inadequate labeling could pose significant risks.

Although the incentive provided by the pediatric exclusivity provision was expected to result in the submission of pediatric studies for many drugs, the Agency issued the final Pediatric Rule to address some of the gaps left by the pediatric exclusivity provision. No studies mandated under the Pediatric Rule were required to be submitted before December 2, 2000.

### D.    1997 Pediatric Exclusivity Provision

After FDA issued the Proposed Pediatric Rule, but before that rule was finalized in 1998, Congress enacted FDAMA.  Section 505A of FDAMA established economic incentives for conducting pediatric studies.

FDAMA recognized the importance of pediatric studies by providing for 6 months of exclusivity to be attached to existing exclusivity or listed patent protection for a drug whose manufacturer submits pediatric studies in compliance with section 505A.

In the sections that follow, this report discusses the FDA's implementation of the pediatric exclusivity provision during the past 3 years, addressing the issues Congress required the Secretary to address by January 1, 2001.

---

[15] FDA considers the term *substantial number of patients* to mean 50,000 pediatric patients in the U.S. with the disease or condition for which the drug or biological product is indicated (63 FR 66636).
[16] The term *meaningful therapeutic benefit* is defined as a significant improvement in the treatment, diagnosis, or prevention of a disease, compared to marketed products adequately labeled for that use in the relevant pediatric population (314.55(c)(5)).

# IV.    FDA's Implementation of the Pediatric Exclusivity Provision

The Agency has implemented the pediatric exclusivity provision according to the requirements of the statute by:

- publishing a list of drugs for which pediatric information may be beneficial;

- working with sponsors to develop and issue Written Requests for pediatric studies;

- reviewing submitted studies; and

- making exclusivity determinations.

The Agency also has made organizational changes to support the implementation of the pediatric exclusivity provision, including assembling a Pediatric Team and creating a Pediatric Advisory Subcommittee. Finally, the Agency has published three guidances to facilitate the implementation of the exclusivity provision:

- *Qualifying for Pediatric Exclusivity Under Section 505A of the Federal Food, Drug, and Cosmetic Act* (original July 1998; updated September 1999)
- *Pediatric Oncology Studies in Response to a Written Request* (Draft June 2000)[17]
- *General Considerations for Pediatric Pharmacokinetic Studies for Drugs and Biological Products* (Draft November 1998)

## A.    *Publication of the List*

Section 505A(b) of the Act required the Secretary, after consultation with experts in pediatric research, to develop, prioritize, and publish an initial list of approved drugs for which additional pediatric information may produce health benefits in the pediatric population. FDA was required to publish the list no later than 180 days after the date of the enactment and to annually update the list.

The list was developed as required in consultation with experts in pediatric research and published on May 20, 1998. The list contained all drugs approved for use in adults for indications that occur in the pediatric population.

FDA also prioritized the list. To be included on the priority list the drug had to meet one of the following criteria:

---

[17] This guidance was written to address concerns raised by the pediatric oncology community that the pediatric exclusivity provision was not working to generate studies for pediatric cancer drugs. There are unique aspects in pediatric cancers that make it imperative to evaluate the safety and effectiveness of new cancer drugs in pediatric populations. The guidance provides information on a flexible regulatory approach to earning pediatric exclusivity for conducting studies on drugs to treat pediatric cancers.

- The drug product, if approved for use in the pediatric population, would be a significant improvement compared to marketed products labeled for use in the treatment, diagnosis, or prevention of a disease in the relevant pediatric population (i.e., a priority review drug); or,

- The drug is widely used in the pediatric population, as measured by at least 50,000 projected uses per year; or

- The drug is in a class or for an indication for which additional therapeutic or diagnostic options for the pediatric population are needed.

The list has been updated annually as required in the statute. The last update was May 20, 2000. Because a drug need not appear on the priority section of the list to be eligible for pediatric exclusivity and FDA has generally issued Written Requests for pediatric studies without regard to a moiety's appearance on the list, the list has been a source of confusion for the industry.

## B.    Written Requests

Section 505A authorizes exclusivity for those pediatric studies submitted in response to a "Written Request" from the Secretary. A manufacturer who receives a Written Request is under no obligation to conduct a study. However, a manufacturer who submits a pediatric study is not eligible for pediatric exclusivity unless the study was submitted in response to a Written Request, and the study fairly responds to the Written Request.

To facilitate this process, FDA issued a guidance document that describes the format and contents of a Written Request (Qualifying for Pediatric Exclusivity Under Section 505A of the Federal Food, Drug, and Cosmetic Act). To ensure that studies eligible for pediatric exclusivity provide meaningful safety and effectiveness information on the use of the drug in relevant pediatric age groups, a Written Request addresses, among other things, the type of studies to be performed, study design, appropriate study age groups, and clinical endpoints. To help focus scarce Agency resources on issuing Written Requests for studies that manufacturers were interested in conducting, FDA asked interested sponsors to submit a Proposed Pediatric Study Request (PPSR). In some cases, FDA has issued Written Requests to sponsors on its own initiative. As of September 1, 2000, FDA had received 191 PPSRs and issued 157 Written Requests (see Appendix B, table 1).

FDA interprets the statute as requiring the sponsor to have received the Written Request before submitting a study report to FDA. If the sponsor obtains data different from the data specified in the Written Request, the sponsor must contact the FDA to discuss whether an amendment to the Written Request is appropriate. The sponsor must obtain an amended Written Request before submitting any pediatric study reports.

## C.    Written Agreements

Section 505A(d)(1) permits the Secretary to enter into a Written Agreement with a sponsor for the conduct of a pediatric study. A Written Agreement may serve to clarify any points in a Written Request for which additional detail or specificity are needed to ensure that the proposed plan is clearly understood and responsive to the Written Request. However, section 505(d)(2) also provides that a pediatric study submitted pursuant to a Written Agreement must be conducted in accordance with both the Written Request and the Written Agreement. Having a Written Agreement in place does not provide any assurances that a particular study will satisfy the terms of the Written Request and thus result in exclusivity.

Because compliance with the terms of the Written Request is required for an exclusivity award, drug sponsors initially became interested in having Written Agreements to minimize the risk of loss of exclusivity through a misinterpretation of the terms of the Written Request. The addition of a Written Agreement, however, may further complicate the process for awarding exclusivity. When a Written Agreement is in place, the terms of both the Written Request and the Written Agreement must be satisfied before pediatric exclusivity can be awarded. The more details agreed to in the Written Agreement, the greater the chance that the final studies will fail to meet its terms. To date, one Written Agreement has been completed.

## D.    Scope of Pediatric Exclusivity

Section 505A does not expressly address a key question in the implementation of the provision. When a drug sponsor is awarded exclusivity for submitting pediatric studies, to which of the sponsor's patents and previous grants of exclusivity does six months of exclusivity attach? FDA has interpreted the provision to add the six months of exclusivity to any of the sponsor's listed patents or previous non-expired grants of exclusivity on drug products containing the *active moiety* that was studied. This is a broad interpretation of the scope of exclusivity because it may attach to patents and exclusivity on drug products other than those studied. FDA concluded, however, that this interpretation was the most consistent with the language and purpose of the pediatric exclusivity provision. As a necessary corollary of this interpretation, FDA has construed the provision to permit the Agency to include within a single Written Request pediatric studies on any drug products containing the active moiety, if such drug products have significant uses in the pediatric population.

FDA's interpretation of the scope of the pediatric exclusivity resulted in a lawsuit brought by members of the generic drug industry. The court in that case upheld FDA's interpretation of the statute.[18]

---

[18] National Pharmaceutical Alliance v. Henney, 47 F. Supp. 2d 37 (D.D.C. 1999)

## V.    Specific Issues to be Addressed Under Section 505A(k)

Section 505A(k) requires that the Secretary's report to Congress "examine all relevant issues, including-

1. the effectiveness of the program in improving information about important pediatric uses for approved drugs;

2. the adequacy of the incentive provided under this section;

3. the economic impact of the program on taxpayers and consumers, including the impact of the lack of lower cost generic drugs on patients, including on lower income patients; and

4. any suggestions for modification that the Secretary determines to be appropriate."

The remainder of this report will focus on these specific questions.

### A.    Effectiveness of the Pediatric Exclusivity Provision

The pediatric exclusivity provision has been highly effective for many drugs.  In general, the industry's response has been vigorous and the public health benefits have been extensive.

### 1.    Pharmaceutical Industry's Response

The response from the research based pharmaceutical industry to the pediatric exclusivity provision has been vigorous.  Between the publication of the guidance in July 1998 and September 2000, drug sponsors have submitted over 191 proposed study requests and FDA has issued 157 Written Requests (see Appendix B, table 2).  The Written Requests cover a broad range of diseases and conditions, including life-threatening conditions (see Appendix B, table 3).  Sponsors have indicated that they have conducted or will conduct 80 percent or more of the studies that FDA has requested.  Over 58 pediatric studies have already been completed, submitted and received a preliminary review, resulting in 25 grants of pediatric exclusivity (see Appendix B, table 4) as of September 2000.[19]

In contrast, before enactment of the pediatric exclusivity provision, few of the pediatric studies requested by FDA were completed.  Over a 6-year period between 1991 and 1996, drug sponsors promised to complete 71 postmarketing pediatric studies.  Only 11 were completed.

---

[19]  Some sponsors had to conduct more than one study to obtain pediatric exclusivity (e.g., where more than one pediatric age group needed to be studied).

## 2.    Public Health Benefit

The purpose of encouraging pediatric studies is to provide needed pediatric efficacy, safety and dosing information to physicians in product labeling. Implementing the requirement in section 505A(d) that pediatric studies be reported in accordance with FDA's filing requirements, the Agency requires that pediatric studies submitted for exclusivity be submitted as new drug applications or in supplemental applications to the sponsor's new drug application (NDA), with proposed labeling. Of the 25 drugs granted pediatric exclusivity 12 drugs have newly approved labeling for pediatric use. Labeling changes are expected for the remaining drugs granted exclusivity once the reviews have been completed approximately 6-12 months after the studies have been submitted. As a result of these pediatric studies critical drugs used to treat a variety of conditions (e.g., pain, asthma, juvenile rheumatoid arthritis, gastroesophageal reflux disease, hypertension, diabetes mellitus, Obsessive Compulsive Disorder) will now include information on pediatric use in their labeling.

Of the 12 drugs whose labels have already been changed (see Appendix B, table 5), 4 were new molecular entities for which pediatric labeling was available at the time of initial approval. The 8 remaining marketed products now have complete labeling in the relevant pediatric population. This is a significant response in only 2 years, taking into consideration the time necessary for FDA review of the studies, which under PDUFA goals ranges from a minimum of 6 months to a maximum of 1 year.

The important label changes made on these twelve drugs as a result of pediatric studies requested by FDA in a Written Request are as follows:

1. Extension of the age range down to 6 months of age for the over-the-counter use of **ibuprofen** products. (The active moiety by 2 different sponsors, each of whom received a Written Request, was granted pediatric exclusivity).

   Ibuprofen is one of the most commonly used drugs in infants to reduce fever and is relied upon by parents in times of illness to provide comfort to their children. Until these studies, ibuprofen products carried no dosing information for children under 2 years of age. An appropriate dose should provide symptom relief without side effects. If the dose is too low, the child will not experience relief. If the dose is too high, the child may experience an increase in side effects. Studies in thousands of young infants established a safe and effective dose in infants and young children from 6 months to 2 years.

