IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MYLAN LABORATORIES INC., AND MYLAN PHARMACEUTICALS INC., | |
| *Plaintiffs*, | |
| and | |
| MUTUAL PHARMACEUTICAL CO., | |
| *Intervenor-Plaintiff,* | |
| v. | Civil Action No. 07-579 (RMU) |
| MICHAEL O. LEAVITT, et al., | Judge Ricardo M. Urbina |
| *Defendants, Cross-Defendants* | |
| and | |
| TEVA PHARMACEUTICALS USA, INC., | |
| *Intervenor-Defendant* | |
| and | |
| APOTEX INC., | |
| *Intervenor-Defendant,Cross claimant* | |

**APOTEX'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

I.    APOTEX IS ENTITLED TO A PRELIMINARY INJUNCTION TO COMPEL
      IMMEDIATE FINAL APPROVAL OF ITS OWN ANDA

   A.    Apotex Is Likely To Succeed On The Merits Because The Applicable
         Courts Find The Federal Circuit Judgment Of March 22, 2007 To Be
         A Determination

Contrary to the FDA's position, both the Federal Circuit and the Northern District of
Illinois view the Federal Circuit's March 22, 2007 judgment in *Pfizer v. Apotex* as a court
determination worthy of affording legal effect. The Federal Circuit itself gave effect to its March
22, 2007 judgment in granting Mylan a stay of injunction in its district court proceeding. Order,
*Pfizer v. Mylan Laboratories*, No. 2007-1194 (Fed. Cir. March 23, 2007) (attached as Exhibit A).
In granting Mylan its relief, the Federal Circuit defined its March 22, 2007 judgment as an
"invalidity **determination**" stating:

> Pfizer and Mylan are each are directed to respond, no later
> than 10 a.m. on Monday, March 26, 2007, concerning how ***the
> invalidity determination*** affects the pediatric exclusivity period
> and the ANDA approval. Inter alia, the parties should address
> when and how the FDA will likely respond to the court's decision
> in no. 2006-1261. Each response should not exceed 15 pages.

The FDA's view that the Federal Circuit's judgment of invalidity was not a court
determination is arbitrary, capricious and not in accordance with law. The FDA knew that the
Federal Circuit characterized its own action as a "determination." The FDA also knew that the
Federal Circuit relied on the March 22, 2007 judgment to give relief to a third party (Mylan)
prior to patent expiration based on its determination. The FDA recognized the stay in
acquiescing to Mylan's entry into the market for generic amlodipine besylate, but that stay was
itself predicated on the March 22, 2007 judgment.  Government Defendants' Combined
Memorandum In Opposition To Motions For Injunctive Relief Filed By Teva, Apotex, and

Mylan, at 30 (hereinafter "FDA Mem."). Because the "stay" that the FDA recognized is itself dependant on the March 22, 2007 judgment on which it is predicated, the FDA is being arbitrary and capricious in giving Mylan the benefit of the judgment and not Apotex.

The FDA allowed Mylan to go to market on the strength of the "stay" of the injunction in the district court. That the FDA has not allowed Apotex to go to market with *its* stay of *its* district court injunction is also a reason that the FDA's decision in this matter is arbitrary, capricious and not in accordance with law. Unlike the FDA, the Northern District of Illinois gave effect to the Federal Circuit's determination and judgment that claims 1-3 of the Pfizer's patent were invalid. On March 29, 2007, the Northern District of Illinois ordered that its injunction against Apotex would be lifted on April 3, 2007 in view **of the March 22, 2007 judgment, not patent expiration**. *See Order*, Pfizer v. Apotex No. 3-C-5289 (N.D. Ill. Mar. 29, 2007) (attached as Exhibit B).

The district court was correct in acting based on the Federal Circuit determination. The Federal Circuit opinion and judgment was precedential and unvacated as of March 22, 2007. The opinion is not a legally powerless document – it has precedential effect upon release unless vacated. *Vaicaitiene v. Partners in Care, Inc.*, 2005 U.S. Dist. LEXIS 13490 (D.N.Y. 2005) (observing that opinions are precedent, but may be vacated for mootness).

The actions of the Federal Circuit and the Northern District of Illinois comport with the standard legal definitions of "judgment" and "mandate." A "judgment" is "[a] court's final **determination** of the rights and obligations of the **parties** in a case." Black's Law Dictionary, at 856 (8th ed. 2004) (emphasis supplied) (attached as Exhibit C). A "mandate" is "[a]n **order** from **an appellate court** directing **a lower court** to take a specified action." *Id*. at 980 (emphasis supplied). It is the judgment that set forth the parties' rights and obligations, not the mandate.

-2-

Therefore, it is the judgment and opinion entered on March 22, 2007 by the Federal Circuit that meet the "court determines" language of the statute, not a mandate to be issued at some indeterminate point in the future. Both the Federal Circuit and the Northern District of Illinois were correct in acting on the determination of the March 22, 2007 judgment.

