# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MYLAN LABORATORIES INC. and<br>MYLAN PHARMACEUTICALS INC., | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| and | ) <br> ) |
| MUTUAL PHARMACEUTICAL CO., INC., | ) <br> ) |
| Intervenor-Plaintiff, | ) <br> ) |
| v. | ) <br> ) |
| MICHAEL O. LEAVITT,<br>in his official capacity as<br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES, | ) <br> ) Civil Action No. 07-cv-579 (RMU)<br> ) <br> ) <br> ) |
| ANDREW C. VON ESCHENBACH, M.D.,<br>in his official capacity as<br>COMMISSIONER OF FOOD AND DRUGS, | ) <br> ) <br> ) <br> ) |
| UNITED STATES FOOD AND DRUG<br>ADMINISTRATION, *et al.*, | ) <br> ) <br> ) |
| Defendants, | ) <br> ) |
| and | ) <br> ) |
| TEVA PHARMACEUTICALS USA, INC., | ) <br> ) |
| and | ) <br> ) |
| APOTEX INC., | ) <br> ) |
| Intervenor-Defendants. | ) |

## PLAINTIFFS' EMERGENCY APPLICATION TO TEMPORARILY RESTRAIN THE FDA FROM APPROVING ANY ADDITIONAL AMLODIPINE ANDAS IN DEROGATION OF MYLAN'S RIGHT TO 180-DAY MARKET EXCLUSIVITY

Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc. (collectively, "Mylan") respectfully submit this application for a preliminary injunction enjoining defendants, the U.S. Food and Drug Administration ("FDA"), Andrew C. von Eschenbach, M.D., in his official capacity as Commissioner of Food and Drugs, and Michael O. Leavitt, in his official capacity as Secretary of Health and Human Services, (collectively, "FDA") from taking any action to issue an approval of any Abbreviated New Drug Application for amlodipine besylate products in derogation of Mylan's right to 180-day exclusivity until the issue is finally decided on appeal.

The bases for the present application are fully set forth in the accompanying Memorandum in Support of Plaintiffs' Emergency Application to Temporarily Restrain the FDA from Approving any Additional Amlodipine ANDAs in Derogation of Mylan's Right to 180-Day Market Exclusivity and the Declaration of Shannon M. Bloodworth in Support thereof.

Dated: June 26, 2007                    Respectfully submitted,


    /s/ David J. Harth
David J. Harth (#474632)
HELLER EHRMAN LLP
One East Main Street, Suite 201
Madison, Wisconsin 53703
(608) 663-7460

Shannon M. Bloodworth (#474925)
Joseph P. Whitlock (#484247)
HELLER EHRMAN LLP
1717 Rhode Island Avenue, NW
Washington, D.C. 20036
(202) 912-2000

E. Anthony Figg (#345124)
Steven Lieberman (#439783)
Minaksi Bhatt (#434448)
ROTHWELL, FIGG, ERNST & MANBECK PC
1425 K Street, NW
Suite 800
Washington, DC 20005
(202) 783-6040

Stuart A. Williams
Jill Ondos
MYLAN LABORATORIES INC.
1500 Corporate Drive
Suite 400
Canonsburg, Pennsylvania 15317
(724) 514-1840

Attorneys for Plaintiffs
MYLAN LABORATORIES INC. and
MYLAN PHARMACEUTICALS INC.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MYLAN LABORATORIES INC. and<br>MYLAN PHARMACEUTICALS INC., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MUTUAL PHARMACEUTICAL CO., INC., | ) | |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| in his official capacity as | ) | Civil Action No. 07-cv-579 (RMU) |
| SECRETARY OF HEALTH AND | ) | |
| HUMAN SERVICES, | ) | |
| | ) | |
| ANDREW C. VON ESCHENBACH, M.D., | ) | |
| in his official capacity as | ) | |
| COMMISSIONER OF FOOD AND DRUGS, | ) | |
| | ) | |
| UNITED STATES FOOD AND DRUG | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| APOTEX INC., | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
EMERGENCY APPLICATION TO TEMPORARILY RESTRAIN THE FDA FROM
APPROVING ANY ADDITIONAL AMLODIPINE ANDAS IN
<u>DEROGATION OF MYLAN'S RIGHT TO 180-DAY MARKET EXCLUSIVITY</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ........................................................................................2

LEGAL BACKGROUND - The Hatch-Waxman Act.................................................5

ARGUMENT ..............................................................................................................8

I.  MYLAN IS LIKELY TO SUCCEED ON APPEAL BECAUSE ITS 180-DAY
    EXCLUSIVITY HAD VESTED BEFORE PATENT EXPIRATION AND THE FDA'S
    REGULATIONS AND PRECEDENT CLEARLY REQUIRE A PATENT TO REMAIN
    LISTED IN THE ORANGE BOOK UNTIL THE 180-DAY EXCLUSIVITY OF THE
    FIRST-TO-FILE COMPANY HAS EXPIRED ................................................................8

    A.  ONCE MYLAN'S 180-DAY GENERIC EXCLUSIVITY RIGHT VESTED, IT COULD NOT
        BE DIVESTED BY THE '303 PATENT'S EXPIRATION ..................................................9

        1.  The Statute's Plain Language Requires That Vested 180-Day Generic
            Exclusivity Extends Beyond Patent Expiration ..........................................9

        2.  The Statute's Legislative History and Purpose Require that Vested 180-
            Day Generic Exclusivity Extends Beyond Patent Expiration....................11

        3.  This Is A Case of First Impression:  The FDA Has Never Before Cut Short
            A First Filer's 180-Day Exclusivity Period Once It Has Vested...............13

    B.  THE FDA CANNOT DELIST THE '303 PATENT UNTIL MYLAN'S 180-DAY GENERIC
        EXCLUSIVITY EXPIRES ...........................................................................................17

II.  MYLAN WILL BE IRREPARABLY HARMED IF A TRO IS NOT ENTERED
     BECAUSE DELISTING OF THE PATENT WOULD DESTROY MYLAN'S 180-DAY
     EXCLUSIVITY ........................................................................................................20

III.  THE PUBLIC WILL BE HARMED IF A TRO IS NOT ENTERED BECAUSE THE
      INCENTIVES FOR GENERIC DRUG COMPANIES TO FILE PARAGRAPH IV
      CHALLENGES WILL BE SIGNIFICANTLY REDUCED............................................22

IV.  BALANCING THE HARM FAVORS ENTRY OF A TRO ...........................................23

CONCLUSION.............................................................................................................23

# TABLE OF AUTHORITIES

**Federal Cases**

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
    256 F.3d 799 (D.C. Cir. 2001) .................................................................................. 5-6

*Apotex, Inc. v. Food and Drug Administration*,
    No. 06-0627, 2006 U.S. Dist. LEXIS 20894 (D.D.C. Apr. 19, 2006),
    *aff'd*, 449 F.3d 1249 (D.C. Cir. 2006) ..................................................................... 20

*Bracco Diagnostics Inc. v. Shalala*,
    963 F. Supp. 20 (D.D.C. 1997) ................................................................................ 21

*Bristol-Myers Squibb Co. v. Royce Labs. Inc.*,
    69 F.3d 1130 (Fed. Cir. 1995) ................................................................................... 6

*Canales v. Paulson*,
    No. 06-1330, 2006 U.S. Dist. LEXIS 61915 (D.D.C. Aug. 30, 2006) .............................. 8

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
    467 U.S. 837 (1984) ................................................................................................. 10

*CityFed Financial Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) ..................................................................................... 8

*Clinton v. New York*,
    524 U.S. 417 (1998) ................................................................................................. 16

*Collagenex v. Thompson*,
    No. 03-1405, 2003 U.S. Dist. LEXIS 12523 (D.D.C. July 22, 2003) ............................ 22

*Dr. Reddy's Labs., Inc. v. Thompson*,
    302 F. Supp. 2d 340 (D.N.J. 2003) ..................................................................... 6, 13-14

*Express One Int'l, Inc. v. USPS*,
    814 F. Supp. 87 (D.D.C. 1992) ................................................................................ 22

*FEC v. Democratic Senatorial Campaign Comm.*,
    454 U.S. 27 (1981) ................................................................................................... 9

*Fleischmann Constr. Co. v. United States ex rel. Forsberg*,
    270 U.S. 349 (1926) .............................................................................................. 16-17

*Granutec, Inc. v. Shalala*,
    Nos. 97-1873, 97-1874, 1998 U.S. App. LEXIS 6685 (4th Cir. Apr. 3, 1998) ................. 9

ii

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982)..................................................................................................... 16

*Gulf Oil Corp. v. Dep't of Energy*,
    514 F. Supp. 1019 (D.D.C. 1981) ................................................................................ 21

*Inwood Labs., Inc. v. Young*,
    723 F. Supp. 1523 (D.D.C. 1989) .................................................................................. 9

*Katz v. Georgetown Univ.*,
    246 F.3d 685 (D.C. Cir. 2001) ....................................................................................... 8

*Lamie v. United States Trustee*,
    540 U.S. 526 (2004)..................................................................................................... 10

*McGregor Printing Corp. v. Kemp*,
    No. 91-3255, 1992 U.S. Dist. LEXIS 6717 (D.D.C. May 14, 1992),
    *rev'd on other grounds*, 20 F.3d 1188 (D.C. Cir. 1994) ................................................ 21

*MCI Telecomms. Corp. v. AT&T Co.*,
    512 U.S. 218 (1994)..................................................................................................... 12

*Mova Pharm. Corp. v. Shalala*,
    140 F.3d 1060 (D.C. Cir. 1998) ......................................................................... 7, 9, 10

*Mova Pharmaceutical Corp. v. Shalala*,
    955 F. Supp. 128 (D.D.C. 1997),
    *aff'd*, 140 F.3d 1060 (D.C. Cir. 1998) ......................................................... 20-21, 22, 23

*Mylan Pharms. Inc. v. Henney*,
    94 F. Supp. 2d 36 (D.D.C. 2000) ......................................................................... 9, 10, 13

*National Medical Care, Inc. v. Shalala*,
    No. 95-0860, 1995 U.S. Dist. LEXIS 10074 (D.D.C. June 6, 1995)........................... 21-22

*O'Donnell Constr. Co. v. District of Columbia*,
    963 F.2d 420 (D.C. Cir. 1992) ..................................................................................... 22

*Pfizer Inc. v. Apotex, Inc.*,
    No. 2006-1261, 2007 U.S. App. LEXIS 6623 (Mar. 22, 2007)........................................ 4

*Quinn v. Butz*,
    510 F.2d 743 (D.C. Cir. 1975) ..................................................................................... 17

*Ranbaxy Labs. Ltd. v. Leavitt*,
    469 F.3d 120 (D.C. Cir. 2006) ............................................................................ *passim*

*Sereno Lab. v. Shalala*,
   158 F.3d 1313 (D.C. Cir. 1998) ............................................................... 8

*Teva Pharms. Indus. Ltd. v. Crawford*,
   410 F.3d 51 (D.C. Cir. 2005) ................................................................... 5

*Teva Pharms. USA, Inc. v. FDA*,
   182 F.3d 1003 (D.C. Cir. 1999),
   *on remand*, 1999 U.S. Dist. LEXIS 14575 (D.D.C. Aug. 18, 1999),
   *aff'd*, 2000 U.S. App. LEXIS 38667 (D.C. Cir. Nov. 15, 2000) .................................. 9, 17

*TorPharm Inc. v. Shalala*,
   No. 97-1925, 1997 U.S. Dist. LEXIS 21983 (D.D.C. Sept. 15, 1997) ........................ 9, 21

*United States v. American Trucking Ass'ns*,
   310 U.S. 534 (1940) ............................................................................ 17

**Federal Statutes**

21 U.S.C § 355 ...................................................................................... 5

21 U.S.C. § 355(j)(2)(A)(iv) .................................................................... 6

21 U.S.C. § 355(j)(2)(A)(vii)(I) ............................................................... 6

21 U.S.C. § 355(j)(2)(A)(vii)(II) ............................................................. 6, 15

21 U.S.C. § 355(j)(2)(A)(vii)(III) ............................................................ 6

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ............................................................. 7, 18

21 U.S.C. § 355(j)(5)(B)(i) ..................................................................... 16

21 U.S.C. § 355(j)(5)(B)(ii) .................................................................... 16

21 U.S.C. § 355(j)(5)(B)(iii) ................................................................... 7, 16

21 U.S.C. § 355(j)(5)(B)(iv) .............................................................. *passim*

35 U.S.C. § 271(e)(2) (2006) .................................................................. 7

**Other Authorities**

149 Cong. Rec. S15670-03 (daily ed. Nov. 24, 2003) ................................................................... 11

149 Cong. Rec. S8686-03 (daily ed. June 26, 2003) ....................................................................... 11

152 Cong. Rec. S7922 (daily ed. July 19, 2006) ........................................................................... 11

21 C.F.R. § 314.94(a)(12)(viii)(B) ........................................................................................... 18, 19

54 Fed. Reg. 28872 (July 10, 1989) .............................................................................................. 11

59 Fed. Reg. 50,338, 50,339 (Oct. 3, 1994) ...................................................... 17, 18, 19-20

*Approved Drug Products with Therapeutic Equivalence Evaluations* ................................. *passim*

Drug Price Competition and Patent Term Restoration Act of 1984 ................................................ 5

Federal Trade Commission, "Generic Drug Entry Prior to Patent Expiration," July 2002,
    http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf .................................................. 11-12

H.R. Rep. No. 98-857 (Part I) (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647 ............................ 5

Hatch-Waxman Act ........................................................................................................... *passim*

*Medicare Prescription Drug, Improvement and Modernization Act of 2003*,
    Pub. L. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ................................................................ 5

Proposed Rule, 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications,
    64 Fed. Reg. 42873, 42874 (Aug. 6, 1999),
    *withdrawn on other grounds by* 67 Fed. Reg. 212, 66593 (Nov. 1, 2002) ...................... 11

## <u>INTRODUCTION</u>

In April, this Court denied Mylan's motion for a preliminary injunction seeking to enjoin the FDA from approving Apotex's amlodipine ANDA when the Federal Circuit mandate issued in *Pfizer v. Apotex*.  In that motion, Mylan argued that Apotex's application was barred both by pediatric exclusivity and 180-day generic exclusivity.[1]  Subsequently, although Mylan appealed the Court's denial, the mandate issued, and Apotex was approved and entered the market.  The FDA refused to approve any other amlodipine ANDAs, however, because it had determined that Pfizer's pediatric exclusivity applied to all other pending ANDAs.  As things stood until last Friday, Mylan and Apotex were the only two ANDA filers marketing amlodipine.

On Friday, June 22, without notice to Mylan or anyone else, the FDA, at Pfizer's request, "delisted" the '303 patent on the hypertension drug Norvasc, that is, the FDA removed the '303 patent from the Orange Book.[2]  As a result, according to the FDA notice letter announcing the delisting, "there is no pediatric exclusivity barrier to approval of ANDAs for amlodipine." Bloodworth Decl.,[3] Exh. A at 2.  Moreover the FDA stated in its letter that the D.C. Circuit's recent decision[4] holding that the FDA "must leave a patent listed in the Orange Book, notwithstanding an NDA holder's request to delist, if an ANDA applicant is eligible for 180-day exclusivity" does not apply "where the patent has expired."  Bloodworth Decl., Exh. A at 2, n.2.

---

[1] *Memorandum of Points and Authorities in Support of Plaintiffs' Application for a Preliminary Injunction* [Dkt. No. 44-2].

[2] *Approved Drug Products with Therapeutic Equivalence Evaluations* (hereinafter the "Orange Book").

[3] *Declaration of Shannon M. Bloodworth in Support of Plaintiffs' Emergency Application to Temporarily Restrain the FDA from Approving Any Additional Amlodipine ANDAs in Derogation of Mylan's Right to 180-Day Market Exclusivity.*

[4] *Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120 (D.C. Cir. 2006).

Absent maintaining the *status quo* until Mylan's right to 180-day exclusivity is finally determined, at least eight other generic competitors who filed ANDAs on amlodipine will enter the market, much to Mylan's detriment.

Now that the FDA has delisted the Pfizer patent, Mylan's claim to 180-day exclusivity has moved to the forefront. One of the issues in the pending appeal to the D.C. Circuit from the Court's denial of a preliminary injunction in this case is whether the FDA's position that Mylan's 180-day exclusivity did not survive the expiration of the '303 patent is in conflict with the governing provisions of the Hatch-Waxman Act. Mylan is well aware that the Court in its Memorandum Opinion summarily addressed Mylan's contention that 180-day exclusivity, once triggered, does not terminate upon patent expiration. With respect, however, the Court did not have the benefit of full briefing on this complex issue, and, as a result, got it wrong. Mylan is likely to prevail on its claim to 180-day exclusivity in the Court of Appeals, but its victory will be hollow unless the Court maintains the status quo until the appeal has been decided. Mylan therefore asks this Court for a temporary restraining order to enjoin the FDA from approving any additional ANDAs on amlodipine in derogation of Mylan's right to 180-day exclusivity until the issue is finally decided on appeal.

## FACTUAL BACKGROUND

For 15 years, beginning in 1992, Pfizer enjoyed a patent monopoly on a best-selling hypertension drug called Norvasc[®] (amlodipine besylate). Pfizer's patent went unchallenged until May 22, 2002, when Mylan filed an ANDA that included a paragraph IV certification asserting that Pfizer's patents on Norvasc were invalid. Pfizer sued Mylan in the Western District of Pennsylvania for patent infringement, although it did not file within the 45 days required to invoke the "automatic stay" provisions of the Hatch-Waxman Act (the "*Mylan*

2

action"). *Pfizer, Inc. v. Mylan Laboratories Inc., et al.*, No. 2:06-3462 (W.D. Pa.). When Mylan filed its paragraph IV certification, the expiration of Pfizer's last patent was almost five years away—March 25, 2007. Not until a year after Mylan filed its paragraph IV certification challenging Pfizer's patent did another generic company follow Mylan's lead. That company was Apotex, which Pfizer proceeded to sue in the Northern District of Illinois (the "*Apotex* action").

On October 3, 2005, while both the *Mylan* and *Apotex* actions were pending, the FDA granted final approval of Mylan's ANDA. Bloodworth Decl., Exh. B. In the approval letter, the FDA confirmed that because Mylan had been the first applicant to file an ANDA with a paragraph IV certification, "Mylan is eligible for 180-days of market exclusivity." *Id.* at 2. The letter went on to state, consistent with the plain language of the Hatch-Waxman Act, that Mylan's 180-day generic marketing exclusivity "will begin to run from the earlier of the commercial marketing or court decision dates identified in [21 U.S.C.] section 505(j)(5)(B)(iv)." *Id.* The FDA approved Mylan's amlodipine ANDA even though the FDA had previously granted Pfizer a six-month period of pediatric exclusivity. *See* Bloodworth Decl., Exh. C ("FDA Ltr.") at 4.

Although Mylan beat Apotex to the punch by a year, the *Apotex* action was the first to proceed to judgment. On January 29, 2006, the district court for the Northern District of Illinois entered judgment against Apotex, declaring that Pfizer's patent was valid, enforceable, and infringed by Apotex's amlodipine tablets. The district court ordered that the effective date of Apotex's ANDA be reset to September 25, 2007 (reflecting the patent term plus six months of pediatric exclusivity). Bloodworth Decl., Exh. D. Apotex appealed the district court judgment to the Federal Circuit. Bloodworth Decl., Exh. E.

Just over a year later, on February 27, 2007, while the *Apotex* action was pending on appeal, the district court for the Western District of Pennsylvania in the *Mylan* action reached the same conclusion as the district court in the *Apotex* action. The Pennsylvania district court ordered that the approval of Mylan's ANDA would not be made effective until after Pfizer's patent expired a month later, on March 25, 2007, and enjoined Mylan from going to market with its generic version of the drug until then. Bloodworth Decl., Exh. F.

On March 22, 2007, just days before Pfizer's patent expired, the Federal Circuit issued its decision in the *Apotex* case, holding Pfizer's patent invalid as obvious. *Pfizer Inc. v. Apotex, Inc.,* No. 2006-1261, 2007 U.S. App. LEXIS 6623 (Mar. 22, 2007). The following day, the Federal Circuit stayed the district court's order in the *Mylan* action. *See* Bloodworth Decl., Exh. G. Mylan began commercial marketing of its generic amlodipine besylate tablets that same day. *See id.* at Exh. H.

On April 18, 2007, the FDA issued a formal letter decision ruling *inter alia* that Mylan's marketing exclusivity rights did not survive the expiration of the Pfizer patent because at patent expiration all unapproved applications, including those with paragraph IV certifications, are deemed to have been converted to paragraph II certifications, which may be approved without regard to generic exclusivity. Bloodworth Decl., Exh. C. In its preliminary injunction ruling, this Court held Mylan's 180-day generic exclusivity under § 355(j)(5)(B)(iv) did not survive patent expiration. This Court found that the plain language of the 180-day generic exclusivity provision only blocks paragraph IV ANDAs and, since all unapproved paragraph IV ANDAs, such as Apotex's, were deemed to contain paragraph II certifications upon the patent's expiration, the plain language of § 355(j)(B)(iv) did not apply to Apotex. Mem. Op. at 18-19 ("[Section 355(j)(5)(B)(iv)] by its terms, applies only to paragraph IV certification, which cease

to exist upon patent expiration.").  Mylan filed a motion for reconsideration of the district court's April 30 decision, which was denied without opinion on May 14, 2007.