2. Addition of pediatric dosing information for a new oral formulation of **midazolam,** a sedative**,** and identification of a subpopulation of pediatric patients at higher risk for adverse events.

   Midazolam is one of the most commonly used medicines to sedate children undergoing surgery or other procedures. Until a new oral formulation was developed, midazolam was available only by injection of the drug directly into a vein

9

or muscle. Any parent whose child has had to undergo surgery or other procedures, or had a needle injected to draw blood or provide fluid or medicines, is aware of the terror and distress demonstrated by young children in these situations. The studies submitted not only involved a new oral syrup for use by young children, but also identified the correct dose for use of the syrup in this young population. The studies also identified a serious adverse event in children with heart disease and pulmonary hypertension that can be prevented by administering a lower dose.

3. Provision of directions for use of **abacavir** in the treatment of HIV for pediatric patients 3 months to 12 years.

HIV is a life-threatening disease. Many anti-HIV drugs have side effects that can make them intolerable for some people. Because side effects differ from one agent to another, it is important to have several drugs available for HIV-infected children, should a child be unable to tolerate one or more of the available drugs. Abacavir, a new anti-HIV drug, was studied in children before its approval, offering an additional option for infected children. The availability of pediatric dosing information at the time of abacavir's approval was particularly important to provide an additional potent antiretroviral agent for the treatment of a life-threatening condition in patients with limited therapeutic options.

4. Addition of information on the use of **ranitidine** in the neonatal population.

Gastroesophageal reflux is experienced as heartburn in adults but is a life-threatening event when it occurs in seriously ill neonates. The anatomy of infants allows stomach contents to easily flow up the esophagus and into the lungs. Premature infants often have underdeveloped or damaged lungs and the ongoing insult of aspirating stomach contents into the lungs can be life-threatening and lead to chronic respiratory problems. Ranitidine can be used to manage reflux of stomach contents, preventing damage to the lungs of neonates. In addition, ranitidine is frequently used in the intensive care unit where neonates requiring chronic ventilation develop gastric hyperacidity leading to gastrointestinal bleeding. The studies of ranitidine in neonates provided accurate dosing information for safer and more effective use of this drug in the management of reflux and hyperacidity in seriously ill neonates.

5. Provision of directions for use of **insulin glargine** for pediatric patients 6 years and older.

Diabetes is a life-threatening disease. Better control of diabetes means fewer organ failures and a healthier life. In addition, for children with diabetes, wide swings in blood sugar interfere with daily functioning and learning. Because learning is one of the fundamental tasks of childhood, it is critically important to stabilize blood sugar levels. The new recombinant insulin requires administration only once a day. This insulin is expected to provide better control of blood sugar in pediatric patients and patients will be able to stick themselves less frequently to check blood sugar levels. The new recombinant products are also reported to have fewer allergic reactions

and therefore are able to be used longer, an advantage for children, who will take insulin for longer periods than those with adult-onset diabetes. Pediatric information was included in the label at the time the drug was approved.

6. Provision of safety and effectiveness information for both **pemirolast** and **azelastine** for use down to the age of 3 years.

   Itchy, watery eyes are symptoms associated with the condition of allergic conjunctivitis. Drugs such as pemirolast and azelastine are administered as eye drops to relieve the symptoms of itchiness or tearing. Treatment of the condition and the relief of symptoms should prevent children from traumatizing their eyes because they itch. Watery and matted eyes can also cause a decrease in vision that can be dangerous in the active and exploring young child and may interfere with learning in the older child. Both drugs were studied in children before approval, resulting in labeled directions for pediatric use at the time of initial approval of the drugs.

7. New indication for **etodolac** for patients 6 to 16 years old.

   This was an important milestone for children with juvenile rheumatoid arthritis (JRA) because there was only one other oral drug approved to treat this frequently debilitating disease. JRA is a form of arthritis that affects approximately 100,000 children in the United States. Young children and adolescents with JRA face tremendous challenges in everyday life to cope with this painful disease. It affects school, social life, family relationships, dating, sports and almost every other aspect of their daily lives.

8. Addition of proper dosing information for **cromolyn** in children between the ages of 2 years and 6 years, as well as additional data supporting safety and compliance.

   Cromolyn is an important preventative medicine in the armamentarium of therapies for allergies. Prevention is always a better approach than treating allergy symptoms after they occur. Many of the therapies for allergies are sedating or conversely act as stimulants and potentially interfere with the important task of learning. Cromolyn has neither of these side effects.

9. Provision of appropriate pediatric dosing and long-term safety information for **fluvoxamine** in pediatric patients 8 years to 17 years.

   The obsessions (persistent and recurrent ideas, images, thoughts) or compulsions (repetitive, purposeful, and intentional behaviors, such as hand washing) in patients with obsessive compulsive disorder (OCD) cause marked distress, and interfere with the child's ability to learn and play. These behaviors often lead to taunting and rejection by their peers. Fluvoxamine is approved for the treatment of OCD in children. The studies performed indicated that the dose in adolescents may need to be increased up to the adult dose. Further, girls (8-11 years) may require a lower dose. In addition, long term safety appears to be similar to that seen in adults.

11

10. Provision of safety and effectiveness information down to 2 years of age for **ammonium lactate** in the treatment of ichthyosis vulgaris and xerosis.

The conditions of ichythosis vulgaris and xerosis are manifested by dry, scaly skin. The skin becomes less flexible and rough and is prone to cracking and fissuring. Children experience itchiness of the skin that is particularly troublesome and may lead to scratching, excoriation, and ultimately to infection of the skin. In addition, these children are fussy and irritable, causing them problems with concentrating during the day and sleeping at night. Ammonium lactate is now shown to be safe and effective down to 2 years of age. The drug increases skin hydration and provides symptomatic relief to the dry, itchy skin.

As another measure of the benefit provided by the pediatric exclusivity provision, the Secretary obtained information on the extent of use of the drugs studied. Providing adequate labeling instructions for pediatric use is particularly important where children are frequently exposed to a drug. The Secretary obtained IMS HEALTH data from January 1994 through December 1999 (6 years) on how often 14 of the 25 drugs granted pediatric exclusivity were mentioned in the pediatric population requested for study (see Appendix B, table 6). IMS HEALTH data are used to project the number of times that a particular drug is used in a specified population. The greatest number of mentions in the 6-year period evaluated was for ibuprofen for children 6 months to 2 years old: an average of 1.4 million uses per year. Cromolyn sodium had an average of 396,000 mentions in children 2 to 6 years old per year. Ranitidine had an average of 247,000 mentions in neonates per year. The remaining drugs had between 2700 and 65,000 mentions per year in the specified population.

## B.    Adequacy of the Incentive

In general, the pediatric exclusivity provision has done more to generate clinical studies and useful prescribing information for the pediatric population than any other regulatory or legislative process to date. However, experience with the provision has revealed several categories of products and age groups for which the incentive is not adequate. Limitations on the scope and effect of the pediatric exclusivity provision have left some significant gaps in pediatric labeling. For example, because exclusivity applies only to products that have existing patent protection or exclusivity under the Drug Price Competition and Patent Term Restoration Act or the Orphan Drug Act, there is no incentive for sponsors to conduct studies on most antibiotics or on those products that no longer enjoy exclusivity or patent protection. The pediatric exclusivity provision does not provide adequate incentives to study the following products:

## 1.    Drugs Lacking Exclusivity or Patent Protection

As noted previously the incentive for developing pediatric information under section 505A currently applies only to those products that are covered by listed patents or exclusivity under the Drug Price Competition and Patent Term Restoration Act or the

Orphan Drug Act.  Sponsors of marketed products that have no remaining patent life or exclusivity have no economic incentive to study these products.  Many such products, however, have important uses in children and have not been adequately studied.  For example, dopamine is a very important drug used in the treatment of serious life-threatening conditions (i.e., hypotension, heart conditions).  However, it will most likely not be studied due to the lack of exclusivity or patent protection.  In 1994, FDA conducted a study to determine the 10 drugs most widely used in children without adequate labeling information (see Appendix B, table 7).[20]  Of these 10 drugs, 6 are not covered by exclusivity or patent protection and none of the sponsors of these drugs has submitted a PPSR.

Old antibiotics — those approved under Section 507 of the Federal, Food, Drug, and Cosmetic Act, which was repealed in FDAMA — are ineligible for the pediatric exclusivity incentive, because they were never eligible for patent listing or exclusivity under the Drug Price Competition and Patent Term Restoration Act.  Many of these antibiotics have the potential to provide a significant clinical benefit in the pediatric population.  Studies of this group of drugs are needed to assess their use in neonates and to treat serious diseases that affect small numbers of pediatric patients.  Despite the need, these antibiotics will remain unstudied under the pediatric exclusivity provision.

## 2.    Drugs with Insufficient Sales

The exclusivity incentive is inadequate for products that do not generate sufficient sales in either the adult or pediatric population to provide a large market return for conducting pediatric studies.  For example, amphotericin, which is used for serious and life-threatening fungal infections, even if covered by exclusivity or patent life, has such a small market that it is unlikely the pediatric exclusivity incentive would be adequate to produce pediatric studies.

## 3.    Drugs for which Sequential Pediatric Studies are Necessary

Many drugs of importance to children need to be studied in more than one pediatric age group because size and maturation of body systems can affect both dosing and side effects.  For some drugs, such as neurotropic drugs, heightened safety concerns about exposure of neonates, infants, and young children to the drugs have dictated that studies in these age groups be deferred until additional information is available from animal studies, studies in older children, or wider use in adults.  In these settings, FDA has granted pediatric exclusivity upon completion of the studies in the older pediatric age groups.

Once pediatric exclusivity is granted for studies in older pediatric age groups, section 505A does not provide an adequate incentive to conduct later studies in the younger age groups.  The opportunity to obtain a second grant of exclusivity for later studies on the same drug, in 505A(h), applies to a very limited subset of drugs (see section V. D. 2,

---

[20] IMS HEALTH Inc., *National Disease and Therapeutic Index™*

below). This has left some age groups, especially neonates, unstudied, even where the need for the drug in those age groups is great.

## C. Economic Impact of the Pediatric Exclusivity Provision

Section 505A(k) specifically asks that the Secretary examine:

"The economic impact of the program on taxpayers and consumers, including the impact of the lack of lower cost generic drugs on patients, including on lower income patients."

The robust incentives provided by the newly authorized pediatric exclusivity should lead to significant advances in pediatric medicine. The pediatric exclusivity granted under this program should reduce certain types of health care expenditures, but increase others. Superior drug treatment information will permit quicker recoveries from childhood illnesses, with fewer attendant hospital stays and physician visits. These improved health outcomes should produce significant health care cost savings for the United States economy.