**B.      Apotex Is Likely To Succeed On The Merits Because Mylan And The FDA Have Not Rebutted Apotex's Arguments**

The FDA and Mylan have failed to rebut Apotex's showing that the March 22, 2007 Federal Circuit judgment was a final "determination." In particular, neither the FDA nor Mylan has rebutted that:

(1)      As of March 22, 2007, the judgment entered on March 22, 2007 was the type of determination required for a petition for certiorari to the Supreme Court under Supreme Court Rule 14. (Apotex's Memorandum of Points And Authorities In Support Of Its Motion For Preliminary Injunction, at 6. (hereinafter "Apotex Mem."). Therefore, the judgment was "effective" as to at least the Supreme Court.

(2)      Under the Federal Rules of Appellate Procedure, opinions or judgments are not automatically vacated when further review is granted. Apotex Mem. at 6.

(3)      The discretionary reviews that follow the judgment do not principally consider the merits of the case. Apotex Mem., at 6-7.

(4)      The statutes that the FDA alleges demonstrate "ambiguity" in the term "determines" are inapposite. Apotex Mem., at 9-10.

(5)     Rather than giving determinative effect to the Federal Circuit's opinion and judgment, FDA is giving Pfizer's petition for a rehearing the effect of "vacating" the Federal Circuit's opinion and judgment. Apotex Mem., at 9-10.

(6)     The prospects of discretionary review are very low-percentage. Apotex Mem., at 10.

These factors alone support a decision by this Court to grant Apotex's motion for preliminary injunction. The Federal Circuit's March 22 opinion and judgment is the last "determination" of validity and infringement by a "court" that is certain or even likely to occur. At this time, there is no judicial power that is holding up final approval for Apotex, only Pfizer's pediatric exclusivity based on a patent that has been held invalid as to Apotex. Any other conclusion allows Pfizer to effectively make its own "determination" that the patent is valid and infringed binding on the FDA and Apotex by merely filing a petition for rehearing.

**C.     On March 22, 2007, "A Court Determine[d]" That Pfizer's Patent Was Invalid**

The only proper question before the FDA is whether on March 22, 2007, the Federal Circuit (a "court") had "determined" that Pfizer's patent was invalid or not infringed vis-à-vis Apotex. 21 U.S.C. § 355a(c)(2)(B) ("the court determines"). The FDA is being arbitrary and capricious because it uses the direct results of the March 22, 2007 Judgment as a determination to permit Mylan to be on the market, and refuses to allow Apotex to be on the market from the same determination – a determination that Apotex had won, not Mylan.

The FDA's (and Mylan's) reliance on the commentary to Federal Rule of Appellate Procedure 41 does not overcome the fact that there was a "court" "determination" on March 22. For example, the commentary to Federal Rule of Appellate Procedure 41(d) shows that

"judgment" was addressed in the commentary for Federal Rule of Appellate Procedure 41(c) only in the context of the "suspending" the finality of the judgment. This has nothing to do with whether a judgment represents a court determination (which it does). This is also in line with Black's Law Dictionary, which defines "suspend" as "to interrupt, postpone, defer." Black's Law Dictionary, at 1487 (8th ed. 2004). Finally, this is also in line with *Hibbs v. Winn*, 542 U.S. 88, 97 (2004). In *Hibbs v Winn*, the Supreme Court noted: "That order, we conclude, *suspended* the judgment's finality under *§ 2101(c)*, just as a timely filed rehearing petition would, or a court's appropriate decision to consider a late-filed rehearing petition" (emphasis added). One can only suspend something that already exists – therefore, there *was* a final determination as of March 22, 2007, and both the FDA and Mylan have so admitted.

Finally, the case law cited by Mylan and the FDA does not assist them because none of their authorities deal with the issue of whether a judgment *was* final before its finality was suspended, which it was. The fact that the Federal Circuit's March 22 judgment will not become final again until the discretionary procedures have run their course is immaterial.

## II.    APOTEX IS ENTITLED TO A PRELIMINARY INJUNCTION TO REQUIRE FDA TO ORDER MYLAN TO STOP MARKETING

Pursuant to 35 U.S.C. §271(e)(4)(A), the Pennsylvania district court's order automatically changed the status of Mylan's application from finally to tentatively approved. FDA and Mylan erroneously argue the Pennsylvania district court's order changing the effective date of approval of Mylan's application is ineffectual because FDA never got around to changing the effective date. FDA argues it was too busy litigating its authority to "convert" Mylan's final approval to a tentative approval in response to the district court's injunction, and that the matter became moot when the Federal Circuit stayed the district court's injunction. FDA's Mem. at 38.

Mylan argues its application is finally approved because once the Federal Circuit issued its stay, the FDA "properly refused to act to reset the effective date of Mylan's approval." Plaintiffs' Opposition to Apotex's Motion for Preliminary Injunction (hereinafter "Mylan's Opposition") at 11. FDA and Mylan fail to acknowledge that, pursuant to 35 U.S.C. § 271(e)(4)(A), the Pennsylvania district court's decision did not require any FDA action to change the status of Mylan's approval; rather Mylan's final approval was converted to a tentative approval by operation of law.