On May 21, 2007, the Court of Appeals for the Federal Circuit denied Pfizer's Petition for Rehearing and Rehearing *En Banc* and issued an immediate mandate.  Bloodworth Decl., Exh. I.  On May 23, 2007, the FDA granted final approval of Apotex's amlodipine ANDA and Apotex has entered the market.

In addition to Mylan and Apotex, there are at least eight other generic manufacturers that are awaiting final FDA approval for their amlodipine ANDAs.  *See* Bloodworth Decl., Exh. J.  The FDA's decision to delist the '303 patent from the Orange Book clears the way for these applicants to also receive final FDA approval.

## LEGAL BACKGROUND - The Hatch-Waxman Act

The purpose of the Hatch-Waxman Act[5], formally known as the Drug Price Competition and Patent Term Restoration Act of 1984, was to "make available more low cost generic drugs by establishing a generic drug approval procedure."  H.R. Rep. No. 98-857 (Part I), at 14-15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647.  In the Hatch-Waxman Act, Congress struck an intricate balance among multiple competing interests.  On the one hand, Congress wished to promote the interest in "quickly getting lower-cost generic drugs to market."  *Teva Pharms. Indus. Ltd. v. Crawford*, 410 F.3d 51, 54 (D.C. Cir. 2005).  On the other hand, Congress "also wanted to protect the patent rights of the pioneer applicants," thereby fostering innovation.

---

[5] Certain Hatch-Waxman provisions have been superseded by the *Medicare Prescription Drug, Improvement and Modernization Act of 2003* ("MMA"), Pub. L. 108-173, 117 Stat. 2066 (Dec. 8, 2003).  But the 1984 version of the Hatch-Waxman Act applies to the provisions at issue here because the MMA provisions control only those ANDAs filed after December 3, 2003.  *See* FDA Ltr. at 1 n.1; MMA, at § 1102(b)(1).  Unless indicated otherwise, all references herein will be to 21 U.S.C. § 355, *et seq.* (2002).

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 802 (D.C. Cir. 2001); *see Bristol-Myers Squibb Co. v. Royce Labs. Inc.*, 69 F.3d 1130, 1133-34 (Fed. Cir. 1995) ("Congress's objective . . . was to strike a 'careful balance between the policies of fostering the availability of generic drugs and of providing sufficient incentives for research on breakthrough drugs.'") (citations omitted). Congress adopted an incentive structure that awarded certain generic drug companies preferential treatment, and accorded certain brand name drug makers additional benefits, depending upon whether they took steps that Congress wished to reward.

To expedite the approval process for generic drugs, the Hatch-Waxman Act permits a generic drug company to submit an Abbreviated New Drug Application, or ANDA, to the FDA. The ANDA must include studies showing that the generic product is "bioequivalent" to the name brand drug that has already been approved. *See Dr. Reddy's Labs., Inc. v. Thompson*, 302 F. Supp. 2d 340, 343 (D.N.J. 2003) ("*DRL*") (citing 21 U.S.C. § 355(j)(2)(A)(iv)). The ANDA must also contain a certification that relates to the patent rights of the branded drug manufacturer that are listed in the Orange Book. The generic drug company must file one of four possible certifications to each patent listed in the Orange Book. The four certifications are labeled according to the paragraph number in the statute that describes them—paragraphs I through IV.

The first three certifications pose no threat to the brand name drug maker's patent rights. A "paragraph I" certification informs the FDA that there are no patents listed in the Orange Book for the drug in question. 21 U.S.C. § 355(j)(2)(A)(vii)(I). A "paragraph II certification" informs the FDA that there is a patent listed in the Orange Book, but that the patent has expired. *Id.* at § 355(j)(2)(A)(vii)(II). A "paragraph III" certification informs the FDA that the Orange Book lists unexpired patents on the drug in question and certifies that the applicant does not intend to enter the market until those patents have expired. *Id*. at § 355(j)(2)(A)(vii)(III). A paragraph I,

II or III certification means that the brand name manufacturer's patents, if any, will not be at stake by the filing of the ANDA.

A paragraph IV certification, in contrast, is a declaration of war—the filer asserts that the brand name drug has no valid patent protection.  21 U.S.C § 355(j)(2)(A)(vii)(IV).  A paragraph IV certification often triggers a lawsuit by the brand name drug maker asserting its patent rights. *See* 21 U.S.C. § 355(j)(5)(B)(iii); 35 U.S.C. § 271(e)(2) (2006).

But litigating a patent challenge against a pharmaceutical giant is a time consuming and expensive proposition, so Congress decided to provide generic drug companies with an incentive to file such challenges.  The reward is the right of the first paragraph IV filer to enter the market for 180-days free from competition from other generics.  Mechanically, Congress accomplished this end by directing the FDA to delay approval of later paragraph IV ANDAs.  The relevant provision directs that "[i]f the [ANDA of a competing generic company] contains a [paragraph IV certification] and is for a drug [with an ANDA already containing] such a certification, the application shall be made effective not earlier than one hundred eighty days after . . . the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application . . . ."  21 U.S.C. § 355(j)(5)(B)(iv).  As this Court has emphasized, the meaning of the "literal language" of this provision is clear:  "Section 355(j)(5)(B)(iv) says that, if an applicant has already filed a paragraph IV ANDA, later applications shall be approved 'not earlier than one hundred and eighty days after' the commercial-marketing trigger or the court-decision trigger is satisfied." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1069 (D.C. Cir. 1998) (quoting 21 U.S.C. § 355(j)(5)(B)(iv) (2002)).

**ARGUMENT**

Mylan is entitled to a temporary restraining order because it can show "1) a substantial likelihood of success on the merits, 2) that [plaintiff] would suffer irreparable injury if the injunction is not granted, 3) that any injunction would not substantially injure other interested parties, and 4) that the public interest would be served by the injunction." *Canales v. Paulson*, No. 06-1330, 2006 U.S. Dist. LEXIS 61915, at *8 (D.D.C. Aug. 30, 2006) (quoting *Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001)). These factors "interrelate on a sliding scale and must be balanced against each other." *Id.* (quoting *Sereno Lab. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). Furthermore, "'[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in the other areas are rather weak.'" *Id.* (quoting *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

I.    **MYLAN IS LIKELY TO SUCCEED ON APPEAL BECAUSE ITS 180-DAY EXCLUSIVITY HAD VESTED BEFORE PATENT EXPIRATION AND THE FDA'S REGULATIONS AND PRECEDENT CLEARLY REQUIRE A PATENT TO REMAIN LISTED IN THE ORANGE BOOK UNTIL THE 180-DAY EXCLUSIVITY OF THE FIRST-TO-FILE COMPANY HAS EXPIRED**

The portion of the FDA's regulations relied upon in the FDA's April 18, 2007 letter decision to find that Mylan's eligibility for 180-day generic exclusivity does not extend beyond the '303 patent's expiration is arbitrary, capricious, and contrary to law because Mylan's right to the 180-day generic exclusivity reward vested *prior to* the patent's expiration and under the plain language of 21 U.S.C. § 355(j)(5)(B)(iv), the FDA does not have authority to cut short Mylan's generic exclusivity period. Mylan is likely to succeed on the merits because the FDA's own regulations prohibit it from delisting patents held invalid based on a paragraph IV challenge, such as the '303 patent, during that challengers entitled reward of 180-day generic exclusivity.

A.    **ONCE MYLAN'S 180-DAY GENERIC EXCLUSIVITY RIGHT VESTED, IT COULD NOT BE DIVESTED BY THE '303 PATENT'S EXPIRATION**

1.    *The Statute's Plain Language Requires That Vested 180-Day Generic Exclusivity Extends Beyond Patent Expiration*

Throughout the years, the FDA has repeatedly attempted to narrow the scope of the application of the exclusivity. The Courts have likewise repeatedly thwarted those attempts and overturned the FDA's 180-day determinations. *See, e.g.*, *Mova*, 140 F.3d at 1069 (rejecting FDA's "successful defense" prerequisite to 180 day exclusivity); *Granutec, Inc. v. Shalala*, Nos. 97-1873, 97-1874, 1998 U.S. App. LEXIS 6685, at *20-21 (4th Cir. Apr. 3, 1998) (same); *Inwood Labs., Inc. v. Young*, 723 F. Supp. 1523, 1526 (D.D.C. 1989) (same); *Teva Pharms. USA, Inc. v. FDA*, 182 F.3d 1003, 1010-1011 (D.C. Cir. 1999) *on remand*, 1999 U.S. Dist. LEXIS 14575 (D.D.C. Aug. 18, 1999), *aff'd*, 2000 U.S. App. LEXIS 38667 (D.C. Cir. Nov. 15, 2000) (rejecting FDA's interpretation of a "decision of court"); *Mylan Pharms. Inc. v. Henney*, 94 F. Supp. 2d 36, 52-54 (D.D.C. 2000) (same); *TorPharm Inc. v. Shalala*, No. 97-1925, 1997 U.S. Dist. LEXIS 21983, *11-12 (D.D.C. Sept. 15, 1997) (same). The regulations at issue here are these same regulations that have been piecemeal rejected by the Courts.

"[T]he courts are the final authorities on issues of statutory construction," and "must reject administrative constructions . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981). In its April 18 decision, the FDA stated its "longstanding position that 180-day exclusivity expires with the patent." FDA Ltr. at 10. But this conclusion is precluded by the plain language of the 180-day generic exclusivity provision of the Hatch-Waxman Act, which reads:

If the application contains a certification described in subclause (IV) of paragraph (2)(A)(vii) [*i.e.*, a paragraph IV certification] and is for a drug for which a previous application has been submitted under this subsection continuing [sic]

9

such a certification, the application shall be made effective not earlier than one hundred and eighty days after—

> (I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

> (II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed,

whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002). Mylan was the first to file a paragraph IV certification and its 180-day generic exclusivity began on March 23, 2007, when it notified the FDA that it had begun commercial marketing. *See Mylan*, 94 F. Supp. 2d at 40 ("By its terms, the [180-day generic exclusivity statute] affords the first filer protection from competition from subsequent generic makers for 180 days beginning from the earlier of a commercial marketing or court decision.").

The plain language of § 355(j)(5)(B)(iv) is not limited to patent terms. As the D.C. Circuit has emphasized, the meaning of the "literal language" of this provision is clear: "Section 355(j)(5)(B)(iv) says that, if an applicant has already filed a paragraph IV ANDA, later applications shall be approved 'not earlier than one hundred and eighty days after' the commercial-marketing trigger or the court-decision trigger is satisfied." *Mova*, 140 F.3d at 1069 (quoting 21 U.S.C. § 355(j)(5)(B)(iv)); *see also Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (quotations and citations omitted). Since the intent of Congress is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984). Accordingly, Mylan's 180-day generic exclusivity bars the FDA from approving any other

ANDAs with paragraph IV certifications, even though the '303 patent has expired.

> 2.   *The Statute's Legislative History and Purpose Require that Vested 180-Day Generic Exclusivity Extends Beyond Patent Expiration*

Nothing in the text or legislative history of the 180-day generic exclusivity statute indicates that the right created thereby is cut short upon patent expiration.  In fact, Congress adopted the 180-day generic exclusivity statute, *inter alia*, to encourage generics to file paragraph IV challenges to the validity of pharmaceutical patents and to reward such challengers for their risk and expense.[6]  According to a 2002 Federal Trade Commission report, the 180-day generic exclusivity statute has worked, encouraging challenges to patents and resulting in 73% of those challenges succeeding in removing the barriers created by an invalid patent.  *See* Federal Trade Commission, "Generic Drug Entry Prior to Patent Expiration," July 2002, at 16, available

---

[6] *See, e.g.*, 152 Cong. Rec. S7922, at S7928 (daily ed. July 19, 2006) (statement of Sen. Leahy) ("[T]he original intent of the Hatch-Waxman law . . . was to provide incentives for generic companies to challenge the validity of patents on medicines and provide incentives for generic companies to manufacture low-cost medicines" and "that [a] generic company would have the exclusive right for 180 days to make the generic version of the patented medicine); 149 Cong. Rec. S15670-03, at S15746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer) ("Fourth, the generic provisions revamp the 180-day exclusivity incentive provided in the Hatch-Waxman Act.  Under the act, the first generic drug company to challenge a patent on a brand drug has the exclusive right to market its drug for 6 months before any other generic can compete.  This feature encourages generic applicants to challenge weak patents and brings consumers much quicker access to affordable generic drugs."); 149 Cong. Rec. S8686-03, at S8691 (daily ed. June 26, 2003) (statement by Sen. Hatch) ("The Waxman-Hatch law provides an incentive for generic firms to challenge patents.  To encourage generic competitors to pursue patent challenges in a vigorous fashion, the 1984 law provided 180 days of marketing exclusivity in situations where a generic drug firm could show the pioneer's patents were invalidated or not infringed."); Proposed Rule, 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 64 Fed. Reg. 42873, 42874 (Aug. 6, 1999), *withdrawn on other grounds by* 67 Fed. Reg. 212, 66593 (Nov. 1, 2002) ("Given this risk of patent infringement litigation, section 505(j)(5)(B)(iv) of the act provides an incentive for generic drug applicants to file paragraph IV certifications challenging patents that may be invalid, unenforceable, or not infringed by the product that is the subject of the ANDA."); 54 Fed. Reg. 28872, 28895 (July 10, 1989) ("The purpose of [the 180-day exclusivity provision] of the act is to reward the first applicant to test the scope or validity of a patent. . . .").

at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf.

But Congress's purpose can only be accomplished if the first filer challenging the invalid patent is assured of 180-day generic exclusivity, regardless of how long the litigation takes. If potential challengers must consider factors such as the speed of various courts' dockets, the possibility that various presiding judges may retire, and other uncontrollable events in deciding whether to challenge invalid patents, this inevitably will deter the challenges that Congress intended to encourage, particularly as the end of the patent term draws closer. The D.C. Circuit has rejected previous attempts to reduce the period of 180-day generic exclusivity, there in the related context of delisting, because it would be contrary to the intent of Congress:

> By thus reducing the certainty of receiving a period of marketing exclusivity, the FDA's delisting policy diminishes the incentive for a manufacturer of generic drugs to challenge a patent listed in the Orange Book in the hope of bringing to market a generic competitor for an approved drug without waiting for the patent to expire. The FDA may not, however, change the incentive structure adopted by the Congress, for the agency is bound "not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."

*Ranbaxy*, 469 F.3d at 126 (quoting *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994)). The FDA's decision that vested 180-day generic exclusivity does not survive patent expiration "change[s] the incentive structure adopted by the Congress" in the same manner the D.C. Circuit has rejected.

Mylan was the first to file under paragraph IV and the first to be sued by Pfizer for patent infringement. Mylan's patent infringement case, the Pennsylvania action, was delayed due to circumstances outside of its control, including a lengthy delay caused by a change of trial judges. That resulted in the unique situation in which Apotex, which Pfizer sued later, was able to use Mylan's arguments and expert reports in the Pfizer-Apotex litigation. Mylan took the risk that was recognized by Congress as critical, and Mylan is entitled to the reward of 180-day generic

exclusivity regardless of how long its case took to resolve.  The FDA's ruling that Mylan's 180-day generic exclusivity does not survive patent expiration cannot justify a "departure from the plain meaning of statutory language," and its reliance on vague notions of Congressional intent cannot satisfy this "considerable burden."  *Mylan*, 94 F. Supp. 2d at 55; *id.* at 56 (noting that, to depart from the plain language of a statute, there must be a "clear indication of congressional intent at odds with the text of the statute").

The FDA agrees that Congress created the 180-day generic exclusivity statute for these purposes.  But it argues that, "[o]nce a listed patent expires and is no longer a barrier to ANDA approval, there is no longer a need to provide an incentive to challenge it in court."  FDA Ltr. at 11.  The FDA's analysis is focused on today, which is the wrong time; of course there need be no incentive to challenge a patent once it expires.  The critical time period is 2002, when Mylan filed its ANDA with a paragraph IV certification.  Mylan's filing came nearly five years before the '303 patent was to expire and brought the '303 patent's validity before the courts.  Thus, Congress's intent in creating incentives to the challenge of pharmaceutical patents was fulfilled.  Had Mylan known in 2002 that a combination of events out of its control would deprive it of that 180-day generic exclusivity, Mylan would not have filed a paragraph IV certification.  It would have filed with a paragraph III certification (thus insulating itself from the burden of patent infringement litigation) and it would have waited until the '303 patent expired.  That series of events would have been directly contrary to Congress's purpose in adopting the 180-day generic exclusivity statute.

3.    *This Is A Case of First Impression:  The FDA Has Never Before Cut Short A First Filer's 180-Day Exclusivity Period Once It Has Vested*

The two cases that the FDA relies upon are inapposite.  Neither *Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 126 (D.C. Cir. 2006) nor *Dr. Reddy's Labs., Inc. v. Thompson*, 302 F.

Supp. 2d 340, 354-55 (D.N.J. 2003) ("*DRL*") addressed vested exclusivity rights.  In *Ranbaxy*, the Court of Appeals recognized that the issue of whether 180-day generic exclusivity survived the patent's expiration was not before it.  *See Ranbaxy*, 469 F.3d at 126 ("We need not address the question of patent expiration in this case.").  The FDA often points out that the *Ranbaxy* opinion goes on to note in *dicta* "that the text and structure of the statute suggest a distinction between expiration and delisting such that the first generic applicant may no longer retain exclusivity when the patent has expired."  *Id*.  But importantly, in neither *Ranbaxy* nor *DRL* had the first filer triggered its period of 180-day exclusivity – as Mylan did here – when the FDA cut short that exclusivity.

In *DRL*, the court upheld the FDA's decision that DRL's tentatively approved ANDA was no longer *eligible* for exclusivity because once the underlying patent expires, its ANDA was deemed to convert from a paragraph IV certification to a paragraph II certification.  302 F. Supp. 2d at 351 (noting FDA's explanation that "a paragraph IV certification on a patent loses its eligibility for exclusivity based upon that patent when the patent expires *before either of the triggering events occurs*) (emphasis added).  Without a paragraph IV certification, DRL was not eligible for exclusivity under the plain language of the generic exclusivity provision.  *Id.* at 351 ("[T]he FDA will not grant exclusivity based upon a paragraph IV certification on a patent that has expired at the time the exclusivity decision is made.").  That reasoning does not apply here because, prior to the '303 patent's expiration, the FDA had approved Mylan's ANDA with a paragraph IV certification, the 180-day exclusivity period had begun, and Mylan's 180-day generic exclusivity had vested.  The FDA has conceded as much.  *See* FDA Ltr. at 13.

The FDA's principal argument is based on the statute's explicit focus on ANDAs with paragraph IV certifications.  Although Congress certainly was concerned about subsequent

paragraph IV filers, that concern was not to the exclusion of all other filers.  Moreover, Congress certainly did not know when it enacted the statute in 1984 that, ten years later, the FDA would deem all paragraph IV certifications to be paragraph II certifications after the relevant patent had expired.[7]  The FDA therefore is incorrect when it argues that, after the patent expires, subsequent filers avoid 180-day generic exclusivity because their paragraph IV certifications are required "[b]y the terms of the statute" to change to certifications under paragraph II.  FDA Ltr. at 10.  The FDA itself has argued just the opposite in the Apotex proceedings, where it has continued to treat Apotex's certification as a paragraph IV, even after the '303 patent had expired, so that Apotex can avoid Pfizer's pediatric exclusivity.  *Id.* at 8-9.  Under the construction adopted by the FDA in the pediatric exclusivity context, Apotex's ANDA still contains a paragraph IV certification and, by the express terms of the statute, cannot be approved during Mylan's 180-day generic exclusivity.  *Id.*; *see also Apotex's Opposition to Mylan's Motion for a Preliminary Injunction* [Dkt. No. 55] ("Apotex Br.") at 5 (agreeing with the FDA's "decision to not automatically convert Apotex's paragraph IV certification to a paragraph II certification").

The rest of the ANDAs are subject to Mylan's 180-day generic exclusivity as well, even if they contain or are changed to paragraph II certifications.  "*Exclusivity*" was the term that Congress itself chose to describe the right it was bestowing on the first to challenge patents (*i.e.*, the title of the statutory paragraph is "180-day exclusivity period").  The term "exclusivity" demonstrates an intent to make the first-filer's right to sell exclusive of other generics, regardless of the paragraph under which they certified.  On the other hand, the FDA's interpretation would lead to the absurd result that filers that certified under paragraph IV, and thus took on the risk of

---

[7] A paragraph II certification states that that the relevant patent "has expired."  21 U.S.C. § 355(j)(2)(A)(vii)(II).  An ANDA filer will not be sued for patent infringement when it certifies under paragraph I (certifying the relevant patent has not been filed), paragraph II, or paragraph III (certifying the date on which the relevant patent will expire).

litigation (such as Apotex), were blocked by Mylan's 180-day generic exclusivity, while the FDA would be free to approve those who merely certified under paragraphs II and III and took no risk at all.