Although FDA anticipates that these future health care cost savings will be substantial, the expected improved health outcomes have just begun to be realized. Consequently, the Agency has not attempted to develop a quantitative estimate of these savings. Nevertheless, in the preamble to the Pediatric Rule, the Agency gave several anecdotal examples that illustrate the potential cost savings that could follow the availability of expanded pediatric clinical information (63 FR 66665-66667). To consider these potential savings, the Agency examined hospitalization rates for five serious illnesses (asthma, HIV/AIDS, cancer, pneumonia, and kidney infections) and found significantly higher rates for children than for middle-aged adults. FDA hypothesized that a substantial fraction of the difference between these pediatric and adult hospitalization rates for like disease conditions may be attributable to the greater range of informed drug therapies and better data on drug dosage for adults. The Agency calculated that eliminating just 25 percent of these differentials for these five illnesses would lead to direct medical cost savings of $228 million annually. This figure does not capture the potential cost savings from the many other illnesses that are common to children, including such life-threatening conditions as hypertensive disease and renal disease.

On the other hand, pediatric exclusivity will increase the level of certain health care expenditures, because it will delay the introduction of lower-priced generic drugs, which will temporarily raise the average price of prescription drugs. The increased dollar outlays are estimated to total about $13.9 billion over the 20-year period. Sixteen of the drugs studied account for about one-half of the $13.9 billion and one product accounts for 11.1 percent. The estimated present value of these revenue/cost increases (discounted at the 7 percent rate preferred by the U.S. Office of Management and Budget) amounts to approximately $7.2 billion, or $61 million per drug over the next 20 years. (Discounting reflects the time value of money by accounting for the fact that a dollar paid or received in the future is worth less than a dollar today.) Figure 1 presents

14

a bar graph of the estimated undiscounted costs of the exclusivity by year for 20 years. Some years are considerably more expensive than others, but the estimated *annual* cost over the 20-year period averages $695 million. Figure 2 displays the discounted costs by year. The method used to derive these costs and the sensitivity of the results to the assumptions made may be found in Appendix C.





## 1.    Consumer and Taxpayer Impacts

Section 505A(k) directs the Secretary to examine the economic impact of the program on taxpayers and consumers, including the impact on lower income patients. This analysis finds that the cost impact on consumers will be substantial due to the additional 6 months of time that innovator drugs will be marketed without competition from lower-priced generic drugs.

Figure 3 graphically demonstrates the methodology for a hypothetical drug with innovator sales reaching a peak of $500 million in a six-month period, or $1 billion a year. (Our estimates indicate that the actual average annual peak revenue for the studied drugs will be about $710 million.) During the first 10 years, innovator sales



Figure 3: Typical Sales History of Drug reaching $1 Billion per Year

revenues increase until market exclusivity expires. During the 3 years following the
expiration of innovator marketing exclusivity, total drug sales revenues decline.

Finally total sales revenues are assumed to stabilize 3 years after the first generic
competition enters the market. The two illustrated sales curves are identical, except that
one includes an additional 6 months of innovator sales before generic competition enters
the market. The shaded area, or the difference between the curves, represents the
increased costs to consumers of these drugs. Beyond the 3-year period following
patent/exclusivity expiration, the estimated differences disappear. It is important to
recognize that these projected sales include sales for all therapeutically equivalent
products containing the moiety of the innovator drug. That is, after the expiration of the
drug's patent or exclusivity, generic sales are included in the sales projections.

These pediatric exclusivity awards are expected to increase the cost of drugs by an
average of about $695 million per year in undiscounted dollars (see figure 1). Estimates
of total national pharmaceutical spending provide a perspective for such outlays. The
Health Care Financing Administration (HCFA) indicates that prescription drug spending
reached just over $100 billion in 1999 and projects this figure will rise to about $185
billion by 2005.[21] The National Association of Chain Drug Stores reports that
prescription drug spending already exceeded $121 billion in 1999.[22] Consequently, the

---

[21]Office of the Actuary, Health Care Financing Administration, "National Health Expenditures Projections:
1998-2008," Table 12a.

[22]"Pharmaceutical Marketplace Dynamics," Presentation by John Coster, Vice President, National
Association of Chain Drug Stores, at the National Health Policy Forum, May 31, 2000. Data referenced to
IMS HEALTH. If this information was to be updated as of November 2000, the figure would be $130.1
billion.

Secretary expects pediatric exclusivity costs to add about one half of one percent to the nation's pharmaceutical bill.

It is difficult to determine which consumer groups will ultimately bear the greatest burden, because the nation's pharmaceutical payment systems are likely to undergo significant change over the next decade. HCFA reports that public sources (Federal, State & Local, Medicare, Medicaid) accounted for about 21 percent of all pharmaceutical spending in 1999, but suggests that this percentage will rise over the next few years. Thus, government may bear at least 21 percent of the additional costs and private payers 79 percent.

## 2.    Lower Income Patients

The greatest burden will fall on consumers with no private or public insurance support, which may disproportionately affect lower income purchasers. IMS HEALTH data indicate that the percentage of prescription drugs paid for by cash at the pharmacy has declined sharply, from slightly over 50 percent in 1993, to about 25 percent in 1998.[23] Among these purchasers, the relative burden of higher drug prices may fall disproportionately on lower income families, as the percent of consumers without drug insurance coverage varies inversely with income.[24] This burden would be moderated to the extent that prescription drug benefits are extended to the Medicare population.

## 3.    Impacts by Sector

As detailed in Appendix C, four main groups will experience economic impacts from pediatric labeling exclusivity: consumers facing higher drug prices, generic drug firms losing sales revenues, pharmacies receiving smaller retail price markups, and drug innovator firms gaining increased sales. The revenues gained by the innovator firms will just equal the sum of the losses of the former three groups. As previously described, we expect consumers to pay $13.9 billion (undiscounted) and $7.2 billion (discounted) for higher priced drugs over the next 20 years.

The generic drug sector will forego an estimated $10.7 billion ($5.7 billion discounted) in new sales over the 20-year period. On an annual basis, this figure amounts to about $537 million, or 6.7 percent of the reported $8 billion in industry sales.[25] As the generic drug industry's net income as a percentage of sales is about 9 percent,[26] these firms could lose over $48 million per year in unrealized profits.

---

[23]The National Association of Chain Drug Stores, "The Chain Pharmacy - Industry Profile," 1999, p. 46.

[24]Department of Health & Human Services, "Prescription Drug Coverage, Spending, Utilization, and Prices: Report to the President," April 2000, pp. 25-35.

[25] Generic Pharmaceutical Industry Association; accessed July 18, 2000, at: http://www.gpia.org/edu_facts.html

[26] Average of 28 largest generic drug manufacturers, "MedAdNews," November, 1998

Retail pharmacies will also lose future revenues, because the average retail markup on generic drugs exceeds that on brand name drugs. These firms may lose $4.9 billion over the 20-year period, which amounts to about $247 million per year, or 0.2 percent of the $103 billion retail pharmacy prescription drug sales reported in 1998.[27] The discounted figures imply lost pharmacy revenues of $2.6 billion over the 20-year period.

Finally, innovator drug firms will gain sales revenues estimated at approximately $29.6 billion ($15.3 billion discounted) over the 20-year period. On an annual basis, these revenues will amount to almost $1.5 billion per year. Assuming costs of production, administrative, and marketing amount to 60 percent of brand name drug sales,[28] industry profits would rise by about $592 million annually.

In summary, while the expected improved health outcomes provided by appropriate labeling of drugs used in the pediatric population will likely result in significant health care cost savings, the health benefits of the pediatric exclusivity program will not be realized until pediatric trials are completed and the findings added to the drug labels. On the other hand, pediatric exclusivity will increase the level of certain health care expenditures, because they will delay the introduction of lower-priced generic drugs, which will temporarily raise the average price of prescription drugs.

If Congress concludes that the costs of the pediatric exclusivity provision exceed its benefits, the Secretary recommends that Congress consider reducing the size of the incentive provided by the statute rather than refusing to reauthorize the entire provision.

## D.    Suggestions for Modification

### 1.    Recommended Modifications

Based on its experience with the pediatric exclusivity provision since 1997, the Secretary believes that Congress should renew, with modifications, section 505A of the Act. The Secretary recommends the following modifications:

- eliminate the requirement for the pediatric list;

- eliminate the second exclusivity period; and

- eliminate the Written Agreement.

These modifications are addressed in more detail in the following paragraphs.

---

[27] National Association of Chain Drug Stores, "The Chain Pharmacy – Industry Profile," 1999, p.9.

[28] Office of Technology Assessment, "Pharmaceutical R&D: Costs, Risks and Rewards, Washington, DC: U.S. Government Printing Office," Appendix G, February 1993.

## a.    The List

Eliminate the requirement for the pediatric list.

As the pediatric exclusivity program approaches its fourth year, the Secretary believes that there is no longer a benefit in maintaining a prioritized list of drugs, as currently required under section 505A(b).  The existence of the list has not facilitated the drug development process for those drugs that would produce a health benefit in the pediatric population.  In addition, the continued requirement of updating the priority list is not an efficient use of FDA's resources, for the following reasons:

- Section 505A does not require that a drug be on the priority list to qualify for pediatric exclusivity.  In practice, the FDA's review divisions are now considering every proposal for pediatric studies under section 505A on its individual merits, regardless of whether the product is on the priority list.  New and rapid development of the science in a disease or condition frequently accelerates the need for pediatric drug development in an area and should not be constrained by its absence from the priority list.

- The resource-intensive effort to update the priority list annually diverts resources from the timely review of specific requests for pediatric studies.

- The incorrect assumption that inclusion on the priority list is necessary to obtain exclusivity has been a source of confusion to drug sponsors.

- There is little reason to believe that products that have not been studied in children after remaining on the priority list for the first 5 years of the program will later be studied as a result of their continued presence on the list.

- The relative priority of the need for pediatric information varies with the perspective of the disease-specific advocacy group, expert/professional organization, and individual health care practitioners.  Because the science is evolving rapidly, it has proven more efficient to bring experts together to focus on specific drugs and drug classes as issues arise than to attempt prospectively to develop a list of highest priority drugs.

## b.    Second 6-Month Period of Pediatric Exclusivity

Delete the second period of pediatric exclusivity.

The Secretary believes that section 505A(h), which authorizes a second grant of exclusivity is extremely limited in scope and has little value to sponsors.[29]

---

[29] As currently drafted, FDA understands that section 505A(h) limits second extensions of exclusivity to a very limited set of drugs: those that have obtained 3 years of exclusivity for making a change in an already approved product, e.g., adding a new indication, if the application was supported by clinical trials.

### c.    Written Agreement

Delete the optional Written Agreement.

Because compliance with the terms of the Written Request is required for the exclusivity award, some drug sponsors expressed initial interest in Written Agreements to try to eliminate ambiguity in a Written Request and minimize the risk of loss of exclusivity based on a misinterpretation of the terms of the Written Request. The addition of a Written Agreement, however, complicates matters rather than clarifying them. When a Written Agreement is in place, the terms of both the Written Request and the Written Agreement must be satisfied before pediatric exclusivity can be awarded. The more details agreed to in the Written Agreement, the greater the chance that the final studies will fail to meet its terms. After initial efforts to develop Written Agreements, it became clear that to prevent any possible misinterpretation, a Written Agreement must become long and cumbersome. Because, in practice, the Agency recognized that Written Agreements make it harder rather than easier for sponsors to earn exclusivity, the Agency has negotiated fewer than five Written Agreements and completed only one.