The effective date of an approval following a finding of infringement by a district court is governed by the patent laws, **not** the FDC Act. While FDA is entrusted to interpret and enforce the provisions of Hatch-Waxman, *Mylan v. Thompson*, 389 F.3d 1272, 1280 (D.C. Cir. 2004) ("*Mylan (fentanyl)*"), FDA is not entrusted with interpreting any provision of the patent statute and its interpretations are due no deference. *Id.* at fn. 5 ("Mylan also asserts, correctly, that the court owes no deference to the FDA's interpretation of 35 U.S.C. Section 271(e)(4)(A), a patent statute provision which the FDA is not charged with administering.") In *Mylan (fentanyl)* the D.C. Circuit interpreted the Patent Statute, 271(e)(4)(A), and held the district court – **not** FDA – delayed the approval of an application after a finding of infringement. FDA is now bound by that decision.

Despite the D.C. Circuit's ruling, FDA now argues *Mylan (fentanyl)* supports its position that FDA action is required to convert the final approval to tentative approval. FDA's arguments are not based on the interpretation of any law, but rather a misinterpretation of the D.C. Circuit's *Mylan (fentanyl)* decision. FDA argues that "in *Mylan (fentanyl)* the D.C. Circuit noted that some action was required by FDA to convert a final approval to a tentative approval: 'Mylan contends that FDA lacked authority *to revoke* Mylan's final ANDA approval...,' 'the provision

does not prohibit FDA from *withdrawing* approval…'" FDA Mem., p. 39 (emphasis in original). FDA proffers Mylan's arguments in *Mylan (fentanyl)* to support its position.

FDA's quotation of Mylan's arguments and its representation of those arguments as "notations" by the D.C. Circuit that some FDA action is required to "revoke" or "withdraw" final approval is directly contrary to the D.C. Circuit's actual holding in that case. The D.C. Circuit explicitly rejected the very interpretation FDA (and Mylan) are trying to advocate here:

> We are skeptical whether the parties properly characterize the FDA's action as "withdrawal" or "revocation" of approval. It seems to us that Mylan's ANDA approval was never in fact "withdrawn" or "revoked" but remained continuously in effect based on the FDA's review of the ANDA described in the November 21, 2003 final approval letter. The approval merely underwent a change of status or classification from final to tentative **after the Vermont district court delayed its effective date**.

389 F.3d at 1282 fn. 8 (emphasis added). The D.C. Circuit (contrary to FDA's assertion) interpreted the Patent Statute to mean an order of the district court, not any action by FDA, changed the status of Mylan's application. FDA's attempt to elevate previously rejected arguments of Mylan to the status of a notation by the D.C. Circuit court that FDA, not the district court, must change the status of an ANDA approval in this circumstance, demonstrates FDA's decision is arbitrary and capricious and wrong as a matter of law.

FDA's argument also is not supported by its own letter ruling in *Mylan (fentanyl)*, where it found the Vermont district court's order, and not FDA action, changed the status of Mylan's approval. *Id.* at 1277 ("…the Vermont district court's order … ***transformed*** Mylan's ANDA

approval into 'an approval with a delayed effective date,' which 'is a tentative approval that cannot be made effective until FDA issues a letter granting final effective approval'" (emphasis added)).[1]  The D.C. Circuit upheld the FDA's letter ruling finding "the patent remedy statute directs that upon a finding of infringement **the district court establish** a new effective date for approval …" *Id.* 1282 (emphasis added).  After that happened, according to FDA's own regulations it was necessary to issue a second letter granting final approval of Mylan's ANDA application at an appropriate date in the future that was no earlier than the expiration date of the subject patents.[2]  *See* Apotex Mem. at 16-18 and authorities cited.  The FDA and Mylan do not counter these arguments.

Mylan's filing suit in this Court to prevent FDA from doing something that happened automatically when the Pennsylvania district court issued its order is irrelevant to the issue. First, Mylan's efforts to enjoin the FDA constitutes an improper use of this Court to subvert a binding ruling of the Pennsylvania district court.  Both in *Mylan (fentanyl)* and *Ortho-McNeil v. Mylan*, 2007 WL869545, (March 20, 2007), Mylan was told that there was absolutely no basis for Mylan's arguments that the FDA had any choice but to obey the patent court (*Ortho-McNeil* was decided a mere three days prior to Mylan requesting an injunction in this Court).  Mylan was

_____

[1]    FDA later argued to the D.C. Circuit that it could withdraw approval following a §271(e)(4)(A) order; as noted above the Court rejected that premise.

[2]    That FDA issues a letter informing an applicant of the status of its ANDA is of no importance *vis a vis* the district court's order.  Once the district court states the effective date of the application is no earlier than the date of patent expiry, the approval is delayed by operation of law.  FDA's later letters simply constitute housekeeping.  FDA's second letter to Mylan in *Mylan (fentanyl)* says as much. *Id.*  at 1278 (the second letter "again noted that, after the Vermont district court's order, Mylan's ANDA approval had a "delayed effective date," which, by FDA regulation, constitutes 'tentative' rather than 'final' approval").

told this because the patent court, not the FDA, determines the earliest effective date for final ANDA approval following a finding of infringement. In *Mylan (fentanyl)*, the D.C. Circuit explicitly held the FDA was not charged with interpreting the ruling of the Vermont district court setting the earliest effective date of Mylan's approval, and that the order was unambiguous. 389 F.3d at 1279 fn. 5 (the Court held the Vermont district court's decision stating that "the effective date of any approval of Mylan's ANDA product shall be no earlier than the date of expiration of the '580 patent family", *id.* at 1277, "presented [no] ambiguity" that would require interpretation from the FDA.)