Such a result would fly in the face of Congress's intent in adopting the 180-day generic exclusivity statute and its expectations regarding how the FDA would treat the various certifications *vis-à-vis* each other. For example, Congress has expressed its intent that ANDAs with paragraph IV certifications must be treated better than those with certifications under paragraphs II and III by providing that the former "shall" be approved after the 180-day generic exclusivity period ends, but the latter only "may" be approved. *Compare* 21 U.S.C. § 355(j)(5)(B)(iii) ("If the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii), the approval *shall* be made effective immediately. . . .") *with* 21 U.S.C. § 355(j)(5)(B)(i) ("If the applicant only made a certification described in subclause (I) or (II) of paragraph (2)(A)(vii) . . . the approval *may* be made effective immediately") *and* 21 U.S.C.§ 355(j)(5)(B)(ii) ("If the applicant made a certification described in subclause (III) of paragraph (2)(A)(vii), the approval *may* be made effective on the date certified. . . .") (emphases added).

Thus, the FDA's interpretation of the statute produces absurd results, which "are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982); *see also Clinton v. New York*, 524 U.S. 417, 429 (1998) (rejecting interpretation of statute that "would produce an absurd . . . result which Congress could not have intended" (quotations omitted)); *Fleischmann Constr. Co. v. United States ex rel. Forsberg*, 270 U.S. 349, 360-62 (1926) (interpreting a statutory term "'within one year from the completion of the work' to mean 'within one year after

16

the performance and final settlement of the contract'" to avoid "unjust or absurd consequences");

*Quinn v. Butz*, 510 F.2d 743, 753 (D.C. Cir. 1975) ("[A] construction of a statute leading to

unjust or absurd consequences should be avoided.").

Both the D.C. Circuit and the FDA applied this principle in recognizing that a

certification that a patent is "unenforceable" suffices for purposes of the Paragraph IV

certification, even though the statute only mentions patents that are "invalid" or "will not be

infringed." *See Teva Pharms.*, 182 F.3d at 1009; 59 Fed. Reg. 50,338, 50,339 (Oct. 3, 1994)

(explaining that the FDA included "unenforceability" because "the alternative

interpretation . . . would be contrary to Congress' obvious intent in allowing patent challenges

under [the Hatch-Waxman Act] and would lead to absurd results."). Even if the result of the

FDA's interpretation did not rise to the level of absurdity and unfairness—which Mylan believes

it certainly does—but was "merely an unreasonable one plainly at variance with the policy of the

legislation as a whole," that still would be sufficient to require this Court to follow the purpose,

"rather than the literal words." *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543

(1940) (citations omitted).

**B.    THE FDA CANNOT DELIST THE '303 PATENT UNTIL MYLAN'S 180-DAY GENERIC EXCLUSIVITY EXPIRES**

The Hatch-Waxman Acts states that the first company to file an ANDA containing a

paragraph IV certification to a patent listed in the Orange Book "shall be" entitled to 180-days of

exclusivity:

> If the application contains a [paragraph IV certification] and is for a drug for which a previous application has been submitted under this subsection, [containing] such a certification, the application *shall be made effective not earlier than one hundred and eighty days after*
>
> > (I)    the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application; or

(II)   the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed,

whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002) (emphasis added).

Mylan is entitled to 180-day generic exclusivity because it was the first company to file a paragraph IV certification, challenging the validity of the '303 patent, listed as covering Norvasc. *See* 21 U.S.C. § 355(j)(5)(B)(iv) (providing 180-day generic exclusivity only where an ANDA contains a certification "described in" 21 U.S.C. § 355(j)(2)(A)(vii)(IV), which only describes certifications to patents "which claim[] the listed drug . . . or . . . a use for such listed drug. . . ."). Generally, the FDA will delist a patent on the request of the new drug application ("NDA") holder. *See Ranbaxy*, 469 F.3d at 123 ("Merck, however, did not sue Ranbaxy or Teva for patent infringement based upon their paragraph IV certifications.  Instead, before their ANDAs were approved, Merck asked the FDA to delist the '481 and '520 Patents from the Orange Book, which the agency did in 2004.  Consequently, under 21 C.F.R. § 314.94(a)(12)(viii)(B), Ranbaxy and Teva were required to delete the paragraph IV certifications from their ANDAs and thereby lost their eligibility for a period of marketing exclusivity.").

But the FDA created an exception:  it will not delist a patent if doing so would deprive a party of its 180-day generic exclusivity rights.  In interpreting its delisting regulation, 21 C.F.R. § 314.94(a)(12)(viii)(B), the FDA has explained that "[i]f a patent were removed from the list immediately upon a court decision that the patent is invalid or unenforceable, an applicant with a subsequently filed application might seek to certify that there is no relevant patent and seek an immediately effective approval."  59 Fed. Reg. at 50348.  "To ensure that this does not occur, the agency has required that a patent remain on the list after being declared invalid or unenforceable until the end of any applicable 180-day exclusivity period."  *Id*.  Thus, the FDA's policy does

not—and cannot—allow an NDA holder, "by delisting its patent, to deprive the generic applicant of a period of marketing exclusivity." *Ranbaxy*, 469 F.3d at 126 (holding unlawful "the FDA's policy requiring that the first filer of a paragraph IV certification be sued in order to preserve its statutory exclusivity when the NDA holder seeks to delist the patent rather than to litigate"). As shown below, because Mylan's "applicable" exclusivity period extends for a full 180 days irrespective of the '303 patent's interim expiration, the '303 patent may not be delisted until that period has fully run.[8]

The FDA has acknowledged that when there is an outstanding claim of 180-day exclusivity it would be unjust to thwart the challenger's incentive by allowing the patent to be de-listed:

> This regulation recognizes a limited exception to this delisting and amendment requirement when the patent is the subject of a lawsuit. . . . The reason for this limited exception is to avoid an unjust result that would occur if an ANDA applicant who is eligible for exclusivity prevails in the patent litigation but lost exclusivity if the NDA holder decided to delist.

*Federal Defendants' Memorandum in Support of Motion for Summary Judgment and in Opposition to Plaintiffs' Motions for Summary Judgment*, No. 1:05-02180 (RWR) (D.D.C. Dec. 2, 2005) [Dkt. No. 8-1] at 11.

Similarly, the FDA's response to comments regarding the proposed regulation recognized that a first-filer's market exclusivity should not be destroyed by delisting:

> [T]he agency agrees that the protection offered by 180-day exclusivity should not be undermined by changes from paragraph IV certification or by the filing of original certifications other than paragraph IV certifications. If a patent were

---

[8] 21 C.F.R. § 314.94(a)(12)(viii)(B) provides: "A patent that is the subject of a lawsuit under § 314.107(c) shall not be removed from the list until FDA determines either that no delay in effective dates of approval is required under that section as a result of the lawsuit, *that the patent has expired*, or that any such period of delay in effective dates of approval is ended." Mylan is challenging that portion of the FDA's regulations that condition generic exclusivity on whether or not the patent is expired.

> removed from the list immediately upon a court decision that the patent is invalid or unenforceable, an applicant with a subsequently filed application might seek to certify that there is no relevant patent and seek an immediately effective approval. To ensure that this does not occur, the agency has required that a patent remain on the list after being declared invalid or unenforceable *until the end of any applicable 180-day exclusivity period*.

59 Fed. Reg. at 50,348 (emphasis added). The FDA, however, then continues and, ignoring Congress' clear direction to the contrary, hinges generic exclusivity on the patent's life:

> This means that a patent is deemed to be relevant under §314.94(a)(12)(ii) until the end of the term of the patent or applicable 180-day exclusivity period, whichever occurs first. Thus, where there is a patent that has been challenged by a paragraph IV applicant, a subsequent applicant will not be able to file a certification that there is no relevant patent or seek an immediately effective approval until either the patent or the 180-day exclusivity period expires.

*Id*. But there is nothing in the subsection (5)(B)(iv) that states that a subsequent paragraph IV filer shall not be approved – unless the patent expires.


## II.    MYLAN WILL BE IRREPARABLY HARMED IF A TRO IS NOT ENTERED BECAUSE DELISTING OF THE PATENT WOULD DESTROY MYLAN'S 180-DAY EXCLUSIVITY

Until the Court of Appeals has resolved the issue of the expiration date of Mylan's 180-day exclusivity, it would be improper for the FDA to delist the '303 patent, thereby destroying Mylan's 180-day exclusivity and irreparably prejudicing Mylan's right to have the issue decided by the courts.

This Court has recognized that the loss of the 180-day exclusivity period constitutes irreparable harm. *Apotex, Inc. v. Food and Drug Administration*, No. 06-0627, 2006 U.S. Dist. LEXIS 20894, at *58 (D.D.C. Apr. 19, 2006) (finding that the first to file companies "stand to lose a statutory entitlement, which is a harm that has been recognized as sufficiently irreparable[] and that "[o]nce the statutory entitlement has been lost, it cannot be recaptured" (internal citation omitted)), *aff'd*, 449 F.3d 1249 (D.C. Cir. 2006); *Mova Pharmaceutical Corp. v. Shalala*, 955 F.

Supp. 128, 131 (D.D.C. 1997) ("depriving Mova of a 180-day statutory grant of exclusivity and giving Mylan an officially sanctioned head start in the market for generic micronized glyburide products will cause injury to Mova"), *aff'd*, 140 F.3d 1060 (D.C. Cir. 1998).

Mylan has expended tremendous resources on the development and approval of its amlodipine products, including millions of dollars on materials, studies, overhead, and litigation. Roman Decl.[9] ¶3.  Mylan anticipates that its revenues will be several million dollars per day for the balance of the 180-day exclusivity period.  Roman Decl. ¶ 6.  Mylan will irrevocably lose a portion of these revenues if the FDA delists the '303 patent before the issue of Mylan's 180-day exclusivity is resolved by the Court of Appeals.  Roman Decl. ¶ 6.

Mylan's harm will be substantial and irreparable.  *McGregor Printing Corp. v. Kemp*, No. 91-3255, 1992 U.S. Dist. LEXIS 6717, at *16 (D.D.C. May 14, 1992) (irretrievable monetary loss in combination with loss of employment to plaintiff's employees amounted to irreparable injury), *rev'd on other grounds*, 20 F.3d 1188 (D.C. Cir. 1994); *TorPharm,* 1997 U.S. Dist. LEXIS 21983, at *12-13 (irretrievable monetary losses that have a serious effect on plaintiff constitute irreparable harm) (citing *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

The harm to Mylan would be unrecoverable because there is no remedy at law against FDA.  This Court and the D.C. Circuit Court of Appeals have found irreparable harm in situations where there is no one from whom to recover loss.  *Bracco Diagnostics Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997) (when the injury is "admittedly economic" but there is no adequate compensatory or other relief, the balance tips in favor of injunctive relief); *National*

---

[9] *Declaration of Brian S. Roman in Support of Mylan's Emergency Application for a Temporary Restraining Order* [Dkt. No. 3].

*Medical Care, Inc. v. Shalala*, No. 95-0860, 1995 U.S. Dist. LEXIS 10074, at *7-8 (D.D.C. June 6, 1995); *Express One Int'l, Inc. v. USPS*, 814 F. Supp. 87, 91 (D.D.C. 1992) (nonrecoverable monetary loss sufficient to justify injunctive relief); *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 428-429 (D.C. Cir. 1992).

The kind of injury that Mylan would suffer cannot be compensated by monetary damages. Even if it could, Mylan would have no way to recoup its losses from the government, which has no financial liability for erroneous decisions in circumstances like these. *Collagenex v. Thompson*, No. 03-1405, 2003 U.S. Dist. LEXIS 12523, at *33-34 (D.D.C. July 22, 2003).

Even if this Court disagrees about the level of harm to Mylan, injunctive relief may be granted "[w]here, as here, the likelihood of success on the merits is very high, a much smaller quantum of injury will sustain an application for preliminary injunction." *Mova*, 955 F. Supp. at 131.

## III. THE PUBLIC WILL BE HARMED IF A TRO IS NOT ENTERED BECAUSE THE INCENTIVES FOR GENERIC DRUG COMPANIES TO FILE PARAGRAPH IV CHALLENGES WILL BE SIGNIFICANTLY REDUCED

There are sound policy reasons behind the exclusivity provisions of the Hatch-Waxman Amendments, and there are sound bases for not allowing hard-earned exclusivity to be destroyed by the arbitrary delisting of a patent. If the '303 patent is delisted before expiration of Mylan's 180-day exclusivity period, then the incentives for generic drug companies to file paragraph IV challenges will be significantly reduced and the public will be deprived of low cost generic alternatives to brand name drugs that are covered by patents that are invalid, unenforceable, or not infringed.

Mylan relied on the incentives promised by Hatch-Waxman and committed enormous resources to challenging an invalid patent. The FDA should not frustrate the policies of the

statute by delisting the '303 patent prior to judicial resolution of the question of whether 180-day exclusivity ends with patent expiration.

To the extent that Mylan's 180-day exclusivity will limit the number of generic amlodipine products for a short period of time, "the public interest in faithful application of the statutes outweighs . . . a marginal increase in the availability of low-cost generic drug products to American consumers, particularly where, as here, the very statute that was designed with consumers' interests in mind is the statute which so clearly entitles [Mylan] to relief. . ." *Mova*, 955 F. Supp. at 131.

## IV.    BALANCING THE HARM FAVORS ENTRY OF A TRO

The FDA will suffer no harm as a result of a TRO ordering it not to delist the '303 patent until the issue of Mylan's 180-day exclusivity is resolved by the Court of Appeals.  Pfizer likewise will not be harmed by the continued listing of its patent in the Orange Book.  In fact, the continued listing of the patent in the Orange Book benefits Pfizer because the entry of additional generic competitors would significantly erode Pfizer's market share.

## <u>CONCLUSION</u>

For the foregoing reasons, Mylan respectfully asks this Court enter a temporary restraining order enjoining the FDA from approving any additional ANDAs on amlodipine in derogation of Mylan's right to 180-day exclusivity.

Dated: June 26, 2007                    Respectfully submitted,


                                        ___/s/ David J. Harth_____
                                        David J. Harth (#474632)
                                        HELLER EHRMAN LLP
                                        One East Main Street, Suite 201
                                        Madison, Wisconsin 53703
                                        (608) 663-7460

                                        Shannon M. Bloodworth (#474925)
                                        HELLER EHRMAN LLP
                                        1717 Rhode Island Avenue, NW
                                        Washington, D.C. 20036
                                        (202) 912-2000


                                        E. Anthony Figg (#345124)
                                        Minaksi Bhatt (#434448)
                                        ROTHWELL, FIGG, ERNST & MANBECK PC
                                        1425 K Street, NW
                                        Suite 800
                                        Washington, DC 20005
                                        (202) 783-6040

                                        Stuart A. Williams
                                        Jill Ondos
                                        MYLAN LABORATORIES INC.
                                        1500 Corporate Drive
                                        Suite 400
                                        Canonsburg, Pennsylvania 15317
                                        (724) 514-1840

                                        Attorneys for Plaintiffs
                                        MYLAN LABORATORIES INC. and
                                        MYLAN PHARMACEUTICALS INC.


                                        24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| MYLAN LABORATORIES INC. and | ) |
| MYLAN PHARMACEUTICALS INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| MUTUAL PHARMACEUTICAL CO., INC., | ) |
| | ) |
| Intervenor-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL O. LEAVITT, | )      Civil Action No. 07-cv-579 (RMU) |
| in his official capacity as | ) |
| SECRETARY OF HEALTH AND | ) |
| HUMAN SERVICES, | ) |
| | ) |
| ANDREW C. VON ESCHENBACH, M.D., | ) |
| in his official capacity as | ) |
| COMMISSIONER OF FOOD AND DRUGS, | ) |
| | ) |
| UNITED STATES FOOD AND DRUG | ) |
| ADMINISTRATION, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| TEVA PHARMACEUTICALS USA, INC., | ) |
| | ) |
| and | ) |
| | ) |
| APOTEX INC., | ) |
| | ) |
| Intervenor-Defendants. | ) |

_____

**DECLARATION OF SHANNON M. BLOODWORTH IN SUPPORT OF
PLAINTIFFS' EMERGENCY APPLICATION TO TEMPORARILY RESTRAIN THE
FDA FROM APPROVING ANY ADDITIONAL AMLODIPINE ANDAS IN
<u>DEROGATION OF MYLAN'S RIGHT TO 180-DAY MARKET EXCLUSIVITY</u>**

I, Shannon M. Bloodworth, declare and state as follows:

1.      I am an attorney with the law form of Heller Ehrman LLP, counsel to Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc. (collectively "Mylan"), in the above-captioned proceeding.  I submit this declaration in support of Mylan's Emergency Application to Temporarily Restrain the FDA from Approving any Additional Amlodipine ANDAs in Derogation of Mylan's Right to 180-Day Market Exclusivity.

2.      Annexed hereto as Exhibit A is a true and correct copy of correspondence to S. Wayne Talton from Gary Buehler, Office of Generic Drugs, dated June 22, 2007.

3.      Annexed hereto as Exhibit B is a true and correct copy of correspondence to S. Wayne Talton from Gary Buehler, Office of Generic Drugs, dated October 3, 2005.

4.      Annexed hereto as Exhibit C is a true and correct copy of correspondence to ANDA applicants and ANDA holders for amlodipine besylate tablets from Gary Buehler, Office of Generic Drugs, dated April 18, 2007.

5.      Annexed hereto as Exhibit D is a true and correct copy of the decision from the Northern District of Illinois action, dated January 29, 2007.

6.      Annexed hereto as Exhibit E is a true and correct copy of Apotex's Notice of Appeal.

7.      Annexed hereto as Exhibit F is a true and correct copy of the decision from the Pennsylvania District Court action, dated February 27, 2007.

8.       Annexed hereto as Exhibit G is a true and correct copy of the stay issued by the Federal Circuit in *Pfizer Inc. v. Mylan Laboratories Inc., et al.*, No. 2007-1194 (Fed. Cir.), dated March 23, 2007.

9.      Annexed hereto as Exhibit H is a true and correct copy of correspondence to Gary Buehler, Office of Generic Drugs, from S. Wayne Talton, dated March 23, 2007.

10.     Annexed hereto as Exhibit I is a true and correct copy of the Federal Circuit mandate denying Pfizer's motion for rehearing *en banc*, dated May 21, 2007.

11.     Annexed hereto as Exhibit J is a true and correct copy of documents from FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (Electronic Orange Book) regarding amlodipine besylate.

I declare under penalty of perjury that the foregoing is true and correct of my own knowledge. Executed this 26th day of June, 2007 in Washington, D.C.

Shannon M. Bloodworth

3

# Exhibit A

*Declaration of Shannon M. Bloodworth*
*In Support of Plaintiffs' Emergency Application to Temporarily Restrain*
*the FDA from Approving any Additional Amlodipine ANDAs in*
*Derogation of Mylan's Right to 180-Day Market Exclusivity*

**Department of Health and Human Services**
**Public Health Service**

Food and Drug Administration
Center for Drug Evaluation and Research

**Office of Generic Drugs**
**Rockville, Maryland**



[ JUN 2007 ]
RECEIVED

Date: ___6/22/07___

To: ___Mylan Pharmaceutical___
___S. Wayne Talton___

Phone: _____

Fax: ___304-285-6407___

From: ___Gary Buehler___

Phone: (240) 276-9310

Fax: (240) 276-9327

Number of Pages: ___4___
(Including Cover Sheet)

Comments:

_____

_____

_____

THIS DOCUMENT IS INTENDED ONLY FOR THE USE OF THE PARTY TO WHOM IT IS
ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL,
AND PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW.
If you are not the addressee, or a person authorized to deliver the document to the addressee, this communication is not
authorized. If you have received this document in error, please immediately notify us by telephone and return it to us at the
above address by mail. Thank you.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857



Dear ANDA Applicant:

This letter is in reference to your pending or approved abbreviated new drug application ("ANDA") for amlodipine besylate tablets ("amlodipine"). By letter dated June 14, 2007, Pfizer, the sponsor of Norvasc, the product that is the reference listed drug for your ANDA, notified FDA that U.S. Patent No. 4,879,303 (the '303 patent) no longer meets the criteria for listing in *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book") and requested that FDA remove the '303 patent from the listings for Norvasc, NDA 19-787.[1]  On June 22, 2007, FDA removed the '303 patent from the Orange Book listing for Norvasc. Because FDA had previously established a docket regarding administrative issues related to the amlodipine ANDAs, see Docket No. 2007N-0123, FDA is providing notice of this supplemental determination to all of the ANDA applicants, and posting this letter in that docket.

As you are aware, on March 22, 2007, the Federal Circuit issued an opinion finding that Apotex Inc.'s amlodipine product did not infringe claims 1-3 of the '303 patent because those claims were invalid for obviousness. *Pfizer Inc. v. Apotex, Inc.*, 2007 U.S. App. LEXIS 6623, 2007 WL 851203 (Fed. Cir.. Fed. Mar. 22, 2007). Although the patent expired shortly thereafter on March 25, 2007, the patent continued to be potentially relevant to the timing of the approval of the amlodipine ANDAs because of certain exclusivity claims. Those issues have been the subject of litigation. *Mylan Labs, Inc. v. Leavitt.*, 484 F. Supp. 2d 109 (D.D.C. 2007), *appeal pending*, 07-5156 (D.C. Cir.). On May 21, 2007, the Federal Circuit issued the mandate regarding its decision on the '303 patent.