### 2.    Addressing Gaps in the Statute

The Secretary would also like Congress to consider addressing some of the gaps in the current statute. In its deliberations, Congress might take under consideration the following ideas:

### a. Incentive for Studies in Younger Age Groups

There is currently an inadequate incentive to conduct pediatric studies in certain younger age groups when those studies must be deferred until additional information has been gathered from studies in older children or from other sources. To encourage studies in these younger age groups, especially neonates, an additional incentive could be provided. FDA believes this may be advisable because it is clear from its experience that Written Requests issued by the Agency frequently do not request studies in neonates and younger pediatric age groups for scientific, medical or ethical reasons. It is anticipated that as knowledge is obtained in older children, studies in these younger age groups will be appropriate at a future time. Studies of the younger age groups, especially the extremely vulnerable and technically challenging to study neonatal population, should be undertaken with additional caution but should not be excluded from the drug development process.

When there is a need to proceed in a sequential manner for the development of pediatric information, FDA should have the option of issuing a second Written Request for the conduct of studies in the relevant younger age group(s). For this option to be meaningful, the second Written Request, after receiving the studies to an initial Written Request and pediatric exclusivity awarded, would be linked with a meaningful incentive to sponsors. Studies submitted in response to such a request could qualify for the additional incentive.

### b.    Ensuring that Certain Drugs of Importance are Studied

The statute currently provides little or no incentive to conduct studies on drugs that lack patent protection or exclusivity, or that have very small markets. Some of these drugs, however, have very important uses in children. The Secretary would like Congress to consider, perhaps at a later date, ensuring that pediatric studies are conducted on all the drugs of importance to children, not simply on those for which the current incentive is most valuable. Congress should consider various ways to achieve this goal. One possible means would include the following elements:

1.    Expressly codify FDA's authority to require pediatric studies on drugs of importance to children. These would include both marketed and not-yet approved drugs.

    The factors for determining which marketed drugs provide the greatest health benefit would include:

- whether the drug would provide a meaningful therapeutic benefit; or

- whether the drug is or would be used in a substantial number of pediatric patients either for treatment of a labeled indication, or off-label; and

- whether the absence of pediatric labeling could pose significant risks to patients.

    For marketed drugs, FDA would utilize the recommendation of an expert pediatric panel to identify drugs meeting the above criteria. Once the drugs are identified FDA would issue a written notification of requirements for pediatric studies (i.e., analogous to the Written Request), including, if appropriate, development of a pediatric formulation, and the deadline for their submission. Drug sponsors could propose additional drugs for which studies would be required.

2.    For not-yet-approved drugs that represent a meaningful therapeutic benefit or are likely to be used in a substantial number of pediatric patients either for treatment of a labeled indication, or off-label, FDA would consult with the sponsor of the drug early in the drug development process and agree on a schedule for conducting pediatric studies. FDA would issue a written notification of requirements to the sponsor incorporating the elements of the pediatric drug development plan including, if appropriate, development of a pediatric formulation. FDA would not delay approval of a drug for adult use because required pediatric studies were not completed.

3.    For not-yet approved or recently approved drugs, FDA could defer pediatric studies to permit the sponsor and FDA to obtain additional information about the safety of the drug in animals and/or humans.

4.    A period of exclusivity or other incentive would be available to those who submitted the results of the studies that met the terms of the written notification of requirements. The results must be submitted in a new drug application or supplement that included proposed pediatric labeling changes.

- For those drugs with existing exclusivity or listed patents, pediatric exclusivity would be awarded as under the present provision.

- For those drugs without existing exclusivity or listed patents, an alternative incentive (although not within FDA's purview) could be considered by Congress, such as tax incentives or a period of exclusivity that could be transferred to another drug with existing exclusivity or listed patents held by the sponsor, or, if none exists, to a drug from another sponsor. A transferable exclusivity could be shorter than the six months that would have attached had the drug studied obtained pediatric exclusivity under the existing provision. In addition, such an exclusivity should not be transferable to a drug that has already received pediatric exclusivity or to a drug for which FDA has already required pediatric studies.

5.    Congress would require FDA to publish a list of sponsors of approved drugs who have received written notification of required studies, the type of studies required, the timetable for submission and outcome of the studies, if completed. If a sponsor failed to conduct a required study, FDA would have the authority to impose a civil penalty or seek an injunction in federal court requiring that studies be conducted.

## *E.    Other Relevant Issues*

FDA does not currently have sufficient staff with expertise in pediatrics to respond efficiently to the tremendous number of new pediatric studies submitted by the pharmaceutical industry. The number of studies submitted is expected to continuously increase in the future. This shortage will slow initiation and review of studies and negatively impact the entire pediatric drug development program. Since FDAMA exempted these supplements from PDUFA fees, they are not self-financing, and it will be increasingly difficult for FDA to review these pediatric studies in the target time frames.

There is also a great need to address the knowledge gaps that exist in certain conditions particularly in young children and neonates. For example, treatments of many mental health conditions are difficult to study in young children because there is no agreement on how to accurately diagnose the conditions or how to assess improvement. Without additional staff to help develop valid assessment tools and study endpoints, it will be difficult to develop the scientific and regulatory framework necessary to draft Written Requests for these conditions.

# VI.    Conclusion

The pediatric exclusivity provision of FDAMA has been effective for obtaining pediatric studies for many drug products.  An unprecedented number of pediatric studies have been or are projected to be conducted under this provision.  Many of the studies have been conducted on drugs for important childhood diseases and on drugs that are used widely in children.  These studies are expected to result in new pediatric labeling that will improve the medical care of children.  The Agency's experience with the provision during the past 3 years has also revealed that the provision has gaps.  Important categories of drugs and age groups remain unstudied because of limitations on the availability of the incentive it offers.  The Secretary recommends that the pediatric exclusivity provision be renewed, with modifications to improve the efficiency of the pediatric exclusivity program and to close some of the gaps in the current legislation.

Although the pediatric exclusivity provision is expected to lead to significant advances in pediatric medicine and thereby provide great benefits, it also imposes substantial costs on consumers and taxpayers.  However, its unprecedented success in generating needed pediatric studies should not be forfeited.

## Appendix A

### *Public Comments*

To obtain public input on the pediatric exclusivity program, FDA issued a *Federal Register* Notice on May 5, 2000 (Vol. 65, No.88), requesting comments on the provision. In response to the notice, 12 written comments were received from various sources including professional societies, members of the pharmaceutical industry, organizations that conduct pediatric clinical trials, and an organization devoted to pediatric oncology. The comments received looked at the 4 specific areas as outlined in section 505A(k).

### 1.    The effectiveness of the program in improving information about important pediatric uses for approved drugs.

Many comments from manufacturers of brand name drugs and from the pediatric community agreed that the provision has been effective. Comments from other manufacturers expressed concern about the difficulties in conducting pediatric studies and about the time required to develop Written Requests and Written Agreements. Two organizations devoted to pediatric oncology did not believe that the pediatric exclusivity provision has been effective. Comments from generic drug manufacturers argued that the Pediatric Rule should be used to require pediatric studies and that the pediatric exclusivity provision should be allowed to sunset in 2002.

In addition, an unsolicited report by the Tufts Center for the Study of Drug Development published in April 2000 concluded that the intent of the law (to improve information on the effects of existing drugs on the pediatric population) is being met.[30]

### 2.    The adequacy of the incentive provided under this section.

Comments from brand name and generic drug manufacturers, and the American Academy of Pediatrics indicated that the incentive provided by the pediatric exclusivity provision was adequate or more than adequate. An organization of researchers and health care providers in pediatric oncology stated that the incentive was not adequate for pediatric cancer agents.

### 3.    The economic impact of the program on taxpayers and consumers, including the impact of the lack of lower cost generic drugs on patients, including on lower income patients.

Comments from the American Academy of Pediatrics stated that lack of proper pediatric information related to dosing, toxicity, adverse effects, and drug interactions can lead to medical errors and injury, which may be associated with monetary as well as emotional

---

[30] Impact Report, *"Drug Firms Embrace Pediatric Study Program During First 2 Years of FDAMA."* Tufts Center for the Study of Drug Development, vol. 2, April 2000.

and physical costs. These comments stated further that economic arguments "cannot adequately provide the evidence of the effectiveness and importance of this program for children."

Generic drug manufacturers stated that the provision has a negative economic impact on patients, particularly those without insurance and the elderly. They also stated that the provision has a negative impact on the generic drug industry because last minute changes in exclusivity and patent status interfere with the industry's ability to make development and production decisions. Brand name manufacturers provided no comment on the economic impact of the pediatric exclusivity program.

## 4.    Any suggestions for modifications that the Secretary determines to be appropriate.

Comments from the pediatric community and brand name manufacturers stated that incentives should be provided to conduct studies on drugs that are not currently covered by the provision. The American Academy of Pediatrics urged the development of different incentive levels depending on the need for information on specific drugs, to mitigate the tendency to conduct studies on those drugs with the greatest profits rather than those with the greatest need.

Comments from the American Academy Pediatrics and from generic drug manufacturers stated that exclusivity should be expressly tied to labeling changes (i.e., approval of applications or supplements).

Comments from brand name manufacturers suggested adding flexibility to the granting of exclusivity where sponsors have shown "due diligence" in their attempts to comply with Written Requests.

Comments from generic drug manufacturers urged that the pediatric exclusivity program not affect the review and approval of abbreviated new drug application (ANDA) suitability petitions. These comments also urged that exclusivity be available only when (1) a drug is for a serious and life-threatening illness, (2) the studies result in significant new pediatric labeling, and (3) the drug shows an advantage over existing therapies.

Comments from organizations devoted to pediatric oncology urged the addition of adequate incentives for pediatric cancer drugs.

## 5.    Other Relevant Issues

Comments from PhRMA and individual drug sponsors indicate areas in the implementation program where FDA is the "rate-limiting step." The comments focus on the time required to review a Proposed Pediatric Study Request and issue a Written Request and the time required to review and respond to a sponsor's proposal to amend a Written Request. In its comments, PhRMA also stated that "for the legislation to work

25

optimally, the FDA needs to establish consistency among review divisions, based on the best of pediatric and pharmaceutical science." These comments urged additional resources for FDA to address these problems. Comments from the American Academy of Pediatrics and the Pediatric Pharmacology Research Units also stated that appropriate funding for additional FDA staff was needed to expeditiously implement the pediatric exclusivity provision.

**Appendix B**

Table 1

| Proposed Pediatric Study Requests (PPSR) / Written Requests (WR) As of September 2000 | | |
|---|---|---|
| **Review Division** | **PPSRs Received** | **WRs Issued** |
| Cardiorenal | 26 | 24 |
| Neuropharm | 25 | 18 |
| Oncology | 5 | 3 |
| Medical Imaging | 0 | 0 |
| Anesthetic | 14 | 9 |
| Gastroenterology | 11 | 5 |
| Metabolic & Endocrine | 25 | 15 |
| Anti-Infective | 3 | 2 |
| Anti-Viral | 20 | 20 |
| Dermatology | 13 | 7 |
| Anti-Inflammatory | 22 | 36 |
| Over-the-Counter | 4 | 3 |
| Pulmonary | 12 | 9 |
| Reproductive | 1 | 0 |
| Special Pathogens | 10 | 6 |
| **Total** | **191** | **157** |

FDA may have issued more than one Written Request for the same moiety if multiple sponsors hold NDAs for the moiety. This table does not reflect incomplete actions FDA has taken on proposals submitted by industry.