Second, the New Jersey district court criticized Mylan for arguing Hatch-Waxman governed the district court's order under 271(e)(4)(A). *Ortho-McNeil* at *2 ("Mylan asserts that Section 355(j) limits its Section 271(e)(4)(A) relief.… Section 355(j)(5) does not concern the authority of the district court; it limits neither the availability of remedies under Section 271(e)(4)(A), nor the authority of the district court.")  The *Ortho-McNeil* court found Congress intended "that the ***district court change*** the effective date." *Id.* (emphasis added).  That court dismissed Mylan's claims stating that it (not FDA) "will delay the effective date of the ANDAs pursuant to 35 U.S.C. Section 271(e)(4)(A)."  *Id.*

Taken together, these rulings demonstrate that once the Pennsylvania district court ordered Mylan's approval date delayed under § 271(e)(4)(A), there was no basis for Mylan to seek ***any*** remedy from FDA.  Mylan sought an injunction against FDA from this Court anyway. Mylan's attempt to enjoin the FDA was nothing more than a use of the courts of the United States to subvert a valid and binding order of the Pennsylvania district court by obtaining an injunction against FDA forcing it to ignore a binding judgment that had already changed the

status of Mylan's approval.  That suit has no bearing on the issues presently before the Court. This point is lost on FDA, if not Mylan.

Contrary to Mylan's argument that "[i]mprovident action by the FDA would have rendered the Federal Circuit's stay meaningless," Mylan Mem. at p. 12, the Federal Circuit's stay simply allowed FDA to proceed under its established regulations to consider whether it was appropriate to re-issue final approval to allow Mylan to sell.  Pursuant to FDA's regulations, Mylan could only obtain final approval (following conversion to tentative approval) when FDA issued a letter granting it a right to sell its generic.  21 C.F.R. § 314.107(b)(3); *see, Barr Labs. v. Thompson*, 238 F.Supp.2d 236, 245-50 (D.D.C. 2002).

FDA is also incorrect to suggest that once the Federal Circuit stayed the order, the approval was magically converted back to a final approval.  As previously stated, the Federal Circuit ruling simply put the ball back in the FDA's court to decide how to proceed given the status of Mylan's case.  Had FDA considered the issue, it could have solicited comments from all the interested parties and prevented the irreparable harm that is currently being caused Apotex. It also could have allowed all the parties to be hear ***prior*** to its decision whether to grant any generic final approval.  Indeed, had it considered the issue it would have found that Mylan could not be given final approval because Mylan did not have a court judgment finding Pfizer's patent invalid and non-infringed.  Therefore, under FDA's own interpretation of Hatch-Waxman, when the patent expired, Mylan's ANDA certification was converted to a Paragraph II certification and Mylan was barred by Pfizer's pediatric exclusivity.

It is unclear why it offends the FDA to have Mylan caught in FDA's procedural snafu but not Apotex.  In fact, FDA failed to justify its decision to treat the decision of the Pennsylvania district court in Mylan's case as if it never happened, yet to treat the Illinois district court order

in Apotex's case as the only decision that matters.  FDA's inexplicable but overt favoring of Mylan demonstrates its rulings are arbitrary, capricious, and entitled to no deference.

**III.    THE FDA AND MYLAN HAVE FAILED TO COUNTER APOTEX'S STATEMENTS AND ARGUMENTS ON IRREPARABLE HARM**

Mylan failed to negate Apotex's claim that it could obtain 30% market share if it enters the market soon, but only a 10% market share if it does not enter the market soon, *see* Apotex Mem., at 12, other than labeling Apotex's statements as speculative.  The only thing that all of the industry parties agree on is that each party views not being in the market as irreparable harm. (The only party alleging that it is not irreparable harm is the FDA, which is not a market participant, and is not positioned to evaluate whether the harm is irreparable or not.)

Moreover, Apotex provided authority for the proposition that loss of market share in highly competitive industries where the market share is unlikely to be recovered is irreparable harm. Apotex Mem. at 21, *citing Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 595-96 (3d Cir. 2002).  Neither Mylan nor the FDA has provided directly contrary appellate authority.

<u>**CONCLUSION**</u>

For the reasons given above, the Court should grant Apotex's motion for a preliminary injunction.

April 27, 2007

<div style="text-align:right">

Respectfully submitted,
/s/Arthur Y. Tsien
Arthur Y. Tsien, Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, DC 20036-2220
(202) 789-1212
(202) 234-3550 (fax)
Counsel for Apotex Inc.

</div>

<u>Of Counsel</u>:
Robert B. Breisblatt
Steven E. Feldman
A. Sidney Katz
WELSH & KATZ, LTD.
120 South Riverside Plaza
22nd Floor
Chicago, Illinois 60661
Telephone: (312) 655-1500
Fax: (312) 655-1501

# Exhibit A

NOTE: This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-1194

PFIZER INC.,

Plaintiff-Appellee,

v.

MYLAN LABORATORIES, INC. and MYLAN PHARMACEUTICALS, INC.,

Defendants-Appellants.

ON MOTION

Before PROST, <u>Circuit Judge</u>.