After receipt of Pfizer's June 14 letter, FDA determined to remove the '303 patent from the Orange Book listing for Norvasc, consistent with FDA's ministerial role in patent listing, because there was no bar to its removal. FDA's role in patent listing and delisting is generally ministerial. The agency will defer to the NDA holder's judgment as to whether a patent must or must not be listed. *Apotex, Inc. v. Thompson*, 347 F.3d 1335 (Fed. Cir. 2003); *aaiPharma Inc. v. Thompson*, 296 F.3d 227 (4th Cir. 2003); *Alphapharm PTY Ltd. v. Thompson*, 330 F. Supp. 2d 1 (D.D.C. 2004). Exceptions to this ministerial approach are set out at 21 CFR 314.94(a)(12)(viii), which describes certain situations in which a patent will not be removed from the Orange Book. It provides that "[a] patent that is the subject of a lawsuit under § 314.107(c) shall not be removed from the list until FDA determines either that no delay in effective dates of approval is required under that section as a result of the lawsuit, that the patent has expired, or that any such

---

[1] Pfizer also requested that we remove the '303 patent from the Orange Book entry for NDA 21-540 for Caduet.

period of delay in effective dates of approval is ended."[2]  Mylan Labs was eligible for 180-day exclusivity for amlodipine tablets with respect to the '303 patent by virtue of having been the first ANDA applicant to submit a paragraph IV certification to that patent.  However, as FDA previously determined, and the federal district court for the District of Columbia upheld, Mylan's exclusivity with respect to that patent expired with the patent expiration on March 25, 2007. *Mylan v. Leavitt*, 484 F. Supp. 2d 109.  Therefore, under the express provisions of 21 CFR 314.94(a)(12)(viii), there is no bar to removal of the '303 patent from the Orange Book pursuant to Pfizer's request.[3]

As a result of this delisting, applicants with pending applications that reference Norvasc should amend their patent certification as described in 21 CFR 314.94(a)(12)(viii).  ANDAs referencing Norvasc will no longer contain certifications to the '303 patent.  Therefore, under 21 U.S.C. 355a, there is no pediatric exclusivity barrier to approval of ANDAs for amlodipine.  A threshold requirement for pediatric exclusivity associated with a patent is the existence of "a listed patent." 21 U.S.C. 355a(b)(2) and (c)(2).  When there is no listed patent, there is no patent to which pediatric exclusivity may attach.

If you have any questions, please contact Cecelia Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs, at 240-276-9310.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

cc: Pfizer, Inc.

---

[2] In a recent decision, a federal court of appeals determined that FDA also must leave a patent listed in the Orange Book, notwithstanding an NDA holder's request to delist, if an ANDA applicant is eligible for 180-day exclusivity because it submitted the first paragraph IV challenge to the patent, even if the first applicant is not sued as a result of the certification. *Ranbaxy v. Leavitt*, 469 F.3d 120 (D.C.Cir. 2006)  This extension of the bar against delisting is not relevant here, where Mylan was sued and, more importantly, where the patent has expired.

[3] The exception created by section 314.94(a)(12)(viii) applies, by its express terms (by reference to section 314.107(c)), to litigation over 180-day exclusivity, not to litigation over pediatric exclusivity.  In addition, because Pfizer, as the innovator company who submitted pediatric studies, is the entity Congress intended to benefit with the pediatric exclusivity award, Pfizer may waive pediatric exclusivity, and other ANDA applicants are not within the statutory zone of interest to challenge that waiver.

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

```
/s/
---------------------
Gary Buehler
6/22/2007 01:32:08 PM
```

# Exhibit B

*Declaration of Shannon M. Bloodworth
In Support of Plaintiffs' Emergency Application to Temporarily Restrain
the FDA from Approving any Additional Amlodipine ANDAs in
Derogation of Mylan's Right to 180-Day Market Exclusivity*

OCT-03-2005  11:34
FDA CDER OGD CHEMII



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

ANDA 76-418

[ OCT 2005 ]
RECEIVED

Food and Drug Administration
Rockville MD 20857

OCT  3 2005

Mylan Pharmaceuticals Inc.
Attention:  S. Wayne Talton
            Vice President, Regulatory Affairs
781 Chestnut Ridge Road
P.O. Box 4310
Morgantown, WV  26504-4310


Dear Sir:

This is in reference to your abbreviated new drug application
(ANDA) dated May 22, 2002, submitted pursuant to section 505(j)
of the Federal Food, Drug and Cosmetic Act (Act), for Amlodipine
Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base).

Reference is also made to your amendments dated October 2, 2002;
and January 6, April 1, August 1, and August 4, 2005.

We have completed the review of this ANDA and have concluded
that the drug is safe and effective for use as recommended in
the submitted labeling.  Accordingly, the ANDA is approved.  The
Division of Bioequivalence has determined your Amlodipine
Besylate Tablets 2.5 mg (base), 5 mg (base), and 10 mg (base),
to be bioequivalent and therefore, therapeutically equivalent to
the listed drug, Norvasc Tablets 2.5 mg (base), 5 mg (base), and
10 mg (base), respectively, of Pfizer, Inc. (Pfizer).  Your
dissolution testing should be incorporated into the stability
and quality control program using the same method proposed in
your application.

The listed drug product (RLD) referenced in your ANDA, Pfizer's
Norvasc® Tablets, is subject to periods of patent protection.
As noted in the agency's publication entitled <u>Approved Drug
Products with Therapeutic Equivalence Evaluations</u> (the "Orange
Book"), U.S. Patent Nos. 4,572,909 (the '909 patent) and
4,879,303 (the '303 patent) are scheduled to expire (with
pediatric exclusivity added) on January 31, 2007, and
September 25, 2007, respectively.

Your ANDA contains patent certifications under section 505(j)(2)(A)(vii)(IV) of the Act stating that both these patents are invalid, unenforceable, or will not be infringed by your manufacture, use, or sale of Amlodipine Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base), under this ANDA. Section 505(j)(5)(B)(iii) of the Act provides that approval of an ANDA shall be made effective immediately, unless an action is brought against Mylan Pharmaceuticals Inc. (Mylan) for infringement of either of the patents that were the subject of the paragraph IV certifications.  This action must have been brought against Mylan prior to the expiration of 45 days from the date the notice you provided under paragraph (2)(B)(i) was received by the NDA/patent holder(s).  You have notified the agency that Mylan complied with the requirements of section 505(j)(2)(B) of the Act, and that no action for infringement of the '909 patent or the '303 patent was brought against Mylan within the statutory 45-day period, which action would have resulted in a 30-month stay under section 505(j)(5)(B)(iii).[1]

With respect to 180-day generic drug exclusivity, we note that Mylan was the first ANDA applicant to submit a substantially complete ANDA with a paragraph IV certification for Amlodipine Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base). Therefore, with this approval, Mylan is eligible for 180-days of market exclusivity.  This exclusivity, which is provided for under section 505(j)(5)(8)(iv) of the Act,[2] will begin to run from the earlier of the commercial marketing or court decision dates identified in section 505(j)(5)(B)(iv).  Please submit correspondence to the ANDA informing the agency of the date the exclusivity begins to run.

Under section 506A of the Act, certain changes in the conditions described in this ANDA require an approved supplemental application before the change may be made.

---

[1] Because information on the '909 and '303 patents was submitted before August 18, 2003, this reference to section 505(j)(5)(B)(iii) of the Act is to that section of the Act as in effect prior to December 8, 2003, when the Medicare Prescription Drug, Improvement and Modernization Act (MMA)(Public Law 108-173) was enacted.  See MMA § 1101(c)(3).  The Agency is aware that Pfizer initiated patent litigation against Mylan shortly after expiration of the statutory 45-day period.

[2] Because your ANDA was filed before the date of enactment of the Medicare Prescription Drug, Improvement and Modernization Act (MMA)(Public Law 108-173) on December 8, 2003, this reference to the 180-day exclusivity provision is to the section of the Act as in effect prior to December 8, 2003.  See MMA § 1102(b)(1).

Post-marketing reporting requirements for this ANDA are set
forth in 21 CFR 314.80-81 and 314.98.  The Office of Generic
Drugs should be advised of any change in the marketing status of
this drug.

Promotional materials may be submitted to FDA for comment prior
to publication or dissemination.  Please note that these
submissions are voluntary.  If you desire comments on proposed
launch promotional materials with respect to compliance with
applicable regulatory requirements, we recommend you submit, in
draft or mock-up form, two copies of both the promotional
materials and package insert(s) directly to:

        Food and Drug Administration
        Center for Drug Evaluation and Research
        Division of Drug Marketing, Advertising, and Communications
        5901-B Ammendale Road
        Beltsville, MD 20705

We call your attention to 21 CFR 314.81(b)(3) which requires
that materials for any subsequent advertising or promotional
campaign be submitted to our Division of Drug Marketing,
Advertising, and Communications (HFD-40) with a completed Form
FDA 2253 at the time of their initial use.

                    Sincerely yours,

                    Gary Buehler
                    Director
                    Office of Generic Drugs
                    Center for Drug Evaluation and Research

# Exhibit C

*Declaration of Shannon M. Bloodworth*
*In Support of Plaintiffs' Emergency Application to Temporarily Restrain*
*the FDA from Approving any Additional Amlodipine ANDAs in*
*Derogation of Mylan's Right to 180-Day Market Exclusivity*

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

April 18, 2007

Dear ANDA Applicant/Holder for Amlodipine Besylate Tablets:

This letter addresses issues related to the timing of potential approvals of abbreviated new drug applications (ANDAs) that reference Norvasc tablets. This letter construes the provisions of the Drug Price Competition and Patent Term Restoration Act of 1984 (known as the Hatch-Waxman Amendments or Hatch-Waxman), codified at 21 U.S.C. §§ 355, 360cc, and 35 U.S.C. §§ 156, 271, 282, and does not necessarily apply to changes made in the Medicare Modernization Act (MMA) of 2003.[1]

As you are aware, Pfizer Inc. (Pfizer) manufactures and markets Norvasc, a besylate salt of amlodipine, indicated for the treatment of hypertension and angina. Pfizer had listed two patents with FDA, asserting that they claim Norvasc and would be infringed by the marketing of generic versions of the product. The later of these patents, Patent No. 4,879,303 ('303 patent), expired on March 25, 2007, so that these patents, by themselves, no longer bar the marketing of generic versions of Pfizer's product. Several companies have submitted ANDAs for approval to market generic versions of Norvasc. Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc. (Mylan) filed the first ANDA to market a generic version of Norvasc and had challenged Pfizer's patents by submitting the first "paragraph IV certifications" to those patents with its application. FDA approved Mylan's ANDA in October 2005, and Mylan began marketing its product on March 23, 2007. On or about the same day, Pfizer began marketing a generic version of Norvasc.

Pfizer and Mylan now contend that the approvals of the other ANDAs for amlodipine besylate are blocked by Pfizer's "pediatric exclusivity" until September 25, 2007. Mylan contends, alternatively, that the approvals of its competitors' ANDAs are blocked by Mylan's "180-day marketing exclusivity" until September 19, 2007.[2] Resolution of whether pending ANDAs referencing Norvasc are blocked either by Pfizer's pediatric exclusivity or Mylan's 180-day exclusivity involves a number of legal issues, some of first impression for the agency. Part of the analysis requires FDA to determine the effect of a recent Federal Circuit decision in patent litigation between Pfizer and Apotex Inc. (Apotex), another ANDA applicant for amlodipine besylate who filed a paragraph IV certification after Mylan had submitted its certification. On March 22, 2007, the Federal Circuit ruled that the three claims in the '303 patent that Pfizer asserted that Apotex infringed were invalid as obvious. *Pfizer Inc. v. Apotex, Inc.*, No. 2006-1261, 2007 U.S. App. LEXIS 6623 (March 22, 2007) (the *Apotex* decision).

---

[1]  The 1984 Hatch-Waxman provisions govern most issues related to ANDA approval for amlodipine besylate tablets. Although certain provisions of Hatch-Waxman have been superseded by changes made in the MMA, the 180-day exclusivity provisions of the MMA apply only to applications for which the first ANDA with a paragraph IV certification was filed after December 3, 2003. Mylan's ANDA was filed before December 3, 2003, and hence is governed by the pre-MMA provisions with respect to 180-day exclusivity.

[2]  Mylan has claimed in its submissions to FDA that its 180-day exclusivity commenced on March 23, 2007 and would expire on September 23, 2007. See Petition for Stay of Action, Docket 2006P-0116 (March 26, 2007) (http://www.fda.gov/ohrms/dockets/dockets/07p0116/07p-0116-psa0001-01-vol1.pdf). However, 180 days after March 23 is September 19.

2007N-0123                                                        LET 2

The questions presented by the pending applications and exclusivity claims include: (1) whether the *Apotex* decision is effective upon issuance of the opinion or upon issuance of the mandate, for purposes of determining the application of Pfizer's pediatric exclusivity; (2) upon the *Apotex* decision becoming effective, whether Pfizer's pediatric exclusivity bars approval of the Apotex ANDA; (3) upon the *Apotex* decision becoming effective, whether Pfizer's pediatric exclusivity bars approvals of the remaining ANDAs; and (4) whether Mylan's eligibility for 180-day exclusivity blocks approval of ANDAs after the expiration of Pfizer's patent. These questions are addressed in turn in the Discussion section below.

Regulatory Background

A. Patent Listing and Certification

The Hatch-Waxman Amendments permit the submission of ANDAs for approval of generic versions of approved drug products. 21 U.S.C. § 355(j). Under the procedure established in Hatch-Waxman, NDA sponsors are required to list patents that protect their approved drug substances, drug products, or approved methods of use, 21 U.S.C. § 355(b)(1); FDA publishes those patents in FDA's "Approved Drug Products With Therapeutic Equivalence Evaluations" (the Orange Book); and ANDA applicants are required to certify whether their proposed drug products infringe those listed patents. 21 U.S.C. § 355(j)(2)(A)(vii). As to each patent listed in the Orange Book for the listed drug referenced, an ANDA applicant can certify that 1) such patent information has not been filed (paragraph I certification); 2) the patent has expired (paragraph II certification); 3) the date the patent will expire (paragraph III certification); or 4) the patent is invalid or not infringed by the drug product proposed in the ANDA (paragraph IV certification). *Id.*

In the case of paragraph I and paragraph II certifications, the patent does not serve as a barrier to ANDA approval. A paragraph I or paragraph II certification permits immediate effective approval of the ANDA. 21 U.S.C. § 355(j)(5)(B)(i). If an applicant files a paragraph III certification, approval may be made effective when the patent expires. 21 U.S.C. § 355(j)(5)(B)(ii).

If an applicant seeks to challenge a listed patent and to obtain approval before the patent expires, it must provide a paragraph IV certification certifying that "in the opinion of the applicant and to the best of his knowledge" the patent is "invalid or will not be infringed by the manufacture, use or sale of the [drug described in the ANDA]." 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The applicant with a paragraph IV certification must notify the patent owner and NDA holder of its paragraph IV certification and of the basis of its belief that the patent is invalid or not infringed. 21 U.S.C. § 355(j)(2)(B). The filing of a paragraph IV certification "for a drug claimed in a patent or the use of which is claimed in a patent" is an act of infringement. 35 U.S.C. § 271(e)(2)(A). This enables the NDA holder and patent owner to sue the ANDA applicant. If the patent owner or NDA holder brings a patent infringement suit against the ANDA applicant within 45 days after receiving notice of the paragraph IV certification, the suit triggers an automatic stay of FDA approval for 30 months from the date the patent owner or NDA holder received notice of the certification ("30-month stay"). 21 U.S.C. § 355(j)(5)(B)(iii). If the patent owner or NDA holder does not bring suit within 45 days after it has received notice of the paragraph IV certification, the unexpired patent will not, by itself, bar FDA's approval of the ANDA, even if patent litigation is subsequently commenced outside the 45-day period and is ongoing at the time the requirements for approval are met. See *id.*

B. 180-Day Exclusivity

To provide an incentive for ANDA applicants to be the first to challenge a listed patent and remove patent barriers to approval, Congress provided that:

> [I]f the [ANDA] contains a [paragraph IV certification] and is for a drug for which a previous application has been submitted under this subsection . . . [containing] such a certification, the application shall be made effective not earlier than one hundred eighty days after
>
> (I)     the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or
> (II)    the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed, whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv)(2002).

Although this statutory provision is commonly characterized as granting "180-day exclusivity" to the first applicant to submit an ANDA containing a paragraph IV certification challenging a patent, the statute does not provide for that result directly. Instead, this end is accomplished by delaying the approval of subsequent ANDAs *containing a paragraph IV certification* until 180 days after the exclusivity period for the first ("previous") applicant has been triggered. If the first applicant's ANDA no longer contains a valid paragraph IV certification when it is ready for approval, the first applicant is not eligible for exclusivity. Similarly, when subsequent applicants' ANDAs do not contain paragraph IV certifications, their approval is not delayed under the plain language of this statutory provision.

C. Pediatric Exclusivity

The pediatric exclusivity statute, enacted as part of the Food and Drug Administration Modernization Act (FDAMA) and renewed in the Best Pharmaceuticals for Children Act (BPCA), provides an incentive for NDA sponsors to conduct pediatric studies that FDA has requested. Although this incentive for doing pediatric studies is commonly referred to as "pediatric exclusivity," a grant of pediatric exclusivity alone does not guarantee that an NDA will be free of generic competition while the exclusivity is in effect. Instead, as FDA has opined and the D.C. Circuit has affirmed, the applicability of pediatric exclusivity to prevent approval of a particular applicant's ANDA depends on the outcome of that applicant's patent challenges, if any.  See *Mylan Labs., Inc.* v. *Thompson*, 332 F. Supp. 2d 106 (D.D.C. 2004), *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004); *Ranbaxy Labs., Ltd.* v. *FDA*, 307 F. Supp. 2d 15 (D.D.C. 2004) *aff'd*, 2004 U.S. App. LEXIS 8311 (D.C. Cir. April 26, 2004).  Specifically, the statute states that if the approved product has completed the pediatric exclusivity requirements and is subject to

> (i)     "a listed patent for which a [paragraph II] certification has been submitted . . . the period during which an application may not be approved under [21 U.S.C. § 355(j)(5)(B)] shall be extended by a period of six months after the patent expires;"
> (ii)    "a listed patent for which a [paragraph III] certification has been submitted . . . the period during which an application may not be approved under [21 U.S.C. § 355(j)(5)(B)] shall be extended by a period of six months after the date the patent expires;"

3

    (iii)       "a listed patent for which a [paragraph IV] certification has been submitted . . . , and in the patent infringement litigation resulting from the certification the court determines that the patent is valid and would be infringed, the period during which an application may not be approved under [21 U.S.C. § 355(j)(5)(B)] shall be extended by a period of six months after the date the patent expires."

21 U.S.C. § 355a(c)(2)(A)-(B).

Factual Background

On July 31, 1992, FDA approved Pfizer's new drug application (NDA) for amlodipine besylate tablets, which Pfizer began marketing later that year under the brand name Norvasc. Pfizer listed two patents with respect to Norvasc: Patent 4,572,909 ('909 patent), originally due to expire on July 31, 2006, and the '303 patent, originally due to expire on March 25, 2007. Pfizer conducted pediatric studies requested by FDA and, on November 27, 2001, FDA granted Pfizer pediatric exclusivity for Norvasc pursuant to 21 U.S.C. § 355a. Pediatric exclusivity, by delaying approval of ANDAs for six months after the expiration date for a patent, had the potential to block approvals of ANDAs referencing Norvasc until January 31, 2007, with respect to the '909 patent, and until September 25, 2007, with respect to the '303 patent. Because this period with respect to the '909 patent has expired, that patent is no longer relevant to the issues discussed in this letter.

In May 2002, Mylan filed an ANDA for amlodipine besylate, and was the first to file a paragraph IV certification to the '303 patent pursuant to 21 U.S.C. § 355(j)(5)(B)(iv). Pfizer sued Mylan for patent infringement. *Pfizer Inc. v. Mylan Labs. Inc.*, No. 02-cv-1628 (W.D. Pa.). However, because Pfizer did not file its lawsuit within 45 days of receiving notice of Mylan's paragraph IV certification, the filing of the lawsuit did not result in the 30-month stay of approval pursuant to 21 U.S.C. § 355(j)(5)(B)(iii). In October 2005, FDA approved Mylan's ANDA.

In February 2007, the district court in the patent litigation between Mylan and Pfizer entered judgment for Pfizer that Mylan had infringed the '303 patent. *Pfizer Inc. v. Mylan Labs., Inc.*, No. 02-cv-1628, 2007 U.S. Dist. LEXIS 14417 (W.D. Pa. Feb. 27, 2007). On March 16, 2007, the district court amended the judgment and enjoined the approval of Mylan's ANDA until the '303 patent expired. *Id.*, 2007 U.S. Dist. LEXIS 18699 (Mar. 16, 2007).[3] Mylan appealed that judgment and sought a stay of the district court's injunction. The Federal Circuit granted the stay. *Pfizer Inc. v. Mylan Labs., Inc.*, No. 2007-1194 (Mar. 23, 2007). Mylan began marketing its product on March 23, 2007.