**Appendix B**
Table 2
# Approved Active Moieties to which FDA has issued a Written Request for Pediatric Studies under Section 505A of the Federal Food, Drug, and Cosmetic Act

NOTE: This list simply identifies approved drug products (as of April 1, 1999) and active moieties (after April 1, 1999) to which FDA has issued a Written Request for pediatric studies. If a product appears on this list, it does not imply that studies have been conducted or submitted to the Agency, nor does it mean that the studies described in the Written Request will be conducted. A sponsor is NOT required to perform pediatric studies in response to a Written Request. Conducting pediatric studies in response to a Written Request is voluntary. For a list of approved products containing the active moiety by the sponsor please see http://www.fda.gov/CDER/Drug.htm and click on approved drug products.

| Active Moiety | Sponsor |
|---|---|
| Abacavir | Glaxo Wellcome |
| Acetazolamide | Wyeth-Ayerst |
| Alosetron | Glaxo Wellcome |
| Amiodarone | Wyeth Ayerst |
| Amlexanox | Block Drug |
| Amlodipine | Pfizer, Inc. |
| Ammonium Lactate | Westwood Squibb |
| Amprenavir | Glaxo Wellcome |
| Atorvastatin | Warner-Lambert |
| Atovaquone/Proguanil | Glaxo Wellcome |
| Azelastine | ASTA Medica |
| Beclomethasone | Schering |
| Benazepril | Novartis |
| Betamethasone | Schering |
| Betaxolol | Lorex Pharmaceuticals |
| Betaxolol | Alcon |
| Bisoprolol | Wyeth-Ayerst |
| Brimonidine | Allergan |
| Brinzolamide | Alcon |
| Budesonide | Astra Zeneca |

| | |
|---|---|
| Buproprion | Glaxo Wellcome |
| Buspirone | Bristol-Myers Squibb |
| Busulfan | Orphan Medical |
| Calcitriol | Abbott |
| Candesartan | Astra Pharmaceuticals |
| Carteolol | CIBA |
| Carvedilol | SmithKline Beecham |
| Celecoxib | Searle |
| Cerivastatin | Bayer |
| Cetirizine | Pfizer |
| Ciprofloxacin | Bayer |
| Ciprofloxacin | Alcon |
| Cisatracurium | Glaxo Wellcome |
| Citalopram | Forest Laboratories |
| Cromolyn Sodium | Pharmacia & UpJohn |
| Cromolyn Sodium | Bausch & Lomb |
| Cytarabine | SkyePharma Inc. |
| Dichlorphenamide | Merck |
| Didanosine | Bristol-Myers Squibb |
| Dorzolamide | Merck |
| Efavirenz | DuPont |
| Enalapril Maleate | Merck |
| Esmolol | Baxter Pharmaceutical |
| Etodolac | Wyeth-Ayerst |
| Famotidine | Merck |
| Felodipine | Astra Pharmaceutical |
| Fenoldopam | Elan Pharmaceutical |
| Fentanyl | Janssen |
| Fexofenadine | Aventis |
| Fluvoxamine | Solvay Pharmaceutical |
| Fluoxetine | Lilly |
| Fluticasone | Glaxo Wellcome, Inc. |

| | |
|---|---|
| Fosinopril | Bristol-Myers Squibb |
| Fosphenytoin | Parke-Davis |
| Gabapentin | Parke-Davis |
| Gentamicin | Schering |
| Glatiramer Acetate | Teva |
| Ibuprofen | McNeil |
| Ibuprofen | Whitehall-Robbins |
| Indinavir | Merck |
| Insulin aspart [rDNA origin] | Novo Nordisk |
| Insulin glargine | Aventis |
| Irbesartan | Bristol-Myers Squibb |
| Isotretinoin | Hoffman-LaRoche |
| Itraconazole | Janssen |
| Ketoconazole | Janssen |
| Ketorolac | Allergan |
| Labetalol | Schering |
| Lamivudine | Glaxo Wellcome, Inc. |
| Lamotrigine | Glaxo Wellcome, Inc. |
| Lansoprazole | TAP Holdings, Inc. |
| Leflunomide | Hoechst Marion Roussel |
| Levobetaxolol | Alcon |
| Levobunolol | Allergan |
| Linezolid | Pharmacia & UpJohn |
| Lisinopril | Zeneca Pharmaceutical |
| Lisinopril | Merck |
| Loratadine | Schering |
| Losartan | Merck |
| Lovastatin | Merck |
| Metformin | Bristol-Myers Squibb |
| Methazolamide | Wyeth-Ayerst |
| Metipranolol | Bausch & Lomb |
| Metoprolol | Astra Zeneca |

| | |
|---|---|
| Midazolam | Hoffmann-La Roche |
| Milrinone | Sanofi Synthelabo |
| Mirtazepine | Organon Inc. |
| Moexipril | Schwarz Pharma |
| Mometasone | Schering |
| Montelukast | Merck |
| Nabumetone | SmithKline Beecham |
| Nefazodone | Bristol-Myers Squibb |
| Nelfinavir | Agouron |
| Nevirapine | Boehringer Ingelheim |
| Nicotine | SmithKline Beecham |
| Norfloxacin | Merck |
| Ofloxacin | Allergan |
| Omeprazole | Astra Zeneca |
| Oseltamivir | Roche |
| Oxcarbazepine | Novartis |
| Oxaprozin | Searle |
| Oxycodone | Purdue Pharma L.P. |
| Paroxetine | SmithKline Beecham |
| Pemirolast | Santen |
| Pravastatin | Bristol-Myers Squibb |
| Propofol | Zeneca Pharmaceutical |
| Quinapril | Parke-Davis |
| Ranitidine | GlaxoWellcome |
| Remifentanil | Glaxo Wellcome |
| Repaglinide | Novo Nordisk |
| Ribavirin in combination with Interferon alfa-2B, recombinant | Schering |
| Rifapentine | Hoechst-Marion Roussel |
| Ritonavir | Abbott Laboratories |
| Ropivacaine | Astra Zeneca |
| Rosiglitazone | SmithKline Beecham |
| Salmeterol | Glaxo Wellcome, Inc. |

| | |
|---|---|
| Saquinavir | Hoffman-La Roche Inc. |
| Sertraline | Pfizer Pharmaceutical |
| Sevoflurane | Abbott |
| Sibutramine | Knoll Pharmaceutical |
| Simvastatin | Merck |
| Sirolimus | Wyeth-Ayerst |
| Somatropin [rDNA origin] | Serono Laboratories |
| Sotolol | Berlex Laboratories |
| Stavudine | Bristol-Myers Squibb |
| Sumatriptan | Glaxo Wellcome |
| Tamoxifen | Astra Zeneca |
| Timolol | Merck |
| Timolol | Falcon Pharmaceutical |
| Timolol | Santen |
| Tobramycin | Falcon Pharmaceutical |
| Topotecan HCl | SmithKline Beecham |
| Tramadol | R.W. Johnson |
| Venlafaxine | Wyeth-Ayerst |
| Verapamil | Elan Pharmaceuticals |
| Zafirlukast | Zeneca Pharmaceutical |
| Zanamivir | Glaxo Wellcome |
| Zolmitriptan | Zeneca Pharmaceutical |

## Spectrum of Diseases/Conditions for Which
## FDA Has Issued Written Requests

# Appendix B

Table 3

**Cardiovascular**
Hypertension
Pre-op Hypertension
Controlled Hypotension
Congestive Heart Failure
Tachyarrhythmia

**Neurology**
Depression
Partial Seizures
Generalized Seizures
Migraine
Obsessive Compulsive Disorder
General Anxiety Disorder
Multiple Sclerosis

**Analgesics and Anesthetics**
Mild Pain
Moderate – Severe Pain
Chronic Pain
Anesthesia
Sedation

**Gastroenterology**
Reflux
Irritable Bowel Syndrome

**Dermatology**
Oral mucositis
Aphthous ulcers
Cutaneous candidiasis
Atopic Dermatitis
Ichthyosis vulgaris
Tinea cruris
Tinea pedis
Steroid-responsive Dermatosis
Xerosis

**Oncology**
Refractory or Relapsed CNS Leukemia and
    Lymphoma
Refractory or Relapsed Pediatric
    Malignancies
Allogeneic bone marrow transplants

**Endocrine**
Familial Hypercholesterolemia
Type 1 Diabetes
Type 2 Diabetes
Renal Failure 2° Hyperparathyroidism
Obesity
McCune-Albright Syndrome

**Infections (not viral)**
Complicated Urinary Tract Infection
Tuberculosis
Malaria
Candidiasis
Skin and Skin Structure
Bacterial Meningitis
CSF Shunt Infections

**Antivirals**
HIV
Hepatitis B
Hepatitis C
Influenza A & B

**Ophthalmologic**
Increased Intraocular Pressure
Neonatal Conjunctivitis
Allergic Conjunctivitis

**Pulmonary/Allergy**
Allergic Rhinitis
Asthma
Chronic idiopathic urticaria

**Immunomodulators**
Renal Transplant
Immune Suppression

**Other**
Symptoms associated with common cold and
    influenza
Smoking Cessation
Juvenile Rheumatoid Arthritis

**Appendix B**

Table 4

| | Pediatric Exclusivity Granted (as of September 2000) | | | |
|---|---|---|---|---|
| | **Granted** | **Moiety** | **Sponsor** | **Indication** |
| 1 | 7/1/98 | Ibuprofen | McNeil | Fever, Aches/Pains, Cold Symptoms |
| 2 | 7/1/98 | Ibuprofen | Whitehall | "         " |
| 3 | 9/18/98 | Midazolam | Roche | Sedation/Anxiolysis/Amnesia |
| 4 | 12/14/98 | Abacavir | Glaxo | HIV |
| 5 | 1/19/99 | Ranitidine | Glaxo | Gastro-esophageal reflux |
| 6 | 7/12/99 | Insulin glargine | Aventis | Diabetes Mellitus |
| 7 | 8/11/99 | Pemirolast | Santen | Allergic conjunctivitis |
| 8 | 8/11/99 | Propofol | Zeneca | Anesthetic |
| 9 | 8/11/99 | Azelastine | Astra | Itching associated with allergic conjunctivitis |
| 10 | 10/1/99 | Ammonium lactate | Westwood-Squibb | Ichthyosis Vulgaris/xerosis |
| 11 | 11/2/99 | Cromolyn sodium | Pharmacia & UpJohn | Allergic Rhinitis |
| 12 | 12/6/99 | Etodolac | Wyeth Ayerst | Juvenile Rheumatoid Arthritis |
| 13 | 12/6/99 | Oxaprozin | Searle | Juvenile Rheumatoid Arthritis |
| 14 | 1/3/00 | Fluvoxamine | Solvay | Obsessive Compulsive Disorder |
| 15 | 1/6/00 | Sotalol | Berlex Lab | Arrhythmias |
| 16 | 2/2/00 | Gabapentin | Parke Davis | Epilepsy |
| 17 | 2/2/00 | Enalapril | Merck | Hypertension |
| 18 | 3/15/00 | Remifentanil | Abbott | Analgesic |
| 19 | 3/15/00 | Metformin | Bristol-Myers | Diabetes Mellitus |
| 20 | 4/19/00 | Tramadol | R.W. Johnson | Analgesic |
| 21 | 4/19/00 | Bisoprolol/HCTZ | Wyeth-Ayerst | Hypertension |
| 22 | 5/22/00 | Buspirone | Bristol-Myers | Generalized Anxiety Disorder |
| 23 | 8/2/00 | Sevoflurane | Abbott | Anesthetic |
| 24 | 8/14/00 | Loratadine | Schering | Seasonal allergic rhinitis & chronic idiopathic urticaria |
| 25 | 9/22/00 | Lamivudine | Glaxo | HIV |