<u>O R D E R</u>

Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc. (Mylan) move for a stay, pending appeal, of the amended judgment of the United States District Court for the Western District of Pennsylvania that ordered that the effective date of any approval of Mylan's abbreviated new drug application "shall be a date which is not earlier than the date of expiration of the '303 patent" and that prohibited Mylan from making, using or selling the concerned drug. Pfizer Inc. opposes. Mylan replies. Mylan also moves for leave to "append" to its motion certain news articles that are not part of the district court record. Mylan submits a supplement to its motion to make arguments concerning this court's recent decision in <u>Pfizer Inc. v. Apotex, Inc.</u>, --- F.3d ---, no. 2006-1261 (Fed. Cir. March 22, 2007), invalidating the asserted claims of the patent in this case. Pfizer responds.

Upon consideration thereof,

IT IS ORDERED THAT:

(1)     Pfizer and Mylan are each are directed to respond, no later than 10 a.m. on Monday, March 26, 2007, concerning how the invalidity determination affects the pediatric exclusivity period and the ANDA approval.    Inter alia, the parties should address when and how the FDA will likely respond to the court's decision in no. 2006-1261.  Each response should not exceed 15 pages.

(2)     Mylan's motion for a stay, pending appeal, is held in abeyance pending receipt of the parties' responses to this order and the court's consideration of the papers submitted.

(3)     The district court's order is temporarily stayed, pending this court's further consideration of the papers submitted.

MAR 2 3 2007
_____
Date

_____
Sharon Prost
Circuit Judge

cc:    Richard G. Greco, Esq.
       David J. Harth, Esq.

s8

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

MAR 2 3 2007

JAN HORBALY
CLERK

# Exhibit B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
3-C-5289 (JMR/MTM)

Pfizer, Inc.            )
                        )
        v.              )        ORDER
                        )
Apotex, Inc.            )

The defendant comes before the Court seeking expedited relief from an injunction previously issued after trial in this matter. The injunction had enjoined defendant from manufacturing, using, offering to sell, or selling generic amlodipine besylate in the United States until September 25, 2007. The defendant moves the Court to lift its injunction pending issuance of a mandate by the Federal Circuit, which reversed this Court's judgment on March 22, 2007. No. 2006-1261 (Fed. Cir.). The plaintiff opposes the motion.

After an emergency telephonic hearing on March 28, 2007, the Court considers it appropriate to grant the requested relief. Therefore, pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, and for the reasons stated at the hearing, IT IS ORDERED that:

1.  Defendant's motion [Docket No. 170] is granted.

2.  The Court's injunction, issued January 29, 2006, is lifted.

3.  This order is stayed to and until April 3, 2007.

1

Dated:    March 29th, 2007


                              ___s/ James M. Rosenbaum_____
                              JAMES M. ROSENBAUM
                              United States Chief District Judge

2

# Exhibit C

# Black's Law Dictionary®

## Eighth Edition

**Bryan A. Garner**
Editor in Chief



THOMSON
WEST

Mat #40231642
Mat #40235008—deluxe

judge of a general court-martial must also be a member of an independent judiciary. A military judge is detailed to every general court-martial and usu. to a special court-martial. [Cases: Military Justice ⚖881. C.J.S. *Military Justice* § 148.]

**municipal judge.** A local judge having criminal or civil jurisdiction, or sometimes both, within a city. — Also termed *city judge.*

**presiding judge. 1.** A judge in charge of a particular court or judicial district; esp., the senior active judge on a three-member panel that hears and decides cases. **2.** A chief judge. — Abbr. P.J. — Also termed *president judge.*

**probate judge.** A judge having jurisdiction over probate, inheritance, guardianships, and the like. — Also termed *judge of probate; surrogate; register; registry.*

**puisne judge** (pyoo-nee). [Law French *puisné* "later born"] **1.** A junior judge; a judge without distinction or title. • This was the title formerly used in English common-law courts for a judge other than the chief judge. Today *puisne judge* refers to any judge of the English High Court, apart from the Chief Justice. **2.** See *associate judge.*

**senior administrative patent judge.** *Patents.* A semi-retired administrative patent judge who remains active in hearing interferences in the U.S. Patent and Trademark Office. — Abbr. SAPJ.

**senior judge. 1.** The judge who has served for the longest time on a given court. **2.** A federal or state judge who qualifies for senior status and chooses this status over retirement. See SENIOR STATUS.

**side judge.** *Archaic.* A judge — or one of two judges — of inferior rank, associated with a judge of a higher rank for the purpose of constituting a court.

**special judge.** A judge appointed or selected to sit, usu. in a specific case, in the absence or disqualification of the regular judge or otherwise as provided by statute. [Cases: Judges ⚖13–19, 25. C.J.S. *Judges* §§ 161–183, 185.]

> "Many, if not all, jurisdictions have made provision for the selection of a substitute or special judge to serve in place of the regular judge in the event of disqualification, voluntary recusal, disability, or other absence of the regular judge. The circumstances under which a special or substitute judge may act in place of the regular judge, and the manner in which such a judge may be chosen, are matters of purely local regulation, entirely dependent on local constitutions and statutes." 46 Am. Jur. 2d *Judges* § 248, at 331 (1994).

**temporary judge.** See *visiting judge.*

**trial judge.** The judge before whom a case is tried. • This term is used most commonly on appeal from the judge's rulings.