Apotex, Inc. (formerly Torpharm, Inc.) filed an ANDA for amlodipine besylate, which contained a paragraph IV certification to the '303 patent. On July 20, 2003, Pfizer sued Apotex for patent infringement. In January 2006, the district court held the patent was valid and infringed. *Pfizer, Inc.* v. *Apotex*, No. 03C 5289, 2006 U.S. Dist. LEXIS 95778 (N.D. Ill. January 29, 2006). The Federal Circuit reversed in the opinion noted above, finding that Apotex's amlodipine besylate

---

[3] When an NDA holder or patent owner sues the ANDA applicant and wins — that is, the court hearing the patent infringement litigation finds the patent valid and infringed -- the Patent Code provides that "the court shall order the effective date of any approval of the drug * * * involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed." 35 U.S.C. § 271(e)(4)(A).

tablets did not infringe claims 1-3 of the '303 patent because those claims were invalid for obviousness. See *Apotex* decision. The Federal Circuit did not address the validity of the remaining claims of the patent, presumably because those were not claims on which Pfizer had sued Apotex. On April 5, 2007, Pfizer filed a motion in the Federal Circuit, seeking a rehearing and/or rehearing en banc of the *Apotex* decision. This motion stayed issuance of the mandate pending its resolution under Rule 41(d)(1) of the Federal Rules of Appellate Procedure (FRAP).

At midnight on March 25, 2007, the '303 patent expired. Pfizer submitted a letter to FDA dated March 25, 2007, contending that approval of Apotex's ANDA was barred by Pfizer's pediatric exclusivity, at least until the Federal Circuit's mandate issues.

On March 26, 2007, Mylan submitted to FDA a Petition for Stay of Action requesting that the FDA refrain from taking any action to approve any ANDA for amlodipine besylate tables until Mylan's 180-day exclusivity expires. According to Mylan, the 180-day exclusivity for amlodipine besylate tablets had been triggered when it commenced marketing on March 23, and is due to expire on September 19, 2007. Also on March 26, Mylan sued FDA in the '303 District Court for the District of Columbia, alleging that it was entitled to 180-day exclusivity as to the '303 patent and requesting that the court enjoin FDA from approving additional ANDAs for amlodipine until the merits of its claim for 180-day exclusivity could be heard. *Mylan Labs., Inc.* v. *Leavitt*, CA No. 07-579 (RMU)(D.D.C.).

FDA determined that it was unprepared to immediately resolve all of the legal questions raised by the pending applications and exclusivity claims, and would benefit from soliciting the views and legal arguments of the interested parties. FDA informed the court that it proposed to seek comments to be submitted by April 4, 2007, and to issue its determination by April 11, 2007. The court memorialized FDA's proposal, and enjoined FDA from implementing any ANDA approval decisions, once made, until 5:00 PM on April 13, 2007 to allow the court to review FDA's decisions. *Mylan Labs.*, CA No. 07-579 (RMU), Order (March 26, 2007). FDA subsequently moved the court for an extension of time, until April 18, 2007, to issue its determination, which the court granted.

By letter dated March 28, 2007, FDA requested comments on five specific questions from Pfizer and the ANDA applicants for amlodipine besylate tablets. FDA created a docket for collecting the comments and posting them on the internet, and posted its letter requesting comments to give other interested parties an opportunity to comment on the questions FDA raised. (http://www.fda.gov/ohrms/dockets/dockets/07n0123/07n0123.htm) Several parties expressed a range of opinions on the questions FDA posed. *See id.* After receiving and considering submissions from interested parties, FDA reaches the following conclusions.

Discussion

1. For Purposes of Pediatric Exclusivity, the *Apotex* Decision Will Not be Effective until Issuance of the Mandate.

Under the language of the statute, pediatric exclusivity operates by delaying the approval of an ANDA for six months after a patent expires.[4] The operative subsection of the statute varies

---

[4] In this case, Mylan's ANDA is not blocked by Pfizer's pediatric exclusivity because its ANDA was already approved in October 2005, and therefore, under the literal terms of the statute, the ANDA's approval cannot be delayed. 21 U.S.C. § 355a(c)(2)(A)-(B). One commenter maintained that FDA should have converted the approval status of Mylan's ANDA to tentative approval after Mylan lost its patent litigation in the district court. See Comments of Synthon Pharmaceuticals, Inc. at 4. However,

according to the certification submitted by the ANDA applicant. When the ANDA applicant, such as Apotex, submits a paragraph IV certification, "if . . . in the patent litigation resulting from the certification the court determines that the patent is valid and would be infringed, the period during which an application may not be approved . . . shall be extended by a period of six months after the date the patent expires . . . ." *See* 21 U.S.C. § 355a(c)(2)(B). As discussed in greater detail below, FDA has previously opined, and concludes below, that this provision means that pediatric exclusivity does *not* apply when the ANDA applicant prevails in its patent challenge -- that the court determines that the patent is *in*valid or would *not* be infringed, and that construction has been acknowledged as appropriate by a court. Accordingly, this provision governs the application of pediatric exclusivity, at least with respect to Apotex.

In determining the effect of the *Apotex* decision on Pfizer's pediatric exclusivity claim, the first issue that FDA must resolve is to ascertain the meaning of the phrase "the court determines" for purposes of the statutory provision quoted above. Specifically, FDA must decide whether the Federal Circuit "determined" invalidity when it issued its opinion or will not "determine" validity or infringement until the mandate issues. Because the Court of Appeal's opinion is not effective until the mandate issues, Pfizer argues that the Federal Circuit will not have determined invalidity until that time. Apotex and others have asserted that the March 22, 2007 date of the issuance of the Federal Circuit opinion is the operative date.

FDA finds that the operative phrase -- "the court determines" -- is ambiguous as to the action it describes. Congress could have been more precise in indicating the action by the court to which it was referring, as it has done in other statutes. Compare, e.g., 26 U.S.C. § 7481(a) (finality is determined "upon mandate" issued by Court of Appeals or Supreme Court) with 21 U.S.C. § 355(j)(5)(B)(iii)(I)(aa)-(bb) (approval "shall be made effective on the date on which the court enters judgment reflecting the decision; or the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed."). Instead, it chose a phrase that, as the comments submitted to FDA reflect, is susceptible to more than one interpretation. On the one hand, the use of the present tense in the word "determines" could suggest that the issuance of the opinion itself is sufficient. Indeed, one dictionary definition of "determine" is "to come to a decision . . . as the result of investigation or reasoning." Webster's Third New International Dictionary (2002) at 616 (definition 1.c). Under this view, a court "determines" validity and infringement when it issues an initial ruling to that effect.

On the other hand, the choice of the word "determines" suggests the fixing or settling of rights and obligations. The dictionary definitions of "determine" include: "to fix conclusively or authoritatively," "to settle a question or controversy about," "to settle or decide by choice of alternatives or possibilities." *Id.* (definitions 1.a, 1.b, and 1.d.). See also Webster's II New Riverside University Dictionary (1994) at 369 ("[t]o end or decide by final, esp. judicial action") (definition 1.b). Under this view, where an appellate court is reversing the district court's judgment below, the parties' rights and obligations continue to be governed by the district court determination until the appellate court issues its mandate effectuating its judgment.

The Federal Rules of Appellate Procedure provide some additional guidance regarding which should be the relevant time frame for determining generally when the Federal Circuit's decision is effective. The rules themselves do not conclusively resolve the issue: FRAP 36 states that a judgment is entered when it is noted on the docket, while FRAP 41(c) states that the mandate is

---

before FDA took such action, the Federal Circuit stayed the district court injunction in that litigation. After that stay, FDA had no basis to convert the approval status of Mylan's ANDA from approved to tentatively approved.

effective when issued.  However, the 1998 advisory committee notes to FRAP 41(c) state that "[a] court of appeals judgment or order is not final until issuance of the mandate; at that time the parties' obligations become fixed."  These notes have been cited with approval by courts, *Mercer v. Duke Univ.*, 401 F.3d 199, 212 n.7 (4th Cir. 2005); *Stewart Park & Reserve Coalition Inc. v. Slater*, 374 F. Supp. 2d 243, 248 n.5 (N.D.N.Y. 2005); *United States v. Swan*, 327 F. Supp. 2d 1068, 1071-72 (D. Neb. 2004), and no commenters have cited any authority to FDA that would indicate that the advisory committee notes do not state the current rule regarding finality of appellate court decisions.[5]  Therefore, under these rules, until the mandate issues, the parties continued to be bound by the district court judgment.

In FDA's view, the phrase "the court determines" in section 355a(c)(2)(B), in the context of a federal court of appeals reversing a district court judgment, should be read as the date the mandate issues for several reasons.  When the district court decides a patent issue, FDA applies that decision, unless it is stayed, in determining issues related to ANDA approval.  The district court decision continues to control the rights of the parties  until the appellate court mandate issues.  Thus, the vital date under this scheme is when the rights of the parties become fixed by the decision of the court of appeals, that is, the date the mandate issues.  This understanding of the phrase "the court determines" is further supported by the dictionary definitions of "determine" that use the terms "fixing" and "settling," and by the practice under the FRAP, as reflected in the advisory committee notes and as accepted by courts.  Furthermore, as a matter of policy, FDA believes that the parties to paragraph IV litigation are best served by a rule that, consistent with the statutory language, errs on the side of greater finality.  Such a rule reduces the possibility that an appellate court opinion will be relied on and then overturned (through an adverse opinion after rehearing or rehearing en banc) in very short order.  Accordingly, FDA concludes that, in determining the applicability of pediatric exclusivity, this language requires FDA to await issuance of the mandate before giving effect to an appellate court opinion that would overturn a district court's ruling.

In this case, therefore, for purposes of determining the applicability of Pfizer's pediatric exclusivity, FDA will continue to be governed by the district court decision upholding the validity of the patent unless or until the mandate is issued, effectuating the appellate court's judgment.[6]  As a result, all of the unapproved ANDAs are currently blocked by Pfizer's pediatric exclusivity.  If the mandate does not issue before September 25, 2007, when the pediatric exclusivity expires, Pfizer and Mylan will have no additional competition during the interim period and thus will obtain the full benefit that could be derived under pediatric and 180-day marketing exclusivity.  In that event, the remaining issues discussed in this letter will be moot.  However, given the possibility that the mandate making the panel decision effective may issue before September 25, 2007, FDA will continue with its analysis.

---

[5] Several commenters have cited an FDA Guidance document issued in March 2000.  See, e.g., Mylan Comments at 2; Pfizer comments at 2.  FDA is not relying on this guidance document, however, because it relates to a different statutory provision, with different language, context, and purposes.

[6] In this case, the district court found patent validity and infringement and the appellate court opinion found invalidity.  Under these circumstances, FDA here declines to give effect to the appellate court's judgment of invalidity until the mandate issues and the patent and pediatric exclusivity attached to the patent block ANDA approvals in the interim.  We note, however, that the agency's position on this also suggests that, had the district court found invalidity and the appellate court reached the contrary conclusion of validity and infringement, the converse would also be true:  in spite of the appellate court opinion finding validity and infringement, ANDAs could be approved (or could retain their approvals) and neither the patent itself nor pediatric exclusivity would attach to that patent to block such approvals unless and until the mandate issued.

**2. Apotex will Cease to be Subject to Pfizer's Exclusivity if the Mandate Issues before September 25, 2007.**

This is the first time that FDA has been called upon to determine whether an ANDA applicant is subject to the innovator's pediatric exclusivity when the ANDA applicant has received a *favorable* court decision in its paragraph IV litigation but has not yet obtained final approval when the patent expires. The pediatric exclusivity provisions address several scenarios in terms of the status of the ANDA applications, but there are several scenarios that they fail to address, including this one.

The statute provides that, where the ANDA applicant submits paragraph IV certification, "if . . . in the patent litigation resulting from the certification the court determines that the patent is valid and would be infringed, the period during which an application may not be approved . . . shall be extended by a period of six months after the date the patent expires . . . ." *See* 21 U.S.C. § 355a(c)(2)(B). Based on this language, FDA determines that the converse must also be true - if in paragraph IV litigation a court determines that a patent is *invalid* or *not infringed*, pediatric exclusivity will not bar approval of that applicant's ANDA. This is the implicit meaning and logical interpretation of subsection 355a(c)(2)(B); otherwise, the qualification in that provision regarding the victory for the patent holder in the patent litigation would make no sense and would be superfluous, at least as to any ANDA that did not receive final approval before the patent expired. In addition, this outcome is consistent with the goals of the 180-day exclusivity statute which encourages patent challenges to remove barriers to approval. As noted, FDA had previously opined that this was the logical interpretation of 355a(c)(2)(B), although FDA was not directly applying that interpretation at that time. See *Mylan Labs., Inc.* v. *Thompson*, 332 F. Supp. 2d at 124 (D.D.C. 2004) ("As the FDA has correctly noted in its papers, § 355a(c)(2)(B) would apply 'where an ANDA applicant submits a paragraph IV certification, and prevails in the patent litigation.'")(dicta, citing Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction and Summary Judgment and In Support of Cross Motion for Summary Judgment at 38 (July 8, 2004)), *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004). FDA therefore concludes that, where an applicant has challenged a patent and has received a decision of invalidity or non-infringement, that applicant will not be subject to the NDA holder's pediatric exclusivity once that decision becomes effective.

FDA has previously been called upon to address other gaps in the pediatric exclusivity provisions. Specifically, the paragraph III and paragraph IV provisions are silent on the applicability of pediatric exclusivity to delay ANDA approvals where an ANDA applicant has a paragraph III or IV certification and has not received final approval at the time the patent expires. In determining the operation of the statute in those circumstances, FDA has relied on the broader certification scheme under Hatch-Waxman.

It has been FDA's longstanding view, that, when a patent expires before pending patent litigation is resolved, ANDA applicants who have not received final effective approval are required under Hatch-Waxman, to change their paragraph III and paragraph IV certifications to paragraph II certifications. Because, upon patent expiry, all ANDA applicants are presumed to have paragraph II certifications, the paragraph II provision of the pediatric exclusivity statute, 21 U.S.C. § 355a(c)(2)(A)(i), would control. The D.C. Circuit has upheld this approach in two recent decisions. See *Mylan Labs., Inc.* v. *Thompson*, 332 F. Supp. 2d 106, 124 (D.D.C. 2004), *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004); *Ranbaxy Labs., Ltd.* v. *FDA*, 307 F. Supp. 2d 15 (D.D.C. 2004) *aff'd*, 2004 U.S. App. LEXIS 8311 (D.C. Cir. April 26, 2004).

In considering these earlier determinations regarding the switch to paragraph II certifications with today's decision regarding the non-applicability of pediatric exclusivity to applicants who prevail in patent litigation, FDA determines as follows. When the '303 patent expired on March 25, 2007, all of the unapproved ANDAs were required to change (or deemed to have changed) to paragraph II certifications and became subject to Pfizer's pediatric exclusivity at that time. That is their status during the period before the mandate issues. However, FDA believes that the language of the statute manifests a clear Congressional intent that pediatric exclusivity not block the approval of an ANDA where the ANDA applicant has prevailed in the paragraph IV patent litigation and therefore creates an exception to the application of the Hatch-Waxman certification provisions. Thus, if and when the mandate finalizing the panel's March 22 decision issues in the *Apotex* case, Apotex's ANDA will not be blocked by Pfizer's pediatric exclusivity.

### 3. If the Mandate Issues Before the Expiration of Pediatric Exclusivity on September 25, 2007, ANDAs Other than Apotex May Not Be Eligible for Immediate Approval.

Although Apotex is the only ANDA applicant to have obtained a favorable decision on the merits against Pfizer in the amlodipine besylate patent litigation, several commenters maintain that all or some of the other ANDAs should not be blocked by Pfizer's pediatric exclusivity because of the *Apotex* decision. Some maintain that, once the patent is declared invalid, it should be presumed delisted from the Orange Book. See Medco Comments at 7. That would mean that no ANDA applicants would be required to maintain their certifications to that patent, and pediatric exclusivity, by its literal terms, would not bar any approvals.

Others maintain that, once a patent is found invalid in litigation against one party, the patent owner is collaterally estopped from asserting infringement claims based on that patent against additional defendants. See, e.g. *Blonder-Tongue Labs., Inc.* v. *University of Ill. Found.*, 402 U.S. 313, 350 (1971). They argue that, applying collateral estoppel, all applicants who submitted paragraph IV certifications should be considered victorious in their individual patent litigation against Pfizer. At that point, they continue, the analysis applied to Apotex's ANDA should be applied to them as well so that their ANDAs would not be blocked by pediatric exclusivity. This would mean, according to at least one commenter, that ANDAs containing paragraph IV certifications at the time of patent expiration would be eligible for approval, while those containing paragraph III certifications would be blocked. See Teva Comments at 11-13.

Other commenters noted, however, that the *Apotex* decision addressed only claims 1-3 of an 11 claim patent. These commenters assert that the patent should stay listed in the Orange Book because some of the claims have not been declared invalid. See Mylan Comments at 1-2; Daiichi Sankyo Inc. Comments at 2. Nevertheless, another commenter maintains that there are no viable claims remaining for these products once claims 1-3 are declared invalid. See Caraco Pharmaceutical Labs, Ltd. at 3.

Patents are required to be listed in FDA's Orange Book if they claim the approved drug substance, approved drug product, or an approved method of use. 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.53. If the remaining claims do not provide a basis on which to list the patent (i.e., do not claim the approved drug substance, drug product, or an approved method of use), the patent would no longer be eligible for listing in the Orange Book. In such a case, the patent must be withdrawn by Pfizer and any pediatric exclusivity that attached to the patent will no longer serve as a barrier to ANDA approval. If, on the other hand, one or more of the remaining claims claims the approved drug substance, approved drug product, or approved method of use, the patent can remain properly listed until the expiration of pediatric exclusivity. In such a case, the patent should remain in the Orange Book and the remaining unapproved ANDAs are potentially subject to Pfizer's pediatric exclusivity.

It is not clear to FDA, based on the current record, whether the remaining claims of the '303 patent would provide a valid basis to list the patent if claims 1-3 are invalid.  Moreover, FDA has long maintained that its has neither the expertise nor the resources to resolve patent issues and does not make independent determinations of the merits or applicability of patent claims.  59 Fed. Reg. 50338, 50342-43, 50345, 50349, 50352 (1994).  FDA's ministerial role in the listing process has been upheld.  *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1348-49 (Fed. Cir. 2003); *aaiPharma, Inc. v. Thompson*, 296 F.3d 227, 243 (4th Cir. 2002), *cert. denied*, 538 U.S. 923 (2003); *Alphapharm Pty Ltd. v. Thompson*, 330 F. Supp 2d 1, 7-8 (D.D.C. 2004).

Because FDA lacks both relevant information and expertise to resolve this issue based on the information before it, in the absence of further judicial or other action clarifying the status of the patent, FDA will assume the '303 patent remains validly listed.  If one or more of the remaining claims qualified the patent for listing as of the time the patent expired, all of the remaining ANDAs who had paragraph III and paragraph IV certifications at the time of patent expiry are required to maintain their paragraph II certifications.  As such, those ANDAs will be blocked by Pfizer's pediatric exclusivity.

4.  Mylan's Eligibility for 180-day Exclusivity Does Not Extend Beyond the Expiration of the Patent.

Mylan asserts that regardless of the applicability of pediatric exclusivity, all of the remaining ANDAs are subject to Mylan's 180-day exclusivity, which, if viable, would expire on September 19, 2007.  Most commenters assert that it is well settled that 180-day exclusivity does not extend beyond the expiration of the patent.  See, e.g., Apotex Comments at 8; Teva Comments at 6-7.  Although Mylan acknowledges FDA's longstanding position that 180-day exclusivity expires with the patent, Mylan urges FDA to change that position, at least in the circumstances here, where the 180-day exclusivity has been triggered and begun to run before the patent expires.

By the terms of the statute, when a listed patent expires, a paragraph IV certification is no longer accurate.  In these circumstances, the statute and FDA's regulations require ANDA applicants to change from a paragraph IV certification stating that the patent "is invalid or will not be infringed" to a paragraph II certification stating "that such patent has expired." 21 U.S.C. § 355(j)(2)(A)(vii)(II),(IV); 21 C.F.R. § 314.94(a)(12)(viii)(C) ("an applicant shall amend a submitted certification if, at any time before the effective date of the approval of the application, the applicant learns that the submitted certification is no longer accurate").  In cases where an applicant neglects to amend its certification to a paragraph II certification after a patent expires, FDA will treat it as having done so. This approach was upheld in *Dr. Reddy's Laboratories, Inc.* v. *Thompson*, 302 F. Supp. 2d 340 (D.N.J. 2003) and *Ranbaxy Labs., Ltd.* v. *FDA*, 307 F. Supp. 2d 15 (D.D.C. 2004) *aff'd*, 2004 U.S. App. LEXIS 8311 (D.C. Cir. April 26, 2004).