**Appendix B**

Table 5

| Labeling Changes as of September 2000 | | |
|---|---|---|
| **Product** | **Indication** | **Label Changes** |
| Ibuprofen - Motrin | Fever, minor aches & pain, cold symptoms | Extended age range to include 6 months - 2 years |
| Ibuprofen - Advil | Fever, minor aches & pain, cold symptoms | Extended age range to include 6 months - 2 years |
| Midazolam - Versed | Sedation/anxiolysis/amnesia | - Specified the effective dose, effective dose range, and time of onset<br>- Defined volume of distribution and similarity to adult protein binding and elimination<br>- Additional information on AEs and warnings about concomitant medications<br>- Identified a subpopulation (children with congenital heart disease and pulmonary hypertension) at higher risk for AEs |
| Abacavir - Ziagen | HIV infection | Labeling for 3 months - 12 years |
| Ranitidine - Zantac | Gastroesophageal Reflux | Extended age range to include 0 to 1 month, characterized PK in single and continuous infusions |
| Pemirolast- Alamast | Allergic Conjunctivitis | Safety and effectiveness established down to 3 years |
| Insulin glargine- Lantus | Type 1 Diabetes | Safety and effectiveness established down to 6 years |
| Azelastine-Optivar | Itching associated with Allergic Conjunctivitis | Safety and effectiveness established down to 3 years |
| Cromolyn- Nasalcrom | Prevention and relief of nasal symptoms of hay fever and other nasal allergies | Established proper dose in 2 year – 6 year olds and provided additional safety and compliance data for this age group |
| Etodolac-Lodine | Signs and symptoms of Juvenile Rheumatoid Arthritis | New indication in 6 years –16 years |
| Fluvoxamine - Luvox | Treatment of obsessions and compulsions in patients with OCD | Determined that a dose adjustment (increased dose) may be necessary in adolescents and girls 8-11 years of age may require lower doses |
| Ammonium lactate-Lachydrin | Xerosis, ichthyosis | Safe and effective down to 2 years |

35

**Appendix B**
Table 6

| IMS HEALTH Data (Outpatient Data) National Disease and Therapeutic Index™ 1994 through 1999 | | |
|---|---|---|
| **Drug** | **Age Range** | **# of Drug Mentions** |
| Bisoprolol | 0 - 16 years | 27,000 |
| Cromolyn Sodium | 2 years - 6 years | 2,375,000 |
| Enalapril | 0 - 16 years | 366,000 |
| Etodolac | 6 years - 16 years | 277,000 |
| Fluvoxamine | 7 years - 17 years | 390,000 |
| Gabapentin | 0 - 12 years | 126,000 |
| Ibuprofen | 6 months - 2 years | 8,576,000 |
| Metformin | 8 years - 16 years | 46,000 |
| Midazolam | 6 months - 16 years | 568,000 |
| Oxaprozin | 6 years - 16 years | 274,000 |
| Propofol* | 0 - 16 years | 24,000 |
| Ranitidine | 0 - 1 month | 1,483,000 |
| Sotalol* | 0 - 16 years | 16,000 |
| Tramadol | 0 - 16 years | 135,000 |

This table represents IMS HEALTH data on 14 of the 25 drugs granted pediatric exclusivity under the FDAMA provision. The National Disease and Therapeutic Index™ (NDTI) database is a compilation of statistical and demographic information about the patterns and treatment of disease encountered in office-based practice. These data reflect the projected number of drug uses for the product groups and age ranges identified during a patient (diagnostic) visit. These data are not the projected number of prescriptions dispensed. These data are from the time period 1994 through 1999.

*Generally used only in a hospital setting or initiated in a hospital based program.

**Appendix B**

Table 7

**10 Drugs most widely prescribed in pediatric age groups in 1994 for which the label carried no directions for use**

| Drug | Treatment Use | Number of uses | Study proposal submitted by sponsor | Exclusivity or patent life |
|---|---|---|---|---|
| Albuterol Inhalation solution | asthma | 1,626,000 times to pediatric patients under 12 | No (currently labeled for patients > 2) | No |
| Phenergan | allergic reactions | 663,000 times to pediatric patients under 2 | No | No |
| Ampicillin Injection | infection | 639,000 times to pediatric patients under 12 | No | No |
| Auralgan otic solution | ear pain | 600,000 times to pediatric patients under 16 | No | No |
| Lotrisone cream | topical infections | 325,000 times to pediatric patients under 12 | Yes | Yes |
| Prozac | depression and obsessive compulsive disorder | 349,000 times to pediatric patients under 16 | Yes | Yes |
| Intal | asthma | solution prescribed 109,000 times to pediatric patients under 2; aerosol prescribed 399,000 times to pediatric patients under 5 | Yes | Yes |
| Zoloft | depression | 248,000 times to pediatric patients under 16 | Yes | Yes |
| Ritalin | attention deficit disorder and narcolepsy | 226,000 times to pediatric patients under 6 | No | No |
| Alupent | asthma | 84,000 times to pediatric patients under 6 | No | No |

IMS HEALTH Inc., *National Disease and Therapeutic Index ™*

**Appendix C**

### *Economic Impacts Methodology*

Congress specifically asked that FDA examine:

> "the economic impact of the program on taxpayers and consumers, including the impact of the lack of lower cost generic drugs on patients, including on lower income patients"...

### Overview

In determining the economic impact of allowing an extra 6 months of marketing exclusivity in exchange for the conduct of studies designed to determine efficacy in pediatric populations, FDA looked at the difference in sales revenue for each drug (or moiety) granted pediatric exclusivity compared with sales revenue had the drug not been granted pediatric exclusivity.

Estimating these differences was accomplished for each identified drug in three primary steps:

1) estimating sales revenue during the year of patent/exclusivity expiration,

2) estimating sales revenues following patent/exclusivity expiration, and

3) comparing the sales revenues of all products containing the identified moiety with and without a 6-month period of additional exclusivity added to the innovator's patent/exclusivity expiration.

Generally, once a new drug product commences marketing, its sales revenues increase until generic competition enters the market place at some point in the future – usually determined by patent expiration or some other exclusive marketing rights granted by Hatch Waxman legislation or the Orphan Drug Act. These future dates are readily available for almost all drugs in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book).

Once generic competition enters the market, total drug sales revenue (the sum of the revenue from innovator and generic sales) gradually declines due to the lower prices of generic products and the entry of a growing number of generic competitors. FDA estimates assume that stabilization occurs 3 years after generic competition first enters the market.

Figure 1 graphically demonstrates the methodology for a hypothetical drug with innovator sales reaching a peak of $500 million in a 6-month period, or $1 billion a year. During the first 10 years, innovator sales revenues increase until market exclusivity



expires. During the 3 years following the expiration of innovator marketing exclusivity, total drug sales revenues decline.

Finally total sales revenues stabilize 3 years after the first generic competition enters the market. The two illustrated sales curves are identical, except that one includes an additional 6 months of innovator sales before generic competition enters the market. The shaded area, or the difference between the curves, represents the increased costs to consumers of these drugs. Beyond the 3-year period following patent/exclusivity expiration, the estimated differences disappear. It is important to recognize that these projected sales include sales for all therapeutically equivalent products containing the moiety of the innovator drug. That is, after the expiration of the drug's patent or exclusivity, generic sales are included in the sales projections.

In the hypothetical example illustrated by Figure 1, the additional consumer costs accrue in years 11, 12 and 13, and total about $165 million. If this were a new drug in 1999, the present value of the additional costs, or the "discounted" total would equal about $78 million. Discounting adjusts the costs downward to account for the fact that a dollar received/spent in the future is worth less than a dollar received/spent today. Consequently, it considers the time between the present and the years that the increased revenues will be realized. Discounting has the largest effect on cost estimates for drugs whose exclusivity expires far in the future (e.g., a 7% discount rate approximately halves the costs where exclusivity expires in 2007, but has a much smaller effect on those exclusivities expiring in the next couple of years).

It is important to note that the only variables affecting the undiscounted costs are the eventual stabilized loss of the innovator market share and the final generic price as a proportion of the innovator price. The length of the phase-in period for either the market penetration or the price variation becomes irrelevant to the calculation, because the two

total revenue streams are identical except for the one period shift. Thus, the time needed to achieve the stabilized generic penetration or eventual price reduction affects the discounted, but not the undiscounted cost estimates.[31]

<u>Estimating Average Sales at the Year of Patent/Exclusivity Expiration</u>:

Pediatric exclusivity attaches to all products with listed patents or exclusivity that contain the same active moiety as the product or products studied. An innovator may receive 6 months of exclusivity for several products by virtue of conducting studies on a single active moiety. Sometimes, these products may have differing dates of exclusivity expiration. For this analysis, products were generally treated as one drug if their exclusivity expiration dates were identical and as separate drugs if an innovator's product had two or more operating exclusivities. Such multiple product cases were infrequent, however, and had only a slight effect on the "per drug" cost estimates and no effect on the overall program costs.

Using IMS HEALTH data,[32] FDA developed complete sales histories for each of the 119 drug products (including 102 moieties) for which a sponsor had indicated, by March 1, 2000, the intent to submit pediatric studies. These sales histories ran from the year each drug is first marketed through the 1999 calendar year and ranged from 1 year to more than 18 years.

Next, based on these sales history data, FDA constructed an average sales profile using:

---

[31] Let:

Annual sales of innovator drug at exclusivity expiration $= P$
Discount on generic drug in period $i = d_i$ $\{d_1, d_2, \ldots d_n\}$
Fraction of market captured by generics in period $i = f_i$ $\{f_1, f_2, \ldots f_n\}$

Then,

| | |
|---|---|
| Innovator sales w/o additional exclusivity $= P + (1-f_1)*P + (1-f_2)*P + \ldots + (1-f_n)*P$ | $\{1\}$ |
| Innovator sales with additional exclusivity $= P + P + (1-f_1)*P + (1-f_2)*P + \ldots + (1-f_{n-1})*P$ | $\{2\}$ |
| Generic sales w/o additional exclusivity $= P*f_1*d_1 + P*f_2*d_2 + \ldots + P*f_n*d_n$ | $\{3\}$ |
| Generic sales with additional exclusivity $= 0 + P*f_1*d_1 + P*f_2*d_2 + \ldots + P*f_{n-1}*d_{n-1}$ | $\{4\}$ |

So,

The difference in innovator sales $= \{2\}-\{1\} = P - (1-f_n)*P = P*f_n$     $\{5\}$
The difference in generic sales $= \{4\}-\{3\} = -P*f_n*d_n$     $\{6\}$

Finally, the costs to consumers $= \{5\} + \{6\} = P*f_n - P*f_n*d_n = P*f_n*(1-d_n)$

[32] IMS HEALTH Inc., *Retail Perspective and Provider Prospective Combined Purchases*

1) the average sales in the <u>first full calendar year</u> ($124 million) for all 102 products with at least 1 full calendar year of sales data, and

2) the percentage change in sales from one year to the next for all years after the first full year of marketing.