***United States Magistrate Judge.*** See UNITED STATES MAGISTRATE JUDGE.

**visiting judge.** A judge appointed by the presiding judge of an administrative region to sit temporarily on a given court, usu. in the regular judge's absence. — Also termed *temporary judge; judge pro tempore.* [Cases: Judges ⚖13–19, 25. C.J.S. *Judges* §§ 161–183, 185.]

**judge advocate.** *Military law.* **1.** An officer of a court-martial who acts as a prosecutor. **2.** A legal adviser on a military commander's staff. **3.** Any officer in the Judge Advocate General's Corps or in a department of a U.S. military branch. — Abbr. JA.

> **staff judge advocate.** A certified military lawyer with the staff of a convening or supervisory authority that exercises general court-martial jurisdiction.

**Judge Advocate General.** *Military law.* The senior legal officer and chief legal adviser of the Army, Navy, or Air Force. — Abbr. JAG.

**Judge Lynch.** See LYNCH LAW.

**judge-made law. 1.** The law established by judicial precedent rather than by statute. See COMMON LAW. [Cases: Courts ⚖88. C.J.S. *Courts* § 139; *Trade-Marks, Trade-Names, and Unfair Competition* § 187.] **2.** The law that results when judges construe statutes contrary to legislative intent. See JUDICIAL ACTIVISM. — Also termed (in sense 2) *judicial legislation; bench legislation; judicial law.*

**judgement.** See JUDGMENT.

**judge's chamber.** See CHAMBER.

**judgeship. 1.** The office or authority of a judge. **2.** The period of a judge's incumbency.

**judge-shopping.** The practice of filing several lawsuits asserting the same claims — in a court or a district with multiple judges — with the hope of having one of the lawsuits assigned to a favorable judge and of nonsuiting or voluntarily dismissing the others. Cf. FORUM-SHOPPING.

**judge trial.** See *bench trial* under TRIAL.

**judgment. 1.** A court's final determination of the rights and obligations of the parties in a case. • The term *judgment* includes an equitable decree and any order from which an appeal lies. Fed. R. Civ. P. 54. — Abbr. J. — Also spelled (esp. in BrE) *judgement.* — Also termed (historically) *judgment ex cathedra.* Cf. RULING (1); OPINION (1). [Cases: Federal Civil Procedure ⚖2391–2628; Judgment ⚖1. C.J.S. *Judgments* §§ 2–3, 6, 8, 13.] **2.** *English law.* An opinion delivered by a member of the appellate committee of the House of Lords; a Law Lord's judicial opinion. — Also termed (in sense 2) *speech.*

> "An action is instituted for the enforcement of a right or the redress of an injury. Hence a judgment, as the culmination of the action declares the existence of the right, recognizes the commission of the injury, or negatives the allegation of one or the other. But as no right can exist without a correlative duty, nor any invasion of it without a corresponding obligation to make amends, the judgment necessarily affirms, or else denies, that such a duty or such a liability rests upon the person against whom the aid of the law is invoked." 1 Henry Campbell Black, *A Treatise on the Law of Judgments* § 1, at 2 (2d ed. 1902).

**accumulative judgment.** A second or additional judgment against a person who has already been convicted, the execution of which is postponed until the completion of any prior sentence.

**agreed judgment.** A settlement that becomes a court judgment when the judge sanctions it. • In effect, an agreed judgment is merely a contract acknowledged in open court and ordered to be recorded, but it binds the parties as fully as other judg-

**mancipable** (man-si-pə-bəl), *adj.* Capable of mancipation.

**mancipant** (man-si-pənt), *n.* One who transfers property by mancipation.

**mancipare** (man-sə-**pair**-ee), *vb.* [fr. Latin *manus* "hand" + *capere* "to take"] *Roman law.* **1.** To alienate (a thing) through mancipation. **2.** To sell (esp. a person) fictitiously as part of the emancipation process. See MANCIPATION.

**mancipatio** (man-sə-**pay**-shee-oh), *n.* [Latin] See MANCIPATION.

**mancipation** (man-si-**pay**-shən), *n.* [fr. Latin *mancipatio* "hand-grasp"] **1.** *Roman law.* A legal formality for transferring property by either an actual or a simulated purchase; a formal conveyance in the guise of a sale. ● The formality required the presence of the thing being conveyed (*res mancipi*), and of five adult male citizens acting as witnesses. Another person (the *libripens*) held the bronze scales with which the purchase price had been weighed out. The buyer made an assertion of ownership, struck the scales with a piece of bronze or copper, then gave the metal piece to the seller as a symbolic price. In Roman classical law, either this procedure or *cessio in jure* was necessary to pass legal title. This form of sale was abolished by Justinian. **2.** A similar form used for making a will, adoption, emancipation of children, etc. — Also termed *mancipatio*. See RES MANCIPI. Cf. EMANCIPATION. — **mancipate**, *vb.* — **mancipatory** (man-si-pə-tohr-ee), *adj.* .

> "Mancipatio is the solemn sale per aes et libram. In the presence of five witnesses (cives Romani puberes) a skilled weighmaster (libripens) weighs out to the vendor a certain amount of uncoined copper (aes, raudus, raudusculum) which is the purchase-money, and the purchaser, with solemn words, takes possession with his hand — hence the description of the act as 'hand-grasp' — of the thing purchased as being his property." Rudolph Sohm, *The Institutes: A Textbook of the History and System of Roman Private Law* 48 (James Crawford Ledlie trans., 3d ed. 1907).