As noted above, applications with paragraph II certifications are eligible for immediate effective approval; the patent ceases to be a barrier to that approval upon its expiration. 21 U.S.C. § 355(j)(2)(A)(ii); 21 U.S.C. § 355(j)(5)(B)(i)(where an applicant files a paragraph II certification, approval of the applicant's ANDA "may be made effective immediately"); 21 C.F.R. § 314.94(a)(12)(viii).  Thus, consistent with the statutory language and purpose of 180-day exclusivity, FDA has consistently construed the statute to award 180-day exclusivity based upon paragraph IV certifications only to unexpired patents. See 59 Fed. Reg. 50338, 50348 (stating "a patent is deemed to be relevant [for exclusivity purposes] until the end of the term of the patent or applicable 180-day period, whichever occurs first").  Because only subsequent applicants with valid paragraph IV certifications are blocked by 180-day exclusivity, and

because paragraph IV certifications cease to be accurate once the patent expires, the patent and 180-day exclusivity based on a paragraph IV certification to that patent cease to prevent approval of subsequent ANDAs once the patent expires.[7] See *Ranbaxy Labs., Ltd.* v. *Leavitt,* 469 F.3d 120, 126 (D.C. Cir. 2006)("[T]he first generic applicant may no longer retain exclusivity when the patent has expired.").

This plain language reading of the statute effectuates the statutory goals. The 180-day exclusivity provisions were drafted to give ANDA applicants an incentive to be first to challenge a listed patent and remove that patent as a barrier to approval. Once a listed patent expires and is no longer a barrier to ANDA approval, there is no longer a need to provide an incentive to challenge it in court. Thus, an expired patent does not serve as the basis for a 180-day exclusivity award and 180-day exclusivity does not extend beyond the life of the patent.

Mylan has argued that 21 U.S.C. § 355a(k) compels the conclusion that 180-day exclusivity extends beyond the date the patent expires. See Mylan comments at 7-8. That section provides that:

> If [180-day exclusivity period] overlaps with a 6-month [pediatric exclusivity] period . . ., so that the applicant for approval of a drug under section 505(j) entitled to the 180-day period under that section loses a portion of the 180-day period to which the applicant is entitled for the drug, the 180-day period shall be extended from
>> (1) the date on which the 180-day period would have expired by the number of days of overlap, if the 180-day period would, but for application of this subsection, expire after the 6-month exclusivity period; or
>> (2) the date on which the 6-month exclusivity period expires, by the number of days of the overlap if the 180-day period would, but for application of this subsection, expire during the six-month exclusivity period.

21 U.S.C. § 355a(k). On its face, this section is inapplicable here because Mylan is approved and is not subject to Pfizer's pediatric exclusivity and, thus, there is no 180-day exclusivity to restore. No commenters appear to contend otherwise.

Instead, Mylan argues that, by providing, in circumstances not applicable here, that 180-day exclusivity will follow pediatric exclusivity, Congress must have been assuming that 180-day exclusivity survives patent expiration. See Mylan comments at 7-8. If Mylan were correct, then section 355a(k) would conflict with FDA's longstanding understanding of the Hatch-Waxman statutory provisions governing 180-day exclusivity, as discussed above, which FDA believes to be compelled by the plain language of the statute. Thus, Mylan is essentially arguing that section 355a(k) repealed part of the Hatch-Waxman 180-day exclusivity provisions.

For one federal statute to repeal another:

---

[7] We note that if Mylan were correct and 180-day exclusivity continued to block approvals of ANDAs with paragraph IV certifications after the patent expired (essentially ignoring the automatic switch of the certifications to paragraph II), 180-day exclusivity would block ANDAs containing paragraph IV certification but not those containing paragraph III certifications under the plain language of 21 U.S.C § 355(j)(5)(B)(iv). This would have the perverse effect of punishing applicants who took the risk of challenging a patent with a paragraph IV certification in order to remove a barrier to approval and to reward those applicants who sat back and waited for the patent to expire. This result is clearly inconsistent with the intent and logic of Hatch-Waxman. Thus, the fact that section 355(j)(5)(B)(iv) by its terms blocks only ANDAs containing paragraph IV certifications -- the only ANDA that can be approved before the expiration of an applicable patent -- indicates that Congress did not intend exclusivity to extend beyond patent expiration.

[T]he intention of the legislature to repeal must be clear and manifest. . . . In practical terms, this "cardinal rule" means that in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 189 (1978) (citations omitted).  The "irreconcilable conflict" required is a conflict

in the sense that there is a positive repugnancy between [the two statutes] or that they cannot mutually coexist.  It is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem.

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (emphasis added).  Here, there is no evidence that Congress ever affirmatively indicated that it intended to repeal or change the operation of the 180-day exclusivity provision in enacting section 355a(k).

Nor can Mylan show that the 180-day provisions in Hatch-Waxman and section 355a(k) are irreconcilable because it is possible to construe them in a way that they can mutually coexist.  By its terms, section 355a(k) only addresses the curtailment of exclusivity to which the applicant is otherwise "entitled."  As explained above, under Hatch-Waxman, the applicant is not entitled to exclusivity after the patent expires.  That means, in reconciling the statutes, that the application of section 355a(k) is limited to the situation where there is more than one patent and the two exclusivity periods are each attached to different patents.  Thus, one patent may expire, and pediatric exclusivity would start to run, but the ANDA applicant could still be eligible for 180-day exclusivity on a later patent that had not yet expired.  If that 180-day exclusivity period were triggered by a court decision on the later patent, it would be running at the same time the ANDA was blocked from approval by the pediatric exclusivity on the earlier patent.

Indeed, the legislative history demonstrates that Congress intended to address this narrow situation by adding 21 U.S.C. § 355a(k) to restore the exclusivity to which the ANDA applicant was entitled but which otherwise would have been lost because the pediatric exclusivity on another patent blocked final effective approval:

The amendment gives the filer of an [ANDA] who challenges a patent no more and no less time to market his drug exclusively before subsequent [ANDAs] for the drug may be approved then it would have received but for the intervening period of pediatric exclusivity.
For example, the committee understands that there may be instances in which 2 patents on a drug are challenged in an [ANDA], and that, in subsequent litigation, a court holds the first patent to expire to be valid and infringed, and the second patent to expire to be invalid.  If the section [355(b)(1), 21 U.S.C.] drug is granted a period of pediatric exclusivity with respect to the first patent, and if the court decision, which triggers the beginning of ANDA exclusivity, falls 60 days before that period of pediatric exclusivity begins (that is, 60 days before the first patent will expire), the ANDA exclusivity will overlap with the pediatric exclusivity for 120 days.  In the absence of the pediatric exclusivity, the holder of the [ANDA] would enjoy at most 120 days to market its drug before a subsequent [ANDA] for the drug could be approved. But for the amendment, because of pediatric exclusivity, the holder of the [ANDA] would enjoy no ANDA exclusivity, because

12

the first 120 days of the pediatric exclusivity period would run over the last 120 days of its ANDA exclusivity period.

S. Rep. No. 107-79, at 6-7 (2001); see also *id.* at 14 ("[Section 9 of BPCA] specifies that, when the pediatric exclusivity period for a drug overlaps with a period of ANDA exclusivity for the drug, the period of ANDA exclusivity is extended by an amount necessary to ensure that the holder of ANDA exclusivity enjoys the same possibility of exclusive commercial marketing as that the holder would have enjoyed in the absence of pediatric exclusivity, no more and no less."). This language confirms both that Congress intended only the limited application of section 355a(k) and that this section can be construed consistently with the Hatch-Waxman exclusivity provisions. Thus, "[b]ecause the statutes are not irreconcilable and there is no convincing evidence that the later act was intended as a substitute, . . . . a repeal by implication did not occur." *United States v. Williams*, 216 F.3d 1099, 1102 (D.C. Cir. 2000).

Furthermore, the statute also does not distinguish, as Mylan proposes, between situations in which 180-day exclusivity has been awarded and triggered at the time of patent expiry and cases in which it has not. See Mylan Comments at 12-14. Although Mylan correctly notes that the obligation to update a patent certification only applies before the effective date of approval, *id.* at 14; Mylan's Petition for Stay at 3, and thus approved applications (such as Mylan's) have no continuing obligation to update their patent certifications, this does not mean that 180-day exclusivity for an approved application extends beyond the date the patent expires. On the contrary, if all of the remaining unapproved applications change to a paragraph II certification when the patent expires, as they are required to do, they will no longer be applications containing paragraph IV certifications that are blocked by the previous application containing a paragraph IV certification. This is the case regardless of whether Mylan's application, which has been approved, is also required to change its certification. As a result, because all unapproved applications must change to a paragraph II certification when the patent expires, and applications with paragraph II certifications are not blocked by 180-day exclusivity, for all intents and purposes, Mylan's 180-day exclusivity will terminate with the expiration of the patent regardless of the fact that Mylan itself is no longer obligated to change its certification upon patent expiry.

Conclusion

In sum, FDA has concluded:

- All of the unapproved ANDAs are currently blocked by Pfizer's pediatric exclusivity.
- If and when the mandate effectuating the panel's March 22 decision issues in the *Apotex* case, Apotex's ANDA will not be blocked by Pfizer's pediatric exclusivity.
- FDA cannot determine on the current record whether other ANDAs will continue to be blocked by pediatric exclusivity at that time.
- Mylan's 180-day marketing exclusivity terminated when the patent expired.

If you have any questions regarding this letter please contact Cecelia Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs at 240-276-9319

Sincerely,

Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research
Food and Drug Administration

cc: Pfizer Inc.

# Exhibit D

*Declaration of Shannon M. Bloodworth*
*In Support of Plaintiffs' Emergency Application to Temporarily Restrain*
*the FDA from Approving any Additional Amlodipine ANDAs in*
*Derogation of Mylan's Right to 180-Day Market Exclusivity*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| PFIZER INC., | ) | |
| | ) | No. 03C 5289 |
| Plaintiff and Counterclaim | ) | |
| Defendant, | ) | |
| | ) | The Honorable James M. Rosenbaum |
| v. | ) | |
| | ) | |
| APOTEX INC., f/k/a TORPHARM, INC., | ) | |
| | ) | |
| Defendant and Counterclaim | ) | |
| Plaintiff. | ) | |

**FINAL JUDGMENT**

This action having come to trial before the Court, Honorable James M. Rosenbaum,

Chief Judge, United States District Court for the District of Minnesota, presiding; the issues

having been heard and a decision having been rendered on January 18, 2006;

**IT IS ORDERED AND ADJUDGED** this ___ day of January, 2006, for the reasons set

forth in the Court's decision read into the record on January 18, 2006, that Judgment shall be

entered in favor of plaintiff Pfizer Inc. ("Pfizer") and against defendant Apotex Inc., f/k/a

Torpharm, Inc. ("Apotex") on Pfizer's claims that Apotex has infringed claims 1-3 of United

States Patent No. 4,879,303 (the"'303 patent"); and it is further,

**ORDERED AND ADJUDGED** that Judgment shall be entered in favor of Pfizer and

against Apotex on all counterclaims alleging, and seeking declarations of noninfringement,

invalidity, or unenforceability of the '303 patent, and it is further,

31209505.WPD

**ORDERED** that pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any approval

of Apotex's Abbreviated New Drug Application No. 76-719 shall be a date which is not earlier

than the date of expiration of the '303 patent (March 25, 2007, with attached six months of

pediatric exclusivity ending on September 25, 2007, to which Pfizer is entitled); and it is further,

**ORDERED** that pursuant to 35 U.S.C. § 271(e)(4)(B), Apotex, its officers, agents,

servants, employees and attorneys, and those persons in active concert or participation with it are

enjoined until the date of expiration of the '303 patent (March 25, 2007, with attached six

months of pediatric exclusiviity ending on September 25, 2007, to which Pfizer is enttitled) from

engaging in the manufacture, use, offer to sell, or sale within the United States, or importation

into the United States, of any product comprising amlodipine besylate covered by, or the use of

which is covered by claims 1-3 of the '303 patent.

_____

United States District Judge

31209505.WPD                                              2

# Exhibit E

*Declaration of Shannon M. Bloodworth*
*In Support of Plaintiffs' Emergency Application to Temporarily Restrain*
*the FDA from Approving any Additional Amlodipine ANDAs in*
*Derogation of Mylan's Right to 180-Day Market Exclusivity*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MYLAN LABORATORIES INC. AND MYLAN
PHARMACEUTICALS INC.,

     *Plaintiffs,*

and

MUTUAL PHARMACEUTICAL CO.,

     *Intervenor-Plaintiff*

  v.

MICHAEL O. LEAVITT, et al.,

     *Defendants, Cross-Defendants,*

and

TEVA PHARMACEUTICALS USA, INC.,

     *Intervenor-Defendant,*

and

APOTEX INC.,

     *Intervenor-Defendant,Cross claimant*

Civil Action No. 07-579 (RMU)

Judge Ricardo M. Urbina

## NOTICE OF APPEAL

Notice is hereby given this the 14th day of May 2007, that Apotex Inc. appeals to the United States Court of Appeals for the District of Columbia Circuit from the April 30, 2007 Memorandum Opinion and Order denying its motion for preliminary injunction and the May 14, 2007 Order denying its motion for reconsideration, and all orders now appealable as of right..

     Respectfully submitted,

May 14, 2007                 /s/Arthur Y. Tsien
                         Arthur Y. Tsien, Bar No. 411579

OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, DC 20036-2220
(202) 789-1212
(202) 234-3550 (fax)

A. Sidney Katz
Robert B. Breisblatt
Steven E. Feldman
WELSH & KATZ, LTD.
120 South Riverside Plaza, 22nd Floor
Chicago, Illinois 60661
(312) 655-1500
(312) 655-1501 (fax)

Counsel for Apotex Inc.

# Exhibit F

*Declaration of Shannon M. Bloodworth*
*In Support of Plaintiffs' Emergency Application to Temporarily Restrain*
*the FDA from Approving any Additional Amlodipine ANDAs in*
*Derogation of Mylan's Right to 180-Day Market Exclusivity*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PFIZER, INC., | ) |
| | ) |
| Plaintiff and | ) |
| Counterclaim Defendant, | ) |
| | ) |
| v. | )    02:  02cv1628 |
| MYLAN LABORATORIES, INC. and | ) |
| MYLAN PHARMACEUTICALS, INC., | ) |
| | ) |
| | ) |
| Defendants and | ) |
| Counterclaim Plaintiffs. | ) |

## JUDGMENT

AND NOW, this 27th day of February, 2007, it is hereby ORDERED, ADJUDGED AND

DECREED that judgment is entered in favor of Pfizer, Inc. and against Mylan Laboratories, Inc.

and Mylan Pharmaceuticals, Inc.


BY THE COURT:


s/ Terrence F. McVerry
United States District Court Judge

cc:    All Counsel of Record

# Exhibit G

*Declaration of Shannon M. Bloodworth*
*In Support of Plaintiffs' Emergency Application to Temporarily Restrain*
*the FDA from Approving any Additional Amlodipine ANDAs in*
*Derogation of Mylan's Right to 180-Day Market Exclusivity*

NOTE: This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-1194

PFIZER INC.,

Plaintiff-Appellee,

v.

MYLAN LABORATORIES, INC. and MYLAN PHARMACEUTICALS, INC.,

Defendants-Appellants.

ON MOTION

Before BRYSON, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and PROST, Circuit Judge.

PROST, Circuit Judge.

### O R D E R

Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc. (Mylan) move for a stay, pending appeal, of the amended judgment of the United States District Court for the Western District of Pennsylvania that ordered that the effective date of any approval of Mylan's abbreviated new drug application shall be a date not earlier than the date of expiration of the patent. Pfizer Inc. opposes. Mylan replies. Mylan also moves for leave to "append" to its motion certain news articles that are not part of the district court record. The parties also submit responses to the court's March 23, 2007 order. Pfizer moves to lift the court's temporary stay of the district court's judgment and order.

To obtain a stay, pending appeal, a movant must establish a strong likelihood of success on the merits or, failing that, nonetheless demonstrate a substantial case on the merits provided that the harm factors militate in its favor. Hilton v. Braunskill, 481 U.S.

770, 778 (1987). In deciding whether to grant a stay, pending appeal, this court "assesses the movant's chances of success on the merits and weighs the equities as they affect the parties and the public." E. I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 835 F.2d 277, 278 (Fed. Cir. 1987). See also Standard Havens Prods. v. Gencor Indus., 897 F.2d 511 (Fed. Cir. 1990).

Upon consideration thereof,

IT IS ORDERED THAT:

(1)   Mylan's motion for a stay, pending appeal, is granted.

(2)   Mylan's motion for leave to append is denied.

(3)   Pfizer's motion to lift the temporary stay is denied.

FOR THE COURT

MAR 2 6 2007
_____
Date

cc:   Richard G. Greco, Esq.
      David J. Harth, Esq.

s8

_____
Sharon Prost
Circuit Judge

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

MAR 2 6 2007

JAN HORBALY
CLERK

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

717 MADISON PLACE, N.W.
WASHINGTON, D.C. 20439

JAN HORBALY
CLERK

TELEPHONE: (202) 633-6550
FAX: (202) 633-9623



## FAX MATERIAL COVER SHEET

TO: DAVID J. HARTH

FROM: CLERK'S OFFICE

This is page 1 of __3__ pages being transmitted.

Day sent: MARCH 26, 2007

Message/Instructions:

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
FOR QUESTIONS, CALL (202) 633-6550
FOR RETURN FAX, DIAL (202) 633-9623
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# Exhibit H

*Declaration of Shannon M. Bloodworth*
*In Support of Plaintiffs' Emergency Application to Temporarily Restrain*
*the FDA from Approving any Additional Amlodipine ANDAs in*
*Derogation of Mylan's Right to 180-Day Market Exclusivity*



## MYLAN PHARMACEUTICALS INC

781 Chestnut Ridge Road • P.O. Box 4310 • Morgantown, West Virginia 26504-4310 U.S.A. • (304) 599-2595

March 23, 2007

### GENERAL CORRESPONDENCE

Office of Generic Drugs, CDER, FDA
Gary J. Buehler, Director
Document Control Room
Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773

      RE:    AMLODIPINE BESYLATE TABLETS, 2.5MG, 5MG AND 10MG
               ANDA 76-418
               Notification of Commencement of Commercial Marketing

Dear Mr. Buehler:

Reference is made to the Abbreviated New Drug Application (ANDA) identified above and to the Agency's letter dated October 3, 2005 notifying us that our application was approved. The October 3rd approval letter requested that Mylan submit correspondence stating the date our 180 days of market exclusivity begins to run since Mylan was the first ANDA applicant to submit a substantially complete ANDA containing a paragraph IV certification. A copy of the October 3, 2005 approval letter is provided in Attachment A for your reference.

The purpose of this correspondence is to provide FDA with notification that Mylan commenced commercial marketing of Amlodipine Beyslate Tablets, 2.5mg, 5mg and 10mg on March 23, 2007. We are also requesting that FDA's 'Orange Book' be updated accordingly.

This amendment is submitted in duplicate. Should you require additional information or have any questions regarding this amendment, please contact the undersigned at (304) 599-2595, ext. 6551 or via facsimile at (304) 285-6407.

Sincerely,

*S. Wayne Talton*

S. Wayne Talton
Vice President
Regulatory Affairs

SWT/dn

Enclosures

Desk Copy:    Mr. Martin Shimer, Branch Chief
                      Regulatory Support

| Department—Fax Numbers | | Information Systems | (304) 285-6404 | Purchasing | (304) 598-5401 |
|---|---|---|---|---|---|
| Accounting \\project\ANDA\AMLODIPINE-BESYLATE\General Correspondence-032307.doc | | Legal Services | (800) 848-0463 | Quality Assurance | (304) 598-5407 |
| Administration | (304) 599-7284 | Legal Services | (304) 598-5408 | Quality Control | (304) 598-5409 |
| Business Development | (304) 598-5419 | Maintenance & Engineering | (304) 598-5411 | Regulatory Affairs | (304) 285-6407 |
| Corporate Services | (304) 285-6482 | Medical Unit | (304) 598-5445 | Research & Development | (304) 285-6419 |
| Human Resources | (304) 598-5406 | Product Development | (304) 285-6411 | Sales & Marketing | (304) 598-3232 |

MYLAN PHARMACEUTICALS INC.