FDA derived the average weighted percentage change for each market year's sales by summing the percentage changes for each drug and weighting these changes by each drug's previous year sales. This weighting assures that the largest selling drugs (those that contribute the most to the costs of the pediatric labeling program) have a proportionately large effect on the percentage change estimates. As shown in Figure 2, which displays the estimated weighted percentage sales changes for years 3 through 17, the "average" annual percentage changes rise steadily through year 11 and then gradually level off though year 14. The change was erratic after year 14, but is based on only three or fewer drugs. For this analysis, FDA assumes that sales after year 14 remain constant at the year 14 level.

**Figure 2: Average annual Percentage Increase in Sales (Weighted by Sales in Previous Year)**

| Market Yr | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Change | 58% | 35% | 34% | 20% | 15% | 13% | 11% | 12% | 8% | 0% | 3% | 0% | 0% | 0% | 0% |
| Drugs used | 88 | 77 | 62 | 50 | 42 | 37 | 28 | 19 | 18 | 15 | 13 | 7 | NA | NA | NA |

FDA used the average percentage changes to construct an "average sales curve," based on the first full calendar year sales of the 102 drugs, inflated to 1999 dollars. The "average sales curve" data, as shown in Figure 3, were then used to project sales for two sets of drugs – those which had at least one full calendar year of data (the 102 drugs), and the remaining 17 drugs (5 having a partial year of data in 1999, and 12 that were not yet marketed). For each drug in the first set (the 102 drugs), FDA projected sales at the year of patent/exclusivity expiration using their 1999 sales, their market age in 1999, their expected patent/exclusivity expiration, and the percentage changes displayed in Figure 3.

**Figure 3: Projected Sales for Average Drug**

| Market Yr | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Change | N/A | 58% | 35% | 34% | 20% | 15% | 13% | 11% | 12% | 8% | 0% | 3% | 0% | 0% | 0% | 0% |
| Annual Sales ($ millions) | $124 | $197 | $265 | $356 | $428 | $490 | $554 | $616 | $689 | $743 | $740 | $764 | $762 | $762 | $762 | $762 |
| Drugs used | 102 | 88 | 77 | 62 | 50 | 42 | 37 | 28 | 19 | 18 | 15 | 13 | 7 | NA | NA | NA |

FDA also used the "average sales curve" to project sales during the year of patent/exclusivity expiration for all drugs in the second data set; i.e., those data that had not completed a full year of marketing by the end of 1999 (the 17 drugs). In other words, FDA assumed average future sales for these 17 drugs based on the sales of the

drugs for which we had sales data for more than 1 year. For five of these drugs, we had an initial marketing date and a patent or exclusivity expiration date. In these cases, FDA used these dates and the "average sales curve" to project future sales. In four additional cases, the drugs had been approved, although not yet marketed, and we knew the drugs' patent expiration dates. In these cases, FDA assumed marketing would begin in the year 2000 and again used the "average sales curve" to project future sales. In the final eight cases, the drugs had either just been approved, approvable, or not yet approved, and FDA did not know the year of patent or exclusivity expiration. Here, FDA assumed the first year of marketing would be 2000 or 2001, depending on its current status, and assumed an average market life until patent expiration (equal to 13 years based on the other drugs in our data set). Using our "average sales curve," FDA estimated that each of these eight drugs would reach peak sales of $764 million by 13 years after initial marketing.

This methodology provides an estimate of each drug's expected sales revenues during the year of exclusivity expiration. On average, this estimating approach predicts that the average annual sales revenue at patent/exclusivity expiration (inflation adjusted to 1999 dollars) for all 119 drugs will peak at about $710 million per drug about 13 years following market entry. The estimate appears quite reasonable when compared to the average 1999 sales of $394 million for those 102 drugs on which the model is based. In 1999, on average, these 102 drugs had been on the market for approximately 6 years.

Estimating Average Sales after Patent/Exclusivity Expiration:

To estimate industry sales revenues following patent/exclusivity expiration, FDA relied on its own review of industry sales following the patent expiration of eight large selling drugs and on data presented in a recent study prepared by the Congressional Budget Office (CBO).[33] The eight particular drugs FDA reviewed (alprazolam, ranitidine, clonazepam, piroxicam, naproxen, acyclovir, cimetidine, and captopril) were chosen because each was regarded as a "blockbuster" drug and each encountered its first generic competition relatively recently (between 1992 and 1997). This analysis of industry sales data[34] found that within 3 years, generic penetration had reduced innovator revenues, on average, by 84 percent (with individual rates ranging from 68.6% to 89.7%) of sales prior to patent expiration. Assuming that brand name prices change little upon the introduction of generic competition, these percentages also hold for unit sales. Alternatively, the CBO study relied on somewhat older data to project a 60 percent loss of unit market share after 3 years of generic competition. Because both estimates are uncertain predictors of the future, FDA has assumed that the innovator market share (both units and revenues) will decline by 70 percent within 3 years of generic competition.

FDA's analysis of the eight "blockbuster" drugs also confirms previous findings that the quantity of prescriptions sold for a particular drug remains relatively constant following

---

[33] The Congress of the United States, Congressional Budget Office, *How Increased Competition from Generic Drugs has Affected Prices and returns in the Pharmaceutical Industry*, July 1998.
[34] IMS HEALTH Inc., *National Prescription Audit*

generic competition. On average, prescription volume for these eight drugs was 99.5 percent of the previous innovator volume after 1 year of competition, 98.2 percent after 2 years, and 104.4 percent after 3 years. However, there was considerable variation among the eight drugs at the end of the third year following patent expiration. The highest volume reached 146 percent and the lowest 65 percent.

## Effects on Various Sectors

There are four main groups that share the economic consequences of the pediatric labeling exclusivity – innovator companies that gain additional sales revenues, consumers who face higher drug prices, and generic drug firms and retail marketers that lose sales revenues. The revenue gain to the innovator companies will equal the sum of the losses of the latter three groups.

### Innovator Sector:

The innovator drug industry will gain sales revenues estimated at approximately $29.6 billion over affected 20-year period (119 drugs x average peak year sales of $710 million/drug x 70% avoided lost market share x 0.5 years). The agency's actual calculations assume that innovator market share falls to 80 percent during the first 6 months of generic competition, 60 percent during the second 6 months, 52.5 percent during the third 6 months, 45 percent during the fourth 6 months, 37.5 percent during the fifth 6 months, and 30 percent thereafter. On an annual basis, these new revenues amount to almost $1.5 billion per year undiscounted. As explained earlier, the pace of this market penetration does not influence the undiscounted costs, although it does affect the discounted totals, which are $15.3 billion

### Costs to Consumers:

The undiscounted cost of the pediatric exclusivity program to consumers is determined by both the unit market share ultimately gained by the generic industry (assumed to be 70%) and the relative price of the generic drug compared to the brand name drug. Based on retail pharmacy data, the CBO study found that the average generic retail price is about 53 percent of the innovator price at the end of 3 years. FDA has no better estimate.

Using these values, FDA projected complete sales histories (using 1999 sales and marketing age of each product in 1999) for each drug to a point several years beyond exclusivity expiration. Finally, we projected the same sales histories plus an additional 6 months (added for pediatric exclusivity) and compared the two histories for each product. The difference in these two projections measures the transfer of income from drug consumers to the pharmaceutical industry, owing to the pediatric exclusivity extension.

As noted above, the agency's actual calculations assume that the innovator market share falls to 80 percent during the first 6 months of generic competition, 60 percent

43

during the second 6 months, 52.5 percent during the third 6 months, 45 percent during the fourth 6 months, 37.5 percent during the fifth 6 months and 30 percent thereafter. We assumed generic prices would be about 84 percent of innovator prices during the first 6 months following exclusivity expiration, 69 percent during the second 6 months, 61 percent during the third, 57 percent during the fourth, 55 percent during the fifth and 53 percent thereafter. We also assumed that consumer demand for each drug remains constant following patent expiration (consistent with the eight-drug analysis described above) and that the price of the innovator drugs remains unchanged after adjusting for inflation.

As a result, following generic entry, innovator firms are assumed to lose 70 percent of the drug's total revenue and other industry sectors (generally generic firms and retail pharmacies) are assumed to gain 53 percent of the 70 percent, or about 37 percent. Consequently, over the 3-year period, consumer expenditures for a typical drug fall by about 33 percent (70% - 37%). Total projected peak year sales revenues amount to $84.5 billion (119 drugs x $710 million). Thus, pediatric exclusivities are predicted to increase consumer expenditures by about $13.9 billion ($84.5 billion x ½ year x 33%) over the affected 20-year period. The annual cost to consumers, therefore, is $695 million undiscounted. On a discounted basis, these expenditures rise by $7.2 billion.

Costs to Generic Drug Manufacturers:

Manufacturers of generic drugs will experience lost revenues. Projecting these losses requires an estimate of the ratio of brand name prices to generic drug prices at the manufacturing level. Although retail prices for generic drugs were assumed to stabilize at 53 percent of the brand name price, the ratio of generic to brand name prices will be still smaller at the manufacturing level.

Unfortunately, few sources were available to provide accurate estimates of the needed generic to brand name price relationship. The agency therefore relied on a study conducted by Grabowski and Vernon[35] and the CBO report referenced above to derive an estimated generic-to-brand name price ratio of 36.3 percent at the manufacturer level. Grabowski and Vernon found that at 1 year after market entry, the generic to brand name price ratio at the wholesale level (actually the "exit manufacturer" level) was about 68.5 percent of the generic to brand name price ratio at the retail level. The CBO report found that generic prices were 53 percent of brand name prices 3 years after the onset of generic competition. Thus, if we assume no change in the generic to innovator mark-up ratio between year 1 and year 3 of generic competition, the generic price as a percentage of the innovator price at the manufacturer level would be 36.3 percent at year 3 of generic competition (68.5% x 53%).

The 36.3 percent generic-to-brand name price ratio estimate may be imprecise for several reasons. First, the data sources are from different time periods. Second, it

---

[35] Longer Patents for Increased Generic Competition in the US; PharmacoEconomics 1996; Suppl 10, 2: 110-23

assumes a constant relationship between retail and manufacturer mark-ups between year 1 and year 3 of generic competition, although generic prices will decline over the period. Nevertheless, there is no obvious reason to expect the ratio of mark-ups to change over that time.

These assumptions indicate that the generic drug industry will forego significant increases in product sales, losing an estimated $10.7 billion (undiscounted) over the next two decades ($710 million average peak year sales x 119 drugs x 70% market share x 0.363 price ratio x 0.5 for ½ year). Figure 4 presents the projected timing of the estimated average annual sales shortfall. The average annual loss is about $537 million per year (undiscounted). Figure 5 indicates that if these figures are discounted at a 7 percent rate, the estimated total sales shortfall over the next 20 years is about $5.7 billion.