**mancipatory will.** See WILL.

*mancipi res* (man-sə-pı reez). See RES MANCIPI.

*mancipium* (man-**sip**-ee-əm), *n.* [Latin "a slave"] *Roman law.* **1.** A slave, esp. by virtue of being captured by an enemy in war. **2.** A temporary quasi-servile status, necessarily occurring in an emancipation, and also when a father noxally surrendered a son to answer for a delict. See EMANCIPATION; NOXAL ACTION (1).

> "But if the *patria potestas* could be created, it could also be terminated, by an artificial process ... . The father could not by a simple act of his own will release the son from his control. For this purpose he must sell him out of his own hands into that state of *mancipium* or qualified slavery of which we have spoken. Even then the father's power was not destroyed: it was suspended during the existence of the *mancipium*; but if the *mancipium* ceased, if the son was set free by the person who held him in that condition, the father's right revived ... . It was not until he had sold him three times over, that he used up his right of control beyond the possibility of a revival. This, then, was the form by which the son was liberated from the *patria potestas*." James Hadley, *Introduction to Roman Law* 126–27 (1881).

**3.** MANCIPATION (1).

**M & A.** *abbr.* Mergers and acquisitions. See MERGER.

**mandamus** (man-**day**-məs), *n.* [Latin "we command"] A writ issued by a superior court to compel a lower court or a government officer to perform mandatory or purely ministerial duties correctly. — Also termed *writ of mandamus*; *mandate*; (in BrE) *order*. [Cases: Mandamus ⚖️1. C.J.S. *Mandamus* §§ 2–6.] Pl. **mandamuses. — mandamus**, *vb.*

*alternative mandamus.* A mandamus issued upon the first application for relief, commanding the defendant either to perform the act demanded or to appear before the court at a specified time to show cause for not performing it. [Cases: Mandamus ⚖️158. C.J.S. *Mandamus* § 343.]

*peremptory mandamus.* An absolute and unqualified command to the defendant to do the act in question. ● It is issued when the defendant defaults on, or fails to show sufficient cause in answer to, an alternative mandamus. [Cases: Mandamus ⚖️179. C.J.S. *Mandamus* § 376.]

*mandans* (man-danz), *n.* [Latin] *Roman law.* The principal for whom a mandated person undertakes to perform a gratuitous service. See MANDATOR.

**mandant** (man-dənt), *n.* [French] *French & Scots law.* The principal in a contract of mandate, such as a bailor in a bailment. See MANDATOR (2).

**mandatary** (man-də-ter-ee), *n.* **1.** A person to whom a mandate is given. See MANDATE (5). **2.** An agent, esp. one who acts gratuitously but is entitled to be indemnified for expenses incurred in carrying out the mandate. — Also termed (in Roman law) *mandatarius*. **3.** *Civil law.* The person who is employed to a mandator in a gratuitous agency. — Also termed *mandatee*; *mandatarius*. See MANDATE (5). — **mandatary**, *adj.*

**mandate**, *n.* **1.** An order from an appellate court directing a lower court to take a specified action. — Also termed (in BrE) *order*. See MANDAMUS. [Cases: Appeal and Error ⚖️1186.1; Federal Courts ⚖️949.1. C.J.S. *Appeal and Error* § 968.] **2.** A judicial command directed to an officer of the court to enforce a court order. **3.** In politics, the electorate's overwhelming show of approval for a given political platform. **4.** *Roman & civil law.* A written command given by a principal to an agent; specif., a commission or contract by which one person (the *mandator*) requests someone (the *mandatary*) to perform some service gratuitously, the commission becoming effective when the mandatary agrees. La. Civ. Code art. 2989. ● In this type of contract, no liability is created until the service requested has begun. The mandatary is bound to use reasonable care in performance, while the mandator is bound to indemnify against loss incurred in performing the service. — Also termed *mandatum*. **5.** *Louisiana law.* A contract by which one person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal. La. Civ. Code arts. 2989 et seq. ● The contract of mandate may be either onerous or gratuitous. It is gratuitous if the parties do not state otherwise. **6.** *Hist. Int'l law.* An authority given by the League of Nations to certain governments to take over the administration and development of designated territories. Cf. TRUSTEESHIP (2). — **mandate**, *vb.*

**mandatee.** See MANDATARY.

**suspicious-activity report**

**suspect class.** A group identified or defined in a suspect classification.

**suspect classification.** *Constitutional law.* A statutory classification based on race, national origin, or alienage, and thereby subject to strict scrutiny under equal-protection analysis. ● Examples of laws creating suspect classifications are those permitting only U.S. citizens to receive welfare benefits and setting quotas for the government's hiring of minority contractors. See STRICT SCRUTINY. Cf. FUNDAMENTAL RIGHT. [Cases: Constitutional Law ⚖️213.1(1). C.J.S. *Constitutional Law* §§ 714–715, 718.]