**SIGNED FORM FDA 356h**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

## APPLICATION TO MARKET A NEW DRUG, BIOLOGIC, OR AN ANTIBIOTIC DRUG FOR HUMAN USE
(Title 21, Code of Federal Regulations, Parts 314 & 601)

*Form Approved: OMB No. 0910-0430*
*Expiration Date: April 30, 2009*
*See OMB Statement on page 2.*

**FOR FDA USE ONLY**

APPLICATION NUMBER

### APPLICANT INFORMATION

| | |
|---|---|
| NAME OF APPLICANT<br>**MYLAN PHARMACEUTICALS INC.** | DATE OF SUBMISSION<br>**March 23, 2007** |
| TELEPHONE NO. *(include Area Code)*<br>**(304) 599-2595** | FACSIMILE *(FAX)* Number *(include Area Code)*<br>**(304) 285-6407** |
| APPLICANT ADDRESS *(Number, Street, City, State, Country, ZIP Code or Mail Code, and U.S. License number if previously issued)*:<br>**781 Chestnut Ridge Road**<br>**P.O. Box 4310**<br>**Morgantown, WV  26504-4310** | AUTHORIZED U.S. AGENT NAME & ADDRESS *(Number, Street, State, ZIP Code, telephone & FAX number)* IF APPLICABLE<br><br>**N/A** |

### PRODUCT DESCRIPTION

| | |
|---|---|
| NEW DRUG OR ANTIBIOTIC APPLICATION NUMBER, OR BIOLOGICS LICENSE APPLICATION NUMBER *(if previously issued)*     **76-418** | |
| ESTABLISHED NAME *(e.g., Proper name, USP/USAN name)*<br>**Amlodipine Besylate Tablets** | PROPRIETARY NAME *(trade name)* IF ANY<br>**N/A** |
| CHEMICAL/BIOCHEMICAL/BLOOD PRODUCT NAME *(if any)*<br>**(R.S.) 3-ethyl 5-methyl-2-(2-aminoethoxymethyl)-4-(2-chlorophenyl)-1,4-dihydro - 6-methyl-3,5-pyridinedicarboxylate benzenesulphonate** | CODE NAME *(if any)*<br>**N/A** |

| DOSAGE FORM:<br>**Tablets** | STRENGTHS:<br>**2.5mg, 5mg and 10mg** | ROUTE OF ADMINISTRATION:<br>**Oral** |
|---|---|---|

(PROPOSED) INDICATION(S) FOR USE:

> **Indicated for the treatment of hypertension, chronic stable angina and the treatment of confirmed or suspected vasospastic angina.**

### APPLICATION DESCRIPTION

APPLICATION TYPE
*(check one)*     ☐ NEW DRUG APPLICATION (CDA, 21 CFR 314.50)   ☒ ABBREVIATED NEW DRUG APPLICATION (ANDA, 21 CFR 314.94)

☐ BIOLOGICS LICENSE APPLICATION (BLA, 21 CFR Part 601)

IF AN NDA, IDENTIFY THE APPROPRIATE TYPE     ☐ 505 (b)(1)     ☐ 505 (b)(2)

IF AN ANDA, OR 505(b)(2), IDENTIFY THE REFERENCE LISTED DRUG PRODUCT THAT IS THE BASIS FOR THE SUBMISSION
Name of Drug   **Norvasc®**     Holder of Approved Application     **Pfizer**

TYPE OF SUBMISSION *(check one)*   ☐ ORIGINAL APPLICATION     ☐ AMENDMENT TO A PENDING APPLICATION     ☐ RESUBMISSION

☐ PRESUBMISSION     ☐ ANNUAL REPORT     ☐ ESTABLISHMENT DESCRIPTION SUPPLEMENT     ☐ EFFICACY SUPPLEMENT

☐ LABELING SUPPLEMENT     ☐ CHEMISTRY MANUFACTURING AND CONTROLS SUPPLEMENT     ☒ OTHER

IF A SUBMISSION OF PARTIAL APPLICATION, PROVIDE LETTER DATE OF AGREEMENT TO PARTIAL SUBMISSION: _____

IF A SUPPLEMENT, IDENTIFY THE APPROPRIATE CATEGORY     ☐ CBE     ☐ CBE-30     ☐ Prior Approval (PA)

REASON FOR SUBMISSION
**Notification of Commencement of Commercial Marketing**

PROPOSED MARKETING STATUS *(check one)*   ☒ PRESCRIPTION PRODUCT (Rx)     ☐ OVER THE COUNTER PRODUCT (OTC)

NUMBER OF VOLUMES SUBMITTED _____**1**_____   THIS APPLICATION IS   ☐ PAPER   ☐ PAPER AND ELECTRONIC   ☐ ELECTRONIC

ESTABLISHMENT INFORMATION (Full establishment information should be provided in the body of the Application.)
Provide locations of all manufacturing, packaging and control sites for drug substance and drug product (continuation sheets may be used if necessary). Include name, address, contact, telephone number, registration number (CFN), DMF number, and manufacturing steps and/or type of testing (e.g. Final dosage form, Stability testing) conducted at the site. Please indicate whether the site is ready for inspection or, if not, when it will be ready.

**N/A**

Cross References (list related License Applications, INDs, NDAs, PMAs, 510(k)s, IDEs, BMFs, and DMFs referenced in the current application)

**N/A**

| | This application contains the following items: *(Check all that apply)* |
|---|---|
| ☐ | 1. Index |
| ☐ | 2. Labeling *(check one)*    ☐ Draft Labeling    ☐ Final Printed Labeling |
| ☐ | 3. Summary (21 CFR 314.50 (c)) |
| ☐ | 4. Chemistry section |
| ☐ | A.    Chemistry, manufacturing, and controls information (e.g., 21 CFR 314.50(d)(1); 21 CFR 601.2) |
| ☐ | B.    Samples (21 CFR 314.50 (e)(1); 21 CFR 601.2 (a)) (Submit only upon FDA's request) |
| ☐ | C.    Methods validation package (e.g., 21 CFR 314.50(e)(2)(i); 21 CFR 601.2) |
| ☐ | 5. Nonclinical pharmacology and toxicology section (e.g., 21 CFR 314.50(d)(2); 21 CFR 601.2) |
| ☐ | 6. Human pharmacokinetics and bioavailability section (e.g., 21 CFR 314.50(d)(3); 21 CFR 601.2) |
| ☐ | 7. Clinical Microbiology (e.g., 21 CFR 314.50(d)(4)) |
| ☐ | 8. Clinical data section (e.g., 21 CFR 314.50(d)(5); 21 CFR 601.2) |
| ☐ | 9. Safety update report (e.g., 21 CFR 314.50(d)(5)(vi)(b); 21 CFR 601.2) |
| ☐ | 10. Statistical section (e.g., 21 CFR 314.50(d)(6); 21 CFR 601.2) |
| ☐ | 11. Case report tabulations (e.g., 21 CFR 314.50(f)(1); 21 CFR 601.2) |
| ☐ | 12. Case report forms (e.g., 21 CFR 314.50 (f)(2); 21 CFR 601.2) |
| ☐ | 13. Patent information on any patent which claims the drug (21 U.S.C. 355(b) or (c)) |
| ☐ | 14. A patent certification with respect to any patent which claims the drug (21 U.S.C. 355 (b)(2) or (j)(2)(A)) |
| ☐ | 15. Establishment description (21 CFR Part 600, if applicable) |
| ☐ | 16. Debarment certification (FD&C Act 306 (k)(1)) |
| ☐ | 17. Field copy certification (21 CFR 314.50 (l)(3)) |
| ☐ | 18. User Fee Cover Sheet (Form FDA 3397) |
| ☐ | 19. Financial Information (21 CFR Part 54) |
| ☒ | 20. OTHER *(Specify)*    **Notification of Commencement of Commercial Marketing** |

**CERTIFICATION**

I agree to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling. I agree to submit safety update reports as provided for by regulation or as requested by FDA. If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to the following:

    1. Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, Parts 606, and/or 820.
    2. Biological establishment standards in 21 CFR Part 600.
    3. Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809.
    4. In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202.
    5. Regulations on making changes in application in FD&C Act section 506A, 21 CFR 314.71, 314.72, 314.97, 314.99, and 601.12.
    6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.80, and 600.81.
    7. Local, state and Federal environmental impact laws.

If this application applies to a drug product that FDA has proposed for scheduling under the Controlled Substances Act, I agree not to market the product until the Drug Enforcement Administration makes a final scheduling decision.
The data and information in this submission have been reviewed and, to the best of my knowledge are certified to be true and accurate.
**Warning:** A willfully false statement is a criminal offense, U.S. Code, title 18, section 1001.

| SIGNATURE OF RESPONSIBLE OFFICIAL OR AGENT | TYPED NAME AND TITLE | DATE: |
|---|---|---|
| *S. Wayne Talton* | **S. Wayne Talton**<br>**Vice President**<br>**Regulatory Affairs** | **March 23, 2007** |

| ADDRESS *(Street, City, State, and ZIP Code)* | Telephone Number |
|---|---|
| **781 Chestnut Ridge Road, P.O. Box 4310, Morgantown, WV  26504-4310** | **(304) 599-2595** |

Public reporting burden for this collection of information is estimated to average 24 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

Department of Health and Human Services
Food and Drug Administration
Center for Drug Evaluation and Research
Central Document Room
5901-B Ammendale Road
Beltsville, MD 20705-1266

Department of Health and Human Services
Food and Drug Administration
Center for Biologics Evaluation and Research (HFM-99)
1401 Rockville Pike
Rockville, MD 20852-1448

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

MYLAN PHARMACEUTICALS INC.

**AMLODIPINE BESYLATE TABLETS, 2.5MG, 5MG AND 10MG**

**ATTACHMENT A**

**APPROVAL LETTER DATED OCTOBER 3, 2005**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

ANDA 76-418



Food and Drug Administration
Rockville MD 20857

OCT . 3 2005

Mylan Pharmaceuticals Inc.
Attention:  S. Wayne Talton
            Vice President, Regulatory Affairs
781 Chestnut Ridge Road
P.O. Box 4310
Morgantown, WV  26504-4310

Dear Sir:

This is in reference to your abbreviated new drug application
(ANDA) dated May 22, 2002, submitted pursuant to section 505(j)
of the Federal Food, Drug and Cosmetic Act (Act), for Amlodipine
Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base).

Reference is also made to your amendments dated October 2, 2002;
and January 6, April 1, August 1, and August 4, 2005.

We have completed the review of this ANDA and have concluded
that the drug is safe and effective for use as recommended in
the submitted labeling.  Accordingly, the ANDA is approved.  The
Division of Bioequivalence has determined your Amlodipine
Besylate Tablets 2.5 mg (base), 5 mg (base), and 10 mg (base),
to be bioequivalent and therefore, therapeutically equivalent to
the listed drug, Norvasc Tablets 2.5 mg (base), 5 mg (base), and
10 mg (base), respectively, of Pfizer, Inc. (Pfizer).  Your
dissolution testing should be incorporated into the stability
and quality control program using the same method proposed in
your application.

The listed drug product (RLD) referenced in your ANDA, Pfizer's
Norvasc® Tablets, is subject to periods of patent protection.
As noted in the agency's publication entitled Approved Drug
Products with Therapeutic Equivalence Evaluations (the "Orange
Book"), U.S. Patent Nos. 4,572,909 (the '909 patent) and
4,879,303 (the '303 patent) are scheduled to expire (with
pediatric exclusivity added) on January 31, 2007, and
September 25, 2007, respectively.

Your ANDA contains patent certifications under section 505(j)(2)(A)(vii)(IV) of the Act stating that both these patents are invalid, unenforceable, or will not be infringed by your manufacture, use, or sale of Amlodipine Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base), under this ANDA. Section 505(j)(5)(B)(iii) of the Act provides that approval of an ANDA shall be made effective immediately, unless an action is brought against Mylan Pharmaceuticals Inc. (Mylan) for infringement of either of the patents that were the subject of the paragraph IV certifications. This action must have been brought against Mylan prior to the expiration of 45 days from the date the notice you provided under paragraph (2)(B)(i) was received by the NDA/patent holder(s). You have notified the agency that Mylan complied with the requirements of section 505(j)(2)(B) of the Act, and that no action for infringement of the '909 patent or the '303 patent was brought against Mylan within the statutory 45-day period, which action would have resulted in a 30-month stay under section 505(j)(5)(B)(iii).[1]

With respect to 180-day generic drug exclusivity, we note that Mylan was the first ANDA applicant to submit a substantially complete ANDA with a paragraph IV certification for Amlodipine Besylate Tablets, 2.5 mg (base), 5 mg (base) and 10 mg (base). Therefore, with this approval, Mylan is eligible for 180-days of market exclusivity. This exclusivity, which is provided for under section 505(j)(5)(8)(iv) of the Act,[2] will begin to run from the earlier of the commercial marketing or court decision dates identified in section 505(j)(5)(B)(iv). Please submit correspondence to the ANDA informing the agency of the date the exclusivity begins to run.

Under section 506A of the Act, certain changes in the conditions described in this ANDA require an approved supplemental application before the change may be made.

---

[1] Because information on the '909 and '303 patents was submitted before August 18, 2003, this reference to section 505(j)(5)(B)(iii) of the Act is to that section of the Act as in effect prior to December 8, 2003, when the Medicare Prescription Drug, Improvement and Modernization Act (MMA)(Public Law 108-173) was enacted. See MMA § 1101(c)(3). The Agency is aware that Pfizer initiated patent litigation against Mylan shortly after expiration of the statutory 45-day period.

[2] Because your ANDA was filed before the date of enactment of the Medicare Prescription Drug, Improvement and Modernization Act (MMA)(Public Law 108-173) on December 8, 2003, this reference to the 180-day exclusivity provision is to the section of the Act as in effect prior to December 8, 2003. See MMA § 1102(b)(1).

Post-marketing reporting requirements for this ANDA are set forth in 21 CFR 314.80-81 and 314.98. The Office of Generic Drugs should be advised of any change in the marketing status of this drug.

Promotional materials may be submitted to FDA for comment prior to publication or dissemination. Please note that these submissions are voluntary. If you desire comments on proposed launch promotional materials with respect to compliance with applicable regulatory requirements, we recommend you submit, in draft or mock-up form, two copies of both the promotional materials and package insert(s) directly to:

    Food and Drug Administration
    Center for Drug Evaluation and Research
    Division of Drug Marketing, Advertising, and Communications
    5901-B Ammendale Road
    Beltsville, MD 20705

We call your attention to 21 CFR 314.81(b)(3) which requires that materials for any subsequent advertising or promotional campaign be submitted to our Division of Drug Marketing, Advertising, and Communications (HFD-40) with a completed Form FDA 2253 at the time of their initial use.

        Sincerely yours,

        Gary Buehler
        Director
        Office of Generic Drugs
        Center for Drug Evaluation and Research

# Exhibit I

*Declaration of Shannon M. Bloodworth*
*In Support of Plaintiffs' Emergency Application to Temporarily Restrain*
*the FDA from Approving any Additional Amlodipine ANDAs in*
*Derogation of Mylan's Right to 180-Day Market Exclusivity*

# United States Court of Appeals for the Federal Circuit

2006-1261

PFIZER, INC.,

Plaintiff-Appellee,

v.

APOTEX, INC. (formerly known as TorPharm, Inc.)

Defendant-Appellant.

Richard G. Greco, Kay Scholer LLP, of New York, New York, filed a combined petition for rehearing and rehearing en banc for plaintiff-appellee. With him on the petition were Milton Sherman, and David O. Bickart.

A. Sidney Katz, Welsh & Katz, Ltd., of Chicago, Illinois, filed a response for defendant-appellant. With him on the response were, Robert B. Breisblatt, Steven E. Feldman and Philip D. Segrest, Jr..

Carter G. Phillips, Sidley Austin LLP, of Washington, DC, filed an amici curiae brief for SmithKline Beecham Corporation (d/b/a/ GlaxoSmithKline) and Eli Lilly and Company. With him on the brief were Jeffrey P. Kushan and Peter S. Choi. Also on the brief were David T. Pritikin, John W. Treece and Constantine L. Trela, Jr., of Chicago, Illinois. Of counsel on the brief were James J. Kelley and Paul J. Gaylo, Eli Lilly and Company, of Indianapolis, Indiana; and Sherry M. Knowles, GlaxoSmithKline, of King of Prussia, Pennsylvania.

Charles E. Lipsey, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, filed an amicus curiae brief for the Biotechnology Industry Organization. With him on the brief were Howard W. Levine and Scott J. Popma. Of counsel on the brief were Hans Sauer, Biotechnology Industry Organization, of Washington, DC; and Brian P. Barrett, Eli Lilly and Company, of Indianapolis, Indiana.

Christopher N. Sipes, Covington & Burling LLP, of Washington, DC, filed an amicus curiae brief for the Pharmaceutical Research and Manufacturers of America. With him on the brief were Richard L. Rainey and Scott C. Weidenfeller.

E. Anthony Figg, Rothwell Figg Ernst & Manbeck, of Washington, DC, filed an amicus curiae brief for Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc. With him on the brief were Steven Lieberman and Minaksi Bhatt.

William L. Mentlik, Lerner, David, Littenberg, Krumholz & Mentlik, LLP, of Westfield, New Jersey, filed an amicus curiae brief for the Generic Pharmaceutical Association. With him on the brief were Roy H. Wepner and Michael H. Teschner.

Appealed from:  United States District Court for the Northern District of Illinois

Chief Judge James M. Rosenbaum

# United States Court of Appeals for the Federal Circuit

2006-1261

PFIZER, INC.,

Plaintiff-Appellee,

v.

APOTEX, INC. (formerly known as TorPharm, Inc.)

Defendant-Appellant.

Before MICHEL, <u>Chief Judge</u>, NEWMAN, MAYER, LOURIE, RADER, SCHALL, BRYSON, GAJARSA, LINN, DYK, PROST, and MOORE, <u>Circuit Judges</u>.

<u>ORDER</u>

The Appellee, Pfizer, Inc. filed a combined petition for panel rehearing and rehearing en banc, and a response thereto was invited by the court and filed by the Appellant, Apotex, Inc. The petition for rehearing was referred to the panel that heard the appeal, and thereafter the petition for rehearing en banc and response were referred to the circuit judges who are authorized to request a poll whether to rehear the appeal en banc. A poll was requested, taken, and failed.

Apotex, Inc. moves for expedited denial of rehearing and rehearing en banc, and for expedited issuance of the mandate.  Pfizer, Inc. opposes.

Upon consideration thereof,

IT IS ORDERED THAT:

(1)  The petition for rehearing and rehearing en banc is denied.

(2)  The motion for expedited denial of rehearing and rehearing en banc is denied as moot.

(3)  The motion for expedited issuance of the mandate is granted.

NEWMAN, LOURIE, and RADER, <u>Circuit Judges</u>, would rehear the appeal en banc.

NEWMAN, <u>Circuit Judge</u>, dissents in the denial of the petition for rehearing en banc in a separate opinion.

LOURIE, <u>Circuit Judge</u>, dissents in the denial of the petition for rehearing en banc in a separate opinion.

RADER, <u>Circuit Judge</u>, dissents in the denial of the petition for rehearing en banc in a separate opinion.

FOR THE COURT

<u> May 21, 2007 </u>
Date

<u> s/Jan Horbaly    </u>
Jan Horbaly
Clerk

cc:   Richard G. Greco, Esq.
      Robert B. Breisblatt, Esq.
      Charles E. Lipsey, Esq.
      James J. Kelley, Esq.
      Christopher N. Sipes, Esq.
      Carter G. Phillips, Esq.
      William L. Mentlik, Esq.
      E. Anthony Figg, Esq.

ISSUED AS A MANDATE :  <u>MAY 21, 2007</u>

# United States Court of Appeals for the Federal Circuit

2006-1261

PFIZER, INC.,

Plaintiff-Appellee,

v.

APOTEX, INC. (formerly known as TorPharm, Inc.),

Defendant-Appellant.

NEWMAN, Circuit Judge, dissenting from the denial of rehearing *en banc*.

The court has not accepted the suggestion that this case be reviewed *en banc*, and the panel was unpersuaded by the argument that the decision is incorrect when the law of precedent is applied. I write separately because the panel's statement of the applicable law and its application to the facts of this case are inconsistent with the court's precedent. Our obligation as an appellate court is to assure that the law is both correctly stated and correctly applied. When inconsistency is raised by the panel's treatment, our obligation is to assure that conflicts with precedent -- whether real or apparent -- are resolved, as well as to assure that the law is correctly applied. From the court's denial of rehearing *en banc*, I respectfully dissent.

The ruling in this case has important policy as well as legal implications, as the many amici curiae point out, each side stressing a different aspect of the effect on commercial

activity in the pharmaceutical field.  Both sides acknowledge that the effects of chemical changes on properties of medicinal products is not predictable; the difference residing in the panel's acceptance of the long-discredited "obvious to try" standard, on which the panel superimposes the theory that the skill of these inventors guided them to trial of the besylate salt (despite the prior art's preference for the maleate salt), thereby negating patentability. The panel's application of the obvious-to-try standard is in direct  conflict with precedent; it has long been the law that "patentability shall not be negated by the manner in which the invention is made."  35 U.S.C. §103.  In <u>Gillette Co. v. S.C. Johnson & Son, Inc.</u>, 919 F.2d 720, 725 (Fed. Cir. 1990) this court stated that "we have consistently held that 'obvious to try' is not to be equated with obviousness."  In <u>In re Tomlinson</u>, 363 F.2d 928, 931 (CCPA 1966) the court explained that "there is usually an element of 'obviousness to try' in any research endeavor, that . . . is not undertaken with complete blindness but rather with some semblance of a chance of success."   The amici curiae representing research pharmaceutical industries in this petition point out that methodical experimentation is fundamental to scientific advance, and particularly for biological and medicinal products, where small change can produce large differences.  At the trial there was no contradiction to the testimony of Pfizer's expert witness Dr. Anderson that "one of ordinary skill in the art could neither draw any conclusions nor have any expectations about the properties of amlodipine besylate from the properties of a besylate salt of a different compound."  Pfizer Br. at 7.  Indeed, the parties stipulated this scientific fact.