Figure 4: Sales Loss in Generic Drug Industry
FDAMA Pediatric Labeling Costs by Year (undiscounted 1999 dollars)



Figure 5: Sales Loss in Generic Drug Industry
FDAMA Pediatric Labeling Costs by Year (discounted at 7% annually in 1999 dollars)

Costs to Retailers:

Similarly, pharmaceutical distributors, particularly at the retail pharmacy level, are estimated to forego future sales revenues, because generic drugs are assumed to have a higher price markup than brand name drugs. We estimated above that innovator revenues will increase by $29.6 billion over the 20-year period. Increased consumer

45

costs of $13.9 billion and generic industry sales shortfalls of $10.7 billion will contribute to these gains. The remaining revenue losses of $4.9 billion (i.e., $29.6 billion – ($13.9 billion + $10.7 billion)[36] will be experienced by the drug distribution sector.

An alternative means of reaching this same result is to note that the generic drug industry accounts for about 68.5 percent (36.3% ÷ 53.0%) of the price differentials at the retail level and the drug distribution system accounts for the remainder, or 16.7 percent (i.e., 53.0% - 36.3%). This calculation also implies that drug distributors will lose an estimated $4.9 billion (undiscounted) over the next two decades ($710 million average peak year sales x 119 drugs x 70% market share x 0.167 price ratio x 0.5 for ½ year). Figure 6 presents the projected timing of the estimated average annual sales shortfall. On average, this loss amounts to about $245 million annually. Figure 7 indicates that if these figures are discounted at a 7 percent rate, the estimated total sales shortfall over the next 20 years is about $2.6 billion.



**Figure 6: Sales Loss in Retail/Wholesale Sector**
FDAMA Pediatric Labeling Costs by Year (undiscounted 1999 dollars)



**Figure 7: Sales Loss in Retail/Wholesale Sector**
FDAMA Pediatric Labeling Costs by Year (discounted 7% annually in 1999 dollars)

## Estimation Uncertainties

These projections may provide only a rough approximation of future events, because they are based on a variety of plausible but uncertain assumptions. For example, FDA

---

[36] Discrepancy due to rounding

relied on patent or exclusivity termination dates presented in the agency's *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book), but these dates are frequently subject to litigation by both innovator and generic firms, which can affect the timing of generic entry. Also, drugs are sometimes discontinued for safety reasons. The above estimates do not account for such events. Further, the agency's drug revenue projections are based on historical growth patterns, but recent changes within the pharmaceutical industry could alter these trends. Similarly, the number of affected drugs is uncertain. This analysis assumes that 119 will gain added exclusivity, but this number may be low if additional study requests are issued. Alternatively, the number may be high, because not all sponsors will complete acceptable studies. (FDA estimates that approximately 85% of the expected sponsors will respond and 90 to 95% of those responding will be granted exclusivity.) Moreover, different projection methodologies could provide different results. For example, if either the innovator share or generic prices fall by an amount greater than assumed, the impact of the pediatric exclusivity program on consumers and taxpayers will be larger than estimated. Conversely, if either the innovator share or generic prices fall by an amount smaller than assumed, the impact will be less. Finally, the use of varying discount rates would modify the present value cost projections. We now present sensitivity analyses that illustrate the impact of a number of alternative assumptions.

## Sensitivity Analyses

### Total Program Costs (costs to consumers)

To assess the range of plausible cost values, we determined the sensitivity of our cost estimates to several of the respective variables. We primarily looked at alternative weighting methods, and changes in the final generic penetration rate, the relative price of generic and innovator products, and the discount rate. The first row of Table 1 shows that our "best" estimate of the discounted costs over the affected 20-year period is $7.2 billion. The results of the alternative assumptions are provided in the following rows.

Our methodology considered three different methods of weighting the annual percentage increases used to project future sales. We selected "prior" year sales weighting as our "best" estimate (the percentage increases shown in Figure 2 above). If the annual percentage changes are *not* weighted (annual percentage sales increases are considered equally for all 102 drugs in our data set), the total discounted program costs would be about $8.0 billion. If the annual percentage changes were weighted by following year sales (sales during the year following the calculated percentage change), the total discounted program costs would be about $8.1 billion.

**Table 1: Sensitivity Analyses - Discounted Costs to Consumers ("Best" Estimate in Bold)**

| Generic Market Share | Wt | Discount Rate | Generic Price | Total Costs (billions) |
|---|---|---|---|---|
| 70% | P | 7% | 0.53 | **$7.2** |
| 70% | N | 7% | 0.53 | $8.0 |
| 70% | F | 7% | 0.53 | $8.1 |
| 60% | P | 7% | 0.53 | $6.2 |
| 80% | P | 7% | 0.53 | $8.2 |
| 70% | P | 7% | 0.40 | $9.2 |
| 70% | P | 7% | 0.60 | $6.1 |
| 70% | P | 3% | 0.53 | $10.3 |
| 70% | P | 10% | 0.53 | $5.7 |

Our "best" estimate of the eventual stabilized generic market share assumed that generic products would ultimately account for 70 percent of the quantity (prescriptions) of the moiety sold. We also assessed the costs using market penetration rates of 60 percent and 80 percent, while holding the values of other variables constant. If generic penetration stabilizes at 60 percent, the estimated discounted costs are about $6.2 billion, or about $1 billion less than our "best" estimate. If generics eventually capture 80 percent of the market, the total estimated discounted costs are about $8.2 billion, or about $1 billion more than our "best" estimate.

The data reviewed by the CBO found that generic prices stabilized at about 53 percent of innovator prices. We used this value, but also looked at the effects of assuming 40 percent and 60 percent. If the average generic price stabilizes at 40 percent of the innovator price, the total estimated costs are $9.2 billion, or an increase of $2 billion above our "best" estimate. If the average generic price stabilizes at 60 percent of the innovator price, the total estimated costs are $6.1 billion, or a decrease of $1.1 billion compared to our "best" estimate.

Discounting the value of future costs has the greatest effect on dollars spent well into the future. We used a discount rate of 7 percent for our primary analysis. We also assessed total costs using rates of 3 percent and 10 percent. Total costs were estimated to be about $10.3 billion, using a rate of 3 percent, or an increase of about $3.1 billion over our "best" estimate. If a rate of 10 percent were used, total costs fall to about $5.7 billion or about $1.5 billion less than our "best" estimate.

Comparing the sensitivity analyses described above, we found that these one-at-a-time changes resulted in a high discounted cost estimate of $10.3 billion and a low discounted cost estimate of $5.7 billion.

**Lost New Sales for Generic Drug Industry**

We also looked at the effect of our assumptions on our estimate of lost future sales for the generic drug industry. Table 2 presents these estimated effects. We compared our base 70 percent estimate against the alternative rates of 60 percent and 80 percent for generic drug market penetration; our base 0.53 figure against values of 0.40 and 0.60 for the relative price of generics to brand name products; and our base 7 percent to values of 3 percent and 10 percent for annual discount rates. Total discounted sales loss over the affected 20-year period using our "best" assumptions was $5.7 billion. Changing these assumptions caused the estimated sales loss to the generic industry to vary between $4.4 billion and $8.0 billion.

**Table 2: Sensitivity Analyses – Discounted Lost Sales to Generic Drug Industry ("Best" Estimate in Bold)**

| Generic Market Share | Discount Rate | Generic Price | Sales Loss (billions) |
|---|---|---|---|
| 70% | 7% | 0.53 | **$5.7** |
| 60% | 7% | 0.53 | $5.0 |
| 80% | 7% | 0.53 | $6.5 |
| 70% | 7% | 0.40 | $4.4 |
| 70% | 7% | 0.60 | $6.5 |
| 70% | 3% | 0.53 | $8.0 |
| 70% | 10% | 0.53 | $4.6 |

**Lost New Revenues for Retail Pharmacies**

Projections pertaining to the drug distribution sector are also affected by our assumptions. Table 3 presents the effect of these assumptions on the future sales revenues of these firms. We compared our base estimate of 70 percent against the alternative rates of 60 percent and 80 percent for generic drug market penetration; our base estimate of 0.53 percent against values of 0.40 and 0.60 for the relative price of generics to innovator products; and the 7 percent discount rate against values of 3 percent and 10 percent for annual discount rates. Total discounted sales loss over the affected 20-year period using our "best" assumptions was $2.6 billion. Changing these assumptions caused the estimated sales loss to the drug distribution sector to vary between $3.7 billion and $2.1 billion, or a range of $1.6 billion.

49

**Table 3: Sensitivity Analyses – Discounted Costs to Retail/Wholesale Sector ("Best Estimate in Bold)**

| Generic Market Share | Discount Rate | Generic Price | Sales Loss (billions) |
|---|---|---|---|
| 70% | 7% | 0.53 | **$2.6** |
| 60% | 7% | 0.53 | $2.3 |
| 80% | 7% | 0.53 | $3.0 |
| 70% | 7% | 0.40 | $2.0 |
| 70% | 7% | 0.60 | $3.0 |
| 70% | 3% | 0.53 | $3.7 |
| 70% | 10% | 0.53 | $2.1 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MYLAN LABORATORIES, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| MUTUAL PHARMACEUTICAL CO., INC. | ) |
| | ) |
| Intervenor-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL O. LEAVITT, Secretary, | ) |
| Health and Human Services, *et al.* | ) |
| | )   Civil Action No. 07-0579 (RMU) |
| Defendants | ) |
| | ) |
| and | ) |
| | ) |
| TEVA PHARMACEUTICALS USA, INC., | ) |
| | ) |
| Intervenor-Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| APOTEX INC., | ) |
| | ) |
| Intervenor-Defendant. | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of April, 2007, Intervenor-Plaintiff Mutual

Pharmaceutical Co., Inc.'s Memorandum in Opposition to Apotex, Inc.'s Motion For

Preliminary Injunction and Teva Pharmaceutical USA Inc.'s Motion for Declaratory and

Injunctive Relief and the Declaration of Chad A. Landmon was filed with the Clerk of the

Court using the CM/ECF system, which will automatically send e-mail notification of

NYDOCS:30094.1

such filing to the attorneys of record listed below. In addition, a true and correct copy

was served on the attorneys of record listed below by electronic mail and Federal

Express.

David J. Harth
HELLER EHRMAN LLP
One East Main Street Suite 201
Madison, WI 53703
(608) 663-7460
(608) 663-7499 (facsimile)
david.harth@hellerehrman.com

Drake S. Cutini
DEPARTMENT OF JUSTICE
Office of Consumer Litigation
P.O. 386
Washington, DC 20044
(202) 307-0044
(202) 514-8742 (facsimile)
drake.cutini@usdoj.gov

Jay Lefkowitz
Michael Shumsky
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005-5793
(202) 879-5000
(202) 879-5200 (facsimile)
jlefkowitz@kirkland.com
mshumsky@kirkland.com

Arthur Y. Tsien
OLSSON, FRANK AND WEEDA, PC
1400 16th Street, N.W.
Suite 400
Washington, DC 20036-2200
(202) 789-1212
(202) 234-3550 (facsimile)
atsien@ofwlaw.com

Robert B. Breisblatt
Steven E. Feldman
WELSH & KATZ, Ltd.
120 South Riverside Plaza
22nd Floor
Chicago, IL 60606
(312) 655-1500
(312) 655-1501
rbbreisblatt@welshkatz.com
sefeldman@welshkatz.com

/s/ Chad A. Landmon
Chad A. Landmon