> **quasi-suspect classification.** A statutory classification based on gender or legitimacy, and therefore subject to intermediate scrutiny under equal-protection analysis. ● Examples of laws creating a quasi-suspect classification are those permitting alimony for women only and providing for an all-male draft. See INTERMEDIATE SCRUTINY. [Cases: Constitutional Law ⚖️213.1(1), 224(1). C.J.S. *Constitutional Law* §§ 714–715, 718, 733–734, 941–944.]

**suspend,** *vb.* **1.** To interrupt; postpone; defer <the fire alarm suspended the prosecutor's opening statement>. **2.** To temporarily keep (a person) from performing a function, occupying an office, holding a job, or exercising a right or privilege <the attorney's law license was suspended for violating the Model Rules of Professional Conduct>. [Cases: Licenses ⚖️38; Officers and Public Employees ⚖️65. C.J.S. *Agriculture* §§ 4.5; *Architects* § 10; *Licenses* §§ 48, 50–63; *Officers and Public Employees* §§ 139, 141–142.]

> **suspend the rules.** *Parliamentary law.* To pass a motion that overrides an agenda or other procedural rule, for a limited time and purpose, so that the deliberative assembly may take some otherwise obstructed action.
>
> "When a body wishes to do something that cannot be done without violating its own rules, but yet that is not in conflict with the constitution or with any controlling statutory provision, it 'suspends the rules that interfere with' the proposed action. Suspension differs from amendment because it is limited in scope and in time. The object of the suspension must be specified, and nothing falling outside the stated limits of the motion to suspend the rules can be done under the suspension." National Conference of State Legislatures, *Mason's Manual of Legislative Procedure* § 279, at 211 (2000).

*suspendatur per collum* (sas-pen-**day**-tar par **kahl**-am). [Law French] *Hist.* Let him be hanged by the neck. ● This phrase was written by a judge in the margin of the sheriff's calendar, opposite the name of a prisoner who had been sentenced to death. — Abbr. *sus. per coll.*

> "And now the usage is, for the judge to sign the calendar, or list of all the prisoners' names, with their separate judgments in the margin, which is left with the sheriff. As, for capital felony, it is written opposite to the prisoner's name, 'hanged by the neck;' formerly, in the days of Latin and abbreviation, 'sus. per coll.' for 'suspendatur per collum.' And this is the only warrant that the sheriff has for so material an act as taking away life of another." 4 William Blackstone, *Commentaries on the Laws of England* 396 (1769).

**suspended sentence.** See SENTENCE.

**suspended trading.** See TRADING HALT.

**suspense.** The state or condition of being suspended; temporary cessation <a suspense of judgment>.

**suspense account.** See ACCOUNT.

**suspense reserve.** See *appropriated retained earnings* under EARNINGS.

**suspension. 1.** The act of temporarily delaying, interrupting, or terminating something <suspension of business operations> <suspension of a statute>. **2.** The state of such delay, interruption, or termination <corporate transfers were not allowed because of the suspension of business>. **3.** The temporary deprivation of a person's powers or privileges, esp. of office or profession; esp., a fairly stringent level of lawyer discipline that prohibits the lawyer from practicing law for a specified period, usu. from several months to several years <suspension of the bar license>. ● Suspension may entail requiring the lawyer to pass a legal-ethics bar examination, or to take one or more ethics courses as continuing legal education, before being readmitted to active practice. [Cases: Licenses ⚖️38; Officers and Public Employees ⚖️65. C.J.S. *Agriculture* §§ 4.5; *Architects* § 10; *Licenses* §§ 48, 50–63; *Officers and Public Employees* §§ 139, 141–142.] **4.** The temporary withdrawal from employment, as distinguished from permanent severance <suspension from teaching without pay>. [Cases: Master and Servant ⚖️30–31. C.J.S. *Employer–Employee Relationship* §§ 35, 38–40, 42–43, 52, 56, 60.] **5.** *Eccles. law.* An ecclesiastical censure that can be temporary or permanent, and partial or complete. See DEPRIVATION. **6.** *Scots law.* The process of staying a judgment pending an appeal to the Supreme Court.

**suspension of arms.** See TRUCE.

**suspension of judgment.** See STAY.

**suspension of trading.** The temporary cessation of all trading of a particular stock on a stock exchange because of some abnormal market condition.

**suspensive appeal.** See APPEAL.

**suspensive condition.** See CONDITION (2).

**suspensive veto.** See *suspensory veto* under VETO.

**suspensory veto.** See VETO.

*sus. per coll. abbr.* SUSPENDATUR PER COLLUM.

**suspicion.** The apprehension or imagination of the existence of something wrong based only on inconclusive or slight evidence, or possibly even no evidence.

> **reasonable suspicion.** A particularized and objective basis, supported by specific and articulable facts, for suspecting a person of criminal activity. ● A police officer must have a reasonable suspicion to stop a person in a public place. See STOP AND FRISK. Cf. PROBABLE CAUSE. [Cases: Arrest ⚖️63.5. C.J.S. *Arrest* §§ 38–42.]

**suspicious-activity report.** A form that, as of 1996, a financial institution must complete and submit to federal regulatory authorities if it suspects that a federal crime has occurred in the course of a monetary transaction. ● This form superseded two earlier forms, the criminal-referral form and the suspicious-transaction report. — Abbr. SAR. [Cases: Banks and