Nor was there any evidence contradicting Pfizer's position that "the superior properties at issue were not some abstract concept of 'good' properties, but specific properties which solved both the sticking and instability problems of the prior art, while providing non-hygroscopicity and good solubility. . . .  Trade-offs in salt properties are the

2006-1261                    2

rule, and one of skill must usually accept some undesirable properties to achieve other desirable ones.  Amlodipine besylate, unlike any other amlodipine salt, presented no trade-offs."  Id.  The panel further erred in declining to give weight to these acknowledged "secondary considerations" of unexpected results.  See Richardson-Vicks, Inc. v. Upjohn Co.,122 F.3d 1483 (Fed. Cir. 1997) (evidence of unexpected results must be considered); Ruiz v. AB Chance Co., 234  F.3d 654, 667 (Fed. Cir. 2000) ("Our precedents clearly hold that secondary considerations, when present, must be considered in determining obviousness.")

The panel decision changes the criteria as well as the analysis of patentability, with results of particular significance for their effect on the conduct of R&D, the costs of drug development, and the balance between generic access to established products and the incentive to development of new products.  The amici curiae on both sides of the issue stress different policy considerations:  the pharmaceutical research companies point out that diminished access to patenting will affect the kind and direction of product development; the generic producers point out that the sooner they can enter the market for established drugs, the lower the consumer price.  The placement of the balance in this ever-present conflict between innovator and copier has long engaged the public and Congress, and needs must continue to do so.  Meanwhile, however, it is inappropriate for a panel of this court to make a change in the precedent by which both sides of the debate have heretofore been bound.

Stability of precedent and the uniform application of correct law to achieve the correct result are the assignment of the Federal Circuit, for our rulings are of nation-wide effect.  A primary purpose for which our court was formed was to provide the judicial stability that supports commercial investment -- this was a unique judicial  role, and was

adopted in recognition of the dependence of technology-based industry on an effective patent system.  It was recognized that a nationally uniform, consistent, and correct patent law is an essential foundation of technological innovation, which is today the dominant contributor to the nation's economy.  See the Report of the Domestic Policy Review of Industrial Innovation, Department of Commerce 1979 (stressing the need for judicial administration of correct and uniform patent law).  In enacting the implementing statute, Congress explained:

> The purpose [of establishment of the Federal Circuit] is to resolve some of the myriad structural administrative and procedural problems that have impaired the ability of our Federal courts to deal with the vast range of controversies among our citizens and to respond promptly and meaningfully to their demands for justice . . . which include the inability of our present system to provide a prompt, definitive answer to legal questions of nationwide significance . . .

S. Comm. on the Judiciary, Federal Courts Improvement Act of 1981, S. Rep. No. 97-275, at 1 (1981).

When conflicts arise between panel decisions of the Federal Circuit the ensuing uncertainty is of national scope, contravening the purpose of establishing this court.  This adds weight to our obligation to undertake *en banc* review, both to reestablish consistency in the law and to correct errors in panel decisions.  In 1998, in a letter to the Commission on Structural Alternatives for the Federal Courts of Appeals, Justice Scalia wrote:

> [T]he function of en banc hearings . . . is not only to eliminate intra-circuit conflicts, but also to correct and deter panel opinions that are pretty clearly wrong . . . . The disproportionate segment of [the Supreme Court's] discretionary docket that is consistently devoted to reviewing [a regional court of appeals'] judgments, and to reversing them by lop-sided margins, suggests that this error-reduction function is not being performed effectively.

Letter dated Aug. 21, 1998, Hearing before the S. Subcomm. on Administrative Oversight and the Courts of the S. Comm. on the Judiciary, 106th Cong. 72 (1999).

2006-1261                                    4

Justice O'Connor wrote in similar vein:

> It is important to the federal system as a whole that the Courts of Appeals utilize en banc review to correct panel errors within the circuit that are likely to otherwise come before the Supreme Court.

Letter dated June 23, 1998, id. at 71.

For the Federal Circuit, it was intended and expected that this court would provide uniform national law in all of the fields assigned to our exclusive jurisdiction; not only in patent law. Our cases are rarely factually simple, and when there arise apparently divergent panel statements of the law and its application, the responsibility for *en banc* review looms large. The goal of judging is "full, equal and exact" enforcement of the law. See Roscoe Pound, "The Etiquette of Justice," 3 Proceedings Neb. St. Bar Assn. 231 (1909) ("full, equal and exact enforcement of substantive law is the end" of the judicial process). Through the system of *en banc* review, courts can remedy panel lapses, if indeed this decision represents such a lapse, or uniformly adopt panel advances in the law, if indeed this decision represents such an advance. From the court's decision to decline this review, I must, respectfully, dissent.

# United States Court of Appeals for the Federal Circuit

2006-1261

PFIZER, INC.,

Plaintiff-Appellee,

v.

APOTEX, INC. (formerly known as TorPharm, Inc.),

Defendant-Appellant.

LOURIE, Circuit Judge, dissenting from the denial of rehearing en banc.

I respectfully dissent from the court's decision not to rehear this case en banc.  At bottom, I consider that the decision of the panel was incorrect.  But, we do not rehear appeals simply because a non-panel member disagrees with its result.  See Amgen Inc. v. Hoechst Marion Roussel, Inc., 469 F.3d 1039, 1043 (Fed. Cir. 2006) (Lourie, J., concurring) ("I do not believe that every error by a panel is enbancable.  A panel is entitled to err without the full court descending upon it.").  Federal Rule of Appellate Procedure 35(a) provides that "[a]n en banc hearing or rehearing is not favored and ordinarily will not be ordered unless: (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance."  Our Internal Operating Procedures ("IOPs") state that "[a]mong the reasons for en banc actions are:  (1) necessity of securing or maintaining uniformity of decision; (2) involvement of a question of exceptional importance; (3) necessity of overruling a prior holding of this or a predecessor court expressed in an

opinion having precedential status; or (4) the initiation, continuation, or resolution of a conflict with another circuit." IOP 13(2).

However, consistent with those established criteria for taking a case en banc, I consider that the panel erred in its legal determinations, and that those errors will confuse the law relating to rebuttal of a prima facie case of obviousness of a chemical compound. Thus, an en banc hearing is warranted in this case in order to maintain uniformity of the court's decisions and because it presents questions of exceptional importance.

The panel reversed the district court's decision that claims relating to amlodipine besylate (the active ingredient in the hypertension drug Norvasc®) were valid and nonobvious after a bench trial. Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348 (Fed. Cir. 2007). In my view, several legal errors were made in this decision, and improper deference was given to fact-findings of the district court.

First, the panel failed to defer to fact-findings made by the district court that were not clearly erroneous regarding the unexpected properties of amlodipine besylate. Evidence in the record, including trial testimony of experts and Pfizer scientists, internal research and development documents, and a scientific article, supported the district court's finding that "the besylate salt clearly and unexpectedly exhibited a superior combination of properties when compared to what was suggested in the preferred preparation." District Court Oral Op. Tr. at 23:13-15; see Pet. for Reh'g en banc at 5-6. The panel disregarded that express finding of fact, holding that "Pfizer has simply failed to prove that the results are unexpected." Pfizer, 480 F.3d at 1371. Moreover, relying on the testimony of both parties' experts, the district court found that there was no

reasonable expectation of success with regard to using the besylate salt form of amlodipine. District Court Oral Op. Tr. at 23:1-9. However, rather than give deference to the district court's fact-findings, the panel substituted its own finding that a reasonable expectation of success existed in the art. See Pfizer, 480 F.3d at 1361, 1364-65 ("The record also satisfies us that, contrary to the district court's finding, a reasonable fact-finder could only conclude that the skilled artisan would have had a reasonable expectation of success with the besylate salt form of amlodipine."). Much public discussion has occurred, and even judicial comments in opinions, that we should defer to district court judges concerning certain aspects of claim construction, which we have held is a matter of law. Be that as it may, it is undisputed that we must defer to fact-findings by a district court, unless they are clearly erroneous, and I do not believe that they were here.

In addition, the panel improperly placed greater importance on the therapeutic value of a claimed compound over the value of its physical properties. The panel concluded that the improvement of the invention, which related to drug formulation, viz., increased stability and decreased stickiness, was "insufficient" to meet the standards of patentability. Id. at 1368 (emphases added) ("[W]e hold that the optimization of the acid addition salt formulation for an active pharmaceutical ingredient would have been obvious where as here the acid addition salt formulation has no effect on the therapeutic effectiveness of the active ingredient and the prior art heavily suggests the particular anion used to form the salt."). I read that conclusion as improperly requiring a compound to possess a specific type of improvement over the prior art—in this case, improved therapeutic properties—to be patentable, negating other important properties,

a conclusion that is not compelled by our case law and not sound. Any useful and unexpected property should be eligible to overcome a prima facie obviousness determination. See In re Papesch, 315 F.2d 381, 391 (CCPA 1963) ("From the standpoint of patent law, a compound and all of its properties are inseparable; they are one and the same thing. . . . There is no basis in law for ignoring any property in making such a comparison.").

Third, the panel also found that the invention was the result of routine experimentation, and therefore was not patentable. See Pfizer, 480 F.3d at 1367 (emphases added) (stating that the "type of experiments used by Pfizer's scientists to verify the physicochemical characteristics of each salt are not equivalent to the trial and error procedures often employed to discover a new compound where the prior art gave no motivation or suggestion to make the new compound nor a reasonable expectation of success"). That conclusion conflicts with the statutory requirement that "[p]atentability shall not be negatived by the manner in which the invention was made." 35 U.S.C. § 103(a). Moreover, the conclusion contradicts the district court's supported findings that the results were unexpected, and that the experiments led to showing the totality of the properties of the invention, see Papesch, 315 F.2d 381, which makes the compound nonobvious, not merely to the verification of results.

In addition, holding an inventor's expectations of success against the objective unexpectedness of the properties of the compound unfairly suggests that an inventor should try only that which he doubts will work. See Pfizer, 480 F.3d at 1371 ("Dr. Wells' testimony reflects the fact that he believed that amlodipine besylate would solve the

problems of amlodipine maleate."). Inventors generally are optimistic about what they choose to experiment with, but that does not necessarily suggest obviousness.

These issues are of exceptional importance. Chemical and pharmaceutical compounds often can be found to be prima facie obvious, as they are based on prior work that could reasonably suggest them, see KSR Int'l Co. v. Teleflex Inc., --- S.Ct. ---, 2007 WL 1237837 (Apr. 30, 2007), but commercialization of such compounds may depend on their possession of unexpected properties. Such properties may be biological or physical. A failure to recognize all such properties that may be relevant to the value of such a compound may doom the compound to being poured down the drain rather than becoming an important therapeutic. The general public, innovative companies, and, ultimately, generic companies, depend upon faithful adherence to this principle. In addition, our cases hold that unexpected properties make for non-obviousness, see Papesch, 315 F.2d 381, and this decision disdains such properties if they are not biological. That is a conflict with our precedent that needs resolution.

Not least, the question of deference to district courts, at least on fact issues, needs reaffirming. We must not shy away from reversing fact-findings that truly are clearly erroneous, as we do encounter them from time to time, but this case does not present them.

Thus, I would rehear this case, and I dissent from the court's determination not to do so.

# United States Court of Appeals for the Federal Circuit

2006-1261

PFIZER, INC.,

Plaintiff-Appellee,

v.

APOTEX, INC. (formerly known as TorPharm, Inc.),

Defendant-Appellant.

RADER, Circuit Judge, dissenting from the denial of rehearing *en banc*.

I respectfully dissent from the decision to deny rehearing.

In this case, the trial court made the factual determination that the besylate salt form of amlodipine had unexpected superior properties over the closest prior art. Accordingly, the underlying patent ('303) was valid and nonobvious. Three separate district courts held trials involving the '303 patent. Indeed, each of those three different district court judges came to the same factual conclusion regarding the nonobviousness of amlodipine besylate. Because the factual determinations in the case below were not clearly erroneous, this court should have deferred to the district court's factual findings.

As the testimony indicated, the properties of new pharmaceutical salt forms are entirely unpredictable. Even the Berge reference on which the panel relied clearly states: "Unfortunately there is no reliable way of predicting the influence of a particular salt species on the behavior of the parent compound." The district court agreed and

made the factual determination that the superior properties of amlodipine besylate over the prior art (increased stability and decreased stickiness) were indeed unexpected – a finding that deserved deference.

Furthermore 'obvious to try' jurisprudence has a very limited application in cases of this nature. With unpredictable pharmaceutical inventions, this court more wisely employs a reasonable expectation of success analysis. In this case, salt selection is unpredictable, thus rebutting, as most other courts found, any reasonable expectation of success. Although the panel gives "lip service" to the principle that 'obvious to try' does not work in this field, it nonetheless appears to be the basis for its decision in this case. In addition, the panel discerned a reasonable expectation of success by giving undue emphasis to the inventor's subjective hopes for the outcome of his experiments.

The panel also mistakenly determined that the superior properties of the besylate did not overcome a prima facie case of obviousness because they showed no superior *therapeutic value*—the maleate salt form of amlodipine worked just as well as the besylate form in clinical trials. Therapeutic value, however, is just one property of a pharmaceutical. Other properties, such as solubility, stability, hygroscopicity, and processability, must also play a role in the analysis of advantages. The superior properties of the besylate salt form of amlodipine, overcame the stability and stickiness problems that existed with the maleate salt form and created a superior formulation. Although the maleate salt form was also therapeutically effective, the besylate form was still a significant improvement because it overcame the stability and processing problems that could have prevented successful commercial marketing.

2006-1261

2

The panel also found that amlodipine besylate was not patentable since it was made by a routine testing or a "well known problem solving strategy."  This clearly violates the statutory mandate that "patentability shall not be negatived by manner in which the invention was made."  35 U.S.C. 103(a).  Many if not most pharmaceutical inventions are discovered through a routine screening protocol or through an established trial and error process.  Pharmaceutical inventions discovered by these routine screening methods include not only new formulations and salt forms, but also include the active pharmaceutical compounds themselves.  Thus, this decision calls into question countless pharmaceutical patents, which in turn could have a profoundly negative effect on investments into the design and development of new life-saving pharmaceuticals.  With many questions about this case, I would have reheard it en banc.

2006-1261

3

# Exhibit J

*Declaration of Shannon M. Bloodworth*
*In Support of Plaintiffs' Emergency Application to Temporarily Restrain*
*the FDA from Approving any Additional Amlodipine ANDAs in*
*Derogation of Mylan's Right to 180-Day Market Exclusivity*



**U.S. Food and Drug Administration**

CENTER FOR DRUG EVALUATION AND RESEARCH

FAQ | Instructions | Glossary | Contact Us | CDER Home

Department of Health and Human Services

**Drugs@FDA**
FDA Approved Drug Products

Start Over    Back to Search Results

## Overview

**Drug Name**    AMLODIPINE BESYLATE

**Active Ingredient(s)**    • AMLODIPINE BESYLATE

**Form(s) and Strength(s) Available**    • TABLET; ORAL: 10MG; 2.5MG; 5MG; EQ 10MG BASE; EQ 2.5MG BASE; EQ 5MG BASE

Details about drugs are organized by FDA Application Number (NDA or ANDA or BLA).

## Click on a drug name or application number to view drug details:
Click on a column header to re-sort the table:

| Drug Name and FDA Application Number | Dosage Form/Route | Strength | Marketing Status | Company |
|---|---|---|---|---|
| AMLODIPINE BESYLATE (ANDA # 076418) | TABLET; ORAL | Multiple Strengths | Prescription | MYLAN |
| AMLODIPINE BESYLATE (ANDA # 076692) | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | DR REDDYS LABS LTD |
| AMLODIPINE BESYLATE (ANDA # 076719) | TABLET; ORAL | Multiple Strengths | Prescription | APOTEX |
| AMLODIPINE BESYLATE (ANDA # 076846) | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | TEVA PHARMS |

| | | | |
|---|---|---|---|
| **AMLODIPINE BESYLATE (ANDA # 077073)** | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | WATSON LABS |
| **AMLODIPINE BESYLATE (ANDA # 077262)** | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | ROXANE |
| **AMLODIPINE BESYLATE (ANDA # 077333)** | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | GEDEON RICHTER USA |
| **AMLODIPINE BESYLATE (ANDA # 077362)** | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | GENPHARM |
| **AMLODIPINE BESYLATE (ANDA # 077516)** | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | KALI LABS |
| **AMLODIPINE BESYLATE (ANDA # 077974)** | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | RANBAXY |
| **AMLODIPINE BESYLATE (ANDA # 078224)** | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | MATRIX LABS |
| **AMLODIPINE BESYLATE (ANDA # 078226)** | TABLET; ORAL | Multiple Strengths | None (Tentative Approval) | ZYDUS PHARMS USA |

**Back to Top | Back to Previous Page | Back to Drugs@FDA Home**

Disclaimer
CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA/Center for Drug Evaluation and Research
Office of Training and Communications
Division of Information Services
Update Frequency: Daily

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

MYLAN LABORATORIES INC. and )
MYLAN PHARMACEUTICALS INC., )
)
    Plaintiffs, )
)
and )
)
MUTUAL PHARMACEUTICAL CO., INC., )
)
    Intervenor-Plaintiff, )
)
   v. )
)
MICHAEL O. LEAVITT, )
in his official capacity as )  Civil Action No.  07-cv-579 (RMU)
SECRETARY OF HEALTH AND )
HUMAN SERVICES, )
)
ANDREW C. VON ESCHENBACH, M.D., )
in his official capacity as )
COMMISSIONER OF FOOD AND DRUGS, )
)
and )
)
UNITED STATES FOOD AND DRUG )
ADMINISTRATION, *et al.*, )
)
    Defendants, )
)
and )
)
TEVA PHARMACEUTICALS USA, INC., )
)
and )
)
APOTEX INC., )
)
    Intervenor-Defendants. )
_____

**[PROPOSED] ORDER**

This matter is before the Court on the emergency application of Plaintiffs, Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc. (collectively "Mylan"), for a temporary restraining order to enjoin the FDA defendants from taking any action to issue an approval of any Abbreviated New Drug Application for amlodipine besylate products in derogation of Mylan's right to 180-day exclusivity until the issue is finally decided on appeal.

Having considered those application papers, Mylan's  application  is GRANTED and defendants are hereby enjoined and prohibited from taking any action to issue an approval of any Abbreviated New Drug Application for amlodipine besylate products in derogation of Mylan's right to 180-day exclusivity until further order of this Court.

Signed this _____ day of _____, 2007.


_____
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| MYLAN LABORATORIES INC. and MYLAN PHARMACEUTICALS INC., | ) ) ) |
| Plaintiffs, | ) ) ) |
| and | ) ) |
| MUTUAL PHARMACEUTICAL CO., INC., | ) ) |
| Intervenor-Plaintiff, | ) ) ) |
| v. | ) ) |
| MICHAEL O. LEAVITT, in his official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, | ) ) ) ) ) | Civil Action No.  07-cv-579 (RMU)
| ANDREW C. VON ESCHENBACH, M.D., in his official capacity as COMMISSIONER OF FOOD AND DRUGS, | ) ) ) ) |
| and | ) ) |
| UNITED STATES FOOD AND DRUG ADMINISTRATION, _et al._, | ) ) ) |
| Defendants, | ) ) ) |
| and | ) ) |
| TEVA PHARMACEUTICALS USA, INC., | ) ) |
| and | ) ) |
| APOTEX INC., | ) ) |
| Intervenor-Defendants. | ) |

_____

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of June, 2007, Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc.'s **PLAINTIFFS' EMERGENCY APPLICATION TO TEMPORARILY RESTRAIN THE FDA FROM APPROVING ANY ADDITIONAL AMLODIPINE ANDAS IN DEROGATION OF MYLAN'S RIGHT TO 180-DAY MARKET EXCLUSIVITY, MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION TO TEMPORARILY RESTRAIN THE FDA FROM APPROVING ANY ADDITIONAL AMLODIPINE ANDAS IN DEROGATION OF MYLAN'S RIGHT TO 180-DAY MARKET EXCLUSIVITY,** and **DECLARATION OF SHANNON M. BLOODWORTH IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION TO TEMPORARILY RESTRAIN THE FDA FROM APPROVING ANY ADDITIONAL AMLODIPINE ANDAS IN DEROGATION OF MYLAN'S RIGHT TO 180-DAY MARKET EXCLUSIVITY** were filed with the Clerk of the Court via the Court's CM/ECF system, which will automatically send electronic mail notification of such filing to the attorneys of record listed below:

Drake S. Cutini
DEPARTMENT OF JUSTICE
Office of Consumer Litigation
950 Pennsylvania Avenue, NW
Washington, DC 20530-001

John Will Ongman
AXINN, VELTROP & HARKRIDER LLP
1801 K Street W, N.W., Suite 411
Washington, DC 20006

Jay Lefkowitz
Michael Shumsky
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005-5793

Jo-Anne Kokoski
Chad Landmon
AXINN, VELTROP & HARKRIDER, LLP
90 State House Square
Hartford, CT 06103

Arthur Y. Tsien
OLSSON, FRANK AND WEEDA, PC
1400 16th Street, NW
Suite 400
Washington, DC 20036-2220

Robert Briesblatt
WELSH & KATZ, LTD.
120 South Riverside Plaza
Chicago, IL 60606

_____
/s/ David J. Harth
David J. Harth